IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ESTATE OF ANTONIO GONZALES, by and through its personal representatives Sandra Gonzales

    Plaintiffs,

V.

OFFICER JOSEPH ANTHONY MENSAH, in his individual capacity,
CITY OF WAUWATOSA,
FORMER CHIEF OF POLICE BARRY WEBER, in his Official capacity,

    Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

### I. INTRODUCTION

In his first five years as a police officer, Joseph Mensah killed three people of color in three separate incidents in the City of Wauwatosa. This is the story of his first victim, Antonio Gonzales.

### II. JURISDICTION AND VENUE

1. This action arises under the Constitution and laws of the United States and is brought pursuant to Title 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiffs' claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

2. Venue is proper in the District Court for the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391(b). All the events alleged herein occurred within Milwaukee County, Wisconsin.

**III. PARTIES**

3. At all times pertinent to the subject matter of this litigation, the decedent Antonio Gonzales, was a citizen of the United States and a resident of and domiciled in the State of Wisconsin. Sandra Gonzales is Mr. Gonzales' mother and serves as the personal representative of the Estate of Antonio Gonzales.

4. At all times, Defendant Joseph Anthony Mensah ("Mensah") was a citizen of the United States and a resident of and domiciled in the State of Wisconsin. Defendant Mensah was a law enforcement officer with the Wauwatosa Police Department and was acting under color of law and within the scope of his employment as a law enforcement officer with the Wauwatosa Police Department at all times relevant hereto. Defendant Mensah is being sued in his individual capacity.

5. Defendant City of Wauwatosa, Wisconsin ("Wauwatosa") is a municipality organized under the laws of the State of Wisconsin and is a "person" subject to suit under 42 U.S.C. § 1983. The Wauwatosa Police Department (WPD) is a law enforcement agency that is part of the City of Wauwatosa. Defendant City of Wauwatosa is responsible for the oversight, supervision, discipline, and training of WPD officers including Defendant Joseph Mensa.

6. Defendant Barry Weber ("Weber") as of June 1, 2021 is the Former Police Chief of the Wauwatosa Police Department. In that capacity he oversaw the WPD and was the Chief

of Police for the Wauwatosa Police Department during Mensah's entire employment with the department which was from January 2015 through November 1, 2020. By law, custom, de facto or otherwise, and/or delegation, he has policymaking authority over the police department for all actions at issue in this case. He is responsible for ensuring that the policies and practices of the WPD comply with federal and state requirements for the treatment of citizens like the Plaintiff. He is being sued in his official capacity.

## IV. GENERAL FACTUAL ALLEGATIONS AND BACKGROUND

7. During the evening of July 16, 2015, a call was placed to the Wauwatosa police department to diffuse a situation involving Antonio Gonzales.
8. Mr. Gonzales, who had mental health issues, had become significantly intoxicated that evening and it was alleged that he was acting in a confrontational manner.
9. In this state of intoxication, it is alleged that Mr. Gonzales had swung a small arrowhead from his necklace at his boyfriend who he lived with.
10. Seeking to diffuse the situation, allegedly a call was made to the police for assistance presumably owing to Mr. Gonzales' intoxication.
11. The police were specifically informed that Mr. Gonzales was intoxicated and that he had mental health issues.
12. Minutes later, former WPD Officer Jeffrey Newmann, a senior officer to Mensah, arrived at the household.
13. Defendant Mensah eventually arrived at the household.

14. Mr. Gonzales and his boyfriend lived in a Wauwatosa residential neighborhood with large lawns and few cars parked on the street. It was generally a quiet and wide open environment.

15. Although Mensah was aware that Mr. Gonzales was significantly intoxicated, and that a WPD officer senior to him was at the scene and in charge of the situation, Mensah immediately drew his weapon.

16. When Mr. Gonzales emerged from the house, Officer Mensah and Officer Newmann were outside.

17. Mr. Gonzales' boyfriend had left the house and was far removed from the property, placing himself far away from any risk to his personal safety.

18. Mr. Gonzales, extremely drunk, was carrying a decorative sword and, upon walking outside, was confronted by Officer Mensah pointing a gun at him.

19. Mr. Gonzales stood on the lawn.

20. Within a minute, without any effort to speak with Mr. Gonzales, without any effort to properly deescalate the situation, without any apparent threat to the safety of the officers or others, and without any effort to retreat, Defendant Mensah shot and killed Antonio Gonzales.

21. Defendant Mensah and Officer Newmann made no effort to deescalate the situation.

22. Defendant Mensah and Officer Newmann made no effort to create additional space between them and Mr. Gonzales.

23. Instead, Defendant Mensah shot Mr. Gonzales the head and shot at him eight times.

24. Defendant Mensah shot Mr. Gonzales six times.

25. This killing was consistent with Defendant Mensah's MO – shoot first and don't worry about asking questions later. As with his other two victims, Mr. Antonio was shot in the head. With that bullet, Mr. Gonzales would never be given an opportunity to answer any questions later.

26. Later, Defendant Mensah would describe this approach as "proactive policing."

27. As would soon become clear, Defendant Mensah, when deploying his firearm, sought not simply to stop Mr. Gonzales, but to execute him. Defendant Mensah aimed for the head.

28. Mr. Gonzales may have been the first individual shot in the head by Defendant Mensah, but tragically, he would not be the last.

29. Within months, Officer Newmann would quit the Wauwatosa police department.

30. Later, it was revealed that before hiring Defendant Mensah, Chief Weber and the Wauwatosa police department had failed to performed sufficient reviews pertaining to psychological fitness, personality reviews, nor any other sufficient investigations into the temperament or aggressive conduct which would quickly be shown by Defendant Mensah to people of color.

31. Chief Weber and the Wauwatosa Police then failed to provided sufficient training on responding to people having mental health breakdowns and were not sufficiently trained on de-escalation techniques.

32. Instead, police officers in Wauwatosa receive weapons training primarily about their firearm.

33. Additionally, the Wauwatosa Police Department has a sordid and retching history of racism.

34. Throughout the 1980s and early 1990s, officers in the Wauwatosa police department held "Martin Luther King parties," parties where officers attended in black face, where overtly racist materials were distributed, including KKK materials, materials which "encourage[d] hunting blacks for sport," materials which declared that ""there will be an open season on blacks," and materials with a caricature of a black man running which stated "Official Runnin' Nigger Target."

35. There were also materials which made derogatory comments about Puerto Ricans.

36. None of the thirteen officers who participated were disciplined.

37. While this may seem like ancient history, much of the senior leadership of the Wauwatosa Police Department today were organizers and hosts of these parties back then.

38. But it's not simply this disgusting conduct which shows the animus that the Wauwatosa Police Department has towards people of color – it's their everyday conduct which shows a deep seated racism.

39. Although fewer than 10% of the residents of Wauwatosa are persons of color, over 70% of all traffic stops are of people of color.

40. This is a Police Department which views people of color as inherently criminal - as inherently dangerous.

## V. CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Excessive Force**
(Against All Defendants)

41. Plaintiff incorporates the preceding allegations as if fully set forth herein.

42. At all relevant times, Defendant Mensah was acting under color of state law in his capacity as a Wauwatosa police officer and his acts and omissions were conducted within the scope of his official duties and employment.

43. At the time of Mr. Gonzales' killing, Plaintiff had a clearly established constitutional right under the Fourth Amendment to be free from excessive force.

44. Defendant Mensah's use of deadly force, as described herein, was objectively unreasonable and excessive in light of the facts and circumstances confronting him at the time, particularly when there were other options that should have been reasonably used to stop any potential threat, including less lethal and non-lethal munitions and de-escalation techniques.

45. Defendant Mensah's own reckless and deliberate actions immediately preceding his use of deadly force precipitated any need to use such force and was immediately connected to any threat of force by Mr. Gonzales.

46. Defendant Mensah's reckless and deliberate actions immediately preceding use of deadly force was entirely contrary to proper police practices for dealing with mentally ill or emotionally upset persons that have weapons and provoked the resulting confrontation.

47. A person's mental health must be taken into account when considering an officer's use of force.

48. The tactics employed against an emotionally distraught individual who is creating a disturbance are different than those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense, and call for conflict resolution and de-escalation, rather than aggressive confrontation.

49. Defendant Mensah and all the officers knew that they were dealing with a mentally ill and emotionally disturbed individual, that he was intoxicated, and that he was not likely to respond rationally to police officers commands.

50. Defendant knew that his actions would likely result in significant risk to Mr. Gonzales' wellbeing.

51. Mr. Gonzales was in need of a medical professional not a jail cell, to Defendant's knowledge.

52. Under these circumstances, Defendant Mensah was required to employ appropriate tactics to de-escalate rather than escalate the situation, including but not limited to: taking cover in his car; requesting backup, particularly backup from individuals appropriately trained in crisis intervention; gathering information on Mr. Gonzales from the individuals present at the scene; using nonthreatening communications when approaching Mr. Gonzales; avoiding physical contact and maintaining the distance between them; retreating when given the opportunity; employing the passage of time to his advantage, and; using less than lethal force to bring the situation to an end.

53. Defendant disregarded the knowledge of Mr. Gonzales' mental condition and recklessly and deliberately provoked a violent confrontation

54. The acts and omissions of Defendant Mensah were engaged in pursuant to the custom, policy, and practice of the Wauwatosa Police Department, which fails to train and supervise its officers in how to deal with mentally ill or disturbed individuals, ratifies the use of such excessive force by law enforcement officers in the City, and treats people of color as inherently dangerous.

55. The acts and omissions of Defendant Mensah was the proximate cause of Mr. Gonzales' death.

56. As a proximate result of Defendant's unlawful conduct, Plaintiff Estate has suffered injuries and losses, including the death of Antonio Gonzales, entitling it to recover his compensatory and special damages, including loss of constitutional rights, loss of enjoyment of life, pain and suffering during this event, permanent lost earnings and earnings capacity for the expected productive working lifetime of Antonio Gonzales under the mortality tables, all in amounts to be proven at trial.

57. Plaintiff Estate has also incurred special damages in the form of funeral expenses.

58. Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

59. In addition to compensatory, economic, consequential and special damages, Plaintiff is entitled to punitive damages against Defendant Mensah, in that the actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

## SECOND CLAIM FOR RELIEF
## 42 U.S.C. § 1983
## Deliberately Indifferent Training and Supervision
(Against Defendant City of Wauwatosa)

60. Plaintiff hereby incorporates the foregoing paragraphs as if fully set forth herein.

61. Defendant Mensah violated Mr. Gonzales' constitutional right to be free from excessive force resulting in death, as set forth in the First Claim for Relief.

62. Defendant Weber was, at all times relevant, a policymaker or final delegated decision-maker for the Wauwatosa Police Department, and in that capacity established policies, procedures, customs, and/or practices for the same.

63. At all times relevant hereto, it was known to Defendant that it was highly probable that Wauwatosa law enforcement officers would encounter citizens suffering from mental illness or intoxication, and that citizens suffering from such disorders are at a highly elevated risk of death from ordinary law enforcement use of force methods to restrain non-compliant persons.

64. Defendant was required to implement policies and train their officers with respect to dealing with persons who are mentally ill, emotionally disturbed, or intoxicated, including but not limited to: requesting backup from people with experience; training not to unreasonably agitate or excite the person; to contain the person; to respect the person's comfort zone; to use nonthreatening communications, and; to employ the passage of time to their advantage.

65. Upon information and belief, at all times material hereto, Defendant did not have specific policies, procedures and training governing law enforcement response to citizens suffering from such mental conditions and did not train all of their law enforcement officers on what uses of force with respect to such citizens were reasonable and constitutional and were, therefore, deliberately indifferent to the constitutional rights of such medically and/or mentally impaired citizens.

66. Defendant also knew that absent the adoption of specific policies, procedures and tactics governing law enforcement response to citizens suffering from mental illness, and absent training of law enforcement officers in such policies, procedures and tactics,

it was highly predictable that such failures to train would lead to law enforcement officers' violation of the Fourth Amendment Rights of citizens, and could likely result in the otherwise avoidable death of such citizens.

67. This deliberately indifferent training and supervision resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant.

68. In light of the duties and responsibilities of those police officers that participate in interactions, arrests, or other dealings with mentally ill or emotionally disturbed individuals, the need for specialized training and supervision is so obvious, and the inadequacy of training and/or supervision is so likely to result in the violation of constitutional rights in these recurring situations, that the failure to provide such specialized training and supervision is deliberately indifferent to those rights.

69. Defendant knew or should have known that the police employees would use unreasonable force when dealing with mentally ill, emotional disturbed individuals, or highly agitated individuals.

70. Defendant was deliberately indifferent to the constitutional rights of mentally disturbed individuals in the public, knowing that dangerous and potentially fatal consequences could be suffered by such individuals (including Mr. Gonzales) by failing to properly train and supervise his employees. Defendant could have and should have pursued reasonable methods for the training and supervising of such employees, but failed to do so.

71. The reckless and deliberately indifferent acts and omissions of Defendant in the training and supervision of its officers, it's as described herein, were moving forces in

the predictable deprivation of Plaintiff's constitutional. Had the officers been properly trained in the fundamental principles of maintaining a covered position and trying to communicate with emotionally upset persons with weapons rather than approaching them loudly with threatening commands, Mr. Gonzales would be alive.

72. Defendant also ratified the conduct of Defendant Mensah and all these officers in concluding that that their conduct was consistent with the policies, procedures, and training of the Wauwatosa Police Department.

73. As a proximate result of Defendants' unlawful conduct, Plaintiff Estate has suffered injuries and losses, including the death of Antonio Gonzales, entitling it to recover his compensatory and special damages, including loss of constitutional rights, pain and suffering during this event, lost earnings, permanent lost earnings and earnings capacity for the expected productive working lifetime of Antonio Gonzales under the mortality tables, all in amounts to be proven at trial.

### THIRD CLAIM FOR RELIEF
### Violation of Title II of the Americans with Disabilities Act
(Plaintiff Estate of Antonio Gonzales Against Defendant City of Wauwatosa)

74. Plaintiff hereby incorporates the foregoing paragraphs as if fully set forth herein.

75. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

76. Discrimination includes a failure to reasonably accommodate a person's disability.

77. The United States Department of Justice regulations state: "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications

are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."

78. Mr. Gonzales was a qualified individual with a disability.

79. At all times relevant hereto, Defendant Mensah was aware of Mr. Gonzales' disability and the symptoms and manifestations of his recognized disability.

80. Defendant City of Wauwatosa excluded Mr. Gonzales from and denied him participation in the benefits of defendants' emergency medical response and law enforcement services, programs, or activities solely by reason of his mental disability by failing to make reasonable modifications in their policies, practices, or procedures to ensure him and equal participation in Defendant's emergency medical response and law enforcement services, programs, or activities.

81. Under these circumstances, there should have been policies to use appropriate tactics to de-escalate rather than escalate the situation, including but not limited to: taking cover in his car; requesting backup, particularly backup from individuals appropriately trained in crisis intervention; eliminating unnecessary emergency lights and sirens; gathering information on Mr. Gonzales from the individuals present at the scene; respecting the person's comfort zone; using nonthreatening communications when approaching Mr. Gonzales; avoiding physical contact and maintaining the distance between them; retreating when given the opportunity, and; employing the passage of time to the officers' advantage.

82. Defendant failed to reasonably accommodate Mr. Gonzales disability and failed to train and employ tactics that would have been likely to resolve the situation without injury

to himself or others, causing him to suffer greater injury in that process than other arrestees or subjects in his position.

83. There was no emergent countervailing concern to employing these reasonable accommodations, as Mr. Gonzales was alone in the house and not a danger to others at that time.

84. The exclusion, denial of benefits, and/or discrimination against Mr. Gonzales was by reason of Mr. Gonzales' recognized disability.

85. As a proximate result of Defendant's unlawful conduct, Plaintiff Estate has suffered injuries and losses, including the death of Antonio Gonzales, entitling it to recover his compensatory and special damages, including loss of statutory rights, pain and suffering, lost past and future earnings, permanent lost earnings capacity for the expected productive working lifetime of Antonio Gonzales under the mortality tables, all in amounts to be proven at trial.

## FOURTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourteenth Amendment
### Denial of Equal Protection – Racially Biased Policing
(Against All Defendants)

86. Plaintiff hereby incorporates the foregoing paragraphs as if fully set forth herein.

87. Defendant Mensah was acting under color of state law in his actions and inactions at all times relevant to this action.

88. At the time of the complained of events, Mr. Gonzales had the clearly established constitutional right to be free from racial discrimination in law enforcement by police officers and to enjoy the equal protection of the laws.

89. Mr. Gonzales's race was a motivating factor in the Defendant Mensah's decision to use excessive deadly force against him under the circumstances. Defendant Mensah acted with the purpose of depriving Mr. Gonzales of the equal protection and benefits of the law, and equal privileges and immunities under the law, in violation of the Fourteenth Amendment.

90. Defendant Mensah's reaction to the circumstances confronting his as described herein were adversely influenced by assumptions and stereotypes arising out of Mr. Gonzales's race. These assumptions and stereotypes caused, wholly or in part, the immediate escalation of the situation to the use of deadly force to apprehend a person of color, a decision that more probably than not would not have been made with a white suspect.

91. Defendant racially profiled Mr. Gonzales and assumed at least partly because of his race that he presented an enhanced threat to their safety. His conduct in his interactions with Mr. Gonzales, including his decision to shoot him in the back of the head, was infected by and motivated by implicit or explicit bias leading him to believe that he was more dangerous than he would have been had he been a white suspect under the same circumstances.

92. Defendant Mensah treated Mr. Gonzales less favorably—and with much more unreasonable force—than his similarly situated White counterparts, wholly or in part because of his race.

93. Race is a suspect class, and differential treatment holly or in part based upon a person's race is presumptively unconstitutional. There was no compelling state interest

justifying the use of deadly force on Mr. Gonzales when such force more probably than not would not have been employed on a similarly situated white suspect.

94. There was not even a rational basis for Defendant Mensah's discriminatory actions, let alone a purpose narrowly tailored to serve a compelling governmental interest.

95. Defendant Mensah used excessive force against Mr. Gonzales without reasonable suspicion or probable cause to believe that Mr. Gonzales posed a threat of harm to any other person that would legally justify the deadly force used.

96. Defendant Mensah intentionally, willfully, unreasonably and wantonly seized Mr. Gonzales by using excessive force against him, wholly or in part because of his race.

97. Defendant Mensah's actions were objectively unreasonable considering the facts and circumstances confronting him.

98. Defendant Mensah engaged in these actions intentionally, willfully, maliciously, and wantonly, showing deliberate indifference to and reckless disregard of Mr. Gonzales' federally protected constitutional rights.

99. Defendant Wauwatosa failed to properly train, supervise, and/or discipline its employees regarding the constitutional requirement not to engage in racially biased policing, resulting in the Defendant Mensah's unlawful racially biased use of excessive force.

100. Wauwatosa's inadequate training, supervision, and/or discipline resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant Wauwatosa.

101. Considering the duties and responsibilities of personnel of Defendant Wauwatosa—who must police and interact with persons of color regularly— and the

frequency with which such law enforcement personnel will confront persons of color while discharging their duties as law enforcement officers as described herein, the need for specialized training, supervision and discipline regarding such decisions is so obvious, and the inadequacy of training and/or supervision is so likely to result in a violation of constitutional rights, such as those described herein, that Defendant Wauwatosa is liable for its failure to properly train, supervise, and/or discipline its subordinate employees and agents.

102. Such failure to properly train, supervise, and/or discipline was a moving force behind and proximate cause of Defendant Mensah's racially biased treatment of Mr. Gonzales, and makes up an unconstitutional policy, procedure, custom, and/or practice.

103. Wauwatosa exonerated Defendant Mensah for his racially biased conduct under Wauwatosa's municipal customs, policies and/or actual practices described herein. Such decision to exonerate racially discriminatory conduct was made deliberately and pursuant to Wauwatosa's longstanding customs and practices. The decision clearly evidences that Defendant Mensah acted pursuant to the customs, practices, and policies of Defendant Wauwatosa.

104. Defendant Wauwatosa's failure to train and/or supervise, as well as the failure to take appropriate disciplinary or remedial action on past instances of similar unconstitutional conduct, as described herein, was a legal and proximate cause of the Mr. Gonzales' death.

105. As a direct and proximate result of Defendants' actions, Mr. Gonzales lost his life and his family has been and continues to be damaged by Defendant Mensah's unreasonable use of excessive force.

106. Mr. Gonzales endured physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, loss of consortium with his family and friends, and sense of security and individual dignity, and tragically the loss of his life.

WHEREFORE, the Plaintiff demands judgment against the Defendants, jointly and severally, as follows:

    a. Against Defendant Joseph Mensah in his individual capacity, for compensatory damages, for the violation of Mr. Gonzales's rights, as set forth above, in an amount to be determined at a trial of this matter;

    b. Against Defendant Chief Barry Weber, in his official capacity, for compensatory damages for the violation of Mr. Gonzales's rights, as set forth above, in an amount to be determined at a trial of this matter;

    c. Against Defendant Mensah for punitive damages for the violation of Mr. Gonzales's rights, as set forth above, in an amount to be determined at a trial of this matter;

    d. Against Defendant Weber for punitive damages for the violation of Mr. Gonzales's rights, as set forth above, in an amount to be determined at a trial of this matter;

    e. Against Defendant City of Wauwatosa for punitive and compensatory damages and for its liability pursuant to Wis. Stat. § 895.46 to indemnify the individual Defendants in an amount to be determined at a trial of this matter;

    f.  For all costs, disbursements and actual attorneys' fees pursuant to 42 U.S.C.A. § 1988, and for such other relief as the Court deems just and equitable.

PLAINTIFF HEREBY DEMANDS A JURY TRIAL OF THIS MATTER ON ALL ISSUES SO TRIABLE.

Dated this 15th day of July, 2021. Respectfully Submitted:

MOTLEY LEGAL SERVICES

<u>s/ Kimberley Cy. Motley</u>
State Bar No.: 1047193
2206 Bonnie Butler Way
Charlotte, North Carolina 28270
Email : kmotley@motleylegal.com
Office Telephone : (704) 765-4887


<u>s/ E. Milo Schwab</u>
Ascend Counsel, LLC
State Bar No.: 47897
2401 S. Downing Street
Denver, CO 80210