# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

ESTATE OF ANTONIO GONZALES, et al,

                 Plaintiff,           Consolidated Case No. 2:21-cv-00848

v.

CITY OF WAUWATOSA, et al.,

                 Defendants.

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

Defendants, by their attorneys, Wirth + Baynard Law Offices, submit this Memorandum in Support of their Motion for Summary Judgment. This Motion is supported by the Declarations and attached exhibits of Jasmyne Baynard, Craig Tutton, Jack Tutton, Elise Sellinger, Timothy Warren, and Wauwatosa police department records custodian Joseph Roy, as well as the Defendants' Proposed Findings of Fact.

### PREFACE [1]

Police officers are tasked with making split-second decisions to use deadly force in dynamic, rapidly evolving, dangerous situations. For this reason, Courts have consistently warned against second guessing such decisions with the benefit of 20/20 hindsight. *Graham v. Connor*, 490 U.S. 386 (1986) This case arises out of one of those situations.

On the night of July 16, 2015, Wauwatosa Police Department ("WPD") Officers Jeffrey Newman and Joseph Mensah were dispatched to 8533 Glencoe Circle in response to a report of

---

[1] All facts necessary to support this Motion for Summary Judgment are stated in the Defendants' statement of proposed findings of fact ("DPFF") filed contemporaneously herewith. This Preface contains a brief factual summary.

an intoxicated, disorderly tenant who was trying to cut his landlord with a spearhead. Upon the Officers' arrival on scene, and with two citizens standing only feet away in the adjacent driveway, and before the officers could assess the situation, Antonio Gonzales exited the residence and confronted the Officers with a samurai sword that had a five-foot blade. Officer Newman radioed dispatch to report Gonzales was armed with a sword, which prompted an "all squad response." The Officers unholstered their handguns and ordered Gonzales to drop the sword, but Gonzales ignored their command and instead advanced toward Officer Mensah. As Gonzales moved closer, Officer Mensah tried to create space, stepping backwards while continuing to command Gonzales to stop moving and to drop the sword. Finally, Officer Mensah warned Gonzales that if he did not drop the sword, he would shoot.

Officer Mensah's orders were loud enough that they prompted Gonzales' neighbor to open her front door and investigate. When she did, she observed Gonzales standing in his front yard holding a samurai sword out in front of him and above his head like he was going to "come at the officers." Another witness recounted that the officers gave Gonzales multiple commands to stop moving and to drop his weapon. Gonzales ignored those commands, raised the sword above his head, and advanced within striking distance of Officer Mensah.

It was raining that evening, the ground was slippery, and Officer Mensah could not back up any further. In that split-second, fearing for his life, his partner's, and the safety of the bystanders, Officer Mensah fired his weapon at Gonzales. Gonzales continued to advance, prompting Officer Newman to also discharge his weapon. Gonzales fell to the ground and his deadly threat had been neutralized. Within moments, backup squads arrived and WPD Officers attempted lifesaving measures on Gonzales. Emergency medical caregivers subsequently arrived and took over lifesaving efforts, but to no avail. Gonzales died in the ambulance at the scene.

2

Antonio Gonzales' estate ("Estate") has now brought this lawsuit against Officer Mensah, the Wauwatosa Chief of Police, and the City of Wauwatosa. The Complaint alleges four claims for civil damages and injunctive relief pursuant to 42 U.S.C. § 1983, including: excessive force against all Defendants (ECF 1 pp. 6-9, first claim for relief); "deliberately indifferent training and supervision" against the City of Wauwatosa (*id*. pp. 9-12, second claim for relief); violation of Title II of the American with Disabilities Act against the City of Wauwatosa (*id*. pp. 12-14; third claim for relief); and Fourteenth Amendment "Denial of Equal Protection – Racially Biased Policing" against all Defendants. (*id*. pp. 14-18; fourth claim for relief).

Defendants move for summary judgment dismissal of the case on the merits and under the doctrine of qualified immunity because Officer Mensah's use of deadly force was constitutionally justified, and because no training or policies of the City were unconstitutional.

## LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is not a disfavored remedy, but rather, "an integral part of the federal rules as a whole which are designed to secure the just, the speedy and inexpensive determination of every action." *Id*. at 327. This is especially true when the defense of qualified immunity is raised as unnecessary litigation of constitutional issues also wastes the parties' resources. See *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)("Qualified immunity is "an immunity from suit rather than a mere defense to liability.")

When faced with a summary judgment motion, the court must decide whether the state of the evidence is such that, if the case were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict. If not, the motion must be granted, and the case dismissed. *Palucki v. Sears Roebuck Co.*, 879 F.2d 1568, 1572-73 (7th Cir. 1989).

To defeat summary judgment, opposing parties must produce specific material facts in support of their claims sufficient to sustain their burden at trial. *Celotex*, 477 U.S. at 324. It is not enough to raise a "metaphysical doubt" with respect to the existence of a genuine issue of triable fact. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[A] party must produce `specific facts showing that there remains a genuine issue for trial' and evidence `significantly probative' as to any [material] fact claimed to be disputed*." Branson v. Price River Coal Company*, 853 F.2d 768, 771-72 (10th Cir. 1988). Similarly, a plaintiff cannot rest on the pleadings but must demonstrate the existence of sufficient evidence that, if believed by a jury, would support a verdict in his or her favor. *Jelinak v. Greer*, 90 F.3d 242, 243-44 (7th Cir. 1996). Absent a showing that a defendant may be liable, the defendant should not be required to undergo the considerable expense of preparing for and participating in trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).

## ARGUMENT

I.     **Officer Mensah's Use of Deadly Force Against Gonzales was Objectively Reasonable Under the Fourth Amendment.**

A claim that a law enforcement officer used excessive force when effectuating an arrest is analyzed under the Fourth Amendment's objective reasonableness standard. *Avina v. Bohlen*, 882 F.3d 674, 678 (7th Cir. 2018). The Supreme Court set out the fundamental framework for analyzing excessive force claims in *Tennessee v. Garner*, 471 U.S. 1(1985), and *Graham v. Connor*, 490 U.S. 386 (1989). *Graham* and *Garner* stand for the proposition that when a police

officer reasonably believes a suspect's actions place "him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988).

Whether deadly force is justified should only be evaluated based on the information known to the officer at the moment that deadly force is used. *Plakas v. Drinski*, 19 F.3d 1143, 1149-1150 (7th Cir. 1994). The determination of whether deadly force is lawful depends on "whether the suspect poses an immediate threat to the safety of the officers" and "whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 at 396.

> [W]e consider factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." We also consider whether the citizen was under arrest or suspected of committing a crime, was armed, or was interfering or attempting to interfere with the officer's execution of his or her duties. In the end, the excessive force inquiry looks to whether the force used to seize the suspect was excessive in relation to the danger he posed—to the community or to the arresting officers—if left unattended.

*Jacobs v. City of Chicago*, 215 F.3d 758, 773 (7th Cir.2000)(quoting *Graham*, 490 U.S. at 396)

Reasonableness is not based on hindsight, but rather is determined considering the perspective of the officer on the scene, allowing "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. 386, 396–97. The court's goal in examining these factors is to determine whether the force used to seize the suspect was excessive in relation to the danger he posed if left unattended. *Dawson*, 803 F.3d at 833. If the undisputed material facts establish that the officer acted reasonably under the circumstances, the court must resolve the issue as a matter of law, rather than allow a jury to "second-guess" the officer's action. *Id.* (citing *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003)).

### A. No rational Jury could find that Officer Mensah's Use of Force was Objectively Unreasonable under the Circumstances.

For the Estate to prevail on its claim under § 1983 that Officer Mensah used excessive force against Gonzales in violation of his Fourth Amendment rights, "plaintiff[s] must show [Officer Mensah's] use of force was objectively excessive from the perspective of a reasonable officer on the scene under the totality of the circumstances." *Horton v. Pobjecky*, 883 F.3d 941, 949 (7th Cir. 2018). The relevant question here is whether Officer Mensah reasonably believed that Gonzales, advancing on him and wielding a five-foot samurai sword, posed an imminent threat at the time he shot Gonzales. The undisputed factual record and the circumstances confronting Officer Mensah demonstrate that the use of deadly force was justified and necessary:

> Officer Mensah was dispatched to a domestic violence incident and based on the information provided by dispatch understood that the suspect had attacked or was attacking the caller with a spearhead or an arrow or some sort of edged weapon, and that both the suspect and victim were still on scene. (DPFF ¶¶ 7-13)

> When Officer Mensah observed Gonzales, he realized he was not simply armed with an arrowhead, but a Samurai Sword with an approximately 5-foot blade. (DPFF ¶ 25)



Officer Mensah knows that a suspect with a knife can be deadly within 21-feet and Gonzales had advanced to within 8-10 feet in his attack of Officer Mensah. (DPFF ¶¶ 42-43, 79-81)

With guns pointed at him, Gonzales was given—but ignored—numerous orders to drop the sword and to stop moving. (DPFF ¶¶ 26, 28-31, 35, 41)

Officer Mensah's orders were so loud that it prompted Gonzales' neighbor to open her front door and investigate and when she did, she observed Gonzales standing in his front yard holding a samurai sword out in front of him and above his head like he was going to "come at the officers."  (DPFF ¶¶ 26, 30, 33, 42)

Witness Jack Tutton recounted the officer giving Gonzales multiple commands to not move and drop his weapon. Gonzales ignored those commands and waved the sword as he continued to advance on the Officers. (DPFF ¶¶ 28, 30, 35, 42)

Gonzales was given a final warning to stop and drop his sword or he would be shot. Gonzales did not comply with that order and instead advanced within striking distance of Officer Mensah with the sword raised above his head. (DPFF ¶¶ 41-43)

Another officer on scene also perceived Gonzales as a deadly threat and fired his service weapon at him. (DPFF ¶¶ 44-46)

Officer Mensah was dispatched to respond to a dangerous scene—a domestic violence complaint involving an intoxicated, violent tenant who had already cut his landlord. **(**DPFF ¶¶ 12-13) As Gonzales approached, with sword raised, Officer Mensah feared for his life. (DPFF ¶¶ 71-72) Gonzales' actions were sudden and unexpected. The critical Fourth Amendment inquiry in this case is whether at the moment Officer Mensah fired his weapon, he reasonably perceived that Gonzales posed an immediate threat to him or others. As demonstrated by the factual record, notably third-party witness accounts—Gonzales posed an obvious and objective threat to Officer Mensah, therefore the use of deadly force was constitutionally permissible.

### B. The Estate improperly applies 20/20 hindsight to second-guess Officer Mensah's decision to use deadly force.

The Estate alleges that Officer Mensah's use of deadly force was unreasonable "when there were other options" …. "including less lethal and non-lethal mutations and de-escalation

7

techniques." (ECF 1 ¶ 44) This suggestion is legally inaccurate, and factually unsupported, the precise argument the Supreme Court has warned against. *Graham*, 490 U.S. at 396 (holding that courts are to evaluate the evidence from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.).

The Fourth Amendment does not require "the use of the least or even a less deadly alternative as long as the use of deadly force is reasonable under *Tennessee v. Gardner* and *Graham v. Connor* ...." *Plakas v. Drinski*, 19 F. 3d 1143, 1149 (7th Cir. 1994). Even when the targeted person suffers from a mental illness—the critical consideration remains whether he or she posed an immediate threat to the officers or to others. *See King v. Hendricks Cty. Commissioners*, 954 F.3d 981, 985 (7th Cir. 2020). And although not required, the record demonstrates that Officers Mensah and Newman attempted other techniques to de-escalate the situation such as giving multiple verbal commands to Gonzales to drop the sword (DPFF ¶¶ 26-30), creating distance until it was no longer feasible, and issuing a final warning to Gonzales that deadly force would be the response to his continued aggression. (*Id*. ¶ 32) Unfortunately, Gonzales continued to advance, and the situation escalated to the point that it became life-or-death for Officer Mensah. (DPFF¶ 36-38, 40)

Recently, this Circuit addressed the issue of mentally unstable individuals, armed with knives, in *Est. of Biegert by Biegert v. Molitor*, 968 F.3d 693, 700 (7th Cir. 2020) and in *King v. Hendricks County Commissioners*, which is directly on point to the present case. The *King* Court concluded that officers reasonably used deadly force during a welfare check when a mentally unstable man "pointed a large knife at them, disregarded their repeated commands to drop the knife, and then charged." 954 F.3d at 985. The Court held that the officers' use of deadly force

was reasonable, even though they did not first attempt to use less lethal means, because the decedent "pose[d] an immediate threat of serious harm to the officers." *Id*.

Our facts, taken as a whole, show that Gonzalez presented an immediate and deadly threat to Officer Mensah, such that responding with deadly force was constitutionally justified. The Estate's suggestion that Gonzales was suffering from emotional distress and "was in need of a medical professional not a jail cell" does not change the immediate and objective danger his attack represented. (ECF 1 ¶ 51) "[T]he question on an excessive force claim isn't whether the plaintiff's motives were benign or his actions could reasonably be interpreted as nonthreatening. Rather, the question is whether the deputies' conduct was reasonable at the time, without the benefit of hindsight." *Stabenow v. City of Eau Claire*, 546 F. Supp. 3d 787, 796 (W.D. Wis. 2021). There is no question that, from Officer Mensah's perspective – and the perspective of Officer Newman, Gonzales' refusal to obey commands and his continued advancement towards Officer Mensah with sword raised posed a deadly threat. (DPFF¶¶ 42-43, 69-72).

There is also no dispute that Officer Mensah and Officer Newman gave loud, clear orders to Gonzales, which orders Gonzales wholly disregarded. (DPFF ¶¶ 26-42). After the officer's initial commands, Gonzales quickly approached Officer Mensah. (*Id*.) Officer Mensah nevertheless continued to retreat from Gonzales and continued to attempt strong verbal commands to get Gonzales to stop. (DPFF ¶¶ 32-37) Despite the commands and attempts to retreat, Gonzales advanced to within striking distance of Officer Mensah. (*Id*. ¶ 43) As the Supreme Court instructed in *Kisela v. Hughes,* Officer Mensah was not required to wait for Gonzales to commence a strike with the sword before deadly force was a justified response. By then, any response would likely have been too late. *See* 138 S. Ct. 1148, 1154 (2018)

As the plaintiff did in *Plakas,* Gonzales' Estate may argue that Officer Mensah had other alternatives to diffuse the situation. There, it was argued:

> [Another officer present] had a canister of CS repellant on his belt. It could have been used to disable [the plaintiff]. Moreover, about ten minutes before the shooting, the services of a canine unit . . . were offered. The police could have tried to put barriers between themselves and [the plaintiff] and maintain distance from him.

*Plakas*, 19 F.3d at 1146. However, "the Constitution does not require law enforcement officers to use all feasible alternatives to avoid a situation where deadly force can justifiably be used." *Id*.; *Ford v. Childers*, 855 F.2d 1271, 1276 (7th Cir. 1988) (after calling out "Halt, police" twice to the plaintiff, who may not have heard the calls, the officers' split-second decision to use their weapons was objectively reasonable under the circumstances as a matter of law). "The only test is whether what the police officers actually did was reasonable." *Plakas*, 19 F.3d at 1149 (citing *Illinois v. Lafayette*, 462 U.S. 640, 647 (1983)).

Based on the Complaint allegation that Officer Mensah and Officer Newman "approached Gonzales loudly with threatening commands" the Estate may argue that deadly force was unreasonable because the commands themselves agitated Gonzales. *See* (ECF. 1 ¶ 71) An identical argument was raised in *Biegert*, where the Estate alleged that the Officers' conduct in "aggressively questioning" the decedent created the conditions that precipitated him becoming violent and ultimately stabbing a police officer. *See* 968 F.3d at 698. The Court dismissed the argument and explained:

> The officers might have made mistakes, and those mistakes might have provoked Biegert's violent resistance. Even if so, however, it does not follow that their actions violated the Fourth Amendment. *City & County of San Francisco v. Sheehan*, 575 U.S. 600 (2015)("[E]ven if [the officers] misjudged the situation, Sheehan cannot 'establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided.'"

> *Est. of Biegert*, 968 F.3d at 698.

Gonzales' sword attack posed an objective and obvious immediate danger to Officer Mensah. The attack unfolded rapidly and unexpectedly. "When police are acting in a swiftly developing situation . . . a court must not indulge in unrealistic second-guessing." *Leaf v. Shelnutt*, 400 F.3d 1070, 1092 (7th Cir. 2005).

Under the facts of this case, Officer Mensah did not violate the constitution when he discharged his weapon at Gonzales and likely saved his own life. Nor did his actions preceding the shooting render his use of force unreasonable. As such, dismissal of the Fourth Amendment claim is warranted as a matter of law.

## II. Officer Mensah is Entitled to Qualified Immunity.

Even assuming *arguendo* that the Estate could demonstrate that Officer Mensah's use of deadly force was objectively unreasonable, he is entitled to qualified immunity against the Fourth Amendment claim.

Government officials performing discretionary functions are immune from civil liability for constitutional violations "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela*, 138 S. Ct. at 1152 (per curiam)(quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam)). Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Because of the importance of qualified immunity to society as a whole, the [Supreme] Court often corrects lower courts when they wrongly subject individual officers to liability." *City & Cty. of San Francisco, California v. Sheehan*, 575 U.S. 600, 611 (2015).

Although the defense of qualified immunity is available to all governmental officials in the performance of discretionary acts, it is especially important to law enforcement officers who are frequently forced to make life and death decisions of constitutional import within a matter of seconds:

> Judges view facts from afar, long after the gunsmoke cleared, and might take months or longer to decide cases that forced police officers to make split-second decisions in life-or-death situations with limited information. We as judges have minutes, hours, days, weeks, even months to analyze, scrutinize, and ponder whether an officer's actions were "reasonable," whereas an officer in the line of duty all too frequently has only that split-second to make the crucial decision. The events here unfolded in heart-pounding real time, with lives on the line. *Pobjecky* lacked our luxury of pausing, rewinding, and playing the videos over and over.

*Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018)(internal quotation marks and citations omitted). For law enforcement officers, every decision concerning the use of deadly force carries with it the risk of death or serious bodily injury to someone—the suspect, an innocent third party, or the officer. To impose personal liability for losses of this magnitude upon officers called upon to act in a split second with less than perfect knowledge and without clear guidance in the law would seriously inhibit the officers in carrying out their duties, if not cause them to leave the profession altogether. It would also thereby seriously endanger the public.

To defeat qualified immunity, the Estate must show "(1) conduct violating [Gonzales'] constitutional or statutory rights that is (2) clearly established at the time of the violation such that a reasonable official would understand that what he is doing violates that right." *Findlay v. Lendermon*, 722 F.3d 895, 889-900 (7th Cir. 2013). The Court has the discretion to decide which prong to address first, and "[i]f the answer to either question is no, [the Defendants are] entitled to summary judgment." *Thompson v. Cope*, 900 F.3d 414, 420 (7th Cir. 2018). Thus, even if Officer Mensah was found to have violated Gonzales' constitutional rights, he is still shielded

from liability "if the right was not clearly established at the time of the violation." *Findlay*, 722 F.3d at 899.

"Before [the Court] can determine if the law was clearly established, 'the right allegedly violated must be defined at the appropriate level of specificity.'" *Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017) (internal quotations and citations omitted); *Weiland v. Loomis*, 938 F.3d 917, 919 (7th Cir. 2019) ("Over and over, the Supreme Court has held that a right is 'clearly established' only if it has been 'defined with specificity.'")(collecting cases). This means that "[c]learly established law 'must be "particularized" to the facts of the case.'" *Thompson*, 900 F.3d at 421 (internal quotations and citations omitted).

It is not enough for the Estate to argue that "deadly force" somehow automatically violates a clearly established law:

> Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue . . . .

*City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019)(internal quotations and citations omitted). Here, the Estate would need to show this court a case, or an interpretive series of cases, in which it was determined that an individual advancing upon an officer with a lethal weapon and ignoring their commands to stop was so specifically *not* a situation in which deadly force was permissible, that the particularized prohibition was "clearly established." *See Cibulka v. City of Madison*, 448 F. Supp. 3d 1002, 1022 (W.D. Wis. 2020)("The use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and so, police

officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue."). **The Estate cannot meet that exacting standard**.

Given the reason officers were dispatched to the scene and Gonzales' behavior once they got there (DPFF ¶¶ 10-13, 18-25, 45) Officer Mensah's use of deadly force to stop an active threat posed by Gonzales' volatility was reasonable. The Estate can point to no case law placing the constitutionality of Officer Mensah's use of deadly force against a sword-wielding assailant unreasonable "beyond debate." *Kemp*, 877 F.3d at 351. To the contrary, the applicable case law supports the reasonableness of Officer Mensah's actions under those circumstances. See, e.g., *Kisela*, 138 S. Ct. at 1153; *see also Est. of Biegert*, 968 F.3d 693.

In *Kisela*, officers responded to a 911 call reporting that a woman was "hacking a tree with a kitchen knife." *Id*. at 1150. As officers arrived on scene, the 911 caller gave them a description of the women and told them that she had been acting erratically. *Id*. at 1151. The officers spotted the woman emerging from a residence carrying a large knife at her side. She walked toward officers and stopped no more than six feet from one officer. *Id*. The officers all drew their weapons and told the woman at least twice to drop the knife. After the women failed to acknowledge at least two commands to drop the knife, an officer shot her four times. Less than a minute had transpired from the moment the officers first saw the woman to the moment shots were fired. *Id*.

The police officer said he fired because, although the officers themselves were in no apparent danger, he believed she was a threat to a bystander. *Id*. at 1153. The officer had mere seconds to assess the potential danger to the bystander and to react. On those facts, the Supreme Court held that qualified immunity was required. *Id*. at 1153.

14

In *King v. Hendricks County Commissioners*, this Court concluded that officers reasonably used deadly force during a welfare check when a mentally unstable man "pointed a large knife at them, disregarded their repeated commands to drop the knife, and then charged" at the officers. 954 F.3d at 985. We held that the officers reasonably applied deadly force—even though they did not first attempt to use less lethal means—because King "pose[d] an immediate threat of serious harm to the officers." Id.

In our case, Officer Mensah was dispatched to a domestic dispute and was almost immediately met upon his arrival by a sword-wielding Gonzales who refused to disarm himself, refused to discontinue his advancement toward an officer, and who adopted a striking posture before he was shot. In light of the undisputed circumstances and the clearly established law in July of 2015, Officer Mensah is entitled, at the very least, to qualified immunity against the Estate's excessive force claim.

### III. The Estate's *Monell* Claims Against the City of Wauwatosa and Police Chief Must be Dismissed.

The Estate asserts various Section 1983 claims against the City of Wauwatosa and the Former Police Chief in his official capacity.[2] The Estates' federal claims against the Chief are functionally identical to the claims against the City of Wauwatosa because the Estate makes no claims against the Chief in his individual capacity and, as such, the claims against the Chief must be dismissed. *Smith v. Sangamon County Sheriff's Dept.*, 715 F.3d 188, 191 (7th Cir. 2013)("An official capacity claim is tantamount to a claim against the government entity itself.")

The Estate's Section 1983 claims against the City are also precluded because the substantive claims against Mensah fail. *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586,

---

[2] The Complaint names former Chief of Police, Barry Weber, in his official capacity only. (ECF 1, ¶ 6) As such, on August 10, 2022, the Court entered an order of substitution, pursuant to Fed.R.Civ.P.25(d)(1), substituting James MacGillis, in his official capacity as the current Chief of Police, for Weber. (ECF 19)

597–98 (7th Cir. 1997). In other words, because there is no basis for individual-capacity liability against Officer Mensah, the Estate's municipal liability claim against the City of Wauwatosa fails as a matter of law. *Doxtator v. O'Brien*, 39 F.4th 852, 864 (7th Cir. 2022)*; Sallenger v. City of Springfield, Illinois*, 630 F.3d 499, 504 (7th Cir. 2010); see also *Tesch v. Cty. of Green Lake*, 157 F.3d 465, 477 (7th Cir. 1998)("A failure to train theory or a failure to institute a municipal policy theory requires a finding that the individual officers are liable on the underlying substantive claim."). *City of Los Angeles v. Heller*, 475 U.S. 796, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986)("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.").

Because there is no basis for individual-capacity liability against Officer Mensah, there can be no municipal liability against the City of Wauwatosa.

**A.** **There is no Evidence of any *Monell* Policy, Practice, or Custom in the City of Wauwatosa Sanctioning the Use of Excessive Force.**

If the Estate could demonstrate that Officer Mensah deprived Gonzales of a constitutional right—which it cannot—any claim against the City of Wauwatosa or Chief of Police nevertheless fails because there is no evidence that the execution of a policy, practice, or custom caused the deprivation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). In short, to impose municipal liability under Section 1983, the Estate must prove that an "official municipal policy" caused the complained-of injury under one of the following theories:

(1) the alleged deprivations were conducted pursuant to an express policy, statement, ordinance, or regulation that, when enforced, caused the constitutional deprivation; (2) the conduct was one of a series of incidents amounting to an unconstitutional practice so permanent, well-settled, and known to [the municipality] as to constitute a "custom or usage" with force of law; or (3) the conduct was caused by a decision of a municipal policymaker with final policymaking authority in the area in question.

16

*Abraham v. Piechowski*, 13 F. Supp. 2d 870, 880 (E.D. Wis. 1998). The Estate "must demonstrate that the 'deliberate action attributable to [City of Wauwatosa] itself is the moving force'" behind the constitutional deprivation. *Monell*, 436 U.S. at 694. "The required level of factual specificity rises with the complexity of the claim," and courts must disregard mere recitations of "legal conclusions or elements of the cause of action . . .." *McCauley v. City of Chicago*, 671 F.3d 611, 616–17 (7th Cir. 2011).

A municipality can be found liable under Section 1983 **only if** the governmental body itself "subjects" a person to a deprivation of constitutional rights or "causes" a person "to be subjected" to such deprivation. *Monell*, 436 U.S. at 692. Local governments are responsible only for "their own illegal acts." *Id.* at 665–83. They cannot be held vicariously liable for the acts of their employees. *Id.* at 691.

The Complaint alleges that excessive force by Officer Mensah was the product of the WPD's custom, policy, and practice, "which fails to train and supervise its officers in how to deal with mentally ill or disturbed individuals, ratifies the use of such excessive force by law enforcement officers in the City, and treats people of color as inherently dangerous." (ECF 1 ¶ 54) However, the Estate cannot point to any specific City of Wauwatosa policy with constitutionally suspect language as it relates to the officers' interactions with Gonzales, let alone that such policy caused Officer Mensah to deprive Gonzales of his constitutional rights. (DPFF ¶ 68) Indeed, the Policy's articulated bases for use of deadly force are entirely consistent with the standard articulated in *Graham*, *Garner*, and other Supreme Court and Seventh Circuit cases defining the use of deadly force. (DPFF ¶¶68-70) The Estate's excessive force claim under the first prong of *Monell* fails.

17

The Estate also lacks evidence to support the second prong of a *Monell* claim, in which it would need to show that the WPD had an unofficial but widespread and well-settled practice or custom of inadequately training or disciplining its officers with respect to the use of excessive force. (ECF 1, pp. 7-9) See *Hahn v. Walsh*, 762 F.3d 617, 640 (7th Cir. 2014)(describing a custom or practice under Monell as one "which, although unwritten, is so entrenched and well-known as to carry the force of policy" (internal citation omitted)). Fundamentally, there is no evidence that the Chief of Police or any other person with policymaking authority was aware of an unwritten and entrenched policy of unconstitutional excessive force in the WPD, much less that it was formally or informally adopted at the time of the Gonzales shooting. *McNabola v. Chi. Transit Auth.*, 10 F.3d 501, 511 (7th Cir. 1993) ("'[A] practice of unconstitutional conduct, although lacking formal approval, may provide a basis for municipal liability' if the plaintiff can establish that the policymaking authority acquiesced in a pattern of unconstitutional conduct.").

**B.    There Is No Evidence of Deliberate Indifference in the City's Training and Supervision that Caused a Constitutional Injury.**

The Estate also alleges that the City's "deliberate indifference" about "policies and practices" permitted excessive force and styled differently, that the City failed to properly train its officers. (ECF 1 at 9). The Estate alleges that the City failed to train police officers on how to encounter and respond to citizens suffering from mental illness or intoxication, "which was deliberately indifferent to the constitutional rights of mentally disturbed individuals such as Gonzales." (ECF 1, ¶¶ 63-67) The Estate's failure to train claim is legally and factually unsupported.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. Relief under such a theory is available only in "limited circumstances." *Id.*; *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 599 (7th Cir.

2019); *Palmquist v. Selvik*, 111 F.3d 1332, 1344 (7th Cir. 1997). Failure-to-train "claims are subject to rigorous fault and causation requirements . . .." *Ruiz-Cortez*, 931 F.3d at 599–600.

"To satisfy [Section 1983], a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Connick*, 563 U.S. at 61. Only then can such a shortcoming be properly thought of as a [municipal] policy or custom that is actionable under § 1983." *Id*. "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id*.

The law poses an extremely high burden of proof. That is, merely because a § 1983 plaintiff can point to something a city could have done to prevent the unfortunate incident does not condemn as deliberate indifference the procedures that the city did undertake. *Graham v. Sauk Prairie Police Com'n*, 915 F.2d 1085, 1102-1104 (7th Cir. 1990)(citing *City of Canton v. Harris*, 489 U.S. 378, 390-91 (1989)). Municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by city policymakers. *Canton*, 489 U.S. at 389 (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 483-484 (1986)(plurality opinion of Brennan, J.)).

In *Ruiz-Cortez*, the Seventh Circuit explained that evidence of other constitutional deprivations caused by the alleged lapse in training "is normally required for . . . a failure-to-train claim." *Ruiz-Cortez*, 931 F.3d at 599–600; *Connick*, 563 U.S. at 62 ("A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train."); see also *Braun v. Abele*, No. 15–CV–252–JPS, 2015 WL 3904960, at *7 (E.D. Wis. June 25, 2015) ("[F]acts evidencing a pattern of similar constitutional violations by untrained employees . . . is ordinarily necessary for a *Monell*

19

claim under that theory." (internal quotations and citations omitted)). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick,* 563 U.S. at 62.

The Estates' failure to train claim in this case necessarily presumes that WPD officers are likely to, or have a history of, encounters with emotionally disturbed individuals such that the City of Wauwatosa "knew or should have known that police would use unreasonable force when dealing with mentally ill, emotionally disturbed, or highly agitated individuals." (ECF 1, ¶ 69) Not only is there absolutely no evidence to support that allegation, but even if there was, the record demonstrates that the City of Wauwatosa provides ample training to its officers on uses of force including that deadly force is justified under the following circumstances:

> (a) Protect the officer or others from what is reasonably believed to be an imminent threat of death or great bodily harm.
>
> (b) When it is necessary to prevent the escape of a fleeing violent felon whom the officer has reasonable belief poses an **imminent** threat of death or great bodily harm to the officer or others.
>
> (c) If feasible the officer must give some verbal warning prior to the use of deadly force.

(DPFF ¶ 68)

The City of Wauwatosa trains its officers as to different scenarios in which force may be used, and the record demonstrates that Officer Mensah employed such training when he (DPFF ¶¶ 67, 69-70, 73-74, 79-81): (1) issued numerous verbal commands to drop the sword (*id.* ¶26,35); (2) backed up to create distance (id. ¶ 36-37); and (3) issued a final warning to Gonzales to drop the sword or Mensah would fire. (*id.* ¶ 41) The use of deadly force with Gonzales was not due to the failure of any police training.

The Estate alleges that the City of Wauwatosa failed to train its police officers, but a *Monell* claim requires more. To establish an actionable failure to train, "[a] pattern of similar constitutional violations is ordinarily necessary to demonstrate deliberate indifference." *Id*. at 62. Even if "a particular officer may be unsatisfactorily trained" that "will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton v. Harris*, 489 U.S. 378, 390-91 (1989). Here, there is no evidence that the City was aware of or put on notice about any recurrent unconstitutional conduct attributable to inadequate training. Nor is there proof that the City knew it was highly predictable that such constitutional deprivations would occur without more or different training because of the alleged pattern.

Moreover, the training of City officers, as well as all other police officers in the state, is governed by § 165.85, Wis. Stats., which establishes the Law Enforcement Standards Board, and empowers it to establish minimum curriculum requirements for police officer training. (DPFF ¶ 82) It is undisputed that Officer Mensah met the minimum training requirements established by the State of Wisconsin to be certified as a police officer and that he maintained his respective certifications throughout his employment with the City of Wauwatosa. (DPFF ¶ 83) It is also undisputed that Officer Mensah and all WPD officers are trained on the Wisconsin Law Enforcement Standards Board DAAT manual. (DPFF ¶¶ 67-68, 70 75) The 2014 version effective at the time of this incident trained officers on scenarios where a threat to an officer is imminent and deadly force is authorized. (*id*. ¶ 70)

Specifically, for a subject's threat to be considered imminent, it must meet three criteria: Intent, Weapon, and Delivery System. (*id*. ¶¶ 69-71) The DAAT manual trained Officer Mensah that "[s]ome of the ways that intent might be shown would include deliberately pointing a

weapon at you, stating an intention to kill you, rushing at you with a knife, and so on." (*id.* ¶ 70) Gonzales' actions in advancing with a raised samurai sword evidenced both the presence of a weapon and an intent to cause great bodily harm, and his continued advancement toward Officer Mensah with the deadly weapon, would constitute a delivery system. (DPFF ¶ 72, 80-82)

The DAAT manual also provides training to officers—including Officer Mensah—on encountering individuals who are experiencing medically significant behavior, including mental illness explaining that "[y]ou are not expected to diagnose and treat medical or psychiatric conditions, and you are not expected to jeopardize your safety or the safety of others when a subject's behavior poses a danger." (DPFF ¶ 76) Officer Mensah testified that, based upon his training and experience, he was aware that if an officer knows someone is suffering from mental illness, there are additional personnel/resources that can be called to the scene. (DPFF ¶ 77-78) Officer Mensah also testified that based on his training (mostly in investigating OWIs and standardized field sobriety tests) and experience (especially working for UW-Madison police), he knows that intoxicated individuals' decision-making may be impaired and that they can become aggressive. (DPFF ¶ 79) However, on the evening of July 16, 2015, Mensah had no information suggesting that Gonzales may be experiencing a mental illness episode, and no such information had been reported to police dispatch. (DPFF ¶¶ 13, 19) Instead, it was reported to Officer Mensah that Gonzales was intoxicated and violent—the latter he experienced first-hand. Even if the Estate had evidence that Gonzales was in a mental health crisis and that Officer Mensah had prewarning, it would not matter. Officer Mensah arrived on scene and before he could attempt to engage with Gonzales or assess the situation, Gonzales exited the house with a samurai sword and began advancing on him.

The Estate speculates that if officers had been properly trained on "maintaining a covered position" and trying to communicate with emotionally upset persons who are armed with weapons "rather than approaching them loudly with threatening commands", Mr. Gonzales would be alive. (ECF 1, ¶ 71). Pure speculation is not evidence. Gonzales' sudden and unpredictable actions posed an immediate and objective danger of great harm, and those actions forced the Officers to employ deadly force in response.

On this record, no reasonable factfinder could conclude that the City had a policy with constitutionally violative language nor that the City had adopted a "policy of inaction" with respect to training needs. See *King*, 680 F.3d at 1021. With no evidence of an infirm policy, practice, or custom, and no evidence of deliberate indifference to constitutionally impermissible informal conduct or to improper police training, the Estates' second and third Claims for relief must be dismissed.

### IV.    The Estate Has No Cognizable Claim for Violations of Title II of the Americans with Disability Act.

The Estate's third cause of action alleges a violation of Title II of the Americans with Disabilities Act against the City of Wauwatosa. (ECF 1 at 12-14) The Complaint asserts that Gonzales was an individual with a "mental disability" (*id*. ¶ 78-80) and that the City of Wauwatosa failed to accommodate that disability by deescalating the situation (*id*. ¶ 81) and by denying him access to an emergency medical response. (*id*. ¶ 80) The Estate's ADA claim is legally meritless, factually unsupported, and must be dismissed.

To establish a violation of Title II of the ADA, the Estate must prove that Gonzales [1] is a 'qualified individual with a disability, [2] that he was denied 'the benefits of the services, programs, or activities of a public entity' or otherwise subjected to discrimination by such an

entity, and [3] that the denial or discrimination was 'by reason of' his disability." *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015).

To show that he was discriminated against or denied benefits or services because of his disability, the Estate must present "evidence that (1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people." *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006). "Intentional" action by the defendant includes "deliberate indifference." *See Lacy v. Cook County*, 897 F.3d 847, 863 (7th Cir. 2018). For purposes of Title II, deliberate indifference means, "both (1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood." *Id.* In applying the Title II standards to arrests:

> Courts have identified two general theories describing ways in which a police officer may violate the ADA in executing an arrest. The first such theory (which we shall call the "effects" theory) holds that a violation may be found when police wrongly arrested someone with a disability because they misperceived the effects of that disability as criminal activity. The second such theory (which we shall call the "accommodation" theory) holds that a violation may be found when police officers properly investigated and arrested a person with a disability for a crime unrelated to that disability, [but] they failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees.

*Gray v. Cummings,* 917 F.3d 1, 15 (1st Cir. 2019)(internal citations and quotations omitted). Both the effects and accommodation theories require some prior knowledge or notice of a qualified individual's purported disability. *See* (Title II protects people who are "regarded has having [an] impairment," 42 U.S.C. § 12132(1)(C).)

<u>In Gonzales' case, the Estate's ADA claim fails for three reasons:</u>

**First,** although the Estate's Title II claim is purportedly brought against the City of Wauwatosa, the allegations relate only to the conduct of Officer Mensah. *See* (ECF 1 ¶ 79

24

"Defendant Mensah was aware of Mr. Gonzales' disability…..")  To the extent the Estate's ADA claim is for Officer Mensah's actions – the claim must be dismissed. See *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 609 (2015) ("Only public entities are subject to Title II[.]"); Walker v. Snyder, 213 F.3d 344, 346 (7th Cir. 2000) ("Under Title II of the ADA ... the proper defendant is that 'entity.' ... [A]s a rule there is no personal liability under Title II[.]").

**Second,** the Estate's Complaint fails to identify any specific mental illness in Gonzales and instead waffles between suggestions that Gonzales was merely intoxicated, suffering from a mental illness, or both. *See* (ECF 1 ¶ 8, 15, 64) There is absolutely no relevant and admissible evidence in this case that Gonzales was "a qualified individual with a disability" (*id*. ¶ 78) or that the City of Wauwatosa had prior knowledge of Gonzales' purported disability. The Estate cannot show that Gonzales was actually suffering from an identifiable mental illness when he attacked Officer Mensah, let alone that Officer Mensah was aware of any such illness. To the contrary, the undisputed facts demonstrate that Officer Mensah had never interacted with Gonzales prior to July 16, 2015. (DPFF ¶ 19) Officer Mensah and Officer Newman were dispatched to a complaint that a subject had or was trying to cut his roommate. (DPFF ¶ 12) At some point, dispatch radioed that Gonzales was "intoxicated" and "violent." (DPFF ¶¶10-13) It was never reported that Gonzales had any mental disability or that he was suffering from the effects of such an illness, and the Estate's conclusory suggestion that Officer Mensah should have observed the "manifestation of the symptoms" of mental illness is factually erroneous and legally insufficient to demonstrate an ADA violation. (ECF 1, ¶ 79; see *Walker*, 213 F.3d at 346)

**Third**, assuming *arguendo* that the Estate could demonstrate both a cognizable mental illness and adequate notice of Gonzales' disability, there is still no evidence that the City Defendants discriminated against him on the basis of that disability. The Estate alleges that the

City of Wauwatosa denied Gonzales access to emergency medical response after the shooting based solely on his mental illness. (ECF 1 ¶ 80) That is demonstrably unsupportable. Moments after the shooting, Emergency Medical Services personnel were dispatched to the scene while, in the meantime, additional responding police officers had arrived and began administering first aid. (DPFF ¶¶ 47-48) Within five minutes of the shooting, the Wauwatosa Fire Department arrived on scene and took over life-saving measures. (DPFF ¶ 49) No reasonable factfinder could conclude from that timeline that the City of Wauwatosa denied Gonzales access to emergency medical care. See e.g*., Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1090 (9th Cir. 2006)(police acted reasonably when they promptly summoned necessary medical assistance, even if they did not administer CPR); see also *Sallenger v. City of Springfield, Illinois*, 630 F.3d 499, 504 (7th Cir.2010)(police acted reasonably when they promptly summoned necessary medical assistance and administered CPR).

The Estate's Title II ADA claim must be dismissed as a matter of law.

### V.      There Is No Evidence to Support a Claim for Denial of Equal Protection Based Upon Racially Biased Policing.

The Estate's final claim asserts a denial of equal protection against *all Defendants* by alleging "racially biased policing" in violation of the Fourteenth Amendment. (ECF 1 p. 14) In support, the Estate baldly asserts that "Defendant Mensah treated Mr. Gonzales less favorably— and with unreasonable force—than his similarly situated White counterparts, wholly or in part because of his race." *Id*. ¶ 92. The Estate has not produced nor has discovery revealed any widespread pattern, custom, or practice as the driving force behind any alleged incidents of "racially biased policing." Rather, the allegations against the City amount to obvious and improper attempts to hold the City vicariously liable for unproven conduct that it attributes to unidentified City employees based solely on unsubstantiated allegations of a generic pattern.

Claims that law enforcement used "impermissible racial classifications in determining whom to stop, detain, and search" are analyzed as Equal Protection Clause violations. *See Chavez v. Ill. State Police*, 251 F.3d 612, 635 (7th Cir. 2001). Discriminatory intent requires Plaintiff to show that Defendants acted with intent or deliberate indifference against them because of membership in a definable class. *See Nabozny v. Podlesny*, 92 F.3d 446, 454 (7th Cir. 1996). As with other deliberate indifference cases, a showing of negligence is insufficient. *Id*. at 453. Instead, discriminatory purpose "implies more than ... intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of' ... its adverse effects upon an identifiable group." *Chavez*, 251 F.3d at 645 (quoting *McCleskey v. Kemp*, 481 U.S. 279, 298 (1987)).

To survive summary judgment on this claim, the Estate must prove that deadly force was used against Gonzales because Officer Mensah was motivated by a discriminatory intent. *Id*. at 635–36. The time to produce evidence, not argument, has arrived, and the Estate has no such evidence. Officer Mensah's decision to use deadly force was a response to the immediate threat that Gonzales posed. (DPFF ¶ 58) The Estate alleges that Officer Mensah acted unlawfully towards Gonzales based on his "race," but does not identify what his race was, that Officer Mensah had any idea what Gonzales' race was, or that Gonzales' race was a motivating factor in any decision that occurred that evening. (ECF 1, ¶¶ 95-97). Gonzales was not identified by name in the emergency call, there was no information reported to dispatch regarding Gonzales' race or that such factor was thereafter relayed to Mensah, the area of the shooting was poorly lit, and Officer Mensah had never interacted with Gonzales before that night. (DPFF¶¶ 19, 23-24).

The claim of racially biased policing must be summarily dismissed.

**CONCLUSION**

Based on the foregoing facts, arguments and legal authority, the Defendants respectfully request that the Court grant their Motion for Summary Judgment and dismiss this action in its entirety upon the merits, with prejudice, and with such costs and disbursements as the Court deems equitable.

Dated at Wauwatosa, Wisconsin this 15th day of June 2023.

**WIRTH + BAYNARD**
Attorneys for Defendants

 */s/ Jasmyne M. Baynard*
Jasmyne M. Baynard, WI Bar No. 1099898
9898 W. Bluemound Road, Suite 2
Wauwatosa, Wisconsin 53226
T: 414) 291-7979 / F: (414) 291-7960
Email: jmb@wbattys.com