ESTATE OF ANTONIO GONZALES,
by and through its Personal Representative,
Sandra Gonzales,

                Plaintiffs,                CASE NO. 2:21-cv-00848

v.

CITY OF WAUWATOSA, et al.,

                Defendants.

## DEFENDANTS' PROPOSED FINDINGS OF FACT
## IN SUPPORT OF SUMMARY JUDGMENT

Defendants, by their attorneys, Wirth + Baynard, submit the following Proposed Findings of Fact in support of their Motion for Summary Judgment:

### The Parties

1. At the time of his death on July 16, 2015, Antonio Gonzales was an adult resident of the State of Wisconsin. (ECF 1, ¶ 3) Sandra Gonzales is Mr. Gonzales' mother and serves as the personal representative of the Estate of Antonio Gonzales. (ECF 1, ¶ 5)

2. Defendant City of Wauwatosa is a Wisconsin municipal corporation whose principal offices are located in Wauwatosa, Wisconsin. (ECF 1, ¶ 5)

3. Defendant Chris MacGillis is the Chief of Police for the City of Wauwatosa and is named in his official capacity only. (ECF 1, ¶ 19)

4. At all relevant times, Defendant Joseph Mensah (Officer Mensah) was a police officer with the Wauwatosa Police Department. (Baynard Decl. Ex. A, 3/17/22 Deposition of Joseph Mensah p. 102)

**Jurisdiction and Venue**

5. This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. The Court has jurisdiction over the Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343. (ECF 1, ¶ 1)

6. The Eastern District of Wisconsin is the proper federal venue for this action pursuant to 28 U.S.C. § 1391(b) because it is where all acts alleged in the Complaint occurred. (ECF 1, ¶ 2)

**The July 16, 2015, Critical Incident**

7. In July of 2015, Antonio Gonzales was renting a room in a home owned by his landlord and friend, Craig Tutton, located at 8533 Glencoe Circle in Wauwatosa. (Craig Tutton Decl. ¶¶ 1-3)

8. On the evening of July 16, 2015, Gonzales had become verbally and physically abusive to Craig Tutton. Gonzales was loud, and was hitting Tutton by swinging his arrowhead necklace, which resulted in Tutton sustaining minor cuts and bruises. (Craig Tutton Decl. ¶¶ 9-11, Jack Tutton Decl. ¶ 14)

9. Tutton's minor son, Jack, who was also residing at the home, heard the commotion and came upstairs. At that point, Gonzales' physical and verbal aggression toward Craig Tutton escalated and Gonzales threatened Jack Tutton (Craig Tutton Decl. ¶¶ 10-12, Jack Tutton Decl. ¶¶ 9-11)

10. On July 16, 2015, at approximately 9:17pm, Craig Tutton called 911 and reported that his roommate was being very unruly, intoxicated, and physically violent. (Roy Decl. Exh. L, 911 audio at timestamp 1:10-1:33, 2:25)

11. Craig Tutton also reported to dispatch that his roommate was still at the residence. (Roy Decl. Exh. L, 911 audio at timestamp 1:10-1:33, 2:25)

12. On July 16, 2015, at 9:18 p.m., Wauwatosa Police Officers Jeffrey Newman and Joseph Mensah were dispatched to 8533 Glencoe Circle for a report of an intoxicated tenant who had become violent. (Roy Decl. Exh. A, Report Newman Statement p. 2; Roy Decl. Exh. B, CAD report; *see also* Mensah 3/17/22 Dep. pp. 154-156)

13. Prior to arriving on scene, Officer Mensah understood that he was responding to a domestic violence incident and based on the information provided by dispatch believed that the suspect had attacked or was attacking the caller with a spearhead or an arrow or some sort of edged weapon, and that both the suspect and victim were still on scene. (Mensah 3/17/22 Dep. pp. 154-157)

14. Officer Newman arrived on scene before Officer Mensah and upon his arrival, he observed two individuals outside of the residence—an older male standing on the front lawn and a younger male standing by the sidewalk. (Roy Decl. Exh. A, Newman Statement p. 2; *see also* Mensah 3/17/22 Dep. p. 158)

15. Officer Newman was not familiar with the address or the occupants. (Roy Decl. Exh. A, Newman Statement p. 2; *see also* Mensah 3/17/22 Dep. p. 158)

16. Officer Newman instructed the two males to stand on the side of the residence, away from the front door, where he believed the suspect would be exiting. (Roy Decl. Exh. A, Newman Statement p. 3, *see also* Jack Tutton Decl. ¶ 26)

17. Officer Newman then backed away from the front door and drew his service pistol. (Roy Decl. Exh. A, Newman Statement p. 3, *see also* Jack Tutton Decl. ¶ 26)

18. Officer Mensah arrived on scene, parked his squad, and observed Officer Newman

3

already on the front lawn with his gun unholstered and two people standing right next to the house that he was responding to. (Mensah 3/17/22 Dep. pp. 157, 161-163)

19. Officer Mensah had no contact with Antonio Gonzales before July 16, 2015, and did not know who he was. (Mensah 3/17/22 Dep. p. 199)

20. Officer Mensah unholstered his firearm based on the information that the subject had a weapon, his perception that this domestic violence call was in-progress, and based on his observation of Officer Newman, a veteran officer who also had his weapon unholstered, and joined Officer Newman on the front lawn. (Mensah 3/17/22 Dep. pp. 163-166, 168-169; Jack Tutton Decl. ¶ 28)

21. The two Officers made eye contact, which Officer Mensah perceived to be an acknowledgement that they were ready to approach the house together. (Mensah 3/17/22 Dep. pp. 163-166, 168-169; Jack Tutton Decl. ¶ 28)

22. Officer Mensah and Officer Newman approached the house with their guns unholstered, but not raised. (Mensah 3/17/22 Dep. p. 155, 173; Jack Tutton Decl. ¶ 31)

23. Suddenly, the front door opened and Gonzales stepped out onto the dimly lit porch, not saying anything. (Mensah 3/17/22 Dep. pp. 155, 173; Jack Tutton Decl. ¶ 31)

24. Initially, it appeared to Officer Mensah that Gonzales had a large stick in his hand; however, when Gonzales stepped into the light, Officer Mensah could see he was holding a large sword and a sheath in one hand and a round object in his other hand. (Mensah 3/17/22 Dep. pp. 173-175; Roy Decl. Exh. A, Newman Statement p. 3; *see also* Jack Tutton Decl. ¶ 29)

25. The Samurai Sword displayed by Gonzales had a 49" blade and 16 3/4" handle, was recovered at the scene of the Gonzales critical incident and was maintained throughout the chain of custody and is currently in the possession of the Wauwatosa Police Department

inventoried as property no. 16-006762-003-003. (Roy Decl. ¶ 5)



26. The Officers started yelling at Gonzales to, "Stop don't move anymore!" followed by "Don't move!" "Stay there!" "Drop the weapon." The commands were so loud it prompted neighbor E. Sellinger to open her front door to see what was going on. (Jack Tutton Decl. ¶ 33; Mensah 3/17/22 Dep. p. 181; Roy Decl. Exh. A, Newman Statement p. 3; Sellinger Decl. ¶¶ 3-5)

27. Gonzales was facing toward Officer Mensah and Officer Newman and threw the circular object to the ground. (Mensah 3/17/22 Dep. p. 179; Jack Tutton Decl. ¶ 34; Sellinger Decl. ¶ 4; Roy Decl. Exh. A, Newman Statement p. 3)

28. In one swift motion, Gonzales raised the sword above his head and the sheath came off, exposing a large blade. (Mensah 3/17/22 Dep. p. 179; Jack Tutton Decl. ¶ 34; Sellinger Decl. ¶ 4; Roy Decl. Exh. A, Newman Statement p. 3)

29. At some point after Gonzales exited the residence and displayed the sword, Officer Newman broadcast that the subject had a sword and requested squads to step it up, and the call

5

was upgraded to an "all officer assists." (Mensah 3/17/22 Dep. p. 179; Timothy Warren Declaration ¶ 4)

30. After Gonzales took the sword out of the sheath, the Officers continued to shout: "Stay there, drop your weapon." (Jack Tutton Decl. ¶ 34; Mensah 3/17/22 Dep. p. 179; Roy Decl. Exh. A, Newman Statement p. 3; Sellinger Decl. ¶¶ 3-5)

31. When Officer Mensah realized Gonzales had a sword, he raised his firearm and pointed it at Gonzales. (Mensah 3/17/22 Dep. p. 181)

32. At the same time, Officer Mensah continued backing up in an attempt to create distance, while ordering Gonzales to drop the sword. (Mensah 3/17/22 Dep. p. 181)

33. Gonzales was holding the sword and began moving toward the officers and they ordered him to drop the sword. As Gonzales walked towards the Officers he was looking back and forth between Officer Newman and Officer Mensah. Officer Mensah perceived that Gonzales was challenging them. (Mensah 3/17/22 Dep. at 179; Roy Decl. Exh. A, Newman Statement at 3; *see also* Sellinger Decl. ¶ 6)

34. Gonzales then focused in on Officer Mensah and stared at him in what Officer Mensah described, and trained in the DAAT manual, as a 1,000-yard stare. (Mensah 3/17/22 Dep. p. 179; Roy Decl. Exh. A, Newman Statement p. 3)

35. The Officers shouted constant commands to Gonzales to, "Stay there, drop your weapon, put the weapon down." (C. Tutton Decl. ¶ 20; Jack Tutton Decl. ¶ 37)

36. Gonzales ignored the Officers' commands and instead walked towards the Officers. (Mensah 3/17/22 Dep. pp. 179; 199:23-200:8; Roy Decl. Exh. A, Newman Statement p. 3)

37. As the incident unfolded, it began to rain. Officer Mensah continued to back up and create space between himself and Gonzales; Gonzales continued to walk toward him. (Mensah

6

3/17/22 Dep. p. 185)

38. Officer Mensah backed up until he could no longer do so without fear of slipping or falling on the curb. (Mensah 3/17/22 Dep. pp. 183-184, 196)

39. As Mensah backed up, he could see the two individuals standing near the residence. (Mensah 3/17/22 Dep. pp. 183-184, 196)

40. Mensah feared that he would trip and drop his gun, or that he would create too much distance and not be able to protect the individual standing by the house. (Mensah 3/17/22 Dep. pp. 183-184, 196)

41. Gonzales continued to advance on Officer Mensah and Officer Mensah issued him a final warning to "stop or I will shoot you." (Mensah 3/17/22 Dep. pp. 186-187; Newman Statement p. 3; Jack Tutton Decl. ¶ 37)

42. Gonzales ignored the command, raised the sword, and came toward Officer Mensah in a movement described by witness Sellinger as "coming at the officers" and witness Jack Tutton explained that Gonzales waved the sword as he advanced on officer Mensah. (Jack Tutton Decl. ¶ 37; Sellinger Decl. ¶ 6; *see also* Mensah 3/17/22 Dep. pp. 186-187; Newman Statement p. 3)

43. When Gonzales came within 10 feet, Officer Mensah fired. (Mensah 3/17/22 Dep. pp. 186-187; Newman Statement p. 3; Jack Tutton Decl. ¶ 37)

44. The first two rounds struck Gonzales but did not stop him from advancing forward and Officer Mensah shot again to stop the threat posed by Gonzales. (Mensah 3/17/22 Dep. pp. 187-189)

45. Gonzales did not stop advancing after Officer Mensah fired and Officer Newman feared for Officer's Mensah's safety and believed that Gonzales intended to cause death or great bodily harm to Officer Mensah. (Newman Statement p. 3)

7

46. Officer Newman discharged his firearm once at Gonzales. (Newman Statement p. 3)

47. By the time Officers Mensah and Newman stopped shooting, police sirens were sounding and back up Wauwatosa Police Officers had arrived on scene and began administering first aid to Gonzales. (Newman Statement p. 3; Warren Decl. ¶ 5; Baynard Decl. Exh. D, Mastrocola Report at 9; *see also* Sellinger Decl. ¶ 8 (within five minutes of the shooting she observed Gonzales revising chest compressions)

48. The Wauwatosa Fire Department arrived on scene while Wauwatosa Officers were administering CPR to Gonzales and took over administering lifesaving care. (Warren Decl. ¶ 7)

49. The Fire Department call notes demonstrate that they were dispatched at 21:25:27 (9:25 p.m.) and arrived on scene at 21:29:24 (9:29 p.m.). (Roy Decl. Exh. M, Fire Dept Call Notes)

**Investigation into the July 16, 2015 Critical Incident**

**Milwaukee Police Department Metro Unit Investigation**

50. Wisconsin Act 348 mandates that an outside agency must investigate all police related critical incidents. (Roy Decl. ¶ 6, Exh. C; *see also* Mastrocola Dep. pp. 38-39, 54-55)

51. In accordance with Wisconsin Act 348, it was the policy of the Wauwatosa Police Department that the Milwaukee Police Department (Metro Unit) lead the investigation of any officer-involved or in-custody death, excluding traffic related officer-involved deaths. (Roy Decl. ¶ 6, Exh. C; *see also* Mastrocola Dep. pp. 38-39, 54-55)

52. The Milwaukee Police Department Metropolitan Division was requested to be the lead investigative agency for the Gonzales' critical incident. (Baynard Exh. D, Mastrocola Report p. 1; Mastrocola Dep. p. 55)

### Milwaukee County District Attorney Review

53. On or before October 1, 2015, the Milwaukee Police Department concluded their investigation and turned over their findings to the Milwaukee County District Attorney to review the matter for potential criminal prosecution. (Roy Decl. ¶ 9, Roy Exh. F, DA Letter)

54. The Milwaukee County District Attorney declined to bring criminal charges and concluded that, "the actions of Officer Mensah and Officer Newman were privileged under the law of self-defense and defense of others, in that the officers reasonably believed that they were confronting an armed suspect who intended to cause them great bodily harm or death." (Roy Decl. ¶ 9, Roy Exh. F, DA Letter)

### Wauwatosa Police Department Internal Investigation

55. At the time of the July 16, 2015, critical incident, it was the policy of the Wauwatosa Police Department Police Chief to order a separate internal investigation to determine whether any officers violated any department rules, regulations, or policies and to identify potential training deficiencies of all officer involved fatalities. (Roy Decl. ¶ 6, Exh. C; Mastrocola Dep. pp. 87-90; Weber 9/16/22 Dep. pp. 272-278)

56. After the Milwaukee County District Attorney rendered their decision to not charge Officer Mensah in relation to the shooting of Antonio Gonzales, the Wauwatosa Police Department conducted an internal administrative review of the Officer involved shooting to determine if actions taken by officers were consistent with the rules, regulations, polices, and procedures of the Wauwatosa Police Department and to identify any training deficiencies that may have occurred. (Mastrocola Dep. pp. 89-90; Baynard Exh. D, Mastrocola Report p. 1)

57. Part of the administrative review was to evaluate Officer Mensah and Officer Newman's actions in accordance with the State of Wisconsin Defense and Arrest Tactics (DAAT)

system and ultimately determine whether there was justification to use deadly force against Gonzales. (Mastrocola Dep. pp. 114-115; Baynard Exh. D Mastrocola Report p. 6)

58. The Administrative Review determined that the actions of Officer Mensah and Officer Newman were objectively reasonable, and the use of deadly force was justified, concluding that:

> Even though the call was dispatched as a "disorderly" subject, it quickly escalated to armed subject whose actions had the potential for death or great bodily harm. Because Gonzales would not follow commands of the officers to drop the sword, coupled with the fact that Tutton and his son were nearby and unprotected, Gonzales posed an immediate threat to the officers and the Tuttons. Not only was Gonzales non-compliant, he actively resisted the officers commands by increasing his distance and speed toward the officers and raising a sword.

(Baynard Exh. D, Mastrocola Report p. 8)

59. At the time of the July 16, 2015, critical incident, it was the policy of the Wauwatosa Police Department that Officers involved in a fatality attend counseling and evaluation with an approved specialist prior to returning to full duty patrol after an officer involved shooting. (Roy Decl. ¶6, Exh. C at 4)

60. After the July 16, 2015, Gonzales shooting incident, Officer Mensah was referred to licensed professional counselor Marcia Williams at Systemic Perspectives, for evaluation and counseling regarding the critical incident. (Roy Decl. ¶ 8, Roy Exh. E; Weber 9/16/22 Dep. pp. 234-235; Mensah 2/28/23 Dep. pp. 122-124)

61. Officer Mensah met with Marcia Williams on July 27, 2015, August 3, 2015, August 18, 2015, and August 24, 2015, regarding the critical police event that occurred on July 16, 2015. (Roy Decl. ¶ 8, Roy Exh. E)

62. At the time of the July 16, 2015, critical incident, it was the policy of the Wauwatosa Police Department that officers are placed on administrative leave pending

investigation into the critical incident. (Roy Decl. ¶ 7, Roy Exh. C1 at 4; Weber 9/16/22 Dep. p. 234)

63. Per department policy, Officer Mensah remained on administrative leave until the conclusion of the Milwaukee Police Department investigation, the DA's charging decision, and clearance from a licensed counselor. (Roy Decl. ¶ ¶7-11; Roy Exhs. D and G)

**Training, Policy, and Practice Claims**

**Wauwatosa Police Department's Hiring Process**

64. Under Wisconsin law all police officers must undergo psychological pre-employment testing before they can be certified through the state. (Weber 9/16/22 Dep. pp. 46-47)

65. As such, all officers hired by the Wauwatosa Police Department are required to undergo a preemployment psychological screening to determine their fitness for duty from a psychological standpoint. (Weber 9/16/22 Dep. pp. 46-47)

66. Prior to his employment with the Wauwatosa Police Department, Officer Mensah underwent a preemployment psychological screening with Dr. Bauman and was deemed fit for duty by Dr. Bauman. (Weber 9/16/22 Dep. pp. 55, 251; Baynard Decl. Exh. E; Mensah 4/17/22 Dep. p. 129)

**Use of Force Training**

67. Officer Mensah received use of force training at the police academy, through the Wisconsin DAAT manual, and while a field training officer at the Wauwatosa Police Department. (Mensah Dep. pp. 254-244)

68. At the time of the July 16, 2015, Gonzales critical incident, the Wauwatosa Police Department trained officers that the use of deadly force is justified in the following circumstances:

>   (a) Protect the officer or others from what is reasonably believed to be an imminent threat of death or great bodily harm.

(b) When it is necessary to prevent the escape of a fleeing violent felon whom the officer has reasonable belief poses an imminent threat of death or great bodily harm to the officer or others.

(c) If feasible the officer must give some verbal warning prior to the use of deadly force.

(Roy Decl. Exh. I, WPD Use of Force Policy p. 7)

69. Officer Mensah has been trained that if there is an imminent threat of death or great bodily harm you are allowed to use deadly force to stop that threat. (Mensah 3/17/22 Dep. p. 190)

70. The DAAT manual in effect at the time of the Gonzales incident trained officers that for a threat to be considered imminent it must meet three criteria:

- Intent
- Weapon
- Delivery System

(Roy Decl. ¶ 21, Exh. K, pp. 65-66; *see also* Mastrocola Report at 9; *see also* Baynard Decl. Exh. F, Mensah 2/28/23 Dep. pp 140-141)

71. On July 16, 2015, Officer Mensah shot Gonzales because he believed Gonzales posed an imminent and deadly threat. (Mensah 3/17/22 Dep. pp. 189, 193-194, 198)

72. At the time Officer Mensah discharged his weapon, all three criteria for imminent threat were met. Gonzales' intent was clear. He had switched hands with the sword and raised it above his head as if he were preparing to swing. Gonzales was armed with a weapon—the samurai sword, which is a deadly weapon. Gonzales had a delivery system to cause death or great bodily harm as he advanced on officers and closed distance. (Mastrocola Report p. 9; Mastrocola Dep. pp. 117-118, Farina Dep. p. 77).

73. At the moment he discharged his firearm, Officer Mensah believed Gonzales was trying to kill him and that shooting him was the only way to stop the threat. (Mensah 3/17/22 Dep. pp. 189, 193-194, 198)

74. Throughout his career, Officer Mensah has received training in defense and arrest tactics, use of force justifications, less lethal uses of force, and firearms, and at all relevant times maintained his certification through the State of Wisconsin. (Mensah 3/17/22 Dep. pp. 40-42, 76, 102-107, 120; *see also* Roy Decl. ¶ 19; Exh. J, Mensah Training records)

75. While employed by the City of Wauwatosa, Officer Mensah received training on de-escalation tactics, in both a classroom setting and in scenario-based settings. (Mensah 3/17/22 Dep. pp.117-118)

76. The DAAT manual also provides training to officers—including Officer Mensah—on encountering individuals who are experiencing medically significant behavior, including mental illness, explaining that "You are not expected to diagnose and treat medical or psychiatric conditions, and you are not expected to jeopardize your safety or the safety of others when a subject's behavior poses a danger." (Roy Decl. Ex. K, DAAT Manual p. 159)

77. During his career in law enforcement, Officer Mensah received training on dealing with people experiencing excited delirium or an altered mental state. (Mensah 3/17/22 Dep. p. 122-123)

78. Officer Mensah has been trained that every encounter is different, and that you must assess the situation and, if you have time, call in resources. (Mensah 3/17/22 Dep. p. 123)

79. Officer Mensah also testified that based on his training (mostly in investigating OWIs and standardized field sobriety tests) and experience (especially working for UW-Madison police), he knows that intoxicated individuals' decision making is hampered, and that they can

become aggressive. (Mensah Dep. 3/17/22 pp. 123-124)

80. During his 10 plus years in law enforcement, Officer Mensah has received training on uses of force, which includes edged weapons. (Mensah 3/17/22 Dep. p. 116)

81. With regard to dealing with individuals armed with an edged weapon, Officer Mensah has been trained that an edged weapon is a deadly weapon that can cause death. (Mensah 3/17/22 Dep. p. 116; Baynard Decl. Exh. H, Deposition of Jeffrey Farina p. 77)

82. Officer Mensah was taught that when someone is within 21 feet of you with an edged weapon, those individuals are dangerous, and your reaction time is limited. (Mensah 3/17/22 Dep. p. 110; *see also* Weber 9/16/ 22 Dep. p. 167)

83. The State of Wisconsin established the Law Enforcement Standards Board (LESB) to prescribe minimum requirements for police officer training. The LESB issued regulations governing police officer training standards in such areas as Defense and Arrest Tactics (DAAT) and effecting an arrest. (Roy Decl. ¶¶ 18-20; Roy Decl. Exh. J)

84. Officer Joseph Mensah met or exceeded the minimum training requirements established by the State of Wisconsin to be certified as a Police Officer and had maintained his respective certifications throughout their employment with the City of Wauwatosa. (Roy Decl. ¶¶ 18-20; Roy Decl. Exh. J)

Dated at Wauwatosa, Wisconsin this 17th day of July 2023.

**WIRTH + BAYNARD**
Attorneys for Defendants

*/s/ Jasmyne M. Baynard*
Jasmyne M. Baynard, WI Bar No. 1099898
9898 W. Bluemound Road, Suite 2
Wauwatosa, Wisconsin 53226
T: 414) 291-7979 / F: (414) 291-7960
Email: jmb@wbattys.com