UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ESTATE OF JAY ANDERSON, JR.
by Special Administrator, Starkeisha DeLaRosa;
J.A. minor child, through her next friend Starkeisha DeLaRosa,

        Plaintiffs,                    CASE NO. 2:21-cv-00848

v.

CITY OF WAUWATOSA,
JOSEPH ANTHONY MENSAH, and
FORMER CHIEF OF POLICE BARRY WEBER,

        Defendants.

---

### DEFENDANTS' PROPOSED FINDINGS OF FACT
### IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

Defendants, by their attorneys, Wirth + Baynard, submit the following Proposed Findings of Fact in support of their Motion for Summary Judgment.

**The Parties**

1. At the time of his death on June 23, 2016, Jay Anderson Jr. was an adult resident of the State of Wisconsin. (ECF 47[1], Amend. Compl. ¶ 9)

2. Plaintiff Starkeisha DeLaRosa is an adult resident of the State of Wisconsin and serves as the representative of the Estate of Jay Anderson. (ECF 47, ¶ 9)

3. Plaintiff J.A. is the minor child of Jay Anderson, Jr., and is represented through her mother, Starkeisha Delarosa. (ECF 47, ¶10)

4. Defendant City of Wauwatosa is a Wisconsin municipal corporation whose principal offices are located in Wauwatosa, Wisconsin. (ECF 47, ¶ 11)

---

[1] ECF 47 refers to the Amended Complaint filed in Eastern District Case No. 21-cv-01179. All other ECF referenced documents were filed in consolidated Case No. 21-cv-848.

5. Defendant Barry Weber is the former Chief of Police for the City of Wauwatosa and is named in his individual capacity. (ECF 47, ¶ 15; *see also* ECF 54, Order, p. 4)

6. At all relevant times, Defendant Joseph Mensah (Officer Mensah) was a police officer with the Wauwatosa Police Department. (ECF 77-1, Exh. A, 3/17/22 Deposition of Joseph Mensah, p. 102)

**Jurisdiction and Venue**

7. This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. The Court has jurisdiction over the Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343. (ECF 47, ¶ 7)

8. The Eastern District of Wisconsin is the proper federal venue for this action pursuant to 28 U.S.C. § 1391(b) because it is where all acts alleged in the Amended Complaint occurred. (ECF 47, ¶ 8)

**The June 23, 2016, Critical Incident at Madison Park**

9. On the night of June 22, 2016, and into the morning of June 23, 2016, Officer Mensah was working the late shift in full uniform as a patrol officer for the Wauwatosa Police Department. (ECF 77-6, Exh. F, 02/28/2023 Deposition of Joseph Mensah (hereinafter Mensah 2/28/23 Dep.) pp. 7, 143)

10. Officer Mensah was assigned to patrol squad area 5 in the City of Wauwatosa, which encompasses Madison Park. (Mensah 2/28/23 Dep. pp 7–8, 143)

11. It was Officer Mensah's responsibility to do parking enforcement in his assigned area, including checks of Madison Park, which he did "just about every night" as part of his routine patrol. (Mensah 2/28/23 Dep. pp. 9-10, 141; *see also* ECF 77-1, Ex. K, Deposition of Stephen Mills (hereinafter Mills Dep.) p. 57)

12. Madison Park closes at 10:00 p.m. and being in the park after hours is a violation of Milwaukee County Ordinance § 47.27, which provides "no person shall remain in the park or parkways during the hours they are closed." [2] (Mensah 2/28/23 Dep. pp. 23-25, 55)

13. It was one Officer Mensah's patrol responsibilities to routinely check Madison Park after hours and investigate the presence of anyone found in the park, ascertain their reasons for being in the park, eliminate the possibility of medical distress, and ensure there was no illicit or illegal activity whether it's doing drugs, having sex, or engaging in any activity that violates any city, county, or state ordinances, and welfare checks. (Mensah 2/28/23 Dep. pp. 11-12, 30, 55)

14. In Mensah's prior experience encountering people in the park after hours, the presence of police would result in the individuals leaving the park upon his approach or upon his request. (Mensah 2/28/23 Dep. pp. 23-24, 88, 141; *see also* Mills Dep. p. 59)

15. Officer Mensah has never written a ticket for an after-hours ordinance violation. (Mensah 2/28/23 Dep. pp. 23-24, 141)

16. On June 23, 2016, around 12:30 a.m. Officer Mensah went to Madison Park to conduct a park check and encountered an individual who he instructed to leave. (Mensah 2/28/23 Dep. pp. 12, 133)

17. At 3:01 a.m., Officer Mensah entered Madison Park to conduct another park check and observed a single vehicle parked in the center of the lot and noticed at least one person was in it. (Mensah 2/28/23 Dep. pp. 12, 15)

18. Officer Mensah parked his squad facing the front of the suspect vehicle and turned on his bright illumination lights referred to as "take down lights," which allowed him to see inside

---

[2] https://library.municode.com/wi/milwaukee_county/codes/code_of_ordinances?nodeId=MICOCOGEORVOI_CH47PAPA_SUBCHAPTER_IINGE_47.28PEOBPE

the vehicle and observe movement in the vehicle. (Mensah 2/28/23 Dep. pp. 16-17, 29)

19. Officer Mensah observed an occupant in the front driver seat who appeared to be sleeping. (Mensah 2/28/23 Dep. pp. 18, 29)

20. At 3:02 a.m., Officer Mensah radioed dispatch and advised them of his location at Madison Park and of the presence of an occupied auto. (Mensah 2/28/23 Dep. p. 48; ECF 76-16, Roy Decl. Exh. Q Radio Traffic Transmissions (hereinafter Radio Trans.) at 0:00:01)

21. It was standard practice at the Wauwatosa Police Department that dispatch would automatically send a second squad as back up in response to a report of an occupied auto. (Mensah 2/28/23 Dep. pp. 87-88; Mills Dep. p. 59)

22. At 3:02:44, dispatch sent Wauwatosa Police Officer Salyers, who was operating Squad 318, to Madison Park. (Radio Trans. at 0:00:05)

23. While waiting for backup, Officer Mensah exited his squad and walked around to the back of the vehicle to get the license plate number. (Mensah 2/28/23 Dep. pp. 15-18, 25)

24. A 3:03 a.m., Officer Mensah radioed dispatch and requested a license plate of the occupied auto. (Radio Trans. at 0:00:55; Mensah Dep. pp. 17, 27-28, 48)

25. At 3:04 a.m., dispatch advised Mensah that the vehicle had not been reported as stolen and was registered to Elena DeLaRosa. (Radio Trans. at 0:01:24; Mensah 2/28/23 Dep. pp. 56-57)

26. Officer Mensah approached the suspect vehicle from the passenger side to attempt to make contact with the driver, and the passenger's front window was rolled up. (Mensah 2/28/23 Dep. pp. 35-36, 143)

27. Based on Officer Mensah's training and experience, there are multiple ways to approach a vehicle; a passenger side approach is one of those. Approaching from a passenger side

in this type of vehicle contact you can get a better view into the vehicle. (Mensah 2/28/23 Dep pp. 143-145)

28. Officer Mensah knocked on the passenger front window, identified himself as police and told the driver that he needed to speak to him. After a couple of times repeating himself, the driver woke up again, turned the key in the ignition and rolled down the passenger front window. (Mensah 2/28/23 Dep. pp. 36-38, 102)

29. Officer Mensah asked the driver (Anderson) if he had a driver's license or identification, to which Anderson responded "no." (Mensah 2/28/23 Dep. pp. 38-39)

30. It was later determined that Anderson did not have a driver's license but did have a state-issued ID card. (Mensah 2/28/23 Dep. p. 99; Baynard Supplemental Decl. Exhibit T, Deposition of Troy Porter (hereinafter Porter Dep.) p. 20)

31. Officer Mensah did not observe Mr. Anderson to be intoxicated, nor did he report Anderson to have slurred speech. (Mensah 2/28/23 Dep. p. 121)

32. Officer Mensah was standing about an arm's length away from the passenger front door while addressing Anderson, and observed Anderson make several glances over to the passenger seat then look back up at Mensah. (Mensah 2/28/23 Dep. pp. 39-41)

33. Officer Mensah stepped closer to the car and looked down into the passenger seat. He spotted a semi-automatic handgun, with its magazine inserted, on Anderson's front passenger seat. (Mensah 2/28/23 Dep. pp. 41, 112-113)

34. When Officer Mensah saw the gun he stepped back, radioed dispatch that Anderson had a gun and requested additional assistance. (Mensah 2/28/23 Dep. pp. 46, 59, 105-106; Radio Trans at 03:06:18)

35. At 3:06 a.m., Officer Mensah radioed, "Step it up. He has a gun." (Radio Trans.

at 03:06:18; *see also* Mensah 2/28/23 Dep. pp. 59, 46, 105-106)

36.     Officer Mensah knew the phrase "step it up" would prompt dispatch to send all squads to his location. (Mensah 2/28/23 Dep. pp. 79-80)

37.     Based on his training and experience, Officer Mensah knows that action is quicker than reaction, which is why he unholstered his weapon in response to observing the gun on Anderson's front seat. (Mensah 2/28/23 Dep. pp. 40, 91, 94)

38.     Officer Mensah kept his gun at the low ready position and told Anderson that he saw the gun and told Anderson not to reach for it. (Mensah 2/28/23 Dep. pp. 41-42, 59, 91)

39.     Anderson reached toward the front passenger seat again and Officer Mensah ordered Anderson not to reach for the weapon. (Mensah 2/28/23 Dep. pp. 59 -60)

40.     Officer Mensah saw Anderson make at least 4 separate movements with his right arm toward the front passenger seat. (Mensah 2/28/23 Dep. pp. 59-60, 112-114)

41.     Officer Mensah warned Anderson a few times to keep his hands up, and then Anderson told Mensah, "it's nothing; there's nothing there." (Mensah 2/28/23 Dep. pp. 66-67, 91)

42.     In response to Anderson continuing to reach for the gun, Officer Mensah pointed his gun at Anderson and again ordered him to not reach for the gun. (Mensah 2/28/23 Dep. pp. 41-42)

43.     Officer Mensah gave Anderson strong forceful commands to not reach for the gun. (Mensah 2/28/23 Dep. pp. 61, 92-94)

44.     The last time Anderson made a movement, instead of just his right arm moving toward the gun on the seat, his whole body lunged toward it. (Mensah 2/28/23 Dep. pp. 58-60, 112-114; *see also* ECF 77-17, Exh. O Mensah Squad Video (hereinafter Mensah Squad) at

03:07:14)

45. When Anderson made this movement, Officer Mensah believed that Anderson was reaching toward the firearm that was located on the front passenger seat. (Mensah 2/28/23 Dep. pp. 74, 142:19-143:5)

46. After Anderson moved his body towards the passenger seat where the gun was located, Officer Mensah immediately discharged his firearm six times as he disengaged, walking backwards. (Mensah 2/28/23 Dep. at 114; *see also* Mensah Squad at 03:07:14)

47. At 3:07:19 Officer Mensah radioed "Shots fired." (Radio Trans. at 0:4:40)

48. At 3:08 a.m. EMS-advanced life support was dispatched. (Radio Trans. at approximately 0:05:43).

49. Immediately after discharging his weapon Mensah pressed the button on his squad mic that activated his squad car's dash camera. The squad car's dash camera goes back 30 seconds without audio. (Mensah 2/28/23 Dep. pp. 82, 105)

50. Officer Mensah remotely activated his squad camera immediately after discharging his firearm because he knew it was just him and Anderson and he wanted people to believe him. He knew there was going to be an investigation and he wanted to make sure he captured what happened. (Mensah 2/28/23 Dep. pp. 83, 105, 147-148)

51. Officer Mensah remotely activated his squad camera immediately after discharging his firearm because he knew it was just him and Anderson and he wanted the incident to be documented. (Mensah 2/28/23 Dep. pp. 147-148)

52. Officer Mensah's squad video starts at 3:06:55 and shows Officer Mensah standing on the passenger side of the vehicle with his firearm pointing at Anderson. (Mensah Squad at 03:06:55)

53. During the 28-second video, Anderson dropped his right hand towards the passenger seat, raised it for an instant and then quickly dropped it again and he leaned towards the front set where the gun was located. (Mensah Squad at 03:06:55 – 03:06:7:12)



54. At 3:08 a.m., Wauwatosa Police Officers Ralph Salyers radioed Officer Mensah and asked if it's safe to come in. Soon after Officers Salyers and Mills entered the parking lot and arrived on scene. (Radio Trans. at 0:05:43; *see also* ECF 77-10, Exh. J, Ralph Salyers Deposition (hereinafter Salyers Dep.) p. 16; ECF 77-11, Exh. K, Stephen Mills Deposition (hereinafter Mills Dep.) p. 12; see also Salyers Squad at 03:08:17)

55. After arriving on scene, Officer Mills with his handgun drawn, and Officer Salyers, with a long gun, and Officer Mensah approached the car to assess whether Anderson remained a threat. (Salyers Dep. pp. 19-20; Mills Dep. p. 13; *see also* Salyers Squad at 03:10:40)

56. Officer Salyers and Officer Mills observed the black semi-automatic handgun located on the front passenger seat of Anderson's car within reach of Anderson's right hand.

(Salyers Dep. pp. 28-29, 35-36; Mills Dep. pp. 19-20)

57. Officer Mensah told Officers Salyers and Mills that the gun is "right next to him on the passenger seat." (Baynard Supplemental Decl. Exh. U, Salyers Squad Video at 3:10)

58. Officer Salyers believed it was best to remove the firearm for safety reasons because the Fire Department was staging, and they would not come in until the scene was safe. (Salyers Dep. pp. 33-34, 43-46; Mills Dep. pp. 20-21)

59. At approximately 3:12:02 Officer Mills approached the passenger side of the vehicle, reached, and grabbed the gun off the front passenger seat and secured it in his trunk. (Mills Dep. pp. 21, 23, 25-28; Salyers Squad 03:12:07)

60. After securing the firearm, the officers pulled Anderson from the vehicle and conducted a pat down search. (Salyers Dep. p. 46, 52-53)

61. By then, a third Wauwatosa officer helped Salyers move Anderson from the car to the ground as the Wauwatosa medical unit arrived and began administering first aid. (Salyers Dep. pp. 48-50)

**Wauwatosa Police Department Procedure for Officer-Involved Shooting**

62. The Wauwatosa Police Department follows the process outlined in WPD policy titled Investigation of Law Enforcement Involved Fatalities/Great Bodily Harm, after all Officer Involved fatalities. (Baynard Supplemental Decl. Exh. S, Barry Weber 7/7/23 Deposition (hereinafter Weber 7/7/23 Dep.) pp. 72-76)

63. At the time of the June 23, 2016, shooting it was the policy of the Wauwatosa Police Department that officers are placed on administrative leave pending the investigation into the critical incident. (ECF 76 ¶ 6; ECF 76-3, Exh. C1 p. 4; *see also* Baynard Supplemental Decl. Exh. S, Barry Weber 7/7/23 Deposition (hereinafter Weber 7/7/23 Dep.) pp. 74-75)

64. Officer Mensah was placed on administrative leave after the Anderson critical incident. (ECF 76 ¶ 30; ECF 76-21; *see also* Weber 7/7/23 Dep. at 74-75)

65. At the time of the June 23, 2016, Anderson shooting incident, it was the policy of the Wauwatosa Police Department that Officers involved in a fatality attend counseling and evaluation with an approved specialist prior to returning to full duty patrol. (ECF 76 ¶ 6; ECF 76-3, p. 4; Weber 6/6/23 Dep. pp. 68-69; *see also* Weber 7/7/23 Dep. p. 76)

66. After the June 23, 2016, Anderson shooting incident, Officer Mensah was referred to licensed professional counselor, Jay Schrinsky, for evaluation and counseling regarding the critical incident. (Mensah 2/28/23 Dep. pp. 123-125, 138-139; Weber 6/6/23 Dep. pp. 231-232; *see also* Weber 7/7/23 Dep. pp. 76-77 *citing* ECF 76-22 Schrinsky Ltr.)

67. Officer Mensah met with Jay Schrinsky at ABC Medical Clinics on June 30, July 6, August 3, August 24, and September 13, 2016. (Mensah 2/28/23 Dep. p. 125; ECF 76-22)

68. On December 7, 2016, Dr. Bauman evaluated Joseph Mensah for the purpose of providing a Fitness for Duty evaluation. (ECF 77-5, Exh. E; see also Weber 7/7/23 Dep. 87-88, 96-97)

69. Dr. Bauman "found Officer Mensah to be competent and capable of rendering appropriate Law Enforcement service to the Wauwatosa community" and cleared him to return to full duty. (ECF 77-5)

70. As part of that evaluation, Dr. Bauman conducted a face-to-face assessment with Officer Mensah, communicated with Captain Tim Sharpee, and reviewed his personal history, current stressors, and specific experiences leading to the assessment. <u>Specifically, Dr. Bauman determined</u>:

> The results of the current assessment indicate a person of strong psychological health. From the perspective of his psychological health, I certify that Officer

Mensah can perform Patrol Officer duties without restriction …."

(Baynard Supp. Decl. ¶ 3, Exh. M, Bauman Fitness for Duty Report pp.1-2)

71. On December 12, 2016, Mensah returned to full duty on patrol. (ECF 76 ¶ 30; ECF 76-21; *see also* Weber 7/7/23 Dep. pp. 75-76)

### Investigations into the June 23, 2016, Critical Incident

#### Milwaukee Police Department Metro Unit

72. Wisconsin Act 348 mandates that an outside agency must investigate all police related critical incidents. (ECF 76 ¶ 6, ECF 76-3 Exh. C1)

73. In accordance with Wisconsin Act 348, it was the policy of the Wauwatosa Police Department that the Milwaukee Police Department (Metro Unit) lead the investigation of any officer-involved or in-custody death, excluding traffic related officer-involved deaths. (ECF 76 ¶ 6, ECF 76-3; *see also* ECF 76-3, Mastrocola Dep. pp. 38-39, 54-55)

74. The Milwaukee Police Department Metropolitan Division lead the investigation into the Anderson critical incident. (Baynard Supplemental Decl. Exh. T, Deposition of Troy Porter (hereinafter Porter Depo) at p. 6)

#### Milwaukee County District Attorney Review

75. On or before December 5, 2016, the Milwaukee Police Department concluded their investigation and turned over their findings to the Milwaukee County District Attorney to review the matter for potential criminal prosecution. *See generally* (ECF 76-20; Weber 7/7/23 Dep. pp. 59-60)

76. On December 5, 2016, the Milwaukee County District Attorney declined to bring criminal charges and concluded that the conduct of Officer Joseph Mensah on June 23, 2016, was privileged in self-defense and justified under Wisconsin law. *See generally* (ECF 76-20)

## Wauwatosa Police Department Internal Investigation

77. At the time of the June 23, 2016, critical incident, it was the policy of the Wauwatosa Police Department Police Chief to order a separate internal investigation to determine whether any officers violated department rules, regulations, or policies and to identify any potential training deficiencies in all officer-involved fatalities. (Roy Decl. ¶ 6, Exh. C; Weber 7/7/23 Dep pp. 63-65; see also Weber 6/6/23 Dep. pp. 100-102)

78. Lt. Jeffrey J. Farina and Sgt. Michael Schultz were assigned to conduct the Administrative Review of the Officer Involved Shooting of Jay Anderson Jr. to determine if actions taken by Officer Mensah were consistent with the rules, regulations, polices, and procedures of the Wauwatosa Police Department, as well as identify any potential training deficiencies that may have occurred. (ECF 77-8 Jeffrey Farina Deposition (hereinafter Farina Dep.) p. 29-31 *referencing* ECF 77-9)

79. The Administrative Review determined that the actions of Officer Mensah were objectively reasonable, and the use of deadly force was justified, concluding that:

> This incident began as a lower-level police interaction that was completely controlled by Jay Anderson and his actions. If Anderson would not have reached for a firearm and if he would have listened to Officer Mensah's orders, this would have ended up as a "routine" officer/citizen contact. However, due to Anderson's actions we will never know. Very soon as arriving on scene, Officer Mensah was faced with a deadly force threat that would cause any reasonable officer to act as Officer Mensah did.
>
> The investigation showed Officer Mensah gave Jay Anderson many opportunities to comply with his orders before he was forced to make the hardest decision, we ask of law enforcement officers. The investigation revealed that Jay Anderson was, at several points, complying with the orders from Officer Mensah not to reach for the gun. Jay Anderson decided to ignore the officers' orders and reach for the gun, changing the outcome of this incident.
>
> (ECF 77-9 at p. 13)

### US Department of Justice Review

80. On February 16, 2017, the U.S. Department of Justice (DOJ) also reviewed the matter and declined to press charges against Officer Mensah for his actions in shooting Anderson, relying on the following points of evidence:

> Officer Mensah's explanation for the shooting was that he acted reasonable to protect himself from deadly force because there was a loaded hand gun on the front passenger seat of Mr. Anderson's car and Mr. Anderson kept reaching for it despite the officers' command not to do. No evidence contradicts Mensah factually. His statements over the radio to other police officers corroborate him, or at least his belief about Mr. Anderson's gun.
>
> A number of key pieces of evidence contradict Mensah's version. When other police officers arrived, they found a loaded hand gun on the front passenger seat, just as Mensah stated. Mr. Anderson's DNA was found on that gun.
>
> The video recording of the incident from Officer Mensah's squad car indicates that Mr. Anderson did repeatedly move his arm towards the gun as Mensah confronted him. Ultimately, Anderson did lean his whole body down toward this gun just before Mensah started firing.

*See generally* (ECF 76 ¶ 33, ECF 76-23p. 1)

### Special Prosecutor Review

81. This matter was also reviewed by two special prosecutors who issued a final report[3] on June 1, 2022, concluding in part:

> We believe a jury would rely heavily on Mensah's dash camera video to answer the key questions in this case. The video captures the actions of Anderson and Mensah shortly before and during the shooting. The video confirms that Anderson disregarded Mensah's commands to keep his hands up and instead reached towards the passenger seat where his gun was laying. These actions would have caused a reasonable person to fear an imminent threat of death or great bodily harm and to use deadly force to protect themselves.

---

[3] The Final Report on Charging Decision (Docket 108) in Milwaukee County Case No. 2020JD000015 is a public record and appropriate subject of judicial notice. *In the Matter of Lisse*, 905 F.3d 495, 496 (7th Cir. 2018); *see also Menominee Indian Tribe v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998); Fed. R. Evid. 901(b)(7).

### Training, Policy, and Practice Claims

#### WPD Hiring Process

82. Under Wisconsin Law all police officers have to undergo psychological preemployment test before they can be certified through the state. As such, all officers hired by the Wauwatosa Police Department are required to undergo a preemployment psychological screening to determine their fitness for duty, from a psychological standpoint. (ECF 77-2, Weber 9/16/22 Dep. pp. 46-47)

83. Prior to his employment with Wauwatosa Police Department, Officer Mensah underwent a preemployment psychological screening with Dr. Bauman and was deemed fit for duty by Dr. Bauman. (ECF 77-2, Weber 9/16/22 Dep. pp. 55, 251; ECF 77-7 Weber 6/6/23 Dep. pp. 98-99 *referencing* Baynard Supp Decl. Exh. L; see also ECF 77-1 Mensah 3/17/22 Dep. p. 129)

#### Use of Force Training

84. Officer Mensah received use of force training at the police academy, through the Wisconsin DAAT manual and while a field training officer at Wauwatosa Police Department. (Mensah 2/28/23 Dep. at 254-244)

85. At that time of the June 23, 2016, Anderson critical incident, the Wauwatosa Police Department trained officers that the use of deadly force is justified in the following circumstances:

    (a) Protect the officer or others from what is reasonably believed to be an imminent threat of death or great bodily harm.

    (b) When it is necessary to prevent the escape of a fleeing violent felon whom the officer has reasonable belief poses an imminent threat of death or great bodily harm to the officer or others.

    (c) If feasible the officer must give some verbal warning prior to the use of deadly force.

14
Case 2:21-cv-00848-LA    Filed 07/24/23    Page 14 of 17    Document 79

(ECF 76 ¶ 12, ECF 76-10 WPD Use of Force Policy p. 7)

86. Officer Mensah has been trained that if there is an imminent threat of death or great bodily harm you are allowed to use deadly force to stop that threat. (Mensah 3/17/22 Dep. p. 190; Mensah 6/26/23 Dep. pp. 269-270; *see also* ECF 76 ¶ 12-14 & ECF 76-10)

87. The DAAT manual in effect at the time of the Anderson incident trained officers that for a threat to be considered imminent it must meet three criteria: Intent, Weapon, and Delivery System. (Roy Decl. ¶ 21, Exh. K, pp. 65-66; see also Mensah 2/28/23 Dep. pp. 140-141)

88. At the time of the shooting, Anderson was in possession of a firearm, which constitutes a weapon. (Mensah 2/28/23 Dep. p. 41; *see also* Mills Dep. p 19)

89. The gun was on Anderson's passenger seat within Anderson's reach, which, based on Officer Mensah's training, contributes to the delivery system. (Mensah 2/28/23 Dep. pp. 140-141)

90. At the time that Officer Mensah fired, Anderson was reaching for the firearm, which demonstrates his intent. (Mensah 2/28/23 Dep. pp.141-142; Mensah Squad at 03:07:14)

91. On June 23, 2016, Officer Mensah shot Anderson because he believed Anderson posed an imminent and deadly threat because he reached for the gun after being instructed not to do so. (Mensah 2/28/23 Dep. p. 142)

92. Mensah did not shoot Anderson because he thought he was reaching for a cellphone or anything else on the seat. At that time of the shooting, Officer Mensah did not recall seeing anything else on the seat. (Mensah 2/28/23 Dep. pp. 95, 142-143)

93. Officer Mensah did not have time to ask any additional information from Anderson because Anderson was already reaching for the firearm and Officer Mensah could not get him to stop. (Mensah 2/28/23 Dep. p. 93)

94. Throughout his career, Officer Mensah has received training in defense and arrest tactics, use of force justifications, firearms and at all relevant times, maintained his certification through the state of Wisconsin. (Mensah 3/17/22 Dep. pp. 40-42, 76, 102-107, 120; *see also* Roy Decl. ¶ 19; Exh. J, Mensah Training records)

95. The State of Wisconsin established the Law Enforcement Standards Board (LESB) to prescribe minimum requirements for police officer training. The LESB issued regulations governing police officer training standards in such areas as Defense and Arrest Tactics (DAAT) and effecting an arrest. (Roy Decl. ¶¶ 18-20; Roy Decl. Exh. J)

96. Officer Joseph Mensah met or exceeded the minimum training requirements established by the State of Wisconsin to be certified as a Police Officer and had maintained his respective certifications throughout their employment with the City of Wauwatosa. (Roy Decl. ¶¶ 18-20; Roy Decl. Exh. J)

**Additional Relevant Factual Findings**

97. At the time of the shooting, Anderson was in possession of a Ruger model SR9c, 9mm, semi-automatic pistol. (ECF 76, ₱ 28)



98. Officer Mensah's contact with Anderson on June 23, 2016, was not a traffic stop. (Mensah 2/28/23 Dep. pp. 54, 62-63; Mills Dep. pp. 56-57; Weber 6/6/23 Dep. pp. 95-96)

99. The toxicology report ordered during Anderson's autopsy revealed the presence of marijuana in his system and a blood alcohol level of .144. (ECF 76-20 p. 3)

100. The semi-automatic firearm recovered from Anderson's vehicle was examined and found to be loaded with sixteen rounds, including one in the chamber. Anderson's DNA was also detected on the handgun. *See* (ECF 76 ¶ 28 & ECF 76-20)

Dated at Wauwatosa, Wisconsin this 24th day of July 2023.

**WIRTH + BAYNARD**
Attorneys for Defendants

*/s/ Jasmyne M. Baynard*
Jasmyne M. Baynard, WI Bar No. 1099898
9898 W. Bluemound Road, Suite 2
Wauwatosa, Wisconsin 53226
T: (414) 291-7979 / F: (414) 291-7960
Email: jmb@wbattys.com