# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

---

ESTATE OF JAY ANDERSON, JR.
by Special Administrator, Starkeisha DeLaRosa;
J.A. minor child, through her next friend Starkeisha DeLaRosa,

      Plaintiffs,       CASE NO. 2:21-cv-00848

  v.

CITY OF WAUWATOSA,
JOSEPH ANTHONY MENSAH, and
FORMER CHIEF OF POLICE BARRY WEBER,

     Defendants.

---

# DEFENDANTS' BRIEF IN
# SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

---

This is a use of deadly force case. The Estate of Jay Anderson, Jr. ("Plaintiff" or "Estate") has filed a 42 U.S.C. § 1983 lawsuit against the City of Wauwatosa ("City"), current Wauwatosa Police Chief James MacGillis ("MacGillis"), former Wauwatosa Chief of Police Barry Weber ("Weber"), and former Wauwatosa Police Officer Joseph Mensah ("Mensah"). The claims allege, *inter alia*, that Mensah used excessive force in violation of Jay Anderson's Fourth Amendment right to be free from unreasonable seizures and that the related training and supervision of the City and Police Chief were unconstitutional and violated the equal protection clause. *See generally* (ECF 47, Amend. Compl.)[1]

Defendants subsequently moved to dismiss the lawsuit for failure to state a claim. (ECF 50) The Court granted Defendants' motion in part and dismissed the official capacity excessive

---

[1] ECF 47 refers to the Amended Complaint filed in the *Estate of Jay Anderson, Jr., et al v. the City of Wauwatosa, et al.*, Eastern District of Wisconsin Case No. 21-cv-01179. All other ECF references relate to docket entries filed in the consolidated case (Eastern District of Wisconsin Case No. 21-cv-00848).

force claims against Weber and MacGillis as duplicative of the claims against the City of Wauwatosa (ECF 54 at 4); dismissed the equal protection claims against Weber; dismissed the loss of society and companionship claim brought by Delarosa and the Estate (*id*. at 8); and further dismissed "Plaintiffs assortment of claims such as a purported deliberate inference claim under the Fourteenth Amendment, an indemnity claim, claims under § 1983 against CVMIC and claims involving damages." *Id*.

Accordingly, four operative claims in the Amended Complaint remain to be dismissed via this motion. They are:

First claim for relief alleging a Fourth Amendment violation for excessive force against Weber and Mensah (ECF 47 at 18-22);

Third claim for relief alleging a Fourteenth Amendment violation for denial of equal protection against the City and Mensah (*id*. at 25-29);

Fourth claim for relief alleging a Fourth Amendment violation for J.A.'s loss of society and companionship against the City and Mensah (*id*. at 29); and

Fifth claim for relief alleging *Monell* liability against the City and Weber for failing to adequately train, supervise and discipline its officers (*id*. at 30-32).

As will be shown, summary judgment in favor of Defendants must be granted upon the merits and/or under the doctrine of qualified immunity, because Officer Mensah's use of deadly force was justified, and the related training and policies of the City were not unconstitutional.

**UNDISPUTED FACTUAL SUMMARY** [2]

On June 23, 2016, at 3:00 a.m., Officer Mensah was patrolling Madison Park, located at 9800 W. Glendale Avenue in Wauwatosa, when he observed a suspicious vehicle parked in the middle of a parking lot. (DPFF 9-11) Madison Park closes at 10:00 p.m., and after-hours presence in the park is a violation of City ordinance. (DPFF 12) It was one of Mensah's patrol

---

[2] All facts necessary to support this Motion for Summary Judgment are stated in the Defendants' Statement of Proposed Findings of Fact ("DPFF") filed contemporaneously herewith. A summary of those facts is presented here.

responsibilities to routinely check Madison Park after hours and investigate the presence of anyone found in the park, ascertain their reasons, eliminate the possibility of medical distress, and ensure there was no illicit or illegal activity. (DPFF 13) It was Mensah's experience that when he would encounter someone in the park after hours, the police presence would result in the individuals leaving the park upon his approach or upon his request – indeed, Mensah had never been forced to issue a citation for an afterhours ordinance violation. (DPFF 14-15)

Unfortunately, Mensah's encounter with the vehicle occupied by Jay Anderson, Jr., in the early morning hours of June 23, 2016, produced a different result. When Officer Mensah approached the Anderson vehicle and knocked on the window, he found both Anderson and a loaded handgun. (DPFF 16-19, 28-33) The events preceding that discovery were memorialized through audio and video.

At 3:02 a.m., Mensah radioed dispatch and informed them that he was in Madison Park and had discovered a parked, occupied auto. As was protocol, dispatch sent a second squad car to assist. (DPFF 17-22) Mensah parked his squad in front of, and facing, the vehicle and turned on his "take down lights", bright illumination lights that allowed him to see inside the vehicle. Mensah was able to observe movement in the vehicle. (DPFF 18) Mensah radioed dispatch with the license plate information and, less than a minute later, he was advised that the vehicle had not been reported stolen and was registered to a female, Olena DeLaRosa. (DPFF 24-25)

Officer Mensah approached the vehicle from the passenger side to speak with the occupant and investigate the purpose for being in the park at that time. (DPFF 26) Mensah used his flashlight to illuminate the interior of the vehicle and he confirmed that the driver was the only occupant. Because of the movement within the vehicle that Mensah had already observed, he believed the occupant was pretending to be asleep. Officer Mensah knocked on the passenger window and

stated "Police, wake up, gotta talk to you." (DPFF 28) The driver rolled down the window and engaged in brief dialogue with Mensah through the open window. Officer Mensah asked if he had a driver's license or identification, to which the driver responded "no." (DPFF 29) It was later determined that Anderson did not have a driver's license but did have an ID card. (DPFF 30)

During that brief interaction, Officer Mensah observed Anderson looking at him and then looking down at the passenger seat. (DPFF 32) Mensah felt the conduct was odd which prompted him to step back from the vehicle. When he did so, Mensah saw a loaded semi-automatic handgun with its magazine inserted. (DPFF 33) In response to his observation of the loaded gun, Officer Mensah unholstered his firearm, held it at the low ready position and commanded Anderson to not reach for the gun. (DPFF 34) At 3:06 a.m., Officer Mensah called for help over the radio, stating, "Step it up. He has a gun!" The call prompted a dispatch of all Wauwatosa Police squads to Madison Park, within seconds. (DPFF 35-36)

While waiting for his back up, Officer Mensah told Anderson he saw the gun and ordered Anderson to keep his hands up and to not reach for it. Anderson initially did put his hands up, however then reached for the gun several times. (DPFF 37-41) Mensah raised and pointed his firearm at Anderson and again ordered him to not reach for the gun. Anderson then lunged towards the gun and, in fear for his life, Mensah discharged his firearm at Anderson. (DPFF 42-46)

Immediately after discharging his weapon Officer Mensah radioed, "Shots fired!" and then remotely activated his squad dash camera by pressing the activation button on his vest. (DPFF 47, 49) Officer Mensah knew that upon activation, recording equipment on the squad car's dash camera would recover and preserve 30 seconds of video recorded prior to activation, and would therefore preserve a recording of his encounter with Anderson. Officer Mensah wanted the encounter recovered because he knew it would be the only way to document what happened. (DPFF 50-51)

The squad video shows Officer Mensah standing on the passenger side with his firearm pointing at Anderson. At that time Anderson's hands appear to be up above his shoulders, which is consistent with Officer Mensah's request to him. The video then shows Anderson drop his right hand towards the passenger seat, raise it for an instant but then quickly drop it again as he leans towards the gun's location on the seat. (DPFF 52-53)



In response to Anderson's maneuver towards the gun, Officer Mensah discharged his weapon. (DPFF 46)

Wauwatosa Police Officers Ralph Salyers and Stephen Mills were the first officers to respond to the scene after the shooting. (DPFF 54) While EMS was *en route*, Officers Salyers and Mills approached the vehicle using a long gun as cover to confirm that Anderson was no longer a threat and to secure the scene. (DPFF 55) When officers approached the car, they observed the loaded firearm on the front passenger seat within reach of Anderson's hand. (DPFF 56) The officers removed the gun and secured it in the trunk of Officer Mills' squad. (DPFF 57-59)

After securing the firearm, officers removed Anderson from the vehicle and began emergency aid; thereafter, emergency medical caregivers arrived and took over lifesaving efforts, but to no avail. (DPFF 60-61)

## SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is not a disfavored remedy, but rather, "an integral part of the federal rules as a whole which are designed to secure the just, the speedy and inexpensive determination of every action." *Id*. at 327. This is especially true when the defense of qualified immunity is raised. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)("Qualified immunity is "an immunity from suit rather than a mere defense to liability.")

Once the moving party has met this initial burden, the opposing party must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion. *Id*. at 242. Similarly, speculation, hearsay, and conclusory allegations will not suffice to defeat summary judgment. *Gobitz v. Corvilla, Inc*., 196 F.3d 879, 882 (7th Cir. 1999). Additionally, "[w]hen video footage firmly settles a factual issue, there is no genuine dispute about it, and [courts] will not indulge stories clearly contradicted by the footage" at summary judgment. *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018)(citing *Scott v. Harris*, 550 U.S. 372, 378–81 (2007)); *see also Cibulka v. City of Madison*, 448 F. Supp. 3d 1002, 1025 (W.D. Wis. 2020) (declining to credit plaintiff's testimony at summary judgment where video footage clearly contradicted the testimony); *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) ("[W]e assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene.").

6

**LEGAL ARGUMENT**

I.      **NO INDIVIDUAL CAPACITY CLAIMS AGAINST WEBER EXIST FOR "SUPERVISOR LIABILITY."**

The Estate seeks to hold former Wauwatosa Police Chief Barry Weber individually liable under Section 1983 upon a theory of supervisor liability. *See generally* (ECF 54, p. 4) However, such a claim is unavailable when the basis is nothing more than Weber's employment as Chief of Police at the time of the Anderson shooting. *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001)(quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). Indeed, to succeed under the theory of supervisor liability, the Estate must demonstrate the existence of discoverable, culpable conduct of a subordinate, and that Weber "[knew] about the conduct and facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye for fear of what [he] might see. [Weber] must in other words act either knowingly or with deliberate, reckless indifference." *Id*. (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992–93 (7th Cir. 1988)).  Such evidence does not exist.

The Estate alleges that Weber knew that Mensah was involved in the on-duty fatal shooting of Antonio Gonzales a year prior, but failed to conduct an internal investigation into the Gonzales shooting, failed to determine whether Officer Mensah was fit for duty before returning him to active duty, and thereby "condoned" the shooting of Gonzales through an award of valor to Mensah. (ECF 54, p. 4) Although those unsupported and erroneous allegations withstood Defendants' Motion to Dismiss, they cannot survive summary judgment. *See King v. Hendricks Cty. Commissioners*, 954 F.3d 981, 984 (7th Cir. 2020)(a party must present more than mere speculation or conjecture to defeat a summary judgment motion).

**First,** the Estate's allegations that WPD never conducted a psychological evaluation prior to hiring Joseph Mensah is false. (ECF 47, ¶ 50) The undisputed record demonstrates that Officer Mensah underwent a psychological pre-employment evaluation with Dr. Rick Bauman as part of

7

the rigorous hiring process to become an officer with the Wauwatosa Police Department. (DPFF 82-83) Dr. Bauman concluded that Officer Mensah was an above-average candidate.

**Second,** the Estate falsely asserts that Officer Mensah never underwent a fitness evaluation for returning to duty after the Gonzales shooting and "instead . . . Chief Weber simply decided that Mensah was fine." (ECF  47, ¶ 63) Counseling evaluations are not required by state law, but Wauwatosa Police Department Policy No. 14-07, titled Investigation of Law Enforcement Officer Involved Fatalities, provides for post-incident protocol that includes:

> As soon as practical and at Department expense, all Involved Officers will be required to **attend a counseling evaluation** session with an approved specialist. Details of the evaluation will remain confidential and will not be shared with the Department.

Officer Mensah was evaluated by an approved specialist and licensed counselor, Marcia Williams, on July 27, 2015, following the Gonzales critical incident. (DPFF_) Not only did Officer Mensah attend the counseling evaluation session as required by WPD Policy, but he also met with Ms. Williams on August 3, 2015, for an individual therapy session; on August 18, 2015, for a group intervention session at the scene of the event; and on August 24, 2015, for another individual therapy session.  (ECF 71 DPFF 59-61)

**Third,** the Estate baselessly asserts that WPD failed to conduct an internal investigation into the July 16, 2015, Gonzales incident, at any time before the June 23, 2016, Anderson incident. (ECF 47, ¶ 65)  In reality, Officer Mensah was placed on administrative leave after the Gonzales shooting and remained on leave until a full investigation by the Milwaukee Police Department was completed, which was then followed by a Milwaukee County District Attorney review and charging consideration. (ECF 71 DPFF 50-63) On October 1, 2015, the District Attorney exonerated Mensah, concluding that "the actions of Officer Mensah and Officer Newman were privileged under the law of self-defense, and the defense of others, in that the officers reasonably

believed that they were confronting an armed subjected who intended to cause them great bodily harm or death." (ECF 71 DPFF 53-54)

Despite Officer Mensah's actions being deemed justified by an outside agency, and though not required by law, Weber also ordered an internal administrative review into the Gonzales critical incident:

> The law allows for a separate internal investigation into the incident, **provided that it does not interfere with the criminal investigation**. The Chief of Police may order a separate internal investigation to determine whether Officer(s) violated any department rules, regulations, or policies, and / or to identify training deficiencies. *WPD Policy No. 14-07*

(ECF 71 DPFF 51)(emphasis added) Wauwatosa Police Lieutenant James Mastrocola conducted the Wauwatosa Police Department Administrative Review into the Gonzales Officer Involved Shooting, after receiving the DA's clearance letter. The internal administrative review determined that the actions of Officer Mensah and Officer Newman were objectively reasonable, and that the use of deadly force was justified. (ECF 71 DPFF 58; *see also* ECF 77-4, p. 8)

The internal administrative review was completed and submitted on October 29, 2015, which was 8 months before the June 23, 2016, Anderson incident. (*Id.*) Following the internal investigation, Officers Mensah and Newman received Weapon Re-Introduction Firearms Training before returning to full duty after the Gonzales incident. (ECF 76 ¶ 11 & ECF 76-9)

Contrary to the Estate's baseless allegations that Weber and the WPD failed to investigate the 2015 Gonzales incident before Officer Mensah was involved in the 2016 Anderson incident, the evidence shows that Mensah had been placed on leave, an investigation was conducted by an outside agency, reviewed by the Milwaukee District Attorney, Mensah had been cleared of any wrongdoing, there was an internal investigation producing a second conclusion that Mensah's actions were justified, and all were concluded at least eight months before the Anderson incident.

9

**Finally**, as Chief, Weber did not award Officer Mensah a medal of valor for shooting Gonzales as the Estate implies. (ECF 47, ¶ 68) Instead, both Officers Mensah and Newman were recognized for their actions in responding professionally and appropriately during a critical incident that avoided great bodily harm, injury, or death to the officers or innocent others. (ECF 76-2 pp. 181-182)

The witness Declarations filed in support of the summary judgment motion in the consolidated Gonzales action (E. Sellinger, C. Tutton, J. Tutton), including the District Attorney's letter outlining why Officer Mensah's actions were justified, and the internal administrative review, all demonstrate that there would be absolutely no basis for Weber to discipline Mensah following the Gonzales incident.   *See* (ECF Nos. 73-75)

The entirety of the Estate's 1983 claim against Weber is simply an impermissible invitation to this court to speculate that alleged acts and omission occurring after the Gonzales incident– allegations unsupported by evidence–may have contributed to the Anderson incident at issue here.

**II.    OFFICER MENSAH'S USE OF DEADLY FORCE WAS OBJECTIVELY REASONABLE UNDER THE CIRCUMSTANCES CONFRONTING HIM ON JUNE 23, 2016, AND THEREFORE DID NOT VIOLATE ANDERSON'S FOURTH AMENDMENT RIGHTS.**

The Estate alleges that Officer Mensah used excessive force when he shot Anderson on June 23, 2016. *See* (ECF. 47 ¶ 148) A claim that a law enforcement officer used excessive force to effect a seizure is governed by the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386 (1989), and *Tennessee v. Garner*, 471 U.S. 1 (1985). Section 1983 provides the vehicle by which excessive force claims are brought. Where the facts are undisputed, whether conduct is objectively reasonable is a question of law for the court to decide. *See Scott v. Harris*, 550 U.S. 372, 381, n. 8 (2007); *Bell v. Irwin*, 321 F.3d 637, 640-41 (7th Cir. 2003).

Whether or not deadly force is justified should only be evaluated based on the information known to the officer at the moment that deadly force is used. *Plakas v. Drinski*, 19 F.3d 1143, 1149-1150 (7th Cir. 1994). The determination of whether or not deadly force is lawful depends on "whether the suspect poses an immediate threat to the safety of the officers" and "whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 at 396.

The standard is an objective one, in which the court assesses the totality of the circumstances from the perspective of a reasonable officer on the scene. *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020), citing *Graham*, 490 U.S. at 396. And the inquiry is dispositive: when an officer carries out a seizure that is reasonable, taking into account all relevant circumstances, there is no valid excessive force claim. In seeking to understand the perspective of the officer, the court considers: the information known to the officer at the time of the encounter; the duration of the encounter; the level of duress involved; and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances. *Siler*, 957 F.3d at 759. Importantly, courts must remember that:

> Law enforcement officers on the scene do not have the luxury of knowing the facts as they are known to us, with all the benefit of hindsight, discovery, and careful analysis. Officers must act reasonably based on the information they have. We must always keep in mind that encounters in the field require officers to make split-second decisions of enormous consequence.

*Id*. at 759. This reality is reflected in the fact that courts give considerable leeway to law enforcement officers' assessments about the appropriate use of force in dangerous situations. *Baird v. Renbarger*, 576 F.3d 340, 342 (7th Cir. 2009). "[T]he Fourth Amendment does not require omniscience . . . .Officers need not be absolutely sure…of the nature of the threat or the suspect's intent to cause them harm – the Constitution does not require that certitude precede the act of self protection." *Anderson v. Russell*, 247 F.3d 125, 132 (4th Cir. 2001)(citations omitted).

11

**A.    The Undisputed Evidence Demonstrates that Anderson Posed an Imminent Threat to Officer Mensah.**

This is a case in which Officer Mensah was confronted by Anderson's immediate access to, and his reaching for, a loaded firearm, despite repeated instructions to remain still. (DPFF 45-46, 86-92) When an officer believes that a suspect's actions place him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force. *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988). When evaluating the reasonableness of deadly force, courts focus on the danger posed by the person to whom the force was applied. As a general matter, "[i]f the suspect threatens the officer with a weapon, deadly force may be used." *Sanzone v. Gray,* 884 F.3d 736, 740 (7th Cir. 2018). Here, Anderson's conduct in ignoring Mensah's orders and reaching for a loaded gun posed an obvious, immediate and significant danger to Officer Mensah's life. (DPFF 52-53)

To survive summary dismissal on their excessive force claim, the Estate must demonstrate that Officer Mensah's use of force was objectively unreasonable under the totality of the circumstances. *See Kingsley v. Hendrickson*, 576 U.S. 389, 391–92 (2015) *Kingsley* instructs:

> In deciding whether one or more defendants used 'unreasonable' force against plaintiff, you must consider whether it was unreasonable from the perspective of a reasonable officer facing the same circumstances that defendants faced. You must make this decision based on what defendants knew at the time of the incident, not based on what you know now.

*Id*. 576 U.S. at 394.

**The Estate cannot make this showing.** In the dark, early morning hours of June 23, 2016, Officer Mensah was working routine patrol, in full uniform, conducting after-hour checks at Madison Park. (DPFF 11-13, 17) When Officer Mensah made the split-second decision to use deadly force to stop the threat posed by Anderson, he was confronted by the following

12

circumstances: (1) a suspicious vehicle at 3:00 a.m., loitering after hours in a dark parking lot; (2) a loaded semi-automatic gun within the driver's reach; (3) and an individual who ignored repeated instructions to cease dropping his hands toward the gun before making a final, sudden, quick effort to grab that gun. (DPFF 17, 32-33, 40-45) Under those circumstances a reasonable officer would have feared for his life. An objectively reasonable officer would have believed that he was in imminent danger—shoot or be shot. Under those circumstances a reasonable officer would believe that deadly force was necessary to stop the threat.

In addition to Officer Mensah's sworn testimony, a plain review of the squad video demonstrates that Officer Mensah reasonably perceived that Anderson posed a deadly threat when he lunged for the firearm. *See King v. Hendricks Cnty. Commissioners*, 954 F.3d 981 (7th Cir. 2020)(To ensure fairness to a deceased § 1983 plaintiff whose representative alleges an impermissible use of deadly force, given the impossibility of victim testimony to rebut the officers' account, a court scrutinizes all the evidence to determine whether the officers' story is consistent with other known facts.).

The Estate does not genuinely dispute the dangerousness of the situation, but merely second-guesses how a reasonable officer should have reacted. No matter how the facts in this case are viewed, though, a reasonable officer would have perceived Anderson's actions to have been an immediate, obvious, and deadly threat to Mensah's safety at the time he was forced to respond.

**B.    The Estate's Anticipated Hindsight Arguments Are Improper.**

It is anticipated that the Estate will argue that Anderson did not pose a deadly threat because he never pointed the gun at Officer Mensah during their brief interaction. *See* (ECF 47 ¶ 125) That speculation would not render unreasonable Officer Mensah's belief that Anderson posed an immediate and deadly threat. Officer Mensah was not constitutionally required to wait until Anderson got his hands on the gun and pulled the trigger before employing deadly force to protect himself against Anderson. *See Henning v. O'Leary*, 477 F.3d 492, 496 (7th Cir. 2007)."**Police officers cannot be expected to wait until a resisting arrestee has a firm grip on a deadly weapon** and completely freed himself from officers trying to subdue him **before taking action to ensure their safety**. Nor can they be required to take a less deadly shot where none is available that would not place someone else also in jeopardy." *Id*. (emphasis added).

In *Sanzone v. Gray*, 884 F.3d 736, 740 (7th Cir. 2018), the Seventh Circuit explained that "[i]f the suspect threatens the officer with a weapon, deadly force may be used. At that point, the risk of serious physical harm to the officer or others has been shown." The defense of the safety of an officer and others does not violate a suspect's Fourth Amendment right based upon speculation about what the suspect might have done with the weapon. *Id*. "A visibly agitated Koster threatened that he would 'fire a warning shot,' and then raised his arm, gun in hand. While the Estate contends that Koster's warning shot would have been fired straight up in the air, we will not assume that. Koster could easily have meant that he intended to attempt firing a bullet that would whiz past Gray's ear. Gray did not need to wait and hope that Koster was a skilled marksman before taking action to shut down Koster's threat."

In the Seventh Circuit case of *Conley-Eaglebear v. Miller*, "The undisputed facts show that Conley–Eaglebear, while running away from Miller, drew a gun from his waistband and looked

back over his shoulder toward Miller. (Conley–Eaglebear's assertion that he had ditched the gun before he was shot lacks any evidence in the record to support it.) Miller saw the gun's barrel moving in his direction and shot Conley–Eaglebear twice. Miller did not need to wait for Conley–Eaglebear to face him or point the gun directly at him before acting to protect himself and the community." *Conley-Eaglebear v. Miller*, No. 16-3065, 2017 WL 7116973, at *2 (7th Cir. Sept. 26, 2017).

The Estate may argue that Officer Mensah was not in imminent danger, speculating that Anderson was actually reaching for a cellphone next to the gun on the front seat of his vehicle. Whether Anderson was reaching for the gun to shoot Officer Mensah or reaching for a cellphone adjacent to the gun (arguing he may have intended to record Officer Mensah) does not defeat Officer Mensah's entitlement to summary judgment. Police are justified in using deadly force when they have reason to believe that a suspect is armed, even if it later turns out they were mistaken. *Doxtator v. O'Brien*, 39 F.4th 852, 861 (7th Cir. 2022)("In short, the fact that Tubby had wriggled his handcuffed hands under his feet and then began acting like he was concealing a weapon under his shirt was more than enough to justify O'Brien's belief that he was armed, notwithstanding Wernecke's earlier search.").

Officer Mensah's belief that Anderson was armed is readily justified: (1) Mensah both saw and identified the gun in his radio transmission calling for heightened back-up response (DPFF 35); (2) when Officers Salyers and Mills arrive on scene, Mensah is heard telling them that the gun was on the seat (*id*. ¶ 57); (3) Officers Salyers and Mills both testified to the presence and the location of the gun (*id*. ¶ 56); and (4) the loaded semi-automatic hand was retrieved from the scene and tested for Anderson's DNA (*id*. ¶ 97,100).

Finally, the Estate alleges that Anderson "struggled to keep his hands up because he was

tired and intoxicated" presumably as an explanation for his refusal to comply with Officer Mensah's commands. (ECF 47 ¶ 106) Yet, the Estate also alleges that "throughout the entire encounter, [Anderson] complied with every order given by Defendant Mensah." (*Id.* ¶ 127). Both cannot be true. The toxicology report following Anderson's autopsy revealed the presence of marijuana and a blood alcohol level of .114, but Officer Mensah was not aware of those results at the time of his 3:00 a.m. interaction with Anderson. (DPFF 99) Anderson's actions, not his intoxication by alcohol and illegal drugs, rendered Officer Mensah's use of force reasonable.

Whether Anderson's movements were a willful effort to hurt Officer Mensah or the result of sleepiness and/or the effects of marijuana and alcohol, Mensah's response to the movements was objectively reasonable under WPD Policy 13-01, the Wisconsin DAAT manual, and *Graham v. Conner*. (DPFF 84-87) Officer Mensah was not required under law or policy to wait until Anderson actually gained control of the nearby firearm before responding to the threat that the firearm created. Anderson's movement towards the firearm, not his intoxication, was the threat that Officer Mensah faced.

### C. Officer Mensah's Pre-Shooting Conduct Did Not Violate the Fourth Amendment.

Beyond the actual use of deadly force, the Estate might assert that Fourth Amendment liability can be based on actions taken by Officer Mensah before he used deadly force. (ECF 47, ¶¶ 90-93) The Estate alleges that Officer Mensah acted unreasonably and created the situation that ultimately led to Anderson's death by parking facing Anderson's vehicle, approaching the passenger side of a vehicle, not waiting for back-up before conducting a routing park check, and loudly knocking on the window and waking up an intoxicated individual. (*Id.*) But none of those actions rendered Officer Mensah's subsequent use of force unreasonable. *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765, 1777, 191 L.Ed.2d 856 (2015) ("[E]ven if

[the officers] misjudged the situation, Sheehan cannot 'establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided.' " (citation omitted)). The only relevant period for Fourth Amendment scrutiny is the time of the officer's action:

> Our historical emphasis on the shortness of the legally relevant time period is not accidental. The time-frame is a crucial aspect of excessive force cases. Other than random attacks, all such cases begin with the decision of a police officer to do something, to help, to arrest, to inquire. If the officer had decided to do nothing, then no force would have been used. In this sense, the police officer always causes the trouble. But it is trouble which the police officer is sworn to cause, which society pays him to cause and which, if kept within constitutional limits, society praises the officer for causing.

*Plakas v. Drinski,* 19 F.3d 1143, 1150 (7th Cir. 1994). Accordingly, Officer Mensah's conduct should only face Fourth Amendment scrutiny for the moment that deadly force was used. *Marion v. City of Corydon, Indiana*, 559 F.3d 700, 705 (7th Cir. 2009) ("[P]re-seizure police conduct cannot serve as a basis for liability under the Fourth Amendment; we limit our analysis to force used when a seizure occurs."); *Carter v. Buscher*, 973 F.2d 1328, 1332 (7th Cir. 1992) (an officer's "pre-seizure conduct is not subject to Fourth Amendment scrutiny"). However, even if Fourth Amendment liability could be found based on an officer's pre-seizure conduct, Officer Mensah's pre-seizure conduct was objectively reasonable as a matter of law.

The Court should also reject the anticipated arguments from the Estate that Officer Mensah's actions violated police department regulations and that these violations have any bearing on the reasonableness of his use of deadly force. The Estate lacks any evidentiary support for such claims, and it is well-established that § 1983 "protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices." *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003).

### III. OFFICER MENSAH IS ENTITLED TO QUALIFIED IMMUNITY.

Even assuming *arguendo* that the Estate could demonstrate that Officer Mensah's use of deadly force was objectively unreasonable, he is entitled to qualified immunity because no clearly established law put him on notice that his use of deadly force in response to Anderson action of reaching for a loaded firearm after being instructed not to was unconstitutional.

Qualified immunity is an immunity from suit rather than a mere defense to liability. *Pearson v. Callahan*, 555 U.S. 223, 237 (2009). Under the doctrine of qualified immunity, police officers are "shield[ed] ... from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The appropriateness of qualified immunity in a particular case should be decided as early as possible, in order to fulfill the policy objective of protecting police officers from the burdens of litigation as well as civil damages. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

There is generally a two-part test in determining whether qualified immunity should be granted to a state actor: (1) whether the plaintiff has established a deprivation of a constitutional right; and if so, (2) whether the right was clearly established at the time of the alleged violation. *Wilson v. Layne*, 526 U.S. 607, 609 (1999). Unless the answer to both questions is yes, a government official is entitled to qualified immunity. *Jones v. Wilhelm*, 425 F.3d 455, 460 (7th Cir. 2005). If qualified immunity applies to an officer's conduct, "the officer should not be subject to liability or, indeed, even the burdens of litigation." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

18

Although the privilege of qualified immunity is a defense, the plaintiff carries the burden of defeating it. *Mannoia v. Farrow*, 476 F.3d 453, 457 (7th Cir. 2007). In excessive force claims, qualified immunity should be granted if a reasonable officer, facing the same situation, could have believed that deadly force was necessary to protect himself or others from death or serious physical harm. *Graham*, 490 U.S. at 396; *Garner*, 471 U.S. at 11. Accordingly, it is the Estate's burden to demonstrate the existence of a clearly established right by identifying a closely analogous case that had decided that the conduct at issue was forbidden. *Forman v. Richard Police Department*, 104 F.3d 950, 958 (7th Cir. 1997).

No clearly established law rendered Officer Mensah's use of deadly force to stop the imminent threat posed by Anderson—who was in possession of a loaded handgun and reached for it and multiple commands to not do so—unreasonable. *See Ford v. Childers*, 855 F.2d 1271, 1275 (7th Cir. 1988) (under the objective reasonableness standard, if it appears that an individual poses a serious threat of death or significant bodily harm, deadly force may be used if any misinterpretation of what appeared to be the case was reasonable under the particular facts and circumstances); *Henning*, 477 F.3d at 495 ("Deadly force…is reasonable where an officer has probable cause to believe the suspect poses a danger of serious bodily harm, such as when the officer believes the suspect has a weapon or has committed a violent crime."); *Conley-Eaglebear v. Miller*, (No. 1:2014cv1175 (E.D. Wis. 2016) (officer shooting suspect in back as he was beginning to turn toward officer with a gun in his hand was justified in doing so because the suspect posed a serious threat of physical harm in making this movement).

Realizing they cannot identify any case law that renders Officer Mensah's conduct unreasonable under the Fourth Amendment, it is anticipated that Estate will cite cases where courts found that individuals who were in possession of firearms did not pose an immediate threat to

19

officers justifying deadly force. *See Weinmann v. McClone*, where the Seventh Circuit held that existing precedent established that a suicidal person sitting with a gun across his lap, who had not threatened an officer with any harm, had the right to be free from the use of deadly force. 787 F.3d 444, 451 (7th Cir. 2015), and *Estate of Williams v. Ind. State Police Dep't*., 797 F.3d 468 (7th Cir. 2015). These cases are not sufficiently analogous to govern the facts and circumstances that confronted Officer Mensah.

As described herein Anderson posed an imminent and deadly threat when he reached for a loaded gun after being commanded not to do so.

## IV. THE ESTATE'S MONELL CLAIMS AGAINST THE CITY AND CHIEF WEBER MUST FAIL.

As a preliminary matter, there can be no claim against the City under *Monell v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658 (1978), unless a plaintiff first establishes an underlying constitutional violation. *See Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) ([T]here can be no liability under *Monell* … when there has been no violation of the plaintiff's constitutional rights.). In *Jenkins*, the jury found that Mr. Jenkins' constitutional rights were not violated when Officer Bartlett fired upon him, thus the City cannot be held liable [under *Monell*]. *See also Alexander v. City of South Bend*, 433 F.3d 550, 557 (7th Cir. 2006)(noting that a municipality may not be held liable under *Monell* when the plaintiff fails to demonstrate any underlying constitutional violation by a municipal employee).

Even if the Estate could demonstrate that Anderson was deprived of a constitutional right– which they cannot–any claim against the City of Wauwatosa must fail because there is no evidence that the execution of a policy, practice or custom caused the alleged deprivation. *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 694 (1978). A municipality cannot be liable under 42 U.S.C. § 1983 on a theory of *respondeat superior* or vicarious liability. See *Monell*, 436 U.S. at 694. Rather, there

20

must be a "link between a municipal policy or custom and the alleged constitutional violation." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989); *see also Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 306 (requiring a showing of a "causal link" between the municipal policy and the constitutional violation). Generally speaking, there are four bases for finding municipal liability: (1) a formal policy; (2) a well-settled custom or practice; (3) a final decision of a municipal policymaker; or (4) deliberate indifference for training or supervision.

The Estate cannot identify any credible evidence that the City's use of force policy or any training provided by WPD to is constitutionally suspect.Indeed, the Policy's articulated bases for use of deadly force is entirely consistent with the standard articulated in *Graham*, *Garner*, and other Supreme Court and Seventh Circuit cases defining the use of deadly force. (DPFF 85) As a result, it appears that the Estate's *Monell* claim against the City of Wauwatosa proceeds only under the second prong—alleging that the WPD had an unofficial but widespread and well-settled practice or custom of inadequately training or disciplining its officers with respect to the use of excessive force against minorities. (ECF 47, pp. 18-22, first cause of action, and pp. 30-32, fifth cause of action; *see also* ECF 54 p. 5).

### A. There is no Evidence to Support a Claim That the City of Wauwatosa Has a Widespread Practice or Custom of Sanctioning the Use of Excessive Force Against Minorities.

To prevail on a "widespread practices" claim, the Estate must show that the City engaged in a practice "so permanent and well settled as to constitute a custom or usage with the force of law." *Wragg v. Vill. of Thornton*, 604 F.3d 464, 467(7th Cir. 2010); *see also Moore v. City of Chicago*, 126 Fed.Appx. 745, 747 (7th Cir. 2005)(Plaintiff must show the police department "engaged in a widespread practice so well-settled that it had the effect of a custom."). A "widespread practice" is "not tethered to a particular written policy" and "requires more evidence

than a single incident to establish liability." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005).

The Amended Complaint alleges that the "many other instances of Defendant Wauwatosa's similar constitutional violations show that the use of excessive force by WPD officers, especially against Black people and other people of color, is customary and the standard operating procedure in the City of Wauwatosa…." (ECF 47, ¶ 139) Lacking evidence to demonstrate such a pattern, the Estate misrepresents the factual circumstances of dissimilar incidents. (*Id*. ¶¶ 142-145)

The Estate cites the August 10, 2006 arrest of Aaron Lawrence, which was the subject of litigation in *Lawrence v. Lewandowski*, Eastern District of Wisconsin Case No. 08-C-108. (ECF *Id*. ¶ 143) Even under the Estate's characterization of the facts of Mr. Lawrence's arrest, the Court found that the Wauwatosa Officers' use of force was objectively reasonable and dismissed the case on summary judgment. *See Lawrence*, Case No. 08-C-108, Dkt. No 65, Summary Judgment Order. The Estate cites two other instances, one from August 8, 2002 and another from June 25, 1996. (*Id.* ¶¶ 143-44) The 2002 incident relates to claims that WPD officers lacked basis to stop a vehicle and used excessive force during the stop. *Id.* ¶ 143; *see Durrah v. City of Wauwatosa*, No. 07-C-0426, 2009 WL 10710621, at *6 (E.D. Wis. Mar. 30, 2009). Durrah's wrongful arrest claims were summarily dismissed, and the Court found a dispute of fact as it related to her excessive force claims. The matter was later resolved and there was never a finding of excessive force.

The 1996 incident relates to Adrian Patterson's allegations that the Wauwatosa Police Department subjected him to excessive force. *Patterson v. Wauwatosa Police Dep't*, 930 F. Supp. 1293 (E.D. Wis. 1996). The *Patterson* case never made it through the pleading stage and was dismissed as legally frivolous. *Id*. The 2002 and 1996 instances cited by the Estate are irrelevant, too remote, and wholly insufficient to demonstrate a purported pattern of racial profiling and

excessive force. Moreover, no evidence surmised in either of these alleged instances has revealed any discriminatory intent or effect.

Finally, the Estate relies on the red-herring argument of Officer Mensah's involvement in the Gonzales shooting as proof of an unconstitutional widespread practice of using excessive force. As explained above and in Defendants' moving brief filed in that matter, that incident was investigated, and the use of force was determined to be justified. *See* (ECF 70 pp. 4-10)

The mere fact that a police department has investigated complaints of excessive force is insufficient to demonstrate that the City has a widespread practice of using excessive force. The Estate must prove a specific pattern of conduct or series of incidents violative of constitutional rights in order to establish the existence of a municipal policy or custom. *See Hossman v. Blunk,* 784 F.2d 793, 796–797 (7th Cir. 1986) (citations omitted). The Estate attempts to premise liability on unsubstantiated claims of excessive force against minorities. The Estates' comparative data is neither complete nor entirely comparable and is thus wholly insufficient to support a wide spread practice. Contrary to the Estate's suggestion, absent a finding of excessive force, the officer cannot be disciplined and will remain in his or her position of authority.

Further, even if evidence of a widespread pattern and practice is present, establishing such a pattern is still not enough. The Estate must also demonstrate that the widespread pattern and practice directly and proximately caused the underlying alleged constitutional violation. *City of Canton v. Harris*, 489 U.S. at 385 (holding that there must be a "direct causal link" between the municipal policy and the constitutional deprivation). It is insufficient for plaintiff to simply argue that an injury or accident could have been avoided if an officer had had better or more training or that there was something the city could have done' to prevent the unfortunate incident. *Id*. at 392. A municipality can be liable under § 1983 only where its policies are the "moving force [behind]

23

the constitutional violation." *Polk County v. Dodson*, 454 U.S. 312, 326 (1981); *Monell*, 436 U.S. at 694. Said otherwise, the identified deficiency … must be closely related to the ultimate injury. *Harris*, 489 U.S. at 391.

### B. There Is No Evidence of Deliberate Indifference in the City's Training and Supervision that Caused a Constitutional Injury.

The Estate alleges that these Defendants failed to train employees (ECF 47 ¶ 216), but a *Monell* claim requires more. To establish a failure to train claim, "[a] pattern of similar constitutional violations is ordinarily necessary to demonstrate deliberate indifference." Even if "a particular officer may be unsatisfactorily trained" that "will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton v. Harris*, 489 U.S. 378, 390-91 (1989). Here, there is no evidence the City was aware of or put on notice of any allegedly unconstitutional conduct attributable to inadequate training or that the City knew it was highly predictable that such constitutional deprivations would occur without more or different training because there was a pattern of similar constitutional violations.

Moreover, the training of City officers, as well as all other police officers in the state, is governed by § 165.85, Wis. Stats., which establishes the Law Enforcement Standards Board, and empowers it to establish minimum curriculum requirements for police officer training. (DPFF 95) It is undisputed Officer Mensah met the minimum training requirements established by the State of Wisconsin to be certified as a police officer and have maintained their respective certifications throughout their employment with the City of Wauwatosa. (DPFF 96)

Finally, the Seventh Circuit's decision in *Tapia v. City of Greenwood*, 965 F.2d 336, 339 (7th Cir. 1992) is dispositive of any failure to train claim. In that case, the question was whether the defendant city had adequately trained police officers regarding procedures for warrantless

searches. The city showed that it was in compliance with the minimum standards for training police officers under Indiana law and that the officers involved had received such training. The Seventh Circuit dismissed plaintiff's claim, holding that, where the state impose[s] minimum training standards on municipalities, evidence showing adherence to those standards [bars] any finding that the city's policymakers were deliberately indifferent to the need for better training. *Johnson v. City of Milwaukee, 41 F. Supp. 2d 917*, 931 (E.D. Wis. 1999)(citing *Tapia*, 965 F.2d at 339). Further, even if the state's minimum standards do not adequately address the issue …, compliance by a municipality with such standards defeats any possibility that a reasonable jury could uphold a charge of deliberate indifference. *Johnson*, 41 F. Supp. 2d at 931.

Based on the undisputed facts, no reasonable jury could return a verdict to the Estate on their Monell claims. Thus, dismissal is required.

## V.     THE ESTATE LACKS SUFFICIENT EVIDENCE TO SURVIVE SUMMARY JUDGMENT DISMISSAL OF ITS EQUAL PROTECTION CLAIM.

The Estate alleges that the City of Wauwatosa and Officer Mensah violated Anderson's Fourteenth Amendment rights by denying him equal protection in using excessive force against him because of his race. (*See* ECF 47 at pp. 25-29) Although essentially duplicative of the excessive force claim, the crux of the Estates' equal protection claim is that Anderson was racially profiled by Officer Mensah as a pretext for his use of deadly force, in accordance with the City's alleged policy of condoning racially biased policing. *See id.*  If this were true, it would represent a serious violation of the Fourteenth Amendment's Equal Protection Clause. *See Wren v. United States*, 517 U.S. 806, 813 (1996)("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race."). The Estate's problem is that it lacks evidence to satisfy the prerequisites of equal protection jurisprudence.

25

To show a violation of the Equal Protection Clause, plaintiffs must prove that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose. *Chavez v. Ill. State Police*, 251 F.3d 612, 635-36 (7th Cir. 2001)(internal quotations omitted). "To prove discriminatory effect, [plaintiffs] are required to show that they are members of a protected class, that they are otherwise similarly situated to members of the unprotected class, and that plaintiffs were treated differently from members of the unprotected class." *Id*. at 636. To prove discriminatory intent or purpose, plaintiffs must show that a " 'decisionmaker selected or reaffirmed a particular course of action at least in part "because of" its adverse effects upon an identifiable group.' " *Id*. at 645, quoting *McCleskey v. Kemp*, 481 U.S. 279, 298 (1987).

The Estates' purported "evidence" of discriminatory intent is nonexistent, and the "evidence" of discriminatory purpose is entirely conjecture.

Survival on summary judgement requires proof that Anderson was a member of a protected class and was treated differently by Officer Mensah based on his race. The Estate cannot provide direct evidence of discriminatory intent and conclusory alleges that "Defendant Mensah (who is black) treated Mr. Anderson (who is also black) less favorably—and with unreasonable force— than his similarly situated White counterparts, wholly or in part because he was Black" (ECF 47, ¶ 191) However, the Estate has failed to name any non-black individual who was similarly-situated yet treated differently.

The Estate claims that WPD's clear pattern of use of excessive force against Black people is unexplainable on grounds other than race, yet cites no other relevant or admissible instances of excessive force by Officer Mensah or any other Wauwatosa Police Officer.

The record demonstrates that Officer Mensah's decision to use deadly force against Anderson was justified. (DPFF 91) Officer Mensah encountered Anderson in a park after hours,

with no driver's license and a loaded handgun. Officer Mensah sought to determine the nature of Anderson's presence in the park at 3:00 a.m. and in doing so, observed him to be in possession of a loaded handgun. Officer Mensah repeatedly gave Anderson commands to not reach for the gun, which Anderson ignored. (DPFF 17, 26-45) Ultimately, and as demonstrated by the video evidence, Anderson lunged towards a loaded gun and in doing so, caused the encounter to become deadly. (DPFF 52-53) Officer Mensah's use of deadly force was investigated by the Milwaukee Police Department, the Milwaukee County District Attorney, the Wauwatosa Police Department, the United States District Attorney, and a special prosecutor who all came to the same conclusion—Officer Mensah had an objectively reasonable belief that he needed to use deadly force to prevent Anderson from shooting him with the handgun he was reaching for. (DPFF 72-81) The Estate cannot rest their claim on Officer Mensah's justified use of deadly force against Antonio Gonzales as proof his discriminatory intent in the present situation. *See* (ECF 70 pp. 4-10)

That said, even if the Estate could show discriminatory effect, they lack anything indicative of discriminatory intent. Bare allegations of racism are not enough. *See Minority Police Officers Ass'n of S. Bend v. City of S. Bend*, 801 F.2d 964, 967 (7th Cir. 1986)(emphasis added). The Estate attempts to rely on out-of-context statistics regarding race and traffic stops to meet their burden. (*See* ECF 47 ¶ 41 citing statistics from 2018 traffic stops). However, even if the statistics were relevant, a claimant cannot rely solely on statistics to establish discriminatory purpose. *Chavez*, 251 F.3d at 647-648; *see also Buchanan v. Kelly*, 592 F. App'x 503, 507, 508 (7th Cir. 2014)(noting that "general statistics alone do not plausibly suggest that [the defendant] himself acted with racially discriminatory intent...."). The Estate needs to come forward with evidence that Officer Mensah and the City of Wauwatosa selected "a particular course of action at least in part 'because

27

of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *McCleskey v. Kemp*, 481 U.S. 279, 298 (1987)(internal citations omitted). It is unable to do so.

Based on the undisputed facts, no reasonable jury could return a verdict to the Estate on their equal protection claim. Thus, dismissal is required.

## VI.     J.A.'S LOSS OF SOCIETY AND COMPANIONSHIP CLAIM CANNOT SURVIVE SUMMARY JUDGMENT.

The Estate alleges a cause of action under § 1983 on behalf of Anderson's minor daughter's loss of society and companionship of her father. (ECF 47 p. 36) While the Seventh Circuit has yet to consider whether minor children have standing to bring claims under § 1983 for loss of society or companionship of a parent, *Est. of Fiebrink by Cade v. Armor Corr. Health Servs., Inc*., No. 18-CV-832, 2019 WL 1980625, at *11 (E.D. Wis. May 3, 2019), courts in this district have allowed such claims to go forward in the face of a constitutional violation. *See id*.; *see also Avery v. City of Milwaukee*, No. 11-C-408, 2015 WL 13016242, at *1 (E.D. Wis. May 19, 2015). However, to demonstrate such a claim, the Estate must first demonstrate an underlying constitutional violation.

As demonstrated above, J.A.'s loss of society and companionship claim raised under § 1983 fails, because consistent with the above argument, the Estate cannot demonstrate that Anderson's death was caused by a constitutional violation.

## CONCLUSION

Based on the foregoing, the Defendants respectfully request that the Court grant their Motion for Summary Judgment and dismiss this action in its entirety on the merits, with prejudice, and with such costs and disbursements as the Court deems equitable.

Dated at Wauwatosa, Wisconsin this 24th day of July 2023.

**WIRTH + BAYNARD**
Attorneys for Defendants

*/s/ Jasmyne M. Baynard*
Jasmyne M. Baynard, WI Bar No. 1099898
9898 W. Bluemound Road, Suite 2
Wauwatosa, Wisconsin 53226
T: 414) 291-7979 / F: (414) 291-7960
Email: jmb@wbattys.com