## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ESTATE OF ALVIN COLE, et al.,

               Plaintiffs,                         CASE NO. 2:21-cv-00848

v.

CITY OF WAUWATOSA, et al.,

               Defendants.

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## DEFENANTS' MOTION FOR SUMMARY JUDGMENT

On February 2, 202, Alvin Cole brought a stolen gun to Mayfair Mall and while there, started an argument with another patron. During the altercation, Cole threatened the patron with the firearm which promoted Mayfair Mall security to call Wauwatosa Police Department. The report of disorderly conduct while armed in a public venue created a dangerous situation and prompted a large response from the Wauwatosa Police Department. Ultimately, Cole was confronted by officers in the mall parking lot, led them on a foot pursuit, and discharged his gun. Officers ordered Cole to surrender the weapon. Cole refused, and with his finger on the trigger, pointed the gun at the officers. In response to Cole's actions, Officer Mensah shot him.

The Estate of Alvin Cole ("Plaintiff" or "Estate") has filed a 42 U.S.C. § 1983 lawsuit against the City of Wauwatosa ("City"), former Wauwatosa Chief of Police Barry Weber ("Weber"), and former Wauwatosa Police Officer Joseph Mensah ("Mensah"), alleging, *inter alia* that Officer Mensah used excessive force in violation of Cole's Fourth Amendment right and that the related training, and supervision of the City and Police Chief were unconstitutional and volitive

of the equal protection clause. *See generally* (ECF 20, Amend. Compl.)[1]

Defendants subsequently moved to dismiss the lawsuit for failure to state a claim. (ECF 21) The Court granted Defendants' motion in part and dismissed the official capacity excessive force claims as duplicative of the claims against the City of Wauwatosa (ECF 54 at 4); dismissed the equal protection claims against Weber; dismissed the loss of society and companionship claim brought by Delarosa and the Estate (*id.* at 8); and further dismissed "Plaintiffs assortment of claims such as a purported deliberate inference claim under the Fourteenth Amendment, an indemnity claim, claims under § 1983 against CVMIC and claims involving damages." *Id*.

Accordingly, the operative remaining claims in the Amended Complaint to be dismissed via this motion are:

> First claim for relief alleging a Fourth Amendment violation for excessive force against all Defendants (ECF 20 p. 21);
>
> Third claim for relief alleging a Fourteenth Amendment violation fore denial of equal protection by racially biased policing, against the City of Wauwatosa and Officer Mensah (*id*. pp. 29-31);
>
> Fourth claim for relief alleging *Monell* liability against the City of Wauwatosa for having a custom of utilizing excessive force particularly against minorities, and for failing to adequately train, supervise and discipline its police officers for their uses of excessive force (*id.* pp. 31-34); and
>
> Eighth claim for relief alleging loss of society and companionship against the City of Wauwatosa and Officer Mensah (*id.* pp. 38-39).

Summary judgment in favor of Defendants on all claims is necessary on the merits and under the doctrine of qualified immunity because Officer Mensah's use of deadly force was justified, and the City's training and policies did not cause denial of the Plaintiff's constitutional rights.

---

[1] ECF 20 refers to the Amended Complaint filed in the *Estate of Alvin Cole, et al v. the City of Wauwatosa, et al*., (Eastern District of Wisconsin Case No. 22-cv-856). All other ECF references relate to docket entries filed in the consolidated case (Eastern District of Wisconsin Case No. 21-cv-00848).

## SUMMARY JUDGEMENT

Summary judgment is appropriate when evidentiary materials submitted with a motion show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Judgment cannot be denied where a "mere possibility that a factual dispute may exist." *Posey v. Skyline Corp.*, 702 F.2d 102, 106 (7th Cir. 1983). A genuine issue of material fact exists only if there is enough evidence that a reasonable jury could return a verdict in favor of the nonmovant. *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012). Opinions that the existence of a purported fact "might have" been true are insufficient to create a dispute *Press v. Raether*, 227 F. Supp. 2d 1022, 1031 (E.D. Wis. 2002), and inferences supported by speculation or conjecture do not suffice. *Collins v. Am. Red Cross*, 715 F.3d 994, 997 (7th Cir. 2013).

At the outset, "the moving party has the burden of demonstrating that there are no genuine questions of material fact." *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 (7th Cir. 1994). "This burden 'may be discharged by ... pointing out to the district court that there is an absence of evidence to support the nonmoving party's case.'" *Id*. To defeat the motion, the nonmovant must then show that there is, in fact, a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). If a party "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,'" summary judgment must be granted. *See Weinberger v. Wisconsin*, 105 F.3d 1182, 1186 (7th Cir. 1997), cert. denied, 522 U.S. 932 (1997) (quoting *Celotex*, 477 U.S. at 322). A complete failure to establish an essential element of the nonmoving party's case necessarily makes all other facts immaterial. *Celotex*, 477 U.S. at 322-23. In such cases, there can be no genuine dispute of material fact to defeat summary judgment. *Id*.

3

**LEGAL ARGUMENT**

I.    **OFFICER MENSAH'S DECISION TO USE DEADLY FORCE WAS OBJECTIVELY REASONABLE UNDER THE CIRCUMSTANCES CONFRONTING HIM, AND THEREFORE DID NOT VIOLATE COLE'S FOURTH AMENDMENT RIGHTS.**

A police officer's use of deadly force on a suspect is a seizure within the meaning of the Fourth Amendment, so the force must be reasonable to be constitutional. *Scott v. Edinburg*, 346 F.3d 752, 755 (7th Cir. 2003). Reasonableness is not based on hindsight, but rather is determined considering the perspective of the officer on the scene, allowing "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). The test for reasonableness under the Fourth Amendment requires an analysis of the totality of the circumstances assessed "from the perspective of a reasonable officer on the scene, rather than with 20/20 hindsight." *Id*. at 97. This perspective is critical. *See Doxtator v. O'Brien*, 39 F.4th 852, 861 (7th Cir. 2022)("We remain mindful that the opportunity to debate the merits of various law enforcement responses 'in the peace of a judge's chambers' is a privilege unavailable to most officers in real time.").

The question whether the use of force during an arrest is proper under the Fourth Amendment depends on the objective reasonableness of the officer's actions, judged on the basis of the conditions the officer faced. *Graham*, 490 U.S. at 396. In order to assess objective reasonableness, the court must consider all the circumstances, including:

[1]    the severity of the crime at issue,

[2]    whether the suspect poses an immediate threat to the safety of the officers or others, and

[3]    whether he is actively resisting arrest or attempting to evade arrest by flight.

4

*Id.* (internal quotations omitted). Courts also consider whether the citizen was under arrest or suspected of committing a crime, was armed, or was interfering or attempting to interfere with the officer's execution of his or her duties. In the end, the excessive force inquiry looks to whether the force used to seize the suspect was excessive in relation to the danger he posed—to the community or to the arresting officers—if left unattended. *Jacobs v. City of Chicago*, 215 F.3d 758, 773 (7th Cir.2000)(quoting *Graham*, 490 U.S. at 396). Finally, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

### A. No Reasonable Jury Could Conclude That Officer Mensah's Use of Deadly Force Was Objectively Unreasonable Under the Circumstances.

To survive summary judgment on their excessive force claim, the Estate must show that Officer Mensah's use of force was objectively unreasonable from the perspective of a reasonable officer on the scene under the totality of the circumstances. *Horton v. Pobjecky*, 883 F.3d 941, 949 (7th Cir. 2018); *see also Graham*, 490 U.S. at 396–97. "Reasonableness" cannot be precisely defined. It requires careful consideration of all facts and circumstances surrounding the event, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Analysis of each of these factors weighs in favor of concluding that a reasonable officer would have believed that Cole posed a threat of death or serious physical injury to Officers Mensah, Olson, Shamsi and the public at large.

### 1. The crimes at issue were severe.

The Estate claims that it was "unclear" whether Cole had committed any crime when he was confronted by WPD officers in the Mayfair Mall parking lot on February 2, 2020. *See* (ECF 20 ¶ 120) This is inaccurate.

On February 2, 2020, at approximately 5:40 p.m., the Wauwatosa Police Department received a report of a disturbance at Mayfair Mall where a weapon was displayed. (DPFF 9-11) Based on this report, WPD Officers Albiter and Schleis were dispatched and responded to investigate the crime of disorderly conduct while armed. (DPFF12) Upon arrival at the mall, Officer Albiter met with the victim, and learned that a suspect approached him in the mall, started a confrontation and then flashed the firearm. (DPFF13) The victim described the armed suspect as a black male, approximately 5'05", skinny build, light complexion, wearing a light hooded sweatshirt, with gold or black fanny pack strapped across his chest. (DPPF 14-15) The suspect was later identified as Cole.

Any crime involving a firearm creates a dangerous situation and that danger is even greater when that occurs at a public mall, as it did here. It is undisputed that firearms are not permitted inside of Mayfair Mall for any reason other than in the possession of authorized law enforcement. (DPFF 16) The severity of this crime prompted multiple WPD officers to leave their assigned squad areas and respond to the Mall. (DPFF 17-23) Officer Olson described this situation as a "propensity crime" or a situation that could turn into a higher magnitude of danger. (DPFF 23) Not only was the initial report of disorderly conduct while armed a dangerous crime, Cole committed additional crimes that escalated the level of dangerous of the situation relating to his refusal to obey lawful orders and resisting arrest, leading officers on a foot pursuit and discharging his firearm while doing so. (DPFF 66)

### 2. Cole fled and was actively resisting arrest.

It is undisputed that Cole actively resisted arrest. (DPFF 25-42, 67-68) After gathering the information that Cole had displayed a firearm during their altercation, and after the victim gave a description of Cole, Officers needed to make contact with him immediately. Reports of the group's location came out over the radio and officers encountered Cole near the Nordstrom parking deck.

Officers Johnson and Shamsi were the first to encounter Cole and his group and ordered them to stop. Cole ignored their command and fled. (DPFF 26) This flight caused officers to initiate a foot pursuit. Officers Johnson and Shamsi focused on Cole because he matched the description of the suspect who committed disorderly conduct while armed, and was believed to have the firearm in the fanny pack that they saw him wearing. (DPFF 10-11, 13-14, 37) Officers were yelling at Cole, "Stop!, Police!" (DPFF 30, 35) At some point before Cole was shot, the other individuals in his group complied with officers' command and stopped running.

Cole disregarded all officer commands. Cole never gave any signs that he intended comply with officers' orders. Cole never put his hands up. Cole never verbalized his intent to surrender or comply. And Cole never stopped running until after he fired his gun. (DPFF 45, 47, 52)

It is unclear why Cole continued to flee with clearly identifiable WPD officers on foot and in a squad and a Mall security officer pursuing him, but the Milwaukee County District Attorney commented that, "Cole should not have been in possession of a firearm for any lawful reason which may have been why he fled from police." *See* (ECF 76-25; p. 13) Regardless, Cole's actions would cause any reasonable officer to believe he was actively resisting and attempting to evade arrest. *See, e.g., Henning v. O'Leary*, 477 F.3d 492, 495–96 (7th Cir. 2007) (concluding deadly force was reasonable where suspect resisted arrest).

### 3.     Cole posed an immediate threat.

No matter how the facts in this case are viewed, a reasonable officer would have believed Cole was an immediate threat to the safety of Officer Mensah, the responding officers, and the public at large at the time Cole was shot. *Siler v. City of Kenosha*, 957 F.3d 751, 758–59 (7th Cir. 2020)("Even without any possibility of escape, an officer is justified in using deadly force when he reasonably believes the suspect poses an imminent threat of serious physical harm to himself or others.").

The Estate attempts to downplay the dangerousness of Cole's conduct claiming that "Cole was attempting to comply with their orders and was no threat to them or any other person," and that Officers Shamsi and Olson had the scene controlled prior to Officer Mensah shooting.  (ECF 20 ¶ 128-129) This is contradicted by the deposition testimony and video evidence. Indeed, Officer Olson testified that the scene was not under control any time prior to Mensah shooting and that even after Cole was shot, his hand was still on the gun. (DPFF 62-64)

It is anticipated that the Estate will argue that Officer Mensah's use of deadly force was unreasonable because at the time he shot, Cole had fallen to the ground and was "disabled." (ECF 20 ¶ 138) Even if that claim were factually supported, it would not support the Estate's position because Cole was never subdued and had the gun in his hand, with his finger on the trigger at the time he was shot. (DPFF 43-65) "It is well established that a police officer may not continue to use force against a suspect who is subdued and complying with the officer's orders. But that principle depends critically on the fact that the suspect is indeed subdued." *Johnson v. Scott*, 576 F.3d 658 (7th Cir. 2009). It does not apply when the suspect falls to the ground while in possession of and firing a gun. *See Doxtator v. O'Brien*, 540 F. Supp. 3d 815, 830 (E.D. Wis. 2021), aff'd, 39 F.4th 852 (7th Cir. 2022). No reasonable jury could conclude that Cole was safely subdued before

Officer Mensah shot him. Even the allegations in Plaintiffs' Amended Complaint contradict this. *See* (ECF 20 ¶ 142)("Cole was on his knees when Mensah first shot him.")

Although the evaluation of reasonableness is specific to Officer Mensah, it is also anticipated that the Estate will attempt to second-guess his decision to use deadly force because two other officers near Cole did not shoot. *See* (ECF 20 ¶ 140) The Estate goes so far as to falsely allege that as Mensah was shooting Cole, Officer Shamsi was yelling at Mensah to "Stop! Stop!" because he did not think deadly force was justified. (ECF 20 ¶ 141) This argument is unsupported by the undisputed factual record.

As soon as he heard the first gunshot, Officer Johnson pulled his firearm to protect himself and others as he perceived that the discharge of a firearm justified deadly force. (DPFF 60) After hearing Cole's gun shot, Officer Shamsi saw the gun in Cole's hand with his finger on the trigger. (DPFF43-46) Officer Shamsi took out his firearm at that point and ordered Cole to drop the gun, but Cole refused. (DPFF 46-47) In the split second before Officer Mensah fired, Officer Shamsi had determined that Cole posed a deadly threat, and that deadly force was justified. (DPFF 57) In the split-second before Officer Mensah shot, Officer Shamsi has his finger depressing the trigger of firearm pointed at Cole. (DPFF 58) In the split second before Officer Mensah fired, Officer Olson had determined that Cole posed a deadly threat, and that deadly force was justified. (DPFF 59) Officer Olson had moved off the mark and acquired shooting position. (DPFF 41, 50)

Based on the facts discussed above, a reasonable officer would and several did reasonably believed that Cole posed a threat of serious physical injury or even death. The fact that Mensah had the better shooting position and made the decision to shoot first does not negate the reasonableness of that decision. For that reason, Plaintiffs cannot meet a key element of their excessive force claim. Therefore, Mensah is entitled to summary judgment.

9

**B.** **The Estate's Anticipated Justification That Cole Did Not Pose a Threat Is Factually Unsupported.**

On February 2, 2020, Cole set into motion a sequence of dangerous events and continued to escalate the danger of the situation. (DPFF 9-11, 26-31, 35, 37-38, 40-42, 44-56) Cole not only refused the officers' lawful commands but led officers on a foot pursuit, during which he pulled out his firearm from its concealed location and fired a round. (DPFF 37-42) Multiple officers on scene observed the firearm and commanded Cole to disarm. (DPFF 43, 45-54) He refused to do so and instead, kept his finger on the trigger, giving him the ability to fire again in a split-second. (DPFF 45-54) While in the public mall parking lot and in the presence of pedestrians and an unarmed security guard, Cole fired his gun and then refused to disarm, thereby creating a serious risk of physical harm to all in the vicinity. This is also a relevant consideration. *See Scott v. Harris*, 550 U.S. 372, 384, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) ("We think it appropriate in this process to take into account not only the number of lives at risk, but also their relative culpability. It was respondent, after all, who intentionally placed himself and the public in danger by unlawfully engaging in the reckless, high-speed flight that ultimately produced the choice between two evils that Scott confronted.").

Under the circumstances he confronted, Officer Mensah's belief that Cole posed an imminent threat of serious injury or death to himself, or others was reasonable. It thus follows that the force used was not excessive and no Fourth Amendment violation occurred.

## II.     OFFICER MENSAH IS ENTITLED TO QUALIFIED IMMUNITY.

Although the defense of qualified immunity is available to all governmental officials in the performance of discretionary acts, it is especially important for law enforcement officers who are frequently forced to make life and death decisions of constitutional import within a matter of

seconds. This contrasts sharply with nonfatal decisions made by judges who, under *Pierson v. Ray*,

386 U.S. 547, 553–54 (1967), have absolute immunity:

> Judges view facts from afar, long after the gunsmoke cleared, and might take months or longer to decide cases that forced police officers to make split-second decisions in life-or-death situations with limited information. We as judges have minutes, hours, days, weeks, even months to analyze, scrutinize and ponder whether an officer's actions were "reasonable," whereas an officer in the line of duty all too frequently has only that split-second to make the crucial decision. The events here unfolded in heart-pounding real time, with lives on the line. Pobjecky lacked our luxury of pausing, rewinding, and playing the videos over and over.

*Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018) (internal quotation marks and citations

omitted). Other than law enforcement officers, no other government officials are called upon to

use deadly force as a normal part of their duties, when their own lives are at stake. Every decision

concerning the use of deadly force carries with it the risk of death or serious bodily injury to

someone—the suspect, an innocent third party, or the officer. To impose personal liability for

losses of this magnitude upon officers called upon to act in a split second with less than perfect

knowledge and without clear guidance in the law would seriously inhibit the officers in carrying

out their duties, if not cause them to leave the profession altogether. It would also thereby seriously

endanger the public. See *Doxtator v. O'Brien*, 540 F. Supp. 3d 815, 833 (E.D. Wis. 2021), aff'd,

39 F.4th 852 (7th Cir. 2022)

There is generally a two-part test in determining whether qualified immunity should be

granted to a state actor: (1) whether the plaintiff has established a deprivation of a constitutional

right; and if so, (2) whether the right was clearly established at the time of the alleged violation.

*Wilson v. Layne*, 526 U.S. 607, 609 (1999). Unless the answer to both questions is yes, a

government official is entitled to qualified immunity. *Jones v. Wilhelm*, 425 F.3d 455, 460 (7th

Cir. 2005). If qualified immunity applies to an officer's conduct, "the officer should not be subject

to liability or, indeed, even the burdens of litigation." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

Although the privilege of qualified immunity is a defense, the plaintiff carries the burden of defeating it. *Mannoia v. Farrow*, 476 F.3d 453, 457 (7th Cir. 2007). In excessive force claims, qualified immunity should be granted if a reasonable officer, facing the same situation, could have believed that deadly force was necessary to protect himself or others from death or serious physical harm. *Graham*, 490 U.S. at 396; *Garner*, 471 U.S. at 11. Accordingly, here it is the Estate's burden to demonstrate the existence of a clearly established right by identifying a closely analogous case that had decided that the conduct at issue was forbidden. *Forman v. Richard Police Department*, 104 F.3d 950, 958 (7th Cir. 1997).

Even assuming arguendo that the Estate could demonstrate that Officer Mensah's use of deadly force was objectively unreasonable, he is entitled to qualified immunity because no clearly established law rendered Officer Mensah's use of deadly force to stop the active threat posed by Cole–who was armed, fled from officers, discharged his weapon, and refused commands to drop his gun and instead pointed it at, or in the direction of officers– unreasonable. *See Ford v. Childers*, 855 F.2d 1271, 1275 (7th Cir. 1988) (under the objective reasonableness standard, if it appears that an individual poses a serious threat of death or significant bodily harm, deadly force may be used if any misinterpretation of what appeared to be the case was reasonable under the particular facts and circumstances); *Henning,* 477 F.3d at 495 ("Deadly force…is reasonable where an officer has probable cause to believe the suspect poses a danger of serious bodily harm, such as when the officer believes the suspect has a weapon or has committed a violent crime."); *Conley-Eaglebear v. Miller,* (No. 1:2014cv1175 (E.D. Wis. 2016)(officer shooting suspect in back as he was

beginning to turn toward officer with a gun in his hand was justified in doing so because the suspect posed a serious threat of physical harm in making this movement).

### III. THERE IS NO BASIS FOR SECTION 1983 LIABILITY AGAINST WEBER IN THIS CASE BASED ON MENSAH'S JUSTIFIED USES OF FORCE IN GONZALES AND ANDERSON.

The Estate seeks to hold former Wauwatosa Police Chief Barry Weber individually liable under Section 1983 upon a theory of supervisor liability. *See generally* (ECF 54, p. 4) To succeed under the theory of supervisor liability, the Estate must demonstrate the existence of discoverable, culpable conduct of a subordinate, and that Weber "[knew] about the conduct and facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye for fear of what [he] might see. [Weber] must in other words act either knowingly or with deliberate, reckless indifference." *Id.* (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992–93 (7th Cir. 1988)). Such evidence does not exist.

It is undisputed that Officer Mensah used deadly force three times during his employment with the Wauwatosa Police Department. Although former Chief Weber was not personally involved in any of those events, the Estate argues a causal connection between Weber's decisions as Chief of Police and Cole's alleged constitutional deprivation based on the following: (1) Weber failed to discipline Mensah for an earlier killing of Gonzales and Anderson (ECF 20, ¶ 155); (2) Weber failed to conduct an internal investigation into Mensah's killing of Antonio Gonzales and Anderson (*id.* ¶¶ 79, 104); and (3) Weber generally failed to make sure Mensah was fit to return to patrol after those incidents. (*id.* ¶ 109) In essence, the Estate argues that if Chief Weber would have taken different action after Mensah's first two shootings, the third (almost five years later) would not have occurred. This argument ignores the circumstances of each separate shooting.

13

### *Antonio Gonzales*

On July 16, 2015, Officer Mensah and his partner responded to a domestic violence call, arrived on scene and were confronted by Antonio Gonzales yielding a samurai sword with a five-foot blade. Gonzales ignored the officers' commands to stop and drop the sword and advanced on Officer Mensah in a sudden deadly attack. This action created a life-or-death situation and prompted Officer Mensah and his partner to both discharge their firearms at Gonzales. The undisputed evidence in Gonzales, namely sworn eye-witness testimony filed in support of the Gonzales summary judgment motion, the District Attorney's letter outlining why Officer Mensah's actions were justified, and the internal administrative review, all demonstrate that Mensah's action were justified to stop the threat posed by Gonzales. *See* (ECF No. 70 pp. 4-10)

### *Jay Anderson, Jr.*

On June 23, 2016 at 3:00 a.m. while conducting a routine after-hours park check, Officer Mensah observed a suspicious vehicle. It was not uncommon to find people in the park after dark and usually Mensah encountered hormonal teenagers and simply told them to leave. Unfortunately, Mensah's encounter with the vehicle occupied by Jay Anderson, Jr. produced a different result. When Officer Mensah approached the Anderson vehicle and knocked on the window, he found both Anderson and a loaded handgun. The events that unfolded over the next few moments escalated as Anderson reached for the gun and Mensah ordered him not to. Anderson lunged towards the gun and, in fear for his life, Mensah discharged his firearm at Anderson. The Anderson incident was memorialized in relevant part by Mensah's squad camera. (ECF 76-17; see also ECF 79 ¶¶ 50-54)

Officer Mensah's intentional decision to remotely activate his squad camera proved crucial in the multiple, intensive investigations that were subsequently conducted: the criminal homicide

investigation conducted by the Milwaukee area investigative team (ECF 79 ¶¶ 75-76); the Milwaukee County District Attorney's review (ECF 79 ¶¶ 75-76) the United States Department of Justice investigation (ECF 79 ¶ 80); and the Wauwatosa Police Department administrative investigation. (ECF 79 ¶¶ 77-79). <u>Finally</u>, and almost five years after the Anderson incident, the matter was investigated by two independent special prosecutors.[2] (ECF 79 ¶ 81) The conclusion among all these agencies was unanimous—Officer Mensah's use of deadly force was a privilege under Wisconsin's self-defense statute.

Defendants acknowledge that these inquests largely relate to pending criminal prosecution, however, the evidence relied on in the evaluation by the District Attorney (ecf 76-20), United States Attorney (ecf 76-23), and special prosecutors is the same evidence this court will be tasked with evaluating. The video confirms that Anderson disregarded Mensah's commands to keep his hand up and instead reached toward the passenger seat where his gun was laying. These actions would have caused a reasonable person to fear and imminent threat of death of great bodily harm and to use deadly force to protect themselves.[3]

### *Weber's Post Incident Due Diligence*

The argument that Weber allowed Mensah's unconstitutional conduct to go "unchecked" (ECF 22 p. 7) could not be further from the truth. The undisputed facts—namely the subsequent external and investigations demonstrate that there was absolutely no basis for Weber to discipline Mensah following the Gonzales or Anderson incidents.

The undisputed facts demonstrate that after the Gonzales and Anderson incidents, Officer Mensah was placed on administrative leave pending the results of the Milwaukee Area

---

[2] The Final Report on Charging Decision (Docket 108) in Milwaukee County Case No. 2020JD000015 is a public record and appropriate subject of judicial notice. *In the Matter of Lisse*, 905 F.3d 495, 496 (7th Cir. 2018); *see also Menominee Indian Tribe v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998); Fed. R. Evid. 901(b)(7).
[3] Supra Fn 2.

Investigative Team investigation, the DA's evaluation, and counseling. (ECF 71 ¶¶ 55-63; ECF 79 ¶¶ 62-71) The undisputed facts demonstrate that after the Gonzales shooting, Officer Mensah attended multiple counseling sessions with a licensed counselor who cleared him to return to duty on August 24, 2015. (ECF 71 ¶¶ 59-61) Even after clearance from the counselor, Mensah was not returned to full duty until after the DA rendered its charging decision, on October 1, 2015. (ECF 71 ¶ 63)

After the Anderson shooting Officer Mensah again attended multiple counseling session with a licensed therapist, and Chief Weber took the additional step of sending Officer Mensah for a psychological evaluation which certified that Officer Mensah was psychologically fit to return to full patrol duties without restriction (ECF 79 ¶¶ 55-71; *see also* ECF 80-2) At no time did any of those providers alert Weber of any concern, nor was Weber ever concerned, with Mensah's ability to fulfill his role as a police officer. (DPFF 93-94)

The undisputed facts show that after each shooting incident, although not a requirement by state statute, Chief Weber ordered an internal investigation into the shooting which included a review of the officers' actions in accordance with WPD Policy and confirmation that the use of force complied with the requirements of *Graham v. Conner*. (DPFF 75, 87, 95, 96-97) The undisputed facts demonstrate that the Gonzales administrative review was completed prior to the Anderson shooting, and that that Anderson administrative review was completed prior to the Cole shooting. (ECF 77-4; ECF 77-9)

Chief Weber awarding commendations for Officer Mensah and other on-scene officers for their actions during the critical incidents does not demonstrate his approval of constitutionally violative conduct, as the Estate implies. (ECF 20, ¶ 102) The commendation Officer Mensah received for his actions during the Gonzales incident were for protecting bystanders from

16

Case 2:21-cv-00848-LA   Filed 07/31/23   Page 16 of 28   Document 84

Gonzales' violent actions (DPFF 106); and those for the Cole incident were for preventing harm to himself and other officers. Indeed, Officer Olson testified that Officer Mensah saved his life. (DPFF 107-108)

Plaintiffs' mischaracterize the intent of these accommodations is insufficient to support an individual capacity claim against Weber especially where Officer Mensah was found to have been justified in perceiving both Gonzales and Cole as deadly threats.

The entirety of the Estate's 1983 claim against Weber is simply an impermissible invitation to this court to speculate that alleged acts and omissions occurring after the Gonzales and Anderson incidents–allegations unsupported by evidence–may have contributed to the Cole incident at issue here. These undisputed facts demonstrate that Chief Weber took all necessary steps with due diligence to ensure Officer Mensah was able to perform his duties appropriately. He relied on opinions from professionals and the assessment of outside law enforcement agencies. (DPFF 93-94) The suggestion that Chief Weber was required to do more is not rooted in any clearly established law.

As demonstrated by the consolidated record, there is no basis for Section 1983 liability for Officer Mensah for his actions during the Gonzales, Anderson and Cole shootings and thus there can be no liability for Weber.

## IV.   THE ESTATE'S MONELL CLAIMS AGAINST THE CITY OF WAUWATOSA AND CHIEF WEBER MUST FAIL.

Plaintiffs assert a claim under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), alleging that the City has a persistent and widespread custom of racially motivated policing and excessive force used against minorities. (ECF 20 pp. 24-28, 32-34) They further allege that the City of Wauwatosa and former Chief Weber failed to institute training to address discriminatory policing and de-escalation, and instead "trained Mensah that he should

17

always use deadly force at the first sight of a weapon or had failed to receive training consistent with the Fourth Amendment." (*Id.* ¶¶ 47, 70-71)

Because Officer Mensah did not violate Cole's constitutional rights, the Estate's claim of municipal liability fails. "[A] municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee*." Sallenger v. City of Springfield, Illinois*, 630 F.3d 499, 504 (7th Cir. 2010); *see also Tesch v. Cty. of Green Lake*, 157 F.3d 465, 477 (7th Cir. 1998) ("A failure to train theory or a failure to institute a municipal policy theory requires a finding that the individual officers are liable on the underlying substantive claim.").

Even if Plaintiffs could demonstrate that Cole was deprived of a constitutional right–which they cannot–any claim against the City Defendants fails because there is no evidence that the execution of a policy, practice or custom caused the alleged deprivation. *Monell*, 436 U.S. at 694 It is well-settled that a municipality cannot be liable under 42 U.S.C. § 1983 on a theory of *respondeat superior* or vicarious liability. *Id.* at 694. Rather, a municipality can be liable only if Plaintiffs show that the underlying unconstitutional act was caused by: (1) an official policy the municipality adopted and promulgated; (2) a practice or custom that, although not officially authorized, is widespread and well-settled; or (3) an official with final policy-making authority. *Monell*, 436 U.S. at 690.

The Supreme Court has clarified that a municipal entity may only be held liable if a municipal policy or custom caused the plaintiff's injury, explaining:

> [I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997).

18

As demonstrated below, the Estate's *Monell* claim is factually unsupported because they cannot identify any credible evidence that the City's use of force policy or any training provided by WPD to Mensah is constitutionally suspect, and their purported "pattern" evidence is erroneous.

### A. There is no Evidence to Support a Claim That the City of Wauwatosa Has a Widespread Practice or Custom of Sanctioning Use of Excessive Force Against Minorities.

To prevail on a "widespread practices" claim, the Estate must show that the City engaged in a practice "so permanent and well settled as to constitute a custom or usage with the force of law." *Wragg v. Vill. of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010); *see also Moore v. City of Chicago*, 126 Fed.Appx. 745, 747 (7th Cir. 2005)(Plaintiff must show the police department "engaged in a widespread practice so well-settled that it had the effect of a custom."). As the party on whom the burden of proof rests at trial, the Estate is obligated to come forth with evidence to support this claim in order to survive summary judgment. The Estate attempts to meet this burden by referencing six instances that occurred over a 24-year period, in which Wauwatosa police allegedly "used excessive force against other black individuals." *See* (ECF 20, ¶ 211) The Estate contends that these instances demonstrate that the City of Wauwatosa has a custom of "racially-biased policing" and excessive force.

The Estate cites a 2019 traffic stop that was the subject of litigation which was handled by the undersigned attorney, *Carter et al v. City of Wauwatosa et al*, Eastern District of Wisconsin Case No. 19-cv-01422-JPS. *See* (ECF 20, ¶ 211) The Carter Amended Complaint alleges that during this traffic stop WPD officers drew and pointed their weapons at Akil Carter, threw him to the ground, and handcuffed him. *Id*. This is a complete misrepresentation of the facts and video evidence that demonstrates no officer drew or pointed their weapon at Mr. Carter, and he was never

19

thrown to the ground.[4] Prior to trial, Judge Stadtmueller determined that there was no evidence to demonstrate that the stop was the subject of racial profiling, nor was excessive force employed during the stop.[5] A jury spent less than an hour and returned a verdict in favor of the Wauwatosa Police officers finding that there stop of the Plaintiffs' vehicle was constitutionally complaint.[6]

The Estate cites the August 10, 2006 arrest of Aaron Lawrence and subsequent lawsuit as an example of use of excessive force against a black man. (ECF 20 ¶ 211) Conveniently, the Estate fails to provide that the case was dismissed on summary judgment with the Court finding that the Wauwatosa officers' use of force was objectively reasonable. *See Lawrence v. Lewandowski*, No. 08-CV-108, 2011 WL 940358, at *5 (E.D. Wis. Mar. 16, 2011).

The Estate cites the 2002 arrest of a Black women and suggests that "WPD pointed their guns at her when they had no basis to suspect she committed a crime." (ECF 20 ¶ 51) Durrah's wrongful arrest claims were summarily dismissed, and the Court found a dispute of fact as it related to her excessive force claims. The Court dismissed the equal protection claim alleging a pattern and practice of "racially-biased policing," holding that, "Durrah has failed to present any evidence that the defendants treated her differently because she is black." *Id.*, at *9. The matter was later resolved and there was never a finding of use of excessive force. *See Durrah v. City of Wauwatosa*, No. 07-C-0426, 2009 WL 10710621, at *6 (E.D. Wis. Mar. 30, 2009).

The Estate cites the 1996 arrest of Adrian Patterson and alleges that "WPD subjected Patterson to excessive force." (ECF 20 ¶ 51, citing *Patterson v. Wauwatosa Police Dep't*, 930 F. Supp. 1293 (E.D. Wis. 1996)). The Estate inconveniently ignores the decisive result of that case— a dismissal at the pleading stage as legally frivolous. *Id.*

---

[4] https://www.dailymotion.com/video/x6t9ri4
[5] See *Carter et al v. City of Wauwatosa et al,* Eastern District of Wisconsin Case No. 19-cv-01422-JPS, Docket ECF 133, Final Pretrial Hearing Transcript 02/08/2023 Order p. 7
[6] *Supra* Fn 5, Carter Docket ECF 152, Verdict Form.

Finally, the Estate relies on the red-herring argument of Officer Mensah's involvement in the Gonzales and Anderson shootings as proof of an unconstitutional widespread practice of using excessive force. As explained in Defendants' moving brief filed in those matters, the incidents were investigated, and the use of force was determined to be justified. *See* (ECF 70 pp. 4-10; ECF 81 pp. 10-17)

Unsupported allegations of excessive force are insufficient to demonstrate a "widespread practice" for *Monell* liability. The mere fact that a police department has investigated complaints of excessive force is insufficient to demonstrate that the City has a widespread practice of using excessive force. The Estate must prove a specific pattern of conduct or series of incidents violative of constitutional rights in order to establish the existence of a municipal policy or custom. *See Hossman v. Blunk*, 784 F.2d 793, 796–797 (7th Cir. 1986) (citations omitted). The Estate attempts to premise liability on unsubstantiated claims of excessive force against minorities. The Estates' comparative data is neither complete nor comparable, and is thus wholly insufficient to support a finding of a wide-spread practice. Contrary to the Estate's suggestion, absent a finding of excessive force, the officer cannot be disciplined and will remain in his or her position of authority.

Indeed, the Constitution does not require that an officer be fired [merely because] complaints against him are received. *Savage v. Dane County*, 588 F. Supp 1129, 1133 (W.D. Wis. 1984). Such a policy would be violative of the officer's due process rights. *Id*. Thus, it is entirely inappropriate for Plaintiffs to rest their pattern or practice claims on unsubstantiated claims of excessive force, and even more importantly, claims of excessive force that were adjudicated in the officer's favor.

> It would be a rare officer who was never accused of using excessive force when he is faced with dealing with people under [] circumstances [involving intoxicated or combative, resisting individuals].… [J]ust because the officer could have handled a situation in such a way that confrontation could have been avoided does not mean

that he is guilty of using excessive force. Even if the officer is somehow guilty of provoking a confrontation by lack of tact, he is still privileged to use whatever force necessary to quell the confrontation.

*Savage*, 588 F. Supp. at 1133. Not only does the record belie any inference of recklessness by virtue of the City or former Chief Weber, but the record appears to show that an exoneration of the officer in each instance was justified.

Even if evidence of a widespread pattern and practice is present, establishing such a pattern is still not enough. Plaintiffs must also demonstrate that the widespread pattern and practice directly and proximately caused the underlying alleged constitutional violation. *Harris*, 489 U.S. at 385 (holding that there must be a "direct causal link" between the municipal policy and the constitutional deprivation). It is insufficient for Plaintiffs to simply argue that an injury or accident could have been avoided if an officer had had better or more training or that there was something the city could have done' to prevent the unfortunate incident. *Id*. at 392. A municipality can be liable under § 1983 only where its policies are the "moving force [behind] the constitutional violation." *Polk County v. Dodson*, 454 U.S. 312, 326 (1981); *Monell*, 436 U.S. at 694.

Simply put, alleging that the City did something wrong without showing how that wrongdoing resulted in a widespread pattern of constitutional violations of the underlying type about which Plaintiffs are complaining (the unconstitutional use of deadly force), fails to establish a *Monell* claim as a matter of law. The Seventh Circuit has explained the type of showing that is required:

If Winnebago County had seen a rash of police killings of crazy people and it was well understood that these killings could have been avoided by the adoption of measures that would adequately protect the endangered police, then the failure to take these measures might, we may assume without having to decide, be found to manifest deliberate indifference to the rights of such people…. But the plaintiffs made no effort to establish the premises of such an argument.

*Pena v. Leombruni*, 200 F.3d 1031,1033-1034 (7th Cir. 1999)(internal citations omitted).

**B. There Is No Evidence of Deliberate Indifference in the City's Training and Supervision That Caused a Constitutional Injury.**

The inadequacy of police training serves as a basis for liability under Section 1983 only if the failure to train amounts to "deliberate indifference" to the rights of persons with whom the police deal. *Erwin v. County of Manitowoc*, 872 F.2d 1292, 1297–1298 (7th Cir. 1989). A plaintiff cannot prevail merely by proving that an injury could have been avoided had an officer received enhanced training. *Id.* at 1298. To establish the requisite deliberate indifference in this case, Plaintiffs must make three showings:

> (1) that City knew to a moral certainty that officers will confront a given situation; (2) that the situation either presents the officer with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of officers mishandling the situation; and (3) that the wrong choice by the officer will frequently cause the deprivation of a citizen's constitutional rights.

*See Alexander v. City of S. Bend*, 320 F. Supp. 2d 761, 783–84 (N.D. Ind. 2004), aff'd, 433 F.3d 550 (7th Cir. 2006) (citing *Kitzman–Kelley ex rel. Kitzman–Kelley v. Warner*, 203 F.3d 454, 459 (7th Cir. 2000).

The Seventh Circuit explained, "liability [must] be based on a finding that the policymakers have actual or constructive notice that a particular omission [] is likely to result in constitutional violations." *Cornfield v. Consol. High School Dist. No. 230*, 991 F.2d 1316, 1327 (7th Cir. 1993). Stated another way, if the City "is faced with actual or constructive knowledge that its agents will probably violate constitutional rights, [it] may not adopt a policy of inaction." *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (internal citation and quotation marks omitted).

Here, Plaintiffs cannot point to evidence from which a reasonable jury could find that the City, through former Chief Weber as a policymaker, acted with deliberate indifference to actual or constructive knowledge of a specific need for additional training on how to police minorities or

23

when a suspect's actions justify the use of deadly force. The City of Wauwatosa provides ample training to its officers on uses of force including that deadly force is justified under the following circumstances:

(a) Protect the officer or others from what is reasonably believed to be an imminent threat of death or great bodily harm.

(b) When it is necessary to prevent the escape of a fleeing violent felon whom the officer has reasonable belief poses an imminent threat of death or great bodily harm to the officer or others.

(c) If feasible the officer must give some verbal warning prior to the use of deadly force.

(DPFF 95-97, 99) These circumstances mirror the constitutional standards permitting deadly force. The City of Wauwatosa trains its officers as to different scenarios in which force may be used, and the record demonstrates that Officer Mensah employed such training when he encountered Cole. (DPFF 51-54, 65-71) Officers also testified that they are trained that racial-motivating policing is prohibited. (DPFF 72, 104-105)

The Estate alleges that the City of Wauwatosa failed to train its police officers, but a *Monell* claim requires more. To establish an actionable failure to train, "[a] pattern of similar constitutional violations is ordinarily necessary to demonstrate deliberate indifference." *Connick*, 563 U.S. at 62. Even if "a particular officer may be unsatisfactorily trained" that "will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Canton*, 489 U.S. at 390-91. Here, there is no evidence that the City was aware of or put on notice about any recurrent unconstitutional conduct attributable to inadequate training. Nor is there proof that the City knew it was highly predictable that such constitutional deprivations would occur without more or different training because of the alleged pattern.

24

Moreover, the training of City officers, as well as all other police officers in the state, is governed by § 165.85, Wis. Stats., which establishes the Law Enforcement Standards Board, and empowers it to establish minimum curriculum requirements for police officer training. (DPFF 88, 102) It is undisputed Officer Mensah met the minimum training requirements established by the State of Wisconsin to be certified as a police officer and have maintained his necessary certifications throughout his employment with the City of Wauwatosa. (DPFF 89, 98, 100-103)

Finally, the Seventh Circuit's decision in *Tapia v. City of Greenwood*, 965 F.2d 336, 339 (7th Cir. 1992) is dispositive of any failure to train claim. There Seventh Circuit dismissed plaintiff's claim, holding that, where the state impose[s] minimum training standards on municipalities, evidence showing adherence to those standards [bars] any finding that the city's policymakers were deliberately indifferent to the need for better training. *See id*.

## V.   THERE IS NO EVIDENCE TO SUPPORT PLAINTIFF'S CLAIM OF DENIAL OF EQUAL PROTECTION FOR ALLEGED RACIALLY BIASED POLICING.

Claims that law enforcement used "impermissible racial classifications in determining whom to stop, detain, and search" are analyzed as Equal Protection Clause violations. *See Chavez v. Ill. State Police*, 251 F.3d 612, 635 (7th Cir. 2001). To show a violation of the Equal Protection Clause based on an allegation of racial profiling, or selective enforcement of the law, Plaintiffs "must prove that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose." *Id*., at 635–36. To prove the first element, discriminatory effect, the Estate "is required to show that they are members of a protected class, that they are otherwise similarly situated to members of the unprotected class, and that plaintiffs were treated differently from members of the unprotected class." *Id*. at 636. To prove the second element, discriminatory intent or purpose, Plaintiffs must show that a " 'decisionmaker selected or reaffirmed a particular course

25

of action at least in part "because of" its adverse effects upon an identifiable group.' " *Id*. at 645, quoting *McCleskey v. Kemp*, 481 U.S. 279, 298 (1987).

There is no dispute that Cole is a member of a protected class however, survival on summary judgment requires more. A "plaintiff asserting an equal protection violation must establish that a state actor purposefully treated [her] differently because of [her] race." *Durrah v. City of Wauwatosa*, No. 07-C-0426, 2009 WL 10710621, at *9 (E.D. Wis. Mar. 30, 2009) citing *Billings v. Madison Metro. Sch. Dist.*, 259 F.3d 807, 813 (7th Cir. 2001). The Estate must go beyond conclusory allegations and put forth relevant and admissible evidence proving that Cole was treated differently by Officer Mensah based on his race. The Estate cannot provide direct evidence of discriminatory intent and conclusory alleges that, "Defendant Mensah (who is black) treated Mr. Cole (who is also black) less favorably—and with unreasonable force—than his similarly situated White counterparts, wholly or in part because he was Black" (ECF 20, ¶ 201) However, the Estate has failed to name any non-black individual who was similarly-situated yet treated differently.

Moreover, the undisputed record demonstrates that Officer Mensah's use of force had nothing to do with Cole's race and had everything to do with the imminent threat he posed after he threated a mall patron with a gun, fled from police, fired his gun, and refused to obey commands. (DPFF 9-14, 26, 30, 35, 37, 39-54)

Even if Plaintiffs were able to show a discriminatory effect, their claim would still fail because they cannot demonstrate any discriminatory purpose.

> "Discriminatory purpose" implies more than intent as awareness of consequences.
> It implies that the decisionmaker selected or reaffirmed a particular course of action
> at least in part because of its adverse effects upon an identifiable group.

*Chavez*, 251 F.3d at 645 (internal citations, brackets, and quotations omitted). Bare allegations of

racism are not enough. *See Minority Police Officers Ass'n of S. Bend v. City of S. Bend*, 801 F.2d 964, 967 (7th Cir. 1986)(emphasis added). The Estate alleges that the Police Department's "history and disproportionate use of excessive force against black people is evidence of discriminatory intent." *Id*. ¶ 205. However, as discussed herein, Plaintiffs' mischaracterizations of alleged uses of force are incomplete, incomparable, non-existent (ECF 20 ¶ 211), and fail to demonstrate a pattern of excessive force by Officer Mensah or any other Wauwatosa Police Officer.

The Estate's purported "evidence" of discriminatory intent is nonexistent, and the "evidence" of discriminatory purpose is entirely conjecture. Consequently, they cannot meet their burden of proof on their equal protection claim and summary judgment is warranted.

## VI.    PLAINTIFFS' LOSS OF SOCIETY AND COMPANIONSHIP CLAIM CANNOT SURVIVE SUMMARY JUDGMENT.

Plaintiffs Tracy and Albert Cole allege a cause of action under § 1983 for the loss of society and companionship of their son. *See* (ECF 20 p. 38-39) These substantive due-process claims are based on the officer having deprived them of their liberty interest in the companionship and society of their loved one.  An officer violates a family member's due-process rights when their conduct "shocks the conscience;" or, when the circumstances allowed for the officer to actually deliberate, then "an officer's 'deliberate indifference' may suffice to shock the conscience." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010).  On the other hand, if the officer "makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Wilkinson*, 610 F.3d at 554.  Parents or children must show that the officer acted with "deliberate indifference," or "with a purpose to harm" the decedent.  Unfortunately, siblings cannot yet bring such claims.

However, to demonstrate such a claim, Plaintiffs must first demonstrate an underlying constitutional violation. Plaintiffs Tracy and Albert Cole's loss of society and companionship claim

raised under § 1983 fails, because consistent with the above arguments, they cannot demonstrate that Cole's death was caused by a constitutional violation.

## CONCLUSION

Based on the foregoing, the Defendants respectfully request that the court grant their motion for summary judgment and dismiss this action in its entirety on the merits, with prejudice, and with such costs and disbursements as the court deems equitable.

Dated at Wauwatosa, Wisconsin this 31st day of July 2023.

**WIRTH + BAYNARD**
Attorneys for Defendants

*/s/ Jasmyne M. Baynard*
Jasmyne M. Baynard, WI Bar No. 1099898
9898 W. Bluemound Road, Suite 2
Wauwatosa, Wisconsin 53226
T: 414) 291-7979 / F: (414) 291-7960
Email: jmb@wbattys.com