# EXHIBIT 9

Deposition of Luke O'Day
taken July 23, 2023



In the matter of:

**Estate of Antonio Gonzales, et al.**
**v.**
**Joseph Anthony Mensah, et al.**

Case No.:  2:21-CV-00848

Witness:  Luke O'Day

Date:  July 21, 2023

Court Reporter:  Alice Barbeln

790 North Milwaukee Street, Suite 100-C
Milwaukee, WI 53202
414.585.8128
www.creamcityreporting.com

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

--------------------------------------------------------

ESTATE OF ANTONIO GONZALES, et
al.,
        Plaintiffs,

    -vs-
                Case No. 21-CV-848-LA

JOSEPH ANTHONY MENSAH, et al.,

        Defendants.
_____

ESTATE OF JAY ANDERSON, JR.,
et al.,
        Plaintiffs,

    -vs-
                Case No. 21-CV-1179-LA

JOSEPH ANTHONY MENSAH, et al.,

        Defendants.
_____

ESTATE OF ALVIN COLE, et al.,

        Plaintiffs,

    -vs-
                Case No. 22-CV-856-LA

JOSEPH ANTHONY MENSAH, et al.,

        Defendants.
--------------------------------------------------------

Examination of LUKE O'DAY,

taken at the instance of the Plaintiffs, under and

pursuant to the Federal Rules of Civil Procedure,

before ALICE M. BARBELN, a Registered Professional

Reporter and Notary Public in and for the State of

Wisconsin, via Zoom videoconference, on

July 21, 2023, commencing at 9:34 a.m. and concluding

at 11:36 a.m.

1                    A P P E A R A N C E S

2

 3   MOTLEY LEGAL SERVICES, by,
     MS. KIM MOTLEY,
     P.O. Box 1433,
 4   Matthews, North Carolina 28106-1433,
     appeared on behalf of the Plaintiffs.
5

 6   CADE LAW GROUP, LLC, by
     MS. ANTONIQUE WILLIAMS,
     2525 North Terrace Avenue,
 7   Milwaukee, Wisconsin 53211,
     appeared on behalf of the Plaintiffs.
8

 9   WIRTH + BAYNARD, by
     MS. SHEILA THOBANI,
     9898 West Bluemound Road, Suite 2,
10   Wauwatosa, Wisconsin 53226,
     appeared on behalf of the Defendants.

11

12

13

14                    *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

1              I N D E X

2

3  Examination:                                    Page

   By Ms. Motley.................................  4
4

5  Exhibits Identified:                            Page

6  <mark>Exhibit 31</mark> - 172-Page Milwaukee Police
              Department Investigation Document..  54
7

8  Disposition Of Original Exhibit:

9  Attached To Original Transcript

10

   Requests:                                       Page
11

   By Ms. Motley - Copy of Those 80 Pages That
12              Luke O'Day Received............  79

13
                    * * * * *
14

15

16

17

18

19

20

21

22

23

24

25

1  TRANSCRIPT OF PROCEEDINGS
2       LUKE O'DAY, called as a witness
3  herein, having been first duly sworn on oath,
4  was examined and testified as follows:
5            EXAMINATION
6  BY MS. MOTLEY:
7  Q   Good morning Mr. O'Day.
8  A   **Good morning.**
9  Q   Before we get started, I wanted to make sure
10     that you are comfortable.  I understand that
11     there is some medical concerns.  I want to make
12     sure that you are okay with where you are
13     situated and everything?
14 A   **Yes.**
15 Q   Okay.  Thank you.  Is it okay if I call you
16     Mr. O'Day?
17 A   **You can call me Luke if you like; it makes no**
18     **difference to me.**
19 Q   Okay.  Thank you.  Just for purposes of this,
20     I'll call you Mr. O'Day, but I appreciate it.
21 A   **Okay.  All right.**
22 Q   Before we get started, I just wanted to ask
23     you, have you ever been deposed before?
24 A   **I was deposed once, probably back in 1997 or**
25     **-08, so it's been a while.**

1  Q   Okay.  And with regards to you being deposed
2      before, just so you know, there is certain
3      ground rules.  So any answers to questions, if
4      you could please answer those verbally as
5      opposed to nonverbals because we have a court
6      reporter that's taking everything down.
7  A   **Yes.**
8  Q   And I have a bad habit of this, but we need to
9      make sure that we are not talking over each
10     other because obviously it's going to be
11     difficult for the court reporter to take things
12     down; do you understand that?
13 A   **I do.**
14 Q   Okay.  And are you on any medications today
15     that would hinder your -- what you say in the
16     depositions?
17 A   **No, I'm not.**
18 Q   Okay.  And I don't know how to put this, but
19     you are of sound mind, and you are fine with
20     moving forward with the deposition today?
21 A   **I am, yes.**
22 Q   Okay.  And you are proceeding by yourself,
23     right?
24 A   **I am.**
25 Q   Okay, great.  So I want to begin with -- could

1  you please explain your law enforcement
2  experience to us?
3  A   **So -- such as my whole career?**
4  Q   Yes, please.
5  A   **Okay.  So I was hired in 1996.  I did -- I was**
6      **assigned to a district for about four years.**
7      **Two of those years I was assigned as a**
8      **captain's car, which meant I just -- myself and**
9      **some other officers -- I think there were four**
10     **of us -- we would handle things specific to the**
11     **needs of the captain.  From there, I joined a**
12     **special unit called "Street Crimes."  I think I**
13     **was on that for a year, year-and-a-half.  And**
14     **then I was added to the tactical-enforcement**
15     **unit, which is what other departments call**
16     **SWAT.  I was on that unit for four years.**
17 Q   Excuse me.  Real quick.  And all of these sort
18     of units are with Milwaukee Police Department?
19 A   **Yes, so it's a 25-year career with -- in law**
20     **enforcement only with Milwaukee Police**
21     **Department.**
22 Q   Okay.  Thank you.  Please continue.
23 A   **So the first ten years were those specific**
24     **assignments.  I was promoted to the rank of**
25     **detective where I did 15 years.  I started**

1  off -- I spent almost all of my years on late
2  shift, which would have been from midnight
3  until 8:00, and so I did a couple years --
4  or year and -- a couple years on violent
5  crimes, so shootings, stabbings, robberies,
6  whatnot, and then I was moved to the
7  metropolitan investigation unit, which is what
8  housed the homicide unit.  I was in a support
9  role for maybe a year or two, and then
10 eventually, due to manpower, we were all kind
11 of folded in, and we had -- I did I think about
12 six or seven years on homicide.  I finally went
13 day shift, I believe, in either '17 or '18, and
14 then I spent maybe another year doing violent
15 crimes on day shift, and then I went to the
16 financial-crimes unit I think the last three or
17 four years, so I don't know if the math all
18 works out, but it's 15 years as a detective.
19 Q   Okay, great.  And you are now retired from the
20     City of Milwaukee Police Department?
21 A   **Yes.  I retired in 2021.**
22 Q   Okay, great.  Congratulations.
23 A   **Thank you.**
24 Q   How is retirement treating you?
25 A   **A lot of recovery.  I mean, you know, it's a**

1 tough job, and you don't get a lot of sleep,
2 and so it's been nice to kind of get back to a
3 regular human-being-type role.
4 Q Okay, great. Well, thank you for sharing that.
5 And with regards to your experience as
6 a law enforcement officer, I know you said you
7 were deposed once before, but have you ever
8 testified in court?
9 A From a deposition or from just regular
10 testifying?
11 Q Just regular testifying.
12 A Yes, of course.
13 Q How many times?
14 A A lot. I mean, you have to think, I did a
15 number of trials as a uniform officer. I did a
16 lot of trials as a detective. I don't know, I
17 guess a hundred times, maybe, I don't know,
18 maybe less, maybe more. It's hard to guess.
19 Q But a lot?
20 A A lot, yeah. I've had experience in trials,
21 yes.
22 Q Okay. And have you had experience with traffic
23 stops as a law enforcement officer?
24 A Yes, obviously when I was in patrol I did
25 traffic-accident stops.

1 Q Hundreds of traffic stops, would you say?
2 A No, because I was really only doing routine
3 patrol for a couple of years before I went to
4 the captain's car, which we didn't really focus
5 on that. When I was on street crimes and the
6 tactical-enforcement unit, we did traffic stops
7 but not the frequency you would have done, but
8 I would say maybe a hundred traffic stops,
9 maybe more. I don't know. It's such a long
10 time ago, I have no idea, but I obviously have
11 experience in traffic stops, yes.
12 Q Okay. And I'm sorry if I'm asking questions
13 that are so, obviously can't be answered like
14 how many times, but I just need to make a
15 record.
16 A No problem.
17 Q And you've been involved with a lot of homicide
18 investigations, correct?
19 A I have, yes.
20 Q Would you say, you know, hundreds of
21 homicide -- how many homicide investigations
22 have you been involved in?
23 A I would say definitely over a hundred. So the
24 way Milwaukee Police Department and the
25 homicide unit works, you may get sent out as a

1 unit, but we brief every eight hours and so you
2 may not have worked the night that you had a
3 unit go out, and you come in the next night,
4 and now you have follow-up, so if you are
5 talking specific scenes, yes, definitely over a
6 hundred. If you talk about having a part in
7 the investigations that you weren't initially
8 there for, well over a hundred. I wouldn't
9 know a number to give you, but probably over
10 200 or more. I mean. Milwaukee's had a lot of
11 homicides over the years.
12 Q Yes, unfortunately.
13 A Yes.
14 Q And with your tenure as a police officer,
15 you've dealt a lot with being involved with,
16 you know, direct contact with community people,
17 correct?
18 A Yes, like as victims or suspects or family
19 members and whatnot, that type of thing?
20 Q Yes.
21 A Yes.
22 Q And that you've done hundreds of times,
23 correct?
24 A Yes, hundreds of times.
25 Q Okay. And have you ever been -- other than

1 this case, have you ever been involved in any
2 police-involved criminal investigations?
3 A So officer-involved shootings?
4 Q Well, just criminal investigations, let's start
5 with that first, and I'm going to narrow it
6 down to shootings.
7 A Yes.
8 Q Okay. What type of cases?
9 A Well, so I remember specifically when I was on
10 homicide -- when I was on the
11 tactical-enforcement unit, there was a case of
12 an officer that had been accused of sexual
13 assault, so we had to go out and arrest him, so
14 that type of involvement. There was another
15 case of an employee I think that was accused of
16 child abuse maybe that we had to go out and
17 arrest them, take them into custody, so while
18 in those type of specialty units, it was more
19 of the arrest and whatnot but not the
20 investigation itself. While in the bureau,
21 I've dealt with a couple of cases. I don't
22 remember -- I've dealt with an in-custody case
23 that wasn't a result of a shooting that I had
24 direct involvement in, but the rest of my -- it
25 seems to me they were mostly shootings.

Page 12

1 Q   Okay.  And could you please explain the
2     police-involved shooting cases that you've been
3     involved with?
4 A   So I forget when it became policy to have
5     outside jurisdictions do the investigation when
6     there is an officer-involved shooting that
7     results in a fatality.  There have been -- so I
8     believe there was a couple where there were
9     suspects shot but not fatally that I had a part
10    in and then -- but the majority of them at some
11    point while I was on homicide, it went to that
12    outside jurisdiction, so we were responding,
13    like say the Wauwatosa case here.  I believe
14    there was a West Allis case.  Oh, and I've
15    also, I'm sorry, I've dealt with the in-custody
16    deaths at the sheriff's department, at the
17    criminal-justice facility where I've had to
18    lead in those investigations, so are you
19    looking for specifics, or --
20 Q   No, just your general experience, that's all.
21    There is no wrong answer.
22 A   All right.
23 Q   And so have you been involved in corrections
24    cases, you said?
25 A   So if you'll remember the case -- I forget how

Page 13

1     long ago now, but there was the subject in
2     custody, and he was dehydrated.  They withheld
3     water from him, and I forget his name, but I
4     had that scene investigation, and then I
5     testified in several trials for the various
6     people that were held accountable for it by the
7     district attorney's office.
8 Q   Okay.  And how many officer-involved homicide
9     investigations have you been involved with?
10 A  I believe five or six, but I can't give you --
11    it seems like that seems to be the right
12    number.  I just can't give you specifics.
13 Q   Okay.  And just looking at my notes, it looks
14    like it possibly was 2014 when there were
15    outside agencies that were supposed to
16    investigate police-involved shootings; does
17    that sound correct?
18 A  Is that when -- are you saying when we started
19    this policy?
20 Q   Yes.
21 A  That's probably correct.  I actually have no
22    idea.  If that's what it seems to be, I don't
23    know.
24 Q   Okay.  And, I'm sorry, I just -- I was sort of
25    looking for that document.  How many

Page 14

1     officer-involved fatal police shootings have
2     you been involved in with the investigation?
3 A   The initial investigation or follow-up
4     associated with it after?
5 Q   Well, let's just say the initial investigation
6     first.
7 A   I think two or three or maybe four.  But,
8     again, I can't remember specifics of them;
9     so --
10 Q   Okay.  Well, you were in charge of the
11    investigation to the Jay Anderson shooting,
12    correct?
13 A   In a way.  I mean, I -- so I was the one
14    assigned to handle the interview of Officer
15    Mensah, and then -- I guess, because in the end
16    I ended up compiling all the information and
17    then presenting to the district attorney's
18    office with the lieutenant.
19 Q   Okay.  And was the Jay Anderson shooting the
20    first police-involved investigation for a fatal
21    shooting that you were in charge of?
22 A   Yes.
23 Q   And since that time, you've been involved with
24    maybe three or four after?
25 A   Maybe not that many after.  I just don't

Page 15

1     remember.  I mean, I've been to a number of
2     them, I just can't remember when or how or that
3     type of stuff.
4 Q   Okay.  And with regards to you being like sort
5     of working with officer-involved -- we will
6     just focus on fatal shooting cases and shooting
7     cases --
8 A   Uh-huh.
9 Q   -- when there is an outside agency that's
10    supposed to investigate, could you please
11    explain what that means, what you are talking
12    about?
13 A   So when another outside agency -- now this is
14    just from my perspective.  I'm not a
15    supervisor.  This is really their level, but
16    what it basically means is we come in, you
17    know, we make sure that we have the scene
18    correctly identified as far as the parameters
19    of it.  We process the scene.  We interview any
20    witnesses, including officer witnesses,
21    including the officer that was involved in the
22    shooting.  We collect whatever evidence is
23    available, including, you know, body cams or
24    squad cams, and then we handle the
25    officer-involved interview and then

Page 16

1  eventually -- you know, all that evidence is
2  going to be collected, is going to be processed
3  either at the crime lab or at our place, and
4  then it's all put together and eventually
5  presented to the district attorney's office.
6  Q   Okay.  And with regards to that, there is also
7      a MAIT unit, correct, within the Milwaukee
8      Police Department; have you heard of that unit?
9  A   Do you know what it stands for?
10 Q   It's M-A-I-T unit.  I believe it's a collection
11     of police departments that work together.
12 A   Is it "rapid-response unit," something like
13     that?
14 Q   Yeah.
15 A   So, yeah, so whenever they decided on this
16     policy, my understanding is that a number of
17     agencies got together to -- in order to
18     support, so like when -- so there is -- from
19     what I remember, there is a schedule of what
20     department or unit is available for a time
21     period, so like -- so MPD is so big, when we
22     respond, it's all just MPD.  From my
23     understanding, if I remember correctly, when,
24     say, there is a week that another unit other
25     than ours responds, it's usually made up of a

Page 17

1      team of detectives and whatnot from various
2      suburbs because they don't have the same
3      manpower we have, if I've explained that that
4      you can understand.  So we have our own unit
5      because we are large.  The rest of the
6      jurisdictions kind of combine from various
7      units to make the unit that responds to
8      whatever incident it would be.
9  Q   Okay.  So just to be clear, when Milwaukee --
10     well, who decides who is in charge of a
11     police-involved-shooting investigation or what
12     entity is in charge of that?
13 A   That's all above me; so -- basically, I think,
14     the departments have gotten together to decide
15     on this policy, and then someone within -- at
16     the supervisor level, they work out the
17     schedule, and then I would imagine your own
18     department is the person who selects what
19     individual is going to be a part of that team.
20     I think it's called -- is it a "shoot team"?  I
21     don't remember; so --
22 Q   It's all Greek to me; so --
23 A   Well, and honestly, this is all above me.  I'm
24     just giving you my perception of someone who is
25     not a supervisor.

Page 18

1  Q   I see, okay.  And then you said with the MAIT
2      team, it's more like a lot of the smaller
3      agencies are part of that, and then Milwaukee
4      is also part of that rapid-response team,
5      correct?
6  A   Yes, but when it's -- when we are scheduled,
7      like when we are on call for it, because of our
8      size, we don't need any other outside
9      jurisdictions.
10 Q   Okay.
11 A   I think for a while the Department of Justice
12     had their own unit that -- I think before it
13     became more of a community type of response,
14     the Department of Justice was -- would come in,
15     and I remember being at some of those scenes
16     where they would arrive, and they were drawing
17     officers from -- or their members from all over
18     the place and then bringing them in.
19 Q   Okay.
20 A   But it evolved into what it is today, and I
21     don't know if the Department of Justice still
22     responds or not.
23 Q   Okay.  So in 2016 or at least 2014 when we
24     think that -- let's just say 2016 because we
25     are dealing with Jay Anderson, so on June 23rd

Page 19

1      of 2016, it also was sort of the policy that
2      when Milwaukee was assigned to investigate a
3      police-involved shooting for Jay Anderson that
4      Milwaukee would handle that investigation
5      because of its size and you guys had the
6      resources to do it just yourselves, correct?
7  A   Well, so I don't know if it was set up that it
8      was Milwaukee's time to respond, like if we
9      were part of the schedule, because, again,
10     that's all above me.  All I know is that myself
11     and three other detectives were notified by our
12     boss, there has been an officer-involved
13     shooting in Wauwatosa, and we are responding,
14     so as far as scheduling or who is supposed to
15     go, that's, again, that's all above me, and I
16     don't know that answer.
17 Q   Okay.  But you would agree that for the Jay
18     Anderson, Jr. shooting that Milwaukee Police
19     Department was in charge of this homicide
20     investigation, correct?
21 A   Correct.
22 Q   Okay.  And it is called a "homicide
23     investigation," right?
24 A   Yes.
25 Q   Okay.  And why is that?

1 A   Because someone was shot and killed.

2 Q   Okay.  And if there is a police-involved

3     homicide, is that treated -- is that homicide

4     investigation treated differently than if it

5     was only civilians involved in a shooting that

6     caused somebody's death?

7 A   Well, it's treated differently in that law

8     enforcement, like an outside jurisdiction, does

9     the investigation.  If it was just a regular

10    civilian, we would obviously handle it on our

11    own, but I think we always try to get as

12    much -- like we always look for all the

13    evidence.  We always do the same amount of job

14    that we would do for any homicide

15    investigation.

16 Q   Okay.  I'm sorry, I asked a bad question.

17        So I guess my point is, with a -- the

18    Jay Anderson, Jr. shooting homicide

19    investigation, you would investigate that same

20    as you would investigate if it was a civilian

21    homicide investigation, correct?

22 A   Correct.

23 Q   And with regards to homicide investigations,

24    you know, what are some of the things that you

25    do in a homicide investigation?

1 A   Me specifically or just us as a unit?

2 Q   Well, we will start with you and then you guys

3     as a unit.

4 A   So usually when we respond to a homicide

5     investigation, there is always someone there,

6     like if you want to use the Jay Anderson, you

7     know, there is a supervisor there from their

8     jurisdiction, so he, prior to our arrival, is

9     going to collect what information he has, and

10    then we do a briefing.  So there were four of

11    us that responded, and usually for most of our

12    cases, you have a set number of four or six

13    detectives that respond, so once you get there,

14    you are provided a brief statement to what they

15    know at that time.  The supervisor will then

16    assign you a task, and then as the

17    investigation continues, you may get another

18    task or maybe do something differently.

19        For the last number of years, I kind of

20    concentrated more on doing scene

21    investigations, because I was the senior guy

22    there, and I really enjoy the scenes, and so

23    for me, I would do a scene investigation, which

24    just really encompasses making sure you have

25    the right area.  You identify where the scene

1     was.  You identify the items of evidentiary

2     value.  You are going to photograph them in

3     their position.  You are going to measure them

4     out.  You are going to collect them.  And then

5     you are going to have detectives assigned to

6     witness interviews, be it if it's a regular

7     civilian-type shooting, the civilians -- if you

8     have a suspect in custody, how am I going to

9     deal with that person?  You have a forensic

10    investigator that comes, and you direct that

11    person to whatever photos or videos you may

12    need.  And then you are always updating -- so

13    if you are doing witness interviews, you are

14    always updating your supervisor on the scene

15    that came with you, and then he kind of

16    collects all the statements to see, well, this

17    one isn't consistent with the other ones; let's

18    re-interview him because he's not being

19    truthful or something like that or we are not

20    getting a clear enough statement.  And we try

21    and not leave the scene until we know we have,

22    as far as witness interviews, everything

23    consistent, and then you pack up the scene and

24    you leave.

25        But, you know -- so if it's a Milwaukee

1     shooting, your forensic investigator is also

2     going to download body cam -- actually, either

3     that or the jurisdiction -- or the lieutenant

4     for that area is going to do it.  Somehow you

5     get the body cam.  If there is squad cam, you

6     get squad cam.  You check the surrounding area

7     to see if there is a Ring video or surveillance

8     video, a doorbell Ring, they are really good

9     for video, and so you try to do as complete

10    collection of evidence that you possibly can,

11    and then I'll say like for shootings, both

12    homicides and nonfatal, you try to make sure --

13    like say if you have a weapon recovered, you

14    try and make sure that you account for the

15    amount of missing -- or the amount of casings

16    or the amount of cartridges that are missing in

17    a handgun to make sure you've collected all the

18    casings.

19 Q   Okay.  And then with such investigations, if

20    there is witnesses to the homicide, do you try

21    to separate the witnesses, or do you keep them

22    together so like they can corroborate each

23    other's stories; how does that work with

24    witnesses to homicides?

25 A   We always separate them.  Like hopefully by the

Page 24

1  time you've gotten on scene, they have been
2  separated.  If not, definitely when we are on
3  scene, we separate them.
4  Q  Why?
5  A  Well, you don't want them talking and comparing
6  stories and trying to, you know, get it all
7  into one-story.  And, honestly, you can have
8  people -- they will give you different versions
9  of what they say saw, but you have to remember
10  that no two people are ever going to see the
11  same thing the same.  You know, different
12  perspectives, different viewpoints, but you
13  definitely don't want them comparing because
14  then again when you start talking to that
15  person, that person may remember what the other
16  person said, you know, and -- so you want these
17  individual narratives as much as you can.
18  Q  Okay.  And is that something that you learn in
19  the academy in terms of how to treat
20  investigations that you separate witnesses, or
21  is that just something you do, or is that
22  common practice?
23  A  So the academy was a long time ago; I can't
24  remember that.  I think for sure you learn it
25  on scene, especially when you have senior

Page 25

1  either officers or detectives come on scene,
2  and they are like, "Why are they together?
3  Separate them."  I mean, officers make
4  mistakes.  You know, sometimes scenes are so
5  chaotic, you know, that you just make mistakes,
6  but, for the most part, when we are on scene,
7  we definitely do our best to have people
8  separated.
9  Q  Okay.  And have you ever seen two witnesses
10  that were together that were sort of trying to
11  corroborate their stories?
12  A  Oh, absolutely.
13  Q  Do you have an example, like just one example?
14  A  I can't give you the specific, but I know that
15  we've had -- we have come -- towards the later
16  stage of my career, there were several
17  occasions where we would get to a scene, and
18  witnesses are just standing together in a group
19  talking, and it's not supposed to be that way,
20  obviously, and so we were like, "Separate
21  them."  So it's -- you know, it happens.  Like
22  I said, sometimes officers get lax or sometimes
23  it's a chaotic scene and mistakes happen, but,
24  for the most part, the majority of the scenes
25  that I would go to, the officers have done a

Page 26

1  good job.  And they will put them in their own
2  squads, you know, separate them, put them in
3  their own squads, get them away from each.  If
4  it's -- like the worst scenes are bars, because
5  where do you put 30 people or 20 people, but
6  for the scenes that are more controllable where
7  you only have a handful of people or less, for
8  the most part, they do a good job of separating
9  people.
10  Q  Okay.  And with regards to -- did you get any
11  training as part of your tenure as a law
12  enforcement officer on how to investigate
13  homicides?
14  A  So when I was promoted to the rank of
15  detective, we had training at the training
16  academy that was put on by lieutenants.  I
17  don't recall if it was four or six weeks, and I
18  don't know how they do it now, but it would be
19  like -- because they needed the manpower, and
20  you'd have a week or two and then come back for
21  a week and then another couple of weeks.  I
22  just don't remember if it was four or six
23  weeks, but, you know, the training encompassed
24  witness interviews, suspect interviews,
25  techniques, data -- evidence collection, you

Page 27

1  know, those types of things.  Report writing --
2  I don't remember if there was report writing.
3  At some point you got report writing; so --
4  Q  So it sounds like you continually have to --
5  you did take refresher courses on homicide
6  investigations throughout your time as a police
7  officer; is that fair?
8  A  I don't recall doing a whole lot of extra
9  training.  I was fortunate when I got to the
10  unit our day shift had detectives that had been
11  there for 15, 20 years, and they were just a
12  wealth of experience, so a lot of what I
13  learned were from -- what I learned was from
14  senior detectives, like scenes.  I never
15  actually went to any -- that I can recall,
16  anything outside the department on-scene
17  training, but some of those guys were just
18  amazing, and so I learned from them, which is
19  why I think I like the scene so much, but, you
20  know, in your witness or your suspect
21  interviews, when you are newer, you are always
22  placed with a senior -- we always do suspect
23  interviews as a two-person interview, and one
24  of them was always senior, and so you'd learn
25  the techniques through him and whatnot.  I just

Page 28

1  don't recall going off and doing a whole lot of
2  extra training.
3  Q  Okay.  And while you were a police officer,
4     have you ever been recorded by citizens?
5  A  I have no idea.  Do you mean like without my
6     knowledge?
7  Q  No, with -- have the people -- let me ask a
8     better question.
9        People often use their -- well, have
10    you ever been recorded with your knowledge on
11    someone's phone while you were interacting with
12    them as a police officer?
13 A  So the person I'm speaking to directly, that
14    they were recording me?
15 Q  Yes.
16 A  So not that I'm aware of.
17 Q  Okay.
18 A  I'm sure that I've been on scenes where there
19    had been crowds or people and they are
20    recording what's going on, but I'm not aware of
21    anyone -- or I don't recall anyone recording me
22    that I became aware of, no.
23 Q  Okay.  Would you say that people do record on
24    their phones traffic stops with police
25    officers?

Page 29

1  A  Yeah, yes, I would.
2  Q  Okay.  Would you say that -- and would you say
3     that you've seen recordings of police officers
4     while they are interacting with people on their
5     phones?
6  A  Yes.
7  Q  Okay.  And a citizen recording a police officer
8     during a traffic stop, that's not illegal,
9     correct?
10 A  Not that I'm aware of, no.
11 Q  And a person recording a police officer while
12    they are interacting with them, that's not
13    illegal, correct?
14 A  No, I don't believe so.
15 Q  And in the state of Wisconsin, in 2016, it was
16    legal to have a gun and still is, correct?
17 A  Yeah, as long as you weren't a felon.
18 Q  Right.  And seeing someone with a gun is not --
19    you cannot stop someone simply for having a
20    gun, correct?
21 A  No, you can't.  I don't agree with it, but, no.
22 Q  Okay.  So having a gun on the passenger seat of
23    a car is not illegal in the state of Wisconsin?
24 A  So --
25 Q  Unless you are a felon, sorry.

Page 30

1  A  That as well, but I believe the CCW law back
2     then, if it's not in view, you can't do that,
3     but I can't remember.  I know there was a lot
4     of discussion on like -- because it --
5     obviously if you've got a gun on you and you
6     are in a car, you are not going to put it on
7     your dashboard, but I -- I don't -- I don't
8     remember the law specifically at this point.
9  Q  Okay.  Would it surprise you to know that in
10    2016 a person could legally have a gun sitting
11    on their passenger seat in plain view, and that
12    was legal in Wisconsin?
13 A  No, it wouldn't.
14 Q  Okay.  And --
15 A  I'm not trying to be argumentative at all.
16 Q  I get it.  I get it.  Listen, you are doing
17    exactly what you are supposed to as being
18    accurate.  This is your sworn testimony.
19 A  Okay.
20 Q  So a person, you know, having a gun in and of
21    itself is not a death sentence, correct?
22 A  No, it's not.
23 Q  Okay.  Now, with regards to the investigation
24    to Jay Anderson, Jr.'s shooting -- well, let me
25    back up one step.

Page 31

1        What did you do to prepare for today's
2     deposition?
3  A  So I reached out to the homicide unit for a
4     copy of the reports, and they went through open
5     records, and then open records sent me a copy
6     of my reports.
7  Q  Okay.  Is that -- sorry.
8  A  No, you were speaking.  Go ahead.
9  Q  Is that the 172-page report that you are
10    referring to?
11 A  I don't believe it's 172.  Hold on one second.
12    It's 80 pages.
13 Q  Okay.  So -- okay, so I have a 172-page
14    Milwaukee Police Department report that's
15    obviously not what you are referring to with
16    your report.  Is it mostly your police reports
17    that included in what you reviewed?
18 A  These are all just narratives, supplement
19    reports, so if you have something that has
20    documents or diagrams and stuff like that, or I
21    don't know what it would be, or you might have
22    inventory reports, stuff like that.  I don't
23    have any of that.  I just have supplement
24    reports.
25 Q  So what you reviewed is just straight

Page 32

1 police reports as it relates to the Jay
2 Anderson, Jr. shooting?
3 A  Yes, but I've only really been looking at my
4 reports because I didn't want to have an
5 impression what other people had written and
6 get confused, like, did I write that or did
7 somebody else?  I just did my best to focus on
8 my own reports.
9 Q  Okay, that makes sense, okay.
10         And you did not witness the Jay
11 Anderson, Jr. shooting, correct?
12 A  No, I did not.
13 Q  Do you recall when you arrived to the scene?
14 A  I don't.  So we -- we work out of downtown, so
15 7th and State.  We were notified by my boss at
16 4:05 a.m., so I'm guessing it probably took 20
17 minutes or a little bit more -- so there is a
18 computer-aided dispatch, a CAD, which I imagine
19 you are familiar with.  I would have put myself
20 out when I got there, and so you would have the
21 specific time, but I'm guessing anywhere from
22 20 to 30 minutes because we would have had to
23 gather our things, go downstairs, get our
24 squads, which sometimes is hectic, and then
25 make our way out there, and because it's not an

Page 33

1 active shooter, you are not out there -- lights
2 and siren getting there; you are traveling at
3 a, you know, a legal rate of speed; so --
4 Q  Okay.  So you believe about 4:05 a.m. is when
5 you arrived at the scene at Madison Park?
6 A  No.  4:05 is when our boss told us about the
7 incident and said we need to respond.
8 Q  Okay.  And when you responded to the scene,
9 what did you see?
10 A  Well, obviously I saw the -- Jay Anderson's
11 car.  I believe there were three squads facing
12 Anderson's car about two or three car lengths
13 in front of it to the west.  The cars were in
14 the middle of the Madison parking lot, and I'm
15 trying to remember if it was still dark at that
16 time in the morning.  It's the middle of
17 summer; I know it gets dark earlier -- or gets
18 lighter earlier, and then there were a lot of
19 other squads there in the general vicinity but
20 not within the crime scene itself.
21 Q  Okay.
22 A  So I believe there was quite a bit of response
23 from both Wauwatosa -- I don't recall if any
24 other outside jurisdictions were there, but
25 there were a number of officers there and

Page 34

1 squads there.
2 Q  Okay.  But Milwaukee was in charge of the
3 investigation for the Jay Anderson, Jr.
4 shooting, right?
5 A  Yes, yes.
6 Q  And so when you arrived there, was Joseph
7 Mensah still on the scene?
8 A  No, he was not.  I don't believe he was.
9 Q  Do you recall if Ralph Salyers or Steve was on
10 the scene?
11 A  I can't put a face to the names, so I don't
12 recall.
13 Q  Okay.  Do you recall if Stephen Mills was on
14 the scene?
15 A  I don't recall.
16 Q  Prior to this incident, had you met or did you
17 know Joseph Mensah?
18 A  I did not.
19 Q  And please tell us what you did as part of
20 your -- and you were in charge, I believe you
21 said, of this investigation, correct?
22 A  Well, so Lieutenant Joseph McLin was in charge
23 of the investigation as a supervisor, so he
24 assigned tasks to -- four of us were sent out
25 there.  Nick Johnson was assigned the scene.

Page 35

1 Lieutenant McLin assigned me to the interview
2 of Mensah, and then the two other detectives --
3 I think they responded to the scene and then he
4 later sent them -- well, one of them I think
5 was sent to the hospital where Mensah was --
6 or, I'm sorry, where Anderson was, and the
7 other one I believe did some of the officer
8 involved -- or some of the officer interviews,
9 so like I was in charge of putting everything
10 together after all this to get it to the
11 district attorney's office, but I wasn't in
12 charge of anything while I was on scene.  That
13 would be all Lieutenant McLin.
14 Q  Okay.  So Lieutenant McLin was in charge of
15 this investigation?
16 A  Yes, because he was the on-scene supervisor
17 with our unit.
18 Q  Okay.  And what did you do as part of this
19 investigation?
20 A  So for that morning, Lieutenant McLin asked --
21 you know, directed me to go -- do an interview
22 of Officer Mensah, so I located him with
23 Officer Brian Wade, I believe his last name
24 was, and they were sitting in Officer Wade's
25 car.  I don't recall specifically where the car

Page 36

1    was.  I introduced myself to Officer Mensah.
2    He informed me that the attorney was on the way
3    that represented the officers, Jennifer -- is
4    it Hellmer, maybe, and that he wanted to wait
5    until she arrived on scene before he spoke with
6    me, which I was totally fine with.  So I think
7    in between her arrival -- so that and her
8    arrival, I believe I sat in a squad and was
9    able -- someone -- I have this impression -- I
10   just can't confirm it -- but that I reviewed
11   the shooting portion of the video from the
12   camera, from Mensah's squad, I believe, and
13   then the attorney arrived on scene.  She
14   informed me that she wanted Officer Mensah to
15   have a sleep cycle, which is his right, so I
16   told her I was okay with that.  There were just
17   a couple things I needed to do before he could
18   be released from the scene.  So the first thing
19   I did, we had our forensic investigator on
20   scene, Lee Vedbraaten.  I think it's
21   V-E-D-B-R-A-A-T-E-N.  And so I had Officer
22   Mensah a -- photos taken of him as he appeared
23   that morning, just to show that he was in
24   identifiable police uniform.  And then when
25   that was completed, the attorney and Officer

Page 37

1    Mensah -- we drove to their police department,
2    Wauwatosa Police Department where I had -- took
3    possession of his firearm and went through his
4    equipment.
5  Q  Okay.  And was the attorney's name, just for
6    the record, Jennifer Hellmer, H-E-L-L-M-E-R?
7  A  Yes.
8  Q  Okay.  And that was the attorney that was on
9    the scene for Officer Mensah?
10 A  That's correct.
11 Q  Okay.  And so you said that you looked to see
12   if there was any body-cam video; is that
13   accurate?
14 A  No.  Squad cam.
15   Squad cam, okay.
16 A  Yeah.
17 Q  Was there any body-cam video?
18 A  I don't believe so, no.  I don't recall ever
19   seeing body-cam video, I don't think, on anyone
20   that day.  I'm not even sure if they were even
21   equipped with body cam yet.
22 Q  You said you went to review the squad-cam
23   video.  Where did you review that at?
24 A  In the squad seat.  I'm fairly certain that I
25   saw a portion of it while I was sitting there,

Page 38

1    while I was on scene, and it was enough to see
2    just the first, I think it was 20 or 25
3    seconds, which encompassed the actual shooting.
4    I just -- I believe that's when I saw it there.
5    I'm just not 100 percent sure if I did.
6  Q  Okay.  And when you arrived at the scene, was
7    Jay Anderson, Jr. still there?
8  A  The victim?
9     Yes.
10 A  No.  I don't believe he was on scene.  I think
11   he was transported before our arrival.  In
12   fact, he must have been because that's why one
13   of our detectives was sent to the hospital.
14 Q  Okay.  And you went to the scene, you said,
15   Joseph Mensah was not there when you arrived?
16 A  I'm sorry.  I don't know if I'm getting
17   confused with names.  So Officer Mensah was
18   there.  He was in Officer Wade's squad.  And
19   Jay Anderson wasn't there; he was at the
20   hospital.
21 Q  Okay, got it.  Sorry, that's my -- so Officer
22   Mensah was there, but he was in Officer Wade's
23   squad, and at some point when you were there
24   Officer Mensah left, and you were still at the
25   scene; is that correct?

Page 39

1  A  No.  We left together along with the attorney.
2    I think I drove the three of us to
3    Wauwatosa PD.  Like you never want to take an
4    officer's weapon from him on scene.  I think
5    psychologically, it just makes them feel like
6    they did something wrong.  So the policy has
7    been to take possession of the weapon at
8    another location such as the police department,
9    and they would then, I imagine, reissue him a
10   separate handgun, so at the Wauwatosa Police
11   Department is where I had a chance to look at
12   his weapon and the rest of his, like he had the
13   magazines he had and whatnot.
14 Q  Okay.  And you said that you never want to take
15   an officer's weapon at the scene because
16   psychologically it makes him think he did
17   something.  What do you mean by that?
18 A  I think, like if you take an officer's handgun
19   from him on the scene, it's almost like you are
20   saying, you know, you were wrong in what you
21   did, and so -- and I'm not saying this is the
22   reason why the policy was created, but I've
23   heard that and so what we do is instead of
24   taking someone's weapon on the scene, we take
25   it -- we take it and switch it out with a new

Page 40

1 weapon at the police department.
2 Q    Okay.  And do you know what the name of that
3      policy is that dictates that you don't take an
4      officer's weapon who is involved in a shooting
5      at the scene?  What policy is that?
6 A    I'm not sure it's an actual policy, but it's
7      how we handle things at Milwaukee Police
8      Department.  We never take a weapon from the
9      officer at the scene.
10 Q   Okay.
11 A   Unless of course you are a criminal, like --
12     you are an officer that you are in custody for
13     doing something, then of course we will take
14     your weapon, but for an investigation such as
15     this, you just don't -- just don't do it that
16     way.
17 Q   Okay.  So Mensah was never in custody with
18     regards to this incident?
19 A   No, he was not.
20 Q   Okay.  And how did you secure Mensah's gun?
21 A   So when we went to the police department, I
22     would have, you know, the weapon would have
23     been -- he would have provided the weapon, the
24     magazine that was in the weapon, and then -- so
25     the way we package hand guns is you make it

Page 41

1 safe -- so you are wearing gloves of course,
2 but you make it safe, and you place it in a
3 container; it may be a paper bag or it may be a
4 box, depending on what you have.  And then the
5 magazine would be placed in another container
6 like a bag, a paper bag, and then the unfired
7 cartridges inside the magazine would be pulled
8 out of that and placed in a third bag; so --
9 I'm not sure if I did all of that while I was
10 at Wauwatosa, but I certainly -- I believe I
11 would have separated the two.  In fact, if I
12 recall correctly, I think on my inventory, I
13 had a handgun, a magazine, and then I think I
14 picked up their CAD while I was in their
15 department.
16 Q   Okay.  And what policy is it that an officer
17     immediately gets another gun when they arrive
18     at the police station after an officer-involved
19     shooting?
20 A   So I'm assuming he was issued another handgun.
21     I don't know what Wauwatosa's policy is.  The
22     policy stuff would be above me, but I know that
23     in our own officer-involved shootings, an
24     officer, if you are not in custody, is issued a
25     handgun, I mean, for his own safety, I mean, so

Page 42

1 you would be issued a handgun and you would be
2 sent home.
3 Q    Okay.  And were you able to ask any questions
4      of Officer Mensah on that day?
5 A    I did not ask any questions.
6 Q    Okay.  And with regards to, you know, you
7      explained how you secured the gun, why do you
8      go through all those steps?
9 A    Well, you don't want to contaminate anything,
10     so as far as wearing gloves, obviously you
11     don't want to transfer either -- transfer my
12     DNA on any sort of evidence, so it's not just
13     handguns, it would be anything that you
14     recover, you know, clothing, anything.  When I
15     package evidence, you never package a handgun
16     with the magazine together.  It's not safe, to
17     begin with, and you want them separated
18     anyways, and you don't want to just take
19     everything, throw it into one container because
20     it's then all getting cross-contaminated with
21     whatever might be on it, and then go to your
22     district station or your location that you work
23     out of and then separate them, so it's always
24     policy, when you collect evidence, to do it
25     properly the first time and don't just throw it

Page 43

1 in something and do it later.  I mean, it's the
2 easiest way to identify stuff, and it's the
3 easiest way to do it correctly.
4 Q    Okay.  And is collection of evidence, does that
5      also include taking photographs of where
6      evidence is located?
7 A    Yes, so when you -- so at the scene itself,
8      when you identify evidence or things of
9      evidentiary value, you are going to measure --
10     you want to put everything in a diagram to show
11     the relation to everything, so you measure them
12     out, you photo them in their -- so you provide
13     markers, and then you photograph them in
14     their -- the position before you collect them.
15 Q    Okay.  And when you drove to the station with
16     Officer Mensah, did you drive in his vehicle --
17     his squad vehicle?
18 A    No, I believe I would have taken my vehicle.
19 Q    Okay.  And --
20 A    I'm sorry, I don't mean to interrupt you.  I
21     don't recall if they drove with me -- I'm
22     pretty sure they drove with me.  So -- I'm
23     fairly certain they drove with me.  I never
24     would have driven with them.  Maybe there is a
25     possibility he and the attorney drove, but I

Page 44

1 don't think they would have done that either,
2 I'm fairly certain we all drove together.
3 Q   Okay.  And when you arrived at the scene, was
4     Mensah's car -- are you able to take that off
5     the scene, or was he able to take that off --
6     or anyone able to take that off the scene
7     immediately after the incident, or how does
8     that work?
9 A   No.  Until the scene investigator is done
10    processing the scene, nothing moves, so it all
11    stays there.
12 Q   Okay.  And who was the scene investigator
13    processing the scene?
14 A   Nick Johnson, Nicholas Johnson.
15 Q   Okay.  So until Nicholas Johnson says, you
16    know, things in the scene move, they don't go
17    anywhere?
18 A   Right.  His job is to -- like I explained with
19    everything is to get all that done before you
20    release anything.
21 Q   Okay.
22 A   That would have included any of the three
23    squads that were there, Salyers' squad, Mills'
24    squad, or Mensah's squad.
25 Q   Okay.  And as part of the scene investigation,

Page 45

1     are you allowed to like -- because I know -- I
2     saw photographs of like Mensah's car at the
3     scene with the door open.  Should -- can you
4     close the door?  Can you do -- take the key
5     out?  Are there things you can do to the squad,
6     or you just simply do not touch anything?
7 A   I think it depends on what -- like where -- so
8     this actual scene occurred with Anderson's
9     vehicle, and then Mensah's like -- you're
10    definitely not going to move Mensah's vehicle,
11    but say with Mensah leaving the scene, he -- if
12    he needed to grab something out of the car, as
13    long as he -- it would have been permissible
14    because he's not -- the only thing his car was
15    was there and the fact that it was recording
16    and that the headlamps or the take downs were
17    on, but if he needed to pull something out of
18    his car, I think it would have been allowed,
19    but Wade's car was away from the scene, which
20    is where he was.  So I don't remember
21    specifically, but when we left, if he needed to
22    grab his personal gear, that would have been
23    allowed.
24 Q   Okay.  And with regards to the squad video, did
25    you collect Mensah's squad video that night or

Page 46

1     that early morning?
2 A   I did not.  I don't -- so -- I don't remember
3     who collected the video.  I know some video was
4     provided by Wauwatosa for us where they
5     downloaded it and put it on flash drives.  I
6     don't -- honestly don't know if our
7     investigator -- or forensic investigator
8     collected Mensah's video.  I just wasn't there
9     for it, and I don't know how it was done.
10 Q   Okay.  But at some point you received the squad
11    video?
12 A   Yes, that's correct.
13 Q   Okay.  And you received, I believe, the
14    radio-dispatch audio, correct?
15 A   I did.
16 Q   Okay.  How did you get that?
17 A   I believe the same way.  So all that --
18    whenever we receive video, audio, everything we
19    receive, it goes in our computer system for the
20    homicide unit, which is separate, like no one
21    other than homicide detectives or supervisors
22    can access it, and it's put in a file, so this
23    was called, I think, "OIS16" for 2016, and I
24    think maybe "Mensah," but regardless -- or
25    maybe just "OIS16," but once you went into

Page 47

1     that, then you had subfolders, and inside there
2     is where I located the video and the CAD and
3     the stuff like that that you are referring to,
4     so it had been recovered by somebody and then
5     downloaded into that.  I don't know who did
6     that, though.
7 Q   Okay.  And so as far as squad video, you've --
8     you've driven a squad car, correct?
9 A   I have.
10 Q   Okay.  And have you ever recorded, you know, an
11    interaction from your squad car?
12 A   No.
13 Q   Okay.  Do you know how recording works from a
14    squad car?
15 A   So squad cams, body cams, all happened after I
16    was promoted, so I have never operated a squad
17    or a body cam as part of my equipment.
18 Q   Okay.  Have you had audio recording as part of
19    your equipment?
20 A   Such as?
21 Q   Well, such as audio -- the ability to turn on
22    your squad cam from, you know, something that
23    you have on your person while you are
24    interacting with somebody.
25 A   No.  Again, I've never had any access -- I've

Page 48

```
1   never been in a squad or been equipped with
2   anything that records anything.  It all
3   happened -- it was all instituted after I was
4   promoted in 2006.
5 Q Okay.  But this incident happened in 2016.
6 A I'm sorry, what I'm saying -- like body-cam
7   equipment became part of officer's uniforms
8   equipment at a certain point.  I was already
9   promoted.  Squad cam became part of squad
10  equipment at some point after I was promoted to
11  detective, and detectives' squads, we don't
12  have squad cam.  So all a detective squad has
13  is a radio and a mic, and then -- they even
14  took our side lights away from us, so -- our
15  spotlights so that's all it is.  We don't have
16  any of that, so I don't -- I've never collected
17  it.  You know, it's always been a forensic
18  investigator that's collected it.  Apparently
19  officers can access it.  I just never had to
20  deal with it.  I don't really know anything
21  about it.  I'm sorry.
22 Q Okay.  Wow, I would just assume that detectives
23  would have more equipment than a patrol
24  officer?
25 A Well, if you think about it, we, during the
```

Page 49

```
1   course of our interviews, we hear very private
2   things at times, and -- I don't know if this is
3   the reason why.  I just think that because our
4   interviews with victims and whatnot can be very
5   sensitive, I think that's a reason why -- one
6   reason why.  I don't know for sure.  I'm just
7   guessing here, but that's the reason why we
8   don't record our interviews with victims.  It's
9   kind of the same thing -- I've had a couple of
10  investigations that were -- involved recording
11  people, you know, like spy cams and stuff and
12  because of the nature of it, like when you have
13  this evidence, like district attorneys don't
14  even want any possession of it, you know.  I
15  think there are just certain things they don't
16  want the public to have access to, because of
17  course anything that's on a squad cam or body
18  cam, I think you have public access, you know,
19  you can get it through public access or open
20  records, and I just -- and, again, this is just
21  a guess on my part.  I don't know why the
22  policies are what they are.  It's above me.
23 Q Okay.  And so did you -- because you don't
24  have -- okay, so you said you have a
25  microphone.  What's that for?
```

Page 50

```
1 A I have a radio.  I'm sorry, so in the squad,
2   there is a microphone to say, you know, "put me
3   at this location" or "I'm doing this,"
4   whatever.  The only thing I carry is a radio.
5 Q Okay.  And that radio goes to dispatch?
6 A For Milwaukee's dispatch only.
7 Q Okay.  And so have you ever questioned, you
8   know, someone in their car?
9 A In whose car?
10 Q In their own car?
11 A Their personal vehicle?
12 Q Yes.
13 A No.  All interviews for me have always been
14  either inside my squad for the privacy of it,
15  or, if that's not possible, a distance away
16  from anybody that can hear, but I've never
17  spoken to someone in their own personal
18  vehicle.
19 Q Okay.  Have you ever spoken to someone in a
20  vehicle?
21 A Like my squad car, yes.
22 Q So when you've done traffic stops, you were
23  inside your squad car when you would conduct
24  the traffic stops of other people?
25 A I'm sorry, okay.  I thought we were talking
```

Page 51

```
1   about me as a detective interviewing people.
2 Q Sorry, no, just period.
3 A Okay.  Of course I've interviewed -- when I was
4   in uniform, I interviewed people at traffic
5   stops, yes.
6 Q Okay.
7 A I spoke to them through their car window as
8   they were in the driver's seat or passenger
9   seat, whatever.
10 Q And a person reaching for their phone is not a
11  basis to shoot them, correct?
12 A No, it is not.
13 Q Okay.  And with regards to this investigation,
14  so you said that with the squad video, you
15  received that on a flash drive at some point,
16  right?
17 A It was the department received it, and it was
18  downloaded into a folder, and I reviewed it
19  from the folder, I believe.
20 Q Okay.  And did you -- do you have a memo book?
21 A I had memo books.
22 Q What happened to them?
23 A They are all shredded, all 25 years.
24 Q Oh, wow.  And so was it common practice for you
25  to write notes of interviews you had with --
```

Page 52

1  involving investigations?

2  A  So it would depend.  Most often I would use my

3  notebook, which was like a memo, small,

4  whatever.  However, if I was doing like an

5  interrogation interview or if I was doing

6  something that I knew was going to be a much

7  longer interview, I would use like a pad of

8  paper, like an 8 by 11 pad of paper.

9  Q  Okay.  And do you know when you shredded your

10  memo books?

11  A  The day I retired.

12  Q  And it was in 2021.  What day was that?  Sorry.

13  A  July 31st.

14  Q  That must have been fun.

15  A  Yeah, it was.  I did keep my first memo book

16  and my last memo book just kind of like a

17  memoir-type thing, but everything else is gone.

18  Q  Okay.  That makes sense.  And so at anytime,

19  did anyone ever tell you that with regards to

20  this particular case that you are to preserve

21  any and all evidence that you have in your

22  possession?

23  A  No.  In fact, I thought this was all done until

24  the John Doe investigation in January of '22.

25  That was -- I thought it was all finished.  I

Page 53

1  was surprised I was being asked to give another

2  statement back then.

3  Q  Okay.  And had you ever turned over any of your

4  notes to -- written notes or even typed notes

5  to anybody with regards to this investigation?

6  A  No.  Everything I documented was put in a

7  report.

8  Q  Okay.  Did you have any sort of independent

9  recordings of any witnesses with regards to

10  this investigation that you kept?

11  A  No, absolutely not.

12  Q  Okay.  Did you have any recordings of any

13  interviews with regards to this investigation,

14  period?

15  A  No, I didn't record anybody at any point.

16  Q  Okay.  And so what you received -- we are just

17  going to have to go over each sort of parts of

18  your report, if you don't mind.

19  A  Okay.  Can I follow along with mine as well?

20  Q  Yes.  That's exactly what I would love for you

21  to do.  Thank you.

22  A  Okay.

23  So I want to share my screen with you, so --

24  well, let me just ask this.  Are you okay?  Do

25  you need a break?

Page 54

1  A  No, I'm fine, thanks.

2  Q  Okay.  Does anyone else need a break?

3  So let me just share my screen with

4  you.  Sorry, my messy desktop.  Do you see my

5  screen?

6  A  Yes, I do.

7  Q  Okay.  So -- let me just -- okay.

8  MS. THOBANI:  Sorry to interject.  Do

9  you know if this is something you are going to

10  be marking as an exhibit?

11  MS. MOTLEY:  That's a good point,

12  thank you.  So what I'm going to do is -- I'm

13  going to have to rename this -- but what I'm

14  showing you is what I'm going to -- I'm sorry,

15  do you know the last exhibit number that we

16  were on?  I should have asked that in the

17  beginning.

18  THE COURT REPORTER:  I can check

19  quickly here.  Exhibit 30 was the last one.

20  BY MS. MOTLEY:

21  Q  So what I'm showing you and what's going to be

22  marked as plaintiff's Exhibit 31, which is the

23  172-page Milwaukee Police Department

24  investigation document that I received.  If you

25  look at this document, okay -- I'm trying to

Page 55

1  think of the best way to do this -- so --

2  THE WITNESS:  Are you looking for my

3  first response?

4  BY MS. MOTLEY:

5  Q  Yup.  It's page 20, so I'm going to Exhibit 31,

6  page 20.

7  A  Okay.

8  Q  This is a report written by you regarding your

9  interacting with Joseph Mensah's attorney,

10  Jennifer Hellmer, on June 23, 2016, at about

11  4:05 a.m.; do you see that?

12  A  I do.

13  Q  Okay.  So is this document in the reports that

14  you received as part of the 80-page document

15  that you received to prepare for this

16  deposition?

17  A  It is, and I wonder, if you scroll just a

18  little bit higher, can you see the top of the

19  page?  So do you see where it says "supplement

20  number" in the right corner, 0009?

21  Q  Yes.

22  A  So if you need to refer to a document for me,

23  if you give me the supplement number, I can

24  find it in mine, if that's necessary.

25  Q  Okay.  Well, you know what I would like to do,

Page 56

1  because I was going to try to like -- do you
2  see how there is -- it's page numbers on the
3  bottom left-hand corner, they are not -- they
4  are handwritten?  There is like page 20 and 21.
5  What I kind of wanted to do is to see -- is you
6  to kind of like for the record, just say what
7  documents you are looking -- you received for
8  this -- well, never mind.  Okay.  So this is a
9  document you received, this is two pages,
10 right?
11 A  That's correct.
12 Q  Okay.  And then did you receive, on page 34 of
13 this document, Supplement No. 0019, this is the
14 interview you had with Joseph Mensah; did you
15 receive this document?
16 A  Yes, I did.
17 Q  Okay.  And this is a three-page document,
18 right?
19 A  Yes, it is.
20 Q  Okay.  And this is when you interviewed Joseph
21 Mensah on it looks like June 24, 2016?
22 A  That's correct.
23 Q  Did you interview him any time after this date?
24 A  I did not.
25 Q  Did you interview him any time before this

Page 57

1  date?
2  A  I did not.
3  Q  This is the only interview you had with Joseph
4  Mensah?
5  A  That's correct.
6  Q  And this is your complete report of the
7  interview, correct?
8  A  It is.
9  Q  Okay.  Thank you.  And with regards to this
10 interview, what are some of the things that you
11 reviewed prior to your interviewing Joseph
12 Mensah?
13 A  So, to be honest, so when I was -- when I did
14 the John Doe interview in January last year,
15 one of the questions was did I review the
16 squad-cam video prior to this?  And I
17 honestly -- I replied no, because I did not
18 remember it.  Going through these reports -- so
19 it looks like the -- so I said earlier that I
20 think I sat in the squad and I reviewed the 20
21 seconds or so that encompassed the shooting.
22 And that's what I think I remember.  I'm not
23 sure we had this video by the time I spoke with
24 him, so I just -- I can't give you -- I just --
25 I don't remember if I reviewed it or not.  I

Page 58

1  had this impression I might have, but I just
2  don't know 100 percent.
3  Q  Okay.  So if we go to page 41 to 44, when you
4  reviewed his squad-cam video, you would have
5  written a report, correct?
6  A  I did, and I know that I reviewed the video on
7  the 29th.  I believe it was the 29th.
8  Q  That's correct, so what I'm looking at is page
9  41 of -- and Supplement 0022.
10 A  Okay.
11 Q  And in this report, you talk about reviewing
12 the squad-cam video of Joseph Mensah.
13 A  That's correct.
14 Q  Okay.  And that's the -- when you reviewed the
15 video, right?
16 A  That's when I for sure -- so that's when I
17 transcribed it.  Like I said -- and I'm just
18 trying to be honest here -- I have this
19 impression I sat in the squad and I reviewed 20
20 seconds of it, but when I sat down and did a
21 complete review of the video, it would have
22 been on the 29th.
23 Q  Okay.  So -- okay, so you did a complete review
24 of the video on the 29th, got it, okay.  And
25 that's when you are writing notes of what

Page 59

1  specifically you looked at, but at the scene
2  you weren't necessarily meticulously writing
3  notes of what you looking at, correct?
4  A  I didn't take any notes when we were on scene
5  of the video.
6  Q  Why did you look at the video on the scene?
7  A  I would have done it because there was a period
8  of time between when I spoke initially with
9  Officer Mensah and his attorney arrived on
10 scene, so I went to see -- I would have went to
11 see if the video was available so I could get
12 an idea of what had transpired.
13 Q  Okay.  And how many times did you review the
14 video at the scene?
15 A  If I did, it would have been just while I was
16 sitting there the one time or so.
17 Q  Okay.
18 A  Again -- and I have this impression that it was
19 enough for me to see what I observed in there
20 as far as Anderson's actions and then Officer
21 Mensah and him firing the shots.
22 Q  Okay.  And who helped you play the video?
23 A  It would have been someone on scene, if that's
24 what happened.  I don't recall who it would
25 have been.

Page 60

1  Q   Did you know how to play it?
2  A   Absolutely not.
3  Q   Okay.  And let's go back to his report.  So as
4      part of your interview with Joseph Mensah, you
5      -- what else did you review to prepare you for
6      this interview?
7  A   Nothing.
8  Q   Okay.  And did you review --
9  A   Actually, if I can interrupt.  It's possible
10     the autopsy -- so I know from reviewing these
11     reports, which I didn't have before when I had
12     the John Doe hearing, I believe the autopsy was
13     done on the same day, the 23rd, and so we brief
14     every eight hours during a 24-hour day from one
15     shift to the next, so if the autopsy was done,
16     that would -- that information would have been
17     provided at my midnight shift the 23rd and
18     24th, and so I would have had that information
19     when I went and spoke with Officer Mensah.
20 Q   So when you were interviewed for the John Doe
21     hearing, that was before you retired, correct?
22 A   No, it was after I retired.
23 Q   Okay.  Because the John Doe hearing, it
24     began -- at least it was filed October -- I
25     believe it was January 2021, and you retired on

Page 61

1      July 31st of 2021.
2  A   Yes, but I was asked to be interviewed January
3      3rd, I believe, of 2022.
4  Q   Okay.
5  A   And, again, like I said, I didn't even know
6      that they had even started a John Doe hearing.
7  Q   Okay.  Do you recall who interviewed you?
8  A   There was a defense attorney -- I forget, and I
9      believe a Kenosha DA.
10 Q   Okay.  And I'm sorry, why did you laugh?
11 A   I didn't appreciate some of the things he said.
12 Q   Like what?
13 A   So I imagine the purpose of their
14     investigation, you should be unbiased, right?
15 Q   Right.
16 A   And he told me that no one would ever convince
17     him that Officer Mensah was right in shooting
18     Anderson, and to me, that's pretty biased.  He
19     should have had an open mind.  And then he
20     asked a number of questions that were, quite
21     frankly, ridiculous; so --
22 Q   "He" meaning the attorney?
23 A   Yeah, the defense attorney.
24 Q   Not me?
25 A   Not you, no, ma'am.  I'm talking about him.

Page 62

1  Q   I just want to make it very clear for the
2      record.
3  A   No, I'm talking about January 3rd of '22.  I
4      just thought he could have been more
5      professional; so --
6  Q   Okay, no problem.  I was just asking because I
7      brought forth that John Doe hearing on behalf
8      of the family, so that's why I wanted to just
9      clarify for the record, which obviously you
10     know.
11         So with regards to this interview
12     with Joseph Mensah, did you review Joseph
13     Mensah's personnel file?
14 A   I did not.
15 Q   Did you review any fitness-for-duty records?
16 A   I did not.
17 Q   Did you review any disciplinary issues or
18     complaints he may have had against him?
19 A   I did not.
20 Q   Did you review the prior internal investigation
21     of the Antonio Gonzales shooting?
22 A   Was that the sword?
23 Q   Yes.
24 A   Yeah, I did not, no.
25 Q   Okay.  Did you review the, I believe it was

Page 63

1      the -- whoever it was, I believe it was
2      Milwaukee that was in charge of that
3      investigation for Antonio Gonzales; is that
4      correct?
5  A   I don't know who investigated it.  I didn't
6      have any part of that.
7  Q   Okay.  Did you review any -- anything with
8      regards to the Antonio Gonzales investigation
9      prior to this interview with Joseph Mensah?
10 A   I did not, no.
11 Q   Did you review -- and, I'm sorry, I'm going to
12     ask a lot of questions just for the record.
13 A   Okay.
14 Q   Did you review his personnel file -- any of
15     Joseph Mensah's personnel file in any of his
16     employment?
17 A   I did not, no.
18 Q   Okay.  And the same questions for Ralph
19     Salyers, did you review his personnel file?
20 A   I did not.
21 Q   Any fitness-for-duty records?
22 A   I did not.
23 Q   For Stephen Mills, did you review his personnel
24     file?
25 A   I did not.

1  Q  Any fitness-for-duty records?

2  A  I did not.

3  Q  For Salyers and Mills, did you review any

4     disciplinary complaints or any sort of

5     reprimands or issues that they may have had as

6     a Wauwatosa officer?

7  A  I did not, no.

8  Q  Okay. Thank you. And so is this the -- this

9     report, Supplement 0019, this is the complete

10    report of your interview with Joseph Mensah,

11    right?

12 A  It is.

13 Q  Okay. And there was no follow-up interviews

14    with regards to this?

15 A  No. I did not speak with him after this, no.

16 Q  Okay. And so you conducted this interview --

17    who was in this interview?

18 A  A couple people. So Joseph McLin, the

19    lieutenant. He accompanied me there, which is

20    standard for any officer-involved shooting.

21    The attorney, Jennifer Hellmer was there,

22    Jacqueline Schwartz, who I think is some sort

23    of an associate with Hellmer, and then John

24    Milotzky, who was a detective at Wauwatosa and

25    I believe the union representative, was there

1     as the union representative, so he was there.

2  Q  This says that at 9:50 a.m. you traveled to

3     Wauwatosa Police Department. Do you recall

4     where you had conducted this interview?

5  A  I believe it was in one of their conference

6     rooms. It was a big room with a big table, and

7     then there were chairs around the table. And

8     9:50 a.m. is when I was there, so I had

9     traveled and got there at 9:50, so I'm not

10    saying that I left Milwaukee at 9:50 to get

11    there, but that I was there at 9:50.

12 Q  Okay. And can I assume -- or 9:50 is kind of

13    an odd time to set a meeting. Did this meeting

14    actually start -- was supposed to start at 10

15    a.m.?

16 A  I don't believe so. I can't remember if we

17    said we would be there at 9:50 or that's just

18    when we got there, but I don't know.

19 Q  Okay. So that's what time you got there, and

20    you said there were several people in the room,

21    right?

22 A  Yes.

23 Q  Okay. Who was in the room?

24 A  So Jennifer Hellmer, his attorney, her

25    associate, Jaclyn Schwartz, and then the union

1     representative, Detective John Milotzky, and

2     then Lieutenant McLin as well.

3  Q  Okay. And why was Detective John Milotzky

4     there?

5  A  The union representative?

6  Q  Yes.

7  A  Jennifer didn't have any opposition to it. I

8     assume he was there just to make sure that his

9     rights were not being violated in some way.

10 Q  Was he an attorney?

11 A  I meant from a police officer's perspective.

12 Q  Okay. Is it common --

13 A  Oftentimes --

14 Q  Go ahead.

15 A  I'm sorry. So oftentimes, I know in our

16    department, if you are being interviewed for

17    something like say discipline or something like

18    that, you have the right to have your union

19    representative there; so -- no one brought it

20    up as being odd, and I didn't think anything

21    about it.

22 Q  Okay. And you've conducted homicide

23    investigations before, right?

24 A  Yes, ma'am.

25 Q  Okay. And do you just let a bunch of people in

1     the room when a potential suspect is being

2     interviewed; is that normal practice?

3  A  Well, this is a different circumstance than

4     that, I mean, he's not in custody. He has the

5     right to have his attorney, and if his attorney

6     is okay with the union representative to be

7     there, I didn't have a problem with it. He

8     didn't interject at all during any of the

9     interview. It was basically just a

10    conversation between Officer Mensah and myself.

11    I don't remember if Lieutenant McLin asked a

12    question or two, but I don't recall anybody

13    else in the room ever saying anything.

14 Q  Okay. But this still was a homicide

15    investigation, right?

16 A  Yes, but it's an officer-involved one, which is

17    a little bit different than your regular

18    civilian investigations.

19 Q  Okay. I'm sorry. I understood earlier -- you

20    testified earlier that you treat civilian

21    homicide investigations the same as you would

22    treat an officer-involved homicide

23    investigation; is that not true?

24 A  No, that is true, but this is different in that

25    it's law enforcement, so he has a right to have

Page 68

1 an attorney. If I brought someone in to
2 interview them that was not in custody for a
3 homicide investigation, and they said "I want
4 to bring my attorney," I wouldn't stop them
5 from doing that.
6 Q So both an officer and a civilian, they both
7 have a right to an attorney, correct, during a
8 homicide investigation?
9 A Absolutely.
10 Q Okay. So what's different about a homicide
11 investigation involving a police officer versus
12 a civilian investigation involving a homicide,
13 what's different?
14 A Well, only in the respect to -- I believe he's
15 allowed to have a union representative with
16 him. That's all I'm saying.
17 Q Okay. Is that a policy?
18 A I have -- well, I imagine it is because it has
19 to do with the union, but I didn't really give
20 it any thought because the attorney was okay
21 with him being there. I never thought to ask.
22 Q I'm not trying to beat you up, honestly. I
23 just -- I'm just -- I've just been a defense
24 attorney for, you know, a long time. Isn't it
25 better in these investigations to have -- I

Page 69

1 mean, you are sort of -- if Mensah confessed
2 or -- not confessed, sorry. Anything that
3 Mensah says essentially if you are not his
4 attorney, then other people in the room are
5 witnesses to his statements, right?
6 A That's correct.
7 Q And that could -- they could possibly testify
8 as to what he said if that's not a privileged
9 relationship, correct?
10 A Correct.
11 Q Okay. Did that concern you?
12 A To be honest, I never thought about it. Again,
13 because the attorney was there, and she did not
14 object to John -- or officer -- Detective
15 Milotzky being there, I didn't give it another
16 thought.
17 Q Okay. That's fair. And so did you know
18 Detective John Milotzky prior to this
19 investigation?
20 A I don't believe so. I don't really know many
21 detectives in other departments.
22 Q Okay. Did you know like Attorney Schwartz or
23 Attorney Hellmer prior to this investigation?
24 A No. I don't know either one of them.
25 Q So I'm assuming at the beginning of this

Page 70

1 investigation, there were introductions with
2 everybody, right?
3 A Just by who they were -- by their name and who
4 they were in relationship to it.
5 Q Okay. And so this investigation, was this
6 conducted at the Wauwatosa Police Department?
7 A It was.
8 Q Or was it conducted at CVMIC where -- I was
9 going to call -- say Sheila -- Attorney Thobani
10 -- was this conducted at C-V-M-I-C, CVMIC,
11 which is where Attorney Thobani, T-H-O-B-A-N-I,
12 where her office is? Do you know if it was
13 conducted there in Wauwatosa?
14 A Are they connected somehow?
15 Q Sorry. Never mind. You put the address down.
16 You said you traveled to the Wauwatosa Police
17 Department at 1700 North 116th Street?
18 A Yes. I remember walking into the department
19 and being led to a conference room.
20 Q Okay. So as soon as you walk in, they
21 immediately lead you to the conference room, so
22 what time did this -- did your actual
23 questioning of Joseph Mensah begin?
24 A Maybe within five minutes or so. I really
25 don't know. I mean, there wasn't -- there was

Page 71

1 the introductions; we sat down, and then I
2 began.
3 Q So about 9:55 a.m., is about when this started?
4 A Possibly. I don't know.
5 Q Okay. And did you record this interview?
6 A I did not.
7 Q Did you ask for it to be recorded?
8 A I did not. We have a policy of not recording
9 when we conduct officer interviews.
10 Q Okay. Do you know what policy that is?
11 A I do not.
12 Q All right. Do you have a policy of not
13 recording interviews for homicide
14 investigations?
15 A I've never recorded an interview of a witness
16 on scene or a witness that's come down to the
17 station to speak with me.
18 Q Okay. But do you have a policy to not record a
19 suspect for a homicide investigation?
20 A If the suspect is in custody, then, yes, we
21 would do a recorded interview. He was not
22 recorded. He's not in custody, and I don't
23 know if it's an actual written policy that we
24 don't record officers. It's just a policy as
25 long as I've been within the homicide unit that

Page 72

1  we never record any officers in any form when
2  we do these types of investigations.
3  Q  Okay.  Why is that?
4  A  I don't know.  That's something that's above
5  me, and I was always told we just don't do it.
6  Q  Do you ever ask to record -- did you ever -- is
7  it a policy to also not ask to record
8  interviews of police officers involved in
9  homicide investigations?
10 A  I'm sorry, have I ever asked someone if I can
11 record them?
12 Q  No, is it a policy to also not ask to record?
13 A  That's a lot more thought than I put into it,
14 when I got to the homicide unit, and we did
15 these type of interviews, I was told we don't
16 record officers, so I've never done it.
17 Q  Okay.  And so on June 23, 2016, in relation to
18 this homicide investigation, what is the label
19 that you would give Joseph Mensah?
20 A  Well, I never -- just like I don't -- I don't
21 label Anderson as a victim.  I don't label
22 Mensah as a suspect.  He's just the officer
23 involved in a shooting that resulted in the
24 death of somebody.  That's how I view it.
25 Q  Okay.  And is this a policy to view it that

Page 73

1  way?
2  A  Well, that's just how I think about it.  If you
3  notice in my reports, I don't identify Anderson
4  as a victim, and I don't identify Mensah as a
5  suspect.
6  Q  But Anderson didn't kill himself, correct?
7  A  No, but his actions led to it.
8  Q  Okay.  But he is a victim of a shooting, right,
9  it's whether or not there is -- he's a victim
10 of a crime, but he's a victim, right?
11 A  He's a victim of a shooting, yes.
12 Q  Okay.  And so you said Anderson's actions led
13 to him being shot and killed?
14 A  In my opinion, yes.
15 Q  Okay.  And this is the only interview you had
16 with Joseph Mensah?
17 A  It is.
18 Q  Okay.  And so in this interview, let's see, in
19 this interview, Mensah, was he cooperative?
20 A  Yes, he was.
21 Q  Okay.  And did you ever ask him to write out a
22 statement?
23 A  I did not.
24 Q  Why not?
25 A  That's not how we do these interviews.

Page 74

1  Q  Okay.
2  A  And I understand in some departments -- just in
3  general, like I grew up in the south, and you
4  know, you write out your complaint, but our
5  department has always been that we take the
6  statements, and we write out the complaint -- I
7  mean, we write out the report.  So that's just
8  the practice that we do.
9  Q  Okay.  And so after this -- you went to Madison
10 Park on June 23rd of 2016, right?
11 A  Correct.
12 Q  How long were you there?
13 A  Oh, Lord.  I really don't know.  You'd have to
14 refer to the CAD.  I mean, I was there until I
15 transported him to Wauwatosa Police Department
16 to get his equipment.  It might be in my
17 supplemental report what time I transported him
18 there, and then when I was finished collecting
19 his equipment, I believe I went from there back
20 to the police administration building.  I don't
21 believe I went back to the scene, at least I
22 don't recall doing it.
23 Q  Okay.  After June 23, 2016, did you ever go
24 back to Madison Park to the scene of the
25 incident?

Page 75

1  A  I did not, no.
2  Q  Okay.  Why not?
3  A  There wasn't a need to.
4  Q  Okay.  And how long did your investigation of
5  the Jay Anderson shooting, how long did that
6  take, just period?
7  A  Until it was presented to the district
8  attorney's office, is that what you are asking,
9  or are you talking about the initial
10 investigation?
11 Q  The initial investigation in 2016.
12 A  I guess I'm kind of confused.  Are you talking
13 about how long were we on scene that day, or
14 how long after collecting the interviews and
15 doing all that kind of stuff?
16 Q  I'm saying for the entire investigation of the
17 Jay Anderson, Jr. shooting, how long did that
18 entire investigation take to complete in 2016?
19 A  So it took months, and if you'll let me look at
20 the reports, the final thing I did was wait for
21 the FBI's crime lab to come back with
22 apparently an enhanced version of the video.  I
23 believe that was the last thing that we did, so
24 I can see in my sup when I reviewed that, and
25 that would have been the last thing I did

Page 76

1  before I hand it off to the district attorney's
2  office.
3  Q  Okay.  If you could please do that, I would
4     appreciate it.  Thank you.
5  A  Okay, so on Wednesday October 19th of 2016, is
6     when I received a packet containing enhanced
7     video and digital charts from the FBI.
8  Q  Okay, so, I'm sorry, October 19th?
9  A  Yes.  And then on October 25th, it looks like
10    is when I reviewed them.
11 Q  Okay.  So this investigation was completed
12    October 25th of 2016?
13 A  If -- for me, as I recall -- actually, do you
14    mind if I check something after this?
15 Q  Sure.  Go ahead.
16 A  So I believe that was the last active part of
17    the investigation.  There is two reports after
18    that talking about returning items of evidence,
19    but that wouldn't have had any impact on -- so
20    I was waiting for that report from the FBI that
21    they were going to try and enhance the video,
22    and, after that, it was pretty much wrapped up.
23 Q  I'm sorry, what date was that?
24 A  So I received it October 19th, and then it
25    looks like I reviewed it October 26th.

Page 77

1  Q  Okay.  And then did you write a report on that?
2  A  I did, and it's going to be supplement 0038.
3  Q  Okay.  Let's see.  Was this typed up,
4     Supplement 0038?
5  A  Uh-huh.  It's in a narrative form.  It looks
6     like you didn't get that far.  What's the last
7     sup that you have?
8  Q  The last sup that I have -- and maybe it's in
9     another -- is there a handwritten page number
10    on the bottom?
11 A  No.  Mine are -- they basically -- when you go
12    to open records, which you ask for, they then
13    put it in a file, and then -- mine has -- it's
14    all taken straight from the computer system.
15 Q  Okay, Supplement 35?
16 A  All right.  So you are missing 36, 37, 38, and
17    there is also the 39, and 40.
18 Q  36, 37, 38, 39, and 40?
19 A  Yes.
20 Q  Thank you.  Let me see.  And these were -- 36,
21    37, 38, 39, and 40, were these reports that you
22    wrote?
23 A  No, ma'am.  So 39 is the one I wrote -- I'm
24    sorry, let me go up again.  38 is the one I
25    wrote about the FBI stuff.  37 is from the

Page 78

1  intelligence center for forensic technology,
2  and it looks like -- oh, it's the testing of
3  the firearm.
4  Q  Okay.
5  A  And then 36 is by -- also the fusion center,
6     F-U-S-I-O-N.  Did you say you had 35?
7  Q  Sorry, 36 was the fusion center.  What does
8     that consist of?
9  A  The fusion center, so it's kind of like -- they
10    have -- so the testing of the guns are out of
11    there.  The fusion center, like they have them
12    around the country, and Milwaukee has its own,
13    so this particular one is by Detective Doreen
14    Gordy, and it's about a forensic exam of a
15    phone that was on the inventory, so it had
16    nothing to do with the gun.  I'm sorry.
17 Q  Okay.
18 A  So that was 36, right, you were asking?
19 Q  Yup.  36, 37, 38.  And then what's 39?
20 A  39.  So that was removing an item of evidence
21    from our property-control section and taking it
22    to a lieutenant.
23 Q  Okay.  What evidence was that?
24 A  I don't know what it was, but copies were made
25    of it, so it must have been a document or

Page 79

1  something, and then it was returned.
2  Q  Thank you.
3  A  To property control.
4  Q  Okay, great.  And then what's 40?
5  A  40 is returning items of evidence back to
6     Wauwatosa.  It does not annotate what the
7     descriptions were, just the inventory number
8     and the items themselves, the item numbers.
9  Q  Okay.  And thank you very much.  All right.
10       And these were all documents that you
11    received from the Milwaukee Police Department
12    through open records?
13 A  Yeah, so I received -- I think I said a total
14    of 80 pages, and, like I said, I really just
15    concentrated on my reports, but they gave me
16    everything.
17 Q  Okay.  Could we get a copy of those 80 pages
18    that you received?
19 A  I can.  My portions that I reviewed are
20    highlighted, if that makes any difference to
21    you.
22 Q  Oh, that's fine.
23 A  Okay.  Do you want it right now or e-mail when
24    we get done?
25 Q  What I'll do is I will send an e-mail to your

Page 80

1 attorney -- is Jennifer Williams your attorney?
2 A   I don't have anyone representing me because I'm
3    not the focus of this.
4 Q   So Jennifer Williams reached out to you for
5    this deposition, and she's the attorney for the
6    City of Milwaukee?
7 A   That's correct, yes.
8 Q   So how would you like for me to reach out to
9    you?  Is it okay if I reach out to you
10   directly?
11 A  Actually, I think -- I'm not sure if it would
12   be correct for me to forward something that you
13   can get through open records, but if you were
14   to reach out to Jennifer because I had to
15   actually -- I had trouble receiving it, I
16   think, because of Milwaukee's computer system
17   since I'm not recognized anymore, so I actually
18   had to go through Jennifer to have them e-mail
19   it to me, so I'm sure if you reached out to
20   Jennifer and you gave her the report number and
21   saying that you are missing, you know, some of
22   the reports that we spoke about, she would be
23   happy to get them to you.
24 Q   Okay.  But just to be clear, sorry, so they
25   e-mailed all these documents to you?

Page 81

1 A   Yes.
2 Q   And it wasn't -- it was -- and they gave you a
3    link, so you could download it literally and
4    just e-mail it to Jennifer who can possibly
5    e-mail it to me, so I wouldn't need the hard
6    copy, basically, is what I'm saying?
7 A   Okay, yeah, I can do that.
8 Q   Okay.  So --
9        MS. THOBANI:  Just a pause right
10   there, Kim, so when you do that e-mail, can you
11   forward it to us too so that we have the same
12   supplement numbers?
13       MS. MOTLEY:  Yeah, sure.
14       MS. THOBANI:  Okay.  Thank you.
15       MS. MOTLEY:  Sorry, I don't mean to
16   be a pain, Mr. O'Day, but I just want to make
17   sure we get everything -- well, both parties
18   get everything that you have, you know, so
19   that -- even if it's some things that we have
20   already been provided.  We just have to be sort
21   of anal about that.  I hope you can understand.
22       THE WITNESS:  No, that's fine.  This
23   is going on pretty long.  I don't know if I'll
24   have time to e-mail until after my appointment
25   later on.

Page 82

1        MS. MOTLEY:  No, no, no, you don't
2    even have to worry about it right now.  It
3    doesn't have to be today, so that's fine.
4        THE WITNESS:  Okay.
5        MS. MOTLEY:  I'm just letting you
6    know the steps.  I'm going to e-mail Jennifer
7    and ask for this and CC Attorney Thobani, but
8    it does not have to be today.
9        THE WITNESS:  Okay.  So she will
10   reach out to me, and then I'll provide -- okay,
11   absolutely.
12       MS. MOTLEY:  Yeah, okay, cool.
13 BY MS. MOTLEY:
14 Q   So I'm going to make sure -- we only have about
15   20 minutes left, so don't worry.  We are going
16   to get you out of here, I promise.
17 A   Thank you.
18 Q   So you mentioned earlier, why did you determine
19   that Jay Anderson caused his own death?
20 A   So I think, again, if you take an unbiased
21   view -- so honestly, if you take everything out
22   of it and you watch the video only, and we know
23   that there is a handgun in the seat from the
24   recovery of it, and I haven't seen the video in
25   seven years or six-and-a-half years, whatever,

Page 83

1 so please, I'm doing the best I can -- you
2 know, the video starts, and, you know, Officer
3 Mensah has the handgun pointed at the driver,
4 and Anderson's arms are like shoulder high, but
5 this right arm is moving, and at some point it
6 dips below the dashboard, comes back up and
7 then there is more of a move towards the driver
8 front seat -- the passenger front seat.  So
9 that's a movement towards something on that
10 passenger front seat.  I know that there was a
11 gun recovered from that passenger front seat,
12 because looking at all three -- I believe all
13 three squad cams, you see an officer reach into
14 the squad -- into the vehicle, the passenger
15 side, with nothing in his hand, and when he
16 comes out, he has an object in his hand, and
17 when he -- as he disengages around the back of
18 the vehicle and then back towards the squads,
19 you can make out that object is a handgun, so
20 in my mind, that is a handgun that was on that
21 front seat, plus, if I remember correctly, I
22 believe there is DNA from Anderson, and there
23 is also, I think, a little bit of blood
24 spatter.  So, in my mind, that gun was there.
25 I know there has been this talk about

Page 84

1  there is a cell phone on the seat, but
2  rationally, who lunges for a cell phone, you
3  know.  And I think Officer Mensah's reaction is
4  reasonable.  He has a right to defend himself.
5  And if you believe his statement, which I do,
6  and he's identified himself, he's given him
7  commands, the guy isn't obeying the commands,
8  and his statement is that several times he made
9  these motions, and he kept telling him not to
10 until finally he did, so, in my opinion, you
11 know, his statement corroborates that little
12 bit that we see in the video, and, to me, you
13 know, Mr. Anderson, his actions led to Officer
14 Mensah firing his firearm for his own
15 protection.
16 Q  Did you come to this conclusion when you saw
17    the squad video on June 23, 2016?
18 A  The squad video is definitely a part of it
19    because of the actions that I observed in the
20    video.  Listening to Officer Mensah's version
21    of what he saw and what he did, that is where I
22    made my full decision that, you know, the story
23    is consistent with what we see, and it's
24    reasonable, and I -- that's what I base my
25    decision on.

Page 85

1  Q  Okay.  So you reviewed the squad video on June
2     23rd, and then June 24th is when you got
3     Mensah's one and only statement, correct?
4  A  That's correct.
5  Q  And that's when you made that determination
6     that it was justified?
7  A  Well, some of the things, I believe, like the
8     DNA and the spatter kind of stuff, that came
9     later, that to me further substantiated it,
10    but, in my mind, his statement and the video
11    together is why I have that decision, yes.
12 Q  Okay.  And that was -- and I'm just trying to
13    get the timeline together, that's all.  So then
14    his statement was made June 24th, and that's
15    when you came -- and you had already seen the
16    video by then, right?
17 A  Yeah.  Like I said, I have this impression that
18    I had sat in the car and reviewed it briefly.
19    I just don't have 100 percent memory recall of
20    it, but, you know, it -- the statement and the
21    video, you know, in my mind, like, you know,
22    they were consistent, and his action was
23    reasonable.  Further things as we went down the
24    line, like I said, the DNA, the blood spatter,
25    you know, that further substantiated, you know,

Page 86

1  again, that that gun was there, like how else
2  would you have, you know, any of those things
3  on that gun if they weren't there, and so,
4  again, I was fairly confident after the
5  interview that, yup, this is a justified
6  shooting, and then as other stuff came in, I
7  was 100 percent, you know, this is a justified
8  shooting.
9  Q  You were 100 percent sure it was a justified
10    shooting?
11 A  In my mind, I am 100 percent convinced that
12    Officer Mensah acted to defend his life.
13 Q  Okay.  Where was the gun at on the seat?
14 A  So Officer Mensah stated that when he had
15    stepped forward to see what --
16 Q  No, no, no.  Excuse me, sorry.  Where
17    specifically on the seat was the gun located?
18 A  On the seat.
19 Q  Where?
20 A  Well, Officer Mensah -- are you talking about
21    my opinion of where it was, or --
22 Q  No, no, like where on the seat, there is, you
23    know -- let's take it into four quadrants,
24    right?  There is -- put it -- divide it by
25    four, where specifically was the gun on the

Page 87

1  seat?
2  A  I have no idea where it was, other than Officer
3     Mensah saying that it was on the passenger
4     front seat.
5  Q  Okay.  But he didn't tell you specifically
6     where it was, correct, because you would have
7     put that in your report, right?
8  A  Honestly, when he said it was on the seat, I
9     envision a car seat where you sit down, and
10    there really is just -- the gun is sitting on
11    the seat.
12 Q  Okay.  But just for the record, in your report,
13    you didn't -- you never asked him specifically
14    what area the gun was on the seat?
15 A  No, it doesn't say specifically that.
16 Q  Okay.  And you never asked him that, correct?
17 A  No, because, again, my impression was that the
18    gun was sitting on the -- I mean, there is only
19    one place you can put a gun on a seat which is
20    where you sit at; so --
21 Q  Okay.  And you --
22 A  I'm sorry, I don't mean to interrupt you,
23    like -- I'm sure he would have articulated that
24    it was on the side of the seat or that it was,
25    you know, somewhere else, but when you say the

Page 88

1   gun was on the seat, my -- what I visualize,
2   which I think is reasonable, is that it is
3   lying on the seat where you sit down.
4 Q  Have you ever talked to Officer Mensah after
5   this incident?
6 A  I have not, no.
7 Q  Okay.  Was this the one and only time you had a
8   conversation with him?
9 A  Other than the brief conversation on the 23rd,
10   yes.
11 Q  Okay.  So you don't know him, correct?
12 A  I do not.
13 Q  Okay.  So you don't know what's going on in his
14   head when he says "on the seat," whether
15   it's -- where it specifically is located,
16   right?
17 A  I guess not, no.
18 Q  Okay.  You mentioned earlier that there is this
19   talk of, you know, there being a cell phone on
20   the front seat; do you remember that?
21 A  Yes.
22 Q  Okay.  So I understood that for today's
23   deposition, you prepared by looking at the
24   80-page document that you received, right?
25 A  Specifically my reports in the 80 pages, but,

Page 89

1   yes.
2 Q  So what do you mean there is this talk about a
3   cell phone on the seat; what are you talking
4   about?
5 A  So at some time during -- there is -- on a
6   certain date, we met with the assistant DA who
7   was in charge of it -- and his name eludes me
8   at the moment.  I'm sure you know it -- but
9   Joseph McLin -- or Lieutenant McLin, and then
10   members of the family, and then I think there
11   was an activist or two there, and then one of
12   their attorneys, I believe; I'm not sure of the
13   attorney.  And so we were there to try and talk
14   about the case and to answer questions that
15   they had, and during, I believe, that
16   conversation, someone had said, "Well, he was
17   going for a cell phone."
18 Q  Okay.  And that was --
19 A  And that --
20 Q  Sorry.
21 A  That's where I got that from.
22 Q  And that was a conversation you had with an
23   attorney back in 2016, correct?
24 A  Not the attorney, family -- so there was a lot
25   of family there.  We were, again, in a

Page 90

1   conference room at the district attorney's
2   office on the 4th floor in Room 405, and we
3   were there because the district -- the
4   assistant district attorney, and his name
5   eludes me, he wanted us all to be there with
6   him and to speak with family to try and answer
7   questions that they had.  And it was during
8   there that -- one of the family members had
9   said, "Well, he was going for his cell phone,"
10   and that's all I know.
11 Q  Okay.  And there was a cell phone on the front
12   seat as well, right?
13 A  I don't know.  I don't ever recall looking into
14   the vehicle.  That would have been -- if there
15   was one there, the scene detective would have
16   noted that and inventoried it, but I haven't
17   looked at the evidence that he recovered, so I
18   don't know.
19 Q  You don't know if there was a cell phone that
20   was on the seat, but you know that there was a
21   gun on the seat?  How come -- why is that?  I
22   don't understand.
23 A  Well, the gun is part of Officer Mensah's
24   statement and that we recovered it from there.
25   None of the video I reviewed showed a cell

Page 91

1   phone being recovered.  I'm not saying there
2   wasn't a cell phone there.  I'm just saying I
3   personally never viewed it, and I don't recall
4   if there was a cell phone there.
5 Q  Okay.  What else was on the front seat?
6 A  I don't know.
7 Q  Okay.  Was the gun loaded?
8 A  I don't know.
9 Q  Okay.  What kind of gun was it?
10 A  I know it was described by Mensah as being a
11   black and silver semi automatic with extended
12   magazine, but I never handled the gun.  I never
13   had any part of that part because that was part
14   of the scene investigation.
15 Q  Okay.  So you never -- that was, I believe you
16   said -- sorry, I wrote his name --
17 A  Nicholas Johnson.
18 Q  Nicholas Johnson was in charge of all that
19   evidence, the collecting and everything?
20 A  That's right.
21 Q  So did you ever view physical evidence that was
22   recovered, like the money that was in the car?
23 A  No, I did not.
24 Q  Cell phone?
25 A  No.

Page 92

1 Q   The gun?

2 A   No.

3 Q   Car keys?

4 A   No.

5 Q   Okay.  And, let's see, with regards to your

6     background, what's your educational background?

7 A   I was a -- almost -- I think second semester I

8     was at Marquette University as far as -- I'm

9     sorry, junior year Marquette University, so 100

10    and something credits.

11 Q  Oh, great.  And then with regards to this

12    investigation, did you ever talk to Ralph

13    Salyers?

14 A  I don't believe so, no.

15 Q  Okay.  Did you ever talk to Stephen Mills?

16 A  No.  I believe those were assigned to Steve --

17    Detective Steve Johnson, because I think Matt

18    Gadlinski went to the hospital.

19 Q  So did you ever talk to Joseph Lewandowski?

20 A  I don't even -- I don't recognize the name, I'm

21    sorry.

22 Q  He's a Wauwatosa officer.

23 A  No, I don't recognize it.

24 Q  Did you ever talk to Troy Porter?

25 A  Detective Troy Porter from Milwaukee PD?

Page 93

1 Q   Yes.

2 A   Yes.

3 Q   Okay.  What did you talk to him about?

4 A   Well, so at the end of everything, we would

5     have briefed it, and so -- like so when we

6     would get back to the district to our work

7     location, at some point, I forget how long, but

8     there would have been a briefing probably with

9     day shift, and then if we were there long

10    enough at 4, it would have been at the other

11    one, so statements for that would have been --

12    I mean, that would have been part of the

13    briefing about what the interviews revealed.

14 Q  Okay.  And do you recall what you talked to

15    Troy Porter about?

16 A  I'm sorry, are you saying like did we talk

17    about the case, or are you talking about when

18    we were in the briefings, was it discussed?

19 Q  Did you ever talk to Troy Porter about anything

20    that he did specifically in regards to this

21    case?

22 A  Not that I recall, and, again, it's been seven

23    years.  I can't remember.

24 Q  Yeah, of course.  And were you part of the

25    Alvin Cole investigation as well?

Page 94

1 A   Which one was that one?

2 Q   Sorry, were you a part of the Alvin Cole

3     shooting investigation that occurred on

4     February 2nd of 2020?

5 A   No.  I had gone day shift, and I was no longer

6     in the homicide unit.

7 Q   Okay.  And since you've been in law

8     enforcement, have you ever had any disciplinary

9     issues?

10 A  No.

11 Q  Have you had any complaints against you?

12 A  I think I got notified once that I was accused

13    of taking -- there was a guy with a hematoma at

14    St. Luke's refusing to be cared for, and so I

15    was sent there to see if I could convince him

16    for some reason.  He was a victim of a battery.

17    I mean, a huge knock on his head, and I

18    inventoried his property, and I guess he made a

19    complaint that I took some money out of his

20    backpack, and they found it to be baseless, so

21    I'm sure there are things that people have made

22    complaints that I have never been apprised of

23    because it never got anywhere.  I've never been

24    disciplined for anything.

25 Q  Okay, thank you.

Page 95

1          MS. MOTLEY:  And if I could take one

2     minute to call my colleague to see if she has

3     any other questions that I missed, so just give

4     me one minute.

5          (Recess taken.)

6          MS. MOTLEY:  Thank you Mr. O'Day.  I

7     have nothing further.

8          THE WITNESS:  All right.  Thank you.

9          MS. MOTLEY:  I don't know if Attorney

10    Thobani has anything.

11         MS. THOBANI:  We are good for the

12    record.  I don't have any additional questions

13    for O'Day.

14         (Proceedings concluded at 11:36 a.m.)

15         (Exhibit No. 31 was marked.)

16

Page 96

STATE OF WISCONSIN )
                   ) SS:
COUNTY OF MILWAUKEE )



          I, ALICE M. BARBELN, a Registered

Professional Reporter and Notary Public in and for

the State of Wisconsin, do hereby certify that the

above deposition of LUKE O'DAY was recorded by me on

July 21, 2023, and reduced to writing under my

personal direction.

          I further certify that I am not a

relative or employee or attorney or counsel of any

of the parties, or a relative or employee of such

attorney or counsel, or financially interested

directly or indirectly in this action.

          In witness whereof I have hereunder set

my hand and affixed my seal of office at Milwaukee,

Wisconsin, this 23rd day of July, 2023.




                _____
                          Notary Public
                In and for the State of Wisconsin


My Commission Expires:  September 1, 2025.

**WORD INDEX**

**< 0 >**
**0009**  55:20
**0019**  56:13  64:9
**0022**  58:9
**0038**  77:2, 4
**08**  4:25

**< 1 >**
**1**  96:22
**10**  65:14
**100**  38:5  58:2  85:19
86:7, 9, 11  92:9
**11**  52:8
**11:36**  1:1  95:14
**116th**  70:17
**1433**  2:3
**15**  6:25  7:18  27:11
**17**  7:13
**1700**  70:17
**172**  31:11
**172-Page**  3:6  31:9,
13  54:23
**18**  7:13
**1996**  6:5
**1997**  4:24
**19th**  76:5, 8, 24

**< 2 >**
**2**  2:9
**20**  26:5  27:11  32:16,
22  38:2  55:5, 6  56:4
57:20  58:19  82:15
**200**  10:10
**2006**  48:4
**2014**  13:14  18:23
**2016**  18:23, 24  19:1
29:15  30:10  46:23
48:5  55:10  56:21
72:17  74:10, 23
75:11, 18  76:5, 12
84:17  89:23
**2020**  94:4
**2021**  7:21  52:12
60:25  61:1
**2022**  61:3
**2023**  1:1  96:9, 18
**2025**  96:22

**21**  1:1  56:4  96:9
**21-CV-1179-LA**  1:1
**21-CV-848-LA**  1:1
**22**  52:24  62:3
**22-CV-856-LA**  1:1
**23**  55:10  72:17
74:23  84:17
**23rd**  18:25  60:13, 17
74:10  85:2  88:9
96:18
**24**  56:21
**24-hour**  60:14
**24th**  60:18  85:2, 14
**25**  38:2  51:23
**2525**  2:6
**25th**  76:9, 12
**25-year**  6:19
**26th**  76:25
**28106-1433**  2:4
**29th**  58:7, 22, 24
**2nd**  94:4

**< 3 >**
**30**  26:5  32:22  54:19
**31**  3:6  54:22  55:5
95:15
**31st**  52:13  61:1
**34**  56:12
**35**  77:15  78:6
**36**  77:16, 18, 20  78:5,
7, 18, 19
**37**  77:16, 18, 21, 25
78:19
**38**  77:16, 18, 21, 24
78:19
**39**  77:17, 18, 21, 23
78:19, 20
**3rd**  61:3  62:3

**< 4 >**
**4**  3:1  93:10
**4:05**  32:16  33:4, 6
55:11
**40**  77:17, 18, 21  79:4,
5
**405**  90:2
**41**  58:3, 9
**44**  58:3
**4th**  90:2

**< 5 >**
**53211**  2:7
**53226**  2:10
**54**  3:6

**< 7 >**
**79**  3:12
**7th**  32:15

**< 8 >**
**8**  52:8
**8:00**  7:3
**80**  3:9  31:12  79:14,
17  88:25
**80-page**  55:14  88:24

**< 9 >**
**9:34**  1:1
**9:50**  65:2, 8, 9, 10, 11,
12, 17
**9:55**  71:3
**9898**  2:9

**< A >**
**a.m**  1:1  32:16  33:4
55:11  65:2, 8, 15
71:3  95:14
**ability**  47:21
**able**  36:9  42:3  44:4,
5, 6
**absolutely**  25:12
53:11  60:2  68:9
82:11
**abuse**  11:16
**academy**  24:19, 23
26:16
**access**  46:22  47:25
48:19  49:16, 18, 19
**accompanied**  64:19
**account**  23:14
**accountable**  13:6
**accurate**  30:18  37:13
**accused**  11:12, 15
94:12
**acted**  86:12
**action**  85:22  96:15
**actions**  59:20  73:7,
12  84:13, 19

**active**  33:1  76:16
**activist**  89:11
**actual**  38:3  40:6
45:8  70:22  71:23
**added**  6:14
**additional**  95:12
**address**  70:15
**administration**  74:20
**affixed**  96:17
**agencies**  13:15  16:17
18:3
**agency**  15:9, 13
**ago**  9:10  13:1  24:23
**agree**  19:17  29:21
**ahead**  31:8  66:14
76:15
**al**  1:1
**ALICE**  1:1  96:5
**Allis**  12:14
**allowed**  45:1, 18, 23
68:15
**ALVIN**  1:1  93:25
94:2
**amazing**  27:18
**amount**  20:13  23:15,
16
**anal**  81:21
**ANDERSON**  1:1
14:11, 19  18:25  19:3,
18  20:18  21:6  30:24
32:2, 11  34:3  35:6
38:7, 19  61:18  72:21
73:3, 6  75:5, 17
82:19  83:22  84:13
**Anderson's**  33:10, 12
45:8  59:20  73:12
83:4
**annotate**  79:6
**answer**  5:4  12:21
19:16  89:14  90:6
**answered**  9:13
**answers**  5:3
**ANTHONY**  1:1
**ANTONIO**  1:1
62:21  63:3, 8
**ANTONIQUE**  2:6
**anybody**  50:16  53:5,
15  67:12
**anymore**  80:17

**anytime** 52:*18*
**anyways** 42:*18*
**Apparently** 48:*18*
75:22
**appeared** 2:*4, 7, 10*
36:22
**appointment** 81:2*4*
**appreciate** 4:*20*
61:*11* 76:*4*
**apprised** 94:22
**area** 21:25 23:*4, 6*
87:*14*
**argumentative** 30:*15*
**arm** 83:*5*
**arms** 83:*4*
**arrest** 11:*13, 17, 19*
**arrival** 21:8 36:*7, 8*
38:*11*
**arrive** 18:*16* 41:*17*
**arrived** 32:*13* 33:*5*
34:6 36:*5, 13* 38:*6,*
*15* 44:*3* 59:*9*
**articulated** 87:*23*
**asked** 20:*16* 35:*20*
53:*1* 54:*16* 61:2, *20*
67:*11* 72:*10* 87:*13,*
*16*
**asking** 9:*12* 62:6
75:8 78:*18*
**assault** 11:*13*
**assign** 21:*16*
**assigned** 6:*6, 7*
14:*14* 19:2 22:*5*
34:2*4, 25* 35:*1* 92:*16*
**assignments** 6:2*4*
**assistant** 89:*6* 90:*4*
**associate** 64:2*3* 65:*25*
**associated** 14:*4*
**assume** 48:22 65:*12*
66:*8*
**assuming** 41:*20*
69:25
**Attached** 3:*9*
**attorney** 36:2, *13, 25*
37:8 39:*1* 43:*25*
55:*9* 59:*9* 61:*8, 22,*
*23* 64:*21* 65:2*4*
66:*10* 67:*5* 68:*1, 4, 7,*
*20, 24* 69:*4, 13, 22, 23*
70:*9, 11* 80:*1, 5* 82:*7*

89:*13, 23, 24* 90:*4*
95:*9* 96:*12, 14*
**attorneys** 49:*13*
89:*12*
**attorney's** 13:*7*
14:*17* 16:*5* 35:*11*
37:*5* 75:*8* 76:*1* 90:*1*
**audio** 46:*14, 18*
47:*18, 21*
**automatic** 91:*11*
**autopsy** 60:*10, 12, 15*
**available** 15:*23*
16:*20* 59:*11*
**Avenue** 2:6
**aware** 28:*16, 20, 22*
29:*10*

**< B >**
**back** 4:2*4* 8:2 26:*20*
30:*1, 25* 53:2 60:*3*
74:*19, 21, 24* 75:*21*
79:*5* 83:*6, 17, 18*
89:*23* 93:6
**background** 92:6
**backpack** 94:*20*
**bad** 5:8 20:*16*
**bag** 41:*3, 6, 8*
**BARBELN** 1:*1* 96:*5*
**bars** 26:*4*
**base** 84:2*4*
**baseless** 94:*20*
**basically** 15:*16*
17:*13* 67:*9* 77:*11*
81:*6*
**basis** 51:*11*
**battery** 94:*16*
**BAYNARD** 2:*7*
**beat** 68:22
**began** 60:2*4* 71:2
**beginning** 54:*17*
69:25
**behalf** 2:*4, 7, 10* 62:*7*
**believe** 7:*13* 12:*8, 13*
13:*10* 16:*10* 29:*14*
30:*1* 31:*11* 33:*4, 11,*
*22* 34:*8, 20* 35:*7, 23*
36:*8, 12* 37:*18* 38:*4,*
*10* 41:*10* 43:*18*
46:*13, 17* 51:*19* 58:*7*
60:*12, 25* 61:*3, 9*

62:25 63:*1* 64:*25*
65:*5, 16* 68:*14* 69:*20*
74:*19, 21* 75:*23*
76:*16* 83:*12, 22* 84:*5*
85:*7* 89:*12, 15* 91:*15*
92:*14, 16*
**best** 25:7 32:7 55:*1*
83:*1*
**better** 28:8 68:25
**biased** 61:*18*
**big** 16:2*1* 65:6
**bit** 32:*17* 33:22
55:*18* 67:*17* 83:*23*
84:*12*
**black** 91:*11*
**blood** 83:2*3* 85:2*4*
**Bluemound** 2:*9*
**body** 15:2*3* 23:2, *5*
37:2*1* 47:*15, 17*
49:*17*
**body-cam** 37:*12, 17,*
*19* 48:6
**book** 51:*20* 52:*15, 16*
**books** 51:2*1* 52:*10*
**boss** 19:*12* 32:*15*
33:6
**bottom** 56:*3* 77:*10*
**Box** 2:*3* 41:*4*
**break** 53:25 54:2
**Brian** 35:2*3*
**brief** 10:*1* 21:*14*
60:*13* 88:*9*
**briefed** 93:*5*
**briefing** 21:*10* 93:*8,*
*13*
**briefings** 93:*18*
**briefly** 85:*18*
**bring** 68:*4*
**bringing** 18:*18*
**brought** 62:7 66:*19*
68:*1*
**building** 74:2*0*
**bunch** 66:25
**bureau** 11:2*0*

**< C >**
**CAD** 32:*18* 41:*14*
47:2 74:*14*
**CADE** 2:*4*

**call** 4:*15, 17, 20* 6:*15*
18:7 70:*9* 95:2
**called** 4:2 6:*12*
17:*20* 19:22 46:2*3*
**cam** 23:2, *5, 6* 37:*14,*
*15, 21* 47:*17, 22* 48:*9,*
*12* 49:*17, 18*
**camera** 36:*12*
**cams** 15:2*3, 24*
47:*15* 49:*11* 83:*13*
**captain** 6:*11*
**captain's** 6:8 9:*4*
**car** 6:8 9:*4* 29:2*3*
30:6 33:*11, 12* 35:25
44:*4* 45:2, *12, 14, 18,*
*19* 47:8, *11, 14* 50:*8,*
*9, 10, 21, 23* 51:7
85:*18* 87:9 91:22
92:*3*
**cared** 94:*14*
**career** 6:*3, 19* 25:*16*
**Carolina** 2:*4*
**carry** 50:*4*
**cars** 33:*13*
**cartridges** 23:*16* 41:7
**Case** 1:*1* 11:*1, 11, 15,*
*22* 12:*13, 14, 25*
52:2*0* 89:*14* 93:*17,*
*21*
**cases** 11:8, 2*1* 12:2,
*24* 15:6, 7 21:*12*
**casings** 23:*15, 18*
**caused** 20:6 82:*19*
**CC** 82:7
**CCW** 30:*1*
**cell** 84:*1, 2* 88:*19*
89:*3, 17* 90:*9, 11, 19,*
*25* 91:2, *4, 24*
**center** 78:*1, 5, 7, 9, 11*
**certain** 5:2 37:2*4*
43:2*3* 44:2 48:8
49:*15* 89:6
**certainly** 41:*10*
**certify** 96:*7, 11*
**chairs** 65:*7*
**chance** 39:*11*
**chaotic** 25:*5, 23*
**charge** 14:*10, 21*
17:*10, 12* 19:19 34:2,

20, 22 35:9, *12, 14*
63:2 89:7 91:*18*
**charts** 76:7
**check** 23:6 54:*18*
76:*14*
**child** 11:*16*
**circumstance** 67:*3*
**citizen** 29:7
**citizens** 28:*4*
**City** 7:*20* 80:6
**Civil** 1:*1*
**civilian** 20:*10, 20*
67:*18, 20* 68:6, *12*
**civilians** 20:*5* 22:7
**civilian-type** 22:7
**clarify** 62:9
**clear** 17:9 22:*20*
62:*1* 80:*24*
**close** 45:*4*
**clothing** 42:*14*
**COLE** 1:*1* 93:*25*
94:*2*
**colleague** 95:*2*
**collect** 15:*22* 21:9
22:*4* 42:*24* 43:*14*
45:*25*
**collected** 16:*2* 23:*17*
46:*3, 8* 48:*16, 18*
**collecting** 74:*18*
75:*14* 91:*19*
**collection** 16:*10*
23:*10* 26:*25* 43:*4*
**collects** 22:*16*
**combine** 17:6
**come** 10:*3* 15:*16*
18:*14* 25:*1, 15* 26:*20*
71:*16* 75:*21* 84:*16*
90:*21*
**comes** 22:*10* 83:6, *16*
**comfortable** 4:*10*
**commands** 84:7
**commencing** 1:*1*
**Commission** 96:*22*
**common** 24:*22*
51:*24* 66:*12*
**community** 10:*16*
18:*13*
**comparing** 24:*5, 13*
**compiling** 14:*16*

**complaint** 74:*4, 6*
94:*19*
**complaints** 62:*18*
64:4 94:*11, 22*
**complete** 23:9 57:6
58:*21, 23* 64:9 75:*18*
**completed** 36:*25*
76:*11*
**computer** 46:*19*
77:*14* 80:*16*
**computer-aided** 32:*18*
**concentrated** 21:*20*
79:*15*
**concern** 69:*11*
**concerns** 4:*11*
**concluded** 95:*14*
**concluding** 1:*1*
**conclusion** 84:*16*
**conduct** 50:*23* 71:9
**conducted** 64:*16*
65:*4* 66:*22* 70:6, *8,*
*10, 13*
**conference** 65:*5*
70:*19, 21* 90:*1*
**confessed** 69:*1, 2*
**confident** 86:*4*
**confirm** 36:*10*
**confused** 32:6 38:*17*
75:*12*
**Congratulations** 7:*22*
**connected** 70:*14*
**consist** 78:*8*
**consistent** 22:*17, 23*
84:*23* 85:*22*
**contact** 10:*16*
**container** 41:*3, 5*
42:*19*
**containing** 76:6
**contaminate** 42:9
**continually** 27:*4*
**continue** 6:*22*
**continues** 21:*17*
**control** 79:*3*
**controllable** 26:6
**conversation** 67:*10*
88:*8, 9* 89:*16, 22*
**convince** 61:*16* 94:*15*
**convinced** 86:*11*
**cool** 82:*12*

**cooperative** 73:*19*
**copies** 78:*24*
**Copy** 3:9 31:*4, 5*
79:*17* 81:6
**corner** 55:*20* 56:*3*
**correct** 9:*18* 10:*17,*
*23* 13:*17, 21* 14:*12*
16:7 18:*5* 19:6, *20,*
*21* 20:*21, 22* 29:9, *13,*
*16, 20* 30:*21* 32:*11*
34:*21* 37:*10* 38:*25*
46:*12, 14* 47:8 51:*11*
56:*11, 22* 57:5, *7*
58:*5, 8, 13* 59:*3*
60:*21* 63:*4* 68:7
69:*6, 9, 10* 73:6
74:*11* 80:7, *12* 85:*3,*
*4* 87:6, *16* 88:*11*
89:*23*
**corrections** 12:*23*
**correctly** 15:*18*
16:*23* 41:*12* 43:*3*
83:*21*
**corroborate** 23:*22*
25:*11*
**corroborates** 84:*11*
**counsel** 96:*12, 14*
**country** 78:*12*
**COUNTY** 96:*2*
**couple** 7:*3, 4* 9:*3*
11:*21* 12:8 26:*21*
36:*17* 49:9 64:*18*
**course** 8:*12* 40:*11,*
*13* 41:*1* 49:*1, 17*
51:*3* 93:*24*
**courses** 27:*5*
**COURT** 1:*1* 5:5, *11*
8:*8* 54:*18*
**created** 39:*22*
**credits** 92:*10*
**crime** 16:*3* 33:*20*
73:*10* 75:*21*
**Crimes** 6:*12* 7:5, *15*
9:*5*
**criminal** 11:*2, 4*
40:*11*
**criminal-justice** 12:*17*
**cross-contaminated**
42:*20*
**crowds** 28:*19*

**custody** 11:*17* 13:2
22:*8* 40:*12, 17* 41:*24*
67:*4* 68:2 71:*20, 22*
**CVMIC** 70:*8, 10*
**C-V-M-I-C** 70:*10*
**cycle** 36:*15*

**< D >**
**DA** 61:9 89:6
**dark** 33:*15, 17*
**dashboard** 30:7 83:6
**data** 26:*25*
**date** 56:*23* 57:*1*
76:*23* 89:6
**day** 7:*13, 15* 27:*10*
37:*20* 42:*4* 52:*11, 12*
60:*13, 14* 75:*13* 93:9
94:*5* 96:*18*
**deal** 22:9 48:*20*
**dealing** 18:*25*
**dealt** 10:*15* 11:*21,*
*22* 12:*15*
**death** 20:6 30:*21*
72:*24* 82:*19*
**deaths** 12:*16*
**decide** 17:*14*
**decided** 16:*15*
**decides** 17:*10*
**decision** 84:*22, 25*
85:*11*
**defend** 84:*4* 86:*12*
**Defendants** 1:*1* 2:*10*
**defense** 61:*8, 23*
68:*23*
**definitely** 9:*23* 10:*5*
24:*2, 13* 25:*7* 45:*10*
84:*18*
**dehydrated** 13:*2*
**Department** 3:6
6:*18, 21* 7:*20* 9:*24*
12:*16* 16:*8, 20* 17:*18*
18:*11, 14, 21* 19:*19*
27:*16* 31:*14* 37:*1, 2*
39:*8, 11* 40:*1, 8, 21*
41:*15* 51:*17* 54:*23*
65:*3* 66:*16* 70:6, *17,*
*18* 74:*5, 15* 79:*11*
**departments** 6:*15*
16:*11* 17:*14* 69:*21*

74:2
**depend** 52:2
**depending** 41:4
**depends** 45:7
**deposed** 4:23, 24 5:1 8:7
**deposition** 5:20 8:9 31:2 55:16 80:5 88:23 96:8
**depositions** 5:16
**described** 91:10
**descriptions** 79:7
**desktop** 54:4
**detective** 6:25 7:18 8:16 26:15 48:11, 12 51:1 64:24 66:1, 3 69:14, 18 78:13 90:15 92:17, 25
**detectives** 17:1 19:11 21:13 22:5 25:1 27:10, 14 35:2 38:13 46:21 48:11, 22 69:21
**determination** 85:5
**determine** 82:18
**diagram** 43:10
**diagrams** 31:20
**dictates** 40:3
**difference** 4:18 79:20
**different** 24:8, 11, 12 67:3, 17, 24 68:10, 13
**differently** 20:4, 7 21:18
**difficult** 5:11
**digital** 76:7
**dips** 83:6
**direct** 10:16 11:24 22:10
**directed** 35:21
**direction** 96:10
**directly** 28:13 80:10 96:15
**disciplinary** 62:17 64:4 94:8
**discipline** 66:17
**disciplined** 94:24
**discussed** 93:18
**discussion** 30:4
**disengages** 83:17

**dispatch** 32:18 50:5, 6
**Disposition** 3:8
**distance** 50:15
**DISTRICT** 1:1 6:6 13:7 14:17 16:5 35:11 42:22 49:13 75:7 76:1 90:1, 3, 4 93:6
**divide** 86:24
**DNA** 42:12 83:22 85:8, 24
**Document** 3:6 13:25 54:24, 25 55:13, 14, 22 56:9, 13, 15, 17 78:25 88:24
**documented** 53:6
**documents** 31:20 56:7 79:10 80:25
**Doe** 52:24 57:14 60:12, 20, 23 61:6 62:7
**doing** 7:14 9:2 21:20 22:13 27:8 28:1 30:16 40:13 50:3 52:4, 5 68:5 74:22 75:15 83:1
**door** 45:3, 4
**doorbell** 23:8
**Doreen** 78:13
**download** 23:2 81:3
**downloaded** 46:5 47:5 51:18
**downs** 45:16
**downstairs** 32:23
**downtown** 32:14
**drawing** 18:16
**drive** 43:16 51:15
**driven** 43:24 47:8
**driver** 83:3, 7
**driver's** 51:8
**drives** 46:5
**drove** 37:1 39:2 43:15, 21, 22, 23, 25 44:2
**due** 7:10
**duly** 4:3

**< E >**

**earlier** 33:17, 18 57:19 67:19, 20 82:18 88:18
**early** 46:1
**easiest** 43:2, 3
**EASTERN** 1:1
**educational** 92:6
**eight** 10:1 60:14
**either** 7:13 16:3 23:2 25:1 42:11 44:1 50:14 69:24
**eludes** 89:7 90:5
**e-mail** 79:23, 25 80:18 81:4, 5, 10, 24 82:6
**e-mailed** 80:25
**employee** 11:15 96:12, 13
**employment** 63:16
**encompassed** 26:23 38:3 57:21
**encompasses** 21:24
**ended** 14:16
**enforcement** 6:1, 20 8:6, 23 20:8 26:12 67:25 94:8
**enhance** 76:21
**enhanced** 75:22 76:6
**enjoy** 21:22
**entire** 75:16, 18
**entity** 17:12
**envision** 87:9
**equipment** 37:4 47:17, 19 48:7, 8, 10, 23 74:16, 19
**equipped** 37:21 48:1
**especially** 24:25
**essentially** 69:3
**ESTATE** 1:1
**et** 1:1
**eventually** 7:10 16:1, 4
**everybody** 70:2
**evidence** 15:22 16:1 20:13 23:10 26:25 42:12, 15, 24 43:4, 6, 8 49:13 52:21 76:18 78:20, 23 79:5 90:17 91:19, 21

**evidentiary** 22:1 43:9
**evolved** 18:20
**exactly** 30:17 53:20
**exam** 78:14
**Examination** 1:1 3:1 4:5
**examined** 4:4
**example** 25:13
**Excuse** 6:17 86:16
**Exhibit** 3:6, 8 54:10, 15, 19, 22 55:5 95:15
**Exhibits** 3:5
**experience** 6:2 8:5, 20, 22 9:11 12:20 27:12
**Expires** 96:22
**explain** 6:1 12:1 15:11
**explained** 17:3 42:7 44:18
**extended** 91:11
**extra** 27:8 28:2

**< F >**
**face** 34:11
**facility** 12:17
**facing** 33:11
**fact** 38:12 41:11 45:15 52:23
**fair** 27:7 69:17
**fairly** 37:24 43:23 44:2 86:4
**familiar** 32:19
**family** 10:18 62:8 89:10, 24, 25 90:6, 8
**far** 15:18 19:14 22:22 42:10 47:7 59:20 77:6 92:8
**fatal** 14:1, 20 15:6
**fatality** 12:7
**fatally** 12:9
**FBI** 76:7, 20 77:25
**FBI's** 75:21
**February** 94:4
**Federal** 1:1
**feel** 39:5
**felon** 29:17, 25
**file** 46:22 62:13 63:14, 15, 19, 24

77:*13*
**filed** 60:*24*
**final** 75:*20*
**finally** 7:*12* 84:*10*
**financial-crimes** 7:*16*
**financially** 96:*14*
**find** 55:*24*
**fine** 5:*19* 36:6 54:*1*
79:22 81:22 82:*3*
**finished** 52:25 74:*18*
**firearm** 37:*3* 78:*3*
84:*14*
**firing** 59:*21* 84:*14*
**first** 4:*3* 6:*23* 11:5
14:6, *20* 36:*18* 38:2
42:25 52:15 55:*3*
**fitness-for-duty** 62:*15*
63:*21* 64:*1*
**five** 13:*10* 70:*24*
**flash** 46:5 51:*15*
**floor** 90:2
**focus** 9:*4* 15:6 32:7
80:*3*
**folded** 7:*11*
**folder** 51:*18*, *19*
**follow** 53:*19*
**follows** 4:*4*
**follow-up** 10:*4* 14:*3*
64:*13*
**forensic** 22:9 23:*1*
36:*19* 46:7 48:*17*
78:*1*, *14*
**forget** 12:*4*, *25* 13:*3*
61:*8* 93:7
**form** 72:*1* 77:5
**forth** 62:7
**fortunate** 27:9
**forward** 5:*20* 80:*12*
81:*11* 86:*15*
**found** 94:*20*
**four** 6:6, *9*, *16* 7:*17*
14:7, *24* 21:*10*, *12*
26:*17*, *22* 34:*24*
86:*23*, *25*
**frankly** 61:*21*
**frequency** 9:7
**front** 33:*13* 83:8, *10*,
*11*, *21* 87:*4* 88:*20*
90:*11* 91:5

**full** 84:22
**fun** 52:*14*
**further** 85:*9*, *23*, *25*
95:7 96:*11*
**fusion** 78:5, 7, *9*, *11*
**F-U-S-I-O-N** 78:6

**< G >**
**Gadlinski** 92:*18*
**gather** 32:*23*
**gear** 45:22
**general** 12:*20* 33:*19*
74:*3*
**getting** 22:*20* 33:2
38:*16* 42:*20*
**give** 10:*9* 13:*10*, *12*
24:8 25:*14* 53:*1*
55:*23* 57:*24* 68:*19*
69:*15* 72:*19* 95:*3*
**given** 84:6
**giving** 17:*24*
**gloves** 41:*1* 42:*10*
**go** 10:*3* 11:*13*, *16*
19:*15* 25:25 31:8
32:*23* 35:*21* 42:8, *21*
44:*16* 53:*17* 58:*3*
60:*3* 66:*14* 74:*23*
76:*15* 77:*11*, *24*
80:*18*
**goes** 46:*19* 50:5
**going** 5:*10* 11:5
16:2 17:*19* 21:9
22:2, *3*, *4*, *5*, *8* 23:2, *4*
24:*10* 28:*1*, *20* 30:6
43:9 45:*10* 52:6
53:*17* 54:*9*, *12*, *13*, *14*,
*21* 55:5 56:*1* 57:*18*
63:*11* 70:9 76:*21*
77:2 81:*23* 82:6, *14*,
*15* 88:*13* 89:*17* 90:9
**GONZALES** 1:*1*
62:*21* 63:*3*, 8
**Good** 4:7, *8* 23:8
26:*1*, 8 54:*11* 95:*11*
**Gordy** 78:*14*
**gotten** 17:*14* 24:*1*
**grab** 45:*12*, 22
**great** 5:25 7:*19*, 22
8:*4* 79:*4* 92:*11*

**Greek** 17:22
**grew** 74:*3*
**ground** 5:*3*
**GROUP** 2:*4* 25:*18*
**guess** 8:*17*, *18* 14:*15*
20:*17* 49:*21* 75:*12*
88:*17* 94:*18*
**guessing** 32:*16*, *21*
49:7
**gun** 29:*16*, *18*, *20*, 22
30:5, *10*, 20 40:*20*
41:*17* 42:7 78:*16*
83:*11*, *24* 86:*1*, *3*, *13*,
*17*, *25* 87:*10*, *14*, *18*,
*19* 88:*1* 90:*21*, *23*
91:7, *9*, *12* 92:*1*
**guns** 40:25 78:*10*
**guy** 21:*21* 84:7
94:*13*
**guys** 19:5 21:2
27:*17*

**< H >**
**habit** 5:*8*
**hand** 40:25 76:*1*
83:*15*, *16* 96:*17*
**handful** 26:7
**handgun** 23:*17*
39:*10*, *18* 41:*13*, *20*,
*25* 42:*1*, *15* 82:23
83:*3*, *19*, *20*
**handguns** 42:*13*
**handle** 6:*10* 14:*14*
15:*24* 19:*4* 20:*10*
40:7
**handled** 91:*12*
**handwritten** 56:*4*
77:*9*
**happen** 25:*23*
**happened** 47:*15*
48:*3*, 5 51:22 59:*24*
**happens** 25:*21*
**happy** 80:*23*
**hard** 8:*18* 81:5
**head** 88:*14* 94:*17*
**headlamps** 45:*16*
**hear** 49:*1* 50:*16*
**heard** 16:8 39:*23*
**hearing** 60:*12*, *21*, *23*

61:6 62:7
**hectic** 32:*24*
**held** 13:6
**Hellmer** 36:*4* 37:6
55:*10* 64:*21*, *23*
65:*24* 69:*23*
**H-E-L-L-M-E-R** 37:6
**helped** 59:22
**hematoma** 94:*13*
**hereunder** 96:*16*
**high** 83:*4*
**higher** 55:*18*
**highlighted** 79:*20*
**hinder** 5:*15*
**hired** 6:5
**Hold** 31:*11*
**home** 42:2
**homicide** 7:*8*, *12*
9:*17*, *21*, *25* 11:*10*
12:*11* 13:8 19:*19*, 22
20:*3*, *14*, *18*, *21*, *23*, 25
21:*4* 23:*20* 27:5
31:*3* 46:*20*, *21* 66:22
67:*14*, *21*, 22 68:*3*, 8,
*10*, *12* 71:*13*, *19*, 25
72:9, *14*, *18* 94:6
**homicides** 10:*11*
23:*12*, *24* 26:*13*
**honest** 57:*13* 58:*18*
69:*12*
**honestly** 17:*23* 24:7
46:6 57:*17* 68:22
82:*21* 87:8
**hope** 81:*21*
**hopefully** 23:25
**hospital** 35:5 38:*13*,
20 92:*18*
**hours** 10:*1* 60:*14*
**housed** 7:8
**huge** 94:*17*
**human-being-type** 8:*3*
**hundred** 8:*17* 9:8,
23 10:6, 8
**Hundreds** 9:*1*, 20
10:22, *24*

**< I >**
**idea** 9:*10* 13:22
28:5 59:*12* 87:2
**identifiable** 36:*24*

**Identified** 3:5 15:18 84:6

**identify** 21:25 22:1 43:2, 8 73:3, 4

**illegal** 29:8, 13, 23

**imagine** 17:17 32:18 39:9 61:13 68:18

**immediately** 41:17 44:7 70:21

**impact** 76:19

**impression** 32:5 36:9 58:1, 19 59:18 85:17 87:17

**incident** 17:8 33:7 34:16 40:18 44:7 48:5 74:25 88:5

**include** 43:5

**included** 31:17 44:22

**including** 15:20, 21, 23

**in-custody** 11:22 12:15

**independent** 53:8

**indirectly** 96:15

**individual** 17:19 24:17

**information** 14:16 21:9 60:16, 18

**informed** 36:2, 14

**initial** 14:3, 5 75:9, 11

**initially** 10:7 59:8

**inside** 41:7 47:1 50:14, 23

**instance** 1:1

**instituted** 48:3

**intelligence** 78:1

**interacting** 28:11 29:4, 12 47:24 55:9

**interaction** 47:11

**interested** 96:14

**interject** 54:8 67:8

**internal** 62:20

**interrogation** 52:5

**interrupt** 43:20 60:9 87:22

**interview** 14:14 15:19, 25 27:23 35:1, 21 52:5, 7 56:14, 23, 25 57:3, 7, 10, 14

60:4, 6 62:11 63:9 64:10, 16, 17 65:4 67:9 68:2 71:5, 15, 21 73:15, 18, 19 86:5

**interviewed** 51:3, 4 56:20 60:20 61:2, 7 66:16 67:2

**interviewing** 51:1 57:11

**interviews** 22:6, 13, 22 26:24 27:21, 23 35:8 49:1, 4, 8 50:13 51:25 53:13 64:13 71:9, 13 72:8, 15 73:25 75:14 93:13

**introduced** 36:1

**introductions** 70:1 71:1

**inventoried** 90:16 94:18

**inventory** 31:22 41:12 78:15 79:7

**investigate** 13:16 15:10 19:2 20:19, 20 26:12

**investigated** 63:5

**Investigation** 3:6 7:7 11:20 12:5 13:4 14:2, 3, 5, 11, 20 17:11 19:4, 20, 23 20:4, 9, 15, 19, 21, 25 21:5, 17, 23 30:23 34:3, 21, 23 35:15, 19 40:14 44:25 51:13 52:24 53:5, 10, 13 54:24 61:14 62:20 63:3, 8 67:15, 23 68:3, 8, 11, 12 69:19, 23 70:1, 5 71:19 72:18 75:4, 10, 11, 16, 18 76:11, 17 91:14 92:12 93:25 94:3

**investigations** 9:18, 21 10:7 11:2, 4 12:18 13:9 20:23 21:21 23:19 24:20 27:6 49:10 52:1 66:23 67:18, 21 68:25 71:14 72:2, 9

**investigator** 22:10 23:1 36:19 44:9, 12 46:7 48:18

**involved** 9:17, 22 10:15 11:1 12:3, 23 13:9 14:2, 23 15:21 20:5 35:8 40:4 49:10 72:8, 23

**involvement** 11:14, 24

**involving** 52:1 68:11, 12

**issued** 41:20, 24 42:1

**issues** 62:17 64:5 94:9

**item** 78:20 79:8

**items** 22:1 76:18 79:5, 8

**its** 19:5 78:12

**< J >**

**Jaclyn** 65:25

**Jacqueline** 64:22

**January** 52:24 57:14 60:25 61:2 62:3

**JAY** 1:1 14:11, 19 18:25 19:3, 17 20:18 21:6 30:24 32:1, 10 33:10 34:3 38:7, 19 75:5, 17 82:19

**Jennifer** 36:3 37:6 55:10 64:21 65:24 66:7 80:1, 4, 14, 18, 20 81:4 82:6

**job** 8:1 20:13 26:1, 8 44:18

**John** 52:24 57:14 60:12, 20, 23 61:6 62:7 64:23 66:1, 3 69:14, 18

**Johnson** 34:25 44:14, 15 91:17, 18 92:17

**joined** 6:11

**JOSEPH** 1:1 34:6, 17, 22 38:15 55:9 56:14, 20 57:3, 11 58:12 60:4 62:12 63:9, 15 64:10, 18 70:23 72:19 73:16 89:9 92:19

**JR** 1:1 19:18 20:18 32:2, 11 34:3 38:7 75:17

**Jr.'s** 30:24

**July** 1:1 52:13 61:1 96:9, 18

**June** 18:25 55:10 56:21 72:17 74:10, 23 84:17 85:1, 2, 14

**junior** 92:9

**jurisdiction** 12:12 20:8 21:8 23:3

**jurisdictions** 12:5 17:6 18:9 33:24

**Justice** 18:11, 14, 21

**justified** 85:6 86:5, 7, 9

**< K >**

**keep** 23:21 52:15

**Kenosha** 61:9

**kept** 53:10 84:9

**key** 45:4

**keys** 92:3

**kill** 73:6

**killed** 20:1 73:13

**KIM** 2:3 81:10

**kind** 7:10 8:2 17:6 21:19 22:15 49:9 52:16 56:5, 6 65:12 75:12, 15 78:9 85:8 91:9

**knew** 52:6

**knock** 94:17

**know** 5:2, 18 7:17, 25 8:6, 16, 17 9:9, 20 10:9, 16 13:23 15:17, 23 16:1, 9 18:21 19:7, 10, 16 20:24 21:7, 15 22:21, 25 24:6, 11, 16 25:4, 5, 14, 21 26:2, 18, 23 27:1, 20 30:3, 9, 20 31:21 33:3, 17 34:17 35:21 38:16 39:20 40:2, 22 41:21, 22 42:6, 14 44:16 45:1 46:3, 6, 9 47:5, 10, 13, 22 48:17, 20 49:2, 6, 11, 14, 18, 21 50:2, 8

52:9 54:9, *15* 55:25
58:2, *6* 60:*1, 10* 61:5
62:10 63:5 65:18
66:15 68:24 69:17,
*20, 22, 24* 70:*12, 25*
71:*4, 10, 23* 72:4
74:*4, 13* 78:24 80:21
81:*18, 23* 82:6, *22*
83:2, *10, 25* 84:*3, 11,
13, 22* 85:20, *21, 25*
86:2, *7, 23* 87:25
88:*11, 13, 19* 89:8
90:*10, 13, 18, 19, 20*
91:*6, 8, 10* 95:9
**knowledge** 28:6, *10*

**< L >**
**lab** 16:*3* 75:2*1*
**label** 72:*18, 21*
**large** 17:5
**late** 7:*1*
**laugh** 61:*10*
**LAW** 2:*4* 6:*1, 19*
8:*6, 23* 20:7 26:*11*
30:*1, 8* 67:25 94:7
**lax** 25:22
**lead** 12:*18* 70:2*1*
**learn** 24:*18, 24* 27:24
**learned** 27:*13, 18*
**leave** 22:2*1, 24*
**leaving** 45:*11*
**led** 70:*19* 73:7, *12*
84:*13*
**Lee** 36:20
**left** 38:24 39:*1*
45:2*1* 65:*10* 82:15
**left-hand** 56:*3*
**LEGAL** 2:*1* 29:16
30:*12* 33:*3*
**legally** 30:*10*
**lengths** 33:*12*
**letting** 82:5
**level** 15:*15* 17:16
**Lewandowski** 92:*19*
**lieutenant** 14:*18*
23:*3* 34:22 35:*1, 13,
14, 20* 64:*19* 66:2
67:*11* 78:22 89:*9*
**lieutenants** 26:*16*

**life** 86:*12*
**lighter** 33:*18*
**lights** 33:*1* 48:*14*
**line** 85:24
**link** 81:*3*
**Listen** 30:*16*
**Listening** 84:2*0*
**literally** 81:*3*
**little** 32:*17* 55:*18*
67:*17* 83:23 84:*11*
**LLC** 2:*4*
**loaded** 91:7
**located** 35:22 43:6
47:2 86:*17* 88:*15*
**location** 39:8 42:22
50:*3* 93:7
**long** 9:9 13:*1* 24:*23*
29:*17* 45:*13* 68:24
71:25 74:*12* 75:*4, 5,
13, 14, 17* 81:23 93:7,
*9*
**longer** 52:7 94:5
**look** 20:*12* 39:*11*
54:25 59:6 75:*19*
**looked** 37:*11* 59:*1*
90:*17*
**looking** 12:*19* 13:*13,
25* 32:*3* 55:2 56:7
58:8 59:*3* 83:*12*
88:23 90:*13*
**looks** 13:*13* 56:2*1*
57:*19* 76:*9, 25* 77:5
78:2
**Lord** 74:*13*
**lot** 7:25 8:*1, 14, 16,
19, 20* 9:*17* 10:*10, 15*
18:2 27:8, *12* 28:*1*
30:*3* 33:*14, 18* 63:*12*
72:*13* 89:24
**love** 53:*20*
**LUKE** 1:*1* 3:*12* 4:*2,
17* 96:8
**Luke's** 94:*14*
**lunges** 84:2
**lying** 88:*3*

**< M >**
**ma'am** 61:*25* 66:*24*
77:*23*

**Madison** 33:*5, 14*
74:*9, 24*
**magazine** 40:2*4* 41:*5,
7, 13* 42:*16* 91:*12*
**magazines** 39:*13*
**MAIT** 16:7 18:*1*
**M-A-I-T** 16:*10*
**majority** 12:*10* 25:24
**making** 21:2*4*
**manpower** 7:*10* 17:*3*
26:*19*
**marked** 54:22 95:*15*
**markers** 43:*13*
**marking** 54:*10*
**Marquette** 92:*8, 9*
**math** 7:*17*
**Matt** 92:*17*
**Matthews** 2:*4*
**McLin** 34:22 35:*1,
13, 14, 20* 64:*18* 66:2
67:*11* 89:*9*
**mean** 7:25 8:*14*
10:*10* 14:*13* 15:*1*
25:*3* 28:5 39:*17*
41:25 43:*1, 20* 67:4
69:*1* 70:25 74:7, *14*
81:*15* 87:*18, 22* 89:2
93:*12* 94:*17*
**meaning** 61:22
**means** 15:*11, 16*
**meant** 6:8 66:*11*
**measure** 22:*3* 43:*9,
11*
**medical** 4:*11*
**medications** 5:*14*
**meeting** 65:*13*
**members** 10:*19*
18:*17* 89:*10* 90:8
**memo** 51:2*0, 21* 52:*3,
10, 15, 16*
**memoir-type** 52:*17*
**memory** 85:*19*
**MENSAH** 1:*1* 14:*15*
34:7, *17* 35:*2, 5, 22*
36:*1, 14, 22* 37:*1, 9*
38:*15, 17, 22, 24*
40:*17* 42:*4* 43:*16*
45:*11* 46:24 56:*14,
21* 57:*4, 12* 58:*12*
59:*9, 21* 60:*4, 19*

61:*17* 62:*12* 63:9
64:*10* 67:*10* 69:*1, 3*
70:*23* 72:*19, 22* 73:*4,
16, 19* 83:*3* 84:*14*
86:*12, 14, 20* 87:*3*
88:*4* 91:*10*
**Mensah's** 36:*12*
40:2*0* 44:*4, 24* 45:*2,
9, 10, 25* 46:8 55:9
62:*13* 63:*15* 84:*3, 20*
85:*3* 90:*23*
**mentioned** 82:*18*
88:*18*
**messy** 54:*4*
**met** 34:*16* 89:6
**meticulously** 59:*2*
**metropolitan** 7:7
**mic** 48:*13*
**microphone** 49:*25*
50:2
**middle** 33:*14, 16*
**midnight** 7:2 60:*17*
**Mills** 34:*13* 44:*23*
63:*23* 64:*3* 92:*15*
**Milotzky** 64:2*4* 66:*1,
3* 69:*15, 18*
**Milwaukee** 2:7 3:6
6:*18, 20* 7:20 9:2*4*
16:7 17:*9* 18:*3* 19:*2,
4, 18* 22:*25* 31:*14*
34:2 40:7 54:*23*
63:2 65:*10* 78:*12*
79:*11* 80:6 92:*25*
96:2, *17*
**Milwaukee's** 10:*10*
19:8 50:6 80:*16*
**mind** 5:*19* 53:*18*
56:8 61:*19* 70:*15*
76:*14* 83:2*0, 24*
85:*10, 21* 86:*11*
**mine** 53:*19* 55:*24*
77:*11, 13*
**minute** 95:2, *4*
**minutes** 32:*17, 22*
70:2*4* 82:*15*
**missed** 95:*3*
**missing** 23:*15, 16*
77:*16* 80:2*1*
**mistakes** 25:*4, 5, 23*

moment 89:8
money 91:22 94:19
months 75:19
morning 4:7, 8
33:16 35:20 36:23
46:1
motions 84:9
MOTLEY 2:1, 3 3:1,
9 4:6 54:11, 20 55:4
81:13, 15 82:1, 5, 12,
13 95:1, 6, 9
move 44:16 45:10
83:7
moved 7:6
movement 83:9
moves 44:10
moving 5:20 83:5
MPD 16:21, 22

< N >
name 13:3 35:23
37:5 40:2 70:3 89:7
90:4 91:16 92:20
names 34:11 38:17
narrative 77:5
narratives 24:17
31:18
narrow 11:5
nature 49:12
necessarily 59:2
necessary 55:24
need 5:8 9:14 18:8
22:12 33:7 53:25
54:2 55:22 75:3
81:5
needed 26:19 36:17
45:12, 17, 21
needs 6:11
never 27:14 39:3, 14
40:8, 17 42:15 43:23
47:16, 25 48:1, 16, 19
50:16 56:8 68:21
69:12 70:15 71:15
72:1, 16, 20 87:13, 16
91:3, 12, 15 94:22, 23
new 39:25
newer 27:21
nice 8:2
Nicholas 44:14, 15

91:17, 18
Nick 34:25 44:14
night 10:2, 3 45:25
nonfatal 23:12
nonverbals 5:5
normal 67:2
North 2:4, 6 70:17
Notary 1:1 96:6, 22
notebook 52:3
noted 90:16
notes 13:13 51:25
53:4 58:25 59:3, 4
notice 73:3
notified 19:11 32:15
94:12
number 8:15 10:9
13:12 15:1 16:16
21:12, 19 33:25
54:15 55:20, 23
61:20 77:9 79:7
80:20
numbers 56:2 79:8
81:12

< O >
oath 4:3
obeying 84:7
object 69:14 83:16,
19
observed 59:19 84:19
obviously 5:10 8:24
9:10, 13 20:10 25:20
30:5 31:15 33:10
42:10 62:9
occasions 25:17
occurred 45:8 94:3
October 60:24 76:5,
8, 9, 12, 24, 25
O'DAY 1:1 3:12
4:2, 7, 16, 20 81:16
95:6, 13 96:8
odd 65:13 66:20
office 13:7 14:18
16:5 35:11 70:12
75:8 76:2 90:2
96:17
officer 8:6, 15, 23
10:14 11:12 14:14
15:20, 21 26:12 27:7
28:3, 12 29:7, 11

35:7, 8, 22, 23, 24
36:1, 14, 21, 25 37:9
38:17, 18, 21, 22, 24
40:9, 12 41:16, 24
42:4 43:16 48:24
59:9, 20 60:19 61:17
64:6 67:10 68:6, 11
69:14 71:9 72:22
83:2, 13 84:3, 13, 20
86:12, 14, 20 87:2
88:4 90:23 92:22
officer-involved 11:3
12:6 13:8 14:1 15:5,
25 19:12 41:18, 23
64:20 67:16, 22
officers 6:9 18:17
25:1, 3, 22, 25 28:25
29:3 33:25 36:3
48:19 71:24 72:1, 8,
16
officer's 39:4, 15, 18
40:4 48:7 66:11
Oftentimes 66:13, 15
Oh 12:14 25:12
51:24 74:13 78:2
79:22 92:11
OIS16 46:23, 25
okay 4:12, 15, 19, 21
5:1, 14, 18, 22, 25 6:5,
22 7:19, 22 8:4, 22
9:12 10:25 11:8
12:1 13:8, 13, 24
14:10, 19 15:4 16:6
17:9 18:1, 10, 19, 23
19:17, 22, 25 20:2, 16
23:19 24:18 25:9
26:10 28:3, 17, 23
29:2, 7, 22 30:9, 14,
19, 23 31:7, 13, 25
32:9 33:4, 8, 21 34:2,
13 35:14, 18 36:16
37:5, 8, 11, 15 38:6,
14, 21 39:14 40:2, 10,
17, 20 41:16 42:3, 6
43:4, 15, 19 44:3, 12,
15, 21, 25 45:24
46:10, 13, 16 47:7, 10,
13, 18 48:5, 22 49:23,
24 50:5, 7, 19, 25
51:3, 6, 13, 20 52:9,

18 53:3, 8, 12, 16, 19,
22, 24 54:2, 7, 25
55:7, 13, 25 56:8, 12,
17, 20 57:9 58:3, 10,
14, 23, 24 59:13, 17,
22 60:3, 8, 23 61:4, 7,
10 62:6, 25 63:7, 13,
18 64:8, 13, 16 65:12,
19, 23 66:3, 12, 22, 25
67:6, 14, 19 68:10, 17,
20 69:11, 17, 22 70:5,
20 71:5, 10, 18 72:3,
17, 25 73:8, 12, 15, 18,
21 74:1, 9, 23 75:2, 4
76:3, 5, 8, 11 77:1, 3,
15 78:4, 17, 23 79:4,
9, 17, 23 80:9, 24
81:7, 8, 14 82:4, 9, 10,
12 85:1, 12 86:13
87:5, 12, 16, 21 88:7,
11, 13, 18, 22 89:18
90:11 91:5, 7, 9, 15
92:5, 15 93:3, 14
94:7, 25
once 4:24 8:7 21:13
46:25 94:12
ones 22:17
one-story 24:7
on-scene 27:16 35:16
open 31:4, 5 45:3
49:19 61:19 77:12
79:12 80:13
operated 47:16
opinion 73:14 84:10
86:21
opposed 5:5
opposition 66:7
order 16:17
Original 3:8, 9
other's 23:23
outside 12:5, 12
13:15 15:9, 13 18:8
20:8 27:16 33:24

< P >
P.O 2:3
pack 22:23
package 40:25 42:15
packet 76:6
pad 52:7, 8

**Page** 3:*1, 5, 9* 55:*5, 6, 19* 56:*2, 4, 12* 58:*3, 8* 77:*9*

**Pages** 3:*9* 31:*12* 56:*9* 79:*14, 17* 88:*25*

**pain** 81:*16*

**paper** 41:*3, 6* 52:*8*

**parameters** 15:*18*

**Park** 33:*5* 74:*10, 24*

**parking** 3:*14*

**part** 10:*6* 12:*9* 17:*19* 18:*3, 4* 19:*9* 25:*6, 24* 26:*8, 11* 34:*19* 35:*18* 44:*25* 47:*17, 18* 48:*7, 9* 49:*21* 55:*14* 60:*4* 63:*6* 76:*16* 84:*18* 90:*23* 91:*13* 93:*12, 24* 94:*2*

**particular** 52:*20* 78:*13*

**parties** 81:*17* 96:*13*

**parts** 53:*17*

**passenger** 29:*22* 30:*11* 51:*8* 83:*8, 10, 11, 14* 87:*3*

**patrol** 8:*24* 9:*3* 48:*23*

**pause** 81:*9*

**PD** 39:*3* 92:*25*

**people** 10:*16* 13:*6* 24:*8, 10* 25:*7* 26:*5, 7, 9* 28:*7, 9, 19, 23* 29:*4* 32:*5* 49:*11* 50:*24* 51:*1, 4* 64:*18* 65:*20* 66:*25* 69:*4* 94:*21*

**percent** 38:*5* 58:*2* 85:*19* 86:*7, 9, 11*

**perception** 17:*24*

**period** 16:*21* 51:*2* 53:*14* 59:*7* 75:*6*

**permissible** 45:*13*

**person** 17:*18* 22:*9, 11* 24:*15, 16* 28:*13* 29:*11* 30:*10, 20* 47:*23* 51:*10*

**personal** 45:*22* 50:*11, 17* 96:*10*

**personally** 91:*3*

**personnel** 62:*13* 63:*14, 15, 19, 23*

**perspective** 15:*14* 66:*11*

**perspectives** 24:*12*

**phone** 28:*11* 51:*10* 78:*15* 84:*1, 2* 88:*19* 89:*3, 17* 90:*9, 11, 19* 91:*1, 2, 4, 24*

**phones** 28:*24* 29:*5*

**photo** 43:*12*

**photograph** 22:*2* 43:*13*

**photographs** 43:*5* 45:*2*

**photos** 22:*11* 36:*22*

**physical** 91:*21*

**picked** 41:*14*

**place** 16:*3* 18:*18* 41:*2* 87:*19*

**placed** 27:*22* 41:*5, 8*

**plain** 30:*11*

**Plaintiffs** 1:*1* 2:*4, 7*

**plaintiff's** 54:*22*

**play** 59:*22* 60:*1*

**please** 5:*4* 6:*1, 4, 22* 12:*1* 15:*10* 34:*19* 76:*3* 83:*1*

**plus** 83:*21*

**point** 12:*11* 20:*17* 27:*3* 30:*8* 38:*23* 46:*10* 48:*8, 10* 51:*15* 53:*15* 54:*11* 83:*5* 93:*7*

**pointed** 83:*3*

**Police** 3:*6* 6:*18, 20* 7:*20* 9:*24* 10:*14* 14:*1* 16:*8, 11* 19:*18* 27:*6* 28:*3, 12, 24* 29:*3, 7, 11* 31:*14, 16* 32:*1* 36:*24* 37:*1, 2* 39:*8, 10* 40:*1, 7, 21* 41:*18* 54:*23* 65:*3* 66:*11* 68:*11* 70:*6, 16* 72:*8* 74:*15, 20* 79:*11*

**police-involved** 11:*2* 12:*2* 13:*16* 14:*20* 19:*3* 20:*2*

**police-involved-**

**shooting** 17:*11*

**policies** 49:*22*

**policy** 12:*4* 13:*19* 16:*16* 17:*15* 19:*1* 39:*6, 22* 40:*3, 5, 6* 41:*16, 21, 22* 42:*24* 68:*17* 71:*8, 10, 12, 18, 23, 24* 72:*7, 12, 25*

**Porter** 92:*24, 25* 93:*15, 19*

**portion** 36:*11* 37:*25*

**portions** 79:*19*

**position** 22:*3* 43:*14*

**possession** 37:*3* 39:*7* 49:*14* 52:*22*

**possibility** 43:*25*

**possible** 50:*15* 60:*9*

**possibly** 13:*14* 23:*10* 69:*7* 71:*4* 81:*4*

**potential** 67:*1*

**practice** 24:*22* 51:*24* 67:*2* 74:*8*

**prepare** 31:*1* 55:*15* 60:*5*

**prepared** 88:*23*

**presented** 16:*5* 75:*7*

**presenting** 14:*17*

**preserve** 52:*20*

**pretty** 43:*22* 61:*18* 76:*22* 81:*23*

**prior** 21:*8* 34:*16* 57:*11, 16* 62:*20* 63:*9* 69:*18, 23*

**privacy** 50:*14*

**private** 49:*1*

**privileged** 69:*8*

**probably** 4:*24* 10:*9* 13:*21* 32:*16* 93:*8*

**problem** 9:*16* 62:*6* 67:*7*

**Procedure** 1:*1*

**proceeding** 5:*22*

**PROCEEDINGS** 4:*1* 95:*14*

**process** 15:*19*

**processed** 16:*2*

**processing** 44:*10, 13*

**Professional** 1:*1* 62:*5* 96:*6*

**promise** 82:*16*

**promoted** 6:*24* 26:*14* 47:*16* 48:*4, 9, 10*

**properly** 42:*25*

**property** 79:*3* 94:*18*

**property-control** 78:*21*

**protection** 84:*15*

**provide** 43:*12* 82:*10*

**provided** 21:*14* 40:*23* 46:*4* 60:*17* 81:*20*

**psychologically** 39:*5, 16*

**Public** 1:*1* 49:*16, 18, 19* 96:*6, 22*

**pull** 45:*17*

**pulled** 41:*7*

**purpose** 61:*13*

**purposes** 4:*19*

**pursuant** 1:*1*

**put** 5:*18* 16:*4* 26:*1, 2, 5, 16* 30:*6* 32:*19* 34:*11* 43:*10* 46:*5, 22* 50:*2* 53:*6* 70:*15* 72:*13* 77:*13* 86:*24* 87:*7, 19*

**putting** 35:*9*

**< Q >**

**quadrants** 86:*23*

**question** 20:*16* 28:*8* 67:*12*

**questioned** 50:*7*

**questioning** 70:*23*

**questions** 5:*3* 9:*12* 42:*3, 5* 57:*15* 61:*20* 63:*12, 18* 89:*14* 90:*7* 95:*3, 12*

**quick** 6:*17*

**quickly** 54:*19*

**quite** 33:*22* 61:*20*

**< R >**

**radio** 48:*13* 50:*1, 4, 5*

**radio-dispatch** 46:*14*

**Ralph** 34:*9* 63:*18* 92:*12*

**rank** 6:*24* 26:*14*

**rapid-response** 16:*12* 18:*4*

**rate** 33:*3*

**rationally** 84:2

**reach** 80:*8*, *9*, *14* 82:*10* 83:*13*

**reached** 31:*3* 80:*4*, *19*

**reaching** 51:*10*

**reaction** 84:*3*

**Real** 6:*17*

**really** 9:2, *4* 15:*15* 21:22, *24* 23:8 32:*3* 48:20 68:*19* 69:20 70:24 74:*13* 79:*14* 87:*10*

**reason** 39:22 49:*3*, *5*, *6*, *7* 94:*16*

**reasonable** 84:*4*, *24* 85:23 88:2

**recall** 26:*17* 27:*8*, *15* 28:*1*, *21* 32:*13* 33:23 34:*9*, *12*, *13*, *15* 35:25 37:*18* 41:*12* 43:*21* 59:24 61:7 65:*3* 67:*12* 74:22 76:*13* 85:*19* 90:*13* 91:*3* 93:*14*, 22

**receive** 46:*18*, *19* 56:*12*, *15*

**Received** 3:*12* 46:*10*, *13* 51:*15*, *17* 53:16 54:24 55:*14*, *15* 56:*7*, *9* 76:*6*, *24* 79:*11*, *13*, *18* 88:24

**receiving** 80:*15*

**Recess** 95:*5*

**recognize** 92:20, *23*

**recognized** 80:*17*

**record** 9:*15* 28:*23* 37:6 49:*8* 53:*15* 56:6 62:2, *9* 63:*12* 71:5, *18*, *24* 72:*1*, 6, *7*, *11*, *12*, *16* 87:*12* 95:*12*

**recorded** 28:*4*, *10* 47:*10* 71:7, *15*, 21, 22 96:*8*

**recording** 28:*14*, 20, *21* 29:*7*, *11* 45:*15*

47:*13*, *18* 49:*10* 71:8, *13*

**recordings** 29:*3* 53:9, *12*

**records** 31:*5* 48:2 49:20 62:*15* 63:*21* 64:*1* 77:*12* 79:*12* 80:*13*

**recover** 42:*14*

**recovered** 23:*13* 47:4 83:*11* 90:*17*, 24 91:*1*, 22

**recovery** 7:25 82:24

**reduced** 96:9

**refer** 55:22 74:*14*

**referring** 31:*10*, *15* 47:*3*

**refresher** 27:*5*

**refusing** 94:*14*

**regarding** 55:8

**regardless** 46:*24*

**regards** 5:*1* 8:5 15:*4* 16:*6* 20:*23* 26:*10* 30:23 40:*18* 42:6 45:*24* 51:*13* 52:*19* 53:5, *9*, *13* 57:*9* 62:*11* 63:*8* 64:*14* 92:5, *11* 93:20

**Registered** 1:*1* 96:*5*

**regular** 8:*3*, *9*, *11* 20:*9* 22:6 67:*17*

**re-interview** 22:*18*

**reissue** 39:*9*

**relates** 32:*1*

**relation** 43:*11* 72:*17*

**relationship** 69:*9* 70:*4*

**relative** 96:*12*, *13*

**release** 44:*20*

**released** 36:*18*

**remember** 11:9, *22* 12:*25* 14:*8* 15:*1*, *2* 16:*19*, *23* 17:*21* 18:*15* 24:*9*, *15*, *24* 26:22 27:*2* 30:*3*, *8* 33:*15* 45:*20* 46:2 57:*18*, *22*, *25* 65:*16* 67:*11* 70:*18* 83:*21* 88:*20* 93:*23*

**removing** 78:*20*

**rename** 54:*13*

**replied** 57:*17*

**Report** 27:*1*, *2*, *3* 31:*9*, *14*, *16* 53:*7*, *18* 55:8 57:6 58:*5*, *11* 60:*3* 64:9, *10* 74:*7*, *17* 76:20 77:*1* 80:20 87:*7*, *12*

**Reporter** 1:*1* 5:6, *11* 54:*18* 96:6

**reports** 31:*4*, 6, *16*, *19*, *22*, *24* 32:*1*, *4*, 8 55:*13* 57:*18* 60:*11* 73:*3* 75:20 76:*17* 77:*21* 79:*15* 80:22 88:25

**representative** 64:*25* 65:*1* 66:*1*, *5*, *19* 67:6 68:*15*

**represented** 36:*3*

**representing** 80:2

**reprimands** 64:*5*

**Requests** 3:*9*

**resources** 19:6

**respect** 68:*14*

**respond** 16:22 19:8 21:*4*, *13* 33:7

**responded** 21:*11* 33:8 35:*3*

**responding** 12:*12* 19:*13*

**responds** 16:*25* 17:7 18:22

**response** 18:*13* 33:22 55:*3*

**rest** 11:*24* 17:5 39:*12*

**result** 11:*23*

**resulted** 72:*23*

**results** 12:7

**retired** 7:*19*, *21* 52:*11* 60:*21*, *22*, *25*

**retirement** 7:*24*

**returned** 79:*1*

**returning** 76:*18* 79:*5*

**revealed** 93:*13*

**review** 37:22, *23* 57:*15* 58:*21*, *23* 59:*13* 60:*5*, 8 62:*12*,

*15*, *17*, *20*, *25* 63:*7*, *11*, *14*, *19*, *23* 64:*3*

**reviewed** 31:*17*, *25* 36:*10* 51:*18* 57:*11*, *20*, *25* 58:*4*, 6, *14*, *19* 75:24 76:*10*, *25* 79:*19* 85:*1*, *18* 90:25

**reviewing** 58:*11* 60:*10*

**ridiculous** 61:*21*

**right** 4:*21* 5:23 12:22 13:*11* 19:*23* 21:25 29:*18* 34:4 36:*15* 44:*18* 51:*16* 55:20 56:*10*, *18* 58:*15* 61:*14*, *15*, *17* 64:*11* 65:*21* 66:*18*, *23* 67:5, *15*, *25* 68:7 69:*5* 70:2 71:*12* 73:*8*, *10* 74:*10* 77:*16* 78:*18* 79:9, *23* 81:*9* 82:*2* 83:*5* 84:*4* 85:*16* 86:24 87:7 88:*16*, *24* 90:*12* 91:20 95:*8*

**rights** 66:*9*

**Ring** 23:*7*, 8

**Road** 2:*9*

**robberies** 7:*5*

**role** 7:*9* 8:*3*

**room** 65:*6*, 20, *23* 67:*1*, *13* 69:*4* 70:*19*, *21* 90:*1*, *2*

**rooms** 65:*6*

**routine** 9:*2*

**Rules** 1:*1* 5:*3*

< S >

**safe** 41:*1*, 2 42:*16*

**safety** 41:*25*

**Salyers** 34:*9* 44:*23* 63:*19* 64:*3* 92:*13*

**sat** 36:*8* 57:20 58:*19*, 20 71:*1* 85:*18*

**saw** 24:*9* 33:*10* 37:*25* 38:*4* 45:2 84:*16*, 21

**saying** 13:*18* 39:*20*, 21 48:6 65:*10* 67:*13* 68:*16* 75:*16* 80:*21*

81:6 87:3 91:1, 2
93:16
**says** 44:15 55:19
65:2 69:3 88:14
**scene** 13:4 15:17, 19
21:20, 23, 25 22:14,
21, 23 24:1, 3, 25
25:1, 6, 17, 23 27:19
32:13 33:5, 8, 20
34:7, 10, 14, 25 35:3,
12 36:5, 13, 18, 20
37:9 38:1, 6, 10, 14,
25 39:4, 15, 19, 24
40:5, 9 43:7 44:3, 5,
6, 9, 10, 12, 13, 16, 25
45:3, 8, 11, 19 59:1, 4,
6, 10, 14, 23 71:16
74:21, 24 75:13
90:15 91:14
**scenes** 10:5 18:15
21:22 25:4, 24 26:4,
6 27:14 28:18
**schedule** 16:19
17:17 19:9
**scheduled** 18:6
**scheduling** 19:14
**Schwartz** 64:22
65:25 69:22
**screen** 53:23 54:3, 5
**scroll** 55:17
**seal** 96:7
**seat** 29:22 30:11
37:24 51:8, 9 82:23
83:8, 10, 11, 21 84:1
86:13, 17, 18, 22 87:1,
4, 8, 9, 11, 14, 19, 24
88:1, 3, 14, 20 89:3
90:12, 20, 21 91:5
**second** 31:11 92:7
**seconds** 38:3 57:21
58:20
**section** 78:21
**secure** 40:20
**secured** 42:7
**see** 18:1 22:16 23:7
24:10 33:9 37:11
38:1 54:4 55:11, 18,
19 56:2, 5 59:10, 11,
19 73:18 75:24 77:3,
20 83:13 84:12, 23

86:15 92:5 94:15
95:2
**seeing** 29:18 37:19
**seen** 25:9 29:3
82:24 85:15
**selects** 17:18
**semester** 92:7
**semi** 91:11
**send** 79:25
**senior** 21:21 24:25
27:14, 22, 24
**sense** 32:9 52:18
**sensitive** 49:5
**sent** 9:25 31:5
34:24 35:4, 5 38:13
42:2 94:15
**sentence** 30:21
**separate** 23:21, 25
24:3, 20 25:3, 20
26:2 39:10 42:23
46:20
**separated** 24:2 25:8
41:11 42:17
**separating** 26:8
**September** 96:22
**SERVICES** 2:1
**set** 19:7 21:12
65:13 96:16
**seven** 7:12 82:25
93:22
**sexual** 11:12
**share** 53:23 54:3
**sharing** 8:4
**SHEILA** 2:9 70:9
**sheriff's** 12:16
**shift** 7:2, 13, 15
27:10 60:15, 17 93:9
94:5
**shoot** 17:20 51:11
**shooter** 33:1
**shooting** 11:23 12:2,
6 14:11, 19, 21 15:6,
22 19:3, 13, 18 20:5,
18 22:7 23:1 30:24
32:2, 11 34:4 36:11
38:3 40:4 41:19
57:21 61:17 62:21
64:20 72:23 73:8, 11
75:5, 17 86:6, 8, 10
94:3

**shootings** 7:5 11:3, 6,
25 13:16 14:1 23:11
41:23
**shot** 12:9 20:1 73:13
**shots** 59:21
**shoulder** 83:4
**show** 36:23 43:10
**showed** 90:25
**showing** 54:14, 21
**shredded** 51:23 52:9
**side** 48:14 83:15
87:24
**silver** 91:11
**simply** 29:19 45:6
**siren** 33:2
**sit** 87:9, 20 88:3
**sitting** 30:10 35:24
37:25 59:16 87:10,
18
**situated** 4:13
**six** 7:12 13:10
21:12 26:17, 22
**six-and-a-half** 82:25
**size** 18:8 19:5
**sleep** 8:1 36:15
**small** 52:3
**smaller** 18:2
**somebody** 32:7 47:4,
24 72:24
**somebody's** 20:6
**someone's** 28:11
39:24
**soon** 70:20
**sorry** 9:12 12:15
13:24 20:16 29:25
31:7 35:6 38:16, 21
43:20 48:6, 21 50:1,
25 51:2 52:12 54:4,
8, 14 61:10 63:11
66:15 67:19 69:2
70:15 72:10 76:8, 23
77:24 78:7, 16 80:24
81:15 86:16 87:22
89:20 91:16 92:9, 21
93:16 94:2
**sort** 6:17 13:24
15:4 19:1 25:10
42:12 53:8, 17 64:4,
22 69:1 81:20

**sound** 5:19 13:17
**sounds** 27:4
**south** 74:3
**spatter** 83:24 85:8,
24
**speak** 64:15 71:17
90:6
**speaking** 28:13 31:8
**special** 6:12
**specialty** 11:18
**specific** 6:10, 23
10:5 25:14 32:21
**specifically** 11:9
21:1 30:8 35:25
45:21 59:1 86:17, 25
87:5, 13, 15 88:15, 25
93:20
**specifics** 12:19 13:12
14:8
**speed** 33:3
**spent** 7:1, 14
**spoke** 36:5 51:7
57:23 59:8 60:19
80:22
**spoken** 50:17, 19
**spotlights** 48:15
**spy** 49:11
**squad** 15:24 23:5, 6
36:8, 12 37:14, 15, 24
38:18, 23 43:17
44:23, 24 45:5, 24, 25
46:10 47:7, 8, 11, 14,
15, 16, 22 48:1, 9, 12
49:17 50:1, 14, 21, 23
51:14 57:20 58:19
83:13, 14 84:17, 18
85:1
**squad-cam** 37:22
57:16 58:4, 21
**squads** 26:2, 3 32:24
33:11, 19 34:1 44:23
48:11 83:18
**SS** 96:1
**St** 94:14
**stabbings** 7:5
**stage** 25:16
**standard** 64:20
**standing** 25:18
**stands** 16:9

start 11:*4* 21:2 24:*14* 65:*14*
started 4:*9, 22* 6:*25* 13:*18* 61:6 71:*3*
starts 83:*2*
State 1:*1* 29:*15, 23* 32:*15* 96:*1, 7, 22*
stated 86:*14*
statement 21:*14* 22:*20* 53:2 73:*22* 84:*5, 8, 11* 85:*3, 10, 14, 20* 90:*24*
statements 22:*16* 69:*5* 74:6 93:*11*
STATES 1:*1*
station 41:*18* 42:*22* 43:*15* 71:*17*
stays 44:*11*
step 30:*25*
Stephen 34:*13* 63:*23* 92:*15*
stepped 86:*15*
steps 42:*8* 82:6
Steve 34:*9* 92:*16, 17*
stop 29:*8, 19* 68:*4*
stops 8:*23, 25* 9:*1, 6, 8, 11* 28:*24* 50:*22, 24* 51:*5*
stories 23:*23* 24:6 25:*11*
story 84:*22*
straight 31:*25* 77:*14*
Street 6:*12* 9:*5* 70:*17*
stuff 15:*3* 31:*20, 22* 41:*22* 43:2 47:*3* 49:*11* 75:*15* 77:*25* 85:8 86:6
subfolders 47:*1*
subject 13:*1*
substantiated 85:*9, 25*
suburbs 17:2
Suite 2:*9*
summer 33:*17*
sup 75:*24* 77:*7, 8*
supervisor 15:*15* 17:*16, 25* 21:*7, 15* 22:*14* 34:*23* 35:*16*
supervisors 46:*21*

supplement 31:*18, 23* 55:*19, 23* 56:*13* 58:9 64:*9* 77:*2, 4, 15* 81:*12*
supplemental 74:*17*
support 7:8 16:*18*
supposed 13:*15* 15:*10* 19:*14* 25:*19* 30:*17* 65:*14*
sure 4:*9, 12* 5:9 15:*17* 21:*24* 23:*12, 14, 17* 24:*24* 28:*18* 37:*20* 38:5 40:6 41:9 43:*22* 49:6 57:*23* 58:*16* 66:8 76:*15* 80:*11, 19* 81:*13, 17* 82:*14* 86:9 87:*23* 89:*8, 12* 94:*21*
surprise 30:9
surprised 53:*1*
surrounding 23:6
surveillance 23:7
suspect 22:8 26:*24* 27:*20, 22* 67:*1* 71:*19, 20* 72:*22* 73:5
suspects 10:*18* 12:9
SWAT 6:*16*
switch 39:*25*
sword 62:*22*
sworn 4:*3* 30:*18*
system 46:*19* 77:*14* 80:*16*

< T >
table 65:6, 7
tactical-enforcement 6:*14* 9:6 11:*11*
take 5:*11* 11:*17* 27:5 39:*3, 7, 14, 18, 24, 25* 40:*3, 8, 13* 42:*18* 44:*4, 5, 6* 45:*4, 16* 59:*4* 74:5 75:6, 18 82:*20, 21* 86:*23* 95:*1*
taken 1:*1* 36:*22* 43:*18* 77:*14* 95:5
talk 10:6 58:*11* 83:*25* 88:*19* 89:*2, 13* 92:*12, 15, 19, 24* 93:*3,*

16, 19
talked 88:*4* 93:*14*
talking 5:9 10:5 15:*11* 24:5, *14* 25:*19* 50:*25* 61:*25* 62:*3* 75:*9, 12* 76:*18* 86:*20* 89:*3* 93:*17*
task 21:*16, 18*
tasks 34:*24*
team 17:*1, 19, 20* 18:2, *4*
techniques 26:*25* 27:*25*
technology 78:*1*
tell 34:*19* 52:*19* 87:5
telling 84:9
ten 6:*23*
tenure 10:*14* 26:*11*
terms 24:*19*
Terrace 2:6
testified 4:*4* 8:8 13:5 67:*20*
testify 69:7
testifying 8:*10, 11*
testimony 30:*18*
testing 78:2, *10*
Thank 4:*15, 19* 6:*22* 7:*23* 8:*4* 53:*21* 54:*12* 57:9 64:8 76:*4* 77:*20* 79:2, 9 81:*14* 82:*17* 94:*25* 95:6, 8
thanks 54:*1*
thing 10:*19* 24:*11* 36:*18* 45:*14* 49:9 50:*4* 52:*17* 75:*20, 23, 25*
things 5:*11* 6:*10* 20:*24* 27:*1* 32:*23* 36:*17* 40:7 43:8 44:*16* 45:5 49:2, *15* 57:*10* 61:*11* 81:*19* 85:*7, 23* 86:2 94:*21*
think 6:9, *12* 7:*11, 16* 8:*14* 11:*15* 14:7 17:*13, 20* 18:*11, 12, 24* 20:*11* 24:*24* 27:*19* 35:*3, 4* 36:*6, 20* 37:*19* 38:2, *10*

39:2, *4, 16, 18* 41:*12, 13* 44:*1* 45:*7, 18* 46:*23, 24* 48:*25* 49:*3, 5, 15, 18* 55:*1* 57:*20, 22* 64:*22* 66:*20* 73:2 79:*13* 80:*11, 16* 82:*20* 83:*23* 84:*3* 88:*2* 89:*10* 92:*7, 17* 94:*12*
third 41:*8*
THOBANI 2:*9* 54:*8* 70:*9, 11* 81:*9, 14* 82:*7* 95:*10, 11*
T-H-O-B-A-N-I 70:*11*
thought 50:*25* 52:*23, 25* 62:*4* 68:*20, 21* 69:*12, 16* 72:*13*
three 7:*16* 14:*7, 24* 19:*11* 33:*11, 12* 39:2 44:*22* 83:*12, 13*
three-page 56:*17*
throw 42:*19, 25*
time 9:*10* 14:*23* 16:*20* 19:*8* 21:*15* 24:*1, 23* 27:6 32:*21* 33:*16* 42:*25* 56:*23, 25* 57:*23* 59:*8, 16* 65:*13, 19* 68:*24* 70:*22* 74:*17* 81:*24* 88:*7* 89:*5*
timeline 85:*13*
times 8:*13, 17* 9:*14* 10:*22, 24* 49:2 59:*13* 84:*8*
today 5:*14, 20* 18:*20* 82:*3, 8*
today's 31:*1* 88:*22*
told 33:6 36:*16* 61:*16* 72:*5, 15*
top 55:*18*
total 79:*13*
totally 36:6
touch 45:6
tough 8:*1*
traffic 8:*22* 9:*1, 6, 8, 11* 28:*24* 29:8 50:*22, 24* 51:*4*
traffic-accident 8:*25*
training 26:*11, 15, 23*

27:9, 17  28:2
**transcribed**  58:17
**Transcript**  3:9  4:1
**transfer**  42:11
**transpired**  59:12
**transported**  38:11
74:15, 17
**traveled**  65:2, 9
70:16
**traveling**  33:2
**treat**  24:19  67:20, 22
**treated**  20:3, 4, 7
**treating**  7:24
**trials**  8:15, 16, 20
13:5
**trouble**  80:15
**Troy**  92:24, 25
93:15, 19
**true**  67:23, 24
**truthful**  22:19
**try**  20:11  22:20
23:9, 12, 14, 20  56:1
76:21  89:13  90:6
**trying**  24:6  25:10
30:15  33:15  54:25
58:18  68:22  85:12
**turn**  47:21
**turned**  53:3
**Two**  6:7  7:9  14:7
24:10  25:9  26:20
33:12  35:2  41:11
56:9  67:12  76:17
89:11
**two-person**  27:23
**type**  10:19  11:8, 14,
18  15:3  18:13  72:15
**typed**  53:4  77:3
**types**  27:1  72:2

**< U >**
**Uh-huh**  15:8  77:5
**unbiased**  61:14  82:20
**understand**  4:10
5:12  17:4  74:2
81:21  90:22
**understanding**  16:16,
23
**understood**  67:19
88:22

**unfired**  41:6
**unfortunately**  10:12
**uniform**  8:15  36:24
51:4
**uniforms**  48:7
**union**  64:25  65:1, 25
66:5, 18  67:6  68:15,
19
**unit**  6:12, 15, 16  7:7,
8, 16  9:6, 25  10:1, 3
11:11  16:7, 8, 10, 12,
20, 24  17:4, 7  18:12
21:1, 3  27:10  31:3
35:17  46:20  71:25
72:14  94:6
**UNITED**  1:1
**units**  6:18  11:18
17:7
**University**  92:8, 9
**updating**  22:12, 14
**use**  21:6  28:9  52:2,
7
**usually**  16:25  21:4,
11

**< V >**
**value**  22:2  43:9
**various**  13:5  17:1, 6
**Vedbraaten**  36:20
**V-E-D-B-R-A-A-T-E-**
**N**  36:21
**vehicle**  43:16, 17, 18
45:9, 10  50:11, 18, 20
83:14, 18  90:14
**verbally**  5:4
**version**  75:22  84:20
**versions**  24:8
**versus**  68:11
**vicinity**  33:19
**victim**  38:8  72:21
73:4, 8, 9, 10, 11
94:16
**victims**  10:18  49:4, 8
**video**  23:7, 8, 9
36:11  37:12, 17, 19,
23  45:24, 25  46:3, 8,
11, 18  47:2, 7  51:14
57:16, 23  58:4, 6, 12,
15, 21, 24  59:5, 6, 11,
14, 22  75:22  76:7, 21

82:22, 24  83:2  84:12,
17, 18, 20  85:1, 10, 16,
21  90:25
**videoconference**  1:1
**videos**  22:11
**view**  30:2, 11  72:24,
25  82:21  91:21
**viewed**  91:3
**viewpoints**  24:12
**violated**  66:9
**violent**  7:4, 14
**visualize**  88:1
**vs**  1:1

**< W >**
**Wade**  35:23
**Wade's**  35:24  38:18,
22  45:19
**wait**  36:4  75:20
**waiting**  76:20
**walk**  70:20
**walking**  70:18
**want**  4:11  5:25
21:6  24:5, 13, 16
32:4  39:3, 14  42:9,
11, 17, 18  43:10
49:14, 16  53:23  62:1
68:3  79:23  81:16
**wanted**  4:9, 22  36:4,
14  56:5  62:8  90:5
**watch**  82:22
**water**  13:3
**Wauwatosa**  2:10
12:13  19:13  33:23
37:2  39:3, 10  41:10
46:4  64:6, 24  65:3
70:6, 13, 16  74:15
79:6  92:22
**Wauwatosa's**  41:21
**way**  9:24  14:13
25:19  32:25  36:2
40:16, 25  43:2, 3
46:17  55:1  66:9
73:1
**wealth**  27:12
**weapon**  23:13  39:4,
7, 12, 15, 24  40:1, 4, 8,
14, 22, 23, 24
**wearing**  41:1  42:10

**Wednesday**  76:5
**week**  16:24  26:20, 21
**weeks**  26:17, 21, 23
**Well**  8:4  10:8  11:4,
9  14:5, 10  17:10, 23
19:7  20:7  21:2
22:16  24:5  28:9
30:1, 24  33:10  34:22
35:4  42:9  47:21
48:25  53:19, 24
55:25  56:8  66:2
67:3  68:14, 18  72:20
73:2  81:17  85:7
86:20  89:16  90:9, 12,
23  93:4, 25
**went**  7:12, 15  9:3
12:11  27:15  31:4
37:3, 22  38:14  40:21
46:25  59:10  60:19
74:9, 19, 21  85:23
92:18
**West**  2:9  12:14
33:13
**we've**  25:15
**whatnot**  7:6  10:19
11:19  17:1  27:25
39:13  49:4
**whereof**  96:16
**WILLIAMS**  2:6
80:1, 4
**window**  51:7
**WIRTH**  2:7
**WISCONSIN**  1:1
2:7, 10  29:15, 23
30:12  96:1, 7, 18, 22
**withheld**  13:2
**witness**  4:2  22:6, 13,
22  26:24  27:20
32:10  55:2  71:15, 16
81:22  82:4, 9  95:8
96:16
**witnesses**  15:20
23:20, 21, 24  24:20
25:9, 18  53:9  69:5
**wonder**  55:17
**work**  16:11  17:16
23:23  32:14  42:22
44:8  93:6
**worked**  10:2
**working**  15:5

**works**   7:*18*   9:*25*
47:*13*
**worry**   82:2, *15*
**worst**   26:*4*
**Wow**   48:*22*   51:*24*
**wrapped**   76:*22*
**write**   32:*6*   51:*25*
73:*21*   74:*4, 6, 7*   77:*1*
**writing**   27:*1, 2, 3*
58:*25*   59:2   96:9
**written**   32:*5*   53:*4*
55:*8*   58:*5*   71:*23*
**wrong**   12:*21*   39:6, *20*
**wrote**   77:*22, 23, 25*
91:*16*

**< Y >**
**yeah**   8:*20*   16:*14, 15*
29:*1, 17*   37:*16*   52:*15*
61:*23*   62:*24*   79:*13*
81:7, *13*   82:*12*   85:*17*
93:*24*
**year**   6:*13*   7:*4, 9, 14*
57:*14*   92:9
**year-and-a-half**   6:*13*
**years**   6:6, *7, 16, 23,*
*25*   7:*1, 3, 4, 12, 17, 18*
9:*3*   10:*11*   21:*19*
27:*11*   51:*23*   82:*25*
93:*23*
**Yup**   55:5   78:*19*
86:*5*

**< Z >**
**Zoom**   1:*1*

**Cream City Reporting, LLC**
**414.585.8128**

| Date | | Received By: |
|------|--|--------------|
| Date | | Delivered By: |

| M File Sections | Count |
|-----------------|-------|
| SECTION 1 - ORIGINAL OFFENSE REPORT/CLEARANCE REPORT | |
| SECTION 2 - PINK CONTROL SHEET | |
| SECTION 3 - INDEX TO HOMICIDE | 2 |
| SECTION 4A - TIBURON SUPPLEMENT REPORTS Orig-36 | 69 |
| SECTION 4B - ALL OTHER ORIGINAL REPORTS (LINE-UPS, ETC.) | 0 |
| SECTION 5 - ARREST REPORTS/STATEMENTS/INTERVIEWS (QP'S) | 0 |
| SECTION 6 - CRIME SCENE DRAWINGS & DIAGRAM | 1 |
| SECTION 7 - PHOTOS/VIDEOS | 0 |
| SECTION 8 - PHYSICAL EVIDENCE (INVENTORIES) | 31 |
| SECTION 9 - CRIME LAB REPORTS | 7 |
| SECTION 10 - ANATOMY/CLOTHING REPORTS | |
| SECTION 11 - MEDICAL EXAMINER'S REPORTS (AUTOPSY) | 17 |
| SECTION 12 - COMMUNICATIONS, TTYs, ETC. | 2 |
| SECTION 13 - ALL OTHER RELATED REPORTS (PHONE RECORDS) | 42 |
| SECTION 14 - FINAL DISPOSITION | 0 |
| Total Pages | 171 |

| | Disc Description | Count |
|---|------------------|-------|
| A | CD - Photos of Autopsy 6/23/16 | 1 |
| B | CD - Video of Scene 6/23/16 | 1 |
| C | DVD - Photos @ Hospital 6/23/16 | 1 |
| D | DVD - Photos of Clothing in Drying Room 6/29/16 | 1 |
| E | DVD - Photos of Scene 6/23/16 | 1 |
| F | DVD - Squad Cams - Radio Traffic | 1 |
| G | DVD - Video - Processing Suspect's Vehicle @ tow lot 6/28/16 | 1 |
| H | CD - Photos (6) of 22 Gen4 Austria Glock Gun 6/23/16 | 1 |
| I | CD - Photos (6) of Ruger Gun 6/23/16 | 1 |
| J | CD - Photos (11) @ ME's Office 6/23/16 | 1 |
| K | CD - Photos (47) @ Tow Lot 6/28/16 | 1 |
| L | CD - Photos (47) @ Tow Lot 6/28/16 | 1 |
| M | CD - Photos (5) of Gun/Bullets @ PAB 6/28/16 | 1 |
| N | CD - Photos (3) of Baggie in Forensic Lab 6/23/16 | 1 |
| O | | |
| P | | |
| Q | | |
| R | | |
| S | | |
| T | | |
| U | | |
| V | | |
| W | | |
| X | | |
| Y | | |
| Z | | |
| AA | | |
| | Total Discs (5 DVD 9 CD) | 14 |

Reports not included in discovery: None

Reports not in draft form: 18

Supplement #10 deleted - Information in Supplement #15



O'Day
EXHIBIT: 31
7/21/23   AB
Cream City Reporting,LLC

*Return signed original to MPD Metropolitan Division*

Requested by: Det. O'Day

Prepared by:

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

**161750037**
**DRAFT**
Reported Date
06/23/2016
Nature of Call
OJINVEST
Officer
JOHNSON, NICHOLAS J

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 161750037 | ORIG | 06/23/2016 | 03:07 | 161750406 |

| Status | Nature of Call |
|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) |

| Location | | | | City | ZIP Code | Rep Dist |
|---|---|---|---|---|---|---|
| 9800 W GLENDALE AVE | | | | WAUWATOSA | 53225 | 833 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 4 | 430 | 06/23/2016 | 03:07 | 016252/JOHNSON, NICHOLAS J |

| Assignment | Entered by |
|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | 016252 |

| Assignment | Confidential | Property? | Approving Officer |
|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | HOMICIDE | None | 006709 |

| Approval Date | Approval Time |
|---|---|
| 06/25/2016 | 19:59:55 |

| # Offenses | Offense | | Description | Complaint Type | AC | Use | Bias | Loc |
|---|---|---|---|---|---|---|---|---|
| 1 | WI ACT 348 | | Out of Juris Invest | | | | | |

| #Pr | MOE | Act | Weapon/Force | IBRS | No |
|---|---|---|---|---|---|
| | | | | | |

Case 2:21-cv-00848-LA   Filed 08/22/23   Page 45 of 215   Document 91-9

# Incident Report
## MILWAUKEE POLICE DEPT

161750037
**DRAFT**

### Modus Operandi

| Gang Act? | Gang Name |
|-----------|-----------|
| No | NONE |

### Supplement

On Thursday, June 23rd, 2016 at approximatley 3:03am, at 9800 W. Glendale Ave, Wauwatosa, Wisconsin, a Wauwatosa Police Officer was conducting an after hour park check at Madison Park.

At the park, the officer observed the sole occupant sitting in the front driver seat of a black 2006 Nissan Altima. The officer approached the vehicle from the passenger side and attempted to make contact with the occupant of the vehicle. The officer observed that he subject appeared to be sleeping and upon waking him up, he observed that there was a handgun on the front passenger car seat next to the subject. The officer gave orders for the subject to keep his hands up. The subject then attempted to grab the handgun that was seated next to him. The Officer, fearing for his safety fired his duty handgun at the subject striking him multiple times. The subject was later pronounced deceased as a result of his injuries. OIS 8-2016.

PJD: MENSAH, Joseph (B/M)
Work Address: 1700 N 116th ST, Wauwatosa WI, 53213

VIC: ANDERSON, Jay L (B/M, 07/04/1990)
Conveyed to Froedtert Hospital by Wauwatosa Med Unit #52.

| Report Officer | Printed At | |
|----------------|-----------|---|
| 016252/JOHNSON, NICHOLAS J | 07/25/2016 03:50 | Page 2 of 2 |

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

**161750037**
**DRAFT**

Supplement No
0004

Reported Date
06/23/2016

Nature of Call
OJINVEST

Officer
GADZALINSKI,MATTHEW M

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 161750037 | 0004 | 06/23/2016 | | 10:40 | 161750406 |

| Status | Nature of Call | | | | | | |
|---|---|---|---|---|---|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) | | | | | | |

| Location | | | City | | ZIP Code | |
|---|---|---|---|---|---|---|
| 9800 W GLENDALE AV | | | WAUWATOSA | | 53225 | |

| From Date | From Time | Officer | | | | |
|---|---|---|---|---|---|---|
| 06/23/2016 | 03:07 | 017783/GADZALINSKI,MATTHEW M | | | | |

| Assignment | | Entered by | | | | |
|---|---|---|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | | 017783 | | | | |

| Assignment | | Confidential | Property? | Approving Officer | |
|---|---|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | | HOMICIDE | None | 006709 | |

| Approval Date | Approval Time | | | |
|---|---|---|---|---|
| 06/28/2016 | 15:29:41 | | | |

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| No | NONE | HOMICIDE |

## Supplement

This report is submitted by Detective Matthew GADZALINSKI, assigned to the Metropolitan Investigations Division, Homicide Unit. On 06-23-16, I was informed, and instructed by Lt. Joseph MCLIN to respond to the scene of an Officer Involved shooting which involved the Wauwatosa Police Department. We were informed that the incident had taken place inside of Madison Park, 9800 W Glendale Ave. This incident would be labeled OIS 2016-8.

While headed to the scene of the incident, I was redirected by Lt. MCLIN to head to Froedtert Memorial Hospital, 9200 W Wisconsin Ave, to meet the victim who had been transported. That subject would later be identified as Jay L ANDERSON (B/M 07-04-90). As a result of my part of the investigation, taking place at Froedtert Hospital, I conducted interviews of two officers who had responded to the scene of this shooting prior to their escort of the victim to the hospital.

The second officer I interviewed was Police Officer Andrew FLORYANCE (Employee # 6568, Squad #301,) who was appointed to the Wawautosa Police Department on 12-16-12. P.O. LALLIER stated that he works the late shift, with hours consisting of 10:00pm to 6:24am. During this night's shift, he was assigned Squad # 301, and was operating a fully marked squad, a Ford Explorer #P221, that was equipped with in-squad video. He was in full police uniform.

P.O. FLORYANCE stated that he was out on patrol, 1-man, when he first heard a call come over the police radio from a voice he recognized. P.O. FLORYANCE recognized that voice to belong to his co-worker, Police Officer MENSAH. P.O. FLORYANCE stated that when he first heard a broadcast from P.O. MENSAH, he was at near the WALGREENS DRUG STORE, at 7600 W Center St. The first communication he remembered was P.O. MENSAH stating "SUBJECT HAS A GUN," he also had heard that P.O. MENSAH was at Madison Park (9800 W Glendale Ave.) P.O. FLORYANCE stated he started responding towards the park after hearing this communication.

A short time after hearing the subject with gun communication, he hears P.O. MENSAH state over the radio "SHOTS FIRED." At this point he remembers activating his red/blue lights and in-car video. P.O. FLORYANCE stated his travel time, was the time it took him to get from 76th and Center to the park. P.O. FLORYANCE stated upon arrival, he pulled his car into the parking lot at Madison Park.

When he pulled in, he stated that the shooting victim's vehicle was in about the middle of the lot, facing

| Report Officer | Printed At | |
|---|---|---|
| 017783/GADZALINSKI,MATTHEW M | 07/25/2016 03:50 | Page 1 of 2 |

# Incident Report
# MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

Supplement No
0004

## Supplement

eastbound, and he stated that P.O. MENSAH's vehicle was facing the subject's car at an angle, off to the right, on the driver's side. As he was pulling in, he observed (3) of his fellow Wauwatosa Police Officers in a "LINE FORMATION" moving around, and clearing the shooting victim's vehicle. He stated the only officer he could remember recognizing in that formation, was Police Officer SALYERS, and that at least one of those officers had a long gun.

P.O. FLORYANCE stated that he pulled his squad past the (2) vehicles, to the north end of the parking lot. P.O. FLORYANCE stated that he pulled his car up at the walking path leading to the lot, to block any possible pedestrian traffic. He exited his squad car, and never drew his service weapon. P.O. FLORYANCE approached the vehicles, and off to the side, he observed P.O. MENSAH standing next to a Police Officer WONG.

P.O. FLORYANCE stated he asked them "ARE YOU OKAY," and he stated that P.O. WONG responded "WE'RE OKAY." He did not have a conversation with P.O. MENSAH. Shortly there after, he stated that he went to assist P.O. SALYERS who was about to render aid to the subject later identified as <u>Jay L ANDERSON (B/M 07-04-90)</u>. P.O. FLORYANCE stated that he did not have any latex gloves, so he returned to his vehicle to get some. By the time he returned to where ANDERSON was lying on the ground, Fire Department personnel were already on the scene. P.O. FLORYANCE stated he never touched ANDERSON, and never touched any firearm recovered from ANDERSON's vehicle. P.O. FLORYANCE stated he remembered seeing the rear driver's side window broken out on the vehicle ANDERSON pulled from.

P.O. FLORYANCE stated from there, he provided assistance to the Fire Department by shining down light on them from his flashlight, while they were rendering life saving measures to ANDERSON. P.O. FLORYANCE stated that once the Fire Department loaded ANDERSON into MED Rig 52, he followed the ambulance in his marked police cruiser to Froedtert Hospital. Upon arrival, he checked the back of the ambulance, and recovered the items listed in my previous supplemental report.

P.O. FLORYANCE then assisted me while at the hospital, with an initial inventory assessment of items recovered.

END OF REPORT.........

# Incident Report
# MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

Supplement No
0001

Reported Date
06/23/2016
Nature of Call
OJINVEST
Officer
VEDBRAATEN,LEE F

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 161750037 | 0001 | 06/23/2016 | 10:00 | 161750406 |

| Status | Nature of Call | | | | |
|---|---|---|---|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) | | | | |

| Location | | City | | ZIP Code |
|---|---|---|---|---|
| 9800 W GLENDALE AVE | | WAUWATOSA | | 53222 |

| From Date | From Time | Officer | | |
|---|---|---|---|---|
| 06/23/2016 | 03:00 | 009064/VEDBRAATEN,LEE F | | |

| Assignment | | Entered by | Assignment |
|---|---|---|---|
| INVESTIGATIVE MANAGEMENT DIVISION | | 009064 | INVESTIGATIVE MANAGEMENT DIVISION |

| Confidential | Property? | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|---|
| HOMICIDE | None | 006709 | 06/25/2016 | 14:27:22 |

| MISC INFO | MISC INFO | | | |
|---|---|---|---|---|
| 151 PHOTOS | CAMCORDER VIDEO | | | |

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| No | NONE | HOMICIDE |

## Supplement

This incident supplement was written by Forensic Investigator Lee F. VEDBRAATEN, assigned to Squad 1930, of the Forensics Division, late shift.

On Thursday, June 23rd, 2016, at approximately 5:19 A.M., I was dispatched to the scene of a fatal police involved shooting investigation. Upon my arrival at 9800 W. Glendale Ave., Wauwatosa, WI., I spoke with Detective Nicolas JOHNSON, assigned to Squad 9540, of the CIB, Late shift. Detective JOHNSON informed me of the circumstances and requested that I photograph & record the scene with a camcorder.

I took one hundred fifty-one digital photographs of the scene. The camcorder video was placed on several CD's and handed over to Detective JOHNSON.

| Report Officer | Printed At | |
|---|---|---|
| 009064/VEDBRAATEN,LEE F | 07/25/2016 03:50 | Page 1 of 1 |

# Incident Report
## MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

**161750037**
**DRAFT**

Supplement No
0002

Reported Date
06/23/2016

Nature of Call
OJINVEST

Officer
GADZALINSKI,MATTHEW M

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 161750037 | 0002 | 06/23/2016 | 10:40 | 161750406 |

| Status | Nature of Call |
|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) |

| Location | | City | ZIP Code |
|---|---|---|---|
| 9800 W GLENDALE AV | | WAUWATOSA | 53225 |

| From Date | From Time | Officer |
|---|---|---|
| 06/23/2016 | 03:07 | 017783/GADZALINSKI,MATTHEW M |

| Assignment | Entered by |
|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | 017783 |

| Assignment | Confidential | Property? | Approving Officer |
|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | HOMICIDE | None | 006709 |

| Approval Date | Approval Time |
|---|---|
| 06/25/2016 | 14:28:48 |

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| No | NONE | HOMICIDE |

## Supplement

This report is submitted by Detective Matthew GADZALINSKI, assigned to the Metropolitan Investigations Division, Homicide Unit. On 06-23-16, I was informed, and instructed by Lt. Joseph MCLIN to respond to the scene of an Officer Involved shooting which involved the Wawautosa Police Department. We were informed that the incident had taken place inside of Madison Park, 9800 W Glendale Ave. This incident would be labeled <u>OIS 2016-8</u>.

While headed to the scene of the incident, I was redirected by Lt. MCLIN to head to Froedtert Memorial Hospital, 9200 W Wisconsin Ave, to meet the victim who had been transported. That subject would later be identified as <u>Jay L ANDERSON (B/M 07-04-90)</u>.

Upon arrival I met with members of the Wawautosa Fire Department. I was informed that all members who responded to the scene of this incident, came from <u>Fire House #52.</u>

### MED # 52 Personnel:

*Dispatch time* - 3:08 am - "Assist PD," updated to subject with a GSW, and told to stage.
*On Scene MED 52* - 3:15 am
*Transport to Froedtert Memorial Hospital* - 3:35 am
*On Scene at Froedtert Memorial Hospital* - 3:46 am

<u>Lt. Brian O' DAY</u>- I spoke with Lt. O' DAY at Froedtert, and he stated that the victim was never conscious during any treatment or conveyance. Lt. O' DAY stated that they arrived on scene and immediately attempted lifesaving measures, with treatment for multiple gun shot wounds to the head. They were able to regain a pulse on ANDERSON and conveyed to Froedtert. Lt. O' DAY stated shortly upon their arrival to the Trauma Room, ANDERSON was pronounced deceased. Lt. O' DAY never heard any verbal sounds or communication from ANDERSON. Lt. O' DAY stated he did not deliver any medications, only an I-V with fluid.

<u>Firefighter / Paramedic David TIPPEL (Driver)</u> - Was the initial driver on the rig, however assisted in medical care during the conveyance to the hospital. He was restocking the ambulance when I arrived, and I did not speak with him.

### ENGINE # 52 Personnel:

| Report Officer | Printed At | |
|---|---|---|
| 017783/GADZALINSKI,MATTHEW M | 07/25/2016 03:50 | Page 1 of 3 |

# Incident Report
# MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

Supplement No
0002

## Supplement

Captain Scot FRIDRICK- Initially responded inside the Engine, however drove the MED rig for victim's conveyance. FRIDRICK stated ANDERSON was never conscious, and he never heard any verbal sounds or communication from ANDERSON.

Firefighter Christopher SCHULTZ - Responded with the Engine, and assisted inside the MED rig during victim's conveyance, stated ANDERSON was never conscious, and he never heard any verbal sounds or communication from ANDERSON.

MPO Pat QUINLEAVEN - Responded with the Engine, was not at the hospital.

I was met in the trauma room by **Police Officers Tyler LALLIER** (Squad 306, employee # 6700) & **Andrew FLORYANCE** (Squad 301, employee # 6568,) of the Wauwatosa Police Department, who had taken custody of property, and who were securing ANDERSON's body after he had been pronounced deceased. *SEE SEPARATE SUPPLEMENTS FOR THEIR STATEMENTS REGARDING THE INCIDENT.*

*Admit Time* - 03-46 am

Admit /Attending Physician - Dr. Jillian THEABOLT

*Pronounce Deceased Time* - 04:05 am

Pronouncing Physician - Dr. Jillian THEABOLT

Prior to ANDERSON's transport to the hospital morgue, I was met by Forensic Investigator James PETERSON (Squad 1921) in the trauma room for photographs. ANDERSON had already been placed in to a white body bag, which was zipped up. I was informed by P.O. LALLIER that medical staff had taken custody of property while ANDERSON was being treated. He informed me of the following:

Hospital Tech Dominique OWENS - took custody of ANDERSON's clothing and belongings, and placed in a series of bags.

RN Jennifer LIEBE - placed a paper bag over ANDERSON's right hand after pronouncement

RN Michael ROBINSON - placed a paper bag over ANDERSON's left hand after pronouncement.

I then contacted the Medical Examiners office at approximately 4:30am and spoke with Forensic Investigator Luke WARNKE, advising him of the incident. FI PETERSON then took overall photographs while still in the trauma room, and I opened the body bag for photographs of ANDERSON'S body. Through observation, and explanation from the medical staff, the following probable wounds were discovered:

- Gun shot wound to right cheek, to the right of the ear
- Gun shot wound through the right ear
- Gun shot wound to the top of the right trapezoid area, between base of neck and right shoulder
- Gun shot wound to the rear right of the skull

Dr. THEABOLT informed me that she thought she could feel a probable bullet lodged in the back of ANDERSON's neck, at the base of his skull. A quantity of blood and brain matter were observed, inside the bag, underneath ANDERSON's head.

I took custody of the following items, listed below. All items were conveyed from the scene with ANDERSON's person, and taken to Froedtert. Per P.O. LALLIER who accompanied ANDERSON, ANDERSON's clothing was first cut and shoes removed while inside of the MED rig, enroute to the hospital. P.O. FLORYANCE informed me that upon arrival to the hospital, he did a check of the MED Rig, which he had followed in his squad car. P.O. FLORYANCE recovered the following items from inside the MED Rig, then placed them in the bag which was turned over to me: Item # 1, Item #2, Item #3, & Item # 7:

| Report Officer | Printed At | |
|---|---|---|
| 017783/GADZALINSKI, MATTHEW M | 07/25/2016 03:50 | Page 2 of 3 |

# Incident Report
# MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

The following items had been found co-mingled a brown paper bag, and or separated into a clear plastic bag, these items were all placed on MPD Inventory # 16-022217 :

**Item #1** - Blue and White, Nike Air Jordan high top tennis shoe, Men's size 10 with white laces, right foot, with small amount of possible blood splatter on the inseam of the shoe.

**Item # 2** - Blue and White, Nike Air Jordan high top tennis shoe, Men's size 10 with white laces, left foot, with small amount of possible blood splatter on the toe area of the shoe.

**Item # 3** - Silver, rope style necklace, which was broken outside of the clasp, and had possible blood inside of some of the chain links- *Had been placed in a clear plastic bag.*

**Item # 4** - Red and Black "Ralph Lauren" brand boxer shorts, with a deer style emblem, Size Small, which were cut by medical personnel, and had blood staining on them. *This item was blood soaked, and placed in the drying room under lock # 77941.*

**Item #5** - Blue and White striped, "Ralph Lauren," brand, short sleeve polo, collar style shirt, size XL, which had an apparent bullet hole in the right shoulder area consistent with one of the victim's wounds. *This item was blood soaked, and placed in the drying room under lock # 77941.*

**Item # 6** - (2) Black cotton ankle socks, one of which had holes in the toe area, consistent with common wear and tear.

**Item #7** - "Levis" brand, tan/khaki pants, size 36x30, with a brown leather belt (silver buckle) that is looped through the belt loops. *This item was blood soaked, and placed in the drying room under lock # 77941 -*

**Item #8** - Cousins sub shop, business style "Loyalty Card", which I recovered from the left rear pants pocket of item # 7. The card stated that it was only valid for use at the Cousins, at 11401 W Silver Spring Dr.

**Item #9-** Knotted clear sandwich bag, which was original container for the suspected green plant narcotics, which I recovered from the right front pants pocket of Item # 7. I conveyed this item to the Forensics Section for latent case, and possible DNA examination processing.

While examining Item #7, the pants recovered from ANDERSON, I located at knotted clear plastic sandwich bag in the right front pants pocket. That bag contained a green plant like substance I know to be consistent with marijuana. That bag was later conveyed to the Police Administration Building, I had the green plant like substance tested by Police Officer Todd BOHLEN (Squad 1148.) The substance was tested using the Nark II 05 field test, was positive for THC, and had a total weight of 2.43 grams. I placed the narcotics on MPD Inventory # 16-022224, Item #1.

Handed over to me from P.O. LALLIER, was a specimen jar with the label of India Doe. Inside the trauma room, the hospital staff had placed the following U.S. Coins which were taken from ANDERSON's person: (2) U.S. Quarters and (1) U.S. Penny. The coins equaled .51 cents. I placed the coins, still inside of the jar, on MPD Inventory # 16-022227.

At 5:55am, P.O. LALLIER escorted ANDERSON's body to the hospital morgue. ANDERSON was locked inside by Hospital Tech Kevin Fedderly, awaiting transport from the Medical Examiner's office transport team.

END OF REPORT......

# Incident Report
# MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

Supplement No
0003

Reported Date
06/23/2016

Nature of Call
OJINVEST

Officer
GADZALINSKI,MATTHEW M

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 161750037 | 0003 | 06/23/2016 | | 10:40 | 161750406 |

| Status | Nature of Call | | | | | | |
|---|---|---|---|---|---|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) | | | | | | |

| Location | | | City | | | ZIP Code | |
|---|---|---|---|---|---|---|---|
| 9800 W GLENDALE AV | | | WAUWATOSA | | | 53225 | |

| From Date | From Time | Officer | | | | | |
|---|---|---|---|---|---|---|---|
| 06/23/2016 | 03:07 | 017783/GADZALINSKI,MATTHEW M | | | | | |

| Assignment | | | Entered by | | | | |
|---|---|---|---|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | | | 017783 | | | | |

| Assignment | | | Confidential | Property? | Approving Officer | | |
|---|---|---|---|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | | | HOMICIDE | None | 006709 | | |

| Approval Date | Approval Time | | | | | | |
|---|---|---|---|---|---|---|---|
| 06/28/2016 | 15:29:10 | | | | | | |

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| No | NONE | HOMICIDE |

## Supplement

This report is submitted by Detective Matthew GADZALINSKI, assigned to the Metropolitan Investigations Division, Homicide Unit. On 06-23-16, I was informed, and instructed by Lt. Joseph MCLIN to respond to the scene of an Officer Involved shooting which involved the Wawautosa Police Department. We were informed that the incident had taken place inside of Madison Park, 9800 W Glendale Ave. This incident would be labeled OIS 2016-8.

While headed to the scene of the incident, I was redirected by Lt. MCLIN to head to Froedtert Memorial Hospital, 9200 W Wisconsin Ave, to meet the victim who had been transported. That subject would later be identified as Jay L ANDERSON (B/M 07-04-90). As a result of my part of the investigation, taking place at Froedtert Hospital, I conducted interviews of two officers who had responded to the scene of this shooting prior to their escort of the victim to the hospital.

The first officer I interviewed was Police Officer Tyler LALLIER (Employee # 6700, Squad #306,) who was appointed to the Wawautosa Police Department on 01-03-15. P.O. LALLIER stated that he works the late shift, with hours consisting of 11:00pm to 7:24am. During this night's shift, he was assigned Squad # 306, and was operating a fully marked squad, a Ford Taurus #P207, that was equipped with in-squad video. He was in full police uniform.

P.O. LALLIER stated that he was at the Wawautosa Police Department Station, 1700 N 116th St, when he heard a known voice come over the police radio. P.O. LALLIER stated that voice he recognized was that of Police Officer MENSAH, one of his co-workers, and P.O. MENSAH was calling for assistance. He stated that P.O. MENSAH went out with call for an occupied auto, in Madison Park, and so he started to respond to the park.

P.O. LALLIER stated he did not start responding red/blue lights until he heard P.O. MENSAH state over the air "Subject has a gun!" At this point he stated he responded with his squad car camera, lights, and siren activated. P.O. LALLIER stated that he hears two more separate communications from P.O. MENSAH after the subject with gun statement, those communications were: "SHOTS FIRED," and "SUBJECT DOWN!"

P.O. LALLIER felt that he arrived on scene to Madison Park (9800 W Glendale Ave) as quickly as it took him to get from the station, after that first broadcast. P.O. LALLIER stated that someone over the air, had stated they were in "the parking lot," so he knew exactly where to respond. P.O. LALLIER stated when he arrived, and pulled in the lot, and he observed the following Squads already on scene: *Squad 318 (P.O. Ralph SALYERS) - Squad*

| Report Officer | Printed At | |
|---|---|---|
| 017783/GADZALINSKI,MATTHEW M | 07/25/2016 03:50 | Page 1 of 2 |

# Incident Report
# MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

Supplement No
0003

## Supplement

*301 (P.O. FLORYANCE) - Squad 304(P.O. MILLS)- and Squad 305 (P.O. MENSAH.)*

P.O. LALLIER stated that the shooting victim's vehicle was in about the middle of the lot, facing eastbound, and he stated that P.O. MENSAH's vehicle was facing the subject's car at an angle, off to the right, on the driver's side. P.O. LALLIER stated he could not recall if the victim's vehicle was running or not when he arrived. He stated he remembered that P.O. MENSAH had his squad "Take Down lights" on, but when he arrived he did not remember seeing P.O. MENSAH's red/blue lights activated. P.O. LALLIER stated that he pulled past those two vehicles, and parked his squad car in the north east corner of the lot. He does remember briefly pulling out his service weapon upon arrival, and while he was checking the north side of the lot for any other possible threats during this incident.

P.O. LALLIER stated he remembered seeing P.O. MENSAH off to the side of the vehicles, however he never spoke with him. P.O. LALLIER then went around to Squad 305 where he retrieved an A.E.D and First Aid kit. He approached the subject's vehicle, where he observed the shooting victim seated in the driver's seat of the car. He observed the subject seated upright, slightly laid back, with his head tilted slight to the right. He remembered the subject's hands somewhere around the waist or lap area.

P.O. LALLIER stated that P.O. SALYER had the driver's side door open, and was already attempting to tend to the subject, and had checked the subject's left wrist for a pulse. P.O. LALLIER stated that he also checked the left wrist for a pulse. It was his belief and understanding that both he and P.O. SALYER felt a pulse at the wrist. P.O. LALLIER stated that at no point in having contact with the subject, did he observe him to be conscious.

P.O. LALLIER stated he observed a large quantity of blood on the subject, and next to him in the car. The shooting victim's car itself, he observed to have a shattered out rear driver's side window, and he was immediately struck by the odor of fresh marijuana which was emanating from inside the vehicle. He stated he knew it was a (4) door auto, but at the time was unable to remember much else about the description of the car. P.O. LALLIER observed the subject to be wearing khaki pants, a blue/white polo shirt, and had no head wear.

P.O. LALLIER stated that P.O. SALYERS grabbed hold of the subject, later identified as Jay L ANDERSON (B/M 07-04-90,) on the left side of his body, and started to remove him from the vehicle. P.O. LALLIER stated that he immediately assisted, and started to grab ANDERSON's body on the right side. P.O. LALLIER stated that they lowered ANDERSON to the ground. By the time they got ANDERSON to the ground, he was able to see personnel from their Fire Department arriving on scene. P.O. LALLIER stated he heard there was a gun in vehicle, however he did not observe or touch one. He stated at some point, P.O. SALYERS had acquired an Identification Card for ANDERSON, however did not have any knowledge of where the I.D. had come from.

The medical personnel immediately took over life saving measures. P.O. LALLIER stated that he backed off while the subject was being treated by the Fire Department, and stayed with ANDERSON as he was loaded into MED 52, and subsequently conveyed to Froedtert Hospital. P.O. LALLIER informed me that the strong odor of fresh marijuana continued, now coming from ANDERSON's person, while they were in transit to the hospital. As described in my other supplemental report, P.O. LALLIER took custody of property, and informed me of what happened when they arrived at the hospital.

END OF REPORT................

| Report Officer | Printed At | |
|---|---|---|
| 017783/GADZALINSKI, MATTHEW M | 07/25/2016 03:50 | Page 2 of 2 |

Case 2:21-cv-00848-LA   Filed 08/22/23   Page 54 of 215   Document 91-9

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

**161750037**
**DRAFT**

Supplement No
0005

Reported Date
06/23/2016

Nature of Call
OJINVEST

Officer
JOHNSON, STEVEN S

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 161750037 | 0005 | 06/23/2016 | 11:40 | 161750406 |

| Status | Nature of Call |
|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) |

| Location | City | ZIP Code | Rep Dist |
|---|---|---|---|
| 9800 W GLEDALE AV | WAUWATOSA | 53225 | 833 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 4 | 430 | 06/23/2016 | 03:07 | 010978/JOHNSON, STEVEN S |

| Assignment | Entered by |
|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | 010978 |

| Assignment | Confidential | Property? | Approving Officer |
|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | HOMICIDE | None | 006709 |

| Approval Date | Approval Time |
|---|---|
| 06/25/2016 | 14:30:26 |

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| No | NONE | ALL OTHERS |

## Supplement

This report is written by Detective Steven S. Johnson, assigned to Metropolitan Division, Homicide Unit (Late Shift).

On Thursday, June 23, 2016, at 4:05 AM, I, along with other members of the Metropolitan Division, was directed by Sqd 9509, Lt. Joseph McLin, to respond to the Officer Involved Shooting (Wauwatosa PD) at Madison Park, 9800 W. Glendale Ave. (CAD #16-175-0406).

Upon arrival, Wauwatosa PD, Sqd 370, Lt. Gary GABRISH, briefed us at 3:03 AM, Sqd 305, PO Joseph MENSAH, had conducted a routine park check when he encountered a subject inside a parked vehicle. He found the subject incapacitated and attempted to wake him up by knocking on the window. The subject woke up, ignored his commands, and reached for a handgun on the front passenger seat. Fearing for his safety, PO MENSAH fired into the vehicle. The subject sustained several gunshot wounds and ultimately became deceased at Froedtert Memorial Hospital.

I was instructed by Lt. McLin to conduct the next of kin notification for the subject, identified as Jay L. Anderson Jr. B/M 07-04-90, MPD PIN #405261, 8026 W. Medford Av.. I changed location to the address of 8026 W. Medford Av., where I was met by PO Nate Woods (Squad 4390) in order to make the notification.

Upon arriving at the address of 8026 W. Medford Av., I made contact with a male, identified as Jay L. Anderson Sr. B/M 03-08-67, 8026 W. Medford Av., phone number (414)551-1154. Anderson invited PO Woods and I into his residence and stated "I hope you ain't bringing any bad news". I conducted this interview with Anderson Sr. in the kitchen of the residence, at which time he provided the following information.

****Interview of Jay Anderson Sr.****

Anderson Sr. identified his son as Jay L. Anderson Jr. B/M 07-04-90, who resides at his residence with his girlfriend, identified as Starkeisha DeLaRosa, and her two children. Anderson Sr. stated that his son has one child in common with DeLaRosa, and they live in the basement. In addition, Anderson Sr. identified his wife, who was on scene, as Linda M. Anderson B/F 12-29-65.

Anderson Sr. stated that he last saw Anderson Jr. last night, Wednesday, June 22, 2016, at approximately 10:00pm, at which time Anderson Jr. was watching television in the living room of the residence. Anderson Sr. sated he went to bed at 10:00am, and woke up shortly before my arrival. Anderson Sr. stated when he went to

| Report Officer | Printed At | |
|---|---|---|
| 010978/JOHNSON, STEVEN S | 07/25/2016 03:50 | Page 1 of 2 |

# Incident Report
## MILWAUKEE POLICE DEPT
**161750037**
**DRAFT**

Supplement No
0005

**Supplement**

bed, Anderson Jr. was wearing a white in color Polo shirt with thin blue stripes, blue jeans and blue and white Jordan shoes.

Anderson Sr. asked if something bad had happened because he had turned on the television when he woke up and observed the news broadcasting that there had been a shooting and observed a vehicle involved in the incident looked similar to the vehicle owned by DeLaRosa's mother. Anderson Sr. stated he needed to know now if something had happened.

I advised Anderson Sr. that there had been an officer involved shooting in the City of Wauwatosa and that Anderson Jr. was possibly involved. I advised Anderson Sr. that I would have to show him a photograph of a subject to positively identify if that was Anderson Jr., at which time Anderson Sr. agreed to view the photograph.

I had Anderson Sr. view a photograph that was taken by Detective Matthew Gadzalinski (Squad 9536) at Froedtert Hospital, 9200 W. Wisconsin Av. and sent view a text message to my cell phone. This photograph was photo of Anderson Jr. head. I had Anderson Sr. view the photograph, at which time he positively identified the person in the photograph as his son, Jay L. Anderson, at 7:12am..

Anderson Sr. began despondent upon viewing the photograph and began to yell to his wife that Anderson Jr. was dead. I was able to briefly speak with Anderson Sr. at which time I asked him if he had ever seen Anderson Jr. with a firearm inside of his residence, at which time he said that he had never seen Anderson Jr. in possession of any firearm inside the residence. Due to Anderson Sr. emotional state he was unable to answer any additional questions.

| Report Officer | Printed At | |
|---|---|---|
| 010978/JOHNSON, STEVEN S | 07/25/2016 03:50 | Page 2 of 2 |

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

**161750037**
Supplement No
0006
**DRAFT**
Reported Date
06/23/2016
Nature of Call
OJINVEST
Officer
JOHNSON,STEVEN S

## Administrative Information

| Agency | | | | | | |
|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | Incident No 161750037 | Supplement No 0006 | Reported Date 06/23/2016 | Reported Time 11:30 | CAD Call No 161750406 |

| Status | Nature of Call |
|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) |

| Location | City | ZIP Code | Rep Dist |
|---|---|---|---|
| 9800 W GLENDALE AV | WAUWATOSA | 53225 | 833 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 4 | 430 | 06/23/2016 | 03:07 | 010978/JOHNSON,STEVEN S |

| Assignment | Entered by |
|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | 010978 |

| Assignment | Confidential | Property? | Approving Officer |
|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | HOMICIDE | None | 006709 |

| Approval Date | Approval Time |
|---|---|
| 06/29/2016 | 15:24:46 |

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| No | NONE | HOMICIDE |

## Supplement

This report is written by Detective Steven S. Johnson, assigned to Metropolitan Division, Homicide Unit (Late Shift).

On Thursday, June 23, 2016, at 4:05 AM, I, along with other members of the Metropolitan Division, was directed by Sqd 9509, Lt. Joseph McLIN, to respond to the Officer Involved Shooting (Wauwatosa PD) at Madison Park, 9800 W. Glendale Ave. (CAD #16-175-0406).

Upon arrival, Wauwatosa PD, Sqd 370, Lt. Gary GABRISH, briefed us at 3:03 AM, Sqd 305, PO Joseph MENSAH, had conducted a routine park check when he encountered a subject inside a parked vehicle. He found the subject incapacitated and attempted to wake him up by knocking on the window. The subject woke up, ignored his commands, and reached for a handgun on the front passenger seat. Fearing for his safety, PO MENSAH fired into the vehicle. The subject sustained several gunshot wounds and ultimately became deceased at Froedtert Memorial Hospital.

I was instructed by Lt. McLin to conduct the next of kin notification for the subject, identified as Jay L. Anderson Jr. B/M 07-04-90, MPD PIN #405261, 8026 W. Medford Av.. I changed location to the address of 8026 W. Medford Av., where I was met by PO Nate Woods (Squad 4390) in order to make the notification.

During the next of kin notification at this location I identified as female on scene as Starkeisha M. DeLaRosa B/F 02-19-89, 8026 W. Medford Av., (414)269-7288, who identified herself as the girlfriend of Jay Anderson. I conducted an interview of DeLaRosa as she was seated inside of my unmarked squad car, who provided the following information .

****Interview of Starkeisha DeLaRosa****

DeLaRosa identified herself as the live-in girlfriend of Jay Anderson Jr., whom she has known for five (5) years. DeLaRosa stated that she has one child in common with Anderson, identified as Jaelyn Anderson B/M 03-13-15. DeLaRosa stated that they both currently live with Anderson's parents at the address of 8026 W. Medford Av., along with her two children.

DeLaRosa stated that on yesterdays date, Wednesday, June 22, 2016, she, along with Anderson, slept in their room, which is located in the basement of the residence. DeLaRosa stated she woke up at approximately 9:00am with the children and Anderson slept until approximately 11:30am..

| Report Officer | Printed At | |
|---|---|---|
| 010978/JOHNSON,STEVEN S | 07/25/2016 03:50 | Page 1 of 2 |

# Incident Report
## MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

Supplement No
0006

**Supplement**

DeLaRosa stated she took the children to her mothers, identified as 4520 N 110th St., Wauwatosa, Wi, at approximately 1:00pm, at which time they took the children to the splash pad at Madison Park. DeLaRosa stated when she left the residence, Anderson was watching tv in the living room. DeLaRosa stated that her car had recently been over heating and her mother allowed her to use her vehicle, 2006 Nissan Altima, black in color, which she believed she picked up at her mothers residence on Tuesday.

DeLaRosa stated she dropped her mother off at her residence at approximately 2:00pm, where she then drove back to her residence of 8026 W. Medford Av. in the Nissan Altima. DeLaRosa stated upon entering the residence, Anderson was still at home but could not remember exactly what he was doing.

DeLaRosa stated at approximately 3:30pm, she drove alone to the Materson Staffing, 1509 S. 108th St., leaving the children at home with Anderson in the living room of the residence. DeLaRosa stated she applied form jobs and stayed until approximately 5:00pm, before returning home. DeLaRosa stated upon returning home, Anderson was still inside the residence with the children.

DeLaRosa stated they both stayed at the residence, playing with the children inside and outside and watching television and Anderson did not leave the residence for any extended period of time. DeLaRosa stated she went to sleep with the children at approximately 10:30pm, and Anderson was watching television upstairs.

DeLaRosa stated at approximately 11:30pm, Anderson woke her up and told her he was going to the gas station and she told him to make sure to put the car in the driveway so it would not get a ticket. DeLaRosa stated she fell back asleep and awoke at approximately 1:00am and observed Anderson was not at home. DeLaRosa stated she tried calling his phone, (414)210-0606, at which time she did not receive an answer. DeLaRosa stated she tried calling numerous times and still did not get an answer.

DeLaRosa stated she fell back asleep and awoke several hours later and she observed Anderson was still not at home. DeLaRosa stated she checked upstairs and found Anderson was not there and tried numerous times to call him with no answer. DeLaRosa she fell back asleep and was awoken by the sound of Anderson's parents screaming and crying, at which time she came upstairs and was told Anderson Jr. had been shot by police.

DeLaRosa stated the last time she saw Anderson Jr. he was wearing a white in color short sleeve polo shirt with dark blue thin stripes, blue jeans and unknown shoes. DeLaRosa stated Anderson Jr. is a heavy marijuana user, usually smoking at least seven marijuana "blunts" each day and to the best of her knowledge he does not sell marijuana.. DeLaRosa stated she has never seen Anderson Jr. in possession of a firearm inside their bedroom or at any other times since she has known him. DeLaRosa stated she was aware that Anderson Jr. was arrested regarding a firearm in the past but could not remember the details regarding the incident.

DeLaRosa stated she did not know why Anderson Jr. would have been in the Wauwatosa park in the vehicle, but her mother lived close to the park and one of Anderson Jr. sisters, Tasha Johnson, lived in the "high" numbers on W. Capital Dr.. DeLaRosa stated she does allow Anderson Jr to drive her mothers vehicle, but only for short trips because it is her mothers vehicle. DeLaRosa stated to the best of her knowledge Anderson Jr. was not having any problems with anyone that would require him to be carrying a gun.

DeLaRosa was highly emotional and crying throughout the interview and could provide no additional information.

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee, WI 53210

(414) 935-7502

**161750037**
**DRAFT**

Supplement No
0007

Reported Date
06/23/2016
Nature of Call
OJINVEST
Officer
JOHNSON, STEVEN S

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 161750037 | 0007 | 06/23/2016 | 12:15 | 161750406 |

| Status | Nature of Call |
|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) |

| Location | City | ZIP Code | Rep Dist |
|---|---|---|---|
| 9800 W GLENDALE AV | WAUWATOSA | 53225 | 833 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 4 | 430 | 06/23/2016 | 03:07 | 010978/JOHNSON, STEVEN S |

| Assignment | Entered by |
|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | 010978 |

| Assignment | Confidential | Prop Trans Stat | Property? |
|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | HOMICIDE | Pending | Yes |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| 006709 | 06/25/2016 | 14:32:30 |

## Modus Operandi

| Gang Act? | Gang Name |
|---|---|
| No | NONE |

## Supplement

This report is written by Detective Steven S. Johnson, assigned to Metropolitan Division, Homicide Unit (Late Shift).

On Thursday, June 23, 2016, at 4:05 AM, I, along with other members of the Metropolitan Division, was directed by Sqd 9509, Lt. Joseph McLIN, to respond to the Officer Involved Shooting (Wauwatosa PD) at Madison Park, 9800 W. Glendale Ave. (CAD #16-175-0406).

Upon arrival, Wauwatosa PD, Sqd 370, Lt. Gary GABRISH, briefed us at 3:03 AM, Sqd 305, PO Joseph MENSAH, had conducted a routine park check when he encountered a subject inside a parked vehicle. He found the subject incapacitated and attempted to wake him up by knocking on the window. The subject woke up, ignored his commands, and reached for a handgun on the front passenger seat. Fearing for his safety, PO MENSAH fired into the vehicle. The subject sustained several gunshot wounds and ultimately became deceased at Froedtert Memorial Hospital.

During the course of the on scene investigation, Wauwatosa Police Officer Ralph Salyers recovered property, suspected marijuana and US Currency, from the left front pants pocket of the subject, identified as Jay L. Anderson B/M 07-04-90, MPD PIN #405261. This property was transferred into the custody of Detective Troy Porter on scene at the address of 9800 W. Glendale Av.

Detective Porter conveyed this property to the Milwaukee Police Administration Building, 749 W. State St., where I took custody of the property from Detective Porter while inside of the Metropolitan Investigation Unit, which is located on the Sixth Floor of the Police Administration Building on Thursday, June 23, 2016 at 8:30am.

I hand carried the suspected marijuana to the District #1 Assembly, which is located on the Second Floor of the Police Administration Building to test the suspected marijuana. I, Detective Johnson, tested the substance using the Nark II 05 field test, which tested positive for THC, and had a total weight of 9.98 grams. This marijuana was packaged in one (1) clear plastic sandwich bag. I placed the marijuana on MPD Inventory #16022231, item #1. This piece of evidence was secured inside of drug dropbox in the Investigations Property Room, which is located on the Basement Floor of the Police Administration Building.

In addition to the above listed marijuana, I took custody of US Currency from Detective Porter. This currency was found to be in the following denominations:

| Report Officer | Printed At | |
|---|---|---|
| 010978/JOHNSON, STEVEN S | 07/25/2016 03:50 | Page 1 of 2 |

# Incident Report
## MILWAUKEE POLICE DEPT

161750037
**DRAFT**

Supplement No
0007

**Supplement**

1) $1.00 Bill: Quantity of seven (7). Total value $7.00

2) $10.00 Bill: Quantity of six (6). Total value $60.00

3) $20. 00 Bill: Quantity of thirty one (31). Total value $620.00

4) $50.00 Bill: Quantity of one (1). Total value $50.00

5) $100.00 Bill: Quantity of one (1). Total value $100.00

Total value $837.00.

I placed the US Currency on MPD Inventory #16022225, items #1 - 5. This piece of evidence was secured inside of money dropbox in the Investigations Property Room, which is located on the Basement Floor of the Police Administration Building.

This incident occurred inside of a parked vehicle at the address of 9800 W. Glendale Av., in the City of Waauwatosa. The vehicle the subject was inside of was found to be a 2006 Nissan Altima, Wi plates 749-USD, four door, black in color. A check with WDOT found the vehicle to list to Olena DeLaRosa W/F 08-10-73, 4520 N. 110th St., Wauwatosa, Wi. 53223, (414)394-3097.

I changed location to the address of 4520 N. 110th St., where I spoke with DeLaRosa (see supplemental report). During the interview, I asked for and received consent to search the vehicle involved in this incident for any evidence. DeLaRosa read and signed the Milwaukee Police Department Consent to Search Authorization form, PF-3, at which time she signed the consent form on Thursday, June 23, 2016 at 10:55am, consenting to the search of the vehicle. I provided DeLaRosa with a copy of the Consent to Search form.

I placed this Consent to Search form, PF-3 on Milwaukee Police Department Inventory #16022239, item #1. This piece of evidence was secured inside of the Metropolitan Investigations Evidence Locker, which is located on the Basement Floor of the MPD Police Administration Building, 749 W. State St..

| Report Officer | Printed At | |
|---|---|---|
| 010978/JOHNSON, STEVEN S | 07/25/2016 03:50 | Page 2 of 2 |

# Incident Report
# MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

Supplement No
0008

2333 N. 49TH ST

Milwaukee,WI 53210

Reported Date
06/23/2016
Nature of Call
OJINVEST
Officer
PORTER,TROY V

(414)935-7502

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 161750037 | 0008 | 06/23/2016 | 03:59 | 161750406 |

| Status | Nature of Call |
|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) |

| Location | City | ZIP Code | Rep Dist |
|---|---|---|---|
| 9800 W GLENDALE AV | WAUWATOSA | 53225 | 833 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 4 | 430 | 06/23/2016 | 03:07 | 012439/PORTER,TROY V |

| Assignment | Entered by |
|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | 012439 |

| Assignment | Confidential | Property? | Approving Officer |
|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | HOMICIDE | None | 006709 |

| Approval Date | Approval Time |
|---|---|
| 06/25/2016 | 14:33:10 |

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| No | NONE | HOMICIDE |

## Supplement

This report is written by <u>Detective Troy PORTER (Squad 9539)</u> assigned to the Metropolitan Investigations Division - Homicide Unit, Late Shift.

On Thursday, June 23, 2016 at approximately 3:59AM, <u>Lieutenant Joseph MCLIN (Squad 9509)</u> instructed me to respond to the address of 9800 W. Glendale Avenue in regards to an Officer Involved Shooting involving a Police Officer from the Wauwatosa Police Department.

It should be noted that also responding from the Metropolitan Investigations Division were the following personnel:

-Squad 9540, Detective Nicholas JOHNSON
-Squad 9559, Detective Luke O'DAY
-Squad 9536, Detective Matthew GADZALINSKI
-Squad 9537, Detective Steven JOHNSON

Upon my arrival we were briefed by <u>Wauwatosa Police Department Lieutenant Gary GABRISH (Squad 37)</u>. After the briefing I was assigned to conduct Police Officer witness interviews.

<u>Interview of: Wauwatosa Police Officer Ralph SALYERS (Squad 318)</u>

I then located Officer SALYERS and conducted an interview with him while onscene. Police Officer SALYERS related that his appointment date to the Wauwatosa Police Department was June 3, 2012. He said that his work hours are from 10:00PM to 6:24AM. He said that he is a Patrol Specialist / Crash Investigator.

Regarding the incident, PO SALYERS said that while he was at the Wauwatosa Police Station, 1700 N. 116th Street, Wauwatosa, WI, he was called out to backup <u>Wauwatosa Police Officer Joseph MENSAH (Squad 305</u> in regards to an occupied vehicle that was parked in Madison Park (9800 W. Glendale Avenue). PO SALYERS said that it's normal to find occupied vehicles parked in the park parking lot after the park is closed. He said that they usually find people smoking marijuana and "making out" while parked there.

PO SALYERS said that while enroute, when he reached N. Mayfair Rd and W. North Av, PO MENSAH came over the radio and said, "The subject has a gun. Step it up." Shortly after that PO MENSAH came over the radio saying, "Shots fired."

PO SALYERS said that during this time he activated his lights and siren. He said that <u>Wauwatosa Police Officer</u>

| Report Officer | Printed At | |
|---|---|---|
| 012439/PORTER, TROY V | 07/25/2016 03:50 | Page 1 of 2 |

# Incident Report
# MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

Supplement No
0008

**Supplement**

Stephen MILLS (Squad 304) was few blocks ahead him, but he caught up to PO MILLS prior to entering the park. He said that PO MILLS entered the park and he followed behind. He said PO MILLS parked his squad to the north and behind PO MENSAH'S squad. He said that he (PO SALYERS) parked to the south and behind PO MENSAH'S squad.

PO SALYERS said that as he parked observed PO MENSAH standing at the driver's side of his (PO MENSAH) squad. He said that he observed that the subject (later identified as Jay Loren ANDERSON JR, B/M, 07-04-90) was seated in the driver's seat of the vehicle *(Black Nissan Altima 2.5S, 4dr, WI Plate #749-USD)* with his head back and chin out. He could see that ANDERSON was bleeding from his left ear. He and PO MILLS grouped up. He grabbed the long gun and they began to clear the vehicle. He said as they were clearing he Nissan, PO MILLS spotted a gun in the front passenger seat portion of the Nissan. PO SALYERS did not know where exactly in the front passenger seat PO MILLS located the gun. He said that PO MILLS then recovered the gun that was in the front passenger seat area.

PO SALYERS then opened the driver side doors to clear the Nissan for any other guns. He observed that ANDERSON was bleeding from the back of his head. He then put the long gun away. He could not recall if he did the first check for a pulse on ANDERSON'S neck before he put the long gun away or after. He said when he did check ANDERSON'S neck for a pulse; he did not feel a pulse. He then checked ANDERSON'S left arm for a radial pulse. He then felt that ANDERSON had a pulse. He and Wauwatosa Police Officer Tyler L'ALLIER (Squad 306) then pulled ANDERSON out of the Nissan and laid him on his back on the ground. ANDERSON'S head was facing to the North and his feet were facing to the South. He said at this time the med unit arrived and began life saving measures. He stated that the med unit must have been near by due to the fact that he recalled that at some point the dispatcher asked if the scene was safe. He added that none of the Police Officers were able to start performing life saving measures due to the fact that by the time they pulled ANDERSON out of the Nissan, the med unit pulled up.

PO SALYERS also informed me that he did check ANDERSON'S pants pockets for any form of identification to get him identified. PO SALYERS located a plastic bag containing a green plant-like substance, money (U.S. Currency) and a black phone in ANDERSON'S front left pocket. PO SALYERS also located ANDERSON'S State of Wisconsin Identification Card, but he could not recall which pocket he located the WI ID in. PO SALYERS then turned over the items to me.

PO SALYERS said that he located and marked 6 casings that were on the ground at the northside of ANDERSON'S vehicle.

I later conveyed the items recovered by PO SALYERS to the Police Administration Building (PAB), 749 W. State Street. Upon my arrival I turned over the green plant-like substance to DET S. JOHNSON to be weighed and tested. I also turned over the money that was recovered to DET S. JOHNSON. DET S. JOHNSON will be filing a supplement report in regards to the testing and inventory of the plant-like substance along with the money.

While at the PAB I placed the black iPhone and ANDERSON'S State of Wisconsin ID Card on Milwaukee Police Department Property Inventory #16022226.

PO SALYERS had no further information to provide in regards to the shooting incident.

**END OF REPORT**

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee, WI 53210

(414) 935-7502

**161750037**
**DRAFT**

Supplement No
0009

Reported Date
06/23/2016

Nature of Call
OJINVEST

Officer
O'DAY, LUKE G

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 161750037 | 0009 | 06/23/2016 | | 03:59 | 161750406 |

| Status | Nature of Call | | | | | |
|---|---|---|---|---|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) | | | | | |

| Location | | City | | ZIP Code | | Rep Dist |
|---|---|---|---|---|---|---|
| 9800 W GLENDALE AVE | | MILWAUKEE | | 53225 | | 833 |

| District | Squad | From Date | From Time | Officer | | |
|---|---|---|---|---|---|---|
| 4 | 430 | 06/23/2016 | 03:07 | 010266/O'DAY, LUKE G | | |

| Assignment | | Entered by | | | | |
|---|---|---|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | | 010266 | | | | |

| Assignment | Confidential | Property? | Approving Officer |
|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | HOMICIDE | None | 006709 |

| Approval Date | Approval Time |
|---|---|
| 06/25/2016 | 14:33:49 |

## Modus Operandi

| Gang Act? | Gang Name |
|---|---|
| No | NONE |

## Supplement

This report is written by <u>Det. Luke O'DAY</u> assigned to Metropolitan Division, Homicide Unit (Late Shift).

On Thursday, June 23, 2016, at about 4:05 AM, I, along with other members of the Metropolitan Division, was directed by Sqd 9509, <u>Police Lieutenant Joseph McLIN</u>, to respond to the Officer Involved Shooting (Wauwatosa PD) at Madison Park, 9800 W. Glendale Ave. (CAD #16-175-0406).

Upon arrival, Wauwatosa PD, Sqd 370, <u>Police Lieutenant Gary GABRISH</u>, briefed us at 3:03 AM, Sqd 305, <u>PO Joseph MENSAH</u>, had conducted a routine park check when he encountered a subject inside a parked vehicle. He found the subject incapacitated and attempted to wake him up by knocking on the window. The subject woke up, ignored his commands, and reached for a handgun on the front passenger seat. Fearing for his safety, PO MENSAH fired into the vehicle. The subject sustained several gunshot wounds and ultimately became deceased at Froedtert Memorial Hospital.

Lt. McLIN directed me to conduct an interview with PO MENSAH. I located PO MENSAH, sitting with Wauwatosa <u>PO Bryan WADE</u>, who informed me <u>Atty Jennifer HELLMER</u>, legal counsel for Wauwatosa Police Officers, was en route. HELLMER arrived on scene and informed me she wanted PO MENSAH to have a full sleep cycle before he was interviewed.

I explained to Atty HELLMER there were a few things I needed, per the investigation, that would not violate PO MENSAH's request. I related to her that I would like to take photos of PO MENSAH in his uniform, depicting his appearance at the time of the incident. Sqd 1930, <u>Forensic Investigator Lee VEDBRAATEN</u>, arrived on scene and took those photos. PO MENSAH was wearing a dark blue, Wauwatosa Police Department uniform, equipped with a badge on his left chest and a duty belt (handgun, taser, magazines, handcuffs, flashlight, etc.) around his waist.

I next explained to Atty HELLMER that I needed to recover PO MENSAH's weapon and magazine. I transported PO MENSAH, along with PO WADE, to the Wauwatosa Police Department to obtain the weapon. Atty HELLMER followed us in her vehicle.

Once inside a conference room located inside Wauwatosa PD, I obtained the following items from PO MENSAH:

Black, Glock, model #22, .40 cal, semi-automatic, S/N UFB860, with a 15 round capacity magazine, equipped with

| Report Officer | Printed At | |
|---|---|---|
| 010266/O'DAY, LUKE G | 07/25/2016 03:50 | Page 1 of 2 |

# Incident Report
# MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

Supplement No
0009

**Supplement**

a TLR-1's Streamlight (#198510 1214) tactical flashlight. **(MPD inv #16022232, item #2) (MPD gun tag #75462)**

I examined the magazine that was inserted inside the magazine well and found it loaded with (9) Federal 40 S&W nickel plated brass unfired cartridges. I also found (1) Federal 40 S&W nickel-plated brass unfired cartridge in the chamber of the weapon. **(MPD inv #16022232, item #1)**

PO MENSAH was carrying 3 additional 15 round capacity magazines on his duty belt. All three magazines were loaded with 15 unfired cartridges.

I packaged the items at Wauwatosa PD and hand carried them to the Police Administration Building, where I placed them on MPD inventory #16022232, items #1-2.

Additionally, prior to leaving Wauwatosa PD, I obtained a copy of the Computer Aided Dispatch for this assignment: 16.018370. I placed the original on MPD inv #16022232 as item #3.

PO MENSAH will give a statement on Friday, June 24, 2016, at 9:30 AM.

| Report Officer | Printed At | |
|---|---|---|
| 010266/O'DAY, LUKE G | 07/25/2016 03:50 | Page 2 of 2 |

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee, WI 53210

(414) 935-7502

**161750037**
**DRAFT**

Supplement No
0011

Reported Date
06/23/2016

Nature of Call
OJINVEST

Officer
BRAUNREITER, MICHAEL

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 161750037 | 0011 | 06/23/2016 | | 14:12 | 161750406 |

| Status | Nature of Call | | | | | |
|---|---|---|---|---|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) | | | | | |

| Location | | | City | Rep Dist | District | Squad |
|---|---|---|---|---|---|---|
| 9800 W GLENDALE AV | | | WAUWATOSA | 833 | 4 | 430 |

| From Date | From Time | Officer | | | | |
|---|---|---|---|---|---|---|
| 06/23/2016 | 03:07 | 004609/BRAUNREITER, MICHAEL | | | | |

| Assignment | | Entered by | | | |
|---|---|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | | 004609 | | | |

| Assignment | | Confidential | Prop Trans Stat | Property? |
|---|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | | HOMICIDE | Pending | Yes |

| Approving Officer | Approval Date | Approval Time | |
|---|---|---|---|
| 006709 | 06/25/2016 | 14:35:10 | |

| MISC INFO |
|---|
| EVIDENCE INVENTORY #16022260 |

| MISC INFO |
|---|
| SQUAD 1725 FORENSIC INVESTIGATOR DOUGLAS BRAHM |

| MISC INFO |
|---|
| MEDICAL EXAMINER'S CASE #16-03222 |

## Modus Operandi

| Crime Code(s) |
|---|
| INVS |

## Supplement

This report is submitted by PSSI Michael BRAUNREITER assigned Squad 9522 of the Metropolitan Investigations Division.

On Thursday 06/23/2016 Squad 9522 PSSI Michael BRAUNREITER was assigned to conduct follow-up relative to this investigation. The follow-up needed is to respond to the Milwaukee County Medical Examiner's Office located at 933 W. Highland Ave. to monitor the autopsy be performed on the victim was been tentatively identified as Jay L ANDERSON Jr. B/M 07/04/1990.

Upon my arrival I did observe the victim, he arrived at the Medical Examiner's Office without clothing. The medical examiner's staff did measure the victim and determined that he was 72 inches long and weighed 166 pounds. The medical examiner's staff to assign this victim their case #16-03222.

Squad 1725 Forensic Investigator Douglas BRAHM responded and did take several photographs as well as right index finger prints. These fingerprints were compared to fingerprints already on file with the Milwaukee Police Department at which time a positive identification was made of the victim Jay L ANDERSON Jr. B/M 07/04/1990 with a PIN of 405261.

Also present for this procedure was Wauwatosa Police Detective Joseph LEWANDOWSKI.

I then observed Dr. TLOMAK who was assisted by Autopsy Technician Amanda MEEKER conduct the external examination of the victim. This exam located six (6) gunshot wounds. These wounds are located as follows,

GSW #1 right ear,

GSW #2 behind left ear,

GSW #3 slightly above and behind right ear,

GSW #4 slightly above and behind left ear,

| Report Officer | Printed At | |
|---|---|---|
| 004609/BRAUNREITER, MICHAEL | 07/25/2016  03:50 | Page 1 of 2 |

# Incident Report
# MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

Supplement No
0011

## Supplement

GSW #5 right cheek,

GSW #6 right shoulder.

Dr. TLOMAK conducted the autopsy procedure and stated the bullets that caused these wounds were fired from indeterminate ranges. Dr. TLOMAK then provided the following bullet paths,

(A) this is a perforating gunshot wound, entrance is on the right ear GSW #1 the bullet struck the victim traveling from right to left with no significant front to back or up or down deviation. The bullet passed through the victim's skull and brain exiting GSW #2 behind the left ear.

(B) this is a perforating gunshot wound, entrance is on the right side of the victim's head GSW #3 the bullet struck the victim traveling from right to left with no significant front to back or up to down deviation. The bullet passed through the victim's skull and brain exiting GSW #4 the left side of the head.

(C) this is a penetrating gunshot wound, the entrance is on the right cheek GSW #5 this bullet struck the victim traveling from front to back, right to left and downward traveling through the right cheek and soft tissue of the right side of the neck. This bullet which was recovered at the back of the neck is deformed, semi-jacketed and weighed 162 grain.

(D) this is a penetrating gunshot wound, the entrance is the right shoulder GSW #6 this bullet struck the victim traveling from right to left slightly front to back and downward traveling through the tissue of the right shoulder and muscles of the back. This bullet was recovered in the upper left side of the victim's back, it is deformed, copper jacketed and weighed 182 grain.

Dr. TLOMAK states the victim died as a result of these gunshot wounds and ruled his death a homicide.

I did take 55 photographs during this autopsy procedure.

Forensic Investigator Jason RUDELICH did turnover items of evidence that had been collected during this autopsy procedure. These items were packaged and placed on Milwaukee Police Department inventory #16022260. For a detailed description of these items refer to the property tab.

This investigations pending review.

7, 2

Case 2:21-cv-00848-LA   Filed 08/22/23   Page 66 of 215   Document 91-9

# Incident Report
## MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

**161750037**
**DRAFT**

Supplement No
0012

Reported Date
06/23/2016
Nature of Call
OJINVEST
Officer
VEYTSMAN,DAWN E

### Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 161750037 | 0012 | 06/23/2016 | 14:35 | 161750406 |

| Status | Nature of Call | | | | |
|---|---|---|---|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) | | | | |

| Location | City | ZIP Code | Rep Dist |
|---|---|---|---|
| 9800 W GLENDALE AVE | MILWAUKEE | 53224 | 833 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 4 | 430 | 06/23/2016 | 03:07 | 007993/VEYTSMAN,DAWN E |

| Assignment | Entered by | Assignment |
|---|---|---|
| INVESTIGATIVE MANAGEMENT DIVISION | 007993 | INVESTIGATIVE MANAGEMENT DIVISION |

| Confidential | Prop Trans Stat | Property? | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|---|---|
| HOMICIDE | Pending | Yes | 006709 | 06/25/2016 | 14:36:01 |

### Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| No | NONE | ALL OTHERS |

### Supplement

This incident supplement report is written by Forensic Investigator Dawn VEYTSMAN, assigned to the Forensics Section, Day Shift.

On June 23, 2016, DET. M. GADZALINSKI brought to the Forensics Lab the following items to be processed : one clear fold top baggie. These items were listed on MPD INV #16022217 . I processed this case on June 23, 2016.

Using two sterile cotton swabs, one dry and one moistened with distilled water, I collected possible DNA samples:

DNA sample #1: collected from the edges of the baggie Item 1

These samples were placed on Inventory #16022245.

I processed the items with Cyanoacrylate and Ardrox, and was unable to recover any latent impressions.

I turned all of the evidence over to the Milwaukee Police Property Section.

I took three photos of this incident.

This incident was assigned Case #16-3530.

| Report Officer | Printed At | |
|---|---|---|
| 007993/VEYTSMAN,DAWN E | 07/25/2016 03:50 | Page 1 of 1 |

Case 2:21-cv-00848-LA   Filed 08/22/23   Page 67 of 215   Document 91-9

2 4

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

161750037
**DRAFT**

Supplement No
0013

Reported Date
06/23/2016
Nature of Call
OJINVEST
Officer
ST CLAIR,CHET A

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 161750037 | 0013 | 06/23/2016 | 14:52 | 161750406 |

| Status | Nature of Call |
|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) |

| Location | City | ZIP Code | Rep Dist |
|---|---|---|---|
| 9800 W GLENDALE AV | WAUWATOSA | 53225 | 833 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 4 | 430 | 06/23/2016 | 03:07 | 016638/ST CLAIR,CHET A |

| Assignment | Entered by | Assignment |
|---|---|---|
| INVESTIGATIVE MANAGEMENT DIVISION | 016638 | INVESTIGATIVE MANAGEMENT DIVISION |

| Confidential | Prop Trans Stat | Properly? | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|---|---|
| HOMICIDE | Pending | Yes | 006709 | 06/25/2016 | 14:36:43 |

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| No | NONE | HOMICIDE |

## Supplement

This report is written by Forensic Investigator Chet ST. CLAIR, assigned to Forensics, Early Shift Squad 1831. On Thursday, 06-23-2016 at approximately 12:30pm, I processed evidence brought in by Detective Nicholas JOHNSON for latent fingerprints and possible DNA evidence.

Using cyanoacrylate and ardrox, I processed a black and silver Ruger 9mm pistol, S/N 334-60459, and magazine (16022240 #11). I was unable to recover any lifts of comparative value.

Using two sterile cotton swabs for each sample, one of each pair moistened with distilled water, I collected the following samples for possible DNA evidence:

Sample #1 - collected from the grip and trigger area

Sample #2 - collected from the slide

Sample #3 - collected from the barrel

Sample #4 - collected from the magazine

Following collection, I secured each sample individually and placed them all on MPD Inventory #16022269. I took six digital photographs and assigned this case Latent Case #16-3537.

| Report Officer | Printed At | |
|---|---|---|
| 016638/ST CLAIR,CHET A | 07/25/2016 03:50 | Page 1 of 1 |

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

**161750037**
**DRAFT**

Reported Date
06/23/2016
Nature of Call
OJINVEST
Officer
ST CLAIR,CHET A

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 161750037 | 0014 | 06/23/2016 | 15:19 | 161750406 |

| Status | Nature of Call | | | | |
|---|---|---|---|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) | | | | |

| Location | | City | ZIP Code | Rep Dist |
|---|---|---|---|---|
| 9800 W GLENDALE AV | | WAUWATOSA | 53225 | 833 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 4 | 430 | 06/23/2016 | 03:07 | 016638/ST CLAIR, CHET A |

| Assignment | Entered by | Assignment |
|---|---|---|
| INVESTIGATIVE MANAGEMENT DIVISION | 016638 | INVESTIGATIVE MANAGEMENT DIVISION |

| Confidential | Prop Trans Stat | Property? | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|---|---|
| HOMICIDE | Pending | Yes | 006709 | 06/25/2016 | 14:37:16 |

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| No | NONE | ASSAULTS |

## Supplement

This report is written by Forensic Investigator Chet ST. CLAIR, assigned to Forensics, Early Shift Squad 1831.
On Thursday, 06-23-2016 at approximately 11:00am, I processed evidence brought in by Detective Luke O'DAY for latent fingerprints and possible DNA evidence.
Using cyanoacrylate and ardrox, I processed ten unfired .40 cartridges (16022232 #1) and a black Glock Model 22 .40 pistol, S/N UFB860, with magazine and mounted Streamlight flashlight (#2). I was unable to recover any lifts of comparative value.

Using two sterile cotton swabs for each sample, one of each pair moistened with distilled water, I collected the following samples for possible DNA evidence:

Sample #1 - collected from the grip and trigger area of the pistol (#2)

Sample #2 - collected from the slide

Sample #3 - collected from the barrel

Sample #4 - collected from the magazine

Sample #5 - collected from the unfired cartridges (#1)

Following collection, I secured each sample individually and placed them all on MPD Inventory #16022273.
I took six digital photographs and assigned this case Latent Case #16-3539.

| Report Officer | Printed At | |
|---|---|---|
| 016638/ST CLAIR, CHET A | 07/25/2016 03:50 | Page 1 of 1 |

# Incident Report
# MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

Supplement No
0015

Reported Date
06/25/2016

Nature of Call
OJINVEST

Officer
PORTER,TROY V

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 161750037 | 0015 | 06/25/2016 | 05:55 | 161750406 |

| Status | Nature of Call |
|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) |

| Location | City | ZIP Code | Rep Dist |
|---|---|---|---|
| 9800 W GLENDALE AV | WAUWATOSA | 53225 | 833 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 4 | 430 | 06/23/2016 | 03:07 | 012439/PORTER,TROY V |

| Assignment | Entered by |
|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | 012439 |

| Assignment | Confidential | Property? | Approving Officer |
|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | HOMICIDE | None | 006709 |

| Approval Date | Approval Time |
|---|---|
| 07/04/2016 | 18:05:38 |

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| No | NONE | HOMICIDE |

## Supplement

This report is written by Detective Troy PORTER (Squad 9539) assigned to the Metropolitan Investigations Division - Homicide Unit, Late Shift.

On Thursday, June 23, 2016 at approximately 3:59AM, Lieutenant Joseph MCLIN (Squad 9509) instructed me to respond to the address of 9800 W. Glendale Avenue in regards to an Officer Involved Shooting involving a Police Officer from the Wauwatosa Police Department.

It should be noted that also responding from the Metropolitan Investigations Division were the following personnel:
-Squad 9540, Detective Nicholas JOHNSON
-Squad 9559, Detective Luke O'DAY
-Squad 9536, Detective Matthew GADZALINSKI
-Squad 9537, Detective Steven JOHNSON

Upon my arrival we were briefed by Wauwatosa Police Department Lieutenant Gary GABRISH (Squad 37). After the briefing I was assigned to conduct Police Officer witness interviews.

### Interview of: Wauwatosa Police Officer Stephen MILLS (Squad 304)

I located Police Officer MILLS and conducted and interview with him while on scene. Police Officer MILLS related to me that his appointment date to the Wauwatosa Police Department was March 3, 2013. He said that his work hours are from 10:00PM to 6:00AM. He said he is assigned to Patrol.

Regarding the incident, PO MILLS said that the original call came over as an occupied auto in Madison Park (9800 W. Glendale Ave). He said within 1 minute or so Police Officer Joseph MENSAH (Squad 305) called out over the radio, subject with gun. PO MILLS stated that he was at W. Center Street and N. Mayfair Road at that time. Shortly after, PO MENSAH then called out over the radio, shots fired. PO MILLS activated his lights and siren.

PO MILLS said upon his arrival he observed PO MENSAH'S Squad car parked in front of ANDERSON'S car. He parked his squad car to the north and rear of PO MENSAH'S squad car. He then turned his focus on ANDERSON'S car and ANDERSON who was seated in the driver's seat. He said he did not see PO MENSAH at first. PO MILLS then exited his squad car and covered on ANDERSON'S car. He then observed PO MENSAH

| Report Officer | Printed At | |
|---|---|---|
| 012439/PORTER,TROY V | 07/25/2016 03:50 | Page 1 of 2 |

# Incident Report
# MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

Supplement No
0015

**Supplement**

between his squad car and PO MENSAH'S squad car. He said he thinks he saw PO MENSAH covering (with his gun drawn) on ANDERSON'S car, but he wasn't 100% sure. He said PO Ralph SALYERS, who arrived with him (PO MILLS) and was covering on ANDERSON'S car.

PO MILLS said that he then told PO MENSAH to get back, behind his squad car. He said <u>PO Andrew FLORYANCE (Squad 301)</u> or <u>PO Joseph WONG</u>, he could not recall who exactly, then arrived. He and PO SALYERS then approached ANDERSON at the driver's side of his (ANDERSON) car to clear the car. He observed that ANDERSON was seated in the driver's seat with his head back and mouth open. He observed blood coming from ANDERSON'S left ear. He then observed a baby car seat in the back seat, behind the passenger seat. PO MILLS moved to the rear driver seat to check the car seat for a baby. He said the car seat was empty. He then made his way to the passenger side of ANDERSON'S car. PO MILLS then observed a gun on the front passenger seat.

PO MILLS said the he then recovered the gun from the front passenger seat of ANDERSON'S car. He said he was wearing his black duty gloves when he picked up the gun by the handle using 2 fingers and his thumb. He placed the gun in a plastic bag and then placed the gun in the trunk of his (PO MILLS) squad car to secure it. He then checked on PO MENSAH making sure that PO MENSAH was ok and not injured or bleeding.

PO MILLS could not recall if ANDERSON'S car was running or if ANDERSON'S headlights were on.

PO MILLS had no further information to provide.

*<u>It should be noted that supplement report #10 was deleted due to the fact that I duplicated supplement report #10 with this supplement report #15.</u>*

END OF REPORT.

| Report Officer | Printed At | |
|---|---|---|
| 012439/PORTER, TROY V | 07/25/2016 03:50 | Page 2 of 2 |

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

**161750037**
**DRAFT**
Supplement No
0016
Reported Date
06/26/2016
Nature of Call
OJINVEST
Officer
JOHNSON,STEVEN S

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 161750037 | 0016 | 06/26/2016 | | 01:45 | 161750406 |

| Status | Nature of Call | | | | | |
|---|---|---|---|---|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) | | | | | |

| Location | | | City | | ZIP Code | Rep Dist |
|---|---|---|---|---|---|---|
| 9800 W GLENDALE AV | | | WAUWATOSA | | 53225 | 833 |

| District | Squad | From Date | From Time | Officer | |
|---|---|---|---|---|---|
| 4 | 430 | 06/23/2016 | 03:07 | 010978/JOHNSON, STEVEN S | |

| Assignment | Entered by |
|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | 010978 |

| Assignment | Confidential | Property? | Approving Officer |
|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | HOMICIDE | None | 006709 |

| Approval Date | Approval Time |
|---|---|
| 06/29/2016 | 15:25:20 |

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| No | NONE | HOMICIDE |

## Supplement

This report is written by Detective Steven S. Johnson, assigned to Metropolitan Division, Homicide Unit (Late Shift).

On Thursday, June 23, 2016, at 4:05 AM, I, along with other members of the Metropolitan Division, was directed by Sqd 9509, Lt. Joseph McLIN, to respond to the Officer Involved Shooting (Wauwatosa PD) at Madison Park, 9800 W. Glendale Ave. (CAD #16-175-0406).

Upon arrival, Wauwatosa PD, Sqd 370, Lt. Gary GABRISH, briefed us at 3:03 AM, Sqd 305, PO Joseph MENSAH, had conducted a routine park check when he encountered a subject inside a parked vehicle. He found the subject incapacitated and attempted to wake him up by knocking on the window. The subject woke up, ignored his commands, and reached for a handgun on the front passenger seat. Fearing for his safety, PO MENSAH fired into the vehicle. The subject sustained several gunshot wounds and ultimately became deceased at Froedtert Memorial Hospital.

During the on scene investigation, the subject involved in this incident was identified as Jay L. Anderson Jr. B/M 07-04-90, 8026 W. Medford Av., MPD PIN #405261. This incident occurred as Anderson was seated inside of a 2006 Nissan Altima, 4dr, black in color, Wi plates 749-USD, VIN #1N4AL11DX6C113910.

A routine check with Wisconsin Department of transportation found the vehicle's registered owner listed as Olena E. DeLaRosa W/F 08-10-73, 4520 N. 110th St., Wauwatosa, Wi. 53225. I changed location to the address, where I conducted an interview with DeLaRosa, who was able to provide the following information regarding the vehicle.

****Interview of Olena DeLaRosa****

I spoke with DeLaRosa inside her living room of the address of 4520 N. 110th St., at which time DeLaRosa stated that she is the owner of the 2006 Nissan Altima, Wi plates 749-USD. DeLaRosa stated at the current time, the vehicle is being used by her daughter, identified as Starkeisha DeLaRosa B/F 02-19-89, due to the fact the her daughter's vehicle overheats and she needed a reliable vehicle to drive to a job that she is starting today, Thursday, June 23, 2016. DeLaRosa stated her daughter has had the vehicle for the past two days and left her vehicle in her garage.

DeLaRosa stated that her daughter currently resides with her boyfriend, identified as Jay Anderson, in the area

| Report Officer | Printed At | |
|---|---|---|
| 010978/JOHNSON, STEVEN S | 07/25/2016 03:50 | Page 1 of 2 |

Case 2:21-cv-00848-LA   Filed 08/22/23   Page 72 of 215   Document 91-9

# Incident Report
# MILWAUKEE POLICE DEPT

161750037
DRAFT

Supplement No
0016

## Supplement

of N. 83rd St. and W. Medford Av. in the City of Milwaukee. DeLaRosa stated her daughter has been dating Anderson for five years and they have one child in common. DeLaRosa stated to the best of her knowledge, they live with his parents, whom she believed were named Jay Sr. and Lynn Anderson.

DeLaRosa stated that she saw her daughter yesterday, Wednesday, June 22, 2016, when she came to her residence with her two children to take them swimming in Madison Park at the splash pad. DeLaRosa stated she drove them in her minivan to the park, where they stayed for close to two hours before returning to her residence. DeLaRosa stated Anderson was not with her and she has not physically seen him in the last week.

DeLaRosa stated her daughter left her residence in the 2006 Nissan Altima and she did not speak with her for the rest of the day. DeLaRosa stated her daughter had consent to have the vehicle but Anderson was not supposed to be driving the vehicle because she knows that he has no license and she did want to held responsible for anything if he was driving the vehicle.

| Report Officer | Printed At | |
|---|---|---|
| 010978/JOHNSON, STEVEN S | 07/25/2016 03:50 | Page 2 of 2 |

# Incident Report
# MILWAUKEE POLICE DEPT

161750037

**DRAFT**

Supplement No
0017

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date
06/28/2016
Nature of Call
OJINVEST
Officer
VILLARREAL, ERIK K

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 161750037 | 0017 | 06/28/2016 | 17:00 | 161750406 |

| Status | Nature of Call |
|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) |

| Location | | City | Rep Dist | District | Squad |
|---|---|---|---|---|---|
| 9800 W GLENDALE AV | | WAUWATOSA | 833 | 4 | 430 |

| From Date | From Time | Officer |
|---|---|---|
| 06/23/2016 | 03:07 | 007038/VILLARREAL, ERIK K |

| Assignment | Entered by |
|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | 007038 |

| Assignment | Confidential | Prop Trans Stat | Property? |
|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | HOMICIDE | Pending | Yes |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| 006709 | 06/28/2016 | 18:41:36 |

## Property

| Item | Involvement | Invl Date |
|---|---|---|
| 1 | EVIDENCE | 06/28/2016 |

| Description |
|---|
| MPD Inventory #16022963-2 |

| Typ | Cal | Article | Brand | UCR Type | # Pieces | Rcv Location |
|---|---|---|---|---|---|---|
| A | OTHER | ATM | RCPT | OTHER | 1 | 3800 W LINCOLN AV |

| Rcv City | Rcv St | Rep Dist | Rcv Squad |
|---|---|---|---|
| WMW | WISCONSIN | 5907 | 220 |

| Item | Involvement | Invl Date | In Custody? |
|---|---|---|---|
| 2 | EVIDENCE | 06/28/2016 | Yes |

| Description |
|---|
| MPD Inventory #16022963-1 |

| Typ | Cal | Article | Brand | UCR Type | # Pieces | Rcv Location |
|---|---|---|---|---|---|---|
| A | OTHER | BULLET | FRAG | OTHER | 1 | 3800 W LINCOLN AV |

| Rcv City | Rep Dist | Rcv Squad |
|---|---|---|
| WMW | 5907 | 220 |

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| No | NONE | HOMICIDE |

## Supplement

This report is written by Detective Erik VILLARREAL assigned to the Metropolitan Investigation Division, Cold Case Unit, dayshift.

On Tuesday June 28, 2016, while assigned to Squad 9541, I was instructed to have the suspect auto involved in the Wauwatosa Officer Involved Shooting processed for evidence (OIS #8). The incident occurred at 9800 W. Glendale Ave, on June 23, 2016. The 2006, black Nissan Altima 4-dr, WI Plates, 749-USD, Vin# 1N4AL11DX6C113910, was located in the "X building" at the City of Milwaukee Tow Lot. Squad 1721 Forensic Investigator Yvette BENITEZ met me at that location. Prior to handling the evidence, Tow Lot Officer, Joe ANDERER, had the vehicle moved to the "Z Building" to be processed. Forensic Investigator BENITEZ then video taped the vehicle in its original state and photographed the vehicle as well. BENITEZ later downloaded the video to a DVD, which was then submitted to the file. Forensic Investigator BENITEZ also recovered a blood sample and will file a supplement report regarding her investigation.

Prior to searching the vehicle, I conducted a preliminary check of the auto for visible ballistic evidence and or additional damage from the gunfire and located 3 circular dents / impressions on the upper part of the front passenger side door, just beneath the open window in addition to the broken rear driver side door window, and bullet holes in the driver side front seat headrest. It should be noted that there was a large quantity of dried blood

| Report Officer | Printed At | |
|---|---|---|
| 007038/VILLARREAL, ERIK K | 07/25/2016 03:50 | Page 1 of 2 |

# Incident Report
## MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

Supplement No
0017

on the front driver seat surrounded by blood spatter on the front inside doors, the roof, and the dashboard. As well as a dried pool of blood under the driver side front seat. Forensic Investigator BENITEZ took detailed photographs of the blood spatter. I also located and recovered a small bullet fragment on the front passenger seat and a "Transaction Record" (ATM receipt) from the front passenger door map holder. After the preliminary examination of the auto I conducted a thorough search of the entire vehicle for any other evidence but did not locate any.

Upon conferring with reports from the initial investigation, I learned that the officer fired his service weapon through the open front passenger side window on a slight angle towards the driver. Subsequently, I found 2 through and through bullet holes that passed through the front driver seat headrest. Using trajectory rods to display the bullet paths it was apparent that the 2 bullets traveled through the headrest and out through the rear drivers side door window, breaking the window. Additionally, according to the Medical Examiners report, the suspect, Jay L. ANDERSON (B/M 7/4/90), had 2 through and through gunshot wounds to his head from right to left also consistent with the Officer firing his service weapon from the front passenger side. Those 2 bullets would have also passed through the rear driver side door window as well. ANDERSON had the remaining 2-fired bullets recovered from his body during the autopsy. The 2 aforementioned bullets entered the passenger side of the driver headrest at the following locations:

Bullet 1 entered 3" high and exited the other side of the headrest at 1" high
Bullet 2 entered 8" high and exited the back of the headrest 8" high

The headrest was a rounded rectangular shape approximately 10" high by 9" wide.
At the conclusion of the examination of the suspect auto, I later placed the bullet fragment (#1) and the ATM slip (#2) on MPD Inventory #16022963. The ATM slip was a receipt from VK Petro 5208 N Teutonia Ave, for $80.00 on June 21, 2016 at 5:57 am. This investigation is pending.

This report is submitted by Detective Erik VILLARREAL PS# 007038 LOC# 95

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee, WI 53210

(414) 935-7502

Reported Date
06/28/2016
Nature of Call
HOMICIDE
Officer
PANFIL, YVETTE P

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 161750037 | 0018 | 06/28/2016 | | 18:50 | 161750406 |

| Status | Nature of Call |
|---|---|
| REPORT TO FOLLOW | MURDER, MANSLGHTR/NEGL MANSLGHTR/JUST HOMI |

| Location | | City | Rep Dist | District | Squad |
|---|---|---|---|---|---|
| 9800 W GLENDALE AV | | WAUWATOSA | 833 | 4 | 430 |

| From Date | From Time | Officer |
|---|---|---|
| 06/23/2016 | 03:07 | 010235/PANFIL, YVETTE P |

| Assignment | Entered by | Assignment |
|---|---|---|
| INVESTIGATIVE MANAGEMENT DIVISION | 010235 | INVESTIGATIVE MANAGEMENT DIVISION |

| RMS Transfer | Prop Trans Stat | Property? | Approving Officer |
|---|---|---|---|
| Supplement Transfer Complete | Pending | Yes | 006985 |

| Approval Date | Approval Time |
|---|---|
| 07/05/2016 | 09:18:06 |

## Property

| Item | Involvement | Invl Date | In Custody? |
|---|---|---|---|
| 1 | EVIDENCE | 06/28/2016 | Yes |

| Description |
|---|
| blood from seat |

| Typ | Cat | Article | UCR Type | # Pieces | RMS Transfer |
|---|---|---|---|---|---|
| A | OTHER | SWABS | OTHER | 1 | Successful |

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| No | NONE | HOMICIDE |

## Supplement

This report is being written by Forensic Investigator Yvette Panfil assigned to the MPD's Forensic Section, day shift.

On Tuesday, June 28, 2016, at approximately 10:15 A.M., I, Squad 1721, was dispatched to a homicide investigation at the Milwaukee Tow Lot.

Squad 9541, Detective Erik Villarreal, was investigating and requested I photograph the auto involved, a black 4dr 2006 Nissan Altima with WI plates of 749-USD, video tape it and collect a blood sample.

Using sterile cotton swabs one dry, one moistened with distilled water, I collected a blood sample from the driver's seat of auto.
This sample was then placed on inventory #16022960.
This incident was assigned latent case #16-3649.

Using a Sony Camcorder I video taped the auto, burned the recording to DVD and turned it over to Detective Villarreal.

Using a Nikon D300 camera I also took 126 digital photographs.

| Report Officer | Printed At | |
|---|---|---|
| 010235/PANFIL, YVETTE P | 07/25/2016 03:50 | Page 1 of 1 |

# Incident Report
# MILWAUKEE POLICE DEPT

**161750037**          Supplement No
                       0019
# DRAFT
Reported Date
06/29/2016
Nature of Call
OJINVEST
Officer
O'DAY, LUKE G

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 161750037 | 0019 | 06/29/2016 | | 03:28 | 161750406 |

| Status | Nature of Call |
|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) |

| Location | | City | ZIP Code | Rep Dist |
|---|---|---|---|---|
| 9800 W GLENDALE AVE | | WAUWATOSA | 53225 | 833 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 4 | 430 | 06/23/2016 | 03:07 | 010266/O'DAY, LUKE G |

| Assignment | Entered by |
|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | 010266 |

| Assignment | Confidential | Property? | Approving Officer |
|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | HOMICIDE | None | 006709 |

| Approval Date | Approval Time |
|---|---|
| 07/04/2016 | 18:06:31 |

| MISC INFO |
|---|
| OIS 2016-8 |

## Modus Operandi

| Gang Act? | Gang Name |
|---|---|
| No | NONE |

## Supplement

This report is written by Det. Luke O'DAY assigned to Metropolitan Division, Homicide Unit (Late Shift).

This report details follow-up conducted regarding the Officer Involved Shooting (Wauwatosa PD) at Madison Park, 9800 W. Glendale Ave. (IR #16-175-0037).

On Friday, June 24, 2016, at about 9:50 AM, Police Lieutenant Joseph McLIN and I traveled to the Wauwatosa Police Department, 1700 N. 116th St., to meet with Wauwatosa PO Joseph MENSAH and his representative, Attorney of Law Jennifer HELLMER.

Lt. McLIN and I met with PO MENSAH and Atty HELLER in a conference room on the first floor. Additionally, Attorney Jaclyn SCHWARTZ (with HELLMER) and Union Representative Wauwatosa Detective John MILOTZKY were also present inside the room.

PO MENSAH identified himself as Joseph Anthony MENSAH (B/M 12-27-89), appointment date with Wauwatosa PD 1-3-15, payroll #6701. PO MENSAH stated he had prior law enforcement experience:

- 2009 - 2012 Reserves
- 2012 - 2013 Dane County Sheriff Office
- 2013 - 2014 UW-Madison Patrol Officer

PO MENSAH stated on Thursday, June 23, 2016, he worked Late Shift (11:00 PM - 7:24 AM; Wednesday night into Thursday morning), and was assigned to Squad 305, vehicle P224, as a one-person unit. He was assigned to the area that encompassed W. Burleigh St. to W. Capitol Dr., N. 92nd St. to N. 124th St. PO MENSAH stated was in full uniform that night: dark blue shirt and pants, ballistic vest inside a blue carrier over the shirt, a shield patch on the left breast, and was equipped with a taser, expandable baton, 2 set of handcuffs, Extreme LED flashlight, department issued handgun (equipped with a tactical light), and 3 magazines.

PO MENSAH stated he was on routine patrol and headed to Madison Park to do a "park check" around 2:50 - 3:00 AM. He entered the park by traveling eastbound on W. Glendale Ave. He stated the park was extremely dark without any lighting, except for a light mounted on the exterior of a multi-unit residential complex (located on the east side of the park at 4611 N. 92nd St.).

| Report Officer | Printed At | |
|---|---|---|
| 010266/O'DAY, LUKE G | 07/25/2016 03:50 | Page 1 of 3 |

# Incident Report
# MILWAUKEE POLICE DEPT

**161750037**

**DRAFT**

Supplement No
0019

PO MENSAH observed a single vehicle parked in the center of the lot, facing westbound. (He believed the park was closed after 12:00 AM.) He approached the vehicle, parking about 1-2 car lengths in front of it, and activated his take-down lights. Prior to activating the lights, PO MENSAH stated he believed he had observed some movement inside the vehicle by the driver. Once the take-down lights were on, however, he did not observe any further movement.

PO MENSAH advised Dispatch as he prepared to exit his squad, "305. Occupied auto. Madison Park." He then scanned the rest of the area, looking for additional vehicles or subjects on foot. He then focused on the vehicle as he approached it on foot. PO MENSAH believed the vehicle was a black Nissan Maxima, but was not certain.

PO MENSAH stated he approached the vehicle from the passenger side and observed the passenger front window was rolled up. He used a flashlight to illuminate the inside to check for additional occupants; he did not observe anyone. PO MENSAH stated as he focused the light on the driver, he observed he was "breathing fast" as if nervous or scared. He described him as lying back against the car seat. PO MENSAH felt the driver was faking being asleep.

PO MENSAH tapped the passenger front window and announced, "Police Officer MENSAH with the Wauwatosa Police Department" but did not get a response. After tapping a few more times, the driver "woke up" and looked at PO MENSAH. He scanned his uniform with his eyes and then looked down toward the front passenger seat. PO MENSAH stated the driver looked visibly annoyed and shrugged his shoulders. He then closed his eyes and leaned back in the seat again.

PO MENSAH stated he called out again, "Police Officer MENSAH with the Wauwatosa Police Department. Wake up. Gotta talk to you." After a couple of times repeating himself, the driver "woke up again," turned the key in the ignition and rolled down the passenger front window. (PO MENSAH did not recall if the vehicle started.) PO MENSAH asked if the driver had an ID or a Driver License. The driver replied, "No."

PO MENSAH stated he had been standing about an arm length away from the passenger front door as he addressed the driver. He observed the driver make several glances over to the passenger front seat then back up at him. On one of the occasions, the driver looked at PO MENSAH's chest (badge area) and then back down toward the seat. PO MENSAH asked the driver if he had anything that would identify his name. The driver replied, "No."

PO MENSAH became concerned that the driver had made several separate and distinct glances toward the passenger front seat. He stepped forward and looked into the interior of the vehicle. PO MENSAH observed a black and silver semiautomatic handgun, with an extended magazine inserted in the weapon, on the front seat. (He did not remember seeing anything else on the seat or in which direction the barrel was facing.)

PO MENSAH stated he was a "hazy" with the exact chain of events moving forward, but he believed he immediately un-holstered his weapon, kept it close to his body, and pointed the barrel down to the ground. At the same time, he ordered, "I see the gun! Keep your hands where I can see them!"

PO MENSAH stated the driver initially complied with his order and placed his hands in the air about chest / shoulder height. However, he suddenly reached toward the seat with his right hand while looking at the weapon (on the seat). PO MENSAH stated he immediately moved his weapon to the high ready position (weapon at eye level, arm extended from his body) and ordered, "Hands up!" At about the same time, he radioed Dispatch, "305. He has a gun! Step it up!" (He believed he heard something on the radio, "All squads ..." but didn't remember anything further.) The driver immediately placed both hands in the air, stating, "What? There's nothing there! It's nothing!" (PO MENSAH stated it appeared the driver was annoyed with him and that the officer was bothering him.) PO MENSAH repeated, "I see the gun! Don't reach for it!"

PO MENSAH stated the driver again reached toward the front passenger seat. He (PO MENSAH) ordered, "Stop reaching for the weapon!" The driver pulled back and said, "It's nothing!" PO MENSAH stated the driver made at least 4 separate movements with his right arm toward the front passenger seat. Each time PO MENSAH ordered him to stop, and the driver returned both of his hands into the air.

PO MENSAH stated the last time the driver made a movement, instead of just his right arm moving toward the

# Incident Report
## MILWAUKEE POLICE DEPT

161750037
**DRAFT**

Supplement No
0019

**Supplement**

gun on the seat, his whole body lunged toward it. PO MENSAH yelled, "Keep your hands up!" The driver did not comply and PO MENSAH believed he discharged his weapon approximately 3-4 times.

PO MENSAH stated he took a couple of steps backward as he fired. As he backed away, he did not know if the driver had taken possession of the weapon. PO MENSAH stated he felt exposed because he was in an open parking lot without any cover to place between him and the driver (vehicles, trees, etc.). Additionally, he could not move laterally because the driver would have protection from the vehicle's engine block, which would be in between them.

PO MENSAH stated immediately after discharging his weapon, he pressed the button on his squad mic that activated the camera. (He explained the video goes back 20 seconds without audio.)

PO MENSAH maintained a distance from the vehicle as he waited for backup. He stated the park was huge and extremely dark. He further stated he couldn't see anything because of the take-down lights of his squad. He believed Wauwatosa Officers Ralph SALYERS and Stephen MILLS were the first to arrive on scene. The three of them cleared the vehicle for additional occupants and then PO MENSAH removed himself from the immediate area. At this point, he described himself as "kinda out of it" as a result of the incident.

PO MENSAH stated, at some point, Dispatch asked for his location inside Madison Park. He believed he responded "in the middle" and that the "Fire (Fire Department) can stage on 100th St."

PO MENSAH stated Wauwatosa Police Lieutenant Gary GABRISH was the first supervisor on scene. He (PO MENSAH) provided a brief public safety statement to him. Squad 302, Wauwatosa PO Bryan WADE, was assigned to sit with PO MENSAH. He believed they sat inside WADE's vehicle during the investigation.

I asked PO MENSAH specifically why did he discharge his weapon. He responded that he discharged his weapon because he knew the firearm was on the passenger front seat of the vehicle. He stated he ordered and pleaded with the driver numerous times to not reach for the weapon. He (PO MENSAH) shot because the driver reached for the weapon and he believed the driver was going to use it against him; he knew the potential for the amount of injury the weapon (on the seat) could cause. He stopped firing because he believed the threat had been neutralized / incapacitated. PO MENSAH believed he saw the rounds go into the driver's body. He also observed him slump toward the driver front door; he did not know if the driver had been successful in possessing the weapon on his front seat.

PO MENSAH described the driver as a black male, 25-26 yoa, long dreads / braids. He was unable to describe the driver's clothing. He believed he was inside a black Nissan Maxima but was not sure. He did not recall any prior contact with either the driver or the vehicle.

PO MENSAH stated previous checks in the Madison Park (by himself and other officers) had resulted in recovery of illegal drugs, stolen cars, foot pursuits, etc. When he observed the vehicle inside the lot, PO MENSAH's intention was to simply learn why the driver was there after closing hours. He stated he had numerous contacts with vehicles and occupants after closing hours, prior to that night, and had never before issued a citation. He would learn the reason for being inside the park and direct the occupants to leave.

PO MENSAH stated he had conducted an earlier park check around 12:30 AM. He had encountered 2 vehicles after closing hours. When he turned his squad lights on, one vehicle immediately exited the park. A subject walked up to the second vehicle and PO MENSAH instructed him to leave the park. The subject entered his vehicle and complied. Neither of the two vehicles matched the vehicle that was involved in this incident.

This concluded PO MENSAH's statement and the interview was terminated at 10:37 AM.

3 h

Case 2:21-cv-00848-LA   Filed 08/22/23   Page 79 of 215   Document 91-9

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

**161750037**
**DRAFT**
Supplement No
0020
Reported Date
06/29/2016
Nature of Call
OJINVEST
Officer
O'DAY, LUKE G

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 161750037 | 0020 | 06/29/2016 | | 06:10 | 161750406 |

| Status | Nature of Call | | | |
|---|---|---|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) | | | |

| Location | | City | ZIP Code | Rep Dist |
|---|---|---|---|---|
| 9800 W GLENDALE AVE | | WAUWATOSA | 53225 | 833 |

| District | Squad | From Date | From Time | Officer | |
|---|---|---|---|---|---|
| 4 | 430 | 06/23/2016 | 03:07 | 010266/O'DAY, LUKE G | |

| Assignment | Entered by | | |
|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | 010266 | | |

| Assignment | Confidential | Property? | Approving Officer |
|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | HOMICIDE | None | 006709 |

| Approval Date | Approval Time | | |
|---|---|---|---|
| 07/04/2016 | 18:07:01 | | |

| MISC INFO | | | |
|---|---|---|---|
| OIS 2016-8 | | | |

## Modus Operandi

| Gang Act? | Gang Name |
|---|---|
| No | NONE |

## Supplement

This report is written by Det. Luke O'DAY assigned to Metropolitan Division, Homicide Unit (Late Shift).

This report details follow-up conducted regarding the Officer Involved Shooting (Wauwatosa PD) at Madison Park, 9800 W. Glendale Ave. (IR #16-175-0037).

On Monday, June 27, 2016, I was directed by Police Lieutenant Paul KAVANAGH to contact the immediate family of Jay ANDERSON JR. (B/M 7-4-90) and provide them an opportunity to view a portion of the squad video that depicted the incident. This was offered as a courtesy to them and would be done prior to the case being presented to the District Attorney's Office.

On Tuesday, June 28, 2016, at about 8:00 AM, I spoke with Attorney Yoa O. DINIZULU who informed me and the ANDERSON family had retained his firm and that they would like to view the video. We arranged a time for 3 family members to accompany Atty. DINIZULU to the Police Administration Building (PAB).

At about 11:40 AM, Lt. KAVANAGH, Police Lieutenant Joseph ERWIN, and I met with Atty. DINIZULU, ANDERSONS's parents, Jay L. ANDERSON Sr. (B/M 3-8-67) and Linda M. ANDERSON (B/F 12-29-65), his aunt Jacqueline D. ANDERSON (B/F 10-28-64), and his fiancee Starkeisha M. DELAROSA (B/F 2-19-89) on the 6th floor of the PAB. Jay Sr., Jacqueline, and Starkeisha accompanied us to the Line-Up room to show the video.

I played approximately 20 seconds of the video obtained from PO Joe MENSAH's squad car. The family asked me to play it one more time, which I did.

I explained that the Metropolitan Investigations Division was handling the investigation, and that upon completion, the reports would be handed over to the District Attorney's office.

Only the three members of the family were provided the opportunity to view the video. They were not permitted to bring any recording devices into the room.

| Report Officer | Printed At | |
|---|---|---|
| 010266/O'DAY, LUKE G | 07/25/2016 03:50 | Page 1 of 2 |

# Incident Report
## MILWAUKEE POLICE DEPT
**161750037**
**DRAFT**

Supplement No
0020

Supplement

Case 2:21-cv-00848-LA   Filed 08/22/23   Page 81 of 215   Document 91-9

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee, WI 53210

(414) 935-7502

**161750037**
**DRAFT**
Supplement No
0021
Reported Date
06/29/2016
Nature of Call
OJINVEST
Officer
JOHNSON, STEVEN S

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 161750037 | 0021 | 06/29/2016 | 07:50 | 161750406 |

| Status | Nature of Call | | | |
|---|---|---|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) | | | |

| Location | City | ZIP Code | Rep Dist |
|---|---|---|---|
| 9800 W GLENDALE AV | WAUWATOSA | 53225 | 833 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 4 | 430 | 06/23/2016 | 03:07 | 010978/JOHNSON, STEVEN S |

| Assignment | Entered By |
|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | 010978 |

| Assignment | Confidential | Property? | Approving Officer |
|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | HOMICIDE | None | 006709 |

| Approval Date | Approval Time |
|---|---|
| 07/01/2016 | 18:55:33 |

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| No | NONE | HOMICIDE |

## Supplement

This report is written by Detective Steven S. Johnson, assigned to Metropolitan Division, Homicide Unit (Late Shift).

On Thursday, June 23, 2016, at 4:05 AM, I, along with other members of the Metropolitan Division, was directed by Sqd 9509, Lt. Joseph McLIN, to respond to the Officer Involved Shooting (Wauwatosa PD) at Madison Park, 9800 W. Glendale Ave. (CAD #16-175-0406).

Upon arrival, Wauwatosa PD, Sqd 370, Lt. Gary GABRISH, briefed us at 3:03 AM, Sqd 305, PO Joseph MENSAH, had conducted a routine park check when he encountered a subject inside a parked vehicle. He found the subject incapacitated and attempted to wake him up by knocking on the window. The subject woke up, ignored his commands, and reached for a handgun on the front passenger seat. Fearing for his safety, PO MENSAH fired into the vehicle. The subject sustained several gunshot wounds and ultimately became deceased at Froedtert Memorial Hospital.

I was instructed by Lt. Joseph McLin to conduct an interview with the City of Wauwatosa Fire Department personnel that responded to the scene of this incident. I identified one of the responding Wauwatosa Fire Fighters as Patrick C. Quinlevan W/M 10-13-59, at which time I conducted this interview with Quinlevan as he was seated in my unmarked squad car parked in the parking lot of Madison Park, 9800 W. Glendale Av..

****Interview of Patrick Quinlevan****

Quinlevan stated that he is currently employed by the City of Wauwatosa Fire Department as an Motor Pump Operator, where he has been employed for twenty six years. Quinlevan stated that he is currently assigned to Engine #52, Crew #3, which is located at 4187 N. Mayfair Rd.. Quinlevan stated that on today's date, Thursday, June 23, 2016, he worked Engine #52 along with Captain Scott Friedrick and Fire Fighter Christopher Schultz for their tour of duty hours of 8:00am - 8:00pm.

Quinlevan stated that at approximately 3:05am they were dispatched to "Assist PD" call at 9800 W. Glendale Av.. Quinlevan stated Wauwatosa Fire Department Med #52, which is housed in the same location, responded along with them. Quinlevan identified the Wauwatosa Fire Department personal on Med #52 as Lt. Brian O'Day and Fire Fighter / Paramedic Dave Tipple.

Quinlevan stated as they were en route to the location, the service call was updated to a "Gun shot wound" and

| Report Officer | Printed At | |
|---|---|---|
| 010978/JOHNSON, STEVEN S | 07/25/2016 03:50 | Page 1 of 2 |

# Incident Report
## MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

Supplement No
0021

**Supplement**

they were advised to stage until the scene was safe. Quinlevan, who was operating the fire truck, advised they arrived on scene several minutes later and staged briefly on the access road from W. Glendale Av. that lead into the parking lot of Madison Park. Quinlevan stated after approximately thirty seconds, they were advised the scene was secured and they followed a uniformed marked squad and the Med unit into the parking lot.

Quinlevan stated upon entering the parking lot, he observed at least four uniformed marked squad cars in the parking lot, and one dark colored vehicle parked approximately twenty feet from the squad cars. Quinlevan stated at least two of the uniformed marked squad cars were parked facing the vehicle and were parked to the west of the vehicle. Quinlevan stated he observed several City of Wauwatosa Police Officers removing a subject out of a drivers side door and he pulled to the south of the vehicles and used the trucks emergency flood lights, which are located on the side of the truck, to illuminate the parking lot.

Quinlevan stated upon exiting the truck he grabbed the O2 bag to assist with medical treatment for the subject. Quinlevan stated the Wauwatosa Police Officers had fully removed the person from the drivers side of the vehicle and placed the subject on the ground. Quinlevan was able to describe the person he observed laying on the ground as a B/M late 20's, 5'9", 160 lbs, medium build, dread lock hairstyle to shoulders wearing a lighter color short sleeve polo shirt, unknown pants, with at least one gun shot wound to the right cheek. Quinlevan stated the subjects head was facing north and feet facing south.

Quinlevan stated Lt. O'Day used the portable defibrillator to check for an EKG reading, at which time they were able to get a faint reading. Quinlevan stated as a result, the decision was made to immediately bring the subject into the Med unit. Quinlevan stated upon being loaded into Med #52, he began to hook up a bag of saline for Fire Fighter /Paramedic Tipple, who was starting an IV line in the subjects left arm.

Quinlevan stated as this was happening, Lt. O'Day was giving the subject chest compressions and Schultz was using the bag for rescue breaths. Quinlevan stated after several minutes, he switched positions with Lt. O'Day and performed chest compressions for several minutes. Quinlevan stated he switched positions wit Captain Friedrick, who continued chest compressions for several minutes.

Quinlevan stated they checked for a pulse on the subject, at which time Schultz was able to get a pulse from the subject, along with a blood pressure reading that he believed was possibly 104 / 60. Quinlevan stated as a result of the subject having a faint pulse, the decision was made to transport the subject to Froedtert Hospital. Quinlevan stated he exited the Med unit and was going to follow them to Froedtert Hospital but was asked by Lt. Gabrish of the Wauwatosa PD to remain on scene and provide light for the investigation due to the fact the incident happened during the hours of darkness.

Quinlevan stated he remained on scene to provide light for the police department and did not have any other responsibilities for the remainder of the investigation prior to speaking with myself. Quinlevan stated he only observed one gunshot wound to the subjects right upper cheek and observed a large amount of blood on the subject. Quinlevan stated he did not look inside the vehicle when they approached the subject laying on the ground next to the vehicle and he did not observe any firearms on the ground next to the vehicle. Quinlevan could provide no additional information regarding this incident.

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

**161750037**
**DRAFT**
Reported Date
06/29/2016
Nature of Call
OJINVEST
Officer
O'DAY, LUKE G

Supplement No
0022

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 161750037 | 0022 | 06/29/2016 | 11:26 | 161750406 |

| Status | Nature of Call | | | | |
|---|---|---|---|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) | | | | |

| Location | City | ZIP Code | Rep Dist |
|---|---|---|---|
| 9800 W GLENDALE AVE | WAUWATOSA | 53225 | 833 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 4 | 430 | 06/23/2016 | 03:07 | 010266/O'DAY, LUKE G |

| Assignment | Entered by |
|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | 010266 |

| Assignment | Confidential | Property? | Approving Officer |
|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | HOMICIDE | None | 006709 |

| Approval Date | Approval Time |
|---|---|
| 07/04/2016 | 18:07:39 |

| MISC INFO |
|---|
| OIS 2016-8 |

## Modus Operandi

| Gang Act? | Gang Name |
|---|---|
| No | NONE |

## Supplement

This report is written by <u>Det. Luke O'DAY</u> assigned to Metropolitan Division, Homicide Unit (Late Shift).

This report details follow-up conducted regarding the Officer Involved Shooting (Wauwatosa PD) at Madison Park, 9800 W. Glendale Ave. (IR #16-175-0037).

On Wednesday, June 29, 2016, I reviewed squad car video obtained from the Wauwatosa Police Department. It had been downloaded from Wauwatosa **PO Joseph MENSAH**'s squad camera. I located the video in Mfile folder *Police Related*. Folder *OIS 08-2016Wauwatosa* was located inside. Through a series of folders, I located the player AVViewer. Through the viewer, I was able to access file *0307251.av*.

The video was from 3:06:55 AM - 5:18:43 AM.

I made the following observations:

The video depicts the view of an empty parking lot from the windshield of an PO MENSAH's squad, looking east. Two lights are visible in the distance to the east.. A black vehicle is positioned possibly 2-3 car lengths in front of the squad, facing the camera. PO MENSAH is wearing a dark blue uniform and is standing outside the passenger front door of the vehicle. His right arm is extended toward the passenger front window as if he was pointing a weapon at the driver (weapon is not observed). A subject is sitting in the driver seat and his right arm can be observed in the air.

The numbers "P2245@5 <mailto:P2245@5>" depicts the squad number (P2245) in the lower left corner. The date "06/23/2016" and time "03:06:55" can be viewed underneath the squad information. Displayed underneath the recording, was a box indicating the "Lights" and "Mic" were activated.

03:06:55 - The video began without audio. The driver was moving around with both hands in the air. A circle of light could be observed at PO MENSAH's feet, indicating his flashlight was on.

03:06:59 - PO MENSAH's left hand dropped from his weapon to the area of his duty belt on the left side. The circle of light disappeared, indicating he had holstered his flashlight. The driver's right hand was moving side to side. PO MENSAH's left hand returned to his weapon.

| Report Officer | Printed At | |
|---|---|---|
| 010266/O'DAY, LUKE G | 07/25/2016 03:50 | Page 1 of 4 |

# Incident Report
# MILWAUKEE POLICE DEPT

### 161750037
### DRAFT

Supplement No
0022

**Supplement**

03:12:26 - The second officer walked around the vehicle, from behind, to the driver side and then both officers disengaged from the scene toward the direction of the squad camera.

03:12:28 - PO MENSAH notified Dispatch that the scene was inside Madison Park parking lot. He walked away west as the two clearing officers disengaged.

03:12:31 - As the officers disengage, I observed what appeared to be a handgun in the left hand of the second officer as he walked off the screen.

03:13:18 - Conversation off screen with a male subject and PO MENSAH: "...there's going to be one guy so. There are no runners, no other passengers?" PO MENSAH replied, "I don't why he's here by himself. I have no idea if anyone is here out in the park. I have no clue."

03:13:31 - Unknown officer walks over to the driver side of the vehicle and appears to be checking on the driver. "Let's see if we can do something for this guy." Two additional officers walk over and attempt medical aid. One of the officers brought with him a medical kit.

03:14:05 - **Lt. Gary GABRISH** asked PO MENSAH, "Ok, so who shot who?" PO MENSAH replied, "I did."

03:15:25 - WFD arrived on scene. Officers removed the driver from the vehicle to attempt further medical attention. He was then transported from the scene.

03:16:29 - PO MENSAH gave the following account to Lt. GABRISH.
Lt. GABRISH - "Did you have this recorded by any chance?"

PO MENSAH - "I tried to hit the button a couple of times." "Just a regular occupied auto. I went around to the passenger seat. Knock and knock and knock. Nothing and nothing. Looked down, just doing my search, whatever, and I see a gun there. Pop it out, "Hey, is that a gun? Step it up." (to Dispatch) Then whole time, kept doing this, kept doing this..." (Driver) "I'm not reaching for it, it's nothing there, nothing there." (PO MENSAH) "Stop there's the gun. Right there."

Lt. GABRISH - "Is he up?"

PO MENSAH - "Yeah, he's up. Coherent and everything. Put his hands up... as soon as I woke him up, 'Wauwatosa Police, Wauwatosa Police. Saw the gun there. Get your hands up, hands up.' Put his hands up. Kept saying, 'Keep your hands up, keep your hands up. And lets leave it at that.' And he (Driver) kept reaching for it. Kept reaching for it. And the last thing was he lunged forward again."

PO MENSAH - "Silver semi automatic on the passenger seat.

Lt. GABRISH - "Did you announce police?"

PO MENSAH - "Oh yeah. He knew I was a cop. I kept saying it over and over. 'Wauwatosa Police.' 'Wauwatosa Police.' He looked right over at my name tag. Right at my uniform. Kept looking at it. (Driver stated) "There's nothing there. Nothing there." (PO MENSAH stated) 'Theres a gun right there. I'm seeing it.'"

Lt. GABRISH - "How many rounds did you shoot?"

PO MENSAH - " Maybe 4 or 5."

Lt. GABRISH - "Did you change any magazines out?"

PO MENSAH - "No."

Lt. GABRISH notified PO MENSAH he would change with him (implying his weapon). "Did they do this stuff with you last time?" PO MENSAH replied, "I kept everything. Everything that I have right now, they want photos of exactly how I look right now. And then they take all that stuff at the station. (Lt. GABRISH did not change out PO MENSAH's weapon.)

Lt. GABRISH advised him to stay with Officer WADE.

| Report Officer | Printed At | |
|---|---|---|
| 010266/O'DAY, LUKE G | 07/25/2016 03:50 | Page 3 of 4 |

# Incident Report
# MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

Supplement No
0022

## Supplement

03:18:58 - "I tried to hit record. Kept hitting record over and over but it wouldn't turn on."

03:20:18 - Conversation with PO WADE:

PO WADE, "Was he reaching for a gun or what?"

PO MENSAH, "Yeah."

PO WADE, "So he was like passed out or what?"

PO MENSAH, "He was faking it."

I watched the remaining video. There was nothing further of evidentiary value.

# Incident Report
## MILWAUKEE POLICE DEPT

161750037
**DRAFT**

Supplement No
0022

**Supplement**

03:07:13 - I observed movement by the driver and the right hand could be seen extending toward the passenger front seat. It disappeared for a fraction of a second, then reappeared above the dashboard in front of the passenger front seat. The right hand then immediately dropped from view in front of the passenger front seat..

03:07:15 - PO MENSAH immediately discharged his weapon 6 times as he disengaged, walking backwards (north), disappearing from camera view.

03:07:23 - Audio starts up.

03:07:27 - Dispatch: "305. You ok?"

03:07:31 - PO MENSAH: "305. I'm Ok. Suspect down."
Dispach: "Dispatch copy. Suspect down."

03:07:45 - PO MENSAH could be observed approximately 20 feet from the vehicle. His weapon was trained on the vehicle and it appeared he was attempting to check on the status of the driver from a distance. PO MENSAH can be heard taking deep breaths heavily over the radio.

03:08:16 - PO MENSAH: "305. I'm okay. Suspect down."

03:08:21 - Unknown officer came over the air asking if the fire department could come onto the scene. PO MENSAH instructs the officer, "305. You can have fire stage on 100th St." Dispatch asked if other squads could come into the lot. He replied, "Affirmative for now. I have no idea who else is in the park. It's just me and him right now."

03:08:55 - Dispatch asked if there was anyone else in the car. PO MENSAH replied, "Negative. Just me and him." Sirens could be heard in the background of responding officers.

03:09:40 - The lights of a responding squad appear to the right (south) of the camera.

03:09:41 - PO MENSAH can be heard off camera stating to the responding squad, "I have no idea if there is anyone else in the park. I'm fine."

03:09:55 - Unknown officer over the air asked (PO MENSAH) 305 how was it looking, was he okay, and to confirm if shots had been fired. PO MENSAH responded, "Affirmative. Shots fired. Suspect down."

03:10:33 - Unknown officer can be heard asking if "they were going to go up on it (vehicle)?" A different officer stated, "When we get a third squad we will go up on it (vehicle)." PO MENSAH stated, "He's alone by himself."

03:10:42 - PO MENSAH stated, "The firearm is right next to him on the passenger seat."

03:10:53 - 3 Wauwatosa Police Officers approached the driver side of the vehicle. PO MENSAH was the third officer, a step behind the first two.

03:11:15 - One of the officers opened the driver door and positioned himself at the door. The second officer continued to check the rest of the vehicle for additional occupants.

03:11:29 - PO MENSAH disengaged from assisting in clearing the vehicle and walked away westbound toward the direction of his squad.

03:11:55 - Squad 318 radioed over the air, "318. I have a 30 something year old male black. He's not breathing at this time." Dispatch responded, "10-4. I have Fire (Wauwatosa Fire Department) staging."

03:11:57 - Wauwatosa squads arrive to set up a perimeter on the east side of the parking lot.

03:12:02 - PO MENSAH reappeared on the passenger side of the vehicle but remained about 10 feet away.

03:12:05 - One of the officers (possibly the one at the driver door) asks - "You got it or no?"

03:12:09 - The same officer can be heard stating, "... go on and grab it out of there." The second officer reached in through the passenger front window and appeared to remove an item from the front passenger seat.

| Report Officer | Printed At | |
|---|---|---|
| 010266/O'DAY, LUKE G | 07/25/2016 03:50 | Page 2 of 4 |

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

**161750037**
**DRAFT**

Supplement No
0023

Reported Date
06/30/2016

Nature of Call
OJINVEST

Officer
GADZALINSKI,MATTHEW M

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 161750037 | 0023 | 06/30/2016 | | 00:50 | 161750406 |

| Status | Nature of Call |
|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) |

| Location | | City | Rep Dist | District | Squad |
|---|---|---|---|---|---|
| 9800 W GLENDALE AV | | WAUWATOSA | 833 | 4 | 430 |

| From Date | From Time | Officer |
|---|---|---|
| 06/23/2016 | 03:07 | 017783/GADZALINSKI,MATTHEW M |

| Assignment | Entered by |
|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | 017783 |

| Assignment | Confidential | Property? | Approving Officer |
|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | HOMICIDE | None | 006709 |

| Approval Date | Approval Time |
|---|---|
| 06/30/2016 | 15:04:35 |

## Supplement

This report is submitted by Detective Matthew GADZALINSKI, assigned to the Metropolitan Investigations Division, Homicide Unit. On 06-29-16, I recovered items from the Milwaukee Police Department, evidence drying room, which had I had placed inside on 06-23-16. Those items were initially recovered regarding the shooting death of Jay L ANDERSON (B/M 07-04-90,) which had taken place on 06-23-16 inside of Madison Park, 9800 W Glendale Ave, OIS 2016-8.

Those items were annotated as Item(s) # 4, 5, and 7, on MPD inventory # 16-022217. Once they were removed from the drying room, I had Forensic Investigator James PETERSON (Squad 1921,) photograph the items after they were laid out. This allowed for a better view of the probable bullet hole in the shirt that had been recovered. I the packaged the items for storage.

END OF REPORT.....

| Report Officer | Printed At | |
|---|---|---|
| 017783/GADZALINSKI,MATTHEW M | 07/25/2016 03:50 | Page 1 of 1 |

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

**161750037**
**DRAFT**

Supplement No
0024

Reported Date
07/02/2016
Nature of Call
OJINVEST
Officer
JOHNSON, NICHOLAS J

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 161750037 | 0024 | 07/02/2016 | 04:53 | 161750406 |

| Status | Nature of Call | | | | | |
|---|---|---|---|---|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) | | | | | |

| Location | | City | ZIP Code | Rep Dist |
|---|---|---|---|---|
| 9800 W GLENDALE AVE | | MILWAUKEE | 53225 | 833 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 4 | 430 | 06/23/2016 | 03:07 | 016252/JOHNSON, NICHOLAS J |

| Assignment | Entered by |
|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | 016252 |

| Assignment | Confidential | Prop Trans Stat | Property? |
|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | HOMICIDE | Pending | Yes |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| 006709 | 07/04/2016 | 18:09:29 |

## Modus Operandi

| Gang Act? | Gang Name |
|---|---|
| No | NONE |

## Supplement

This report was written by Detective Nicholas JOHNSON, assigned to the Metropolitan Investigations Division-Homicide Unit, Late Shift.

On Thursday, June 23rd 2016, at approximately 3:59am, I was instructed by Lieutenant Joseph McLIN to respond to an Officer Involved Shooting that occurred at Madison Park, located at 9800 W. Glendale Ave., in the City of Wauwatosa, Wisconsin. I was further advised that the Officer involved was from the City of Wauwatosa Police Department and that our agency would be conducting the investigation.

On scene, myself and other members of the Metropolitan Investigations Division were briefed by Lieutenant Gary GABRISH from the Wauwatosa P.D. as to the status and nature of the incident. Lt. GABRISH informed us that at approximately 3:03am, Police Officer Joseph MENSAH was conducting an "After Hour Park Check" at Madison Park and observed a vehicle in the parking lot with one occupant in the drivers seat. He then informed us that Officer MENSAH observed the subject in the vehicle reach for a firearm and fearing for his safety, Police Officer MENSAH fired his duty weapon striking the subject multiple times. Lt. GABRISH then stated that the subject was transported to Froedtert Hospital where he was pronounced deceased.

Lt. GABRISH then identified the deceased as Jay L. ANDERSON (B/M, 07/04/1990).

After being briefed by Lt. GABRISH, Lt. McLIN informed me that I would be conducting the scene portion of the investigation.

The following Law Enforcement personnel were on scene during the investigation:

Milwaukee Police Department

Squad 9509-Lt. Joseph McLIN
Squad 9536-Det. Matthew GADZALINSKI
Squad 9537-Det. Steven JOHNSON
Squad 9539-Det. Troy PORTER
Squad 9540-Det. Nicholas JOHNSON
Squad 9559-Det. Luke O'DAY
Squad 1921-Forensic Investigator James PETERSON
Squad 1930-Forensic Investigator Lee VEDBRAATEN

| Report Officer | Printed At | |
|---|---|---|
| 016252/JOHNSON, NICHOLAS J | 07/25/2016 03:50 | Page 1 of 5 |

# Incident Report
## MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

Supplement No
0024

Squad 4123-Police Officer Robert MOORE

Wauwatosa Police Department

Lt. Gary GABRISH
Police Officer Joseph MENSHA
Police Officer Brian WADE
Police Officer Ralph SALYERS
Police Officer Stephen MILLS
Police Officer Joseph WANG
Police Officer Tyler L'ALLIER
Police Officer Andrew FLORYANCE

The Following members from the Wauwatosa Fire Department were scene:

ENGINE 52
Captain Scott FRIEDRICK
MPO Patrick QUINLEVAN
Fire Fighter Christopher SCHULTZ

MED UNIT 52
Lieutenant Brian O'DAY
Driver/Fire Fighter David TIPPEL

BATTALION 5
Deputy Chief Brent LEE

During the investigation, Medical Investigator Jason RUDELICH from the Milwaukee County Medical Examiners Office also responded to the scene.

## SCENE DESCRIPTION

The location of the incident occurred at the Milwaukee County Madison Park, which is located at 9800 W. Glendale Ave., Wauwatosa, Wisconsin.

The park is located between N. 92nd St. and N. 100th St. to the east and west and between W. Hampton Ave. and W. Ruby Ave. to the north and south. The only accessible roadway to the parking lot of the park is W. Glendale Ave. from N. 100th St.

The incident occurred in the parking lot of the park. This is the only parking lot and is accessible from W. Glendale Ave. To the north of the parking lot are tennis courts and basketball courts. To the northwest of the parking lot is the pavilion. That is accessible from a path in the northwest corner of the parking lot. To the West of the parking lot is a volleyball court and Madison Elementary School. To the south is a large field to play soccer. To the east of the parking lot is a Service Yard/Maintenance Garage. Directly east of the garage is the Luther Manor Retirement Community.

The only lighting in the parking lot is a single light that is on the west side of the Service Yard/Maintenance Garage. No surveillance cameras are located within the park, however there are surveillance cameras on the exterior of Madison Elementary School.

The length of the parking lot from North to South Measures 224 feet and 8 inches. The length of the parking lot from East to West measures 358 feet and 4 inches.

During the investigation I took note of 4 vehicles that were in the immediate scene where the incident occurred.

The first vehicle is the deceased's vehicle which was a 2006 Black 4-Door Nissan Altima 2.5S with Wisconsin Registration Plate number 749-USD and Vin # 1N4AL11DX6C113910. The vehicle did not have a front license plate. The vehicle was parked with the front facing to the west in a slight southern angle. I did observe that the front driver door, rear driver side door and front passenger side door were open. I further observed that the front passenger door window was in the down position and that the rear driver side door was broken. I further smelled

| Report Officer | Printed At | |
|---|---|---|
| 016252/JOHNSON, NICHOLAS J | 07/25/2016 03:50 | Page 2 of 5 |

# Incident Report
# MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

Supplement No
0024

## Supplement

a strong odor of marijuana in the vehicle. I did not observe any bullet holes on the exterior of the vehicle. I did notice that there was a significant amount of blood on the interior of the vehicle and on the ground next to the front driver side door. I did note that there was an $8.00 (1x $5.00 bill and 3x $1.00 bills) in US currency on the front passenger seat of the vehicle. The money was collected and placed on MPD Inventory # 16022241 as safekeeping. This vehicle was later towed to the City of Milwaukee Tow Lot Z-Building under Evidence Tow # 1641003 which was followed by MPD Squad 4123 (Police Officer Robert MOORE).

The second vehicle of note was the patrol squad being operated by Police Officer MENSAH, Patrol Car # P224. The vehicle was a 2015 Marked black Wauwatosa Police Ford Explorer Police Interceptor with operating red and blue police lights. This vehicle was parked to the west of the Nissan Altima, and was facing a northeast direction. The Plate number is E5578 and Vin # 1FM5K8AR4FGC52132. I did observe that the front driver door of this vehicle was still open as well as the rear tailgate.

Vehicle #3 was another Wauwatosa Police Vehicle (Car # P222) that was parked just north of where Police Officer MENSAH parked his squad. This vehicle is a 2015 Ford Taurus Police Interceptor 4-door Black in color Sedan marked Police Vehicle with operating Red and Blue police lights. The plate number is E5577 and Vin # 1FAHP2MKXFG159815. This vehicle was not part of the incident, however was one of the first responding squads on the scene. The vehicle was also parked facing a northeast direction

Vehicle #4 was another Wauwatosa Police Vehicle (Car # P219) that was parked just south of where Police Officer MENSAH parked his squad. This vehicle is a 2015 Ford Explorer Police Interceptor 4-Door black in color SUV marked Police Vehicle with operating Red and Blue police lights. The plate number is E5559 and Vin# 1FM5K8AR4FGC52129. This vehicle was not part of the incident, however was one of the first responding squads on the scene. The vehicle was also parked facing a northeast direction.

For measuring the evidence as well as the deceased's vehicle and Police Officer MENSAH's vehicle, I used a square sewer grate that was located in the parking lot as my reference point. The sewer grate measured 2 feet 4 inches x 2 feet 2 inches. The sewer grate measured 99 feet south from the north side of the parking lot and 108 feet and 10 inches from the east side of the parking lot.

I did measure the deceased's vehicle in relation to the reference point. The passenger side rear tire measured 21 feet and 8 inches West and 7 inches South of the reference point. The Front passenger tire measured 30 feet and 7 inches West and 11 inches South of the reference point. The rear drivers side tire measured 20 feet and 4 inches West and 5 feet 8 inches south of the reference point. The front drivers side tire measured 29 feet and 2 inches West and 6 feet 9 inches South of the reference point.

I did measure Police Officer MENSAH's vehicle in relation to the reference point. The passenger side rear tire measured 69 feet and 8 inches West and 23 feet and 10 inches South of the reference point. The front passengers side tire measured 60 feet and 9 inches West and 20 feet and 1 inch South of the reference point. The rear drivers side tire measured 71 feet and 1 inch West and 17 feet and 5 inches South of the reference point. The front drivers side tire measured 62 feet and 6 inches West and 14 feet and 4 inches South of the reference point.

The distance from the front center bumper of the deceased's vehicle to the front center bumper of Police Officer MENSAH's squad car measured 26 feet and 2 inches.

The two other Wauwatosa Police Squads were not measured, as they were not part of the initial incident.

I did measure the sole light source that was observed on the utility/maintenance garage that is just east of the parking lot. The light measured 118 feet and 1 inch East and 11 feet and 6 inches South of the reference point.

EVIDENCE

During the investigation I observed and took note of several pieces of evidence. The items of evidence were marked with Yellow Police Markers, measured from the same reference point, and later placed on MPD Inventory # 16022240.

The items are as follows:

| Report Officer | Printed At | |
|---|---|---|
| 016252/JOHNSON, NICHOLAS J | 07/25/2016 03:50 | Page 3 of 5 |

# Incident Report
# MILWAUKEE POLICE DEPT

## Supplement

- **Yellow evidence Marker #1 (Inventory 16022240, Item #1)**-Silver .40 caliber Federal S & W cartridge casing. Measured 36 feet and 4 inches West/ 3 feet and 2 inches North.

- **Yellow evidence Marker #2 (Inventory 16022240, Item #2)**-Silver .40 caliber Federal S & W cartridge casing. Measured 37 feet and 2 inches West/ 6 feet and 0 inches North.

- **Yellow evidence Marker #3 (Inventory 16022240, Item #3)**-Silver .40 caliber Federal S & W cartridge casing. Measured 34 feet and 6 inches West/ 6 feet and 7 inches North.

- **Yellow evidence Marker #4 (Inventory 16022240, Item #4)**-Silver .40 caliber Federal S & W cartridge casing. Measured 32 feet and 11 inches West/ 6 feet and 0 inches North.

- **Yellow evidence Marker #5 (Inventory 16022240, Item #5)**-Silver .40 caliber Federal S & W cartridge casing. Measured 35 feet and 8 inches West/ 9 feet and 1 inch North.

- **Yellow evidence Marker #6 (Inventory 16022240, Item #6)**-Silver .40 caliber Federal S & W cartridge casing. Measured 26 feet and 4 inches West/ 13 feet and 9 inches North.

- **Yellow evidence Marker #7 (Inventory 16022240, Item #7)**-White towel with blood stains. Measured 32 feet and 1 inch West/ 9 feet and 9 inches South.

- **Yellow evidence Marker #8 (Inventory 16022240, Item #8)**-Gold and Diamond praying hands pendent/charm. Measured 24 feet and 8 inches West/ 10 feet and 8 inches South.

- **Yellow evidence Marker #9 (Inventory 16022240, Item #9)**-Deformed copper jacketed projectile. Measured 35 feet and 1 inch East/ 70 feet and 11 inches South.

The following items were also recovered and placed on MPD Inventory # 16022240 during the investigation, however they were not measured. The items and recovery locations are as follows:

- **Yellow Evidence Marker #10 (Inventory 16022240, Item #10)**-White "Blu" brand touch screen cell phone. Item recovered from the front passenger seat of the deceased's vehicle. The item was recovered from the vehicle so that it would not get lost or damaged during the transport. Serial No. G1507283030968.

- **Yellow Evidence Marker #11 (Inventory 16022240, Item #11)**-9mm Ruger SR9c semi-auto handgun with silver slide and black handle with a 17 shot capacity magazine. Serial No. 334-60459. Milwaukee Gun Tag 75495. The firearm was recovered from the trunk of Wauwatosa Sqaud # P222. I did note that the gun was loaded with 16 rounds in the magazine and 1 round in the chamber.

- **Yellow Evidence Marker #12 (Inventory 16022240, Item #12)**-Total of 7-9mm Luger CBC copper jacketed unfired cartridges that were recovered from Item #11.

- **Yellow Evidence Marker #12 (Inventory 16022240, Item #13)**-Total of 5-9mm Luger RP copper jacketed unfired cartridges that were recovered from Item #11.

- **Yellow Evidence Marker #12 (Inventory 16022240, Item #14)**-Total of 5-9mm Aguila copper jacketed unfired cartridges that were recovered from Item #11.

During the investigation, Forensic Investigator VEDBRAATEN did video record the scene using a handheld video recorder. He was then able to transfer the recording onto a DVD which was later placed on Inventory # 16022240 as item #15.

| Report Officer | Printed At | |
|---|---|---|
| 016252/JOHNSON, NICHOLAS J | 07/25/2016 03:50 | Page 4 of 5 |

# Incident Report
## MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

Supplement No
0024

**Supplement**

During the investigation, the area was thoroughly checked using metal detectors for any other casings or fired projectiles, however none were located.

The firearm that I recovered during the incident (Inventory 16022240, Item #1) was later turned over to Forensic Investigator Chet. ST. CLAIR at the Bureau of Identification to be processed for fingerprints and DNA.

THIS CONCLUDES MY REPORT.

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee, WI 53210

(414)935-7502

**161750037**
**DRAFT**

Supplement No
0025

Reported Date
07/02/2016

Nature of Call
OJINVEST

Officer
JOHNSON, NICHOLAS J

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 161750037 | 0025 | 07/02/2016 | 05:58 | 161750406 |

| Status | Nature of Call | | | | |
|---|---|---|---|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) | | | | |

| Location | City | ZIP Code | Rep Dist |
|---|---|---|---|
| 9800 W GLENDALE AVE | WAUWATOSA | 53225 | 833 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 4 | 430 | 06/23/2016 | 03:07 | 016252/JOHNSON, NICHOLAS J |

| Assignment | Entered by |
|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | 016252 |

| Assignment | Confidential | Property? | Approving Officer |
|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | HOMICIDE | None | 006709 |

| Approval Date | Approval Time |
|---|---|
| 07/04/2016 | 18:10:08 |

## Modus Operandi

| Gang Act? | Gang Name |
|---|---|
| No | NONE |

## Supplement

This report was written by Detective Nicholas JOHNSON, assigned to the Metropolitan Investigations Division-Homicide Unit, Late Shift.

This report is filed in regards the Officer Involved Shooting (OIS 8-2016) that occurred on June 23rd 2016 at 9800 W. Glendale Ave. (Madison Park).

On June 24th, 2016 I compiled a Letter Of Transmittal requesting that evidence pertaining to this case be analyzed at the State of Wisconsin Regional Crime Lab.

The following items were sent to the crime lab for analysis.

A. Item A Glock 22, Black .40 caliber handgun serial # UFB860 placed on Milwaukee Police Department Inv# 16022232 as Item #2

B. Silver .40 caliber Federal S&W spent cartridge casing placed on Milwaukee Police Department Inv# 16022240 as Item #1

C. Silver .40 caliber Federal S&W spent cartridge casing placed on Milwaukee Police Department Inv# 16022240 as Item #2

D. Silver .40 caliber Federal S&W spent cartridge casing placed on Milwaukee Police Department Inv# 16022240 as Item #3

E. Silver .40 caliber Federal S&W spent cartridge casing placed on Milwaukee Police Department Inv# 16022240 as Item #4

F. Silver .40 caliber Federal S&W spent cartridge casing placed on Milwaukee Police Department Inv# 16022240 as Item #5

G. Silver .40 caliber Federal S&W spent cartridge casing placed on Milwaukee Police Department Inv# 16022240 as Item #6

H. Deformed copper jacketed bullet placed on Milwaukee Police Department inv # 16022240 as Item # 9.

I. Ruger SR9c 9mm handgun with a silver slide and black handle, serial # 334-60459 placed on Milwaukee Police

| Report Officer | Printed At | |
|---|---|---|
| 016252/JOHNSON, NICHOLAS J | 07/25/2016 03:50 | Page 1 of 2 |

# Incident Report
# MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

Supplement No
0025

## Supplement

Department Inv# 16022240 as item # 11

J.  DNA swabs collected from the grip and trigger of the 9mm Ruger (Item I) placed on Milwaukee Police Department inv # 16022269 as item 1.

K.  DNA swabs collected from the slide of the 9mm Ruger (Item I) placed on Milwaukee Police Department inv # 16022269 as item  2.

L.  DNA swabs collected from the barrel the 9mm Ruger (Item I) placed on Milwaukee Police Department inv # 16022269 item 3

M.  DNA swabs collected from the magazine of the 9mm Ruger (Item I) placed on Milwaukee Police Department inv # 16022269 item 4.

N.  Dried blood standard collected from ANDERSON placed on Milwaukee Police Department Inv# 16022260 as Item #1

O.  Five (5) grain of bullet fragments placed on Milwaukee Police Department Inv# 16022260 as Item #2

P.  162 grain deformed copper jacketed bullet placed Milwaukee Police Department Inv# 16022260 as Item #3

Q.  162 grain deformed copper jacketed bullet placed Milwaukee Police Department Inv# 16022260 as Item #4

<u>THIS CONCLUDES MY REPORT.</u>

| Report Officer | Printed At | |
|---|---|---|
| 016252/JOHNSON, NICHOLAS J | 07/25/2016 03:50 | Page 2 of 2 |

# Incident Report
# MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

Supplement No
0026

Reported Date
07/10/2016
Nature of Call
OJINVEST
Officer
CAMPBELL,JAMES A

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 161750037 | 0026 | 07/10/2016 | 05:30 | 161750406 |

| Status | Nature of Call |
|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) |

| Location | | City | ZIP Code | Rep Dist |
|---|---|---|---|---|
| 9800 W GLENDALE AVE | | WAUWATOSA | 53225 | 833 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 4 | 430 | 06/23/2016 | 03:07 | 013434/CAMPBELL,JAMES A |

| Assignment | Entered by |
|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | 013434 |

| Assignment | Property? | Approving Officer |
|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | None | |

| Approval Date | Approval Time |
|---|---|
| | |

## WITNESS (WITH INFORMATION) 1: LOGGINS JEVONTE D

| Involvement | Invl No | Type | Name |
|---|---|---|---|
| WITNESS (WITH INFORMATION) | 1 | INDIVIDUAL | LOGGINS,JEVONTE D |

| MNI | Race | Sex | DOB | Age | Ethnicity |
|---|---|---|---|---|---|
| 1962449 | BLACK/AFRICAN AMERICAN | MALE | 03/08/1993 | 23 | NOT HISPANIC/LATINO |

| Juvenile? | Hair Color | Eye Color | Res Status |
|---|---|---|---|
| No | UNKNOWN OR COMPLETELY BALD | UNKNOWN | RESIDENT |

| Type | Address | City | State |
|---|---|---|---|
| HOME | 3211 N 36TH ST | MILWAUKEE | WISCONSIN |

| ZIP Code | | | |
|---|---|---|---|
| 53210 | | | |

| Phone Type | Phone No | Phone Type | Phone No |
|---|---|---|---|
| CELL | (414)238-8491 | CELL | (414)758-0554 |

| Employer/School |
|---|
| ELITE MIX TAPES |

## Modus Operandi

| Gang Act? | Gang Name |
|---|---|
| No | NONE |

## Supplement

This report is typed by Det. James CAMPBELL assigned to squad 9527 of The Metropolitan Division, Homicide Unit on The Early Shift.

On Friday 07/08/2016, Lt. Lucretia THOMAS did assign me follow-up regarding the Officer Involved Shooting (Wauwatosa PD), 06/23/2016 that occurred at Madison Park, 9800 W. Glendale Ave. (CAD #16-175-0406). Jay L. ANDERSON was identified as the victim in the offense. The follow-up consisted of conducting an interview of Jevonte D. LOGGINS, B/M 03/08/1993, 3211 N. 36th St, 238-8491, 758-0554. The interview occurred in the Conference room at District 7 while LOGGINS was uncuffed. The interview was specifically geared toward the Ruger SR9C 9mm, Serial #33460459, purchased by LOGGINS 07/14/2014.

LOGGINS stated that he is a CCW permit holder, and he got his license after he turned 21 (March or April 2014). LOGGINS stated that he purchased the gun to carry in July 2014. LOGGINS stated that he often carried it in his car. LOGGINS stated that he last remembers bringing the gun into his house before they had a fire at his house in July 2015. LOGGINS related that he currently does not know where the firearm is.

LOGGINS stated that after the fire, the family moved to a hotel on 107th and Good Hope for several weeks, then moved to St. James Place, then moved back to 3211 N. 36th St in February 2016. LOGGINS stated that he was scared to tell his Father that he could not find the gun. LOGGINS stated that he is the only person who would have had access to the gun. LOGGINS stated that he has been recently travelling the world, making basketball

| Report Officer | Printed At | |
|---|---|---|
| 013434/CAMPBELL,JAMES A | 07/25/2016 03:50 | Page 1 of 2 |

# Incident Report
# MILWAUKEE POLICE DEPT

161750037
**DRAFT**

Supplement No
0026

## Supplement

mix tapes with ELITEMIXTAPE. LOGGINS stated that he had alot of things going on his life and had kind of forgot about the gun.

LOGGINS stated that he had often carried the gun when he first got it, however carried it less frequently because the tint in his car caused him to get stopped. LOGGINS stated that he has a 2015 Kia Optima , Plate 425XHJ. LOGGINS stated that he purchased the gun from Gander Mountain in the company of "Rell", Terrell METCALFE. LOGGINS denied that he had purchased the gun for someone else, and denied loaning it or giving it to anyone.

LOGGINS identified a photo (111508625) of Jay L. ANDERSON, B/M 07/04/1990, as Jay. LOGGINS stated that he knows of Jay from playing pick up Basketball at the West Suburban YMCA. LOGGINS stated that it has been about 5 years since he has seen Jay, and that the last time he had seen him, he had short hair. LOGGINS stated that he had no idea how the gun got into Jays hands. LOGGINS stated that he had seen Jays photo in the news. LOGGINS did inquire about getting his firearm back and I refererred him to The MPD Gun Desk.

A check of RMS revealed there was a fire at his house 06/08/2015, 15-159-0161. The damage to the house was estimated at $50,000.

LOGGINS is not listed in RMS, and has only a paid traffic ticket for an illegal Uturn in CCAP. I was unable to determine any linkage between LOGGINS and ANDERSON from MPD CAD or Incidents.

| Report Officer | Printed At | |
|---|---|---|
| 013434/CAMPBELL, JAMES A | 07/25/2016 03:50 | Page 2 of 2 |

54

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

## 161750037
## DRAFT

Reported Date
07/12/2016
Nature of Call
OJINVEST
Officer
PORTER,TROY V

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 161750037 | 0027 | 07/12/2016 | | 14:05 | 161750406 |

| Status | Nature of Call | | | | | | |
|---|---|---|---|---|---|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) | | | | | | |

| Location | | | City | | ZIP Code | | Rep Dist |
|---|---|---|---|---|---|---|---|
| 8026 W MEDFORD AV | | | WAUWATOSA | | 53225 | | 833 |

| District | Squad | From Date | From Time | Officer | | | |
|---|---|---|---|---|---|---|---|
| 4 | 430 | 06/23/2016 | 03:07 | 012439/PORTER,TROY V | | | |

| Assignment | | Entered by | | | | | |
|---|---|---|---|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | | 012439 | | | | | |

| Assignment | | Confidential | Property? | Approving Officer | | | |
|---|---|---|---|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | | HOMICIDE | None | | | | |

| Approval Date | | Approval Time | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

## Modus Operandi

| Gang Act? | Gang Name |
|---|---|
| No | NONE |

## Supplement

This report is written by Detective Troy PORTER (Squad 9539) assigned to the Metropolitan Investigations Division-Homicide Unit, Late Shift.

This report details follow-up conducted regarding the Officer Involved Shooting, involving a Wauwatosa Police Department Police Officer that occurred on Thursday 06-23-16 at Madison Park, 9800 W. Glendale Avenue, Wauwatosa, WI (IR #16-175-0037).

On Monday, July 10, 2016, I was directed by Lieutenant Joseph MCLIN to assist him in a meeting with Attorney Yoa O. DINIZULU to provide Atty. DINIZULU an opportunity to view a portion of the squad video that depicted the incident. This was offered as a courtesy to Atty. DINIZULU and would be done prior to the case being presented at the District Attorney's Office.

At approximately 11:30 a.m. Lt. MCLIN and I met with Atty. DINIZULU, Investigator Dennis K. WALLER, and Jay ANDERESON JR'S father, Jay L. ANDERSON SR (B/M, 03-08-67) on the 6th floor of the Police Administration Building (PAB), 749 W. State Street. Atty. DINIZULU, WALLER, and ANDERSON SR accompanied Lt. MCLIN and I to the Line-up room to show the video.

Lt. MCLIN played approximately 20 seconds of the video obtained from Police Officer Joseph MENSAH'S squad car. It was viewed on the big projection screen. Atty. DINIZULU asked to view the video on the computer monitor, which appeared to be a clearer view of the video. He was provided with that request.

Lt. MCLIN explained that the Metropolitan Investigations Division was handling the investigation, and that upon completion, the reports would be handed over to the District Attorney's office.

Only the persons mentioned above were provided the opportunity to view the video. They were not permitted to bring any recording devices into the room.

END OF REPORT

| Report Officer | Printed At | |
|---|---|---|
| 012439/PORTER,TROY V | 07/25/2016 03:50 | Page 1 of 1 |

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

**161750037**
**DRAFT**

Supplement No
0028

Reported Date
07/12/2016

Nature of Call
OJINVEST

Officer
O'DAY, LUKE G

## Administrative Information

| Agency | | | | | | |
|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | Incident No 161750037 | Supplement No 0028 | Reported Date 07/12/2016 | | Reported Time 03:59 | CAD Call No 161750406 |

| Status | Nature of Call | | | | |
|---|---|---|---|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) | | | | |

| Location | | | | |
|---|---|---|---|---|
| 8026 W MEDFORD AV | | City MILWAUKEE | ZIP Code 53225 | Rep Dist 833 |

| District 4 | Squad 430 | From Date 06/23/2016 | From Time 03:07 | Officer 010266/O'DAY, LUKE G | |
|---|---|---|---|---|---|

| Assignment | | Entered by |
|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | | 010266 |

| Assignment | Confidential | Property? | Approving Officer |
|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | HOMICIDE | None | |

| Approval Date | Approval Time |
|---|---|
| | |

## Narrative

OIS 2016-8

## Modus Operandi

| Gang Act? | Gang Name |
|---|---|
| No | NONE |

## Supplement

This report is written by <u>Det. Luke O'DAY</u> assigned to Metropolitan Division, Homicide Unit (Late Shift).

This report details follow-up conducted regarding the Officer Involved Shooting (Wauwatosa PD) at Madison Park, 9800 W. Glendale Ave. (IR #16-175-0037).

On Tuesday, July 12, 2016, I reviewed Wauwatosa Police Department radio traffic recorded during the time of the incident . The file had been downloaded from their department and hand delivered to Metro. I located the file in Mfile folder *Police Related*. Folder *OIS 08-2016Wauwatosa* was located inside. Wav file *16-18370 PD radio* was located inside folder *16-18370- Sqd video OIS 2016-8*. The file was 34:18 in length.

PO Joseph MENSAH was assigned to Squad 305.

I made the following observations:

00:02 - PO MENSAH - "(Squad) 305 Occupied auto at Madison Park."

00:05 - Dispatch - "10-4. (Squad) 318"

00:12 - Squad 318 - "10-4. From the station."

00:48 - PO MENSAH - "305"

00:50 - Dispatch - "305"

00:53 - PO MENSAH - "28. 749-Union Sam David, 749-USD."

01:24 - Dispatch - "305. 29's negative. 2016 for an Altima, silver in color. To an Elena DeLaRosa 4520 N 110th St."

01:44 - PO MENSAH - "10-4"

03:36 - PO MENSAH - "305. Step it up. He has a gun."

| Report Officer | Printed At | |
|---|---|---|
| 010266/O'DAY, LUKE G | 07/25/2016 03:50 | Page 1 of 4 |

Case 2:21-cv-00848-LA   Filed 08/22/23   Page 99 of 215   Document 91-9

# Incident Report
# MILWAUKEE POLICE DEPT

161750037
**DRAFT**

Supplement No
0028

**Supplement**

03:41 - Dispatch - "All squads respond to Madison Park. All squads respond to Madison Park."

04:00 - Dispatch - "370. Did you copy?"

04:04 - Squad 370 - "I did not. I'm sorry, can you go ahead?"

04:08 - Dispatch - "305 is out with a subject at Madison Park who has a firearm."

04:18 - Squad 370 - (unable to understand what the squad is saying)

04:22 - Dispatch - "Affirmative. Everybody is going."

**04:40 - PO MENSAH - "305! Shots fired! Shots fired!"**

04:45 - Dispatch - "All squads step it up at Madison Park. All Squads. 305 are you okay?"

04:54 - PO MENSAH - "305. I'm ok. Suspect down."

04:59 - Dispatch - "Dispatch copies. Suspect down."

05:27 - Sqd 370 - "370 en route."

05:30 - Dispatch - "10-4"

05:34 - Dispatch - "305 status?"

05:38 - PO MENSAH - "305. I'm ok. Suspect down"

05:41 - Dispatch - "10-4"

05:44 - WFD - "Fire to Base Command"

05:53 - PO MENSAH - "305. You can have Fire stage on 100th St."

05:58 - Dispatch - "10-4. Is it safe for other squads to come in?"

06:03 - PO MENSAH - "Um. Affirmative. But now I have no idea if there is anyone else in the park. It's just me and him right now."

06:17 - Dispatch - "10-4. Was there anyone else in the car?"

06:21 - PO MENSAH - "Negative. Just me and him."

06:24 - Dispatch - "10-4"

06:28 - Squad 318 - "Squad 318 10-23."

06:30 - Dispatch - "10-4"

07:04 - Dispatch - "370"

07:05 - Squad 370 - "Go ahead."

07:07 - Dispatch - "Would you like any assistance from West Allis?"

07:15 - Squad 370 - "Let see what we have a minute. 370 to 305"

07:20 - PO MENSAH - "305 go."

07:24 - Squad 370 - "How's it looking? Are you okay. And shot's fired correct?"

07:30 - PO MENSAH - "Affirmative. Shots fired. Suspect down."

07:38 - Squad 370 - "10-4"

# Incident Report
# MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

Supplement No
0028

## Supplement

07:44 - Squad 370 - "Dispatch. At this point why don't you have Milwaukee County Sheriff's to respond for mutual aid."

07:52 - Dispatch - "10-4"

07:59 - Squad 301 - "301 23."

08:04 - Dispatch - "10-4 301."

08:05 - Dispatch - "318 were you calling?

08:42 - Dispatch - "305. You have a better area of the park you are in?"

08:48 - Squad 301 - "301 to Dispatch. They are clearing the vehicle right now. I'm headed around the park to see it anyone else is in here."

08:58 - Dispatch - 10-4. "The Sheriffs were asking if there was a better location to respond to in the park."

09:06 - Squad 301 - "The main entrance to the park, the main driveway, is probably best way now."

09:15 - Squad 318 - "318. I have a 30 something year old male black. He's not breathing at this time."

09:25 - Dispatch - "10-4. I have Fire staging."

09:30 - Squad 315 - "315. I'm 23."

09:38 - Dispatch - "10-4"

09:44 - PO MENSAH - "305. We are in the parking lot."

09:48 - Dispatch - "10-4"

10:20 - Squad 370 - "370 is on scene."

10:23 - Dispatch - "10-4"

11:23 - Squad 318 - "318. P&B"

11:28 - Dispatch - "10-4 318. Is it safe for Fire to enter?"

11:32 - Squad 318 - "Affirmative."

11:35 - Dispatch - "10-4"

11:52 - Dispatch - "303. Were you calling?"

11:55 - Squad 303 - "Not for now."

11:58 - Dispatch - "10-4"

12:00 - Squad 370 "370. Have command here."

12:07 - Dispatch - "10-4 370."

12:13 - Squad 22 (?) - "22 is 23."

12:39 - Squad 318 - "318. He does have a pulse."

12:44 - Dispatch - "10-4"

12:45 - Squad 370 - "370. Mark this time right now for Med making contact with the subject."

Case 2:21-cv-00848-LA   Filed 08/22/23   Page 101 of 215   Document 91-9

# Incident Report
# MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

Supplement No
0028

## Supplement

12:52 - Dispatch - "10-4"

I listened to the remaining 21:26 minutes of audio and did not hear anything further of evidentiary value.

Report Officer
010266/O'DAY, LUKE G

Printed At
07/25/2016 03:50

Page 4 of 4

Case 2:21-cv-00848-LA   Filed 08/22/23   Page 102 of 215   Document 91-9

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

**161750037**
**DRAFT**

Supplement No
0029

Reported Date
07/16/2016
Nature of Call
OJINVEST
Officer
O'DAY, LUKE G

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 161750037 | 0029 | 07/16/2016 | 03:15 | 161750406 |

| Status | Nature of Call | | | | | |
|---|---|---|---|---|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) | | | | | |

| Location | | City | ZIP Code | Rep Dist |
|---|---|---|---|---|
| 9800 W GLENDALE AVE | | WAUWATOSA | 53225 | 833 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 4 | 430 | 06/23/2016 | 03:07 | 010266/O'DAY, LUKE G |

| Assignment | Entered by |
|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | 010266 |

| Assignment | Confidential | Property? | Approving Officer |
|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | HOMICIDE | None | |

| Approval Date | Approval Time |
|---|---|
| | |

MISC INFO
OIS 2016-8

## Narrative
OIS 2016-8

## Modus Operandi

| Gang Act? | Gang Name |
|---|---|
| No | NONE |

## Supplement

This report is written by Det. Luke O'DAY assigned to Metropolitan Division, Homicide Unit (Late Shift).

This report details follow-up conducted regarding the Officer Involved Shooting (Wauwatosa PD) at Madison Park, 9800 W. Glendale Ave. (IR #16-175-0037).

On Saturday, July 16, 2016, I reviewed squad car video obtained from the Wauwatosa Police Department. It had been downloaded from Wauwatosa PO Stephen MILLS' squad camera. I located the video in Mfile folder *Police Related*. Folder *OIS 08-2016Wauwatosa* was located inside. Through a series of folders, I located the player AVViewer. Through the viewer, I was able to access file *030642.av*.

The video was from 3:06:21 AM - 3:17:11 AM.

I made the following observations:

The numbers "P222@4" is depicted in the lower right corner of the camera video. The date "06/23/2016" and time "03:06:21" can be viewed underneath.

The video depicts the view from the front dashboard of the squad car. The audio begins at 03:06:41. Lights and siren were activated at 03:06:42.

The squad arrived at 3:09:30 and took a position to the left (north) of PO Joseph MENSAH's vehicle; slightly to the west. PO MILLS was the first backup unit to arrive on scene. PO MENSAH could be observed standing at the driver rear of his squad, monitoring the suspect vehicle while awaiting the arrival of backup.

(* The video depicted a similar viewpoint of PO MENSAH's squad video. That video was described in detail in Supplement report #22.)

03:10:53 - PO Ralph SALYERS, PO MILLS, and PO MENSAH, tactically approach the driver side of the vehicle.

03:11:13 - The driver side door was opened by one of the officers.

| Report Officer | Printed At | Page |
|---|---|---|
| 010266/O'DAY, LUKE G | 07/25/2016 09:50 | 1 of 9 |

Case 2:21-cv-00848-LA Filed 08/22/23 Page 103 of 215 Document 91-9

# Incident Report
## MILWAUKEE POLICE DEPT

**161750037**

**DRAFT**

Supplement No
0029

03:12:07 - PO MILLS removed an item from the passenger front seat with his right hand and walked around the rear of the vehicle with his arm extended in down toward the ground. He rejoined PO SALYERS and together they disengaged from the vehicle.

03:13:34 - An officer approached the driver front door and appeared to check the driver. Other officers join him.

03:15:28 - The officers removed the suspect from the driver seat to administer first aid.

** It should be noted I did not transcribe any radio traffic heard in this video. All radio traffic was previously transcribed in Supplement report #28.

Case 2:21-cv-00848-LA Filed 08/22/23 Page 104 of 215 Document 91-9

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

**161750037**
**DRAFT**
Supplement No
0030

Reported Date
07/21/2016
Nature of Call
OJINVEST
Officer
JOHNSON,NICHOLAS J

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 161750037 | 0030 | 07/21/2016 | 01:47 | 161750406 |

| Status | Nature of Call |
|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) |

| Location | City | ZIP Code | Rep Dist |
|---|---|---|---|
| 9800 W GLENDALE AVE | MILWAUKEE | 53225 | 833 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 4 | 430 | 06/23/2016 | 03:07 | 016252/JOHNSON,NICHOLAS J |

| Assignment | Entered by |
|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | 016252 |

| Assignment | Confidential | Property? | Approving Officer |
|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | HOMICIDE | None | |

| Approval Date | Approval Time |
|---|---|
| | |

## Modus Operandi

| Gang Act? | Gang Name |
|---|---|
| No | NONE |

## Supplement

This report was written by <u>Detective Nicholas JOHNSON</u> assigned to the Metropolitan Investigations Division-Homicide Unit, Late Shift.

On June 24th, 2016 I compiled a Letter of Transmittal to the State of Wisconsin Crime Lab regarding analysis of evidence recovered regarding this investigation. Items sent out to the crime lab included DNA swabs that were taken from a firearm that was recovered from the deceased, identified as <u>Jay L. ANDERSON (B/M, 07/04/1990)</u>, as well as his DNA standard.

On July 21st, 2016 I received a Confidential Report of Laboratory Findings from <u>Michelle M. BURNS</u> of the State of Wisconsin Regional Crime Lab that was dated July 7th, 2016. The case was assigned number R16-2393.

In the report it states "An STR profile that is a mixture of DNA from at least three individuals was detected from the pistol grip and trigger swabs (Item J1). Assuming DNA from only three individuals in this mixture, a major male contributor can be determined at nine genetic markers. The major contributor STR DNA profile determined from Item J1 is consistent with the STR DNA profile detected from Jay L. ANDERSON."

A copy of the report will be kept with the Metropolitan Investigations File regarding this incident.

<u>THIS CONCLUDES MY REPORT.</u>

| Report Officer | Printed At | |
|---|---|---|
| 016252/JOHNSON,NICHOLAS J | 07/25/2016 03:50 | Page 1 of 1 |

# Incident Report
# MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

Supplement No
0031

2333 N. 49TH ST

Milwaukee,WI 53210

Reported Date
07/21/2016

Nature of Call
OJINVEST

Officer
O'DAY, LUKE G

(414)935-7502

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 161750037 | 0031 | 07/21/2016 | 02:44 | 161750406 |

| Status | Nature of Call |
|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) |

| Location | City | ZIP Code | Rep Dist |
|---|---|---|---|
| 9800 W GLENDALE AVE | WAUWATOSA | 53225 | 833 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 4 | 430 | 06/23/2016 | 03:07 | 010266/O'DAY, LUKE G |

| Assignment | Entered by |
|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | 010266 |

| Assignment | Confidential | Property? | Approving Officer |
|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | HOMICIDE | None | |

| Approval Date | Approval Time |
|---|---|
| | |

MISC INFO
OIS 2016-8

## Narrative

OIS 2016-8

## Modus Operandi

| Gang Act? | Gang Name |
|---|---|
| No | NONE |

## Supplement

This report is written by <u>Det. Luke O'DAY</u> assigned to Metropolitan Division, Homicide Unit (Late Shift).

This report details follow-up conducted regarding the Officer Involved Shooting (Wauwatosa PD) at Madison Park, 9800 W. Glendale Ave. (IR #16-175-0037).

On Saturday, July 16, 2016, I reviewed squad car video obtained from the Wauwatosa Police Department. It had been downloaded from Wauwatosa <u>PO Ralph SALYERS</u> squad camera. I located the video in Mfile folder *Police Related*. Folder *OIS 08-2016Wauwatosa* was located inside. Through a series of folders, I located the player AVViewer. Through the viewer, I was able to access file *030615.av*.

The video was from 3:05:54 AM - 3:24:08 AM.

I made the following observations:

The numbers "P219@Sq318" is depicted in the lower right corner of the camera video. The date "06/23/2016" and time "03:05:54" can be viewed underneath.

The video depicts the view from the front dashboard of the squad car. The audio begins at 03:05:54. Lights and siren were activated at 03:06:16.

The squad arrived at 3:09:37 and took a position to the right (south) of PO Joseph MENSAH's vehicle. PO SALYERS parked his squad about half a car length to the west of PO MENSAH's squad. He arrived a few seconds behind PO MILLS who parked on the north side of PO MENSAH's vehicle.

(* The video depicted a similar viewpoint of PO MENSAH's squad video. That video was described in detail in Supplement report #22.)

03:10:02 - PO SALYERS appeared from the driver side of his squad armed with a patrol rifle.

03:10:17 - PO SALYERS - "Joe's (PO MENSAH), are we getting up on there on it or what?" PO MENSAH replied

| Report Officer | Printed At | |
|---|---|---|
| 010266/O'DAY, LUKE G | 07/25/2016 03:50 | Page 1 of 91 |

Case 2:21-cv-00848-LA Filed 08/22/23 Page 106 of 215 Document 91-9

# Incident Report
# MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

Supplement No
0031

that he wasn't. PO SALYERS asks another officer off (who was off screen), "Are we getting up there or what?" That officer replies, "When we get a third squad here we will go up on it."

03:10:40 - PO MILLS stacks up behind PO SALYERS with a handgun and PO MENSAH takes the third position as they make the decision to approach the vehicle.

03:10:41 - PO MENSAH can be heard stating, "The firearm is right next to him on the passenger seat."

03:10:44 - The three officers approach the driver front of the vehicle.

03:11:12 - The driver front door was opened by PO MILLS.

03:11:17 - One of the officers asked, "Where's the gun?" Another officer responds, "Passenger seat."

03:11:22 - An officer asks, "Do you want to go secure it?"

03:11:26 - PO MENSAH disengages and walks back toward the squads.

03:11:34 - An officer asks, "Is he still breathing?"

03:11:41 - One of the officers states, "Just go to the side and secure the gun, ok?" PO MILLS walks around the rear of the vehicle to the passenger front.

03:11:55 - "318. I have a 30 something year old male black. He is not breathing at this time."

03:12:02 - PO SALYERS asked PO MILLS, "Can you grab it or no?" "Put your glove on and grab it out of there."

03:12:08 - PO MILLS reached into the passenger front of the vehicle. "Got it." And returned to the driver side of the vehicle.

03:12:19 - PO MILLS asked, "Come with me? And I can secure the gun." Both officers disengage from the vehicle. PO MILLS left arm was fully extended down by his left side as if he was carrying something.

03:12:34 - PO MILLS changes the object to his right hand and asks, "Do you want me to clear it?" A third officer walks up and asked if the weapon was secured. PO SALYERS responded, "He scooped it up just to get it out of there."

03:13:02 - PO SALYERS stated, "Well, secure that." PO MILLS transfers the weapon back to his left hand. He appears to have some sort of a bag in his right hand (back is to the camera).

03:13:09 - The sound of a weapon being cleared can be heard. (PO SALYERS clearing the patrol rifle.)

03:13:19 - PO SALYRES approached PO MILLS after clearing his patrol rifle. PO MILLS began to ask if he should clear the weapon. PO SALYERS interrupts him to say he wants to check on the subject inside the vehicle; "I just want to make sure to see if I can do anything."

(03:13:45 - 03:13:56 - A handgun can be observed in PO MILLS' left hand.)

03:13:46 - A second police officer walks toward the vehicle to join PO SALYERS.

03:13:55 - PO SALYERS had returned to the vehicle to check on the status of the driver. He stated, "Nothing. He's got no pulse."

03:13:58 - PO SALYERS stated to Dispatch, "318. P & B." At the same time, PO MILLS walks away out of camera view to the northwest. Additionally, a police officer walks up to the vehicle with what appears to be some sort of a med kit.

03:14:04 - Dispatch - "10-4 318. Safe for fire engine?"

03:14:08 - PO SALYERS responded, "Affirmative."

03:14:45 - An officer asked if he was breathing at all. PO SALYERS responded, "No. There's nothing. There's ..."

| Report Officer | Printed At | |
|---|---|---|
| 010266/O'DAY, LUKE G | 03/25/2016 03:50 | |

# Incident Report
# MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

Supplement No
0031

## Supplement

03:14:54 – The officer asked if they should pull him out and start CPR.  PO SALYERS responded that, "He's got a pulse."

03:15:01 – One of the officers says to pull him out.

03:15:05 – One of the officer's calls out (unknown if to Dispatch) – "57E - He's got a pulse."  Pull him out, grab his head, watch his head."  The driver is then moved to the ground from the vehicle.  The officer directs PO SALYERS to notify Dispatch, which he does.

03:15:16 – Wauwatosa Fire Department arrives on scene, stopping to the south of the vehicle.

03:15:20 – Squad 370 – "370.  Mark this time now for Med making contact with subject."

I watched the remaining video.  There was nothing further of evidentiary value.

Case 2:21-cv-00848-LA   Filed 08/22/23   Page 108 of 215   Document 91-9

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

**161750037**
**DRAFT**

Supplement No
0032

Reported Date
07/21/2016
Nature of Call
OJINVEST
Officer
O'DAY, LUKE G

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 161750037 | 0032 | 07/21/2016 | | 04:11 | 161750406 |

| Status | Nature of Call | | | | | | |
|---|---|---|---|---|---|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) | | | | | | |

| Location | | | | City | | ZIP Code | Rep Dist |
|---|---|---|---|---|---|---|---|
| 9800 W GLENDALE AVE | | | | WAUWATOSA | | 53225 | 833 |

| District | Squad | From Date | From Time | Officer | | | |
|---|---|---|---|---|---|---|---|
| 4 | 430 | 06/23/2016 | 03:07 | 010266/O'DAY, LUKE G | | | |

| Assignment | | | Entered by | | | |
|---|---|---|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | | | 010266 | | | |

| Assignment | | | Confidential | Property? | Approving Officer | |
|---|---|---|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | | | HOMICIDE | None | | |

| Approval Date | | Approval Time | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |

| MISC INFO | | | | | | |
|---|---|---|---|---|---|---|
| OIS 2016-8 | | | | | | |

## Narrative
OIS 2016-8

## Modus Operandi

| Gang Act? | Gang Name |
|---|---|
| No | NONE |

## Supplement

This report is written by Det. Luke O'DAY assigned to Metropolitan Division, Homicide Unit (Late Shift).

This report details follow-up conducted regarding the Officer Involved Shooting (Wauwatosa PD) at Madison Park, 9800 W. Glendale Ave. (IR #16-175-0037).

On Thursday, July 21, 2016, I reviewed squad car video obtained from the Wauwatosa Police Department. It had been downloaded from Wauwatosa PO Bryan Wade's squad camera. I located the video in Mfile folder *Police Related*. Folder *OIS 08-2016Wauwatosa* was located inside. Through a series of folders, I located the player AVViewer. Through the viewer, I was able to access file *031447.av*.

The video was from 03:14:17 AM - 03:17:23 AM.

I made the following observations:

The numbers "P232@302" is depicted in the lower right corner of the camera video. The date "06/23/2016" and time "03:14:17" can be viewed underneath.

The video depicts the view from the front dashboard of the squad car. The audio begins at 03:14:48; the emergency lights are activated from the start of the video.

03:14:17 - The squad is traveling toward the scene.

03:15:10 - The squad arrives as the Wauwatosa Fire Department is also arriving. It follows the fire truck onto the scene.

03:15:18 - An officer calls out over the air, "... He's got a pulse."

03:15:24 - Squad 370 - "370. Mark this time now for Med making contact with subject."

03:15:35 - The squad parked on scene (to the south and west of PO MENSAH's). It appeared the driver of the vehicle was laying outside the vehicle with officers and medical attention around him. Neither PO MENSAH

| Report Officer | Printed At | |
|---|---|---|
| 010266/O'DAY, LUKE G | 07/25/2016 09:50 | Page 1 of 2 |

Case 2:21-cv-00848-LA   Filed 08/09/23   Page 109 of 215   Document 91-9

/.2

# Incident Report
## MILWAUKEE POLICE DEPT

161750037
DRAFT

Supplement No
0032

nor PO MILLS (with the firearm) were in view of the squad camera.

03:16:11 - PO WADE was assigned to stay with PO MENSAH by Sqd 370, Lt. GABRISH.

03:17:23 - The video ends.

Case 2:21-cv-00848-LA   Filed 08/22/23   Page 110 of 215   Document 91-9

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

**161750037**
**DRAFT**
Supplement No
0033
Reported Date
07/21/2016
Nature of Call
OJINVEST
Officer
O'DAY, LUKE G

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 161750037 | 0033 | 07/21/2016 | 06:10 | 161750406 |

| Status | Nature of Call | | | | | |
|---|---|---|---|---|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) | | | | | |

| Location | | | City | ZIP Code | Rep Dist |
|---|---|---|---|---|---|
| 9800 W GLENDALE AVE | | | WAUWATOSA | 53225 | 833 |

| District | Squad | From Date | From Time | Officer | |
|---|---|---|---|---|---|
| 4 | 430 | 06/23/2016 | 03:07 | 010266/O'DAY, LUKE G | |

| Assignment | Entered by | | |
|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | 010266 | | |

| Assignment | Confidential | Property? | Approving Officer |
|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | HOMICIDE | None | |

| Approval Date | Approval Time | | |
|---|---|---|---|
| | | | |

## Narrative

OIS 2016-8

## Modus Operandi

| Gang Act? | Gang Name |
|---|---|
| No | NONE |

## Supplement

This report is written by Det. Luke O'DAY assigned to Metropolitan Division, Homicide Unit (Late Shift).

This report details follow-up conducted regarding the Officer Involved Shooting (Wauwatosa PD) at Madison Park, 9800 W. Glendale Ave. (IR #16-175-0037).

On Thursday, July 21, 2016, I reviewed surveillance video obtained from the Wauwatosa Police Department. It had been downloaded from Madison Elementary School located at 9925 W. Glendale Ave. in Wauwatosa. It was delivered to MPD recorded on a Kingston 8GB flash drive. The content was downloaded to Mfile folder titled *Police Related*. Folder *OIS 08-2016Wauwatosa* was located inside. Through a series of folders, I located the player DS Media Player. Through the viewer, I was able to access file *Wauwatosa PD case 16-18370 Madison Elementary_.xpa.*

A supplement report filed by Wauwatosa Police Officer Joel KUTZ was delivered along with the flash drive. PO KUTZ, assigned as a School Resource Officer, authored a report regarding viewing the surveillance video.

I reviewed the video and found PO KUTZ's observations were accurately reported.

| Report Officer | Printed At | |
|---|---|---|
| 010266/O'DAY, LUKE G | 02/25/2016 03:50 | |

# Incident Report
# MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

2333 N. 49TH ST

Milwaukee,WI 53210

Reported Date
07/21/2016
Nature of Call
HOMICIDE
Officer
O'DAY, LUKE G

(414)935-7502

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 161750037 | 0034 | 07/21/2016 | 07:07 | 161750406 |

| Status | Nature of Call |
|---|---|
| REPORT TO FOLLOW | MURDER, MANSLGHTR/NEGL MANSLGHTR/JUST HOMI |

| Location | City | ZIP Code | Rep Dist |
|---|---|---|---|
| 9800 W GLENDALE AVE | WAUWATOSA | 53225 | 833 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 4 | 430 | 06/23/2016 | 03:07 | 010266/O'DAY, LUKE G |

| Assignment | Entered by |
|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | 010266 |

| Assignment | Confidential | Property? | Approving Officer |
|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | HOMICIDE | None | |

| Approval Date | Approval Time |
|---|---|
| | |

## Narrative

OIS 2016-8

## Modus Operandi

| Gang Act? | Gang Name |
|---|---|
| No | NONE |

## Supplement

This report is written by Det. Luke O'DAY assigned to Metropolitan Division, Homicide Unit (Late Shift).

This report details follow-up conducted regarding the Officer Involved Shooting (Wauwatosa PD) at Madison Park, 9800 W. Glendale Ave. (IR #16-175-0037).

Listed below is a timeline of highlights regarding this incident.

Timeline of OIS 2016-8:

01:37:00 - A vehicle matching ANDERSON's vehicle pulled into the lot. (Per school video)

03:01:10 - PO MENSAH's squad entered the park. (Per school video)

03:03:00 - PO MENSAH advised Dispatch of an occupied auto. (Per WPD CAD)

03:06:36 - PO MENSAH radioed, "305. Step it up. He has a gun." (Per MENSAH squad video)

03:07:15 - PO MENSAH discharged his firearm. (Per MENSAH squad video)

03:07:45 - PO MENSAH radioed, "305! Shots fired! Shots fired!" (Per WPD CAD)

03:11:55 - PO SALYERS advised Dispatch subject was not breathing. (Per MENSAH squad video)

03:12:26 - PO MILLS retrieved gun from passenger side of vehicle. (Per MENSAH quad video)

03:14:45 - PO SALYERS advised Dispatch driver had a pulse. (Per SALYERS squad video)

03:15:05 - Driver pulled from vehicle to render first aid. (Per SALYERS squad video)

| Report Officer | Printed At | |
|---|---|---|
| 010266/O'DAY, LUKE G | 07/25/2016 03:50 | Page 1 of 2 |

# Incident Report
## MILWAUKEE POLICE DEPT

161750037
DRAFT

Supplement No
0034

**Supplement**

03:15:16 - Wauwatosa FD arrived on scene. (Per SALYERS squad video)

Case 2:21-cv-00848-LA   Filed 08/22/23   Page 113 of 215   Document 91-9

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

**161750037**
**DRAFT**

Supplement No
0035

Reported Date
06/23/2016
Nature of Call
OJINVEST
Officer
PETROPOULOS,GUST P

## Administrative Information

| Agency | | | | | | |
|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | Incident No 161750037 | Supplement No 0035 | Reported Date 06/23/2016 | Reported Time 03:59 | CAD Call No 161750406 | |

| Status | Nature of Call | | | | |
|---|---|---|---|---|---|
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) | | | | |

| Location | | | | | |
|---|---|---|---|---|---|
| 8026 W MEDFORD AV | | City MILWAUKEE | Rep Dist 833 | District 4 | Squad 430 |

| Officer | Assignment |
|---|---|
| 007375/PETROPOULOS,GUST P | METROPOLITAN INVESTIGATIONS DIVISION |

| Entered by | Assignment | | |
|---|---|---|---|
| 007375 | METROPOLITAN INVESTIGATIONS DIVISION | Confidential HOMICIDE | Property? None |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| | | |

## Modus Operandi

Crime Code(s)
INVS

## Supplement

This report is submitted by Detective Gust Petropoulos assigned to the Homicide Unit.

On Thursday, July 21st, 2016 Lieutenant Joe McLin requested that I retrieve items from a vehicle being stored at the "X" building at the city tow lot and bring them to the office of Deputy District Attorney Kent Lovern. These items specifically were a child's car seat and a wallet. I made contact with Police Officer Jon Parker, who advised that a prior request had been made for these items and that they had been retrieved from the vehicle by Police Officer Joseph Anderer and placed aside the vehicle. I went to the city tow lot, obtained these items, and conveyed them to Mr. Lovern's office where I personally gave them to him.

end of report

| Report Officer | Printed At | |
|---|---|---|
| 007375/PETROPOULOS, GUST P | | |

# Incident Report
# MILWAUKEE POLICE DEPT

**161750037**
**DRAFT**

Supplement No
0036
Reported Date
07/25/2016
Nature of Call
OJINVEST
Officer
JOHNSON, NICHOLAS J

2333 N. 49TH ST

Milwaukee, WI 53210

(414) 935-7502

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 161750037 | 0036 | 07/25/2016 | 02:41 | 161750406 |
| Status | Nature of Call | | | | | |
| REPORT TO FOLLOW | OUTSIDE JURISDICTION INV (WI ACT 348 ONLY) | | | | | |

| Location | | | City | | ZIP Code | Rep Dist |
|---|---|---|---|---|---|---|
| 9800 W GLENDALE AVE | | | WAUWATOSA | | 53225 | 833 |

| District | Squad | From Date | From Time | Officer | | |
|---|---|---|---|---|---|---|
| 4 | 430 | 06/23/2016 | 03:07 | 016252/JOHNSON, NICHOLAS J | | |

| Assignment | Entered by |
|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | 016252 |

| Assignment | Confidential | Property? | Approving Officer |
|---|---|---|---|
| METROPOLITAN INVESTIGATIONS DIVISION | HOMICIDE | None | |

| Approval Date | Approval Time |
|---|---|
| | |

## Narrative

This report was written by <u>Detective Nicholas JOHNSON</u> assigned to the Metropolitan Investigations Division-Homicide Unit, Late Shift.

On June 24th, 2016 I compiled a Letter of Transmittal to the State of Wisconsin Crime Lab regarding analysis of evidence recovered regarding this investigation. Items sent out to the crime lab included the Glock 22 .40 caliber handgun that was recovered from <u>P.O. MENSAH</u>, 6 .40 caliber cartridge casings, 3 fired jacketed hollow point bullets and 4 lead fragments that were recovered over the course of the investigation.

On July 25th, 2016 I received a Confidential Report of Laboratory Findings from <u>Xai XIONG</u> who is a Fireamrs and Toolmark Examiner of the State of Wisconsin Regional Crime Lab that was dated July 8th, 2016. The case was assigned number R16-2393.

In the report it states that the 6 .40 caliber casings were fired from the Glock 22 .40 caliber handgun recovered from P.O. MENSAH. The report further stated that the 3 fired jacketed hollow point bullets were also fired from the Glock 22 .40 caliber handgun from P.O. MENSAH. The 4 lead fragments were not suitable for firearm identification comparison.

Also sent out and requested for analysis was the Ruger SR9C 9mm caliber handgun that was recovered from the vehicle that the deceased was located. The firearm was tested for functionality. The firearm was tested and found to be mechanically functional.

THIS CONCLUDES MY REPORT.

## Modus Operandi

| Gang Act? | Gang Name |
|---|---|
| No | NONE |

| Report Officer | Printed At | |
|---|---|---|
| 016252/JOHNSON, NICHOLAS J | 07/25/2016 03:15 | |



TENNIS COURTS

Basket Ball Courts

REFERENCE POINT

5 3 4 6
2
1 7 8

9

OIS 8-2016 (Wauwatosa Police) 16-175-6037
Occ. 6/23/16  3:07am  9800 W. Glendale Ave, Wauwatosa, WI
                                                        Madison Park

TO W. GLENDALE AVE

| Milwaukee Police Department | IN# 0161750037 | AC# 16022217 | *16022217 |
|---|---|---|---|

**PROPERTY CONTROL SECTION**

**OFFICER DROP RECEIPT**

| | INV | Lab # | Drop Off Time 06/23/2016 07:36:50 AM |
|---|---|---|---|

| RESPONSIBLE WORK **[95] - Metro Investigation Div** | Other# | | PAGE 1 |
|---|---|---|---|

| RESPONSIBLE OFFICER **[017783] - DET Matthew GADZALINSKI** | TYPE **EVID** |
|---|---|

SUBMITTING OFFICER
**[017783] - DET Matthew GADZALINSKI**

**CIRCUMSTANCES**

Evidence recovered from victim at Froedtert Hospital, during an officer involve shoooting, which occurred on 06-23-16, at 9800 W Glendale Av.

**PEOPLE**

| 1 | name Anderson, Jay L | address 8026 W Medford Av Milwaukee, WI 53225 | Relationship(s): Victim |
|---|---|---|---|
| | phone | date of birth 07/04/1990 | |

**ITEMS**

| itm no | qty | ACE generated description | dr | id | flags | user description |
|---|---|---|---|---|---|---|
| 1 | 1 | Y - Blue and white, Nike Air Jordan, size 10, *16022217___1 | | | ⚙ | Blue and white, Nike Air Jordan, size 10, tennis shoe. right foot, item #1 |
| 2 | 1 | Y - Blue and white, Nike Air Jordan, size 10, *16022217___2 | | | ⚙ | Blue and white, Nike Air Jordan, size 10, tennis shoe. left foot, item #2 |
| 3 | 1 | Y - Silver rope style necklace, broken, item #3 *16022217___3 | | | ⚙ | Silver rope style necklace, broken, item #3 |
| 4 | 1 | Y - Red and black, "Ralph Lauren" brand boxer *16022217___4 | ✓ | | ⚙ | Red and black, "Ralph Lauren" brand boxer shorts with deer emblem, cut, with blood staining, item #4 |
| 5 | 1 | Y - Blue and White striped, "Ralph Lauren" brand *16022217___5 | ✓ | | ⚙ | Blue and White striped, "Ralph Lauren" brand shirt, blood soaked, with possible bullet hole right shoulder/neck area, item #5 |
| 6 | 2 | Y - Black ankle style cotton socks, item #6 *16022217___6 | | | ⚙ | Black ankle style cotton socks, item #6 |

| Approval Copy | | TOTAL ITEMS 9 |
|---|---|---|

DROP APPROVAL REQUIRES SIGNATURE OF SOUTH INVESTIGATION DIV WORK LOCATION SUPERVISING

| Supervisor sign here: Print name here: LT Paul R KAVANAGH | PS# | Wrk Loc MP61238 91 | Approved |
|---|---|---|---|

| Milwaukee Police Department | IN# 0161750037 | AC# 16022217 | *16022217 |
|---|---|---|---|

PROPERTY CONTROL SECTION

**OFFICER DROP RECEIPT**

| | INV | Lab # | Drop Off Time 06/23/2016 07:36:50 AM |
|---|---|---|---|

| RESPONSIBLE WORK [95] - Metro Investigation Div | Other# | PAGE 2 |
|---|---|---|

| RESPONSIBLE OFFICER [017783] - DET Matthew GADZALINSKI | TYPE EVID |
|---|---|

SUBMITTING OFFICER
[017783] - DET Matthew GADZALINSKI

### ITEMS

| itm no | qty | ACE generated description | d r | i d | flags | user description |
|---|---|---|---|---|---|---|
| 7 | 1 | Y - "LEVIS" brand, kaki colored pants, size 36x30, *16022217__7 | ✓ | | ✿ | "LEVIS" brand, kaki colored pants, size 36x30, with brown leather belt (silver buckle), blood staining on pants |
| 8 | 1 | Y - Cousins loyalty card, recovered from left rear *16022217__8 | | | ✿ | Cousins loyalty card, recovered from left rear kaki pants pocket. For use at 11401 W Silver Spring Dr. Item # 8 |
| 9 | 1 | Y - Plastic sandwich bag which was original *16022217__9 | | ✓ | ✿ | Plastic sandwich bag which was original container for narcotics recovered in front right kaki pants pocket. |

| Approval Copy | TOTAL ITEMS 9 |
|---|---|

DROP APPROVAL REQUIRES SIGNATURE OF SOUTH INVESTIGATION DIV WORK LOCATION SUPERVISING

| | PS# | Wrk Loc | ☐ Approved |
|---|---|---|---|

Supervisor sign here:

Print name here LT Paul R KAVANAGH

Case 2:21-cv-00848-LA Filed 08/22/23 Page 118 of 215 Document 91-9

MP61238    91

| Milwaukee Police Department | IN# 0161750037 | AC# 16022224 | *16022224 |
| | | | |

**PROPERTY CONTROL SECTION**

**OFFICER DROP RECEIPT**

| INV | Lab # | Drop Off Time 06/23/2016 09:10:26 AM |

| RESPONSIBLE WORK | Other# | PAGE |
| [95] - Metro Investigation Div | | 1 |

| RESPONSIBLE OFFICER | TYPE |
| [017783] - DET Matthew GADZALINSKI | EVID |

SUBMITTING OFFICER
**[017783] - DET Matthew GADZALINSKI**

CIRCUMSTANCES

OFFICER INVOLVED SHOOTING

**Green plant like substance consistent with THC which was recovered from victim's pants pocket during shooting Investigation at Hospital, which occurred on 06-23-16, at 9800 W Glendale Ave.**

PEOPLE

| 1 | name Anderson, Jay L | address 8026 W Medford Av Milwaukee, WI 53225 | Relationship(s): Victim |
| | phone | date of birth 07/04/1990 | |

ITEMS

| itm no | qty | ACE generated description | d r | i d | flags | user description |
|---|---|---|---|---|---|---|
| 1 | 1 | NMARIJU - Green plant Material, contained in (1) *16022224__1 | | | ✪ | Green plant Material, contained in (1) paper fold. 1a) 2.43gr without original container EST GRAMS: 2.43 |

*Test  NARKII 05                    By  P.O. Behlen*

*Wgt   2.43gr                    wit.  Det. Gadzalinski*

| Approval Copy | | TOTAL ITEMS 1 |

26  DROP APPROVAL REQUIRES SIGNATURE OF SOUTH INVESTIGATION DIV WORK LOCATION SUPERVISING

| Supervisor sign here: | PS# MP61251 | Wrk Loc 91 | ☐ Approved |
| Print name here | LT Joseph C McLIN | | |

| Milwaukee Police Department | IN# 0161750037 | AC# 16022225 | *16022225 |
|---|---|---|---|
| PROPERTY CONTROL SECTION | INV | Lab # | |
| **OFFICER DROP RECEIPT** | | | Drop Off Time 06/23/2016 09:12:26 AM |

| RESPONSIBLE WORK **[95] - Metro Investigation Div** | Other# | PAGE 1 |
|---|---|---|
| RESPONSIBLE OFFICER **[010978] - DET Steven S JOHNSON** | TYPE **SAFE** | |
| SUBMITTING OFFICER **[010978] - DET Steven S JOHNSON** | | |

**CIRCUMSTANCES**

Listed US Currency recovered from suspect during OIS 2016-8 investigation at 9800 W. Glendale Av., Wauwatosa, WI. on 06-23-16.
No MPD Receipt for Property issued.

**PEOPLE**

| 1 | name Anderson, Jay L | address 8026 W. Medford Av. Milwaukee, Wi53218 | Relationship(s): Claimant |
|---|---|---|---|
| | phone (414)210-06067 | date of birth 07/04/1990 | |

**ITEMS**

| itm no | qty | ACE generated description | d r | i d | flags | user description |
|---|---|---|---|---|---|---|
| 1 | 1 | $FR - Money [$7.00] - money, US Currency: $1.00 *16022225__1 | | | | money, US Currency: $1.00 bill x 7, total value $7.00 DOLLAR AMT: $7.00 |
| 2 | 1 | $FR - Money [$60.00] - money, US Currency, *16022225__2 | | | | money, US Currency, $10.00 bill x 6, total value $60.00 DOLLAR AMT: $60.00 |
| 3 | 1 | $FR - Money [$620.00] - money, US Currency *16022225__3 | | | | money, US Currency $20.00 bill x 31, total value $620.00 DOLLAR AMT: $620.00 |
| 4 | 1 | $FR - Money [$50.00] - money, US Currency, *16022225__4 | | | | money, US Currency, $50.00 bill x 1, total value $50.00 DOLLAR AMT: $50.00 |
| 5 | 1 | $FR - Money [$100.00] - money, US Currency *16022225__5 | | | | money, US Currency $100.00 bill x 1, total value $100.00 DOLLAR AMT: $100.00 |

| **Approval Copy** | TOTAL MONEY RECEIVED $837.00 | TOTAL ITEMS 5 |
|---|---|---|

DROP APPROVAL REQUIRES SIGNATURE OF SOUTH INVESTIGATION DIV WORK LOCATION SUPERVISING

| Supervisor sign here: | PS# | Wrk Loc | Approved |
|---|---|---|---|
| Print name here: LT Joseph C McLIN | MP61251 | 91 | |

| Milwaukee Police Department | IN# | AC# | | | |
|---|---|---|---|---|---|
| PROPERTY CONTROL SECTION | 0161750037 | 16022225 | *16022225 | | |
| **OFFICER DROP RECEIPT** | INV | Lab # | | Drop Off Time | |
| | | | | 06/23/2016 09:12:26 AM | |

| RESPONSIBLE WORK | | Other# | PAGE |
|---|---|---|---|
| **[95] - Metro Investigation Div** | | | 2 |
| RESPONSIBLE OFFICER | | TYPE | |
| **[010978] - DET Steven S JOHNSON** | | **SAFE** | |
| SUBMITTING OFFICER | | | |
| **[010978] - DET Steven S JOHNSON** | | | |

### ITEMS

| itm no | qty | ACE generated description | d r | i d | flags | user description |
|---|---|---|---|---|---|---|
| | | | | | | |

| Approval Copy | TOTAL MONEY RECEIVED | TOTAL ITEMS |
|---|---|---|
| | $837.00 | 5 |

DROP APPROVAL REQUIRES SIGNATURE OF SOUTH INVESTIGATION DIV WORK LOCATION SUPERVISING

Supervisor sign here

PS#

Wrk Loc

☐ Approved

| Milwaukee Police Department<br>PROPERTY CONTROL SECTION<br><br>**OFFICER DROP RECEIPT** | IN#<br>0161750037 | AC#<br>16022226 | *16022226 |
|---|---|---|---|
| | INV | Lab # | Drop Off Time<br>06/23/2016 09:14:20 AM |

| RESPONSIBLE WORK<br>**[95] - Metro Investigation Div** | Other# | | PAGE<br>1 |
|---|---|---|---|
| RESPONSIBLE OFFICER<br>**[012439] - DET Troy PORTER** | | TYPE<br>EVID | |
| SUBMITTING OFFICER<br>**[012439] - DET Troy PORTER** | | | |

**CIRCUMSTANCES**

Listed items were recovered on 06/23/2016 while at 9800 W. Glandale Ave during an Officer Involved Shooting Incident involving Wauwatosa Police Department.

OIS 2016-8 / IR #16-175-0037
Date: 06/23/2016
Loc: 9800 W Glandale Ave

**PEOPLE**

| 1 | name<br>ANDERSON, Jay L | address<br>8026 W Medford Ave<br>Milwaukee, WI 53225 | Relationship(s): Victim |
|---|---|---|---|
| | phone | date of birth<br>07/04/1990 | |

**ITEMS**

| itm no | qty | ACE generated description | d r | i d | flags | user description |
|---|---|---|---|---|---|---|
| 1 | 1 | Y - Black Apple iPhone recovered from the front<br><br>*16022226___1 | | | | Black Apple iPhone recovered from the front left pants pocket of Jay ANDERSON |
| 2 | 1 | Y - Wisconsin Identification Card for Jay<br><br>*16022226___2 | | | | Wisconsin Identification Card for Jay ANDERSON that was recovered from his pants pocket. |

| Approval Copy | | TOTAL ITEMS<br>2 |
|---|---|---|

| DROP APPROVAL REQUIRES SIGNATURE OF SOUTH INVESTIGATION DIV WORK LOCATION SUPERVISING |
|---|

| Supervisor sign here | PS#<br>MP61238 | Wrk Loc<br>91 | Approved |
|---|---|---|---|
| LT Paul R KAVANAGH | | | |

| Milwaukee Police Department<br>PROPERTY CONTROL SECTION<br><br>**OFFICER DROP RECEIPT** | IN#<br>**0161750037** | AC#<br>**16022227** | **\*16022227** | |
|---|---|---|---|---|
| | INV | Lab # | Drop Off Time<br>**06/23/2016 09:16:58 AM** | |

| RESPONSIBLE WORK<br>**[95] - Metro Investigation Div** | | Other# | PAGE<br>**1** |
|---|---|---|---|
| RESPONSIBLE OFFICER<br>**[017783] - DET Matthew GADZALINSKI** | | TYPE<br>**EVID** | |
| SUBMITTING OFFICER<br>**[017783] - DET Matthew GADZALINSKI** | | | |

**CIRCUMSTANCES**

U.S. Coins recovered from subject, at Froedtert Hospital, 9200 W Wisconsin Ave, in regards to shooting investigation which occurred on 06-23-16, at 9800 W Glendale Ave.

**PEOPLE**

| 1 | name<br>Anderson, Jay L | address<br>8026 W Medford Av<br>Milwaukee, WI 53225 | Relationship(s): Victim |
|---|---|---|---|
| | phone | date of birth<br>07/04/1990 | |

**ITEMS**

| itm no | qty | ACE generated description | d r | i d | flags | user description |
|---|---|---|---|---|---|---|
| 1 | 1 | $ - Money [$0.51] - U.S. Coins<br><br>**\*16022227__1** | | | ⚙ | U.S. Coins<br><br>(2) US Quarters<br>(1) US Penny<br><br>Contained in Specimen Jar that Hospital staff placed them in from ANDERSON's person<br>DOLLAR AMT: $0.51 |

| *8 0* | Approval Copy | | TOTAL MONEY RECEIVED<br>$0.51 | TOTAL ITEMS<br>1 |
|---|---|---|---|---|

DROP APPROVAL REQUIRES SIGNATURE OF SOUTH INVESTIGATION DIV WORK LOCATION SUPERVISING

| Supervisor sign here | PS#<br>MP61251 | Wrk Loc<br>91 | ☐ Approved |
|---|---|---|---|

CDS 2016-8

| Milwaukee Police Department PROPERTY CONTROL SECTION *OFFICER DROP RECEIPT* | IN# 0161750037 | AC# 16022231 | *16022231 |
|---|---|---|---|
| | INV | Lab # | Drop Off Time 06/23/2016 09:38:38 AM |

| RESPONSIBLE WORK [95] - Metro Investigation Div | | Other# | PAGE 1 |
|---|---|---|---|

| RESPONSIBLE OFFICER [010978] - DET Steven S JOHNSON | TYPE FND |
|---|---|

SUBMITTING OFFICER
[010978] - DET Steven S JOHNSON

**CIRCUMSTANCES**

Listed marijuana recovered from OIS 2016-8 deceased suspect, Jay L. Anderson B/M 07-04-1990, at 9800 W. Glendale Av., Wauwatosa, Wi., on 06-23-16.
No Case
No MPD Receipt for Property Issued.

**ITEMS**

| itm no | qty | ACE generated description | d r | i d | flags | user description |
|---|---|---|---|---|---|---|
| 1 | 1 | NMARIJU - Green plant Material, with MPD *16022231__1 | | | | Green plant Material, with MPD paperfold, one (1) clear plastic sandwich bag EST GRAMS: 9.98 |

**Approval Copy**

TOTAL ITEMS
1

DROP APPROVAL REQUIRES SIGNATURE OF SOUTH INVESTIGATION DIV WORK LOCATION SUPERVISING

Supervisor sign here | PS# MP61251 | Wrk Loc 91 | Approved
LT Joseph C McLIN

Milwaukee Police Department
PROPERTY CONTROL SECTION

## *OFFICER DROP RECEIPT*

| IN# 0161750037 | AC# 16022232 | *16022232 |
|---|---|---|
| INV | Lab # | Drop Off Time 06/23/2016 09:53:08 AM |

| RESPONSIBLE WORK [95] - Metro Investigation Div | Other# | PAGE 1 |
|---|---|---|

| RESPONSIBLE OFFICER [010266] - DET LUKE G. O'DAY | TYPE EVID |
|---|---|

SUBMITTING OFFICER
[010266] - DET LUKE G. O'DAY

### CIRCUMSTANCES

Items recovered from Wauwatosa police officer regarding the Officer Involved Shooting that occurred on 6-23-16 at 9800 W. Glendale Ave. (OIS 2016-8)

### PEOPLE

| 1 | name Mensah, Joseph A | address 1700 N. 116th St. Wauwatosa PD | Relationship(s): Claimant |
|---|---|---|---|
| | phone (414) 471-8430 | date of birth | |

### ITEMS

| itm no | qty | ACE generated description | d r | i d | flags | user description |
|---|---|---|---|---|---|---|
| 1 | 10 | WF - Federal 40 S&W nickel plated brass unfired *16022232___1 | | ✓ | | Federal 40 S&W nickel plated brass unfired cartridges |
| 2 | 1 | WPI   GLC40 - Glock mod 22  .40cal semi-auto *16022232___2 | | ✓ | | Glock mod 22 .40cal semi-auto handgun with rubber grip, 15 round magazine, equiped with a TLR-1's Streamlight tactical flashlight. SER #: UFB860 Gun tag #75462 |
| 3 | 1 | Y - Wauwatosa PD 4-page CAD related to the call *16022232___3 | | | | Wauwatosa PD 4-page CAD related to the call at 9800 W. Glendale Ave. |

Approval Copy

| | TOTAL ITEMS 3 |
|---|---|

DROP APPROVAL REQUIRES SIGNATURE OF SOUTH INVESTIGATION DIV WORK LOCATION SUPERVISING

Supervisor sign here

| | PS# | Wrk Loc | Approved |
|---|---|---|---|
| | LT Paul B KAVANAGH | MP61238 | 91 |
| | | 91 | |

# CALL DETAILS FOR:    16.018370

| | |
|---|---|
| Reported Date: | 06/23/16 03:03:00 |
| Location: | 9800 W Glendale Av – Wauwatosa, WI, 53225 |
| CommonName: | Madison Park ; WPD |
| Cross Streets: | Between  No Thru Street  & N 100 St |
| Reported CFS: | SUS2 |
| Receive Source: | O - Officer Initiated |

| | |
|---|---|
| Initial Alarm Level: | / |
| Final Alarm Level: | / |

| | |
|---|---|
| Reported Time: | 06/23/16 03:03:00 |
| Stacked Time: | 06/23/16 03:03:00 |
| Dispatched Time: | 06/23/16 03:03:01 |
| On Scene Time: | 06/23/16 03:03:01 |
| Contained Time: | |
| Finished Time: | |

| | |
|---|---|
| RA #: | |
| X/Y Cords: | A/2 |
| District: | 2 |
| Prime Unit: | 305 |

# Unit Response Information

**104**

| DI | AC | OS |
|---|---|---|
| 5:43:12 | 5:43:53 | 5:51:19 |

**106**

| DI | AC | OS | EN |
|---|---|---|---|
| 5:14:24 | 5:16:40 | 5:20:49 | 6:11:41 |

**301**

| DI | AC | OS | EH | AH |
|---|---|---|---|---|
| 3:06:31 | 3:06:35 | 3:10:27 | 3:47:07 | 3:47:24 |

**302**

| DI | AC | OS |
|---|---|---|
| 3:06:31 | 3:14:31 | 3:14:34 |

**303**

| DI | AC | OS |
|---|---|---|
| 3:06:31 | 3:06:52 | 4:21:09 |

**304**

| DI | AC | OS |
|---|---|---|
| 3:06:31 | 3:06:36 | 3:09:05 |

**305**

| OI | PC |
|---|---|
| 3:03:01 | 3:03:44 |

**306**

| DI | AC | EH | AH |
|---|---|---|---|
| 3:06:31 | 3:09:51 | 3:47:07 | 3:47:24 |

**318**

| DI | AC | OS | EN |
|---|---|---|---|
| 3:03:09 | 3:04:24 | 4:21:09 | 6:15:19 |

**171**

| DI | EN |
|---|---|
| 4:19:22 | 4:19:25 |

**370**

| DI | OS |
|---|---|
| 3:08:23 | 3:13:07 |

**181**

| DI |
|---|
| 4:35:01 |

**133**

| DI | EN | OS |
|---|---|---|
| 5:01:21 | 5:01:27 | 5:06:53 |

**135**

| DI | EN |
|---|---|
| 6:03:36 | 6:03:41 |

**136**

| DI | EN | PU | DI |
|---|---|---|---|
| 4:32:59 | 4:33:04 | 4:34:06 | 5:19:37 |

**139**

| DI | EN |
|---|---|
| 4:34:16 | 4:34:21 |

**195**

| DI | OS | FI |
|---|---|---|
| 4:34:51 | 4:34:51 | 6:23:53 |

**165**

| DI | EN | OS |
|---|---|---|

# Comments

6/23/16 06:19:20      (SYS)
   Update reviewed by dispatcher- Wellman, Katie-6716

6/23/16 06:13:45                          Opr - 6716               Unit - 135
   106 w/ mpd for notification

6/23/16 06:11:27                          Opr - 6716               Unit - 135
   4520 n 110-attempting family notification w/ mpd

6/23/16 05:34:41                          Opr - 6716               Unit - 302
   fire back in quarters

6/23/16 05:25:25                          Opr - 6169

   DR ERTL ADVISED, WILL CANCEL SUMMER SCHOOL
6/23/16 05:10:57                          Opr - 6716               Unit - 302
   180-Command

6/23/16 05:07:59                          Opr - 6716               Unit - 302
   301-FMLH
   302-perimeter/ w/ 305
   303-East perimeter
   304-OS
   306-FMLH
   318-OS

6/23/16 04:29:44      (SYS)
   Update reviewed by dispatcher- Bradley, Katie A-6169

6/23/16 04:24:35                          Opr - 6169

   165 RESPONDING TO THE SCENE
6/23/16 04:10:53                          Opr - 6169

   MPD OS
6/23/16 03:53:32                          Opr - 6169

   181 RESPONDING
6/23/16 03:50:52      (SYS)
   Update reviewed by dispatcher- Wellman, Katie-6716

6/23/16 03:50:48                          Opr - 6716               Unit - 303
   180/sharpee enroute

6/23/16 03:42:44                          Opr - 6716               Unit - 305
   303-East perimeter

6/23/16 03:41:39                          Opr - 6716               Unit - 305
   COMM Post left of scene

6/23/16 03:36:56                          Opr - 6716               Unit - 305
   med unit leaving lot

6/23/16 03:29:00                          Opr - 6169

   MPD HOMICIDE DIV CONTACTED, RESPONDING
6/23/16 03:28:04                          Opr - 6716               Unit - 304
   vin/plate match

6/23/16 03:25:08                          Opr - 6716               Unit - 304
   305-os

6/23/16 03:25:02                          Opr - 6716               Unit - 304
   301-parking lot/following meds
   302-parking lot
   303-clearing bathrooms w/ mcso
   304-os
   306-ambulance/parking lot
   318-os

| | | |
|---|---|---|
| 6/23/16  03:20:31 | Opr - 6169 | |
| 170 ADVISED | | |
| 6/23/16  03:15:39 | Opr - 6716 | Unit - 304 |
| mcso enroute | | |
| 6/23/16  03:15:33 | Opr - 6169 | |
| MEDS PT | | |
| 6/23/16  03:15:08 | Opr - 6169 | |
| 370 - COMMAND | | |
| 6/23/16  03:14:13 | Opr - 6716 | Unit - 304 |
| subj pnb | | |
| 6/23/16  03:12:36 | Opr - 6716 | Unit - 304 |
| middle of parking lot, entrance of park | | |
| 6/23/16  03:12:17 | Opr - 6716 | Unit - 304 |
| 30 y/o m/b not breathing | | |
| 6/23/16  03:10:10 | Opr - 6716 | Unit - 304 |
| 305- is okay | | |
| 6/23/16  03:07:45 | Opr - 6716 | Unit - 304 |
| shots fired | | |
| 6/23/16  03:07:43 | Opr - 6716 | Unit - 304 |
| suspect down | | |
| 6/23/16  03:03:00 | Opr - 6169 | |
| OCC AUTO | | |

## Names

| Milwaukee Police Department | IN# 0161750037 | AC# 16022239 | *16022239 |
|---|---|---|---|
| PROPERTY CONTROL SECTION | INV | Lab # | |
| **OFFICER DROP RECEIPT** | | | Drop Off Time 06/23/2016 11:24:50 AM |

| RESPONSIBLE WORK **[95] - Metro Investigation Div** | Other# | PAGE 1 |
|---|---|---|
| RESPONSIBLE OFFICER **[010978] - DET Steven S JOHNSON** | TYPE EVID | |
| SUBMITTING OFFICER **[010978] - DET Steven S JOHNSON** | | |

**CIRCUMSTANCES**

Listed Consent To Search Authorization form, PF-3, signed by vehicle owner during OIS 2016-8 investigation. Incident occurred at 9800 W. Glendale Av. on 06-23-16.
No MPD Receipt for Property issued.

**ITEMS**

| itm no | qty | ACE generated description | d r | i d | flags | user description |
|---|---|---|---|---|---|---|
| 1 | 1 | Y - MPD Consent to Search Authorization form <br><br> *16022239__1 | | | | MPD Consent to Search Authorization form PF-3 signed by Olena De La Rosa for 2006 Nissan Altima, Wi plates 749-USD |

*81*

**Approval Copy**

| | TOTAL ITEMS 1 |
|---|---|

DROP APPROVAL REQUIRES SIGNATURE OF SOUTH INVESTIGATION DIV WORK LOCATION SUPERVISING

| Supervisor sign here: Print name here: LT Paul R KAVANAGH | PS# MP61238 | Wrk Loc 91 | ☐ Approved |
|---|---|---|---|

Form PF-3 06/14

# MILWAUKEE POLICE DEPARTMENT
## Consent to Search Authorization

 OPS 2016-8

I, _Olena DeLa Rosa_ DOB: _08·10·77_ acknowledge the following:

1. I am voluntarily, freely, and knowingly, without threats or promises, allowing a search of the below listed person, property and/or vehicle by police. I also have the right to end this search at any time after it has begun.

2. I am the legal owner of the below listed location and/or property or it is under my legal control.

3. I give the police officer(s) the authority to remove any contraband, stolen property or evidence of any other crime that is found during their search.

4. I have the constitutional right to refuse this consent search and I have the right to require the police officer(s) to obtain a search warrant before a search is made.

Signed: X _Olena DeLa Rosa_     Date: _06·22·16_     Time: _10:55_ AM/PM

## Consenter's Information

| Last, First MI | | Sex | Race | DOB |
|---|---|---|---|---|
| DeLa Rosa , Olena | | F | W | 08·10·73 |

| Street Address | City, State, Zip | Phone |
|---|---|---|
| 4520 N. 110th St | Wauwatosa, WI  53225 | (414) 394·9097 |

## Location(s) to be Searched

| Street Address | City, State, Zip |
|---|---|
| N/A | N/A |

| Other Descriptive Information or Scope of Search |
|---|
| N/A |

## Vehicle to be Searched

| Vehicle Make/Model | Year | Color | License # and/or VIN |
|---|---|---|---|
| Nissan Altima | 2006 | Black | 749·USD |

| Other Descriptive Information or Scope of Search |
|---|
| Vehicle, interior, trunk, |

## Property to be Searched

| Description of Property | Unlock Pattern: Draw with arrows from start point to end point: |
|---|---|
| N/A | |

| Other Descriptive Information or Scope of Search |
|---|
| N/A |

Cell Phones

My cell phone number, telephone number _N/a_ , PIN (unlock) code _N/a_

O O O
O O O
O O O

## Officer(s) Information

| Officer Name | Officer Signature | P.S. # | Work Loc. |
|---|---|---|---|
| Det. Johnson, Steven S | Johnny | 010978 | 95 |

| Officer Name | Officer Signature | P.S. # | Work Loc. |
|---|---|---|---|
| | | | |

## Check All That Apply:

☑ ID of Person Verified
☐ Consent Given, but Declined to Sign
☐ Audio or Video Recording of Consent Obtained

MPD CAD # (required) _16-175-0406_

MPD IR # (if applicable) _16·175-0037_

| Final Disposition: |
|---|
| ☐ Contraband Located/Seized. |
| ☐ No Contraband Located. |

Distribution: Original (See SOP 085 for routing)
Copy to Arrest/DA Package

Case 2:21-cv-00848-LA   Filed 08/22/23   Page 131 of 215   Document 49-4

# PROPERTY CONTROL
# *PROPERTY SHEET*

| | | | |
|---|---|---|---|
| 0161750037 | 16022240 | | |
| Lab #<br>R162393 | AC#<br>16022240 | | |

| TYPE | VALUE | PROPERTY | PAGE |
|---|---|---|---|
| Evidence | | JONCAS, Edward C Police | 1 |

| RESPONSIBLE WRK LOC | | DATE RECEIVED |
|---|---|---|
| Metro Investigation Div | | 06/24/2016 |

| RESPONSIBLE OFFICER | RANK | PS# | WRK |
|---|---|---|---|
| JOHNSON, NICHOLAS | Detective | MP70593 | Metro Investigation Div |

| SUBMITTING OFFICER | RANK | PS# | WRK |
|---|---|---|---|
| JOHNSON, NICHOLAS | Detective | MP70593 | Metro Investigation Div |

| SIGNATURE SUBMITTING OFFICER | DATE PREPARED |
|---|---|
| | 06/23/2016 |

## CIRCUMSTANCES

Items recovered from the scene investigation of Officer Involved Shooting located at 9800 W. Glendale Ave. (Madison Park), Wauwatosa, WI 53225. Incident occurred on 06/23/2016 at 3:07am.

OIS 8-2016

| ITEM | QTY | SERIAL # | ITEM DESCRIPTION | $ | STATUS | Delay Months |
|---|---|---|---|---|---|---|
| 1 | 1 | | Silver .40 caliber Federal S & W Casing<br>PRJ: Casing | | XOOT | |
| 2 | 1 | | Silver .40 caliber Federal S & W Casing<br>PRJ: Casing | | XOOT | |
| 3 | 1 | | Silver .40 caliber Federal S& W Casing<br>PRJ: Casing | | XOOT | |
| 4 | 1 | | Silver .40 caliber Federal S & W Casing<br>PRJ: Casing | | XOOT | |
| 5 | 1 | | Silver .40 caliber Federal S & W Casing<br>PRJ: Casing | | XOOT | |
| 6 | 1 | | Silver .40 caliber Federal S & W Casing<br>PRJ: Casing | | XOOT | |
| 7 | 1 | | White towel with blood stains | | HOLD | |
| 8 | 1 | | Gold and Diamond praying hands pendent/charm | | HOLD | |
| 9 | 1 | | Deformed copper jacketed projectile<br>PRJ: Bullet | | XOOT | |
| 10 | 1 | G1507283030968 | White "Blu" brand touchscreen cell phone | | HOLD | |
| 11 | 1 | 334-60459 | Semi-Automatic Pistol--9mm Ruger SR9c handgun with Silver slide and black handle with a 17 shot capacity magazine<br>Rcv Dst: 0<br>Tag No: 75495 | | XOOT | |
| 12 | 7 | | 9mm Luger CBC copper jacketing unfired cartridges<br>PRJ: Cartridge - unfired | | HOLD | |

Case 2:21-cv-00848-LA   Filed 08/22/23   Page 132 of 215   Document 91-9

**PROPERTY CONTROL**

**PROPERTY SHEET**

| | | 0161750037 | 16022240 | |
|---|---|---|---|---|
| | | Lab # R162393 | AC# 16022240 | |

| TYPE Evidence | VALUE | PROPERTY JONCAS, Edward C Police | PAGE 2 |
|---|---|---|---|

| RESPONSIBLE WRK LOC Metro Investigation Div | | DATE RECEIVED 06/24/2016 |
|---|---|---|

| RESPONSIBLE OFFICER OHNSON, NICHOLAS | RANK Detective | PS# MP70593 | WRK Metro Investigation Div |
|---|---|---|---|
| SUBMITTING OFFICER OHNSON, NICHOLAS | RANK Detective | PS# MP70593 | WRK Metro Investigation Div |

| SIGNATURE SUBMITTING OFFICER | DATE PREPARED 06/23/2016 |
|---|---|

| ITEM | QTY | SERIAL # | ITEM DESCRIPTION | $ | STATUS | Delay Months |
|---|---|---|---|---|---|---|
| 13 | 5 | | 9mm Luger RP copper jacketed unfired cartridges PRJ: Cartridge - unfired | | HOLD | |
| 14 | 5 | | 9mm Aguila Copper jacketed unfired cartridges PRJ: Cartridge - unfired | | HOLD | |
| 15 | 1 | | DVD containing crime scene footage | | HOLD | |

- NO ITEMS FOLLOW -

90

Message From Terminal/Unit:  TIME    Operator:  TIME
Date/Time Sent:  23-JUN-2016 11:16:03
/0368 B563 G840                    WIMPD0000 NCIC    258317       2 06/23/16 11
:16 01 OF 01 1L01B56300258317
WIMPD0000

NO RECORD SER-OAN/G1507283030968 TYP/YOTHER

PF-11 Rev. 5/2000

# MILWAUKEE POLICE DEPARTMENT
## FIREARM REPORT

*OIS 8-2016*

The below described firearm has come to the attention of the Milwaukee Police Department for one of the following reasons:

- ☐ ABANDONED
- ☐ ARREST
- ☐ HOMICIDE
- ☐ DOMESTIC TROUBLE
- ☐ INJURED PERSON
- ☐ REGISTRATION
- ☐ SUDDEN DEATH
- ☐ SUICIDE & ATTEMPT
- ☒ OTHER *OFFICER INVOLVED*

**REPORTS**

INVENTORY NO. *16088840*

OFFENSE REPORT NO. *16-175-0037*

MURDER FILE NO:

ATTEMPT SUICIDE / INJURED PERSON NO. IS-

SUICIDE / SUDDEN DEATH NO. SD-

OTHER REPORT NO.s *OIS 8-2016*

**PRISONER**

| Last Name | | First | | | M.I. | Sex | Race | Date of Birth |
|---|---|---|---|---|---|---|---|---|
| Address | | City | | | Zip Code | | Place of Birth | |
| Phone: | | Employer: | | | Business Phone: | | | |
| Height | Weight | Hair | Eyes | B of I No. | CIB No. | | FBI No. | |
| Date of Arrest | | Location of Arrest | | | Charge | | | |

## ASSOCIATES / SUSPECTS

| | Last Name | First | M.I. | Sex | Race | Date of Birth |
|---|---|---|---|---|---|---|
| 1 | *ANDERSON* | *IAN* | *L* | *M* | *B* | *7-4-90* |
| | Address *8026 W. Melford Ave* | City *Milwaukee* | Zip Code *53225* | | Place of Birth | |
| 2 | Last Name | First | M.I. | Sex | Race | Date of Birth |
| | Address | City | Zip Code | | Place of Birth | |
| 3 | Last Name | First | M.I. | Sex | Race | Date of Birth |
| | Address | City | Zip Code | | Place of Birth | |
| 4 | Last Name | First | M.I. | Sex | Race | Date of Birth |
| | Address | City | Zip Code | | Place of Birth | |
| 5 | Last Name | First | M.I. | Sex | Race | Date of Birth |
| | Address | City | Zip Code | | Place of Birth | |

**GUN OBTAINED FROM:** ☐ Prisoner ☐ Citizen ☒ Other: *RECOVERED @ SCENE*

| Last Name | First | M.I. | Sex | Race | Date of Birth |
|---|---|---|---|---|---|
| Address | City | | Zip Code | | Phone |

*92*

PER STATE STATUTE NO. 968.18

A receipt must be given to the person from whose possession the property is taken. Said

| Recovery Date: 6-23-16 | Recovery Time: 3:08 AM | Recovery Address: 9800 W. Glendale Ave | City: Wauwatosa | Zip Code: 53225 |
|---|---|---|---|---|

| Vehicle Information: | Make: Nissan | Model: Altima 2.5 S | Year: 2006 | License Plate No.: 749-USN |
|---|---|---|---|---|

**TYPE OF DRUGS RECOVERED:**     **QUANTITY:**

**Circumstances: THIS REPORT IS WRITTEN BY:** Det. Nicholas Johnson PO 6-23-16 at 3:03 AM, Wauwatosa P.O. Joseph Mensah was conducting a Park Check at Madison Park 9800 W. Glendale Ave He observed the subject Jay L. Anderson (B/M 7-4-90) in the front driver seat of the above listed vehicle. Anderson was by himself and in the front driver seat P.O. Mensah attempted to do a vehicle contact and observed a handgun on the front passenger seat of the vehicle. P.O. Mensah observed Anderson reach for the gun and fearing for his safety he shot at Anderson striking him multiple times. Anderson died as a result of his injuries

**Officer:** Det. Nick Johnson / Joseph Mensah    **Payroll No.:** 000258    **Dist/Bureau:** Wauwatosa    **Date:** 6-23-16

**TYPE FIREARM**

- [ ] DERRINGER
- [x] PISTOL
- [ ] RIFLE-SHOTGUN COMBO
- [ ] RIFLE
- [ ] SHOTGUN
- [ ] SUBMACHINE GUN
- [ ] OTHER _____

- [ ] AUTOMATIC
- [ ] PUMP ACTION
- [ ] SIDE BY SIDE
- [ ] OVER / UNDER
- [ ] OTHER _____

- [ ] BLANK
- [x] SEMI-AUTO
- [ ] REVOLVER
- [ ] FLINTLOCK

- [ ] SINGLE SHOT
- [ ] PERCUSSION
- [ ] LEVER ACTION
- [ ] BOLT

**MANUFACTURER** Ruger    **MODEL** SR9c    **CALIBER** 9mm    **BARREL LENGTH** _____    **SHOT CAPACITY** 17

**SERIAL #:** YES 334-60459    NONE _____    OBLITERATED OR ALTERED _____

**FINISH** Silver over black    **IMPORTER** Sturm Ruger    **IMPORTER/CITY/STATE** Prescott AZ U.S.A

**M.P.D. SEAL #** 75495    **OTHER MARKINGS** _____    **COUNTRY OF ORIGIN** U.S.A

**CHECKED AT DIST./BUR. FOR STOLEN:** LOCALLY Yes   NCIC Yes   STOLEN: YES / NO

(When submitting the firearm paperwork, please include any other documents pertaining to hits, etc.)

**REVIEWED AT DIST/BUR BY:** Paul Kiralton    **RANK** Lt    **DATE** 6/23/16

### FOR GUN DESK USE ONLY

| Owner's Last Name | First | M.I. | Sex | Race | Date of Birth |
|---|---|---|---|---|---|
| | | | | | |

| Address | City | | Zip Code | Phone |
|---|---|---|---|---|
| | | | | |

Certifies that he/she:
1. Has not been convicted of a felony.
2. Has not been dishonorably discharged from the Armed Forces
3. Has not been adjudged mentally incompetent.
4. Has not renounced his/her U.S. citizenship.
5. Is not an illegal alien in the U.S.

9.3

Signed:    Date:

Message From Terminal/Unit: TIME     Operator: TIME
Date/Time Sent:  23-JUN-2016 11:15:30
/0386 B563 G840                    WIMPD0000 NCIC    258067      1 06/23/16 11
:15 01 OF 01 1L01B56300258067
WIMPD0000

NO RECORD SER/33460459

OIS 8- 2016

| Milwaukee Police Department | IN# | AC# | *16022241 |
|---|---|---|---|
| PROPERTY CONTROL SECTION | 0161750037 | 16022241 | |

**OFFICER DROP RECEIPT**

| INV | Lab # | Drop Off Time |
|---|---|---|
| | | 06/23/2016 11:29:44 AM |

| RESPONSIBLE WORK | Other# | PAGE |
|---|---|---|
| **[95] - Metro Investigation Div** | | 1 |

| RESPONSIBLE OFFICER | TYPE |
|---|---|
| **[016252] - DET NICHOLAS JOHNSON** | SAFE |

SUBMITTING OFFICER
**[016252] - DET NICHOLAS JOHNSON**

**CIRCUMSTANCES**

Money recovered from the vehicle involved in an officer involved shooting that occurred on 06/23/2016 at 9800 W. Glendale Ave., Wauwatosa WI

OIS 8-2016

**ITEMS**

| itm no | qty | ACE generated description | d r | i d | flags | user description |
|---|---|---|---|---|---|---|
| 1 | 1 | $FR - Money [$5.00] - money-$5.00 bill  *16022241   1 | | | | money-$5.00 bill DOLLAR AMT: $5.00 |
| 2 | 1 | $FR - Money [$3.00] - money 3 x $1.00 bills  *16022241   2 | | | | money 3 x $1.00 bills DOLLAR AMT: $3.00 |

| | Approval Copy | TOTAL MONEY RECEIVED | TOTAL ITEMS |
|---|---|---|---|
| 95 | | $8.00 | 2 |

DROP APPROVAL REQUIRES SIGNATURE OF SOUTH INVESTIGATION DIV WORK LOCATION SUPERVISING

| | PS# | Wrk Loc | |
|---|---|---|---|
| Supervisor sign here: | | | Approved |
| Print name here LT Paul R KAVANAGH | MP61238 | 91 | |

Case 2:21-cv-00848-LA   Filed 08/22/23   Page 138 of 215   Document 49-9

# PROPERTY CONTROL
# PROPERTY SHEET

| | | 0161750037 | 16022245 | |
|---|---|---|---|---|
| | | Lab # | AC#<br>16022245 | |

| TYPE<br>Evidence | VALUE | PROPERTY<br>JONCAS, Edward C Police | | PAGE<br>1 |
|---|---|---|---|---|

| RESPONSIBLE WRK LOC<br>Metro Investigation Div | | DATE RECEIVED<br>06/24/2016 |
|---|---|---|

| RESPONSIBLE OFFICER<br>HADZALINSKI, Matthew | | RANK<br>Detective | PS#<br>MP72262 | WRK<br>Metro Investigation Div |
|---|---|---|---|---|
| SUBMITTING OFFICER<br>HEYTSMAN, DAWN E | | RANK<br>Forensic | PS#<br>MP60815 | WRK<br>invest Manage Div - D |

| SIGNATURE SUBMITTING OFFICER | DATE PREPARED<br>06/23/2016 |
|---|---|

VICTIM(s)

| LAST NAME<br>Anderson | FIRST NAME<br>Jay | MI<br>L | DATE OF BIRTH<br>07/04/1990 | |
|---|---|---|---|---|
| STREET ADDRESS<br>9044 W. Congress St #10<br>Milwaukee, WI 53225 | | | | |

CIRCUMSTANCES

THIS OCCURRED ON 06/23/2016 AT 9800 W GLENDALE AVE (WAUWATOSA)

| ITEM | QTY | SERIAL # | ITEM DESCRIPTION | $ | STATUS | Delay Months |
|---|---|---|---|---|---|---|
| 1 | 2 | | 1-POSS DNA SAMPLE FROM EDGES OF CLEAR FOLD TOP BAGGIE<br>ITEM 1 16022217 | | HOLD | |

- NO ITEMS FOLLOW -

96

| | | | |
|---|---|---|---|
| Milwaukee Police Department | IN# 0161750037 | AC# 16022260 | *16022260 |
| PROPERTY CONTROL SECTION | | | |
| **OFFICER DROP RECEIPT** | INV | Lab # | Drop Off Time 06/23/2016 01:44:25 PM |

| RESPONSIBLE WORK | | |
|---|---|---|
| **[95] - Metro Investigation Div** | Other# | PAGE 1 |

| RESPONSIBLE OFFICER | |
|---|---|
| **[010266] - DET LUKE G. O'DAY** | TYPE **EVID** |

SUBMITTING OFFICER
**[004609] - PSS Michael R BRAUNREITER**

**CIRCUMSTANCES**

Items of evidence recovered during the autopsy procedure, WAUWATOSA POLICE OFFICER SHOOTING occurred on 06/23/2016 at 9800 W. Glendale Ave., Wauwatosa WI.

**PEOPLE**

| | name Anderson, Jay | address 10044 W.Congress St. #10 Milwaukee, WI. 53225 | Relationship(s): Victim |
|---|---|---|---|
| 1 | phone | date of birth 07/04/1990 | |

**ITEMS**

| itm no | qty | ACE generated description | d r | i d | flags | user description |
|---|---|---|---|---|---|---|
| 1 | 1 | Y - Victim's dried blood stain/standard. *16022260 __1 | | | Ⓟ | Victim's dried blood stain/standard. |
| 2 | 1 | WF - Five (5) grain of bullet fragments recovered *16022260 __2 | | | | Five (5) grain of bullet fragments recovered from the victim's hair. |
| 3 | 1 | WF - 162 grain deformed copper jacketed bullet *16022260 __3 | | | | 162 grain deformed copper jacketed bullet recovered from the back of the victim's neck. |
| 4 | 1 | WF - 182 grain deformed copper jacketed bullet *16022260 __4 | | | | 182 grain deformed copper jacketed bullet recovered from the victim's upper left side of back. |
| 5 | 1 | Y - Pubic hair pulled from the victim. *16022260 __5 | | | Ⓟ | Pubic hair pulled from the victim. |
| 6 | 1 | Y - Victim's right fingernail clippings. *16022260 __6 | | | Ⓟ | Victim's right fingernail clippings. |
| 7 | 1 | Y - Victim's left fingernail clippings with clipper. *16022260 __7 | | | Ⓟ | Victim's left fingernail clippings with clipper. |

| | Approval Copy | | TOTAL ITEMS 9 |
|---|---|---|---|

DROP APPROVAL REQUIRES SIGNATURE OF SOUTH INVESTIGATION DIV WORK LOCATION SUPERVISING

| Supervisor sign here: | | PS# | Wrk Loc | Approved |
|---|---|---|---|---|
| Print name here | LT Paul R KAVANAGH | MP61238 | 91 | |

Case 2:21-cv-00848-LA Filed 08/22/23 Page 140 of 215 Document 91-9

| Milwaukee Police Department | IN#<br>0161750037 | AC#<br>16022260 | *16022260 |
|---|---|---|---|
| PROPERTY CONTROL SECTION | INV | Lab # | |
| **OFFICER DROP RECEIPT** | | | Drop Off Time<br>06/23/2016 01:44:25 PM |

| RESPONSIBLE WORK<br>**[95] - Metro Investigation Div** | Other# | PAGE<br>**2** |
|---|---|---|
| RESPONSIBLE OFFICER<br>**[010266] - DET LUKE G. O'DAY** | TYPE<br>**EVID** | |
| SUBMITTING OFFICER<br>**[004609] - PSS Michael  R BRAUNREITER** | | |

**ITEMS**

| itm<br>no | qty | ACE generated description | d<br>r | i<br>d | flags | user description |
|---|---|---|---|---|---|---|
| 8 | 1 | Y - Brown paper bag used to protect the victim's<br><br>*16022260___8 | | | Y | Brown paper bag used to protect the victim's right hand. |
| 9 | 1 | Y - Brown paper bag used to protect the victim's<br><br>*16022260___9 | | | Y | Brown paper bag used to protect the victim's left hand. |

| *g̶g̶* Approval Copy | | TOTAL ITEMS<br>**9** |
|---|---|---|

DROP APPROVAL REQUIRES SIGNATURE OF SOUTH INVESTIGATION DIV WORK LOCATION SUPERVISING

| Supervisor sign here | PS#<br>MP61238 | Wrk Loc<br>91 | Approved |
|---|---|---|---|
| Print name here      L T Paul R KAVANAGH | | | |

Case 2:21-cv-00848-LA   Filed 08/22/23   Page 141 of 215   Document 91-9

Milwaukee Police Department

# PROPERTY CONTROL
# *PROPERTY SHEET*

| | | 0161750037 | 16022269 | |
|---|---|---|---|---|
| | | Lab # R162393 | AC# 16022269 | |

| TYPE Evidence | VALUE | PROPERTY JONCAS, Edward C Police | | PAGE 1 |
|---|---|---|---|---|

| RESPONSIBLE WRK LOC Metro Investigation Div | | | DATE RECEIVED 06/24/2016 |
|---|---|---|---|

| RESPONSIBLE OFFICER JOHNSON, NICHOLAS | | RANK Detective | PS# MP70593 | WRK Metro Investigation Div |
|---|---|---|---|---|
| SUBMITTING OFFICER ST. CLAIR, Chet | | RANK Forensic | PS# MP71063 | WRK Invest Manage Div - D |

| SIGNATURE SUBMITTING OFFICER | DATE PREPARED 06/23/2016 |
|---|---|

## CIRCUMSTANCES

Recovered for Wauwatosa PD officer-involved shooting - occurred 06-23-2016 @ 9800 W Glendale Ave.

| ITEM | QTY | SERIAL # | ITEM DESCRIPTION | $ | STATUS | Delay Months |
|---|---|---|---|---|---|---|
| 1 | 2 | | Cotton swabs - possible DNA evidence from the grip and trigger area of a black and silver Ruger 9mm pistol, S/N 334-60459 (16022240 #11) | | XOOT | |
| 2 | 2 | | Cotton swabs - possible DNA evidence from the slide of a Ruger 9mm pistol, S/N 334-60459 (16022240 #11) | | XOOT | |
| 3 | 2 | | Cotton swabs - possible DNA evidence from the barrel of a Ruger 9mm pistol, S/N 334-60459 (16022240 #11) | | XOOT | |
| 4 | 2 | | Cotton swabs - possible DNA evidence from the magazine from a Ruger 9mm pistol (16022240 #11) | | XOOT | |

- NO ITEMS FOLLOW -

99

Milwaukee Police Department

# PROPERTY CONTROL
## PROPERTY SHEET

| TYPE | VALUE | PROPERTY | | | | | PAGE |
|---|---|---|---|---|---|---|---|
| Evidence | | JONCAS, Edward C Police | | | | | 1 |

Lab #

AC# 16022273

0161750037    16022273

| RESPONSIBLE WRK LOC | DATE RECEIVED |
|---|---|
| Metro Investigation Div | 06/24/2016 |

| RESPONSIBLE OFFICER | RANK | PS# | WRK |
|---|---|---|---|
| O'DAY, LUKE G. | Detective | MP64290 | Metro Investigation Div |

| SUBMITTING OFFICER | RANK | PS# | WRK |
|---|---|---|---|
| ST. CLAIR, Chet | Forensic | MP71063 | Invest Manage Div - D |

| SIGNATURE SUBMITTING OFFICER | DATE PREPARED |
|---|---|
| | 06/23/2016 |

Victim(s)

| LAST NAME | FIRST NAME | MI | DATE OF BIRTH | |
|---|---|---|---|---|
| Mensah | Joseph | A | | |

| STREET ADDRESS |
|---|
| 1700 N 116th St. |
| Wauwatosa, WI |

CIRCUMSTANCES

Recovered for Wauwatosa PD officer-involved shooting - occurred 06-23-2016 @ 9800 W Glendale Ave.

| ITEM | QTY | SERIAL # | ITEM DESCRIPTION | $ | STATUS | Delay Months |
|---|---|---|---|---|---|---|
| 1 | 2 | | Cotton swabs - possible DNA evidence from the grip and trigger area of a black Glock .40 pistol, S/N UFB860 (16022232 #2) | | HOLD | |
| 2 | 2 | | Cotton swabs - possible DNA evidence from the slide of a Glock .40 pistol, S/N UFB860 (16022232 #2) | | HOLD | |
| 3 | 2 | | Cotton swabs - possible DNA evidence from the barrel of a Glock .40 pistol, S/N UFB860 (16022232 #2) | | HOLD | |
| 4 | 2 | | Cotton swabs - possible DNA evidence from the magazine from a Glock .40 pistol (16022232 #2) | | HOLD | |
| 5 | 2 | | Cotton swabs - possible DNA evidence from ten unfired .40 cartridges (16022232 #1) | | HOLD | |
| | | | - NO ITEMS FOLLOW - | | | |

I Ø D

Milwaukee Police Department

# PROPERTY CONTROL
## PROPERTY SHEET

| | | 0161750037 | 16022722 | |||
|---|---|---|---|---|---|---|
| | | Lab # | AC# 16022722 | |||

| TYPE | VALUE | PROPERTY | | PAGE |
|---|---|---|---|---|
| Evidence | | RADTKE, CARRIE R Police | | 1 |

| RESPONSIBLE WRK LOC | | | | DATE RECEIVED |
|---|---|---|---|---|
| Metro Investigation Div | | | | 06/27/2016 |

| RESPONSIBLE OFFICER | | RANK | PS# | WRK |
|---|---|---|---|---|
| O'DAY, LUKE G. | | Detective | MP64290 | Metro Investigation Div |

| SUBMITTING OFFICER | | RANK | PS# | WRK |
|---|---|---|---|---|
| O'DAY, LUKE G. | | Detective | MP64290 | Metro Investigation Div |

| SIGNATURE SUBMITTING OFFICER | DATE PREPARED |
|---|---|
| | 06/27/2016 |

Victim(s)

| LAST NAME | FIRST NAME | MI | DATE OF BIRTH | |
|---|---|---|---|---|
| Mensah | Joseph | A | | |

| STREET ADDRESS |
|---|
| 2700 N 116th St. |
| Wauwatosa, WI |

CIRCUMSTANCES

sqd video recovered during the OIS 2016-8 that occurred on 6-23-16 at 9800 W. Glendale St.

| ITEM | QTY | SERIAL # | ITEM DESCRIPTION | $ | STATUS | Delay Months |
|---|---|---|---|---|---|---|
| 1 | 2 | | plastic zip tie containg two flash drives: 1 - sqd cam video / radio traffic 2 - Madison school surveillance video | | HOLD | |

- NO ITEMS FOLLOW -

Milwaukee Police Department

# PROPERTY CONTROL
# *PROPERTY SHEET*

| | | | |
|---|---|---|---|
| 0161750037 | 16022960 | ‖‖‖‖‖‖‖‖‖‖ | |
| Lab # | AC# 16022960 | ‖‖‖‖‖‖‖‖‖‖ | |

| TYPE | VALUE | PROPERTY | | PAGE |
|---|---|---|---|---|
| Evidence | | HOYT, Steven P. Police Officer ‖‖‖‖‖‖‖‖‖‖ | | 1 |

| RESPONSIBLE WRK LOC | | |
|---|---|---|
| Metro Investigation Div ‖‖‖‖‖‖ | DATE RECEIVED 06/29/2016 | |

| RESPONSIBLE OFFICER | RANK | PS# | WRK |
|---|---|---|---|
| VILLARREAL, ERIK K ‖‖‖‖‖‖‖‖ | Detective | MP59092 | Metro Investigation Div |

| SUBMITTING OFFICER | RANK | PS# | WRK |
|---|---|---|---|
| ANFIL, Yvette P. ‖‖‖‖‖‖‖‖ | Forensic | MP64256 | invest Manage Div - D |

| SIGNATURE SUBMITTING OFFICER | |
|---|---|
| | DATE PREPARED 06/28/2016 |

Victim(s)

| LAST NAME | FIRST NAME | MI | DATE OF BIRTH | |
|---|---|---|---|---|
| ANDERSON | Jay | L | 07/04/1990 | ‖‖‖‖‖‖‖‖‖‖ |

| STREET ADDRESS | |
|---|---|
| 9026 W Medford Ave Milwaukee, WI 53225 | |

CIRCUMSTANCES

Sample taken from auto involved in a homicide investigation occ 9800 w glendale on 6/23/16

| ITEM | QTY | SERIAL # | ITEM DESCRIPTION | $ | STATUS | Delay Months |
|---|---|---|---|---|---|---|
| 1 | 2 | | blood from drivers seat of auto | | HOLD | |

- NO ITEMS FOLLOW -

SIGNATURE RECEIVING PROPERTY OFFICER | DATE RECEIVED | TOTAL MONEY RECEIVED | TOTAL ITEMS

| Milwaukee Police Department PROPERTY CONTROL SECTION **OFFICER DROP RECEIPT** | IN# 0161750037 | AC# 16022963 | *16022963 |
|---|---|---|---|
| | INV | Lab # | Drop Off Time 06/28/2016 02:57:22 PM |

| RESPONSIBLE WORK [95] - Metro Investigation Div | | Other# | PAGE 1 |
|---|---|---|---|
| RESPONSIBLE OFFICER [007038] - DET ERIK K VILLARREAL | COPY | TYPE EVID | |
| SUBMITTING OFFICER [007038] - DET ERIK K VILLARREAL | | | |

**CIRCUMSTANCES**

Evidence recovered regarding OIS #8 of 2016, processing suspect vehicle on June 28, 2016, at the tow lot.

**PEOPLE**

| 1 | name ANDERSON, Jay L | address 8026 W Medford Ave Milwaukee, WI 53225 | Relationship(s): Victim |
|---|---|---|---|
| | phone | date of birth 07/04/1990 | |

**ITEMS**

| itm no | qty | ACE generated description | d r | i d | flags | user description |
|---|---|---|---|---|---|---|
| 1 | 1 | WF - Small bullet fragment *16022963___1 | | | | Small bullet fragment |
| 2 | 1 | Y - Paper- Transaction record from VK Petro on *16022963___2 | | | | Paper- Transaction record from VK Petro on June 21, 2016 @ 5:57 am |

| ID3 | **Approval Copy** | | TOTAL ITEMS 2 |
|---|---|---|---|

DROP APPROVAL REQUIRES SIGNATURE OF SOUTH INVESTIGATION DIV WORK LOCATION SUPERVISING

Supervisor sign here

| | PS# MP58390 | Wrk Loc 91 | Approved |
|---|---|---|---|

LT Thomas J CASPER

| Milwaukee Police Department | IN# OIS0082016 | AC# 16024814 | *16024814 |
|---|---|---|---|
| PROPERTY CONTROL SECTION | | | |
| **OFFICER DROP RECEIPT** | INV | Lab # | Drop Off Time 07/13/2016 04:08:03 PM |

| RESPONSIBLE WORK | Other# | PAGE |
|---|---|---|
| **[95] - Metro Investigation Div** | | 1 |

| RESPONSIBLE OFFICER | TYPE |
|---|---|
| **[010266] - DET LUKE G. O'DAY** | EVID |

SUBMITTING OFFICER
**[006708] - DET Gilbert R CARRASCO**

CIRCUMSTANCES
Recovered from suspects auto regarding OIS-8-2016 that occurred at 9800 W. Glendale, Wauwatosa, WI. on 6/23/16.

ITEMS

| itm no | qty | ACE generated description | d r | i d | flags | user description |
|---|---|---|---|---|---|---|
| 1 | 1 | Y - Samsung smart phone model SGH1577, black<br><br>*16024814_1 | | | | Samsung smart phone model SGH1577, black in color. Recovered from suspect's auto.<br>SER #: R21CC1B5LFW |

| | Approval Copy | | | TOTAL ITEMS |
|---|---|---|---|---|
| *104* | | | | 1 |

DROP APPROVAL REQUIRES SIGNATURE OF SOUTH INVESTIGATION DIV WORK LOCATION SUPERVISING

| | | PS# | Wrk Loc | |
|---|---|---|---|---|
| Supervisor sign here: | | | | ☐ Approved |
| Print name here | LT Paul R KAVANAGH | MP61238 | 91 | |

Form PM-9E
11/09

# MILWAUKEE POLICE DEPARTMENT
## MEMORANDUM



**DATE:** 06-24-2016

**TO:** Aaron RAAP
Captain of Police

**FR:** Detective Nicholas JOHNSON

**RE:** Transmittal of Evidence to Wisconsin Regional Crime Lab

---

     Request evidence in the below described case be transmitted to the Wisconsin Regional Crime Lab for examination:

            **OFFENSE:**   Att. Homicide

            **MPD FILE NUMBER:**   Officer Involved Shooting 08-2016

                    MPD IR # 16-175-0037

            **COURT CASE NUMBER:**

            **CRIME LAB NUMBER:**

            **VICTIM:**   PO Joseph Mensah

            **SUSPECT:**   Jay L. ANDERSON Jr. (B/M, 07/04/1990)

            **LOCATION:**   9800 W. Glendale Ave. Wauwatosa, WI

            **DATE:**   06-23-2016

            **ISSUING D.A.:**

            **STATUS OF SUSPECT:**   Deceased

## DESCRIPTION OF EVIDENCE
    A. Glock 22, Black .40 caliber handgun serial # UFB860 placed on Milwaukee
       Police Department Inv# 16022232 as Item #2

    B. Silver .40 caliber Federal S&W spent cartridge casing placed on Milwaukee
       Police Department Inv# 16022232 as Item #

C. Silver .40 caliber Federal S&W spent cartridge casing placed on Milwaukee Police Department Inv# 16022240 as Item #2

D. Silver .40 caliber Federal S&W spent cartridge casing placed on Milwaukee Police Department Inv# 16022240 as Item #3

E. Silver .40 caliber Federal S&W spent cartridge casing placed on Milwaukee Police Department Inv# 16022240 as Item #4

F. Silver .40 caliber Federal S&W spent cartridge casing placed on Milwaukee Police Department Inv# 16022240 as Item #5

G. Silver .40 caliber Federal S&W spent cartridge casing placed on Milwaukee Police Department Inv# 16022240 as Item #6

H. Deformed copper jacketed bullet placed on Milwaukee Police Department inv # 16022240 Item # 9.

I. Ruger SR9c 9mm handgun with a silver slide and black handle, serial # 334-60459 placed on Milwaukee Police Department Inv# 16022240 as item # 11

J. DNA swabs collected from the grip and trigger of the 9mm Ruger (Item I) placed on Milwaukee Police Department inv # 16022269 item 1.

K. DNA swabs collected from the slide of the 9mm Ruger (Item I) placed on Milwaukee Police Department inv # 16022269 item 2.

L. DNA swabs collected from the barrel the 9mm Ruger (Item I) placed on Milwaukee Police Department inv # 16022269 item 3

M. DNA swabs collected from the magazine of the 9mm Ruger (Item I) placed on Milwaukee Police Department inv # 16022269 item 4.

N. Dried blood standard collected from ANDERSON placed on Milwaukee Police Department Inv# 16022260 as Item #1

O. Five (5) grain of bullet fragments placed on Milwaukee Police Department Inv# 16022260 as Item #2

P. 162 grain deformed copper jacketed bullet placed Milwaukee Police Department Inv# 16022260 as Item #3

Q. 162 grain deformed copper jacketed bullet placed Milwaukee Police Department Inv# 16022260 as Item #4

## EXAMINATION OF EVIDENCE

It is requested that items A (Glock 22 serial # UFB860 ) and I (9mm Ruger SR9c serial # 34-60459) be examined to determine functionality and trigger pull.

It is requested that Items B, C, D, E, F, and G be examined and compared to Items A and I.

It is requested that items H, O, P, and Q be examined and determine (if possible) the caliber, make or type of firearm these projectiles originated from along with examining these items to determine if they were fired from the submitted guns, items A and I. Further request that these items be examined for any other trace evidence you deem appropriate.

It is requested that an examination be performed to determine genetic profile of items J, K, L, and M. Item N is supplied as a comparison standard to any questioned DNA evidence determined in physical evidence within this transmittal.

## STATEMENT OF FACTS

On 6-23-2016, Wauwatosa Police Officer MENSAH was conducting an After Hour Park check at Madison Park located at 9800 W. Glendale Ave. Officer MENSAH observed the suspect asleep in a 2006 Nissan Altima. PO MENSAH attempted to awake the suspect and when he did, he observed a semi-auto handgun next to the suspect. The suspect was ordered to keep his hands up, however the suspect then made movement for his handgun. PO MENSAH fearing for his safety, discharged his duty weapon, striking the suspect several times. The suspect died as a result of his injuries.

## WHERE ITEMS OBTAINED

Items A was recovered from PO MENSAH at the Wauwatosa Police Department at 1700 N 116th ST. Items B thru I were recovered from the scene of the incident at 9800 W. Glendale Ave (Madison Park), Wauwatosa, WI. Items J through M were recovered from suspects gun at the Milwaukee Police Department Administration Building located at 749 W. State St. Items N through Q were recovered from ANDERSON's body at the Medical Examiners Office.

**Note, when items of evidence are ready to be returned, request that the Criminal Investigation Bureau be notified.

Respectfully submitted

Detective Nicholas JOHNSON – P.S. #016252
Metropolitan Investigation Division/Late Shift.

OIS-8-2016

# WISCONSIN DEPARTMENT OF JUSTICE
## DIVISION OF LAW ENFORCEMENT SERVICES
### STATE CRIME LABORATORY - MILWAUKEE

1578 South 11th Street
Milwaukee, WI 53204-2860
(414) 382-7500
FAX (414) 382-7507

CASE NO: **R16-2393**   DATE: 6/24/2016   TIME: 12:34PM

SUB AGENCY NO: 16-175-0037   REC'D VIA: In Person

SUBMITTED BY: Det. Brett Huston   AGENCY: Milwaukee Police Department

| Name Type | Last Name | First Name | Middle Name | Sex | Race | Date Of Birth |
|---|---|---|---|---|---|---|
| Suspect | Anderson, Jr | Jay | L. | M | B | 7/4/1990 |
| Officer | Mensah | Joseph | | | | |

Submission Comments

| Item | Description / Source |
|---|---|
| A | One sealed cardboard box containing handgun Glock 22, .40 caliber, SER# UFB860 (agency inv. # 16022232-2) |
| B | One sealed manila envelope containing fired cartridge case(s) .40 cal, Federal S&W (agency inv. # 16022240-1) |
| C | One sealed manila envelope containing fired cartridge case(s) .40 cal, Federal S&W (agency inv. # 16022240-2) |
| D | One sealed manila envelope containing fired cartridge case(s) .40 cal, Federal S&W (agency inv. # 16022240-3) |
| E | One sealed manila envelope containing fired cartridge case(s) .40 cal, Federal S&W (agency inv. # 16022240-4) |
| F | One sealed manila envelope containing fired cartridge case(s) .40 cal, Federal S&W (agency inv. # 16022240-5) |
| G | One sealed manila envelope containing fired cartridge case(s) .40 cal, Federal S&W (agency inv. # 16022240-6) |
| H | One sealed manila envelope containing fired bullet(s) (agency inv. # 16022240-9) |
| I | One heat-sealed plastic bag containing handgun Ruger SR9c 9mm, SER # 334-60459 (agency inv. # 16022240-11) |
| J | One sealed manila evidence envelope containing swab(s) from the grip and trigger of a 9mm Ruger(Item I) (agency inv. # 16022269-1) |
| K | One sealed manila evidence envelope containing swab(s) from the slide of a 9mm Ruger (item I) (agency inv. # 16022269-2) |
| L | One sealed manila evidence envelope containing swab(s) from the barrel of a 9mm Ruger (item I) (agency inv. # 16022269-3) |
| M | One sealed manila evidence envelope containing swab(s) from the magazine of a 9mm Ruger (item I) (agency inv. # 16022269-4) |
| N | One sealed paper bag containing dried blood standard reportedly recoverd from Jay L. Anderson, Jr (agency inv. # 16022260-1) |
| O | One sealed paper bag containing fired bullet fragment(s) 5 grain (agency inv. # 16022260-2) |
| P | One sealed paper bag containing fired bullet fragment(s) 162 grain (agency inv. # 16022260-3) |
| Q | One sealed paper bag containing fired bullet fragment(s) 162 grain (agency inv. # 16022260-4) |

All item descriptions are as provided by the submitter and are subject to verification.

108

Received By (Signature of Recipient)   Date:   Print Name

Jessica C. Lieske

CONFIDENTIAL REPORT OF LABORATORY FINDINGS
DJ-LE-103 (4/12)



Wisconsin Department of Justice
Division of Law Enforcement Services
State Crime Laboratory-Milwaukee
1578 South 11th Street
Milwaukee, WI 53204-2860
(414) 382-7500
FAX (414) 382-7507

_CES 8- 2016_

Submitting Agency:

Chief Edward A. Flynn
Attn: Det. Nicholas Johnson
Milwaukee Police Department
749 West State Street
P.O. Box 531
Milwaukee WI 53201

| | |
|---|---|
| Date: | July 07, 2016 |
| Case No: | R16-2393 |
| Report No: | 1 |
| Agency No: | 16-175-0037 |

Laboratory Analyst:

Michelle M. Burns
(DNA Analysis)

_EOS 7.7.16_

Case Name:   Anderson, Jr, Jay L. (S)

I do hereby certify this document, consisting of 2 page(s), to be a true and correct report of the findings of the State Crime Laboratory on the items examined as shown by this report. This report contains the conclusions of the above signed analyst.

Brad D. Schimel
ATTORNEY GENERAL

_Nicole L. Roehm 7/13/16_
DESIGNEE

---

The following items of evidence were examined in the DNA Analysis Unit of this Crime Laboratory:

Item J - swabs from the grip and trigger of a Ruger (Milwaukee P.D. Inv. #16022269-1)
Item K - swabs from the slide of a Ruger (Milwaukee P.D. Inv. #16022269-2)
Item L - swabs from the barrel of a Ruger (Milwaukee P.D. Inv. #16022269-3)
Item M - swabs from the magazine of a Ruger (Milwaukee P.D. Inv. #16022269-4)
Item N - blood standard from Jay L. Anderson, Jr. (Milwaukee P.D. Inv. #16022260-1)

### Results

Samples from the pistol swabs (Items J, K, L, and M) were prepared for analysis and sub-designated as Items J1, K1, L1, and M1. A sample from the standard from Jay L. Anderson, Jr (Item N) was prepared for analysis and sub-designated as Item N1.

Human DNA was isolated from the pistol swabs (Items J1, K1, L1, and M1) and the standard from Jay L. Anderson, Jr (Item N1). This DNA was amplified with the polymerase chain reaction (PCR) method and typed for fifteen short tandem repeat (STR) genetic markers and amelogenin, a gender-specific genetic marker, using the Promega PowerPlex® 16 HS amplification kit.

### Autosomal STR DNA Conclusions

A single source STR DNA profile was detected from the standard from Jay L. Anderson, Jr (Item N1).

COPYING AND DISTRIBUTION OF THIS REPORT IS THE RESPONSIBILITY OF THE SUBMITTING AGENCY
The laboratory reserves the right to choose the items which will be tested and the methods which will be used to test them.

An STR DNA profile that is a mixture of DNA from at least three individuals was detected from the pistol grip and trigger swabs (Item J1). Assuming DNA from only three individuals in this mixture, a major male contributor can be determined at nine genetic markers. The major contributor STR DNA profile determined from Item J1 is consistent with the STR DNA profile detected from Jay L. Anderson, Jr. The probability of randomly selecting the observed STR DNA profile from a population of unrelated individuals is approximately one in 4.8 trillion. The minor component STR data obtained from Item J1 does not support any comparisons to other STR DNA profiles due to the limited amount of genetic information available.

STR DNA profiles that are mixtures of DNA from at least three individuals were detected from the pistol slide swabs (Item K1), pistol barrel swabs (Item L1), and pistol magazine swabs (Item M1). Each mixture includes at least one male contributor. The STR data obtained from Item K1, Item L1, and Item M1 do not support any comparisons to other STR DNA profiles due to the complexity of the mixtures.

Statistical calculations were performed using population statistics from databases of unrelated African American, Caucasian, and Hispanic individuals from the Federal Bureau of Investigation (Budowle, *et al.* *Journal of Forensic Sciences* 2001; 46(3): 453-489 and Moretti, *et al.* Erratum. *Journal of Forensic Sciences* 2015; 60(4): 1114-1116) and a published database from Levedakou, *et al.* ([published erratum appears in *Journal of Forensic Sciences* 2001; 46(6): 1553]; *Journal of Forensic Sciences* 2001; 46(3): 736-761).

Identical siblings will share the same STR DNA profile.

The major contributor STR DNA profile determined from the pistol grip and trigger swabs (Item J1) is not eligible for entry into the Forensic Index of the Combined DNA Index System (CODIS).

The STR DNA profile detected from the standard from Jay L. Anderson, Jr (Item N1) was entered into this laboratory's Quality Assurance Index of CODIS. All profiles entered into this Index will be searched against other profiles developed by the State Crime Laboratory in Milwaukee as part of our quality assurance process and then removed after a period of approximately three months. Any significant matches that would constitute an investigative lead for an agency will be reported to that agency per our laboratory's policy.

## Evidence Disposition

The DNA evidence will be returned to the submitting agency upon completion of analysis.

CONFIDENTIAL REPORT OF LABORATORY FINDINGS
DJ-LE-103 (4/12)



Wisconsin Department of Justice
Division of Law Enforcement Services
State Crime Laboratory-Milwaukee
1578 South 11th Street
Milwaukee, WI 53204-2860
(414) 382-7500
FAX (414) 382-7507

Submitting Agency:

Chief Edward A. Flynn
Attn: Det. Nicholas Johnson
Milwaukee Police Department
749 West State Street
P.O. Box 531
Milwaukee WI 53201

Date: July 08, 2016

Case No: R16-2393

Report No: 2

Agency No: 16-175-0037

Laboratory Analyst:

Xai Xiong
(Firearms and Toolmarks Examiner)

Case Name: Anderson, Jr, Jay L. (S)

I do hereby certify this document, consisting of 1 page(s), to be a true and correct report of the findings of the State Crime Laboratory on the items examined as shown by this report. This report contains the conclusions of the above signed analyst.

Brad D. Schimel
ATTORNEY GENERAL

7/13/16            DESIGNEE

The following findings reflect the professional opinion of the examiner authoring this report.

The Glock model 22 Gen4, 40 caliber, semi-automatic pistol, serial number UFB860 (Item A) was examined, test fired, and found to be mechanically functional.

Examination of Items B through G revealed six (6) fired 40 caliber cartridge cases.

Further examination of Items B through G with test fired cartridge cases from Item A revealed Items B through G were fired in the submitted Glock semi-automatic pistol (Item A).

Examination of the three (3) fired jacketed hollow point bullets (Items H, P, & Q) revealed they are 40 caliber and fired through a firearm barrel rifled with six (6) lands and grooves with a right hand twist.

Further examination of Items H, P, & Q with test fired bullets from Item A revealed Items H, P, & Q were fired through the barrel of the submitted Glock semi-automatic pistol (Item A).

The Ruger model SR9c, 9mm caliber, semi-automatic pistol, serial number 334-60459 (Item I) was examined, test fired, and found to be mechanically functional.

Examination of Item O revealed four (4) lead fragments not suitable for further firearm identification comparison.

COPYING AND DISTRIBUTION OF THIS REPORT IS THE RESPONSIBILITY OF THE SUBMITTING AGENCY
The laboratory reserves the right to choose the items which will be tested and the methods which will be used to test them.



Office of the Medical Examiner
## *Milwaukee County*

TO:     Brian Peterson, MD          DATE: _6·23·16_
        Medical Examiner
        Milwaukee County

FROM:

I request that all information pertaining to the death of _Jay L. Anderson_ be exempt from public disclosure at this time. This non-disclosure shall be in effect for 30 days and then expire unless renewed.

The matter is the subject of an ongoing investigation and any disclosure at this time may seriously impede the investigation.

This written request was delivered via   (FAX)   HAND  (circle one)   to:

_____ME_____  On: _Thursday / 6·23·16 / 8:50 am_
        Name/Title                         Day/Date/Time

by  _Det. Luke O. Day_
        Name/Title

ME Case No. _16·3222_

OIS·M 8-2016



OIS - M 8 - 2016

Hr
Wt
Liver
Rigor
Hair
Eyes



PSSI Michael R. Braunreiter
#004609

| Milwaukee County Medical Examiner | Case Number | : 16-03222 |
| 933 W. Highland Avenue | Investigator | : Jason Rudelich, D-ABMDI |
| Milwaukee, WI 53233 | Date of Death | : 6/23/16 |
| (414) 223-1200 | Date Today | : 06/23/16 |

# EVIDENCE RELEASE RECEIPT

**Decedent:** Jay L. Anderson

| Type | Description |
| --- | --- |
| Left Hand Fingernail Clippings | -- |
| Left Hand Paper Bag | -- |
| Right Hand Fingernail Clippings | -- |
| Right Hand Paper Bag | -- |
| Pubic Hair Pluckings | -- |
| DNA Card | -- |
| Bullet/Bullet Fragments | -- |
| Bullet/Bullet Fragments | -- |
| Bullet/Bullet Fragments | -- |

#004609

*PSSI Michael Braunreiter*

_____
SIGNATURE OF RECIPIENT   PSSI Michael Braunreiter

6/23/2016 10:47 AM
_____
DATE                    TIME

MPD CIB - Homicide Division
_____
RELATIONSHIP / TITLE OF RECIPIENT

_____
RELEASED BY: Jason Rudelich, D-ABMDI

6/23/2016 10:47 AM
_____
DATE                    TIME

1 of 1

Milwaukee County Medical Examiner
933 W. Highland Avenue
Milwaukee, WI 53233

AUTOPSY PROTOCOL

NAME: ANDERSON, JAY L., JR.          SEX: MALE          AGE: 25 YEARS

DOB: 07/04/1990

DATE OF DEATH:          JUNE 23, 2016          TIME: 0405 HOURS

DATE OF AUTOPSY:          JUNE 23, 2016          TIME: 0820 HOURS

PLACE OF AUTOPSY:          Milwaukee County Medical Examiner's Office

PERFORMED BY:          Wieslawa Tlomak, MD
                       Deputy Chief Medical Examiner

WITNESSED BY:          Amanda Meeker
                       Forensic Pathology Assistant

                       Detective Joe Lewandowski
                       City of Wauwatosa Police Department

                       Michael Braunreiter, PSS1
                       Milwaukee Police Department

                       Forensic Investigator Doug Brahm
                       Milwaukee Police Department

CAUSE OF DEATH:          Gunshot Wounds of the Head

MANNER OF DEATH:          Homicide

Signed _W. Tlomak, MD_          _7/19/2016_
        Wieslawa Tlomak, MD          Date Signed
        Deputy Chief Medical Examiner

NOTES BY: WE TYPE/SG, MEDICAL TRANSCRIBER

Milwaukee County Medical Examiner
933 West Highland Avenue
Milwaukee, WI 53233

AUTOPSY PROTOCOL

**Final Diagnoses:**

I.  Gunshot wound of the head, indeterminate range of fire with exit
    A.  Entrance gunshot wound on the right ear
    B.  Perforation of the right ear, petrous part of the right temporal bone, clivus, petrous part of the left temporal bone, and left mastoid process
    C.  No projectile recovered
    D.  Exit gunshot wound on the left temporal scalp, behind the left ear
    E.  Trajectory: from the decedent's right-to-left with no significant front/back or upward/downward deviation

II. Gunshot wound of the head, indeterminate range of fire with exit
    A.  Entrance gunshot wound on the right temporal/parietal scalp
    B.  Perforation of the right parietal bone, dura, brain, dura, and left parietal bone
    C.  No projectile recovered
    D.  Exit gunshot wound on the left temporal/parietal scalp
    E.  Trajectory: from the decedent's right-to-left with no significant front/back or upward/downward deviation

III. Gunshot wound of the head, indeterminate range of fire without exit
    A.  Entrance gunshot wound on the right cheek
    B.  Perforation of the right cheek and penetration of soft tissue of the right side of the neck
    C.  A 162 grain projectile recovered
    D.  No exit gunshot wound
    E.  Trajectory: from the decedent's front-to-back, right-to-left and downward

IV. Gunshot wound of the back, indeterminate range of fire without exit
    A.  Entrance gunshot wound on the right shoulder
    B.  Perforation of subcutaneous tissue of the right shoulder and penetration of muscles of the back
    C.  A 182 grain projectile recovered
    D.  No exit gunshot wound

E.  Trajectory: from the decedent's right-to-left, slightly front-to-back, and slightly downward

V.  5 grain in aggregate projectile fragments recovered from hair

The body is received within a body bag.

## WITNESSES:

Personnel present during portions of the autopsy include Wieslawa Tlomak, MD, Deputy Chief Medical Examiner; Amanda Meeker, Forensic Pathology Assistant, Detective Joe Lewandowski, Wauwatosa Police Department, Michael Braunreiter, PSSI, Milwaukee Police Department; and Forensic Investigator Doug Brahm, Milwaukee Police Department.

## RADIOGRAPHS:

Radiographs of the head, neck, and upper chest reveal radiopaque shadows consistent with projectiles and projectile fragments recovered at autopsy.

## CLOTHING:

The body is received undressed.

## GENERAL EXTERNAL EXAMINATION:

The body is that of a well-developed, well-nourished (body mass index of 22.5), adult, black male that weighs 166 pounds, is 72 inches in length, and appears compatible with the reported age of 25 years.

The body is cold. At the time of autopsy, rigor mortis is partially fixed. Blanchable, purple livor mortis extends over the posterior surfaces of the body, except in areas exposed to pressure.

HEAD: The head is normocephalic. The scalp hair is black, curly, and measures up to 15 inches in length over the crown. EYES: The irides are brown. The pupils are round. The corneae are translucent. The sclerae are white and the conjunctivae are unremarkable. No petechial hemorrhages are identified on the sclerae or conjunctivae. NOSE: The nose is normally formed and the septum is in the midline. MOUTH: The teeth are natural and in good condition. No petechial hemorrhages are on the oral mucosa. EARS: The ears are normally formed. FACE: The decedent wears black, short mustache and beard. No petechial hemorrhages are on the facial skin.

## NECK:

The neck organs are in the normal midline position and appear unremarkable.

## CHEST:
The thorax is well developed and symmetrical.

## ABDOMEN:
The abdomen is flat.

## GENITALIA:
The external genitalia are those of a normal adult male.

## ANUS:
The anus is free of lesions.

## EXTREMITIES:
**UPPER EXTREMITIES:** The upper extremities are well developed and symmetrical without absence of digits. The right hand has long, intact fingernails. The left hand has short, intact fingernails. **LOWER EXTREMITIES:** The lower extremities are well developed and symmetrical without absence of digits.

## BACK:
The spine is normally formed.

## IDENTIFYING MARKS, SCARS, AND TATTOOS:
Identifying marks, scars, and tattoos include: two, 1/2 inch, each scars on the left lateral upper eyelid; a 2 inch oblique scar on the left side of the upper abdomen; a 7 x 6 inch tattoo on the right lateral proximal upper arm; a 1/4 x 1/4 inch white scar on the dorsal surface of the third finger of the right hand; a 3 x 3-1/2 inch tattoo on the left lateral proximal upper arm; and a 3/4 x 3/16 inch scar on the right anterior distal lower extremity.

## EVIDENCE OF MEDICAL INTERVENTION:
Evidence of medical intervention includes: a properly placed endotracheal tube, two intravenous accesses, one in the right antecubital fossa and the other on the left dorsal wrist, a needle puncture mark in the left antecubital fossa, one electrocardiograph patch, and a white hospital identification band around the left ankle.

## EVIDENCE OF INJURY:
## DESCRIPTION OF GUNSHOT WOUNDS:

### GUNSHOT WOUND OF THE HEAD:

**ENTRANCE:** On the right ear, close to the external ear canal, with its midpoint 5 inches below the top of the head, 4 inches right of the anterior midline is a 5/16 inch in diameter, round defect with a pink-red, circumferential marginal abrasion consistent with an entrance gunshot wound. The marginal abrasion is widest (3/16 inch) at the 10:00 position, tapering at the 1:00 and 7:00 positions. Soot is not visible on the skin edges or within the hemorrhagic wound track. No stippling or unburned or burned gunpowder particles are on the skin surrounding the entrance gunshot wound.

**PATH:** The hemorrhagic wound track sequentially perforates the right ear (On the skin behind the right ear is a 1/4 inch in diameter round defect with a 3/16 inch in width, red marginal abrasion extending from the 6:00 position to 11:00 position. There is a 1/4 inch radiating laceration at the 4:00 position.), petrous part of the right temporal bone, clivus, petrous part of the left temporal bone, and left mastoid process.

**ASSOCIATED INJURIES:** There are extensive fractures of the base of the skull. Blood is present in the lower airways.

**PROJECTILE:** No projectile is recovered.

**EXIT:** On the left temporal scalp, behind the left ear, 5 inches below the top of the head, 3-1/2 inches left of the anterior midline is a 1/2 inch, gaping laceration without marginal abrasion consistent with an exit gunshot wound.

**TRAJECTORY:** The trajectory is from the decedent's right-to-left with no significant front/back or upward/downward deviation.

### GUNSHOT WOUND OF THE HEAD:

**ENTRANCE:** On the right temporal-parietal scalp, above and behind the right ear, with its midpoint 2-1/2 inches below the top of the head, 4-1/2 inches right of the anterior midline is a 5/16 inch in diameter, round defect with a 1/16 inch in width, pink, circumferential marginal abrasion consistent with an entrance gunshot wound. Soot is not visible on the skin edges or within the hemorrhagic wound track. No stippling or

unburned or burned gunpowder particles are on the skin surrounding the entrance gunshot wound.

**PATH:** The hemorrhagic wound track sequentially perforates the right parietal bone (There is a 5/16 inch in diameter defect with an internal beveling.), dura, brain (right and left parietal lobes) dura, and left parietal bone (There is a 5/16 inch in diameter defect with an external beveling.).

**ASSOCIATED INJURIES:** Reflection of the scalp reveals subcutaneous and subgaleal hemorrhages overlying calvarium in a patchy distribution. There are hemorrhages in both temporalis muscles. There are extensive fractures of the skull including calvarium and base of the skull. The dura is lacerated. Acute subdural hemorrhage overlies convexities of the cerebral hemispheres. Acute subarachnoid hemorrhage overlies cerebral hemispheres and cerebellum in a patchy distribution. The parietal and occipital lobes of the brain are partially pulpified.

Blood is present in the lower airways.

**PROJECTILE:** No projectile is recovered.

**EXIT:** On the left temporal-parietal scalp, 2-1/2 inches below the top of the head, 4 inches left of the anterior midline is a 3/4 x 1/4 inch, gaping laceration without marginal abrasion consistent with an exit gunshot wound.

**TRAJECTORY:** The trajectory is from the decedent's right-to-left with no significant front/back or upward/downward deviation.

**GUNSHOT WOUND OF THE HEAD:**
**ENTRANCE:** On the right cheek, in front of the right ear, with its midpoint 5 inches below the top of the head, 3 inches right of the anterior midline is a 5/16 inch in diameter, round defect with a dark red, circumferential marginal abrasion consistent with an entrance gunshot wound. There are radiating lacerations located at the 7:00 position (1/4 inch) and at the 8:00 position (1/4 inch). Soot is not visible on the skin edges or within the hemorrhagic wound track. No stippling or unburned or burned gunpowder particles are on the skin surrounding the entrance gunshot wound.

**PATH:** The hemorrhagic wound track perforates right cheek and penetrates soft tissue of the right side of the neck.

**PROJECTILE:** A 162 grain, markedly deformed, jacketed projectile is recovered from the subcutaneous tissue of the right side of the posterior neck, 9 inches below the top of the head, 1 inch right of the posterior midline.

**EXIT:** There is no exit gunshot wound.

**TRAJECTORY:** The trajectory is from the decedent's front-to-back, right-to-left, and downward.

**GUNSHOT WOUND OF THE BACK:**

**ENTRANCE:** On the right shoulder with its midpoint 8-1/2 inches below the top of the head, 5-1/2 inches right of the posterior midline is a 3/8 x 3/8 inch defect with a pink, circumferential marginal abrasion consistent with an entrance gunshot wound. The marginal abrasion is widest (1/2 inch) at the 2:00 position, tapering at the 12:00 and 6:00 positions. Soot is not visible on the skin edges or within the hemorrhagic wound track. No stippling or unburned or burned gunpowder particles are on the skin surrounding the entrance gunshot wound.

**PATH:** The hemorrhagic wound track perforates subcutaneous tissue of the right shoulder and penetrates muscles of the upper back.

**PROJECTILE:** A 182 grain, jacketed projectile is recovered from the muscles of the left side of the upper back, 9-1/4 inches below the top of the head, 3-1/4 inches left of the posterior midline.

**EXIT:** There is no exit gunshot wound.

**TRAJECTORY:** The trajectory is from the decedent's right-to-left, slightly front-to-back and slightly downward.

**RECOVERY:** 5 grain in aggregate, projectile fragments are recovered from hair.

**HANDS:** No soot or high velocity blood is seen on hands by visual examination.

## GENERAL INTERNAL EXAMINATION:

The body is opened with a routine thoracoabdominal incision. The skeletal muscle has a dark red-brown color and a normal smooth texture.

## BODY CAVITIES:

No adhesions or abnormal collections of fluid are in the pleural spaces or peritoneal cavity. All body organs are in normal and anatomic position. The serous surfaces are smooth and glistening.

## HEAD:

The skull is of normal thickness. **BRAIN:** The brain weighs 1400 grams. The dura mater and falx cerebri are not adherent to the brain. The leptomeninges are thin and transparent. The cerebral hemispheres have a normal gyral pattern. The structures at the base of the brain, including cranial nerves and blood vessels, are free of abnormality. With the exception of injuries described in "Evidence of Injury", sections through the cerebral hemispheres reveal no lesions within the cortex, subcortical white matter or deep parenchyma of either hemisphere. The cerebral ventricles are of normal size and configuration. Sections through the brainstem and cerebellum reveal no lesions.

## NECK:

Examination of the soft tissues of the neck, including strap muscles and large vessels, reveals no abnormalities. The hyoid bone and thyroid cartilage are intact. The laryngeal mucosa is unremarkable. The tongue is normal.

## CARDIOVASCULAR SYSTEM:

**HEART:** The heart weighs 350 grams. The pericardial sac is free of significant fluid or adhesions. The pericardial surfaces are smooth and glistening. The coronary arteries arise normally and follow the distribution of a right dominant pattern with no significant atherosclerosis. The coronary ostia are patent. The chambers are not dilated. The chambers and valves are proportionate. The valves are normally formed, thin and pliable and free of vegetations and degenerative changes. The following circumferential valve measurements are obtained: tricuspid valve, 13.5 cm; pulmonic valve, 6.5 cm; mitral valve, 11.5 cm; and aortic valve, 7.0 cm. The myocardium is dark red-brown, firm, and free of fibrosis, erythema, pallor, and softening. The atrial and ventricular septa are intact and the septum and free walls are free of muscular bulges. The left ventricle

measures 1.5 cm and the right ventricle measures 0.5 cm in thickness as measured 1.0 cm below the respective atrioventricular valve annulus. The interventricular septum measures 1.5 cm in thickness. **BLOOD VESSELS:** The aorta and its major branches arise normally and follow the usual course, with no significant atherosclerosis. The orifices of the major aortic vascular branches are patent. The vena cava and its major tributaries are patent and return to the heart in the usual distribution and are unremarkable.

## RESPIRATORY SYSTEM:

The right and left lungs weigh 300 grams, each. The upper airways are unobstructed. Blood is present in the lower airways. The mucosal surfaces are smooth and yellow-tan. The pleural surfaces are smooth, glistening and unremarkable. The pulmonary parenchyma is light pink and the cut surfaces exude mild amounts of blood and frothy fluid. The pulmonary arteries are normally developed and unremarkable. There is no saddle embolus on *in situ* examination of the pulmonary trunk.

## LIVER AND BILIARY SYSTEM:

**LIVER:** The liver weighs 1500 grams. The hepatic capsule is smooth, glistening, and intact, covering a red-brown parenchyma. **GALLBLADDER:** A thin-walled gallbladder contains yellow, watery bile without stones.

## GASTROINTESTINAL TRACT:

**ESOPHAGUS:** The esophagus is lined by a gray-white smooth mucosa. **STOMACH:** The gastroesophageal junction is unremarkable. The gastric mucosa is flattened and the lumen contains 100 mL of fluid with partially digested food fragments. **SMALL AND LARGE INTESTINE:** The small intestine has uniform dimension and appears unremarkable. The vermiform appendix is present. The colon has uniform dimension and appears unremarkable. There are no diverticula or externally obvious masses.

## PANCREAS:

The pancreas has a normal size, shape, position, and tan lobulated appearance.

## GENITOURINARY TRACT:

**KIDNEYS:** The right and left kidneys weigh 140 grams, each. The renal capsules are smooth, thin, semitransparent, and strip with ease from the underlying smooth, red-brown, firm, cortical surfaces. The cortices are of normal thickness and delineated from

the medullary pyramids. The calyces, pelves, and ureters are non-dilated and free of stones. **URINARY BLADDER:** The urinary bladder contains a large amount of yellow, clear urine. The bladder mucosa is gray-tan and smooth. **MALE INTERNAL GENITALIA:** The prostate has a tan cut surface and is unremarkable.

## RETICULOENDOTHELIAL SYSTEM:
**SPLEEN:** The spleen weighs 240 grams and has a smooth, intact capsule covering red-purple, moderately firm parenchyma. The splenic white pulp is grossly prominent. **LYMPH NODES:** The regional lymph nodes are unremarkable.

## ENDOCRINE SYSTEM:
**PITUITARY GLAND:** The pituitary gland is unremarkable.
**THYROID GLAND:** The thyroid gland is of normal position, size and texture.
**ADRENAL GLANDS:** The adrenal glands have normal cut surfaces with yellow cortices and brown medullae with the expected corticomedullary ratio.

## MUSCULOSKELETAL SYSTEM:
The cervical spinal column is stable on internal palpation.

The bony framework, supporting musculature, and soft tissues are not unusual.

## ADDITIONAL DISSECTION:
Longitudinal dissection of back and extremities reveals hemorrhagic gunshot wound track in the upper back and no evidence of other injuries.

## SPECIMENS:
At the time of autopsy, vitreous fluid, iliac and right heart blood, liver, gastric contents, and urine are retained.

## EVIDENCE:
Evidence collected at autopsy includes: hand bags, fingernail clippings, pubic hair, DNA blood card, two projectiles and projectile fragments recovered at autopsy.



**TOXICOLOGY LABORATORY**

Case Number: 16-03222

Pathologist: Wieslawa Tlomak, M.D.

Name: Anderson, Jay Loren

Report Date: 7/19/2016

## TOXICOLOGY REPORT

### SPECIMENS COLLECTED

The following Specimens were received by the Toxicology laboratory:

| Item | Description |
|------|-------------|
| Liver 80182 | Liver 80182 was reportedly recovered from Autopsy and was received by the lab on Jun 23, 2016. |
| Gastric 80181 | Gastric 80181 was reportedly recovered from Autopsy and was received by the lab on Jun 23, 2016. |
| Urine 80180 | Urine 80180 was reportedly recovered from Autopsy and was received by the lab on Jun 23, 2016. |
| Cardiac Blood 80179 | Cardiac Blood 80179 was reportedly recovered from Autopsy and was received by the lab on Jun 23, 2016. |
| Cardiac Blood 80178 | Cardiac Blood 80178 was reportedly recovered from Autopsy and was received by the lab on Jun 23, 2016. |
| Iliac Blood 80177 | Iliac Blood 80177 was reportedly recovered from Autopsy and was received by the lab on Jun 23, 2016. |
| Vitreous 80176 | Vitreous 80176 was reportedly recovered from Autopsy and was received by the lab on Jun 23, 2016. |

### SCREENING RESULTS

| Specimen | Compound | Result | Analyst | Instrument |
|----------|----------|--------|---------|------------|
| Cardiac Blood 80178 | Cannabinoids | Indicated | Juan Lezama | ELISA |

### QUANTITATIVE RESULTS

| Specimen | Compound | Result | Units | Analyst | Instrument |
|----------|----------|--------|-------|---------|------------|
| Cardiac Blood 80179 | Ethanol | 0.114 | g/dL | Juan Lezama | HSGC |
| Vitreous 80176 | Ethanol | 0.157 | g/dL | Juan Lezama | HSGC |
| Cardiac Blood 80179 | Caffeine | Confirmed Present | | Gregory Johnson | GCMS |
| Cardiac Blood 80179 | Cotinine | Confirmed Present | | Gregory Johnson | GCMS |
| Cardiac Blood 80179 | Etomidate | Indicated | | Gregory Johnson | GCMS |

### Comments

Presumptive positive result by enzyme linked immunosorbent assay (ELISA). Further tests are required to confirm these results.

### ANALYTICAL PROTOCOL

_127_

County of Milwaukee



Office of the Chief Medical Examiner

Case Number: 16-03222

**TOXICOLOGY LABORATORY**

Name: Anderson, Jay Loren

Pathologist: Wieslawa Tlomak, M.D.

Report Date: 7/19/2016

## TOXICOLOGY REPORT

Immunoassay screening analyzes for the following drugs or drug classes:
Amphetamine/Methamphetamine type compounds, Benzodiazepines, Buprenorphine, Cocaine and related compounds, Cannabinoids, Fentanyl, Methadone, Opiates and Oxycodone.

_Sara J Schreiber_

7/19/2016

Name Of Approver:   Sara J Schreiber

Date Approved

**Forensic Technical Director**

128

## Detailed History for Police Call #161750406 As of 7/12/2016 15:52:56

Output for:

Priority:1 Type:1356 - SHOOTING
Location:8026 W MEDFORD AV,MKE
LocCross:btwn W CUSTER AV and W SHERIDAN AV

| Created: | 06/23/2016 03:59:25 | PD02 | 016182 |
|---|---|---|---|
| Entered: | 06/23/2016 03:59:25 | PD02 | 016182 |
| Dispatch: | 06/23/2016 03:59:25 | PD02 | 016182 |
| Enroute: | 06/23/2016 03:59:25 | PD02 | 016182 |
| Onscene: | 06/23/2016 04:12:26 | PD02 | 016182 |
| Closed: | 06/23/2016 11:10:04 | PD05 | 014980 |

IC: PrimeUnit:9536 Dispo:C18 Type:1356 - SHOOTING
Agency:MWPD DAREA:D4 Squad Area:430 RptDist:833
Case #:IR161750037 ☐ Detail

---
```
03:59:25  CREATE   Location:MADISON PARK Type:SA TypeDesc:SPECIAL ASSIGN Priority:2 Agency:MWPD
03:59:25  ENTRY    DAREA:None-->CITY
03:59:25  DISPER   9536 Location:MADISON PARK
03:59:25  -PRIU    9536
03:59:25  -NPREMS  Comment:(none)
04:07:50  CHGLOC   9536 Location:FROEDTERT MEMORIAL LUTHERAN HOSPITAL,MKE Comment:MEET
                   UP WITH SUSPECT OR VICTIM
04:12:26  BACKOS   9537 UnitID:9536 Location:FROEDTERT MEMORIAL LUTHERAN HOSPITAL,MKE
04:12:26  BACKOS   9559 UnitID:9536 Location:FROEDTERT MEMORIAL LUTHERAN HOSPITAL,MKE
04:12:43  CLOS     9537 9559 Location:N 84TH ST / W HAMPTON AV,MKE
04:17:39  BACKOS   9540 UnitID:9537 Location:N 84TH ST / W HAMPTON AV,MKE
04:17:39  BACKOS   9539 UnitID:9537 Location:N 84TH ST / W HAMPTON AV,MKE
04:18:49  ONSCN    9536
04:48:42  MISC     9536 Comment:REQ ID TECH
04:49:20  BACKER   1921 UnitID:9536 Location:FROEDTERT MEMORIAL LUTHERAN HOSPITAL,MKE
                   Operator:015497 OperNames:PETERSON, JAMES C
04:51:04  CONTCT   9536 9537 9559 9539 9540 1921 ContactTime:120
05:18:11  BACKER   1922 UnitID:9537 Location:9800 W GLENDALE Operator:016643 OperNames:WINKER,
                   MICHAEL J Comment:SAFE ENTRY FROM THE WEST
05:19:23  XPRMPT   1922 Operator:016643 OperNames:WINKER, MICHAEL J
05:19:23  XDISP    1930 Operator:009064 OperNames:VEDBRAATEN, LEE F
05:19:38  CHGLOC   1930 Location:9800 W GLENDALE
05:45:16  ONSCN    1930
05:53:48  CASE     9540 Incident#:IR161750037 Comment:016252
05:55:17  CHANGE   Type:SA-->1356 Response:None-->1PO Priority:2-->1 TypeDesc:SPECIAL ASSIGN--
                   >SHOOTING Comment:***WAWAUTOSA OFFICER INVOLVED SHOOTING***
06:09:06  CLOS     9537 9559 9539 9540 Location:9800 W GLENDALE, WAWAUTOSA
06:16:30  CHGLOC   9537 Location:4520 N 110TH ST, WAWAUTOSA
06:19:20  BACKOS   9500 UnitID:9559 Location:9800 W GLENDALE, WAWAUTOSA Operator:005519
                   OperNames:RAAP, AARON M
06:20:13  ONSCN    1921
06:46:29  ONSCN    9537
06:46:31  CLEAR    9500
06:49:09  CHGLOC   9537 Location:8026 W MEDFORD AV,MKE
06:49:37  MISC     9537 Comment:SS
```

| | | |
|---|---|---|
| 06:49:40 | BACKER | 4390 UnitID:9537 Location:8026 W MEDFORD AV,MKE Operator:016897 OperNames:WOODS, NATHAN L |
| 07:00:44 | CLOS | 9536 Location:PAB,MKE Comment:WITH PROPERTY |
| 07:04:32 | *ONSCN | 4390 |
| 07:17:45 | CONTCT | 9536 9537 9559 9539 9540 1921 1930 4390 ContactTime:120 |
| 07:22:00 | CLEAR | 1921 |
| 07:33:31 | MISC | 9559 Comment:D4 CAR TO MEET AT THE SCENE FOR A TOW |
| 07:36:26 | CHANGE | 4390 Location:MADISON PARK-->8026 W MEDFORD AV,MKE DAREA:CITY-->D4 RptDist:None-->833 SquadArea:None-->430 |
| 07:37:20 | -NPREMS | Comment:(none) |
| 07:55:20 | *CHGLOC | 4390 Location:D4 |
| 07:59:27 | *ONSCN | 4390 |
| 07:59:32 | *CLEAR | 4390 Dispo:C18 DispoLevel:0 |
| 08:01:54 | CLEAR | 9539 Dispo:C8 DispoLevel:0 |
| 08:08:38 | BACKER | 4123 UnitID:9540 Location:9800 W GLENDALE, WAWAUTOSA Operator:007378 OperNames:MOORE JR, ROBERT |
| 08:28:50 | MISC | 4123 Comment:ENROUTE |
| 08:32:58 | ONSCN | 4123 |
| 08:34:29 | ONSCN | 9537 |
| 08:37:43 | CLEAR | 1930 |
| 08:52:48 | *RFT | 4123 Comment:INQUIRY QVEH,,749USD,PC,16,,, |
| 09:12:38 | CLOS | 9559 Location:CIB,MKE Comment:6TH FL SEND FI CAR |
| 09:13:17 | BACKER | 1720 UnitID:9559 Location:CIB,MKE Operator:010029 OperNames:ORTIZ, SYLVIA M |
| 09:13:21 | COMBIN | Service:P Call:#161750862 Type:PH Agency:MWPD |
| 09:28:32 | CLEAR | 9540 Dispo:C8 DispoLevel:0 |
| 09:29:48 | CLEAR | 9559 Dispo:C8 DispoLevel:0 |
| 09:30:00 | CLEAR | 9536 Dispo:C8 DispoLevel:0 |
| 09:30:18 | CONTCT | 1720 ContactTime:15 Comment:ENROUTE |
| 09:30:46 | CLEAR | 9537 Dispo:C8 DispoLevel:0 |
| 09:31:08 | CLEAR | 1720 |
| 09:34:35 | CONTCT | 4123 ContactTime:30 Comment:STILL |
| 09:51:47 | CHGLOC | 4123 Location:TOW LOT,MKE Comment:Z BUIDLING FOLLOW TOW |
| 10:33:56 | ONSCN | 4123 |
| 11:10:04 | CLEAR | 4123 Dispo:C18 DispoLevel:0 |
| 11:10:04 | -CLEAR | |
| 11:10:04 | CLOSE | |

*13 D*

CES 8-2016

TOW #: 116460-3   SQUAD: 4/18   EMPLOYEE I.D. # (6 digit): 008578

DATE: 06-22-11   TIME: 9:18

MAKE: Nissan   MODEL: Altra   STYLE: 4DR   YEAR: 06   COLOR: Black

LICENSE #: 749 USA   STATE: WI   EXP: 2/17   VIN: 1N4AL11D16C213911

TOW ADDRESS: 9800 W. Glendale

IMPOUNDMENT LOCATION: _____   NAME OF TOWING SERVICE: _____

**CHECK REASON FOR TOW**

- ☐ Illegally Parked
- ☑ Evidence Auth. By: 008781 LT Nolan
- ☐ Unregistered
- ☐ Stolen
- ☐ Safekeeping
- ☐ Abandoned
- ☐ Prisoner's Property

OTHER: _____   CITATION NUMBER: _____   VIOLATION CODE: _____

## Circle Damaged Areas

Front          Rear

| | Y | N | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Doors Locked | Y | N | Stereo/Sound System | Ⓨ | N | Column Damage | Y | Ⓝ | Snow/Dirt | Y | Ⓝ |
| Flat Tires | Y | N 1 2 3 4 | Tires Missing | Y | Ⓝ 1 2 3 4 | Hubcaps Missing | Y | N 1 2 3 4 | Stolen Check | Y | N |
| Keys | Y | N | Window Damage | Ⓨ | N 1 2 3 4 | Inventory | Y | N | | | |

MPD CASE/IR #: _____   COMMENTS: _____

Tow Authorization Report  PT-27  Rev. 03/15

13(

# Officers on Scene of Madison Park Officer Involved Shooting

## IR# 16-18370   06/23/2016

Captain Tim Sharpee   Commander

Lt. Gary Gabrish   Supervisor/Incident Commander

Lt. Jim Mastrocola   Investigative Commander

Sgt Jack Morrison   Incident Command Asstist

PO Gary Raymond   Perimeter

PO Jamie Cruz   Perimeter

PO Ralph Salyers   Cleared Car/First aid

PO Andy Floryance   Perimeter/Hospital

PO Steve Mills   Cleared Car/First aid

PO Bryan Wade   Stayed with Mensah

PO Joe Wong   Perimeter/Canvass parking lot

PO Tyler L'Allier   Hospital

PO Joe Mensah   Involved Officer

Det Mike Deisinger   Firefighter/Witness Interviews

Det Paula Roberson   Canvass

Det Jeff Griffin   Firefighter/Witness Interviews

Det Joe Roy   Canvass

Det Joe Lewandowski   Hospital/Autopsy

# Wauwatosa Police Department

## Incident Report

**Incident:** Homicide

| | | |
|---|---|---|
| **Incident Report Number:** 16-018370 | **Between: Date - Time** | **And/At: Date-Time** 6/23/16   03:03 |

**Incident Location:** 9800 W Glendale Av, Wauwatosa, WI, 53225

| CFS Code-1: 0999 | CFS Code-2: 9093 | CFS Code-3: | Offense Code-4: |
|---|---|---|---|
| CFS Code-5: | CFS Code-6: | CFS Code-7: | CFS Code-8: |

| COM | **Name (Last, First, Middle)** Mensah, PO Joseph | DOB: | Race/Sex |
|---|---|---|---|

**Address: (Address, City, State, Zip)** 1700 N 116 St, Wauwatosa, WI, 53226

**Employer** Wauwatosa Police Department

Home Phone Number

**Employer Address** 1700 N 116 St, Wauwatosa, WI 53226

Work Phone Number (414) 471-8430

Cell Phone Number

| | **Name (Last, First, Middle)** | DOB: | Race/Sex |
|---|---|---|---|

**Address: (Address, City, State, Zip)**

**Employer**

Home Phone Number

**Employer Address**

Work Phone Number

Cell Phone Number

## NARRATIVE

On 06-23-2016 at 3:03 AM, a Wauwatosa Police Officer located an occupied automobile at Madison Park, 9800 W Glendale Ave. Upon contact the subject, listed on the back side, attempted to arm himself with a hand gun resulting in deadly force being used to stop the threat presented to the officer.

This investigation was turned over to the Milwaukee Police Department.

**Vehicle Information: (Year, Make, Model, Style, Color)**

| License Number: | State: | Expiration Year: | Vin: | Insurance Company: |
|---|---|---|---|---|

**Other Vehicle Information:**

| **Reporting Officer(s):** Lewandowski, Joseph | | NCIC# | |
|---|---|---|---|
| **Time Received:** 03:03:00 | **Time Cleared:** 13:36:29 | **Unit(s) Assigned:** 104, 106, 109, 301, 302, 303, : | **Payroll Number:** 6089 | **Payroll Number:** | **Report Date:** 06/23/2016 |
| **Reviewed by:** 5462 | | **Pages:** | **Payroll Number** | **Copy To** |

1 Of 2

# Wauwatosa Police Department

| Incident Report Number | Incident Location: | | Incident Date: |
|---|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | | 06/23/2016 |

NAMES

Arrested

    Anderson, Jay Loren Jr  B/M-25 of 8026 W Medford Av, MILWAUKEE,WI,53218
    DOB: 07/04/1990
    HT: 510    WT: 160    Hair: Black
    Eyes: Brown
    Other Phone:(414) 915-1521

--------------------------------------------------------------

| Reporting Officer(s): | | | Pages: |
|---|---|---|---|
| Lewandowski, | | 6089 | 2 Of 2 |

**NARRATIVE**

On 6-23-16, I sqd 135 (Griffin) was assigned by Lt. Mastrocola to interview the two Wauwatosa Fire Department Paramedics who worked on and transported our suspect to the hospital. I went to fire station number 2 and spoke with each subject individually.

**INTERVIEW OF WAUWATOSA PARAMEDIC BRIAN O'DAY**

I first spoke with Lieutenant Brian O'Day (w/m 10-13-58) who stated he has been with the fire department for 15 years, a paramedic for 13 years, and a Lieutenant for 6 years. This morning Lt O'Day was the supervisor on Med 52. He rode in the passenger seat and was responsible for reports and decisions on patient care.

Lt O'Day stated as they drove to the scene he did not see any other cars on the street and he did not observe anyone walking or loitering in the area.

Lt O'Day stated when they pulled into the lot he saw the police officers pulling a subject out of the car from the driver's door. The subject was placed face up on the ground with his head near the car and feet away from the car. The officers then checked the subject using their flashlights.

Lt. O'Day did not hear any comments from the officers or the suspect.

Lt. O'Day observed two wounds on the subject. A wound on the subject's right cheek just below the eye and a wound behind the subjects left ear. A large pool of blood formed as the subject lay on the ground.

Lt. O'Day put pads on the subject and the subject had a rhythm and a pulse, but he was not breathing. The subject was placed on a cot and placed in the ambulance where they started ventilation with a bag valve mask and established an IV. As they monitored the subject a rhythm change was noticed and CPR was administered, a tube was also placed down the subject's throat for controlled ventilation. A second IV was established.

An organized rhythm was observed and the subject did have a pulse so he was transported to the hospital. On the way to the hospital the subject's clothes were cut off and bagged. Lt O'Day did not see any other signs of trauma on the subject's body.

Case 2:21-cv-00848-LA   Filed 08/22/23   Page 178 of 215   Document 91-9

| Incident Report Number | Incident Location: | Incident Date: |
|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | 06/23/2016 |

At the hospital the subject was wheeled into the trauma team and turned over the hospital staff. Lt O'Day stated he completed his paperwork at the hospital and before he left he was told the subject had passed.

INTERVIEW OF WAUWATOSA PARAMEDIC DAVID TIPPEL

I spoke with firefighter/paramedic David P. Tippel (w/m 2-4-75) who stated he has been with the fire department for 16 years and a paramedic for 3 years. This morning Paramedic Tippel was the driver of Med 52.

Paramedic Tippel stated as he drove to the scene he did not see any other cars and he did not observe anyone in the area when he arrived.

When Paramedic Tippel drove into the lot he saw two police officers pulling a subject out of the driver's door of a parked auto. Paramedic Tippel drove east past the officers and parked the rig on the driver's side of the subject's car, with the back of the rig stopping just past the driver's door. The subject was placed on the ground face up with his head near the car and his feet away.

Paramedic Tippel did not hear any comments coming from the officers or the suspect.

Paramedic Tippel checked the subject's left arm for a pulse and did find a good pulse, but the subject was not breathing. Paramedic Tippel saw a wound to the subject's right cheek just below the eye. Paramedic Tippel also observed a large (2ft) pool of blood on the ground below the subject's head.

The subject was placed on a cot and put in the ambulance where Paramedic Tippel started an IV in the subject's left arm and then a second IV in the subject's right arm. Both IV's were to introduce saline into the subject's body. The subject was being monitored in the rig when a rhythm change occurred and CPR was started. Paramedic Tippel stated the subject was pulseless, but his pulse did come back as they worked on him.

At the hospital the subject was wheeled into the trauma center where they were met by a team of doctors. Paramedic Tippel stated he wheeled the cart out of the room and went back to the rig to wait for Lt. O'Day. He learned from Lt O'Day that they subject had died.

# Wauwatosa Police Department

| Incident Report Number | Incident Location: | Incident Date: |
|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | 06/23/2016 |

NAMES

Assisting Officer
    Griffin, Det Jeffrey  W/M of 1700 N 116 St, Wauwatosa,WI,53226
    Home Phone:(414) 471-8430

Contact Person-1
    O''Day, Brian  W/M-57 of 4187 N Mayfair rd, Wauwatosa,WI,53226
    DOB: 10/13/1958
    Work Phone:414471846

Contact Person-2
    Tippel, David P  W/M-41 of 4187 Nmayfair rd., Wauwatosa,WI,53226
    DOB: 02/04/1975
    Work Phone:(414) 471-8461

-------------------------------------------------------------------

*137*

Reporting Officer(s):
Griffin, Jeffrey

| Incident Report Number: | Incident Location: | | | Incident Date: |
|---|---|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | | | 06/23/2016 |
| New Incident: | | Original CFS Code - 1: 0999 | New CFS Code -1 : | New CFS Code - 2: |

NARRATIVE

Case Assignment

On 06-23-2016 I, Detective Joe Lewandowski, was assigned, by Detective Lieutenant James Mastrocola, to assist with this investigation. My first assignment was to make contact with Wauwatosa Police Officers Tyler L'Allier and Andy Floryance at Froedtert Hospital. At the time of my assignment, the condition of the suspect was unknown.

Froedtert Hospital

Upon my arrival at Froedtert, I entered into the Trauma room and learned that the suspect, later identified as Jay Loren Anderson Jr (M/B 07/04/1990), was deceased. Milwaukee Police Detective Matthew Gadzalinski (squad 9536) was already present and gathering information; for additional information, see Det Gadzalinski's report (MPD Case # 16-175-0037).

Wauwatosa Fire Station #2

After leaving Froedtert Hospital, I was assigned to interview Wauwatosa Fire Fighter Christopher L Schultz at Fire Station #2.

Upon arrival, Firefighter Schultz and I talked in the kitchen away from any other employees. Firefighter Schultz is assigned to Fire Engine #52. He recalls being dispatched to an "ALS assignment" (Advanced Life Support). While en route, dispatch advised that this call was an Officer Involved Shooting and they were directed to stage at the corner of N 100 St/Glendale Ave. They were stopped there for less than a minute when dispatch notified responding WFD vehicles that the scene was secure.

| Reporting Officer(s): | | Payroll Number: | Payroll Number: | | Report Date: |
|---|---|---|---|---|---|
| Lewandowski, Joseph | | 6089 | | | 06/23/2016 |
| Reviewed by: 5462 | Payroll Number: 5462 | | Copy To: | Page: | 1 Of 3 |

Case 2:21-cv-00848-LA   Filed 08/22/23   Page 181 of 215   Document 91-9

# Wauwatosa Police Department

**Continuation**

| Incident Report Number | Incident Location: | Incident Date: |
|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | 06/23/2016 |

When the engine arrived in the parking lot of Madison Park, Firefighter Schultz observed two officers carrying a subject next to a vehicle, Firefighter Schultz assumed that the suspect was removed from the vehicle. Firefighter Schultz assisted WFD Paramedic Tipple with equipment; he first took over a stretcher and then went back to retrieve the Oxygen tank and Medical bag.

Firefighter Schultz helped WFD members load the patient onto the stretcher and overheard another firefighter announce that the patient had a pulse. Once in the ambulance, Firefighter Schultz placed an oral airway. At one point, Paramedic Tipple removed the oral airway and switched to a King Airway. Firefighter Schultz took over on the bag and continued to operate it until they arrived at the hospital.

At the hospital, Firefighter Schultz passed the bagging responsibility over to WFD Captain Scot R Freidrick. Firefighter Schultz then assisted Paramedic Tipple clean out the back of the ambulance.

I asked Firefighter Schultz if he was able to make any observations about the patient. He told me that the patient was never breathing on his own but did have a pulse. There were, at least, two times that Firefighter Schultz obtained a carotid pulse of 112 beats/minute. He recalls seeing, at least, two gunshot wounds; one in the cheek and one behind his ear. Firefighter Schultz recalls a significant amount of blood and thinks that he smelled alcohol coming from the patient.

Milwaukee County Medical Examiner

Following my interview with Firefighter Schultz, I arrived at the Milwaukee County Medical Examiner's Office for the autopsy of Jay L Anderson. Also present was Milwaukee Police Investigator Michael Braunreiter (Squad 9522). For additional information, see MPD supplemental report by Braunreiter (MPD Case # 16-175-0037).

# Wauwatosa Police Department

**Continuation**

| Incident Report Number | Incident Location: | |
|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | |
| | | Incident Date: 06/23/2016 |

NAMES

Assisting Officer-1
    Lewandowski, Det Joseph  W/M of 1700 N 116 St, Wauwatosa,WI,53226
        Work Phone:(414) 471-8430


Assisting Officer-2
    Braunreiter, Michael  W/M of 749 W State St, Milwaukee,WI,53233
        Work Phone:(414) 935-7360


Other
    Schultz, Christopher  W/M-49 of 4187 N Mayfair Rd, Wauwatosa,WI,53222
    DOB: 08/23/1966
    Work Phone:(414) 471-8461        Cell Phone:(262) 751-3161


Assisting Officer-3
    Gadzalinski, Det Matthew  W/M of 749 W State St, Milwaukee,WI,53233
        Work Phone:(414) 935-7360        Cell Phone:(414) 233-8453

--------------------------------------------------------------------

/ 4 0

Reporting Officer(s):
Lewandowski, Joseph

ID Number: 8089

3 Of 3

## Wauwatosa Police Department

## Supplementary Report

| Incident Report Number: | Incident Location: | | Incident Date: |
|---|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | | 06/23/2016 |
| New Incident: | Original CFS Code - 1: | New CFS Code -1 : | New CFS Code - 2: |
| | 0999 | | |

NARRATIVE

16-18370                     Thursday, June 23, 2016

Madison Park
9800 W Glendale Avenue
Wauwatosa, WI 53225

Suspicious Circumstances

This report is written by Detective Paula Roberson.

Assignment
On Thursday, June 23, 2016 at 0455, I responded to Madison Park, 9800 W.
Glendale Avenue, to assist with the investigation. Once on scene, I learned
that Milwaukee Police Department would be handling this investigation. I was
then assigned to conduct the neighborhood canvas with Detective Joseph Roy.

Lutheran Manor
Detective Roy and I responded to 4535 N. 92nd Street and me with Jason Wilson,
the security officer at the front desk. After advising Wilson of the
situation and obtaining a property map, we proceeded to canvas buildings Q, R,
F and O. I obtained the following results:

Q Building

None of the apartments in this building have west facing windows. The
sitting area does have one west facing window but appears to have been
unoccupied at the time of this incident.

Q305 is the westernmost apartment on the third floor. The resident is listed
as Eleanor Ciurro but I was not able to make contact with her.

Q306 is occupied by Gil Steffen. Steffen stated he was sleeping at that time
and did not hear anything unusual.

Q307 is occupied by Frank Coogan. Coogan stated he was asleep all night and
did not wake up until 0600. He was not even aware of the police presence at

| Reporting Officer(s): | | Payroll Number: | | Payroll Number: | | Report Date: |
|---|---|---|---|---|---|---|
| Roberson, Paula R. | | 5694 | | | | 06/23/2016 |
| Reviewed by: | Payroll Number: | | Copy To: | | Page: | |
| 5462 | 5462 | | | | 1 Of 5 | |

# Wauwatosa Police Department

| Incident Report Number | Incident Location: | Continuation |
|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | Incident Date: 06/23/2016 |

the park.

Q302 is occupied by Dan Anderson. Anderson stated he was asleep all night and did not hear anything unusual.

Q301 is occupied by Inga Harwick. Harwick stated she was awake around 0300 because she went to the bathroom. She stated her apartment windows were open. She stated that she did not hear anything unusual during that time and explained that she did not have her hearing aids in.

Q309 should be occupied by Maury and Gloria Weinhold. No one answered when I knocked at 0634.

Q103 should be occupied by Lois VanDervan. No one answered when I knocked at 0641.

Q102 is occupied by Jean M. Rosier. Rosier stated she was sleeping at that time and did not hear anything unusual.


F Building

None of the apartments in this building have west facing windows.

F203 is occupied by Delores Nix. Nix stated she was asleep and did not wake up throughout the night.

F105 is occupied by Suzanne Badten. Badten stated she was asleep all night and did not hear anything unusual.


O Building

This building runs north and south. A few of the apartments have west facing windows but the view of the Madison Park Parking lot is partially obstructed by the trees.

O207 is occupied by Martha Andeen. Andeen stated that she was asleep all night and then explained that her blinds and drapes have been closed since the previous evening. She stated she wears a hearing aid and was not wearing them while asleep. She explained that even if she was awake during the time of the incident, she still would not have heard or seen anything because of the closed drapes and not wearing her hearing aid.

| ID Number | ID Number | Pages: |
|---|---|---|
| 5694 | | 2 of 5 |

# Wauwatosa Police Department

## Continuation

| Incident Report Number | Incident Location: | Incident Date: |
|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | 06/23/2016 |

*1 4 7*

# Wauwatosa Police Department

## Continuation

| Incident Report Number | Incident Location: | Incident Date: |
|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | 06/23/2016 |

NAMES

Investigator
    Roberson, Det Paula  B/F of 1700 N 116 St, Wauwatosa,WI,53226
    Work Phone:(414) 471-8430

Other-1
    Anderson, Daniel T  W/M-44 of 4535 N 92 St,Q302, Wauwatosa,WI,53225
    DOB: 12/06/1971
    Home Phone:(414) 588-8443

Other-2
    Ziegler, Joyce  W/F-79 of 4535 N 92 St,Q303, Wauwatosa,WI,53225
    DOB: 08/30/1936
    Cell Phone:(414) 559-9029

Other-3
    Steffen, Gil  W/M-90 of 4535 N 92 St,Q306, Wauwatosa,WI,53225
    DOB: 08/13/1925
    Home Phone:(414) 332-2773

Other-4
    Coogan, Frank  W/M-87 of 4535 N 92 St,Q307, Wauwatosa,WI,53225
    DOB: 06/14/1929
    Home Phone:(414) 339-3600

Other-5
    Harwick, Inga  W/F-91 of 4535 N 92 St,Q301, Wauwatosa,WI,53225
    DOB: 03/05/1925
    Home Phone:(414) 527-1099

Other-6
    Rosier, Jean M  W/F-90 of 4535 N 92 St,Q102, Wauwatosa,WI,53225
    DOB: 04/09/1926
    Home Phone:(414) 438-9226

/ 44

Reporting Officer(s):
Roberson, Paula R

# Wauwatosa Police Department

## Continuation

| Incident Report Number | Incident Location: | Incident Date: |
|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | 06/23/2016 |

Other-7
>     Nix, Delores   W/F-87 of 4535 N 92 St,F203, Wauwatosa,WI,53225
>     DOB: 09/16/1928
>     Home Phone:(414) 535-9206

Other-8
>     Badten, Suzanne   W/F-83 of 4535 N 92 St,F105, Wauwatosa,WI,53225
>     DOB: 09/18/1932
>     Home Phone:(414) 461-8281

Other-9
>     Andeen, Martha   W/F-95 of 4535 N 92 St,O207, Wauwatosa,WI,53225
>     DOB: 05/01/1921
>     Home Phone:(414) 578-2809

------------------------------------------------------------------------

| Reporting Officer(s): | ID Number | ID Number | Page |
|---|---|---|---|
| Roberson, | 8694 | | 5 Of 5 |

| Incident Report Number:<br>16-018370 | Incident Location:<br>9800 W Glendale Av, Wauwatosa, WI, 53225 | | Incident Date:<br>06/23/2016 |
| --- | --- | --- | --- |
| New Incident: | Original CFS Code - 1:<br>0999 | New CFS Code -1 : | New CFS Code - 2: |

NARRATIVE

ASSIGNMENT

On 06-23-16 I was given the assignment by Detective Sergeant Brian Skornia of performing a canvass related to an officer involved shooting in Madison Park at about 3:00 AM on 06-23-16. I was given the following apartment units at Luther Manor to make contact with:

Q100, Q103, Q104, Q206, Q305, Q309

R101, R106, R107, R109, R207, R308

F204, F207

O210

I made contact with the following Luther Manor residents:

R106: Ruth Hartwig F/W, 04-03-20 who did not know anything about a police incident until I knocked on her door. I asked her for her phone number, but she did not recall it.

R109: Jerold J Kassens M/W, 12-15-33, C-414-331-9469 who stated he woke up around 3:00 AM to use the bathroom. He saw a police car without red and blue emergency lights drive past his unit on the perimeter road of Luther Manor (this does not connect to Madison Park). He did not see any emergency lights or hear any sirens. He did not hear any gun fire and did not know about the shooting until morning.

Q100: Adeline Amberg F/W, 06-01-18, H-414-462-1416 who stated she was sleeping at 3:00 AM and did not hear or see anything related to the shooting.

| Reporting Officer(s):<br>Romeis, Michael W. | Payroll Number:<br>5807 | Payroll Number: | Report Date:<br>06/23/2016 |
| --- | --- | --- | --- |
| Reviewed by:<br>5462 | Payroll Number:<br>5462 | Copy To: | Page:<br>1 Of 3 |

# Wauwatosa Police Department

**Continuation**

| Incident Report Number | Incident Location: | Incident Date: |
|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | 06/23/2016 |

Q103: Lois VanDerven F/W, 05-19-27, H-414-464-5121 who stated she was sleeping at 3:00 AM and did not hear or see anything related to the shooting.

Q104: Vacant unit.

Q206: Wolf Knappe M/W, 03-30-26, H-414-466-0974 who stated he was sleeping at 3:00 AM and did not hear or see anything related to the shooting.

Q305: Eleanor T Ciurro F/W, 01-06-24, H-414-464-0826 who stated she was sleeping at 3:00 AM and did not hear or see anything related to the shooting.

Q309: No answer. Name plate on door was Maury and Gloria Weinhold. I left my business card.

See Detective Keck's supplement for units R101, R107, R207, R308, F204, F207, O210.

*/47*

Reporting Officer(s):
Romeis, Michael W.

ID Number
9807

Case 2:21-cv-00848-LA   Filed 08/22/23   Page 190 of 215   Document 91-9

2 Of 3

**Wauwatosa Police Department**

**Continuation**

| Incident Report Number | Incident Location: | Incident Date: |
|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | 06/23/2016 |

NAMES

Investigator
    Romeis, Det Michael  W/M of 1700 N 116 St, Wauwatosa,WI,53226
      Home Phone:(414) 471-8430


Other-1
    Kassens, Jerold  W/M-82 of 4545 N 92 St,R109, Wauwatosa,WI,53213
      DOB: 12/15/1933


Other-2
    Vanderven, Lois M  W/F-89 of 4535 N 92 St #Q103, Wauwatosa,WI,53225
      DOB: 05/19/1927
      Home Phone:(414) 464-5121


Other-3
    Hartwig, Ruth M  W/F-96 of 4545 N 92 St,106, Wauwatosa,WI,53225
      DOB: 04/03/1920
      Home Phone:(414) 464-0947


Other-4
    Knappe, Wolf  W/M-90 of 4535 N 92 St,Q206, Wauwatosa,WI,53225
      DOB: 03/30/1926
      Home Phone:(414) 466-0974


Other-5
    Ciurro, Eleanor T  W/F-92 of 4535 N 92 St,Q305, Wauwatosa,WI,53225
      DOB: 01/06/1924
      Home Phone:(414) 464-0826


Other-6
    Amberg, Adeline  W/F-98 of 4535 N 92 St,Q 100, Wauwatosa,WI,53225
      DOB: 06/01/1918
      Home Phone:(414) 462-1416

--------------------------------------------------------------------------

/ 48

| Reporting Officer(s): | ID Number | IO Number | Pages: |
|---|---|---|---|
| Romeis, Michael P. | | | 3 of 3 |

NARRATIVE

Assignment


On 6/23/16 at approximately 6:00 AM , I, Detective Joseph Roy, was given the assignment by Detective Lieutenant James Mastrocola of performing a canvass related to an officer involved shooting in Madison Park at approximately 3:00 AM on 6/23/16. I proceeded to Luther Manor, wher I made contact with the following people:

Upon arrival, Detective Paula Roberson and I made contact with Jason E. Wilson (M/B 3/28/81), a Security Officer with Luther Manor, and advised him that we would be canvassing the buildings. I also asked Wilson to have his supervisor, Thomas Christopher, contact me in regards to any available pertinent surveillance video.

Detective Roberson and I started in the buildings that would have offered the best view of the incident. I made contact with the following residents:

Q305: No Answer at the door.

Q304: Vacant Unit

Q200: Vacant Unit

Q201: Gladys C. Hoppe (F/W 12/9/25) stated that she was asleep at the time of the incident and hadn't seen or heard anything.

Q202: Vacant

Q203: Vacant

Q204: Vacant

Q205: John E. Keller (M/W 4/23/24), stated that he was asleep at the time of the incident and hadn't seen or heard anything.

Q206: No Answer at the door.

Q207: Vacant

Q208: Vacant

| Reporting Officer(s):<br>Roy, Joseph E. | | Payroll Number:<br>6063 | | Payroll Number: | | Report Date:<br>06/24/2016 |
| --- | --- | --- | --- | --- | --- | --- |
| Reviewed by:<br>5462 | | Payroll Number:<br>5462 | | Copy To: | Page:<br>1 Of 8 | |

**Wauwatosa Police Department**     **Continuation**

| Incident Report Number | Incident Location: | Incident Date: |
|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | 06/23/2016 |

Q209: Paul M. Thibaudeau (M/W 1/16/48), 414-393-2042. Mr. Thibaudeau reported
that he was awake at the time of the incident and clearly hear what he
believed to be a string of 5 gunshots in short succession. Mr. Thibaudeau
reported that he then heard sirens approaching from the distance, and believed
they were responding to the "area of the park" while he was pointing in the
direction of Madison park. Mr. Thibaudeau stated that he didn't see the
incident, just heard gunfire.

Q100: No Answer

Q101: Det. Roberson handled.

Q102: Det. Roberson handled.

Q103: Det. Roberson handled.

Q104: No Answer

Q105: Det. Roberson handled.

Q106: Det. Roberson handled.

Q107: Det. Roberson handled.

Q108: Harvin A. Abrahamson (M/W 7/31/24) reported that at about 3:00 AM he
heard what he thought was knocking on his door, but he was in bed and did not
get up to investigate.

Q109: Marilyn H. Arndt (F/W 7/19/25) stated that she was asleep at the time of
the incident and hadn't seen or heard anything.

R300: Gert D. Tews (F/W 12/1/18)  stated that she was asleep at the time of
the incident and hadn't seen or heard anything.

R301: Vacant

R302: Marcella R. Heimerl (F/W 5/16/28)  stated that she was asleep at the
time of the incident and hadn't seen or heard anything.

R303: Lorraine Biang- I was informed by the neighbor in R304 that Ms. Biang is
95 years old, deaf and won't answer the door. I was unable to speak with her.

R304: Dave E. Myers (M/W 8/14/41), 414-445-7855, reported that he heard sirens
in the area but no shots. He stated that the sirens woke him up and at
approximately 3:00AM he got up and looked out his window which faces toward
Madison Park. He observed "at least 10 police cars and other vehicles with

*150*

# Wauwatosa Police Department

## Continuation

| Incident Report Number | Incident Location: | Incident Date: |
|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | 06/23/2016 |

their flashing lights on." Mr. Myers didn't hear see anything else.

R305: Vacant

R306: Vacant.

R307: Joyce C. Heinrich (F/W 1/25/30) stated that sometime before 4:30AM she was woken up by sirens but couldn't see anything.

R308: No Answer

R309: Vacant

R200: Vacant

R201: Vacant

R202: Erwin G. Wegner (M/W 6/15/30) heard what he described as "knocking" at some point in the middle of the night but didn't get out of bed to investigate.

R203: Lorraine H. Guenther (F/W 4/29/20) stated that at some point in the middle of the night she heard sirens and "knocking." She couldn't recall which was first and didn't get up to investigate the noises.

R204: Vacant

R205: Vacant

R206: Vacant

R207: No Answer

R208: Vacant

R209: Marge I. Jothan (F/W 3/13/19) had been awake since approximately 3:00 AM but hadn't heard or seen anything.

R100: Vacant

R101: No Answer

R102: Vacant

R103: Vacant

R104: Vacant

_151_

| Reporting Officer(s): | | ID Number | ID Number | Pages: |
|---|---|---|---|---|
| Roy, Jose | | | | 9 of 8 |

# Wauwatosa Police Department

## Continuation

| Incident Report Number | Incident Location: | Incident Date: |
|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | 06/23/2016 |

R105: Vacant

R106: No Answer.

R107: No Answer.

R108: Vacant

R109: No Answer

R110: Joan M. Evans (F/W 10/26/37) stated that both she and her husband were asleep at the time of the incident and had not heard or seen anything.

O211: Vacant

O210: No Answer

F200: Vacant

F201: Vacant

F202: Vacant

F203: Det. Roberson handled.

F204: No Answer

F205: Ariel T. Pulliam-Love (F/B 11/4/94) was awake at the time of the incident but didn't hear or see anything.

F206: Vacant

F207: No Answer

F208: Vacant

F209: Vacant

F210: Vacant

F211: Vacant

Follow-Up on Video Surveillance

    On 6/23/16 at approximately 2:00 PM I received a phone call from Tom Christopher in regards to the video surveillance. He indicated that the DVR

/52

Reporting Officer(s):
Roy, Joseph B.

ID Number | ID Number | Pages:
1 of 8

Case 2:21-cv-00848-LA   Filed 08/22/23   Page 195 of 215   Document 91-9

# Wauwatosa Police Department

## Continuation

| Incident Report Number | Incident Location: | Incident Date: |
|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | 06/23/2016 |

system which handles the cameras that face north and south along the western edge of the property was not functioning at the time and as such there was no surveillance video in the area.


Detective Joseph Roy, #6063

Case 2:21-cv-00848-LA   Filed 08/22/23   Page 196 of 215   Document 91-9

| Incident Report Number | Incident Location: | Incident Date: |
|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | 06/23/2016 |

**NAMES**

**Investigator**
    Roy, Det Joseph  W/M of 1700 N 116 St, Wauwatosa,WI,53226
    Home Phone:(414) 471-8430

**Other-1**
    Guenther, Lorraine Helen  W/F-96 of 4535 N 92 St,R203, Wauwatosa,WI,53225
    DOB: 04/29/1920
    Home Phone:(414) 461-4496

**Contact Person-1**
    Christopher, Thomas Patrick  W/M-66 of 4545 N 92 St,BLDG, Wauwatosa,WI,53225
    DOB: 02/15/1950
    Work Phone:(414) 464-3880

**Contact Person-2**
    Wilson, Jason E  B/M-35 of 3917 N 76TH ST # 2, MILWAUKEE,WI,53222
    DOB: 03/20/1981
    Other Phone:(414) 364-4500

**Other-2**
    Keller, John E  W/M-92 of 4535 N 92 St,Q205, Wauwatosa,WI,53225
    DOB: 04/23/1924

**Other-3**
    Hoppe, Gladys C  W/F-90 of 4535 N 92 St,Q201, Wauwatosa,WI,53225
    DOB: 12/09/1925

**Other-4**
    Thibaudeau, Paul M  W/M-68 of 4535 N 92 St,Q209, Wauwatosa,WI,53225
    DOB: 01/16/1948
    Home Phone:41439320

**Other-5**
    Arndt, Marilyn H  W/F-90 of 4535 N 92 St,Q109, Wauwatosa,WI,53225

_154_

| Reporting Officer(s): | ID Number | ID Number | Pages: |
|---|---|---|---|
| Roy, Joseph E | 6063 | | 5 of 8 |

# Wauwatosa Police Department

**Continuation**

| Incident Report Number | Incident Location: | Incident Date: |
|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | 06/23/2016 |

DOB: 07/19/1925

Other-6
  Arndt, Harvin A  W/M-91 of 4535 N 92 St,Q108, Wauwatosa,WI,53225
  DOB: 07/31/1924

Other-7
  Evans, Joan M  W/F-78 of 4535 N 92 St,R110, Wauwatosa,WI,53225
  DOB: 10/26/1937
  Cell Phone:(623) 214-7936

Other-8
  Jothen, Marge I  W/F-97 of 4535 N 92 St,R209, Wauwatosa,WI,53225
  DOB: 03/13/1919

Other-9
  Myers, David E  W/M-74 of 4535 N 92 St,R304, Wauwatosa,WI,53225
  DOB: 08/14/1941
  Home Phone:(414) 445-7855

Other-10
  Heimerl, Marcella R  W/F-88 of 4535 N 92 St,R302, Wauwatosa,WI,53225
  DOB: 05/16/1928

Other-11
  Tews, Gert D  W/F-97 of 4535 N 92 St,R300, Wauwatosa,WI,53225
  DOB: 12/01/1918

Other-12
  Pulliam-Love, Ariel T  B/F-21 of 4535 N 92 St,F205, Wauwatosa,WI,53225
  DOB: 11/04/1994
  Cell Phone:(414) 326-7568

Other-13
  Wegner, Erwin G  W/M-86 of 4535 N 92 St,R202, Wauwatosa,WI,53225
  DOB: 06/15/1930

155

# Wauwatosa Police Department

| Incident Report Number | Incident Location: | **Continuation** |
|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | Incident Date:<br>06/23/2016 |

Other-14

    Heinrich, Joyce  W/F-86 of 4535 N 92 St,R307, Wauwatosa,WI,53225
    DOB: 01/25/1930
    Work Phone: (414) 527-7857

-------------------------------------------------------------------

15b

Reporting Officer(s):

Roy, Joseph E

NARRATIVE

### INTERVIEW OF WAUWATOSA FIRE DEPT. CAPTAIN SCOT FRIDRICK

On 06-23-16, I was assigned to interview Wauwatosa Fire Department Captain Scot Fridrick regarding the officer involved shooting at Madison Park.

I met with Fridrick at Wauwatosa Fire Station 52 located at 4187 N. Mayfair Rd. at approximately 7:10 AM. Fridrick was the station commander at the time of the incident.

Fridrick believed that the call came in at approximately 3:00 AM and they were dispatched to an ALS (advanced life support) call for engine 52 and med 52 (paramedic unit) at Madison Park. Once they had got to the engine and med unit, they acknowledged the call to dispatch and they were advised that the call was an officer involved shooting. Fridrick advised he was assigned to Engine 52 with MPO Patrick Quinlevan and Firefighter Christopher Schultz. Med 52 was staffed by Lt. Brian O'Day and Firefighter/Paramedic David Tippel.

As they were arriving at the scene, they were advised by dispatch that the scene was secure so they continued into the parking lot and parked to the South of the suspect's vehicle. Fridrick said upon their arrival he observed at least two police officers removing the suspect, later identified as Jay L. Anderson M/B 07-04-90, from the driver's seat of a dark colored sedan. Fridrick said the suspect vehicle was facing west and the Officers placed the suspect outside the driver side of the car with his head facing to the North and his feet to the South. Fridrick noted a pool of blood forming under the suspect's head. Fridrick said Johnson was unconscious and was not breathing but did have a pulse.

Fridrick said Johnson was placed on a cot and moved to the rescue squad where Lt. O'Day and Tipple began to treat him. This included rescue breathing for Johnson using a bag valve mask, placing "D-fib" pads on his chest, inserting a #4 King airway and starting one IV in each arm for fluids. While they were treating Johnson, he went pulseless. Fridrick and MPO Quinlevan switched off providing chest compressions until they were able to regain a pulse.

At this point, Fridrick said the decision was made to transport Johnson to Froedtert Hospital. Fridrick drove the rescue squad while Lt. O'Day FF/Paramedic Tipple and FF Schultz remained with Johnson. Also present in the rescue squad was a Wauwatosa Police Officer. Fridrick did not know the Officer's name. MPO Quinlevan remained at the scene with Engine 52. Fridrick

# Wauwatosa Police Department

**Continuation**

| Incident Report Number | Incident Location: | Incident Date: |
|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | 06/23/2016 |

drove in Emergency mode to Froedtert with a Wauwatosa Police Squad following the rescue squad. Fridrick said he took N. 100 St. to Hampton Ave., went West on Hampton to the freeway (Highway 45), took the freeway South and exited on Watertown Plank Rd and then went East to Froedtert.

Fridrick said Johnson condition remained the same when they turned him over to the trauma room staff. While they were at the hospital cleaning up, they learned from hospital staff that Johnson had passed away.

Fridrick added that while at Froedtert, Johnson's shirt, which had been cut off him during treatment, was turned over to a Wauwatosa Police Officer. Fridrick said while he was at the hospital he spoke briefly with an MPD detective about this incident.

Fridrick stated that during his contact with Johnson he never regained consciousness and did not say anything. Fridrick said he spoke with two Wauwatosa Police Officers at the scene. Fridrick did not know either of the Officers that he spoke to. Fridrick said he asked one Officer for the suspect's name. The Officer, who had a beard, gave Fridrick Johnson's driver's license. Fridrick recorded the information and returned the Driver's License to the Officer.

Fridrick asked the second Officer which Officer shot the suspect. The officer gave him a name, which Fridrick could not recall. Fridrick asked if the Officer was OK and was told that he was. Fridrick then asked if Johnson had been shot at close range and he was advised that he had been.

I also asked Fridrick if he had observed any witnesses at the scene and he said that he had not observed anyone.

STATEMENT OF LAWRENCE POLLOCK

On 06-23-16 at approximately 8:00 AM Det. Jeffrey Griffin and I responded to 4475 N. 99 St where we met with resident Lawrence R. Pollock W/M 04-04-51 regarding this incident.

Pollock said last evening he went to bed at about 2:20 AM. Pollock said he was sleeping with the windows in his bedroom open. Pollock's bedroom is located in the Northeast corner of his home.

At 3:05 AM, Pollock said he awoke to the sound of gunshots. Pollock was sure of the time because he looked at his clock. Pollock said the shots were in the distance. Pollock said he heard eight to ten shots in a rapid, evenly spaced cadence. At 3:08 AM, Pollock said he heard a police squad go through the intersection of N. 100 St. and W. Ruby Ave headed north, followed

*153*

# Wauwatosa Police Department

## Continuation

| Incident Report Number | Incident Location: | Incident Date: |
|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | 06/23/2016 |

by a number of additional squads. Pollock assumed that something had happened at the Fountains Apartments because of previous problems there.

At about 5:00 AM, Pollock went for a walk and observed the police activity at Madison Park.

*159*

Case 2:21-cv-00848-LA   Filed 08/22/23   Page 202 of 215   Document 91-9

| | ID Number | ID Number | Pages: |
|---|---|---|---|
| | | | 3 of 4 |

| Incident Report Number | Incident Location: | Incident Date: |
|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | 06/23/2016 |

NAMES

Assisting Officer
     Deisinger, Det Michael  W/M of 1700 N 116 St, Wauwatosa,WI,53226
        Work Phone:(414) 471-8430

Contact Person
     Fridrick, Scott  W/M of 10525 Watertown Plank Rd, Wauwatosa,WI,53226
        Work Phone:(414) 471-8463        Cell Phone:(414) 617-8064

Witness
     Pollock, Lawrence R  W/M-65 of 4475 N 99 St, Wauwatosa,WI,53225
        DOB: 04/04/1951
        Home Phone:(414) 466-4309

--------------------------------------------------------------------

*/6 D*

| Reporting Officer(s): | ID Number | ID Number | Pages: |
|---|---|---|---|
| Deisinger, Michael A | | | |

| Incident Report Number: 16-018370 | Incident Location: 9800 W Glendale Av, Wauwatosa, WI, 53225 | | Incident Date: 06/23/2016 |
|---|---|---|---|
| New Incident: | Original CFS Code - 1: 0999 | New CFS Code -1 : | New CFS Code - 2: |

NARRATIVE

CANVASS OF RESIDENTS AT LUTHER MANOR

On Thursday, 06/23/16 I (Det. Martin Keck, Sq. 234) was directed to assist with a canvass of some residents at Luther Manor, 4545 N. 92nd St. I spoke to residents at the following apartments:

*APARTMENT R101*

I attempted contact but received no answer. I left my business card and requested a call.

*APARTMENT R207*

I attempted contact but received no answer. I left my business card and requested a call.

*APARTMENT R308*

I spoke to the resident, Lorrie M. Stanek (F/W 07/04/25). She advised she was home asleep during the overnight hours of 06/22/16 to 06/23/16. She did not hear or see anything out of the ordinary.

*APARTMENT F204*

I spoke to the resident, Ruth M. Militzer (F/W 07/01/34). She advised she was in bed lying awake. Her bedroom patio door was cracked open. Just after 3am, she heard "Bang, Bang, Bang." She believed the bangs were gunshots and estimated hearing five gunshots. Shortly thereafter, she heard a lot of sirens from emergency vehicles.

*APARTMENT F207*

I spoke to the resident, Vida C. Stanton (F/W 08/03/30). She advised she was awoken by three "noises" outside of her bedroom at approximately 3:15am. She explained the noises sounding like pounding on her balcony railing. She then saw flashing lights from emergency vehicles and saw two or three police cars. She then went back to bed.

*APARTMENT O210*

I attempted contact but received no answer. I left my business card and

| Reporting Officer(s): Keck, Martin N. | Payroll Number: 6295 | Payroll Number: | Report Date: 06/24/2016 |
|---|---|---|---|
| Reviewed by: 5462 | Payroll Number: 5462 | Copy To: | Page: 1 Of 3 |

# Wauwatosa Police Department

## Continuation

| Incident Report Number | Incident Location: | Incident Date: |
|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | 06/23/2016 |

requested a call.

PHONE CALL FOLLOW-UP

On Friday, 06/24/16, I spoke with residents at the following addresses:

*APARTMENT R101*

I spoke to Russell J. Hansen (M/W 04/27/47). Hansen advised he was home, but did not hear or see anything out of the ordinary.

*APARTMENT O210*

I spoke to Gloria R. Larson (F/W 01/13/32). Larson advised she was home, but did not hear or see anything out of the ordinary.

REMAINING APARTMENTS

I did not make contact with anyone from APARTMENT R207.

# Wauwatosa Police Department

## Continuation

| Incident Report Number | Incident Location: | Incident Date: |
|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | 06/23/2016 |

NAMES

Contact Person-1
    Militzer, Ruth M  W/F-81 of 4535 N 92 St,F204, Wauwatosa,WI,53225
    DOB: 07/01/1934
    HT: 51    WT: 11    Hair: Gray Or Partially
    Eyes: Green
    Home Phone:(414) 476-1817

Contact Person-2
    Larson, Gloria R  W/F-84 of 4535 N 92 St,O210, Wauwatosa,WI,53225
    DOB: 01/13/1932
    Home Phone:(414) 466-4252

Contact Person-3
    Stanton, Vida C  W/F-85 of 4535 N 92 St,F207, Wauwatosa,WI,53225
    DOB: 08/03/1930
    Home Phone:(414) 463-9894

Contact Person-4
    Stanek, Lorrie M  W/M-90 of 4535 N 92 St,R308, Wauwatosa,WI,53225
    DOB: 07/04/1925
    Home Phone:(414) 438-0434

Contact Person-5
    Hansen, Russell Joseph  W/M-69 of 4535 N 92 St,R101, Wauwatosa,WI,53225
    DOB: 04/27/1947
    HT: 511    WT: 210    Hair: Gray Or Partially
    Eyes: Blue
    Other Phone:(414) 419-2776

--------------------------------------------------------------------

163

| Reporting Officer(s): | ID Number | IO Number | Pages: |
|---|---|---|---|
| Keck, Martin N | | | 3 of 3 |

Case 2:21-cv-00848-LA   Filed 08/22/23   Page 206 of 215   Document 91-9

| Incident Report Number: | Incident Location: | | | Incident Date: |
| --- | --- | --- | --- | --- |
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | | | 06/23/2016 |
| New Incident: | | Original CFS Code - 1: | New CFS Code -1 : | New CFS Code - 2: |
| | | 0999 | | |

NARRATIVE

On 6-27-16, I sqd 135 (Griffin) attempted to make contact at the below listed apartments in regards to this complaint.  I did not receive an answer at either apartment, but did obtain the resident names from the directory.

Q309= Maurice and Gloria Weihold.
R207= Norb Engebrecht

164

| Reporting Officer(s): | Payroll Number: | Payroll Number: | Report Date: |
| --- | --- | --- | --- |
| Griffin, Jeffrey S. | 5311 | | 06/27/2016 |
| Reviewed by: | Payroll Number: | Copy To: | Page: |
| 5462 | 5462 | | 1 Of 1 |

## Wauwatosa Police Department

### Supplementary Report

| Incident Report Number: | Incident Location: | Incident Date: |
|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | 06/23/2016 |

| New Incident: | Original CFS Code - 1: | New CFS Code -1: | New CFS Code - 2: |
|---|---|---|---|
| | 0999 | | |

NARRATIVE

CONTACT AT 4545 N. 92ND ST., APARTMENT R207

On Monday, 06/27/16 at approximately 6:20pm, I (Det. Martin Keck, Sq. 234) made contact with Norbert R. Engbrecht (M/W 07/08/21) at his apartment, 4545 N. 92nd St., Apartment R207. Engbrecht advised he was at home asleep during the time of this incident. He did not hear or see anything out of the ordinary.

ATTEMPT CONTACT AT 4545 N. 92ND ST., APARTMENT Q309

I went to apartment Q309 and saw Det. Romeis' business card still on the outside of the door. I attempted contact but no one answered the door.

_165_

| Reporting Officer(s): | Payroll Number: | Payroll Number: | Report Date: |
|---|---|---|---|
| Keck, Martin N. | 6295 | | 06/28/2016 |

| Reviewed by: | Payroll Number: | Copy To: | Page: |
|---|---|---|---|
| 5462 | 5462 | | 1 Of 1 |

| Incident Report Number: 16-018370 | Incident Location: 9800 W Glendale Av, Wauwatosa, WI, 53225 | | Incident Date: 06/23/2016 |
|---|---|---|---|
| New Incident: Suspicious Vehicle | Original CFS Code - 1: 0999 | New CFS Code -1 : 9093 | New CFS Code - 2: |

NARRATIVE

I (P.O. Joel Kutz) assisted with this investigation. I am primarily assigned as a School Resource Officer, assigned to Whitman Middle School (11100 W. Center St.) and the elementary and private schools on the west side of Wauwatosa. One of my assigned schools is Madison Elementary School (9925 W. Glendale Ave.), which is adjacent to Madison Park.

Madison School has digital surveillance video cameras both on the interior and exterior of the school. I informed Det. Lt. Mastrocola (SQ 171) that I have access to and am able to retrieve archived footage from those cameras. He requested that I review and download video from the area for the early morning hours of 06-23-16 between 1:00 AM and 3:30 AM.

Below is a summary of my observations:

The cameras I reviewed were MA-E-02C, MA-E-02D, MA-E-01A, MA-E-01B, MA-E-01C, MA-E-05A, MA-E-05B, and MA-E-05C. The cameras labeled with 02 in the camera name are located on the west wall of the school along N. 100th St., just south of W. Glendale Ave. and cover sections of N. 100th St. both north and south of Glendale Ave., including the intersection and Glendale Ave. east and west of the intersection. The cameras labeled with 01 in the camera name are located on the north wall of the school near the main school entrance and point north. Those cameras cover the majority of W. Glendale Ave. east of N. 100th St. and into Madison Park, including the parking lot. The cameras labeled with 05 in the camera name are located on the east wall of the school. Those cameras cover part of W. Glendale Ave. (starting with the northeast corner of the school building and to the east), the parking lot east of the school, the parking lot of Madison Park and the grassy area south of Glendale Ave. (It should be noted that all of the cameras that provide coverage of Madison Park do have partial obstructions because of trees. Also, the times between cameras may be a little varied as they are recorded on 2 separate servers whose times are not exactly synced).

1:06 AM - A marked city of Wauwatosa Police SUV can be observed driving through the Madison Park lot and then leaving the area (W/B Glendale to N/B 100th).

1:15 AM - A dark colored minivan (possibly a Dodge or Chrysler) can be observed S/B on 100th to E/B on Glendale and into the Madison Park parking lot. The van parked near the northwest corner of the lot and extinguished its headlights at 1:17 AM.

| Reporting Officer(s): Kutz, Joel R. | Payroll Number: 6064 | Payroll Number: | Report Date: 06/23/2016 |
|---|---|---|---|
| Reviewed by: 5462 | Payroll Number: 5462 | Copy To: | Page: 1 Of 4 |

# Wauwatosa Police Department

**Continuation**

| Incident Report Number | Incident Location: | Incident Date: |
|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | 06/23/2016 |

1:37 AM - A dark colored 4 door sedan (believed to be the suspect vehicle based on the fact that it entered the lot and cannot be seen leaving the lot via Glendale Ave. prior to the incident with police shortly after 3:00 AM) can be observed S/B on 100th to E/B on Glendale and into the Madison Park parking lot. The vehicle parked southeast of the minivan (toward the center of the parking lot) and extinguished its headlights at 1:38 AM. The vehicle turned its headlights on at 1:39:16 AM and of again at 1:39:23 AM, but it did not move from its parked position.

1:58 AM - 1:59 AM - A clean top black and white city of Milwaukee Police squad car can be observed driving S/B on 100th to E/B on Glendale. As it passed Madison Elementary School, the spotlight on the squad was directed north to the grassy area of the park that is west of the parking lot. The squad can then be observed going toward the southeast end of the parking lot, turning around in the lot and exiting W/B on Glendale Ave. As it drove west on Glendale, the Milwaukee squad had its spotlight directed at Madison Elementary School. At the intersection, the Milwaukee squad turned right and went N/B on 100th St. and out of the camera view.

2:00 AM - The dark colored minivan that had parked in the Madison Park parking lot at 1:15 AM can be observed turning its headlights on and leaving the parking lot, traveling W/B on Glendale and N/B on 100th.

2:16 AM - A lighter colored 4 door sedan can be observed S/B on 100th to E/B Glendale and into the Madison Park parking lot. That vehicle leaves the lot via W/B Glendale and then stops facing west on Glendale across from the east parking lot of Madison Elementary School for about 2 minutes, before it continues W/B and then S/B on 100th. The vehicle appears to have a rounded top and curved tail lights (similar to a Ford Crown Victoria or a Mercury Grand Marquis).

2:21 AM - A dark colored sedan (possibly black and similar to a Dodge Charger) can be observed along with a light colored smaller sedan (similar to an older Toyota Corolla) N/B on 100th to E/B on Glendale and into the Madison Park parking lot. Both vehicles can be observed parking near the northwest corner of the lot for just under 2 minutes. Both leave the lot at 2:23 AM, this time with the lighter sedan in front of the dark sedan. They can be observed W/B on Glendale to S/B on 100th and out of the camera view.

3:00:56 AM - Two vehicles (they appear to be the same two that were first observed at 2:21 AM) can be observed N/B on 100th past Madison Elementary, past N. 100th St. and out of camera view.

3:01:10 AM - A marked city of Wauwatosa Police SUV squad can be observed entering the Madison Park parking lot via N/B 100th to E/B Glendale. The

# Wauwatosa Police Department

**Continuation**

| Incident Report Number | Incident Location: | Incident Date: |
|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | 06/23/2016 |

squad pulls into the lot facing east to the rear of the area that the suspect vehicle had last been observed on video parking. Due to the dark conditions and the distance, the headlights and tail lights of the squad can be observed faintly.

3:06:45 AM - Near the upper left of the screen (near the squad), a series of small flashes (consistent with muzzle flashes based on my training and experience) can be observed via camera MA-E-01C and MA-E-05C.

3:08:40 AM - Other city of Wauwatosa Police squads can be observed arriving to assist P.O. Mensah (the officer in the squad that arrived at 3:01 AM).

A copy of the video was saved to a new (never before used) Kingston 8GB flash drive that I removed from its original packaging. A secondary copy was transferred from the first 8GB drive to a Kingston 16GB flash drive. Both flash drives were turned over to Lt. Mastrocola as evidence. The 8GB drive will be turned over to Milwaukee Police Department Detectives as they conduct their investigation. Footage is also saved on the secure Wauwatosa School District servers as a routine practice for all Wauwatosa School District school buildings' surveillance video.

168

# Wauwatosa Police Department

## Continuation

| Incident Report Number | Incident Location: | Incident Date: |
|---|---|---|
| 16-018370 | 9800 W Glendale Av, Wauwatosa, WI, 53225 | 06/23/2016 |

NAMES

Assisting Officer
    Kutz, PO Joel  W/M of 1700 N 116 St, Wauwatosa,WI,53226
    Work Phone:(414) 471-8430

----------------------------------------------------------------------

*169*



**Dinizulu Law Group, Ltd.**
221 North LaSalle Street | Suite 1100 | Chicago, Illinois 60601
312-384-1920 phone | 312-384-1921 fax
www.dinizululawgroup.com | www.dlg-trucking.com

Trust, Integrity & Results

June 30, 2016

<u>VIA US MAIL</u>
Chief of Police Edward A. Flynn
Milwaukee Police Department
Police Administration
749 W. State Street
Milwaukee, WI 53233

Milwaukee Police Department
Internal Affairs Division
6680 North Teutonia Avenue
Room 325
Milwaukee, Wisconsin 53209

Re:    **Client:**    Estate of Jay Anderson
        **DOI:**    June 23, 2016
        **Entity:**    Wauwatosa Police Department

Dear Chief Edward A. Flynn:

I have been retained to represent the family in the family's investigation of the circumstances of Jay Anderson's death on June 23, 2016. As you know, the shooting leading to Jay Ander's death occurred in Wauwatosa, Wisconsin.

On June 28, 2016, certain family members were afforded an opportunity to view a small portion of the video without audio. At that time, they were extremely distraught and, as lay people, could not fully comprehend the import of what was on the video.

Detective Luke O'Day and Lieutenant Paul Kavanaugh of the Milwaukee Police Department, did not allow counsel for the family an opportunity to view the video. Collectively, and as a result, the family was deprived of any meaningful interpretation of that video.

The family and I understand the Police Department's desire protect its investigation of Jay Anderson's death. In that regard, we do not wish to hinder that investigation in anyway.

However, by not permitting the family's counsel an opportunity to view the video, the Milwaukee Police Department deprived the family members of an opportunity to understand the full import of the video. Without that understanding, the family is also being deprived of any possibility of a timely closure regarding the death of their son.

Ultimately, the family would like to have the video released to the public. However, they would first like an opportunity to view the video, with audio, with counsel and/or their designee, in full before it is released to the media. The family members should not have to first see a complete sound includeddepiction of their son's death, if and when the media disseminates it. Additionally, the family would like to review accompanying police reports that provide information of the circumstances surrounding Jay Anderson's death, again with the aid of counsel.

Independent of the above request, we also have a right to these materials under the Wisconsin **Open Records Law, §19.31** *et seq*, To that end, please consider this letter a formal request for the materials delineated below pursuant to that Act:

1. An opportunity for the family and I, and/or a designee, to see the complete video of the events before during and after Jay Anderson's shooting and death, accompanied by the complete audio created at the scene.
2. A copy of the all reports or other documentation authored by the subject officer which provides any rendition of events surrounding Jay Anderson's death.
3. Any autopsy report and investigation as to cause of death.

Consistent with the Open Records Law, I request a written response within the 5 days should you deny this request. If you deny any or all of this request, please cite each specific exemption you feel justifies the refusal to release the information and notify

Additionally, if you expect a significant delay in fulfilling this request, please inform me as to the bases of the delay, and your estimation as to when we can view or receive the materials requested.

In the event of denial, please also provide the appeal procedures available to me under the Act.

In order to facilitate compliance with our request, I propose the following in order to accommodate all parties concerned. If we receive all of the information requested items within 7 business days, and with exception of any consultant that can further give us guidance on this matter, we agree to keep the materials received confidential. This should provide you adequate time to preserve the confidentiality and integrity of the investigation, and, at the same time, provide us with prompt acquisition of the material requested.

If the information is not provided to us in a meaningful manner within 7 business days, you leave us with the only remaining option available to us in order to uncover the information required for the family to have a complete and meaningful understanding of the events surrounding their son's death: the filing of a lawsuit, a circumstance which, at present, we would like to avoid.

Thank you for your anticipated cooperation. I look forward to hearing from you shortly. Please don't hesitate to call me if you have any questions or concerns.

Sincerely,

Yao O. Dinizulu
DINIZULU LAW GROUP, LTD.

cc:     Lieutenant Paul Kavanuagh, pkavan@milwaukee.gov
        Detective Luke O'Day, fax:414-935-7122