UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| ESTATE OF ANTONIO GONZALES, et al., | |
|---|---|
| Plaintiffs, | Case No.: 21-CV-848-LA |
| v. | |
| JOSEPH ANTHONY MENSAH, et al., | |
| Defendants. | |

| ESTATE OF JAY ANDERSON, JR., et al., | |
|---|---|
| Plaintiffs, | Case No.: 21-CV-1179-LA |
| v. | |
| JOSEPH ANTHONY MENSAH, et al., | |
| Defendants. | |

| ESTATE OF ALVIN COLE, et al., | |
|---|---|
| Plaintiffs, | Case No.: 22-CV 856-LA |
| v. | |
| JOSEPH ANTHONY MENSAH, et al., | |
| Defendants. | |

**PLAINTIFF'S PROPOSED FINDINGS OF FACT FOR
THE ESTATE OF JAY ANDERSON, JR. (21-CV-1179)**

NOW COMES Plaintiffs by and through their attorneys Cade Law Group LLC and

Motley Legal Services, to submit the following Proposed Findings of Fact pursuant to Fed. R. Civ. P. 56 and Civil L. R. 56(b)(2)(B)(ii):

**Shooting on June 23, 2016 at Madison Park**

1. Jay Anderson, Jr. legally parked his vehicle at Madison Park in Wauwatosa Wisconsin on June 23, 2016, when he was awakened, shot, and killed by Officer Joseph Mensah. ECF 47, ¶ 2.[1]

2. From approximately 1:30a.m. until 3:00 a.m. Jay simply slept in his car in Madison Park. ECF 47, ¶¶ 77, 78, 8.[2]

3. Anderson was asleep when Mensah approached to knock on his car window. Declaration of Nathaniel Cade, Jr. dated August 22, 2023, at Ex. 1 (Deposition of Joseph Mensah 02/28/2023 (hereafter "Mensah Dep. 02/28/23")), at 18:6-8, 102:9-11, 103:18-21.

4. Mensah called dispatch to alert them of an occupied vehicle in the park and provided the vehicle's license plate. Mensah Dep. 2/28/23 at 48:3-6.

5. Dispatch confirmed that the car was not stolen and identified the owner as Olena Delarosa, the mother of Anderson's fiancé, Starkeisha Delarosa. Decl. of Starkeisha Delarosa, at ¶ 5; ECF 47, ¶¶ 9-10.

6. Mensah doesn't remember if he asked Anderson for the registration of the

---

[1] Defendants failed to file an answer to the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179, after the Court's ruling on the motion to dismiss, and therefore, Defendants admit the allegations contained in Paragraph 2 to the Amended Complaint. *See* FRCP 8(b)(6)("Effect of Failing to Deny. An allegation – other than one relating to the amount of damages – is admitted if a responsive pleading is required and the allegation is not denied. . . ."); *Modrowski v. Pigatto,* 712 F.3d 1166, 1170 (7th Cir. 2013); *Barwin v. Village of Oak Park*, 14-cv-6046, 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

[2] Defendants have admitted the allegations contained in Paragraphs 77, 78 and 85 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

vehicle. Mensah Dep. 2/28/23 53:12-14

7. Mensah did not turn on his vehicle emergency lights, which would have started the squad dashboard camera, as required by Wauwatosa Police Department policy. ECF 47, ¶91-93[3]; Mensah Dep. 2/28/23 at 22:7-22, 34:5-14, Cade Decl., ¶ 20 (hereafter "Mensah Squad Video").

8. When Mensah approached the car, he knocked on the passenger side window to wake Anderson up and asked him to roll the passenger side window down; Anderson complied by waking up, turning his vehicle on, rolling the window down, answering his question, and putting his hands up. Mensah Dep. 2/28/23 at 36:2-16, 37:10-24. ECF 47, ¶99-102.[4]

9. Mensah does not remember if he observed the gun before or after Anderson rolled the window, but Mensah had already walked around the vehicle before waking Anderson up. Mensah Dep. 2/28/23 at 37:7-9, 43:10-14.

10. Although Mensah states that Anderson told Mensah that did not have any identification on him identification was located on Anderson's body after the shooting. Mensah Dep. 2/28/23 38:4-25, 39:10-19.

11. Sometime after Anderson rolled the window down to communicate with Mensah, Mensah observed Anderson's gun and other belongings on the front passenger seat. Mensah Dep. 2/28/23 at 41:11-42:5.

---

[3] Defendants have admitted the allegations contained in Paragraphs 91-93 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

[4] Defendants have admitted the allegations contained in Paragraphs 99-100 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).



12. Mensah cannot remember how the gun was oriented in the car and does not dispute that the gun could have been facing the glovebox, the driver door, or even Anderson the entire time. Mensah Dep. 2/28/23 at 43:15-44:8.

13. There is no physical evidence from photos or reports that Anderson's weapon was loaded at all. Paired with that fact, there are several key items that Mensah cannot recall observing: Anderson's phone, money, and several papers all in the front passenger seat. Mensah Dep. 2/28/23 at 44:21-45:7.

14. Anderson complied when Mensah by raising his arms in the air while Mensah had his service weapon unholstered. Mensah Dep. 2/28/23 at 58:8-59:17.

15. An individual, absent certain restrictions such as being a felon, is legally allowed to have an unloaded weapon in a car under Wisconsin's open carry laws. Mensah

Dep. 2/28/23 70:1-10, 71:4-6; Weber Dep. 6/6/23 at 47:1-3, 11-14; Cade Decl., Ex. 7 (hereafter "Salyer's Dep.") at 59:21-60:3; Wis. Stat. § 941.29.

16. A gun is considered "not concealed" and therefore "open" if it is visible and not concealed in any way. Mensah Dep. 2/28/23 71:4-72:23.

17. Mensah cannot recall if he asked Anderson whether he had a license or registration papers for the weapon. Mensah Dep. 2/28/23 68:14-23, 71:12-15.

18. At 3:05 AM, Mensah communicates with dispatch to "step it up" because Mensah observed a weapon in Anderson's vehicle. Mensah Dep. 2/28/23 78:14-23.

19. At approximately 3:07:15 AM, Mensah fired his weapon at Anderson six times. Mensah Dep. 2/28/23 at 82:8-23.

20. Mensah testified that "both hands went down, and [Anderson] lunged [for his gun]"; yet an objective viewing of the squad video footage of the shooting does not show that both hands dropped towards the gun. Mensah Dep. 2/28/23 at 112:10-13; Mensah Squad Video at 03:07:13.

21. Mensah waits roughly 25-30 seconds, or until 3:07:45 to contact dispatch to alert them that shots have been fired and does not know why he waited this long to contact dispatch. Mensah Dep. 02/28/23 106:5-18.

22. Mensah had the ability to activate his squad car lights remotely from a device he had in his pocket. Cade Decl., Ex. 4 (hereafter "Farina Dep.") at 53:24-25; 54:1-2.

### Anderson Could Have Been Reaching For His Phone

23. Reaching for a phone or recording an interaction with a police officer is not a reason on its own for an officer to shoot the driver. Cade Decl., Ex. 2 Deposition of Barry

Weber 06/06/23 (hereafter "Weber Dep. 6/6/23") at 46:15-19.

24. Mensah admits that Anderson could have been reaching for his cell phone. which was also on the front passenger seat, rather than for the gun. Mensah Dep. at 95:20-23; [5] Weber Dep. 6/6/23 at 92:11-13.

25. Mensah hit his lapel mic *after* discharging his weapon but had the ability engaged his lapel mic or squad footage sooner because every WPD officer was outfitted with a microphone that could record audio and the ability to engage squad lights to begin recording with a device on their person. Mensah Dep. 2/28/23 at 82:21-23; Weber Dep. 6/6/23 at 34:9-11; Farina Dep. at 53:24-25; 54:1-2.

26. Mensah kept a memo book where he, "would have documented what would have taken place prior to the incidents." Cade Decl., Ex. 16 (hereafter "Mensah Dep. 6/26/23") at 283:12-16.

27. After the Antonio Gonzales shooting, the Anderson shooting, and the Cole shooting, Mensah made the conscious decision to throw away his memo book. Mensah Dep. 6/26/23 at 283:21-25.

**Post-Shooting Conduct**

28. When Salyers approached the vehicle, it appeared to him that Anderson was breathing because he was moving slightly, and Anderson's eyes were halfway open. Salyer's Dep. at 28:2-18.

29. Salyers called into dispatch stating "I have a 30 something year old male black who is not breathing at this time" but never tended to Anderson or checked his

---

[5] Q: "So it's fair to say that today you can't state definitively that Mr. Anderson was reaching for a gun as opposed to for his phone, fair?"
A: "Fair."

pulse. Mensah Squad video at 03:11:51; Salyer's Squad Video at 03:11:51.

30. Salyers, Mills, and Mensah never performed any life saving measures to Anderson. Mensah Squad Video. 03:07:15-03:15:26.

31. Salyer did not observe Anderson's hand on the gun. Salyer's Dep. at 39:1-2.

32. Mills retrieved the gun from the passenger seat of Anderson's car and then Anderson's body was removed from the car. Salyer's Dep. at 28:21-24; 32:2-22.

33. Despite not seeing any injuries and a little bit of blood on Anderson, Salyers opened the car door and did not speak to Anderson at all. Salyers Dep. 34:3-22.

34. No photos were taken of Anderson's body positioning or the gun positioning to preserve evidence to showcase the true scene. Salyer's Dep. at 38:1-2; Farina Dep. at 38:9-11.

35. An officer's observation of a gun in the driver's door pocket, stuffed between the seat and the center console, under the seat, in the glove box, in the backseat, or on the dashboard is not a sufficient reason to discharge a weapon. Salyer's Dep. at 62:13-25; 66:5-11.

36. The position of the gun found in Anderson's car is an important factor in determining whether Mensah correctly perceived the level of danger prior to the shooting. Farina Dep. at 35:25; 36:1-4; Weber Dep. 6/6/23 at 90:13-18.

37. There are many factors that must be considered before determining whether someone holding a weapon is a deadly threat, like whether the person is making eye contact or has raised the gun. Farina Dep. at 41:20-25; 42:1-3.

38. If someone is not holding a gun, they cannot refuse an order to put down

7

their gun. Weber Dep. 6/6/23 at 93:13-15.

39. At the time Anderson was approached by Mensah he was not committing a violent crime. Weber Dep. 6/6/23 at 96:20-21.

40. There is no evidence that the Madison Park in Wauwatosa closed at 10 PM; any violation of park hours constitutes nothing more than a municipal citation. Mensah 2/28/23 Dep. at 12:15-19, 23:11-19; Declaration of Jay Anderson, Sr., at ¶¶ 4, 6-9.

**Milwaukee Police Department's Investigation of Anderson's Shooting**

41. The Milwaukee Police Department was in charge of investigating the Anderson shooting. Cade Decl., Ex. 9 (hereafter "O'Day Dep.") at 19:17-21.

42. When gathering evidence, objects should be photographed in the location they are found at the scene before collecting them. O'Day Dep. at 43:4-14.

43. On or about June 23, 2016, Detective Porter was assigned to the officer involved shooting of Anderson and was assigned to the homicide unit and interviewed Mills and Salyers on June 23, 2016. Cade Decl., Ex. 5 (hereafter "Porter Dep.") at 6:19-22; 12:9-15; 24:10-11.

44. At no time did Mills tell Porter where Anderson's arms and hands were in relation to the gun. Porter Dep. at 27:11-14.

45. Salyers recovered Anderson's ID but did not recall which pocket he recovered it from. Porter Dep. 22: 8-9.

46. During his interview with Porter at the scene, Mills, "didn't say exactly where [Anderson's gun] was placed and how it was placed on the front passenger seat. I just got that it was on the front passenger seat." Porter Dep. 27: 4-7.

47. Porter interviewed Mills about Anderson's body positioning and "[Mills]

didn't say the position of his arms or hand. [Mills] just said [Anderson] was seated with his head back and his mouth open." Porter Dep. at 27:16-18.

48. Jeffrey Farina conducted part of the administrative review of Mensah after the Anderson shooting to determine if there were any training needs or policy violations, not whether an officer was fit for duty. Farina was not asked to evaluate whether the level of force used in the Anderson shooting was reasonable. Farina Dep. at 15:13-17, 39:13-15, 30:3-5.

49. Farina interviewed Salyers and Mills almost a full year after the shooting and neither officer indicated the positioning of Anderson's firearm. Farina Dep. at 28:2-25; 29:1-3; 19:18-19, 20:23-21:3.

50. Wauwatosa Police Department has the capability to record interviews as part of an investigation. Farina did not record any of the interviews he conducted as part of the administrative review of the Anderson shooting. Farina Dep. at 22:18-25; 23:1-5.

51. Farina never spoke to Mensah about the position of the firearm found in Anderson's car. Farina Dep. at 37:24-25; 38:1.

52. Luke O'Day arrived at the scene of the Anderson shooting at approximately 4:20 a.m to interview Mensah but was asked by Mensah's attorney who subsequently arrived to wait until the following day. O'Day Dep. at 32:15-17; 35:1-36:6; 37:5-7.

53. O'Day does not know where the gun was positioned outside of what Mensah told him, but O'Day never specifically asked Mensah about Anderson's gun location. O'Day Dep. at 87:2-15.

54. O'Day was aware that Anderson may have been going for his cell phone. O'Day Dep. at 89:1-23.

## **Chief Weber's and Wauwatosa's Involvement in the Mensah's Behaviors**

55. Barry Weber was the chief policy maker for the Wauwatosa Police Department and in that capacity established policies, procedures, customs, and/or practices for the same. Weber 6/6/23 Dep. 101:8-102:2, ECF 47, ¶ 175.

56. The positioning of Anderson's gun would be material to whether Mensah correctly perceived a dangerous encounter or not, yet Weber never spoke to any of his WPD officers, including Mensah, about the location of Anderson's gun. Weber Dep. 06/06/23 at 90:13-18, 93:6-9, 91:12-16.

57. Weber agrees that whether an officer sees situations as more dangerous than the average person would is an important factor to look into to determine whether someone can be a successful police officer. Weber Dep. 6/6/23 at 69 & 70:23-1.

58. To be an effective officer and safe for the public, an officer should have a strong ability to read situation for its true danger. Weber Dep. 6/6/23 at 70:2-6.

59. Despite Mensah's psychological examination when he was hired that determined that he had difficulty evaluating the motivations of others, Weber never questions whether he had the right mental makeup to be in life and death situations. Weber Dep. 6/6/23 at 77:8-18.

60. Weber did not wonder why in one year Mensah killed two people and did not engage his cameras at the right time. Weber Dep. 6/6/23 at 78:4-9.

61. Weber did not know what Mensah's perceptions were with the Antonio Gonzales and the Jay Anderson shootings, and no one from the City of Wauwatosa interviewed Mensah to learn his perceptions. Weber Dep. 6/6/23 at 78:19-22, 79:2-6.

62. An important step for the Wauwatosa Police Department in investigating

whether an officer had acted reasonably would be to interview any officers at the scene. Weber Dep. 6/6/23 at 62:14-17.

63. Weber never questioned whether Mensah perceives danger where others do not or whether Mensah sees situations as inherently more dangerous than an average person would. Weber Dep. 6/6/23 at 69:7-19, 70:20-23.

64. Neither the Milwaukee Police Department nor the Wauwatosa Police Department investigated whether Mensah perceived each shooting as a reasonable officer would. Weber Dep. 6/6/23 at 79, 80:3-82:2.

65. Mensah was on probation as an officer with the WPD when he killed Antonio Gonzales on July 16, 2015. Weber Dep. 6/6/23 at 23:19-21.

66. One of the purposes of the one-year probationary period is to evaluate an officer's conduct by looking for misconduct or other issues. Weber Dep. 6/6/23 at 25:18-23; 26:1-4.

67. Whether Mensah violated use of force policies or used excessive force against Antonio Gonzales investigations, those questions would have been solely within the Wauwatosa Police Department's purview. Weber Dep. 6/6/23 at 14:3-9.

68. Weber cleared Mensah for the Antonio Gonzales shooting based on the MPD reports, and the witness statements, and the clearance of Mensah by the district attorney. Weber Dep. 6/6/23 at 20: 5-10.

69. On August 22, 2016, while Mensah was under investigation by the Milwaukee County District Attorney's Office for shooting and killing Anderson, Weber gave Mensah a medal of valor award. Weber 6/6/23 at 29:2-31:14; ECF ¶68.

70. Awarding someone a medal of valor sends the officer a message that they

conducted themselves the way a Wauwatosa police officer should conduct themselves and ratifies the officer's conduct. Weber Dep. 6/6/23 at 30:19-31:5.

71. For Wauwatosa Police Department, the purpose of the internal investigation of officer involved fatal shooting was "to make sure policies and procedures were followed and to see if there were any training deficiencies." Cade Decl., Ex. 3 (hereafter "Mastrocola Dep.") at 89: 22-24.

72. Mastrocola conducted the administrative review in relation to the Antonio Gonzalez shooting and did not follow up with Mensah or Jeffrey Newman regarding their involvement. Mastrocola Dep. at. 89-90: 25-4, 121:6-17.

73. Mastrocola's focus for the administrative review of the Gonzalez shooting which occurred on July 15, 2015, was to "determine whether any Wauwatosa policies or procedures had been followed or not followed." Mastrocola Dep. at 90: 5-10.

74. Per the City of Wauwatosa "a traffic stop is [when] we're detaining a motorist in their vehicle for some sort of violation or investigation" and have engaged with the individual such that they cannot leave. Cade Decl., Ex. 8 (hereafter "Roy Dep.") at 60:2-8.

75. Per the City of Wauwatosa, if you have stopped someone and given them a command this is in essence a detention. Roy Dep. at 60:15-20.

76. Per the City of Wauwatosa procedure, the failure to record a traffic stop is a violation of WPD policy and places an officer at risk of discipline. Roy Dep. at 60: 1-23.

77. The City of Wauwatosa has notoriously been criticized for its complacency toward racism by condoning and tolerating racist behaviors and policing tactics. ECF No. 47, ¶¶ 16-47.

12
Case 2:21-cv-00848-LA   Filed 08/22/23   Page 12 of 16   Document 92

78. After the Alvin Cole incident, Mensah was brought back to work while he was on administrative leave. Weber Dep. 6/6/23 at 53:16-17.

79. Weber agrees that whether an officer sees situations as more dangerous than the average person would is an important factor to look into to determine whether someone can be a successful police officer. Weber Dep. 6/6/23 at 69 & 70:23-1.

80. There is no step in the WPD administrative review process by which they would evaluate whether a police officer had the right mental makeup to continue to be a police officer. Weber Dep. 6/6/23 at 63:11-21.

81. Mensah was cleared to go back to work before the WPD's internal review into the Antonio Gonzales and Jay Anderson's shootings despite the fact that he was never interviewed by Weber or any of the WPD officers conducting the review and he returned back to work before the review was even completed. Cade Decl., Ex. 12.

82. The WPD internal review in the Jay Anderson shooting was completed around May 15, 2017. Farina Depo 17:5-8.

83. To be an effective officer and safe for the public, an officer should have a strong ability to read situation for its true danger. Weber Dep. 6/6/23 at 70:2-6.

84. Despite Mensah's psychological examination when he was hired that determined that he had difficulty evaluating the motivations of others, Weber never questions whether he had the right mental makeup to be in life and death situations. Weber Dep. 6/6/23 at 77:8-18.

85. Weber, a final policymaker, condoned the shooting of Gonzales by clearing him despite there being no fitness for duty conducted. Weber Testimony 5/4/21, pg. 93 lines 15-20; pg. 93-94 lines 23-4

86. Mensah for active duty without conducting a fitness for duty evaluation, nor did they have a policy, and without conducting an internal investigation of the Gonzales matter. Mastrocola Dep. at. 89-90: 25-4, 121:6-17; Cade Decl. Ex. 13 (hereafter "Weber 5/4/21 Testimony"), 93:15-94:4, ECF 47, ¶ 63 and 646, ECF 20 ¶¶ 77, 78, 155, 157, & 217.[7]

87. Weber testified that, "In the case of an officer-involved shooting and the officer involved is out on administrative leave and if he is cleared to come back, before we would allow him to come back, we would send him to a psychologist that we use to determine if in that person's professional opinion that he is able to return." Weber 5/4/21, Dep. 47:17-22.

88. Despite Weber's policy of officers needing to be evaluated by a psychologist before returning back to work after an officer involved shooting, Mensah was not evaluated nor was there a fitness for duty assessment conducted by a psychiatrist or psychologist after the shooting of Antonio Gonzales on July 15, 2015, and before the shooting of Jay Anderson, Jr. on June 23, 2016, before he came back to work. Weber 5/4/21 Testimony, 93:15-94:4.

89. Starkeisha Delarosa would often go to Madison Park with Jay Anderson, Jr.

---

[6] Defendants failed to file an answer to the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179, after the Court's ruling on the motion to dismiss, and therefore, Defendants admit the allegations contained in Paragraph 2 to the Amended Complaint. *See* FRCP 8(b)(6)("Effect of Failing to Deny. An allegation – other than one relating to the amount of damages – is admitted if a responsive pleading is required and the allegation is not denied. . . ."); *Modrowski v. Pigatto,* 712 F.3d 1166, 1170 (7th Cir. 2013); *Barwin v. Village of Oak Park*, 14-cv-6046, 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

[7] Defendants failed to answer the original Complaint (Dkt. 1) and they failed to answer the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole case 22-cv-856 even after the Court's ruling on the motion to dismiss (Dkt. 25), therefore they have admitted all the allegations contained in the entire complaint but specifically Para. 77, 79, 155, 157, 226, 227 of the Amended Complaint in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

before and after his death and did see any signs that showed when the park closed. Decl. Starkeisha Delarosa ¶¶10-15.

90. On June 23, 2016, the vehicle registration of the car that Jay Anderson, Jr. was driving was in the glove compartment. Decl. Starkeisha Delarosa ¶ 6

91. Jay Anderson, Sr. would often go to Madison Park before and after his death and did see any signs that showed when the park closed. Decl. Jay Anderson, Sr. ¶¶. 4, 6-9.

92. On June 23, 2016, the day that Jay Anderson, Jr. was killed his father and fiancée both went to Madison Park and did not see any signs of when the park closed. Decl. Jay Anderson, Sr. ¶6 and Starkeisha Delarosa ¶10.

93. When Mensah asked Mr. Anderson for his identification, he was not free to leave. Mensah Dep. 2/28/23 at 65:21-24.

94. A person may have a gun on the front seat of their car as long as it is not concealed. Mensah 2/28/23 at 70:1-10, 70 & 71:23-3.

95. Salyers radios dispatch at 3:11:55a.m. that Anderson is not breathing despite no one checking for a pulse. Mensah Squad Video at 3:11:55 a.m.

96. In 2016 the City of Wauwatosa received state and federal grants of which some monies were used towards its police department. ECF 47 ¶ 41; Cade Decl., Ex 14.

97. Upon kill Anderson, Mensah made no effort to provide medical care. ECF 47 ¶ 121.

98. During the next four minutes, Anderson struggled to keep his hands up because he was tired and intoxicated. ECF 47 ¶ 106.

Dated this 22nd day of August, 2023.

**MOTLEY LEGAL SERVICES**

Kimberley Cy. Motley
State Bar No: 1047193
2206 Bonnie Butler Way
Charlotte, North Carolina 28270
E: kmotley@motleylegal.com
P: (704) 763-5413

**CADE LAW GROUP LLC**

By: *s/Nathaniel Cade, Jr.*
Nathaniel Cade, Jr. SBN: 1028115
Annalisa Pusick SBN: 1116379
Antonique C. Williams SBN: 1051850
P.O. Box 170887
Milwaukee, WI 53217
P: (414) 255-3802
F: (414) 255-3804
E: nate@cade-law.com
E: annalisa@cade-law.com
E: antonique@cade-law.com