# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

---

ESTATE OF ANTONIO GONZALES, et al.,

        Plaintiffs,

    v.

JOSEPH ANTHONY MENSAH, et al.,

        Defendants.

Case No.: 21-CV-848-LA

---

ESTATE OF JAY ANDERSON, JR., et al.,

        Plaintiffs,

    v.

JOSEPH ANTHONY MENSAH, et al.,

        Defendants.

Case No.: 21-CV-1179-LA

---

ESTATE OF ALVIN COLE, et al.,

        Plaintiffs,

    v.

JOSEPH ANTHONY MENSAH, et al.,

        Defendants.

Case No.: 22-CV 856-LA

---

## PLAINTIFF'S RESPONSES TO DEFENDANTS' PROPOSED FINDING OF FACT FOR THE ESTATE OF JAY ANDERSON, JR. (21-CV-1179)

Plaintiffs respond to Defendants' proposed findings of fact as follows:

### The Parties

1.    At the time of his death on June 23, 2016, Jay Anderson Jr. was an adult resident of the State of Wisconsin. (ECF 47[1], Amend. Compl. ¶ 9)

**RESPONSE:** No dispute.

2.    Plaintiff Starkeisha DeLaRosa is an adult resident of the State of Wisconsin and serves as the representative of the Estate of Jay Anderson. (ECF 47, ¶ 9)

**RESPONSE:** No dispute.

3.    Plaintiff J.A. is the minor child of Jay Anderson, Jr., and is represented through her mother, Starkeisha Delarosa. (ECF 47, ¶10)

**RESPONSE:** No dispute.

4.    Defendant City of Wauwatosa is a Wisconsin municipal corporation whose principal offices are located in Wauwatosa, Wisconsin. (ECF 47, ¶ 11) Defendant Barry Weber is the former Chief of Police for the City of Wauwatosa and is named in his individual capacity. (ECF 47, ¶ 15; *see also* ECF 54, Order, p. 4)

---

[1] ECF 47 refers to the Amended Complaint filed in Eastern District Case No. 21-cv-01179. All other ECF referenced documents were filed in consolidated Case No. 21-cv-848.

**RESPONSE:** No dispute that Defendant City of Wauwatosa is a Wisconsin municipal corporation whose principal offices are located in Wauwatosa, Wisconsin. (ECF 47, ¶ 11). Disputed as to improper citation. Defendant Barry Weber is the former Chief of Police for the City of Wauwatosa and is named in his individual capacity (ECF 47, ¶ 12) and ECF 54, Order, p. 4 lacks any evidence that supports the proposed fact.

5.     Defendant Barry Weber is the former Chief of Police for the City of Wauwatosa and is named in his individual capacity. (ECF 47, ¶ 15; *see also* ECF 54, Order, p. 4)

**RESPONSE:** No dispute that Defendant Barry Weber is the former Chief of Police for the City of Wauwatosa and is named in his individual capacity. However, disputed as to improper citations and ECF 54, Order, p. 4 lacks evidentiary support for the proposed fact. (ECF 47, ¶ 12)

6.     At all relevant times, Defendant Joseph Mensah (Officer Mensah) was a police officer with the Wauwatosa Police Department. (ECF 77-1, Exh. A, 3/17/22 Deposition of Joseph Mensah, p. 102)

**RESPONSE:** No dispute.

## Jurisdiction and Venue

7.     This action arises under the Fourth and Fourteenth Amendments to the

United States Constitution and 42 U.S.C. § 1983. The Court has jurisdiction over the Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343. (ECF 47, ¶ 7)

>**RESPONSE:** No dispute as to the actions cited and the jurisdiction of this Court. Also note that, jurisdiction supporting Plaintiffs claim for attorneys fees and costs is conferred by 42 U.S.C. § 1988. (ECF 47, ¶ 7).

8.     The Eastern District of Wisconsin is the proper federal venue for this action pursuant to 28 U.S.C. § 1391(b) because it is where all acts alleged in the Amended Complaint occurred. (ECF 47, ¶ 8)

>**RESPONSE:** No dispute.

### The June 23, 2016, Critical Incident at Madison Park

9.     On the night of June 22, 2016, and into the morning of June 23, 2016, Officer Mensah was working the late shift in full uniform as a patrol officer for the Wauwatosa Police Department. (ECF 77-6, Exh. F, 02/28/2023 Deposition of Joseph Mensah (hereinafter Mensah 2/28/23 Dep.) pp. 7, 143)

>**RESPONSE:** No dispute.

10.     Officer Mensah was assigned to patrol squad area 5 in the City of Wauwatosa, which encompasses Madison Park. (Mensah 2/28/23 Dep. pp 7–8, 143)

**RESPONSE:** Disputed.  Per the report of Detective Luke O'Day Madison Park was not the area Mensah was assigned to.  Det. O'Day interviewed Joseph Mensah in on June 24, 2016 and Mensah told O'Day the area "he was assigned to the area that encompassed W. Burleigh St. to W. Capitol Dr. N. 92nd St. to N. 124th St." (O'Day Dep. at 56: 20-25; 57:1-2; Exh. 31 pg. 34.)  In addition, Defendants failed to file an answer to the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179, after the Court's ruling on the motion to dismiss, and therefore, Defendants admit the allegations contained in Paragraph 87 of the Amended Complaint. (Dkt. 47) that as asserted Madison Park was not Mensah's patrol area.  *See* FRCP 8(b)(6)("Effect of Failing to Deny. An allegation – other than one relating to the amount of damages – is admitted if a responsive pleading is required and the allegation is not denied. . . ."); *Modrowski v. Pigatto,* 712 F.3d 1166, 1170 (7th Cir. 2013); *Barwin v. Village of Oak Park*, 14-cv-6046, 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).


11.     It was Officer Mensah's responsibility to do parking enforcement in his assigned area, including checks of Madison Park, which he did "just about every night" as part of his routine patrol. (Mensah 2/28/23 Dep. pp. 9-10, 141; see also ECF 77-1, Ex. K, Deposition of Stephen Mills (hereinafter Mills Dep.) p. 57)


**RESPONSE:** Disputed. In that it was not Officer Mensah's responsibility to do parking enforcement outside his assigned area which Madison Park was.  Also, See PL Response ¶ 10.   In addition, Defendants have admitted the allegations contained

in Paragraph 87 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

12.     Madison Park closes at 10:00 p.m. and being in the park after hours is a violation of Milwaukee County Ordinance § 47.27, which provides "no person shall remain in the park or parkways during the hours they are closed." 2 (Mensah 2/28/23 Dep. pp. 23-25, 55)

**RESPONSE:** Disputed. There is no evidence that the park closed at 10:00 p.m. in 2016 and Mensah testified that the park may have closed at 11:00 p.m. (Mensah 2/28/23 Dep. at 12:15-19); Jay Anderson's father frequently visited Madison Park and observed no signs that indicated the time Madison Park closed; in fact, Jay Anderson's father went to the park before and after the shooting of his son and observed no signs stating that Madison Park was closed during certain hours; (Declaration of Jay Anderson, Sr., at ¶¶ 4, 6-9); additionally, the penalty for being in park after hours is a "municipal or county ordinance violation" of no more than $200. (Mensah 2/28/23 Dep. at 23:11-19).  Also disputed because it is unclear which ordinance as well as where Defendants are citing to that "no person shall remain in the park or parkways during the hours they are closed."

---

2

https://library.municode.com/wi/milwaukee_county/codes/code_of_ordinances?nodeId=MICOCOGEORVOI_CH4
7PAPA_SUBCHAPTER_IINGE_47.28PEOBPE

13.     It was one Officer Mensah's patrol responsibilities to routinely check Madison Park after hours and investigate the presence of anyone found in the park, ascertain their reasons for being in the park, eliminate the possibility of medical distress, and ensure there was no illicit or illegal activity whether it's doing drugs, having sex, or engaging in any activity that violates any city, county, or state ordinances, and welfare checks. (Mensah 2/28/23 Dep. pp. 11-12, 30, 55)

   **RESPONSE:** Disputed. See Response to ¶¶ 10 & 11.  In addition, Defendants have admitted the allegations contained in Paragraph 87 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).14.

14.     In Mensah's prior experience encountering people in the park after hours, the presence of police would result in the individuals leaving the park upon his approach or upon his request. (Mensah 2/28/23 Dep. pp. 23-24, 88, 141; see also Mills Dep. p. 59)

   **RESPONSE:** Disputed. In Mensah's prior experience, individuals would leave the park after Mensah would get out of his car, talk to them, and give them a warning. (Mensah 2/28/23 Dep. 23:20-22, 88:14-18, 141:16-25).

15.     Officer Mensah has never written a ticket for an after-hours ordinance violation. (Mensah 2/28/23 Dep. pp. 23-24, 141)

   **RESPONSE:** Undisputed that Mensah testified that he has never written a ticket

for an after-hours ordinance violation, but further adding that Mensah did not have personal knowledge of whether a city or county ticket was supposed to be issued for an "after-hours" violation and that Mensah gave at least 10 individuals warnings for being in the park "after-hours." (Mensah 2/28/23 Dep. 23:11-25, 24:1-3 141:16-25).

16. On June 23, 2016, around 12:30 a.m. Officer Mensah went to Madison Park to conduct a park check and encountered an individual who he instructed to leave. (Mensah 2/28/23 Dep. pp. 12, 133)

**RESPONSE:** Disputed. That Mensah testified that he found a *couple* of people in the park and further adding that Mensah did activate his emergency lights upon entering Madison Park on June 23, 2016, around 12:30 a.m. on the night Anderson was shot. (Mensah 2/28.23 Dep. at 133:4-10).

17. At 3:01 a.m., Officer Mensah entered Madison Park to conduct another park check and observed a single vehicle parked in the center of the lot and noticed at least one person was in it. (Mensah 2/28/23 Dep. pp. 12, 15)

**RESPONSE:** Undisputed but further adding that when Mensah entered Madison Park to conduct another park check at 3:01 a.m., Mensah did not activate his lights, did not begin his dash recording and did not begin his audio recording (Mensah 2/28/23 Dep. 23:3-10, 34:5-14). Defendants have admitted the allegations contained in Paragraphs 91-95 of the Amended Complaint (Dkt. 47) in the Estate

of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

18.     Officer Mensah parked his squad facing the front of the suspect vehicle and turned on his bright illumination lights referred to as "take down lights," which allowed him to see inside the vehicle and observe movement in the vehicle. (Mensah 2/28/23 Dep. pp. 16-17, 29)

**RESPONSE:** Disputed based on improper citation, the citation lacks evidentiary support for the proposed fact; also, Mensah did not testify as to "observing movement in the vehicle" with his takedown lights. Mensah stated that he felt safe to approach Anderson's vehicle with only his takedown spotlights engaged. (Mensah Dep. 2/28/23 at 26:25, 27:1-4). In addition, Mensah could not remember what he observed about the car or Anderson. (Mensah 2/28/23 Dep. at 17:21-23, 18:9-19).

19.     Officer Mensah observed an occupant in the front driver seat who appeared to be sleeping. (Mensah 2/28/23 Dep. pp. 18, 29).

**RESPONSE:** Undisputed that Jay was sleeping in his car. However, Defendants have admitted the allegations contained in Paragraphs 85 and 88, of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

20.     At 3:02 a.m., Officer Mensah radioed dispatch and advised them of his location at Madison Park and of the presence of an occupied auto. (Mensah 2/28/23 Dep. p. 48; ECF 76-16, Roy Decl. Exh. Q Radio Traffic Transmissions (hereinafter Radio Trans.) at 0:00:01)

**RESPONSE:** No dispute.

21.     It was standard practice at the Wauwatosa Police Department that dispatch would automatically send a second squad as back up in response to a report of an occupied auto. (Mensah 2/28/23 Dep. pp. 87-88; Mills Dep. p. 59)

**RESPONSE:** Disputed. This practice of sending a second squad as backup was not "100 percent mandatory" rather just "something [they] did." Mensah Dep. 87:7-12. Also, dispute that a second vehicle was sent by dispatch as Mensah did not immediately call for backup. Further adding that, Defendants have admitted the allegations contained in Paragraph 90 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

22.     At 3:02:44, dispatch sent Wauwatosa Police Officer Salyers, who was operating Squad 318, to Madison Park. (Radio Trans. at 0:00:05)

**RESPONSE:** Disputed.   At 3:02:44 dispatch did not send Officer Salyers to Madison Park.   Also dispute regarding improper citations.  No dispute that

dispatcher states "10-4 318;" however, disputed that Squad 318 was known to be operated by Officer Salyers based on the citation provided.

23. While waiting for backup, Officer Mensah exited his squad and walked around to the back of the vehicle to get the license plate number. (Mensah 2/28/23 Dep. pp. 15-18, 25)

**RESPONSE:** Undisputed that Mensah ran Anderson's license plate. Dispute that Mensah was waiting for backup and dispute whether Mensah walked around the back of Anderson's vehicle to get the license plate number and the timing of when Mensah ran the license plate based on the citation provided. Mensah did not remember if he immediately went to Anderson's passenger window or if he did a full walk around the vehicle to run the license plate first. (Mensah 2/28/23 Dep at 27:20-25, 28:1). Further adding that, Defendants have admitted the allegations contained in Paragraph 90 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

24. A 3:03 a.m., Officer Mensah radioed dispatch and requested a license plate of the occupied auto. (Radio Trans. at 0:00:55; Mensah Dep. pp. 17, 27-28, 48)

**RESPONSE:** No dispute, but further adding that Mensah could have and "typically" used his computer in his patrol car to look up the license plate instead of radioing dispatch. Also dispute that Mensah "requested a license plate of the occupied

vehicle" but do not dispute that dispatch used the license plate information to determine to run checks on whether the vehicle was stolen. (Mensah 2/28/23 Dep. 17:13-16; 48:7-20)

25.     At 3:04 a.m., dispatch advised Mensah that the vehicle had not been reported as stolen and was registered to Elena DeLaRosa. (Radio Trans. at 0:01:24; Mensah 2/28/23 Dep. pp. 56-57)

**RESPONSE:** No dispute.

26.     Officer Mensah approached the suspect vehicle from the passenger side to attempt to make contact with the driver, and the passenger's front window was rolled up. (Mensah 2/28/23 Dep. pp. 35-36, 143)

**RESPONSE:** No dispute, but further adding that Mensah aggressively knocked on Anderson's passenger side window. Defendants have admitted the allegations contained in Paragraphs 96 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

27.     Based on Officer Mensah's training and experience, there are multiple ways to approach a vehicle; a passenger side approach is one of those. Approaching from a passenger side in this type of vehicle contact you can get a better view into the vehicle. (Mensah 2/28/23 Dep pp. 143-145)

**RESPONSE:** Undisputed that Mensah testified that in his training and experience, there are multiple ways to approach a vehicle. Dispute that the passenger side approach gives officers the ability "see more into the vehicle," at a "different angle, a different view," *during a traffic stop*; and further adding that Mensah finds approaching from the passenger door advantageous because it is "something [suspects] don't expect" and that officers who use the passenger side approach "are aware [suspects] don't expect to see [the officer]." (Mensah 2/26/23 Dep. 144:11-12, 144:16-20).

28.     Officer Mensah knocked on the passenger front window, identified himself as police and told the driver that he needed to speak to him. After a couple of times repeating himself, the driver woke up again, turned the key in the ignition and rolled down the passenger front window. (Mensah 2/28/23 Dep. pp. 36-38, 102)

**RESPONSE:** Disputed that Mensah had to repeat himself; Mensah testified that he "can't remember" much of the interaction, i.e., how many times he knocked on Anderson's window, what Anderson did after he woke up, or what order he identified himself as police and asked Anderson to comply with his commands. Mensah did not remember observing Anderson putting a key in the ignition. Mensah never testified to "repeated" commands or that Anderson woke up more than once. (Mensah 2/28/23 Dep. at 36-39, 102).

29.     Officer Mensah asked the driver (Anderson) if he had a driver's license or

identification, to which Anderson responded "no." (Mensah 2/28/23 Dep. pp. 38-39)

**RESPONSE:** Disputed. As testified Mensah, asked Anderson for identification. (Mensah 2/28/23 Dep. pp. 56: 20). Mensah also testified that, "I don't know if he said no, I don't have it or I don't remember." (Mensah 2/28/23 Dep. pp 39: 16-19).

30.     It was later determined that Anderson did not have a driver's license but did have a state-issued ID card. (Mensah 2/28/23 Dep. p. 99; Baynard Supplemental Decl. Exhibit T, Deposition of Troy Porter (hereinafter Porter Dep.) p. 20)

**RESPONSE:** No dispute.

31.     Officer Mensah did not observe Mr. Anderson to be intoxicated, nor did he report Anderson to have slurred speech. (Mensah 2/28/23 Dep. p. 121)

**RESPONSE:** Disputed. Mensah stated that he <u>did not remember</u> if Anderson was intoxicated or slurring his speech. (Mensah 2/28/23 Dep. 121:5-9). Furthermore, Defendants have admitted that Anderson was tired and intoxicated as set forth in the allegations contained in Paragraphs 97 and 106 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

32.     Officer Mensah was standing about an arm's length away from the

passenger front door while addressing Anderson, and observed Anderson make several glances over to the passenger seat then look back up at Mensah. (Mensah 2/28/23 Dep. pp. 39-41)

      **RESPONSE:** Disputed. Misstated testimony, Mensah testified that he at some point was two arm's length away from the vehicle when he had his gun pointed at Anderson. Defendants have admitted the allegations contained in Paragraphs 98-110, 125-126 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

    33.    Officer Mensah stepped closer to the car and looked down into the passenger seat. He spotted a semi-automatic handgun, with its magazine inserted, on Anderson's front passenger seat. (Mensah 2/28/23 Dep. pp. 41, 112-113)

      **RESPONSE:** Disputed. Misstates testimony in that Mensah never testified to the type of gun Anderson had and whether a magazine was inserted in it; in fact, Mensah cannot remember the weapon at all. (Mensah 2/28/23 Dep. 44:9-20). In addition, the citation does not support the proposed fact. Defendants have admitted the allegations contained in Paragraphs 125-126 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

34.     When Officer Mensah saw the gun he stepped back, radioed dispatch that Anderson had a gun and requested additional assistance. (Mensah 2/28/23 Dep. pp. 46, 59, 105-106; Radio Trans at 03:06:18)

**RESPONSE:** Disputed.  Mensah testified that when he saw the weapon, he drew his gun.   (Mensah 2/28/23 Dep. 41:16-19). However, the mere fact of a person possessing a gun does not generate a dangerous situation; Mensah escalated the situation by unholstering his service weapon without seeking further information from Anderson. Salyer's Dep. at 59:21-60:3, 62:13-25; 66:5-11.

35.     At 3:06 a.m., Officer Mensah radioed, "Step it up. He has a gun." (Radio Trans. at 03:06:18; see also Mensah 2/28/23 Dep. pp. 59, 46, 105-106)

**RESPONSE:** No dispute. See Response to ¶ 34.

36.      Officer Mensah knew the phrase "step it up" would prompt dispatch to send all squads to his location. (Mensah 2/28/23 Dep. pp. 79-80)

**RESPONSE:** No dispute. See Response to ¶ 34.

37.     Based on his training and experience, Officer Mensah knows that action is quicker than reaction, which is why he unholstered his weapon in response to observing the gun on Anderson's front seat. (Mensah 2/28/23 Dep. pp. 40, 91, 94)

**RESPONSE:** Disputed. Mensah testified that he saw the gun and drew his gun. (Mensah 2/28/23 Dep. pp. 41: 16-19) Further adding that Mensah simply stated, "action is quicker than reaction" and did not rely on his "training and experience" as suggested by this fact; Mensah merely made the comment while describing the reason he unholstered his weapon. (Mensah 2/28/23 Dep. 91:13-22). Additionally, Defendants have admitted the allegations contained in Paragraphs 89, 103, 123-128, 134-139 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

38.    Officer Mensah kept his gun at the low ready position and told Anderson that he saw the gun and told Anderson not to reach for it. (Mensah 2/28/23 Dep. pp. 41-42, 59, 91).

**RESPONSE:**  No dispute that this is Mensah's testimony. Disputed, however, because the mere fact that a person has a weapon does not require an officer to escalate an encounter; Wisconsin is an "open-carry" state meaning that an individual may openly carry an unloaded firearm as long as the person is not convicted of a felony or domestic abuse. (Wis. Stat. § 941.29; Mensah Dep 2/28/2023 at 93:1-14; Mills Dep. at 20:6-7). See Response 37.  Furthermore, Defendants have admitted the allegations contained in Paragraphs 96-98 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

39.     Anderson reached toward the front passenger seat again and Officer Mensah ordered Anderson not to reach for the weapon. (Mensah 2/28/23 Dep. pp. 59 - 60)

**RESPONSE:** Disputed. Anderson's cell phone and other belongings were also on the front passenger seat and Mensah could not definitively state that Anderson was reaching for a gun as opposed to his cell phone or if he was reaching for anything. (Mensah 2/28/23 Dep. at 95:20-23). Also, Mensah only ordered Anderson to keep his hands up. (Amended Complaint, ECF 47, paragraph 107). While interacting with Mensah, Jay struggled to keep his hands up because he was tired and intoxicated. (Dkt. 47 ¶106). In addition, Defendants have admitted the allegations contained in Paragraph 106-107, 109, 125, 127 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

40.     Officer Mensah saw Anderson make at least 4 separate movements with his right arm toward the front passenger seat. (Mensah 2/28/23 Dep. pp. 59-60, 112-114)

**RESPONSE:** Disputed. Anderson's cell phone and other belongings were also on the front passenger seat and Mensah could not definitively state that Anderson was reaching for a gun as opposed to his cell phone. (Mensah 2/28/23 Dep. at 95:20-23). Mensah also does not remember if he asked for the car registration which was kept in the glove compartment. (Mensah 2/28/23 Dep. pp. 53: 12-14 ;

Starkeisha Delarosa Decl. ¶6). In addition, Defendants have admitted the allegations contained in Paragraph 106-107, 109, 125 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

41.     Officer Mensah warned Anderson a few times to keep his hands up, and then Anderson told Mensah, "it's nothing; there's nothing there." (Mensah 2/28/23 Dep. pp. 66- 67, 91)

**RESPONSE:** Disputed. Mensah could not definitively state that Anderson was reaching for a gun as opposed to his cell phone. (Mensah 2/28/23 Dep. at 95:20-23). See Response 40. In addition, Defendants have admitted the allegations contained in Paragraph 106, 125-127 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

42.     In response to Anderson continuing to reach for the gun, Officer Mensah pointed his gun at Anderson and again ordered him to not reach for the gun. (Mensah 2/28/23 Dep. pp. 41-42)

**RESPONSE:** Disputed. Anderson never touched or possessed the gun.  Also, misstates testimony as cited Mensah did not testify to what is alleged.  *See* responses to Nos. 39-41. Mensah admitted that Anderson could have been

reaching for his phone. (Mensah Dep. at 95: 20-23). Defendants have also admitted, that, "Jay Anderson struggled to keep his hands up because he was tired and intoxicated." (Dkt. 47 ¶106). *See* Responses to Nos. 39-41. In addition, Defendants have admitted the allegations contained in Paragraphs 106-109, 125-127 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

43.     Officer Mensah gave Anderson strong forceful commands to not reach for the gun. (Mensah 2/28/23 Dep. pp. 61, 92-94)

**RESPONSE:** Disputed. Mensah testified that he does not remember the exact terms of the strong verbal commands that he gave. (Mensah 2/28/23 Dep. pp. 61: 9-11). *See* Responses to Nos. 39-41. Further adding that Defendants have admitted the allegations contained in Paragraph 98, 106, 109, 125-127 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

44.     The last time Anderson made a movement, instead of just his right arm moving toward the gun on the seat, his whole body lunged toward it. (Mensah 2/28/23 Dep. pp. 58-60, 112-114; see also ECF 77-17, Exh. O Mensah Squad Video (hereinafter Mensah Squad) at 03:07:14)

**RESPONSE:** Disputed. Mensah testified that "both hands went down, and [Anderson] lunged [for his gun]; yet the video footage of the shooting does not show that both hands dropped nor did Anderson "lunge." (Mensah Dep. at 112:10-13; 113:22-25, 114:1-8; see Squad Footage at 03:07:14. Mensah admitted that Anderson could have been reaching for his phone. (Mensah Dep. at 95: 20-23). Defendants have also admitted, that, "Jay Anderson struggled to keep his hands up because he was tired and intoxicated." (Dkt. 47 ¶106). *See* Responses to Nos. 39-41. In addition, Defendants have admitted the allegations contained in Paragraphs 106-109, 125-127 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

45.    When Anderson made this movement, Officer Mensah believed that Anderson was reaching toward the firearm that was located on the front passenger seat. (Mensah 2/28/23 Dep. pp. 74, 142:19-143:5)

**RESPONSE:** Disputed. Mensah also testified that Anderson could have been reaching for his cell phone also located on the front passenger seat. (Mensah 2/28/23 Dep. 95:20-23). In addition, Defendants have admitted the allegations contained in Paragraph 104, 106, 109, 120, 125-128 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

46.     After Anderson moved his body towards the passenger seat where the gun was located, Officer Mensah immediately discharged his firearm six times as he disengaged, walking backwards. (Mensah 2/28/23 Dep. at 114; see also Mensah Squad at 03:07:14)

**RESPONSE:** Disputed that Anderson's body moved toward the passenger seat where the gun was located. See Squad Footage at 03:07:14. See Response 45. In addition, Defendants have admitted the allegations contained in Paragraphs 106, 109, 120, 123-128 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

47.     At 3:07:19 Officer Mensah radioed "Shots fired." (Radio Trans. at 0:4:40)

**RESPONSE:** Disputed.  Officer Mensah radioed at 3:07:22**.** Radio Trans. at 0:4:40) (Mensah Squad Video 3:07:22).

48.     At 3:08 a.m. EMS-advanced life support was dispatched. (Radio Trans. at approximately 0:05:43).

 **RESPONSE:** No dispute.

49.     Immediately after discharging his weapon Mensah pressed the button on his squad mic that activated his squad car's dash camera. The squad car's dash camera

goes back 30 seconds without audio. (Mensah 2/28/23 Dep. pp. 82, 105)

**RESPONSE:** Disputed. Misstates testimony as cited Mensah did not testify where cited as to how long the camera goes back. Also, dispute that *immediately* after discharging his weapon Mensah pressed the button on his squad mic. (Mensah squad video as noted at 3:07:15). In addition, Defendants have admitted the allegations contained in Paragraphs 92 – 94 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

50.    Officer Mensah remotely activated his squad camera immediately after discharging his firearm because he knew it was just him and Anderson and he wanted people to believe him. He knew there was going to be an investigation and he wanted to make sure he captured what happened. (Mensah 2/28/23 Dep. pp. 83, 105, 147-148)

**RESPONSE:** Disputed. Mensah testified that he *needed* "people to believe him." However, Mensah failed to remotely activate the squad camera upon "observing" Anderson's gun and Mensah's concern was not his use of deadly force on Anderson but rather to ensure "people believed him." Dispute that Mensah immediately turned on his squad video after he discharged his weapon. See Response 49. (Mensah 2/28/23 Dep. pp 147-148: 17-6). Mensah did not begin his video or audio recording in his immediate interactions with Anderson as required per WPD policy. (Dkt. 47 ¶¶ 92 & 93). In addition, Defendants have admitted the allegations contained in Paragraphs 92 and 93 of the Amended Complaint (Dkt. 47) in the Estate of Jay

Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski*, 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

51.     Officer Mensah remotely activated his squad camera immediately after discharging his firearm because he knew it was just him and Anderson and he wanted the incident to be documented. (Mensah 2/28/23 Dep. pp. 147-148)

     **RESPONSE:** Disputed. *See* Response to No. 49 and 50.

52.     Officer Mensah's squad video starts at 3:06:55 and shows Officer Mensah standing on the passenger side of the vehicle with his firearm pointing at Anderson. (Mensah Squad at 03:06:55)

     **RESPONSE:** No dispute that the time on the squad video shows that the video with no audio begins at 3:06:55 but dispute whether this time is accurate.

53.     During the 28-second video, Anderson dropped his right hand towards the passenger seat, raised it for an instant and then quickly dropped it again and he leaned towards the front seat where the gun was located. (Mensah Squad at 03:06:55 – 03:06:7:12)

     **RESPONSE:** Disputed. Not only did Mensah testify that both of Anderson's hands "lunge" toward the gun, but Anderson's movements were neither quick nor sudden per the squad dash video evidence; Mensah agreed that Anderson could have

been reaching for his cell phone also in the front passenger seat. Mensah Dep. at 112:10-13; 1; 95:20-23; Weber Dep. 6/6/23 at 92:11-13. Defendants have admitted the allegation that Anderson was tired and intoxicated as set forth in the allegations contained in Paragraphs 97 and 106 of the Amended Complaint (Dkt. 47). in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021). In addition, Defendants have also admitted the allegations contained in Paragraphs 104, 106, 109, 125-128 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

54.    At 3:08 a.m., Wauwatosa Police Officers Ralph Salyers radioed Officer Mensah and asked if it's safe to come in. Soon after Officers Salyers and Mills entered the parking lot and arrived on scene. (Radio Trans. at 0:05:43; see also ECF 77-10, Exh. J, Ralph Salyers Deposition (hereinafter Salyers Dep.) p. 16; ECF 77-11, Exh. K, Stephen Mills Deposition (hereinafter Mills Dep.) p. 12; see also Salyers Squad at 03:08:17)

**RESPONSE:** No dispute.

55.    After arriving on scene, Officer Mills with his handgun drawn, and Officer Salyers, with a long gun, and Officer Mensah approached the car to assess whether Anderson remained a threat. (Salyers Dep. pp. 19-20; Mills Dep. p. 13; see also Salyers Squad at 03:10:40)

**RESPONSE:** No dispute that all three officers approached Anderson's car.

56.     Officer Salyers and Officer Mills observed the black semi-automatic handgun located on the front passenger seat of Anderson's car within reach of Anderson's right hand. (Salyers Dep. pp. 28-29, 35-36; Mills Dep. pp. 19-20)

**RESPONSE:** Disputed. Salyers stated that Mills spotted the gun and that he did not know where the gun was on the front seat also dispute that he knew where Anderson's hands were in relation to the gun. Salyers and Mills observed the gun, but further adding that Salyers was not focused on the gun and saw it briefly; and that Anderson's hand was not on the gun. (Mills Dep. at 20:6-7; Salyers Dep. 28:16-17). In addition, Defendants have admitted the allegations contained in Paragraph 125 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

57.     Officer Mensah told Officers Salyers and Mills that the gun is "right next to him on the passenger seat." (Baynard Supplemental Decl. Exh. U, Salyers Squad Video at 3:10)

**RESPONSE:** Disputed based on inadmissible evidence**.** This is an out of court statement being used to prove the truth of the matter asserted, i.e., that the gun was next to Anderson on the passenger seat; and it does not fall into any hearsay exceptions. *See* FRE 801.

58.     Officer Salyers believed it was best to remove the firearm for safety reasons because the Fire Department was staging, and they would not come in until the scene was safe. (Salyers Dep. pp. 33-34, 43-46; Mills Dep. pp. 20-21)

**RESPONSE:** Disputed. Salyers and Mills both came to the conclusion to remove the firearm from the car. (Mills Dep. 20:15-19). Salyers stated that Anderson was not breathing before Officer Mills reached Anderson's vehicle to remove the firearm from the car. (Mills Dep. 21:1-21). Salyers never prevented the Fire Department or EMS from coming to tend to Anderson. (Salyers Dep. at 46:8-13).

59.     At approximately 3:12:02 Officer Mills approached the passenger side of the vehicle, reached, and grabbed the gun off the front passenger seat and secured it in his trunk. (Mills Dep. pp. 21, 23, 25-28; Salyers Squad 03:12:07)

**RESPONSE:** No dispute that the Milwaukee Police Report states this, but disputed that Mills testified to this fact based on his personal knowledge; Mills does not have a recollection of the events. Mills Dep. 21:9-24; 23:2-16.

60.     After securing the firearm, the officers pulled Anderson from the vehicle and conducted a pat down search. (Salyers Dep. p. 46, 52-53)

**RESPONSE:** No dispute that Salyers testified to this.

61.     By then, a third Wauwatosa officer helped Salyers move Anderson from the car to the ground as the Wauwatosa medical unit arrived and began administering first aid. (Salyers Dep. pp. 48-50)


**RESPONSE:** No dispute.


**Wauwatosa Police Department Procedure for Officer-Involved Shooting**

62.     The Wauwatosa Police Department follows the process outlined in WPD policy titled Investigation of Law Enforcement Involved Fatalities/Great Bodily Harm, after all Officer Involved fatalities. (Baynard Supplemental Decl. Exh. S, Barry Weber 7/7/23 Deposition (hereinafter Weber 7/7/23 Dep.) pp. 72-76)


**RESPONSE:** Disputed. Weber *identified* that he was being shown a WPD policy related to officer-involved shootings and simply discusses the steps contained within Exhibit 19, *not how WPD enforces or follows it*; Weber states that the officer would be on "administrative leave," "not [be] responsible for reporting to his normal shift duties" and will engage in zero "police work." Weber Dep. 7/7/23, 75:4-21.


63.     At the time of the June 23, 2016, shooting it was the policy of the Wauwatosa Police Department that officers are placed on administrative leave pending the investigation into the critical incident. (ECF 76 ¶ 6; ECF 76-3, Exh. C1 p. 4; see also Baynard Supplemental Decl. Exh. S, Barry Weber 7/7/23 Deposition (hereinafter Weber 7/7/23 Dep.) pp. 74-75)

**RESPONSE:** No dispute that the policy at the time says this should happen.

64.     Officer Mensah was placed on administrative leave after the Anderson critical incident. (ECF 76 ¶ 30; ECF 76-21; see also Weber 7/7/23 Dep. at 74-75)

**RESPONSE:** No dispute.

65.     At the time of the June 23, 2016, Anderson shooting incident, it was the policy of the Wauwatosa Police Department that Officers involved in a fatality attend counseling and evaluation with an approved specialist prior to returning to full duty patrol. (ECF 76 ¶ 6; ECF 76- 3, p. 4; Weber 6/6/23 Dep. pp. 68-69; see also Weber 7/7/23 Dep. p. 76)

   **RESPONSE:** Disputed. Weber testified that it was Wauwatosa Police Department policy for an officer involved in a fatality to be required to be evaluated by a psychologist who would need to approve them coming back to work. (Weber Dep. 6/6/23 at 69:4-6; Weber Dep. 5/4/21 at 47:17-22). In addition, Defendants have admitted the allegation that Mensah never underwent a fitness for duty evaluation after the Gonzales shooting of 7/16/15 and before the Anderson shooting as contained in Paragraphs 63, 64, and 216 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

66.     After the June 23, 2016, Anderson shooting incident, Officer Mensah was referred to licensed professional counselor, Jay Schrinsky, for evaluation and counseling regarding the critical incident. (Mensah 2/28/23 Dep. pp. 123-125, 138-139; Weber 6/6/23 Dep. pp. 231-232; see also Weber 7/7/23 Dep. pp. 76-77 citing ECF 76-22 Schrinsky Ltr.)

**RESPONSE:** Disputed as to ECF 76-22 as cited. This evidence is inadmissible hearsay as this document is an unsigned letter by an unnamed person and there has been no evidence provided to support as to Jay Schrinsky's credentials, if any. *See* FRE 801. There is no declarant for the unsigned letter and throughout the duration of this matter no one, including Jay Schrinsky, has ever submitted a Declaration as to the accuracy of this document or to his credentials. Additionally, this fact is inadmissible hearsay because Jay Schrinsky never submitted a Declaration. *See* FRE 801. Whether Jay Schrinsky was a "licensed professional counselor" is unknown and thus, lacks trustworthiness. Specifically, that is because Defendant attempts to use this unsigned/unauthored document and to allege Schrinsky's credentials to bolster their position on summary judgment when they vehemently objected to Plaintiff having any access to these materials, even under a protective order. The use of such statements goes against Court orders, is improper, irrelevant, and frivolous. *See* ECF Nos. 42, 43, 44, 53. In addition, Defendants have admitted the allegations contained in Paragraphs 63, 64, and 216, of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

67.     Officer Mensah met with Jay Schrinsky at ABC Medical Clinics on June 30, July 6, August 3, August 24, and September 13, 2016. (Mensah 2/28/23 Dep. p. 125; ECF 76-22)

**RESPONSE:** Disputed.  *See* Response 66.

68.     On December 7, 2016, Dr. Bauman evaluated Joseph Mensah for the purpose of providing a Fitness for Duty evaluation. (ECF 77-5, Exh. E; see also Weber 7/7/23 Dep. 87-88, 96-97)

**RESPONSE:** Disputed. Dr. Bauman's evaluation and/or report is inadmissible hearsay. *See* FRE 801. Dr. Bauman has not submitted a Declaration. In addition, Defendant attempts to use Dr. Bauman's medical findings to bolster their position on summary judgment when they vehemently objected to Plaintiff having any access to these materials, even under a protective order. The use of such statements goes against Court orders, is improper, irrelevant, and frivolous. *See* ECF Nos. 42, 43, 44, 53.  In addition, Defendants have admitted the allegation that Mensah never underwent a fitness for duty evaluation after he killed Antonio Gonzales as contained in Paragraph 63 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

69.     Dr. Bauman "found Officer Mensah to be competent and capable of rendering appropriate Law Enforcement service to the Wauwatosa community" and

cleared him to return to full duty. (ECF 77-5)

**RESPONSE:** Disputed. This fact is inadmissible hearsay because Dr. Bauman never submitted a Declaration. *See* FRE 801. The methods and circumstances used by Dr. Bauman to come to this conclusion is unknown and thus, lacks trustworthiness. Specifically, that is because Defendant attempts to use Dr. Bauman's medical findings to bolster their position on summary judgment when they vehemently objected to Plaintiff having any access to these materials, even under a protective order. The use of such statements goes against Court orders, is improper, irrelevant, and frivolous. *See* ECF Nos. 42, 43, 44, 53. In addition, Defendants have admitted the allegation that Mensah never underwent a fitness for duty evaluation after he killed Antonio Gonzales as contained in Paragraph 63 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

70.    As part of that evaluation, Dr. Bauman conducted a face-to-face assessment with Officer Mensah, communicated with Captain Tim Sharpee, and reviewed his personal history, current stressors, and specific experiences leading to the assessment. Specifically, Dr. Bauman determined:

The results of the current assessment indicate a person of strong psychological health. From the perspective of his psychological health, I certify that Officer Mensah can perform Patrol duties without restriction….

(Baynard Supp. Decl. ¶ 3, Exh. M, Bauman Fitness for Duty Report pp.1-2)

**RESPONSE:** Disputed. This fact is inadmissible hearsay. *See* FRE 801. The methods and circumstances used by Dr. Bauman to come to this conclusion is unknown and thus, lacks trustworthiness. Specifically, that is because defendants attempt to use Dr. Bauman's medical findings with regard to Fitness for Duty to bolster their position on summary judgment when they vehemently objected to Plaintiff having any access to these materials. The use of such statements goes against Court orders, is improper, irrelevant, and frivolous. *See* ECF Nos. 42, 43, 44, 53. In addition, Defendants have admitted the allegation that Mensah never underwent a fitness for duty evaluation after he killed Antonio Gonzales as contained in Paragraph 63 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

71.    On December 12, 2016, Mensah returned to full duty on patrol. (ECF 76 ¶ 30; ECF 76-21; see also Weber 7/7/23 Dep. pp. 75-76)

   **RESPONSE:** No dispute that Weber *wrote* in the special order that he was assigning Mensah to full duty on December 12, 2016.  (ECF 76-21; Weber 7/7/23 Dep. 76:12-20).

   **<u>Investigations into the June 23, 2016, Critical Incident</u>**

   **Milwaukee Police Department Metro Unit**

72.    Wisconsin Act 348 mandates that an outside agency must investigate all police related critical incidents. (ECF 76 ¶ 6, ECF 76-3 Exh. C1)

**RESPONSE:** Disputed. Wisconsin Act 348 mandates how police agencies are to investigate deaths involving officers. *See* Wisconsin Act 348.

73. In accordance with Wisconsin Act 348, it was the policy of the Wauwatosa Police Department that the Milwaukee Police Department (Metro Unit) lead the investigation of any officer-involved or in-custody death, excluding traffic related officer-involved deaths. (ECF 76 ¶ 6, ECF 76-3; see also ECF 76-3, Mastrocola Dep. pp. 38-39, 54-55)

**RESPONSE:** Disputed, see Response 72. Additionally, Wisconsin Act 348 does not articulate which agencies are to lead the investigations of officer-involved or in-custody deaths whether they are traffic related or not. *See* Wisconsin Act 348.

74. The Milwaukee Police Department Metropolitan Division lead the investigation into the Anderson critical incident. (Baynard Supplemental Decl. Exh. T, Deposition of Troy Porter (hereinafter Porter Depo) at p. 6)

**RESPONSE:** Disputed. Misstates testimony of Porter in his deposition on the page cited as there is no reference who was leading the investigation. Porter Depo p. 6.

**Milwaukee County District Attorney Review**

75. On or before December 5, 2016, the Milwaukee Police Department concluded their investigation and turned over their findings to the Milwaukee County

District Attorney to review the matter for potential criminal prosecution. See generally (ECF 76-20; Weber 7/7/23 Dep. pp. 59-60)

> **RESPONSE:** Disputed This fact is inadmissible hearsay. *See* FRE 801. In addition, Weber noted that he never talked to anyone with the Milwaukee Police Department regarding this investigation and has no personal knowledge as to when and why they turned their findings over to the Milwaukee County District Attorney. Weber 6/6/23 Dep. pp. 21:5-6.

76. On December 5, 2016, the Milwaukee County District Attorney declined to bring criminal charges and concluded that the conduct of Officer Joseph Mensah on June 23, 2016, was privileged in self-defense and justified under Wisconsin law. See generally (ECF 76-20)

> **RESPONSE:** Disputed. This fact is inadmissible hearsay. *See* FRE 801.

## Wauwatosa Police Department Internal Investigation

77. At the time of the June 23, 2016, critical incident, it was the policy of the Wauwatosa Police Department Police Chief to order a separate internal investigation to determine whether any officers violated department rules, regulations, or policies and to identify any potential training deficiencies in all officer-involved fatalities. (Roy Decl. ¶ 6, Exh. C; Weber 7/7/23 Dep pp. 63-65; see also Weber 6/6/23 Dep. pp. 100-102)

> **RESPONSE:** No dispute that Weber testified that WPD had this policy in place.

Weber Dep 7/7/23 at 63-65, 78.

78.     Lt. Jeffrey J. Farina and Sgt. Michael Schultz were assigned to conduct the Administrative Review of the Officer Involved Shooting of Jay Anderson Jr. to determine if actions taken by Officer Mensah were consistent with the rules, regulations, polices, and procedures of the Wauwatosa Police Department, as well as identify any potential training deficiencies that may have occurred. (ECF 77-8 Jeffrey Farina Deposition (hereinafter Farina Dep.) p. 29-31 referencing ECF 77-9)

        **RESPONSE:** No dispute as to Lt. Jeffrey J. Farina's testifying as to what his role was. However, this citation refers only to Farina's involvement and is devoid of any evidentiary support related to Sgt. Michael Schultz's involvement and thus dispute his involvement.

79.     The Administrative Review determined that the actions of Officer Mensah were objectively reasonable, and the use of deadly force was justified, concluding that:

> This incident began as a lower-level police interaction that was completely controlled by Jay Anderson and his actions. If Anderson would not have reached for a firearm and if he would have listened to Officer Mensah's orders, this would have ended up as a "routine" officer/citizen contact. However, due to Anderson's actions we will never know. Very soon as arriving on scene, Officer Mensah was faced with a deadly force threat that would cause any reasonable officer to act as Officer Mensah did.
>
> The investigation showed Officer Mensah gave Jay Anderson many opportunities to comply with his orders before he was forced to make the hardest decision, we ask of law enforcement officers. The investigation revealed that Jay Anderson was, at several points, complying with the orders from Officer Mensah not to reach for the gun. Jay Anderson decided to ignore the officers' orders and reach for the gun, changing the outcome of this incident.

(ECF 77-9 at p. 13)

**RESPONSE:** Disputed. This fact is inadmissible hearsay. *See* FRE 801. In addition, Defendants have admitted the allegations that Defendant Mensah's use of deadly force against Anderson was not justified and that he was not in fear for his safety as contained in Paragraph 120, 128 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

### US Department of Justice Review

80.     On February 16, 2017, the U.S. Department of Justice (DOJ) also reviewed the matter and declined to press charges against Officer Mensah for his actions in shooting Anderson, relying on the following points of evidence:

> Officer Mensah's explanation for the shooting was that he acted reasonable to protect himself from deadly force because there was a loaded hand gun on the front passenger seat of Mr. Anderson's car and Mr. Anderson kept reaching for it despite the officers' command not to do. No evidence contradicts Mensah factually. His statements over the radio to other police officers corroborate him, or at least his belief about Mr. Anderson's gun.

> A number of key pieces of evidence contradict Mensah's version. When other police officers arrived, they found a loaded hand gun on the front passenger seat, just as Mensah stated. Mr. Anderson's DNA was found on that gun.

> The video recording of the incident from Officer Mensah's squad car indicates that Mr. Anderson did repeatedly move his arm towards the gun as Mensah confronted him. Ultimately, Anderson did lean his whole body down toward this gun just before Mensah started firing.

*See generally* (ECF 76 ¶ 33, ECF 76-23p. 1)

**RESPONSE:** Disputed. This fact is inadmissible hearsay. *See* FRE 801.  No one from DOJ has submitted a Declaration and Defendants have admitted the

allegations contained in Paragraph 135 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

### Special Prosecutor Review

81.     This matter was also reviewed by two special prosecutors who issued a final report 3 on June 1, 2022, concluding in part:

> We believe a jury would rely heavily on Mensah's dash camera video to answer the key questions in this case. The video captures the actions of Anderson and Mensah shortly before and during the shooting. The video confirms that Anderson disregarded Mensah's commands to keep his hands up and instead reached towards the passenger seat where his gun was laying. These actions would have caused a reasonable person to fear an imminent threat of death or great bodily harm and to use deadly force to protect themselves.

**RESPONSE:** Disputed based on inadmissible hearsay.  See FRE 801. This fact is not subject to judicial notice; "the fact that a document is in a state court's record does not make it an appropriate subject of notice." *In the Matter of Lisse*, 905 F.3d 495, 496-97 (7th Cir. 2018) (finding that court orders are subject to judicial notice, but generally, documents in a court record are not subject to judicial notice when there is a dispute); Fed. R. Evid. 201. The "final report" of two special prosecutors is not a court order and is subject to dispute as it is merely their opinion. The special prosecutors decision was based on if they could get "beyond a reasonable doubt,"

---

[3] The Final Report on Charging Decision (Docket 108) in Milwaukee County Case No. 2020JD000015 is a public record and appropriate subject of judicial notice. *In the Matter of Lisse*, 905 F.3d 495, 496 (7th Cir. 2018); *see also Menominee Indian Tribe v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998); Fed. R. Evid. 901(b)(7).

in fact, the final report states "A criminal prosecution is different than a civil lawsuit to collect damages for an unconstitutional use of force." Moreover, "The Final Report on Charging Decision" was not provided to Plaintiff in discovery. Additionally, see Response 79. In addition, Defendants have admitted the allegations contained in Paragraph 120, 128 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

Training, Policy, and Practice Claims

**WPD Hiring Process**

82.    Under Wisconsin Law all police officers have to undergo psychological preemployment test before they can be certified through the state. As such, all officers hired by the Wauwatosa Police Department are required to undergo a preemployment psychological screening to determine their fitness for duty, from a psychological standpoint. (ECF 77-2, Weber 9/16/22 Dep. pp. 46-47)

**RESPONSE:** Disputed to clarify that the preemployment psychological screening was performed after a police officer passed the written and physical evaluation and was used to determine their "fitness as far as from a psychological standpoint." (ECF 77-2, Weber 9/16/22 Dep. pp. 46:19-25, 49:19-21). In addition, Defendants fail to cite which Wisconsin Law requires this. In addition, Defendants have admitted to the allegation that the WPD never conducted a psychological evaluation of Mensah prior to his employment as alleged contained in Paragraph 50 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

83.     Prior to his employment with Wauwatosa Police Department, Officer
Mensah underwent a preemployment psychological screening with Dr. Bauman and was
deemed fit for duty by Dr. Bauman. (ECF 77-2, Weber 9/16/22 Dep. pp. 55, 251; ECF 77-
7 Weber 6/6/23 Dep. pp. 98-99 referencing Baynard Supp Decl. Exh. L; see also ECF 77-
1 Mensah 3/17/22 Dep. p. 129)


**RESPONSE:** Disputed regarding improper citations. Weber did not testify that the
screening revealed Mensah was fit for duty. (Weber 9/16/22 Dep. at. 55, 252).
Weber's testimony is that the preemployment psychological screening report stated
that Mensah was an "above average candidate." (ECF 77-7, Weber 6/6/23 Dep.
99:20-25). In addition, Mensah testified that he was required to take a psychological
assessment but did not remember the name of the doctor; Mensah did not testify to
the results of that assessment. (Mensah 3/17/22 Dep. at 129:15-25, 130:1-3). In
addition, Defendants have admitted to the allegation that the WPD never conducted
a psychological evaluation of Mensah prior to his employment as alleged contained
in Paragraph 50 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson
case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL
6882305, *1 (N.D. Ill. Apr. 30, 2021).

### Use of Force Training

84.     Officer Mensah received use of force training at the police academy,
through the Wisconsin DAAT manual and while a field training officer at Wauwatosa
Police Department. (Mensah 2/28/23 Dep. at 254-244)

**RESPONSE:** Disputed. The citation does not support the proposed fact as Mensah

Deposition is 175 pages total. Mensah 2/28/23 Dep.


85.    At that time of the June 23, 2016, Anderson critical incident, the Wauwatosa

Police Department trained officers that the use of deadly force is justified in the following

circumstances:

> a.   Protect the officer or others from what is reasonably
>      believed to be an imminent threat of death or great bodily
>      harm.
>
> b.   When it is necessary to prevent the escape of a fleeing
>      violent felon whom the officer has reasonable belief poses
>      an imminent threat of death or great bodily harm to the
>      officer or others.
>
> c.   If feasible the officer must give some verbal warning prior
>      to the use of deadly force.

(ECF 76 ¶ 12, ECF 76-10 WPD Use of Force Policy p. 7)


**RESPONSE:** Disputed. Anderson did not pose an "imminent threat of death or great

bodily harm," and was not "fleeing" as a "violent felon." In addition, Defendants have

admitted the allegations that Defendant Mensah's use of deadly force against

Anderson was not justified and that he was not in fear for his safety as contained in

Paragraph 120, 128 of the Amended Complaint (Dkt. 47) in the Estate of Jay

Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin*

2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).


86.    Officer Mensah has been trained that if there is an imminent threat of death

or great bodily harm you are allowed to use deadly force to stop that threat. (Mensah 3/17/22 Dep. p. 190; Mensah 6/26/23 Dep. pp. 269-270; see also ECF 76 ¶ 12-14 & ECF 76-10)

**RESPONSE:** No dispute. However, this fact does not specify what Mensah was trained on and when he was trained on this. In addition, Defendants have admitted that Mensah's use of force was objectively unreasonable and excessive in light of the facts and circumstances confronting him at the time as the allegations contained in Paragraph 148 and154-158158 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

87.      The DAAT manual in effect at the time of the Anderson incident trained officers that for a threat to be considered imminent it must meet three criteria: Intent, Weapon, and Delivery System. (Roy Decl. ¶ 21, Exh. K, pp. 65-66; see also Mensah 2/28/23 Dep. pp. 140-141)

**RESPONSE:** Disputed. Joseph Roy has not been identified as an expert witness in this matter in any capacity and it is beyond his scope of what he should be allowed to testify to. Additionally, the DAAT manual in effect at the time of the Anderson shooting was not provided to Plaintiff in discovery. In addition, while the current DAAT manual provides instruction on deadly force; disputed that Anderson met the three criteria simply by having a weapon in the front seat while in an open-carry state: "imminent" is defined as "about to happen," or an "immediate threat."

"Intent" is defined as the suspect indicates intent to cause great bodily harm or death to the officer; examples of intent are "deliberately pointing a weapon at you, stating an intention to kill you, rushing at you with a knife." In addition, "delivery system" is defined as the "[suspect] must have a means of using the weapon to inflict harm." (Roy Decl. ¶ 21, Exh. K, pp. 67-68).

88.     At the time of the shooting, Anderson was in possession of a firearm, which constitutes a weapon. (Mensah 2/28/23 Dep. p. 41; see also Mills Dep. p 19)

**RESPONSE:** Disputed. Anderson never touched or held any firearms during the interaction with Mensah; Wisconsin is an "open-carry" state meaning that an individual may openly carry an unloaded firearm, as long as the person is not convicted of a felony or domestic abuse. (Wis. Stat. § 941.29; Mensah Dep 2/28/2023 at 93:1-14; Mills Dep. at 20:6-7). In addition, the citation does not support the proposed fact and Mills was not there at the time of the shooting and has no personal knowledge of the events at the time of the shooting. (Mills 6/6/23 Dep. at 15:1-20). In addition, Defendants have admitted the allegations contained in Paragraph 109, 125 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

89.     The gun was on Anderson's passenger seat within Anderson's reach, which, based on Officer Mensah's training, contributes to the delivery system. (Mensah 2/28/23 Dep. pp. 140-141)

**RESPONSE:** Disputed. Anderson's actions did not satisfy the third criteria. The mere presence of a weapon is not sufficient to satisfy the delivery system criteria. Roy Decl. ¶ 21, Exh. K, pp. 67-68; Salyer's Dep. at 62:13-25; 66:5-11; Weber Dep. 6/6/23 at 47:1-3. Additionally, Mensah admitted that Anderson could have been reaching for his phone. (Mensah Dep. at 95: 20-23). *See also* Responses to Nos. 39-41. In addition, Defendants have admitted that "Jay Anderson struggled to keep his hands up because he was tired and intoxicated." (Dkt. 47 ¶106) as well as the allegations contained in Paragraphs 106-109, 125-127 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

90.      At the time that Officer Mensah fired, Anderson was reaching for the firearm, which demonstrates his intent. (Mensah 2/28/23 Dep. pp.141-142; Mensah Squad at 03:07:14)

**RESPONSE:** Disputed. There is no evidence on the record to suggest that Anderson was reaching for his gun nor any evidence to suggest Anderson's intent. Furthermore, Mensah testified that Anderson could have been reaching for his cell phone or car registration. (Mensah 2/28/23 Dep. at 95:20-23, Decl. of Starkeisha Delrosa, at ¶ 6). *See also* Responses to Nos. 39-41. In addition, Defendants have admitted that "Anderson struggled to keep his hands up because he was tired and intoxicated" as contained in Paragraph 106 of the Amended Complaint (Dkt. 47) in

the Estate of Jay Anderson case; Defendants have also admitted to the allegations contained in Paragraph 106, 109, 120, 126, 128 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

91.     On June 23, 2016, Officer Mensah shot Anderson because he believed Anderson posed an imminent and deadly threat because he reached for the gun after being instructed not to do so. (Mensah 2/28/23 Dep. p. 142)

**RESPONSE:** Disputed.  If someone is not holding a gun, they cannot refuse an order to put down their gun. (Weber Dep. 6/6/23 at 47:11-14).   In addition, Defendants have admitted that Mensah's use of force was objectively unreasonable and excessive in light of the facts and circumstances confronting him at the time as the allegations contained in Paragraph 106, 109, 120, 126, 128, 148, 154-157, and 158 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

92.     Mensah did not shoot Anderson because he thought he was reaching for a cellphone or anything else on the seat. At that time of the shooting, Officer Mensah did not recall seeing anything else on the seat. (Mensah 2/28/23 Dep. pp. 95, 142-143)

**RESPONSE:** Disputed**.** Defendants have admitted that Mensah's use of force was objectively unreasonable and excessive in light of the facts and circumstances

confronting him at the time as the allegations contained in Paragraph 106, 109, 120, 126, 128, 148, 154-157, and 158 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

93.    Officer Mensah did not have time to ask any additional information from Anderson because Anderson was already reaching for the firearm and Officer Mensah could not get him to stop. (Mensah 2/28/23 Dep. p. 93)

**RESPONSE:** Disputed. Upon arriving at the scene, Mensah did not suspect Anderson as a threat; Mensah knocked on Anderson's car window and spoke to Anderson for several minutes; Mensah asked Anderson for his identification and Anderson answered Mensah. (Mensah 2/28/23 Dep. 34:5-14, 38:4-25). Moreover, Anderson could have been reaching for his phone, not the firearm. (Mensah 2/28/23 Dep. at 95:20-23). In addition, Defendants have admitted that Mensah had time to command Anderson to wake, roll his window down, answer a question, and to put his hands up as alleged in Paragraphs 99-100; furthermore, the Defendants have also admitted to the allegations contained in Paragraph 96-102, 104-106, 108-109 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

94.    Throughout his career, Officer Mensah has received training in defense and arrest tactics, use of force justifications, firearms and at all relevant times, maintained his

certification through the state of Wisconsin. (Mensah 3/17/22 Dep. pp. 40-42, 76, 102-107, 120; see also Roy Decl. ¶ 19; Exh. J, Mensah Training records)

**RESPONSE:** Disputed. Joseph Roy worked with Mensah while he was with the WPD from 2015 through 2020 and did not indicate if "throughout his career" Mensah "maintained his certifications." Mensah 3/17/22 Dep. pp. 40-42, 76, 102-107, 120; *see also* Roy Decl. ¶ 19; Exh. J, Mensah Training records.

95.     The State of Wisconsin established the Law Enforcement Standards Board (LESB) to prescribe minimum requirements for police officer training. The LESB issued regulations governing police officer training standards in such areas as Defense and Arrest Tactics (DAAT) and effecting an arrest. (Roy Decl. ¶¶ 18-20; Roy Decl. Exh. J)

**RESPONSE:** Disputed. Joseph Roy has not been identified as an expert witness in this matter in any capacity and it is beyond his scope of what he should be allowed to testify to.

96.     Officer Joseph Mensah met or exceeded the minimum training requirements established by the State of Wisconsin to be certified as a Police Officer and had maintained his respective certifications throughout their employment with the City of Wauwatosa. (Roy Decl. ¶¶ 18-20; Roy Decl. Exh. J)

**RESPONSE:** Disputed. The cited evidence does not provide the amount of "minimum training requirements" or state that Mensah "met or exceeded" them.

(Roy Decl. ¶¶ 18-20; Roy Decl. Exh. J).  Additionally, See Response 95.

### **Additional Relevant Factual Findings**

97.    At the time of the shooting, Anderson was in possession of a Ruger model SR9c, 9mm, semi-automatic pistol. (ECF 76, ¶ 28)



**RESPONSE:** Disputed.  There is no declarant from the Milwaukee Police Department and no evidence that this weapon was loaded.

98.    Officer Mensah's contact with Anderson on June 23, 2016, was not a traffic stop. (Mensah 2/28/23 Dep. pp. 54, 62-63; Mills Dep. pp. 56-57; Weber 6/6/23 Dep. pp. 95-96)

**RESPONSE:** Disputed. Officer Mensah classified the contact with Anderson on June 23, 2016, as beyond a "simple citizen contact," and that Anderson was not

free to go. (Mensah 2/28/23 Dep. at 53:25, 54:1-4, 62:8-14, 65:21-24). It was a traffic stop because Anderson was detained in his vehicle for a violation which Wauwatosa constitutes as a traffic stop. Roy Dep. at 60: 2-4.

99.    The toxicology report ordered during Anderson's autopsy revealed the presence of marijuana in his system and a blood alcohol level of .144. (ECF 76-20 p. 3)

    **RESPONSE:** Undisputed that the letter states the alleged fact. (ECF 76-20 p. 3). Disputed that this is an out of court statement being used to prove the truth of the matter asserted, i.e., that the gun was next to Anderson on the passenger seat; and it does not fall into any hearsay exceptions. *See* FRE 801.

100.    The semi-automatic firearm recovered from Anderson's vehicle was examined and found to be loaded with sixteen rounds, including one in the chamber. Anderson's DNA was also detected on the handgun. See (ECF 76 ¶ 28 & ECF 76-20)

    **RESPONSE:** Disputed. Plaintiffs have received no evidence that depict any bullets located on Anderson's firearm or clip. The above citations are devoid of any factual support to the contrary. In addition, this is an out of court statement being used to prove the truth of the matter asserted, i.e., that the gun was next to Anderson on the passenger seat; and it does not fall into any hearsay exceptions. *See* FRE 801.




*Mensah's Glock*                                   *Anderson's Ruger*


Dated this 23rd day of August, 2023


**MOTLEY LEGAL SERVICES**

Kimberley Cy. Motley
State Bar No: 1047193
2206 Bonnie Butler Way
Charlotte, North Carolina 28270
E: kmotley@motleylegal.com
P: (704) 763-5413

**CADE LAW GROUP LLC**

By: *s/Nathaniel Cade, Jr.*
Nathaniel Cade, Jr. SBN: 1028115
Annalisa Pusick SBN: 1116379
Antonique C. Williams SBN: 1051850
P.O. Box 170887
Milwaukee, WI 53217
P: (414) 255-3802
F: (414) 255-3804
E: nate@cade-law.com
E: annalisa@cade-law.com
E: antonique@cade-law.com