# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

---

ESTATE OF ANTONIO GONZALES, et al.,

                  Plaintiffs,

      v.

JOSEPH ANTHONY MENSAH, et al.,

           Defendants.

Case No: 21-cv-0848

---

ESTATE OF JAY ANDERSON, JR., et al.,

                  Plaintiffs,

      v.

JOSEPH ANTHONY MENSAH, et al.,

           Defendants.

Case No: 21-cv-1179

---

ESTATE OF ALVIN Cole, et al.,

              Plaintiffs,

      v.

JOSEPH ANTHONY MENSAH, et al.,

           Defendants.

Case No: 22-cv-0856

---

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 82) AS TO THE ESTATE OF ALVIN COLE (E.D. Wis. Case No. 22-cv-0856)

---

NOW COMES Plaintiffs, by their attorneys, and for their brief in opposition to Defendants' Joseph Anthony Mensah, Barry Weber, CVMIC, and City of Wauwatosa, (collectively, "Defendants", unless otherwise noted) Motion for Summary Judgment (ECF ¶ 82) in the Alvin Cole matter, Case #22-cv-0856, alleges and shows the Court as follows.

## STATEMENT OF FACTS[1]

It is physically impossible for an individual to point a weapon at three or four different officers at the same time. Yet, Defendants here paint the picture that Mensah was in a precarious, deadly standoff with Alvin Cole when Mensah discharged his weapon, killing Cole. Curiously, several other officers who approached Cole earlier, were providing commands and drawing their weapons while Cole lay prone on the pavement, some also claim that Cole contorted his body to point the weapon at each of them. Not all the officers' stories can be true at once. Without more, this creates a devastatingly disputed issue of fact that only a jury can assess. Credibility of these officers is paramount to whether Mensah acted reasonably under the circumstances.

On February 2, 2020, 17-year-old Alvin Cole was at Mayfair Mall with a group of friends when a verbal disturbance erupted. PFOF ¶ 1. Mayfair Mall security called the Wauwatosa Police Department to the scene based on the alleged disturbance. PFOF ¶ 2. Wauwatosa officers Shamsi, Schleis, Johnson, and Olson were dispatched to investigate. PFOF ¶ 2. Several officers chased various young men throughout the Mayfair Mall parking lot until a single gunshot was heard. PFOF ¶¶ 4-6, 13, 18-19, 21-22. None

---

[1] Plaintiffs have filed a response to the Defendants' proposed findings of fact ("DPFF"), ECF 85[1], as required by this Court, as well as their own proposed findings of fact ("PFOF").

of the officers at the scene, including Mensah, knew where that single shot came from. PFOF ¶¶ 9, 13, 36, 55.

Officer Johnson was on foot pursuit towards Cole when he observed Cole drop to the pavement after the single gunshot was heard. PFOF ¶¶ 4, 8, 15. Cole shot himself in the arm and likely fell face first onto the ground unconscious, explaining why multiple officers claim Cole never moved. PFOF ¶¶ 30-31. Johnson unholstered his service weapon and continued running towards Cole who was 40 yards ahead, shouting commands. PFOF ¶¶ 8-9, 15.

Officer Shamsi arrived in his squad when Johnson was still on foot pursuit chasing Cole when he heard what sounded like a gunshot and observed Cole drop to his knees, but never observed a weapon. PFOF ¶¶ 18-25. As Shamsi approached Cole, who was face-down on the ground, he first observed Cole's weapon about 20 yards ahead. Shamsi drew his service weapon and began shouting commands at Cole. PFOF ¶¶ 25-26. Cole never moves. PFOF ¶¶ 30, 32, 56.

At this point, the story becomes disputed and varied. Shamsi testified that Cole's gun is pointed toward Mayfair Road and Officer Olson was in that general direction. PFOF ¶¶ 24, 27. Shamsi agreed that he could not tell if the gun was aimed at Olson and that Cole never moved. PFOF ¶¶ 30, 96. However, Olson alleges that Cole raised his gun and arm off the ground, twisted his right arm from under his body, and extended his right arm to point the gun directly at him (Olson). PFOF ¶¶ 41-44. Johnson claims he never saw the gun until after Mensah runs on scene and shoots Cole. PFOF ¶¶ 15-16. And finally, Mensah, who was not dispatched to the scene and is on the direct opposite side of Cole compared to Olson, claims that Cole begins to crawl and pointed the gun straight at him (Mensah), with his body and head twisted toward him. PFOF ¶¶ 55-59. Yet, Shamsi,

Johnson, and Olson *do not* shoot Cole. DPFF ¶¶ 46, 50; Cole ECF 20 ¶ 135. Mensah also testified that he never saw Cole turn his head or body *in any direction* nor did he see any other officers (or citizens) in the vicinity when he discharged his weapon. PFOF ¶¶ 56, 60. Importantly, not one single officer testified that they feared for the safety of anyone other than themselves. PFOF ¶ 49.

Mensah ran onto the scene unannounced and fired five shots in full stride at Cole without warning. PFOF ¶ 48. Additionally, Shenora Staten-Jordan and John Rawlings, two citizen witnesses stated that they did not see anything in Cole's hands right before, during, or after they witnessed him being shot by Mensah. PFOF ¶ 54.

## THE APPLICABLE SUMMARY JUDGMENT STANDARD

Summary judgment is required ***only*** where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)(emphasis added). When considering a motion for summary judgment, the Court is to take the evidence in the light most favorable to the non-moving party and may grant the motion only if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 255, 106 S. Ct. 2505 (1986); *Schuetta v. Aurora Nat'l Life Assurance Co.*, 27 F.Supp.3d 949, 955-56 (E.D. Wis. 2014), citing Fed.R.Civ.P. 56(a). Importantly, a court must construe all facts in the light most favorable to the nonmoving party and draw all reasonable and justifiable inferences in favor of that party when determining whether a genuine issue of material fact exists. *See, e.g., Simpson v. Merchants Recovery Bureau, Inc.*, 171 F.3d 546, 551 (7th Cir. 1999). This requires the Court to "construe all inferences in favor of the party against whom the motion under consideration is made." *Rupcich v. United Food & Commercial Workers Int'l Union*, 833 F.3d 847, 853 (7th Cir. 2016)(citations omitted).

4

And, importantly, this requirement even applies when an officer invokes qualified immunity as a defense. *Taylor v. City of Milford*, 10 F.4th 800, 808 (7th Cir. 2021) (noting that summary judgment on the question of qualified immunity is inappropriate where "determining whether [defendant's] violation of [plaintiff's] rights was clearly established [as unlawful]... requires findings of fact."); *Tolan v. Cotton*, 560 U.S. 650, 656, 134 S. Ct. 1861, 188 L.Ed.2d 895 (2014)("But under either [qualified immunity] prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."), (citations omitted). In *Tolan*, the Supreme Court emphasized the "importance of drawing inferences in favor of the nonmovant, even when . . . a court decides only the clearly established prong of the [qualified immunity] standard." *Tolan*, 560 U.S. at 656.

For purposes of this motion, the Court cannot weigh the evidence or decide which testimony is more credible. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)(Credibility determinations and weighing of the evidence ". . . are jobs for a factfinder."). The Court's only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Amer. Hoescht Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

In the Seventh Circuit, summary judgment is to be used sparingly in excessive force cases where, as here, the parties' versions of the facts differ sharply. *See Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (holding that "since the *Graham* reasonableness inquiry 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.'")(quotations omitted). Courts in this Circuit consistently adhere to this rule. *See, e.g.*, *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 520 n. 4 (7th Cir. 2012) ("We

certainly agree that summary judgment is frequently inappropriate in excessive force cases.").

Moreover, summary judgment in this Circuit is especially rare, and a request for such disposition evaluated critically, where the victim of such force is dead. *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994); *see also Abdullahi* 423 F.3d at 772 n.7 ("'The award of summary judgment to the defense in deadly force cases may be made only with particular care *where the officer defendant is the only witness left alive to testify*.'")(emphasis added), quoting *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994).

Finally, it is important to appreciate that "inferences are often necessary when the plaintiff's sole eyewitness is dead," and keep in mind that a plaintiff may always prove her case "by circumstantial evidence where direct evidence is unavailable." *Abdullahi* 423 F.3d at 772, citing *Murrell v. Frank*, 332 F.3d 1102, 1117 (7th Cir. 2003) ("Circumstantial evidence is of equal probative value to direct evidence and in some cases is even more reliable."); *see id.* ("We have previously held that medical evidence and other circumstantial evidence can be sufficient to create triable issues of fact in excessive force cases.")(citations omitted); *Castro v. Devry University, Inc.*, 786 F.3d 559, 565 (7th Cir. 2015) (nonmovant can rely upon circumstantial evidence to preclude summary judgment).

Accordingly, for present purposes the truth of Plaintiffs' well-supported material facts must be assumed. Then, the Court asks whether - on *those* facts - any of the Defendants are entitled to judgment as a matter of law. *See, e.g., Weinmann v. McClone,* 787 F.3d 444, 449 (7th Cir. 2015) ("Our task is to determine, under [Plaintiff's] version of the facts, if [the Defendant Officer] was objectively reasonable in his belief that his life was in danger."); *see also Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003) (must assume non-movant's facts in assessing summary judgment motion).

6

**Defendants' Failed to Respond or Answer All of the Allegations in Plaintiffs' Complaint (ECF 1) and Amended Complaint (ECF 20)**

Before delving into the substance of the argument, it is important to note a procedural issue caused solely by the failure of the defendants. Specifically, Defendants never filed an answer or otherwise pled to the Complaint and the Amended Complaint in the Cole case, 22-cv-0856 (Cole ECF 1; Cole ECF 20), and thus, pursuant to FRCP 8(b)(6), those allegations are deemed admitted.[2] Cole ECF 20 ¶¶ 1-254.

Procedurally, Plaintiffs filed the initial Complaint on July 28, 2022. Cole ECF 1. Soon after filing the initial Complaint, Plaintiffs filed a motion to consolidate all three cases pertaining to Joseph Mensah on August 8, 2022. Cole ECF 12; Gonzales 21-cv-0848 ECF 28. The Court granted the motion on September 22, 2022. Cole ECF 14; Gonzales ECF 34. Defendants never filed their answer to the original Complaint in the Cole case. Cole ECF 1. Instead, Defendants filed a motion to dismiss the original complaint on September 30, 2022. Cole ECF 18. Subsequently, Plaintiffs did not respond to the first motion to dismiss, but instead filed the Amended Complaint on October 21, 2022. Cole ECF 20. This caused the Defendants to file a motion to dismiss the Amended Complaint on November 4, 2022. Cole ECF 21. Plaintiffs responded to the motion to dismiss on November 25, 2022, Cole ECF 22, and Defendants filed their reply to their motion to dismiss on December 9, 2022. Cole ECF 23.

Additionally, in filing their motion to dismiss the Amended Complaint, Defendants moved to dismiss most, ***but not all,*** of the claims contained in the Amended Complaint

---

[2] Plaintiffs are not requesting a default judgment, pursuant to Fed.R.Civ.P, 55, nor are Plaintiffs moving to strike Defendants' motion for summary judgment, as such motions are disfavored by the Court. Civil L.R. 56(b)(10). Instead, the failure to answer the specific factual allegations contained in the Amended Complaint are deemed admitted, FRCP 8(b)(6), and should be the basis for this Court's denial of Defendants' motion for summary judgement.

on November 4, 2022. Cole ECF 21.[3] More specifically, Defendants moved to dismiss Count 1 (¶¶ 159-176) only as to Defendant Weber and Counts 2-3 (¶¶ 177-209) and Counts 5-7 (¶¶ 224-248) of the Cole Amended Complaint. *Id.* Defendants **did not** move to dismiss Count 1 as to Defendants Mensah and the City (¶¶ 159-176), they did not move to dismiss Count 4 as to the Defendant City (¶¶ 210-223), and they did not move to dismiss Count 8 Loss of Society and Companionship against all Defendants (¶¶ 249-254). *Id*. The Court issued a combined decision on the Motions to Dismiss in Anderson and Cole on April 11, 2023. Cole ECF 25; Anderson ECF 56. Defendants failed to file an answer or otherwise plead within 14 days, as required by the federal rules, after the Court's ruling, or by April 25, 2023.[4] Motley Decl., ¶ 23.

Thus, Defendants have admitted the allegations contained in Paragraphs 1-254 of the Amended Complaint (Cole ECF 20). *See* FRCP 8(b)(6)("**Effect of Failing to Deny. An allegation** – other than one relating to the amount of damages – is admitted if a responsive pleading is required and the allegation is not denied. . . ."); *Modrowski v. Pigatto,* 712 F.3d 1166, 1170 (7th Cir. 2013)("Indeed, Modrowski might have **conclusively established** most of the material facts alleged in his complaint simply by highlighting the defendants' failure to file a timely answer to his first amended complaint. . . The defendants' unorthodox strategy of responding to Modrowski's first amended complaint with a motion for summary judgment, unaccompanied by any other responsive pleading, was thus risky, because Modrowski could have pointed to "admissions on file"

---

[3] Defendants also filed a motion to dismiss the Amended Complaint in the Anderson case, 21-cv-1179. *See* Anderson ECF 50.

[4] *See* Fed.R.Civ.P, 12(a)(4)("if the court denies the motion or postpones its disposition until trial, the responsive pleading must be served within 14 days after notice of the court's action"); *Becker v. Fitzgerald*, No. 94 C 7646, 1995 WL 215143, *2 (N.D. Ill. April 10, 1995).

to support his allegations."), citing *Celotex*, 477 U.S. at 324; *Barwin v. Village of Oak Park*, 15-cv-6046, 2021 WL 6882305, \*1 (N.D. Ill. Apr. 30, 2021)("There is a distinction between relying on the *allegations* in the complaint (which is insufficient to survive an opponent's motion for summary judgment) and relying on the defendant's *admission* of those allegations. Barwin has done the latter."(italics in original)), *aff'd in part, rev'd in part and remanded*, 54 F.4ᵗʰ 443 (7th Cir. 2022), citing *Modrowski*. *See also Gopon-Rosel v. Plastics Engineering Co.*, 2009 WL 142354, \*6 n.7 (E.D. Wis. Jan. 20, 2009)(Adelman, J.); *Dunbar v. Prelesnik*, 16-1374, 2016 WL 11618615, \*2 (6th Cir. Oct. 27, 2016)("After the district court denied their motions to dismiss, the defendants filed a motion for summary judgment. While filing a motion to dismiss tolls the deadline for a defendant to file an answer to a complaint by operation of Rule 12(a)(4)(A), Rule 56 has no similar provision for summary judgment motions. Accordingly, when the district court denied the defendants' motion to dismiss, the defendants were required to file an answer within fourteen days. *See* Fed. R. Civ. P. 12(a)(4)(A). The defendants' failure to do so constituted an admission of all of the complaint's factual allegations pursuant to Rule 8(b)(6)."), citing *Modrowski*.

Because of the failure of Defendants to admit, deny or otherwise respond, as required by FRCP 8(b)(6), the allegations contained in the Amended Complaint, Cole ECF 20 ¶¶ 1-254, are deemed admitted and this Court should deny Defendants' motion for summary judgment, and allow this matter to proceed to trial.

## **ARGUMENT**

This is an excessive deadly force case. Defendants argue that Joseph Mensah shot Alvin Cole purportedly because Cole had a weapon allegedly pointed at Mensah. However, Plaintiffs correctly dispute Defendants' version of events, for the reasons noted

below, because there were multiple officers, as well as citizen witnesses, present on the scene and they have given **conflicting testimony** as to whether Cole possessed a weapon at the time he was shot and if he did, as to the direction he purportedly was aiming. This discrepancy between the testimony of the officers should serve as a strong factor for this Court to deny summary judgment.

## I.    MENSAH USED EXCESSIVE FORCE WHEN HE SHOT AND KILLED ALVIN COLE, THEREBY VIOLATING HIS FOURTH AMENDMENT RIGHTS.[5]

Mensah shot Cole five times in the parking lot behind the Cheesecake Factory at Mayfair Mall in Wauwatosa. PFOF ¶¶ 1, 48. There is no dispute that shooting someone is a use of force and a seizure under the U.S. Constitution, and there is no dispute that the force used by Mensah was deadly as to Cole. Thus, the real issue is whether Mensah's use of force was excessive. The answer is yes, and the Court should deny the motion.

A police officer's use of deadly force on a suspect is a seizure under the Fourth Amendment, so that the force the officer uses must be reasonable in order for it to be constitutional. *Scott v. Edinburg*, 346 F.3d 752, 755 (7th Cir. 2003). Police officers may use force, up to and including deadly force, under the appropriate circumstances. "But it is also the case that the Constitution forbids the use of excessive force." *Weinmann*, 787

---

[5] While this section addresses the Claim of excessive force against Mensah, Plaintiffs note that the excessive force claim against the City must also survive summary judgment as Defendant's failed to respond to Plaintiffs Amended Complaint and such allegations of excessive force against the City are deemed admitted and are not otherwise contested.  ECF 20 ¶¶ 134-145, 159-176.  Additionally, Plaintiffs have alleged that the City was on notice to numerous excessive force issues and the undisciplined, over policing by WPD officers particularly against people of color under the authority of its chief policymaker, Weber. PFOF ¶¶ 66-76.  Weber further caused the shootings of Anderson and Cole in numerous ways such as 1) by clearing Mensah without conducting a fitness for duty evaluations or even having a fitness for duty policy, 2) ratifying Mensah's use of excessive force by awarding him with a medal of valor for killing Gonzales, and 3) allowing Mensah back to work without conducting an internal investigation for the Gonzales and Anderson shootings. *Id.*; PFOF ¶¶ 79, 91, 93. Plaintiffs further allege that these constitutional violations were brought on by the City's defacto custom or practices under Weber's authority which resulted in the shootings of Gonzales, Anderson, and Cole. PFOF ¶ 65; ECF 20 ¶¶ 134-145.

F.3d at 447. The determinative issue is whether such use of force "has crossed the constitutional line" under the Fourth Amendment and whether the force used was reasonable (i.e. whether the force used is excessive). *Id.*; *Estate of Sylville K. Smith v. City of Milwaukee*, 410 F. Supp. 3d 1066, 1071 and n.4 (E.D. Wis. 2019)(Adelman, J.).

To make such a determination as to the amount of force used, "The law requires an assessment of the totality of the facts and circumstances, which includes consideration of 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Estate of Smith*, 410 F. Supp. 3d at 1071, quoting *Strand v. Minchuk*, 910 F.3d 909, 914-15 (7th Cir. 2018), *cert. denied,* 139 S. Ct. 1629, 203 L.Ed.2d 900 (2019); *Muhammed v. City of Chicago*, 316 F. 680, 683 (7th Cir. 2002)("Deadly force may be used if the officer has probable cause to believe that the armed suspect (1) 'poses a threat of serious physical harm, either to the officer or to others,' or (2) 'committed a crime involving the infliction or threatened infliction of serious physical harm' and is about to escape.") quoting *Tennessee v. Garner*, 471 U.S. 1, 11-12, 105. S. Ct. 1694, 85 L.Ed.2d (1985). Thus, "[a]s applied to the present case, this means that [Alvin Cole] has a constitutional right to not be shot on sight if he did not put anyone else in imminent danger or attempt to resist arrest for a serious crime." *Weinmann*, 787 F.3d at 447. The discussion of each of the three potential factors for the Court to consider as to the amount of force used demonstrates that Mensah did not have an excuse or justification to use any force, let alone deadly force, as to Cole, and thus, the force applied was objectively unreasonable and excessive.  ECF 20 ¶¶ 161, 167, 169.

A. **Severity of the crime**: Here, there is a dispute as to the severity of the purported crime. Defendants argue that no reasonable jury could find that Mensah's use

of force was unreasonable because he faced an immediate threat of Cole having a weapon. Defendants are just wrong, as Plaintiffs do believe that a properly instructed jury could find that Mensah used excessive force and violated Cole's civil rights.

At the time Mensah and the other Wauwatosa police officers confronted and chased Cole, and the other individuals who were with Cole at Mayfair that night, Cole had not committed a crime nor was there evidence that he had committed a violent felony. PFOF ¶ 3. There is no dispute that Cole was running away from the police, as the video evidence is clear on that point. PFOF ¶¶ 8, 18-19, 21. A dispute that needs to be resolved is whether *simply fleeing* from law enforcement without having committed a crime allows the use of deadly force and whether doing so is reasonable. Plaintiffs dispute Defendants' contention that Cole's flight permitted the use of deadly force, and this Court should conclude, based on legal precedent, that Cole's flight did not permit the use of deadly force and that Mensah's deadly force was unreasonable.

The Supreme Court held in *Garner* that "if the suspect threatens the officer with a weapon or there is probable cause to believe that he *has committed a crime involving* the infliction or threatened *infliction of serious physical harm*, deadly force may be used if necessary to prevent escape . . . ." *Garner*, 471 U.S. at 11-12; *see also Smith*, 410 F. Supp. 3d at 1072. Here, like in *Smith*, where this Court previously denied a motion for qualified immunity, the Wauwatosa Police Department, including Mensah, ". . . did not engage [Cole] in response to reports of a serious crime, as is common where courts grant police officers qualified immunity. Indeed, under plaintiff's version of events, there was no illegal conduct on [Cole's] part that would have warranted *any police scrutiny*, much less a crime involving the infliction (or threatened infliction) of *serious physical harm* necessary to justify deadly force." *Smith*, 410 F. Supp. 3d at 1072 (italics in original).

Certainly, the mere possession of a weapon, with nothing else, is not enough to use deadly force. *Smith*, 410 F Supp. 3d at 1073, *citing Weinmann*, 787 F.3d at 449-50 ("if [decedent] had the gun raised to his shoulder and pointed at [defendant-officer], then [defendant-officer] would have been justified in using deadly force and hence entitled to qualified immunity"); *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993)("If [the plaintiff's] account is to be believed, [the officer] shot him in the back without any indication that he had committed a violent felony or was dangerous. That would make the force used to seize [the plaintiff] excessive under the Fourth Amendment.").

Importantly, Defendants citation to quotes by the Milwaukee County District Attorney about Cole's possession of a weapon, ECF 76-25 and 84 at p. 7, are hearsay and inadmissible. *Schimpf v. Gerald, Inc.*, 52 F. Supp. 2d 976, 981 (E.D. Wis. 1999)(Adelman, J.)("Hearsay that does not fall with an exception in the Federal Rules of Evidence is inadmissible for summary judgment as well as trial.")(citations omitted.) Nor does the alleged crime itself permit a finding that justified Mensah's use of deadly force against Cole. *Cf. Pekrun v. Puente*, 172 F. Supp. 3d 1038, 1045 (E.D. Wis. 2016)(Adelman, J.)(suspect had only committed ordinance violation)(citations omitted).

**B.** **Actively resisting arrest or attempting to evade**: This factor works against Defendants. Cole did run away from the police, but importantly, he was no longer running when he was shot and killed by Mensah; he was already prone on the ground. PFOF ¶¶ 19-20, 25[6]; Cole ECF 20 ¶¶132, 136-137. But, the mere fact that Cole was running is of no moment for purposes of Mensah's use of deadly force, because Cole was not under arrest at the time he ran away from the Wauwatosa police officers nor was he

---

[6] *See also* PFOF ¶¶ 52, 54 ("Two witnesses saw Cole stop running and fall to his knees on the ground [before he was shot].").

accused of a dangerous crime or felony. *Rios v. City of Chicago*, 523 F. Supp. 3d 1020, 1030 (N.D. Ill. 2021)("Under this well-established rule [as to the use of deadly force], it was clear on July 4, 2014, that a law enforcement officer may not reasonably shoot a suspect merely because he is fleeing from police, if the officer lacks any reason to believe that the suspect poses a threat to police or the public or has committed a crime of threatened or actual physical harm."), citing *Ellis*, 999 F.2d at 247 ("If [the plaintiff's] account is to be believed, [the officer] shot him in the back without any indication that *he had committed a violent felony or was dangerous*.")(emphasis added). *See also Garner*, 471 U.S. at 11 ("The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. . . but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect.").

      **C.**     <u>**Poses an Immediate threat to the safety of an officer**</u>: The third factor is the one that the parties heavily dispute. Defendants, in moving for summary judgment, allege that Mensah feared for his safety because Cole possessed a gun and Mensah claims that Cole, after falling forward on his face and knocking himself unconscious, had somehow pointed the gun at Mensah by using his right hand and reaching underneath his body through his left side (without looking at Mensah). PFOF ¶¶ 30-31, 57- 59. While this fact arguably could be a basis to justify the use of force in some circumstances, it is not a basis in this case when it is considered with the clear discrepancy in viewpoints of all of the other officers who had participated in the pursuit of Cole and the citizens who

witnessed the shooting. These discrepancies, as stated below, are disputed issues of material fact that should serve as one of the basis to deny summary judgment.

   **1.    Although Mensah Claims He Shot Cole Out of Fear for His Own Safety, and *Not* The Safety of Other Officers or The Public, but Cole was Not an Immediate Threat of Harm to Mensah or Other Officers.**

But, first, it is important to note that "… someone does not pose 'an immediate threat of serious harm' solely because he is armed. We made that point in *Weinmann v. McClone* . . . [where] [w]e held that the case turned on whether the man had threatened the officer with the shotgun – if he hadn't, it was unreasonable for the officer to shoot him. Having a weapon is not the same thing as threatening to use a weapon." *Estate of Biegert v. Molitor*, 968 F.3d 693, 700 (7th Cir. 2020).

Defendants claim that Cole was not "subdued" because he still had his hand on the weapon. ECF 84, at p. 8. Somehow, Defendants seem to have forgotten the specific words of one of their officers, Shamsi, who ***clearly stated*** that after Cole fell, "I don't recall seeing him move the gun." PFOF ¶ 32. Moreover, Johnson says he saw the gun next to Cole's hand. PFOF ¶ 16. But regardless of whether the gun was in or near his hand, it is important to note that Cole was not moving, likely because he was unconscious. PFOF ¶¶ 30-31. Even if Cole had his hand on the weapon, there are highly disputed material facts regarding whether Cole threatened Mensah with the gun[7], which, if a reasonable jury finds that Cole did not threaten Mensah with a gun or was unconscious, then Mensah's use of deadly force against Cole was unreasonable. *Estate of Biegert*, 968 F.3d at 700.

---

[7] As discussed above, Olson testified the gun was pointed towards himself, Shamsi testified the gun was pointed towards Mayfair Road, Johnson did not see the gun until after Mensah killed Cole, and Mensah (who was on the complete opposite side of Olson) testified that Cole pointed the gun towards himself.

Defendants further admit that "It is well established that a police officer may not continue to use force against a suspect who is subdued and complying with the officer's orders. But that principle depends critically on the fact that the suspect is indeed subdued. *Johnson v. Scott*, 576 F.3d 658[, 660] (7th Cir. 2009). The permitted continued use of force against a suspect does not apply when the suspect falls to the ground while in possession of and firing a gun. *See Doxtator v. O'Brien*, 540 F. Supp. 3d 815, 830 (E.D. Wis. 2021), *aff'd*, 39 F.4th 852 (7th Cir. 2022)."

There is a fundamental problem with Defendants citation to *Doxtator*. There, the victim, despite having his hands handcuffed in front of him, *implied* he might have a weapon when he was shot, and the officer could not see it. *Id.*, 540 F. Supp. 3d at 830-31. Such is not the case here. Although Shamsi was adamant that Cole had his hand on the weapon, he also testified that Cole did not move the gun or raise it up towards any officer. PFOF ¶ 32. But alternatively, Johnson stated that Cole did not have his hand on the weapon. PFOF ¶ 16. Thus, unlike the officer, Tubby, in *Doxtator*, who could be said to have a reasonable belief as to the potential of the threat of a weapon, here there is a disputed issue of material fact about whether Cole actually, was a threat to Mensah or the other officers at the time he was shot and killed.

And despite Defendants argument that no reasonable jury could believe Cole was subdued just because he was on his knees at some point, ECF 84 at 9, a reasonable jury could find Mensah, whose testimony is materially disputed by the other officers at the scene, lacks any credibility; and thus, find in favor of Cole. In fact, if a reasonable jury believes (1) the version of events as told by Shamsi, i.e. that Cole was not moving, did not have his hand on the gun, never pointed or raised the gun at anyone other than Shamsi and/or towards Mayfair Road (but not necessarily aiming at Olson), (2) the

medical evidence about the abrasions on Cole's face that indicate he was unconscious, and (3) the version of facts of Johnson as well as John Rawlings and Shenora Staten-Jordan that Cole did not have his hand on his weapon, the reasonable jury could find that the use of deadly force was unreasonable. PFOF ¶¶ 27, 31 32, 39, 40, 53.

### 2. Each Officer Testified to Different Versions of Events Leading Up to Mensah Shooting Cole, yet None of Them Stated That the Gun was Ever Pointed at Mensah.

Officer Shamsi, who is the only officer who testified that he had visual of Cole and the gun the entire time, indicated that he saw Cole fall face forward and was directly behind Cole after he had fallen, and that Cole did not move. PFOF ¶¶ 30, 32. Importantly, Shamsi also testified that he gave multiple commands to Cole to push the weapon away from his body, PFOF ¶¶ 7, 30. Shamsi indicated that he had considered using deadly force against Cole because Cole was not complying with Shamsi's commands, but it is likely Cole did not comply with Shamsi's commands because Cole was knocked unconscious when he fell. PFOF ¶¶ 30-31. Shamsi testified that the gun was pointed towards Mayfair Road, not that the gun was pointed directly at Olson or that Cole raised up the weapon. PFOF ¶¶ 27, 32. Shamsi also testified that Cole never moved his hand with the gun, nor did Cole point the gun in any other direction. PFOF ¶ 32. Additionally, Shamsi did not testify that Cole pointed the gun at Mensah, who was to the east of Shamsi, nor did Cole reach his right hand under his body.

Officer Olson was to the west of Shamsi and testified that he saw Cole fall and believed the weapon was pointed straight at him. PFOF ¶¶ 41-44.

Officer Johnson testified that, after hearing the first single gunshot, he observed Cole about 40 yards away falling down to his hands and knees. PFOF ¶ 15. Only after Mensah shoots Cole does Johnson observe a weapon *next to Cole.* PFOF ¶ 16.

17

And, importantly, not a single officer testified or put forward a declaration that they feared for the safety of other officers or the general public, not even Mensah. Each officer testified that if they had a fear that they feared only for their individual safety. The importance of this point is that use of deadly force by an officer is only justified to protect oneself, another officer, or the public. There is a dispute as to whether any of the officers were individually threatened. But there is no dispute that any officer believed *another fellow officer, or the public* was threatened. There also is no dispute that Mensah believed no other officer, or the public was threatened. PFOF ¶ 49. Thus, the issue is whether the use of force by Mensah was objectively reasonable as to his individual belief. In light of Shamsi's testimony and the other disputed evidence, a properly instructed jury would have no problem finding that Mensah lacked a reasonable belief as to his own safety.

### 3. A Reasonable Officer Would Not Have Used Deadly Force, Thus, Mensah Unreasonably Used Excessive Deadly Force Against Cole.

Here, what a reasonable officer would know is that: (1) A report had been made of a number of African-American teens at Mayfair Mall; (2) At least one of the teens was reported to have had a weapon (but not by any officer);[8] (3) Several teens were seen near the parking structure at the mall; (4) The male teens ran when police officers arrived; (5) Mensah, Shamsi, Johnson and Olson gave chase to the West; (6) Olson, at the time of the foot chase, parked his car on Mayfair Road and exited his vehicle; (7) Olson left his vehicle and proceeded through the parking lot, heading East; (8) Cole shot himself in his left forearm while he was running; (9) After the single gunshot, Cole fell forward and knocked himself unconscious; (10) Olson was to the West of Cole; (11) Shamsi was to

---

[8] Plaintiffs dispute the admissibility of the evidence regarding the statements of the person who reported Cole having a gun as the statements are inadmissible hearsay and do not fall into any hearsay exception.

the North (or behind) Cole; (12) Mensah was to the Northeast of Cole; (13) There is a dispute as to whether Cole, while he was on the ground, was a threat to any of the officers; (14) There is a dispute as to whether Cole raised the gun up and pointed it straight at Olson; (15) Mensah, who was not near any other officers, believed that Cole was able to do an acrobatic move and point the gun directly and only at him (while not moving and unconscious); (16) No officer testified or believed that any other officer (or the general public) was in danger at the time of the shooting; and, (17) "as of November 8, 2008, it was clearly established that an officer may not use deadly force against a person who is suspected only of minor offenses and who does not pose a danger to the community." *Pekrun*, 172 F. Supp. 3d at 1050, citing *Garner*, 471 U.S. at 11 and *Ellis*, 999 F.2d at 247.

The following table shows the view of all witnesses, police and lay:

| Witness | Observation of Cole Shooting Himself | Contradictory Viewpoints Before Cole was Shot by Mensah |
|---------|--------------------------------------|---------------------------------------------------------|
| Joseph Mensah | Did not see a muzzle flash & did know where the shot came from. PFOF ¶ 5 | Cole was pointing his gun directly at him and no other officers were next to him when he fired his weapon. PFOF ¶¶ 59 & 60 |
| Jeffrey Johnson | Hears first shot, unsure where it came from. PFOF ¶ 13 | Observed Cole "falling or moving down" to "a hands-and-knees position" and was in the "act of falling." PFOF ¶ 15; Observed the "Gun is next to Cole". PFOF ¶6 |
| Evan Olson | Does not know where first shot came from, heard the shot. PFOF ¶. 9 | Cole "extended his right arm from under his body and pointed a dark colored semiautomatic firearm in [his] direction." PFOF #12 Cole pointing his gun "straight at him" and he did not see Cole point his gun at anyone else. PFOF ¶¶ 44, 46 |
| David Shamsi | Only officer who had a visual of Cole and the Gun the entire time. PFOF ¶ 38.<br><br>Heard something that "sounded like a gunshot" no idea where it came from and did not observe a gun at the time. PFOF ¶¶ 21, 36. | Observed Cole face down on the ground and approached Cole's feet – when Cole was running and going down to the ground, Shamsi noticed for the first time that Cole had a gun in his hand. PFOF ¶ 25<br><br>Was giving verbal commands & never saw Cole move himself or the gun after he was on the ground & before shot by Mensah. PFOF ¶ 30. Did not report seeing Cole point his gun at anyone. PFOF ¶ 59 |

| Shenora Stanten-Jordan | No comment | Saw Cole shot on the ground – Nothing in his hands before, during, and after he was shot. PFOF ¶ 17 |
|---|---|---|
| John Rawlings | No comment | Saw Cole shot on the ground – Nothing in his hands before, during, and after he was shot. PFOF ¶ 17 |

Thus, a reasonable officer in Mensah's shoes, who saw Cole fall and knock himself unconscious, who never pointed a gun at Mensah, would have known that the use of excessive deadly force against Cole was unlawful. Because there is a dispute as to what a reasonable jury might do based on these facts, summary judgment is inappropriate.

## II. MENSAH IS NOT ENTITLED TO QUALIFIED IMMUNITY.

Defendants wrongly raise the argument that Mensah is entitled to qualified immunity for killing Cole. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate *clearly established* statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L.d.2d 565 (2009)(emphasis added). Qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Pekrun*, 172 F. Supp. 3d at 1048 (citations omitted).

Once the defense of qualified immunity is raised, a plaintiff "must show (1) that the defendant violated a constitutional right, and (2) that the right was clearly established at the time so that it would have been clear to a reasonable officer that her conduct was unlawful in the situation." *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017) (explaining that "qualified immunity shields from liability [defendants] who act in ways they reasonably believe to be lawful"); *Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016); *Weinmann*, 787 F.3d at 447.

While the Supreme Court's case law "do[es] not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79, 137 S. Ct. 548, 196 L.Ed.2d 463 (2017) (internal citations omitted). "In other words, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L.Ed.2d 271 (1986).

**A.      The Facts Show Mensah Violated Cole's Constitutional Rights to be Free from Excessive Deadly Force.**

Under the Supreme Court precedent, the first prong of inquiry for this Court is to determine whether Mensah used excessive deadly force, and thus violated Cole's Fourth Amendment constitutional rights, pursuant to *Tennessee v. Garner*, 471 U.S.1, 105 S. Ct. 1694, 85 L.Ed.2d 1 (1985), *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865, 104 L.Ed.2d 443 (1989), and their related progeny. *See Strand*, 910 F.3d at 914-15. There is little doubt that shooting and killing a citizen is a use of force and subject to the reasonableness requirement of the Fourth Amendment. *California v. Hodari,* 499 U.S. 621, 625-26, 111 S. Ct. 1547, 113 L.Ed.2d 690 (1991); *Garner*, 471 U.S. at 9 ("Use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable . . . Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."). As noted in Section I, *supra.*, Mensah used excessive deadly force when he killed Cole and such use was not reasonable. Thus, Mensah violated Cole's constitutional right to be free from excessive deadly force.

**B.      The Right was "Clearly Established" at the Time of the Alleged Violation.**

The question here is whether it was clearly established that an officer is not permitted to shoot an unconscious person who has not raised or pointed a gun at any officers. The answer is yes, it was clearly established. *Smith*, 410 F Supp. 3d at 1073, citing *Weinmann*, 787 F.3d at 449-50 ("if [decedent] had the gun raised to his shoulder and pointed at [defendant-officer], then [defendant-officer] would have been justified in using deadly force and hence entitled to qualified immunity"). *Cf. Rios,* 523 F. Supp. 3d at 1030 ("Under this well-established rule [as to the use of deadly force], it was clear on July 4, 2014, that a law enforcement officer may not reasonably shoot a suspect merely because he is fleeing from police, if the officer lacks any reason to believe that the suspect poses a threat to police or the public or has committed a crime of threatened or actual physical harm."), citing *Ellis*, 999 F.2d at 247 ("If [the plaintiff's] account is to be believed, [the officer] shot him in the back without any indication that *he had committed a violent felony or was dangerous*.")(emphasis added). *See also Garner*, 471 U.S. at 11 ("The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. . . but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect.").

Defendants, in moving for summary judgment, assert that Mensah had a right to shoot Cole while he was on the ground unconscious. Mensah testified that he shot Cole out of fear for his own safety, not out of fear for the safety of any other officer, which is why Defendants improperly argue that Mensah's belief that the use of force to protect fellow officers was reasonable. Defendants can only try to argue that Mensah's belief that

the use of force to protect himself was reasonable. And even that argument lacks any support and is heavily disputed by the material facts. Mensah's belief that the use of deadly excessive force was, in fact, unreasonable as Cole was not an imminent threat of serious injury or death to Mensah. *Cf. Bliss v. Chu*, 783 F. Supp. 2d 1058, 1065 (E.D. Wis. 2011) (Adelman, J.) ("Thus, as of August 14, 2006, *it was clearly established* that the Fourth Amendment prohibited Chu from shooting Bliss after the danger posed by his actions had passed.")(emphasis added), citing *Scott v. Edinburg*, 346 F.3d 752, 757 (7th Cir. 2003)("It is clearly established that "even '[w]hen an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity.'")(internal cites omitted).

Even if Cole had his hand on the weapon, he was not pointing it at any officer (rather, at best, the gun was pointed merely in a general direction), and *specifically the gun was never pointed at Mensah*, thereby denying the ability of Mensah to use deadly force. *Est. of Biegert by Biegert v. Molitor*, 968 F.3d 693, 700 (7th Cir. 2020) ("We emphasize that someone does not pose "an immediate threat of serious harm" solely because he is armed. We made that point in *Weinmann v. McClone*, which involved an officer performing a wellness check on a man who had locked himself in the garage with a shotgun on his lap.").

Thus, whether or not Cole had actual possession of the weapon, was threatening if he did possess, and whether Mensah could use deadly excessive force are all disputed issues of material fact that should be decided by a reasonable and properly instructed jury. Because a jury could find Mensah's actions unreasonable, it is impossible for this Court to find that, as a matter of law, Mensah properly exercised deadly force.

## III. INDIVIDUAL CAPACITY CLAIMS AGAINST WEBER FOR SUPERVISOR LIABILITY ARE APPROPRIATE AND SUMMARY JUDGMENT SHOULD BE DENIED.

This Court should deny Defendants' motion for summary judgment as to the individual capacity claims against Chief Barry Weber. As previously noted, Defendants did not file their answer to the original Complaint, ECF 1 or the Amended Complaint, Anderson Cole ECF 20, as required, Fed. R. Civ. P. 12(a)(4)(A), once the Court issued its ruling on the motion to dismiss. Cole ECF 25. The failure to file, for purposes of summary judgment, is an admission that the allegations in the Amended Complaint are deemed admitted. Therefore, for purposes of summary judgment, Defendants have admitted the allegations in the Amended Complaint with regards to the individual capacity claims against Weber for supervisory liability and summary judgment should be denied. FRCP 8(b)(6)(" An allegation . . . is admitted if a responsive pleading is required and the allegation is not denied. . . ."); *Modrowski,* 712 F.3d at 1170, *Barwin*, 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021)("There is a distinction between relying on the *allegations* in the complaint (which is insufficient to survive an opponent's motion for summary judgment) and relying on the defendant's *admission* of those allegations. Barwin has done the latter."(italics in original), *aff'd in part, rev'd in part and remanded*, 54 F.4th 443 (7th Cir. 2022)(citations omitted); *Dunbar*, 2016 WL 11618615, *2 (6th Cir. Oct. 27, 2016).

Defendants, therefore, have admitted the following facts with regards to individual capacity claims against Weber (1) Weber, who was the chief policy maker for Wauwatosa, failed to conduct an internal investigation or conduct a fitness for duty evaluation of Mensah after the Gonzales and Anderson shootings. ECF 20, ¶¶65, 77, 78, 80, 217; (2) WPD never had a fitness for duty policy for any officer-involved shooting from July 16, 2015 to February 2, 2020. ECF 20, ¶78; (3) Despite the investigation of Mensah by the

Milwaukee County District Attorney, Weber decided to award Mensah with a Medal of Valor for killing Antonio Gonzales (and Alvin Cole)[9]. ECF 20, ¶ 100, 107; (4) Wauwatosa failed to create and implement appropriate and adequate use of force policies. ECF 20, ¶172 and (5) Weber was aware of Wauwatosa's defective customs, policies and procedures before Mensah shot and killed Gonzales and Anderson. ECF 20, ¶170. These admissions should be enough to deny summary judgment, as Weber turned a blind eye to what was right in front of him. *Matthews*, 675 F.3d at 708.

## IV. THE COURT MUST DENY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' MONELL CLAIMS.

Defendants move for summary judgment as to the liability of the City of Wauwatosa under *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L.Ed. 2d. 611 (1978). Section 1983 applies to municipalities and other local governmental units. *Monell*, 436 U.S. at 690; *Kujawski v. Board of Com'rs of Bartholomew County, Ind.*, 183 F.3d 734, 737 (7th Cir. 1999). Plaintiffs admit that a municipality "cannot be held liable solely because it employs a tortfeasor - or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell*, 436 U.S. at 691; *Kujawski*, 183 F.3d at 737. Municipalities generally are not liable under § 1983 unless the constitutional violation was caused by (1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with "final policymaking authority." *McCormick v. City of Chi.*, 230 F.3d 319, 324 (7th Cir. 2000); *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005). *Monell* liability attaches when the "execution of a government's policy or custom, whether made by its

---

[9] On May 12, 2021, Weber awarded Mensah with a Medal of Valor for shooting and killing Alvin Cole. PFOF ¶¶72-74, ECF 20 ¶103, 153.

lawmakers or by those whose edicts or act may fairly be said to represented official policy, inflicts injury that the government as an entity is responsible for under section 1983." *Monell*, 436 U.S. at 690-94.

Here, Defendants argue that there was no violation of Wauwatosa policy because there is no evidence that the execution of a policy, practice, or custom of Wauwatosa caused the alleged deprivation. That is wrong. First, as previously noted, Defendants did not file their answer to the Amended Complaint, as required, by Fed. R. Civ. P. 12(a)(4)(A), so, they have admitted the allegations of the Amended Complaint. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170 *Barwin*, 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021). Additionally, Defendants did not move to dismiss the Monell claim against the City of Wauwatosa (Paragraphs 210-223), ECF 21.

That means that Defendants have admitted the following facts for purposes of summary judgment: (1) Wauwatosa had a de-facto policy, regulation, or custom condoning objectively unreasonable excessive force, failed to have in place officer-involved shooting protocols, especially with regards to psychological assessments, and failed to have adequate discipline and training protocols, which were adopted by Wauwatosa, either expressly or implicitly, by Weber's failure to act. Cole ECF 20, ¶¶212, 237; (2) Wauwatosa failed to either investigate or discipline Mensah after the first shooting of Antonio Gonzales. Cole ECF 20, ¶¶ 51, 110, 169, 190, 192, 212, 214, 228, 237, and 238. (3) Wauwatosa failed to either investigate or discipline Mensah after shooting Jay Anderson. Cole ECF 20, ¶¶ 51, 169, 190, 192, 212, 214, 228, 237, and 238; And that, (4) Wauwatosa, through Weber, was aware of these deficiencies. Cole ECF 20, ¶219.

But, even without the admissions for the failure to answer serving as a very reasonable and strong basis to deny summary judgment, Defendants' argument that "the

officers followed the policy" is circular when the lack of a policy itself is what is at the very heart of that which creates *Monell* liability. More to the point, Plaintiffs do not assert nor have evidence that Weber and the City *knew* that Mensah was going to shoot and kill Cole. Instead, it is clear, based on Defendants' own declarations and Weber's deposition testimony that there was no clear policy as to how to handle officers when they **returned** to duty after previously killing someone (Gonzales or Anderson). PFOF ¶¶ 91-94, ECF 20, ¶ 78, 217.

There is liability under *Monell* if there is a lack of a policy that led to the constitutional deprivation. *Glisson v. Indiana Dep't of Corr.,* 849 F.3d 372, 379 (7th Cir. 2017) (citing *Monell*, 436 U.S. 690-91). In *Glisson*, the Seventh Circuit noted that "The central question is always whether an official policy, however expressed (and we have no reason to think that the list in *Monell* is exclusive), caused the constitutional deprivation. It does not matter if the policy was duly enacted or written down, nor does it matter if the policy counsel's aggressive intervention into a particular matter **or a hands-off approach**." Glisson*, 849 F.3d at 379 (emphasis added). Indeed, the court noted that "in situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable." *Glisson*, 849 F.3d at 381; *see also King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (where municipality has "actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction.").

Here, a reasonable jury could find Weber and the City's lack of a policy as to fitness for duty when officers return after killing or seriously wounding an individual (i.e. Mensah's killing of Gonzalez and Anderson) is what contributed or led to the constitutional deprivation as to Cole. Weber gave Mensah a commendation for valor on August 22, 2016 because he shot and killed Gonzalez and while he was being investigated for

Anderson. PFOF ¶¶ 72-75. The commendation was given **before** Mensah purportedly was declared fit for duty and before it was determined if he had violated any criminal and/or policies with the WPD. *Id*.; ECF 20 ¶100.

Furthermore, Weber admitted that awarding an officer a medal of valor ratifies the conduct of an officer and sends a message that they conducted themselves the way a Wauwatosa police officer should. PFOF ¶¶ 73-74. A reasonable jury could find that the fact that Mensah who after seven months of working with the WPD was feted and celebrated by Weber and the City for one killing, justified or not, before Weber and the City both had confirmed that Mensah was cleared for his second shooting less than a year later and verified that he could return to action contributed to Mensah's belief that he was a "super cop" and above the law, that he could not be stopped. The motion for summary judgment should be denied.

## V.    THE EQUAL PROTECTION CLAIM SURVIVES SUMMARY JUDGMENT BECAUSE DEFENDANTS FAILED TO FILE AN ANSWER TO THE AMENDED COMPLAINT AFTER THEIR MOTION TO DISMISS WAS DENIED.

Although raising the issue again begins to sound like a broken record, it still remains true, that Defendants did not file their answer to the Amended Complaint, Cole ECF 20, as required, Fed. R. Civ. P. 12(a)(4)(A), once the Court issued its ruling on the motion to dismiss. Gonzales ECF 25. Therefore, for purposes of summary judgment, Defendants have admitted the allegations in the Amended Complaint, and summary judgment should be denied. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin*, 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

Here, that means that Defendants have admitted the following facts for purposes of summary judgment: (1) Wauwatosa police officers were known to exhibit racist views, especially as they hosted and at least thirteen Wauwatosa officers were in attendance of

thise MLK parties with racist literature. Cole ECF 20, ¶¶19-22, 24; (2) Defendant Weber promoted the host of the parties, John Bozievich, while at the same time the whistleblower (about the parties) claimed that Weber caused him problems. Cole ECF 20, ¶¶ 23, 26-30. (3) In 2018, Wauwatosa's population was reported as only 5.3% Black, yet in 2018, 83% of arrests were of Black people and 64% of traffic stops were of Black people. Cole ECF 20, ¶38; (4) In his first four years and seven months as a police officer with the WPD, Mensah killed three young men of color Gonzales, Anderson, and Cole. Cole ECF 20, ¶ 52. (5) In 2015 Antonio Gonzales was killed and in 2020 Alvin Cole was killed, both by Mensah, and he was awarded a medal of valor for both killings. Cole ECF 20, ¶ ECF 20, ¶ 51, 52 100, 107, 153; (6) In September 2, 2019, WPD pulled over a car with two white women and one young black teenager, Akil Carter, who they drew their weapons ordered him to the ground and hand cuffed and arrested him, even though Carter was the grandson of one of the women and did nothing wrong, additionally the two white women were never arrested nor detained. Cole ECF 20, ¶51; (7) WPD responded to an armed robbery on August 10, 2006, of a man with a red shirt, later a WPD officer tackled a black man who was not the suspect, Aaron Lawrence, who had not committed any crimes, to the ground as well as handcuffing and tasing him several times. *Id.*; and, (8) WPD officers, on August 8, 2002, responding to a robbery who they had the description of the suspect, they encountered Alfrieda Durrah, who did not match the description, other than being a black woman, and they drew guns on her, ordered her to the ground, arrested, and even after finding out that she was not the suspect took her to the police station and put her in a jail cell. Cole ECF 20, ¶ 51.

In 2020 Wauwatosa was the recipient of federal grant funding. PFOF ¶ 89. The Equal Protection Clause provides that "no State shall . . . deny to any persons within its

jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. It is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). An Equal Protection Clause violation typically occurs when state action discriminates based on a person's membership in a protected class, such as race, or interferes with a person's fundamental rights, such as freedom of speech or religion. *Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 943 (7th Cir. 2009). The Equal Protection Clause also may be violated if state action "irrationally targets an individual for discriminatory treatment as a so-called 'class of one.'" *Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010). "To maintain an equal protection claim, 'plaintiffs must prove that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose.'" *Levan Galleries LLC v. City of Chicago*, 790 F. App'x 834, 835 (7th Cir. 2020)(citations omitted).

Defendants concede that Cole is a member of a protected class. ECF 84, p. 26 ¶1. Wauwatosa and their policing and excessive force against Cole was done with a discriminatory purpose and Cole was discriminated against because he was Black. *Dunnet Bay Const. Co. v. Borggren*, 799 F. 3d 676, 697 (7th Cir. 2015). The facts admitted by Wauwatosa demonstrate that there have been numerous incidences of excessive force and a history of not disciplining its officers for racist behavior against people of color, all under the leadership of Weber. Wauwatosa devalues people of color which is reflective in their over policing of Black people and there are no consequences for such behavior. ECF 20, ¶ 42. The continual failure of Wauwatosa to discipline or create policies in the WPD for excessive force as well as its racially biased policing created a culture and custom that emboldened racist policing in Wauwatosa and also emboldened officers like

Defendant Mensah to impose excessive force against black males like Alvin Cole, Jay Anderson, and Antonio Gonzales. ECF 20, ¶¶ 37, 51, 190, 192, 193, 204, 207.

## VI. THE LOSS OF SOCIETY AND COMPANIONSHIP CLAIM SURVIVES SUMMARY JUDGMENT AND IS ENTITLED TO GO TO A JURY.

Without citing to any mandatory caselaw, Defendants are mistaken to suggest that the wrongful death of a loved one does not constitute conduct that "shocks the conscious." Def's Br., 27. However, as Defendants rightfully concede, there must be an underlying constitutional violation for the loss of society and companionship claim to survive. Defendants contend that Mensah's shooting of Cole was permissible, and thus there is no violation. Again, Defendants are wrong. First, Defendants never answered the allegations in the Amended Complaint, Cole ECF 20, and thus the allegations contained therein are admitted,[10] including Paragraphs 251 ("the killing of Alvin Cole was a violation of his constitutional rights under the Fourteenth Amendment."), 252 ("At the time of the killing, Tracy Cole and Albert Cole had a constitutional interest and right in the familial relationship with their child."), 253 and 254. The "admission" through failure to answer permits a jury trial.

Second, as noted *supra.*, at Section II, there is an actual constitutional violation, as the killing seventeen-year-old of Cole by Mensah was done with excessive force, or, at a minimum, it is a disputed issue of material fact that requires a trial.

## <u>CONCLUSION</u>

For the reasons stated herein, Plaintiffs request that this Court **DENY** the Defendants' motion for summary judgment and allow this matter to proceed to trial.

---

[10] FRCP 8(b)(6); *Modrowski*, 712 F.3d at 1170; *Barwin*, 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021); *Dunbar*, 2016 WL 11618615, *2 (6th Cir. Oct. 27, 2016).

31

Dated this August 22, 2023.

**MOTLEY LEGAL SERVICES**

By: */s/Kimberley Cy. Motley*
Kimberley Cy. Motley
State Bar No: 1047193
P.O. Box 1433
Matthews, North Carolina 28106
E: kmotley@motleylegal.com
P: (704) 763-5413
F: (704) 582-6229

**CADE LAW GROUP LLC**

Nathaniel Cade, Jr. SBN: 1028115
Annalisa Pusick SBN: 1116379
Antonique C. Williams SBN: 1051850
P.O. Box 170887
Milwaukee, WI 53217
P: (414) 255-3802
F: (414) 255-3804
E: nate@cade-law.com
E: annalisa@cade-law.com
E: antonique@cade-law.com

32