# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

---

ESTATE OF ANTONIO GONZALES, et al.,

         Plaintiffs,

    v.

JOSEPH ANTHONY MENSAH, et al.,

         Defendants.

Case No.: 21-CV-848-LA

---

ESTATE OF JAY ANDERSON, JR., et al.,

         Plaintiffs,

    v.

JOSEPH ANTHONY MENSAH, et al.,

         Defendants.

Case No.: 21-CV-1179-LA

---

ESTATE OF ALVIN COLE, et al.,

         Plaintiffs,

    v.

JOSEPH ANTHONY MENSAH, et al.,

         Defendants.

Case No.: 22-CV-856-LA

---

## PLAINTIFF'S RESPONSES TO DEFENDANTS' PROPOSED FINDING OF FACT FOR THE ESTATE OF ALVIN COLE (22-CV-856)

---

**The Parties**

1.      At the time of his death on February 2, 2020, Alvin Cole was a resident of the State of Wisconsin. (ECF 20, Amended Complaint ¶ 4)

    **RESPONSE:** No dispute.

2.      Plaintiff Tracey Cole is the biological mother of Alvin Cole and an adult resident of the State of Wisconsin and serves as the special administrator of the Estate of Alvin Cole. Tracey Cole is also named in her individual capacity. (ECF 20, ¶ 5)

    **RESPONSE:** No dispute as to Tracy (sp) Cole as alleged (ECF 20, ¶¶ 4-5).

3.      Plaintiff Albert Cole is the biological father of Alvin Cole and an adult resident of the State of Wisconsin. Albert Cole is named in his individual capacity. (ECF 20, ¶6)

    **RESPONSE:** No dispute.

4.      Defendant City of Wauwatosa is a Wisconsin municipal corporation whose principal offices are located in Wauwatosa, Wisconsin. (ECF 20, ¶ 7)

**RESPONSE:** No dispute.


5.      Defendant Barry Weber is the former Chief of Police for the City of Wauwatosa and is named in his individual capacity. (ECF 20, ¶ 8; ECF 54 p. 4)


**RESPONSE:** No dispute.


6.      At all relevant times, Defendant Joseph Mensah (Officer Mensah) was a police officer with the Wauwatosa Police Department. (ECF 77-1, 3/17/22 Deposition of Joseph Mensah (hereinafter Mensah 3/17/22 Dep.), p. 102)


**RESPONSE:** No dispute.


**Jurisdiction and Venue**

7.      This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. The Court has jurisdiction over the Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343. (ECF 20, ¶ 1-2)


**RESPONSE:** No dispute. as to the actions cited and the jurisdiction of this court. Also note that, jurisdiction supporting Plaintiffs claim for attorneys fees and costs is conferred by 42 U.S.C. § 1988.   (ECF 20, ¶ 1)

8.     The Eastern District of Wisconsin is the proper federal venue for this action pursuant to 28 U.S.C. § 1391(b) because it is where all acts alleged in the Complaint occurred. (ECF 20, ¶ 3)

**RESPONSE:** No dispute.

### February 2, 2020 – Critical Incident

**Wauwatosa Police Department ("WPD") received a Report that a Suspect with a Firearm threatened a Patron at Mayfair Mall**

9.     On February 2, 2020, at approximately 5:43 p.m., Alvin Cole entered Mayfair Mall in the City of Wauwatosa. (ECF 76-25 Exh. W, District Attorney Letter 10/07/2020 p. 2)

**RESPONSE:** Disputed as to improper citation. *See* ECF 76-25 Exh. W, District Attorney Letter 10/07/2020 at p. 1.  In addition, the District Attorney's letter is inadmissible and hearsay that are not subject to any hearsay exceptions.  FRE 801 and 803. No dispute that Alvin Cole was inside Mayfair Mall on February 2, 2020.

10.     Cole was armed with a semi—automatic pistol with a 30-round extended magazine that was loaded with 9mm ammunition. The firearm was concealed in a sling bag hanging from his shoulder. (ECF 76-25, pp.1-2)

**RESPONSE:** Disputed. The District Attorney's letter is inadmissible and hearsay that are not subject to any hearsay exceptions. FRE 801 and 803.

11.     A short time after arriving at the mall, Cole was involved in a verbal confrontation in the mall with another patron and displayed the firearm. (Albiter Decl. ¶ 3, 11; ECF 76-25 Exh. W p. 2)

**RESPONSE:** Disputed based on inadmissible hearsay. FRE 801. In addition, Defendants failed to file an answer to the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole case, 22-cv-0856, after the Court's ruling on the motion to dismiss, and therefore, Defendants admit the allegations contained in Paragraph 119 of the Amended Complaint. (Dkt. 20) that as asserted that the Police were called to a verbal dispute in the mall. *See* FRCP 8(b)(6)("Effect of Failing to Deny. An allegation – other than one relating to the amount of damages – is admitted if a responsive pleading is required and the allegation is not denied. . . ."); *Modrowski v. Pigatto,* 712 F.3d 1166, 1170 (7th Cir. 2013); *Barwin v. Village of Oak Park*, 14-cv-6046, 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

12.     At 5:41 PM Wauwatosa Police Officer Schleis and Officer Albiter, who were assigned to patrol Mayfair Mall, were dispatched to Mayfair Mall to investigate the report of a potential disorderly conduct while armed. (Albiter Decl. ¶ 3; see ECF 80-6,

Exh. Q, Dexter Schleis Deposition (hereinafter Schleis Dep.) pp. 9-10)

**RESPONSE:** Disputed.  In addition, Defendants failed to file an answer to the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole case, 22-cv-0856, after the Court's ruling on the motion to dismiss, and therefore, Defendants admit the allegations contained in Paragraph 119 of the Amended Complaint. (Dkt. 20) that as asserted that the Police were called to a verbal dispute in the mall. *See* FRCP 8(b)(6)("Effect of Failing to Deny. An allegation – other than one relating to the amount of damages – is admitted if a responsive pleading is required and the allegation is not denied. . . ."); *Modrowski v. Pigatto,* 712 F.3d 1166, 1170 (7th Cir. 2013); *Barwin v. Village of Oak Park*, 14-cv-6046, 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

13.     Officers Albiter and Schleis located the victim and obtained a more detailed description of the suspect and confirmed that the suspect had a gun. (Albiter Decl. ¶¶ 10-11; Schleis Dep. pp. 9-10)

**RESPONSE:** Disputed. Officers Albiter and Schleis testimony of the victim's statement is inadmissible hearsay. FRE 801. Also, dispute that anyone was a "victim."

14.     Officer Albiter broadcast the description of the armed suspect—black

male, light skin, slim build, approximately 5'5" tall, wearing a light-colored sweatshirt and fanny pack. (Albiter Decl. ¶ 12; Schleis Dep. pp. 9-10; see also ECF 76-25, Exh. W, p. 4)

> **RESPONSE:** Disputed based on inadmissible evidence; Officer Albiter's out of court statement is hearsay and not subject to any exceptions. FRE 801, 803.

15.     It was also broadcast that the suspect, who we now know to be Alvin Cole, was in a group of 7 males and 3 females and had run out of the mall through the Nordstrom exit. (Albiter Decl. ¶ 9)

> **RESPONSE:** Disputed based on inadmissible evidence as the "victim's" statement is hearsay and the citation does not support the purported fact. FRE 801. In addition, the cited fact does not state where the subjects exited.

16.     Due the nature of the call—armed individual at Mayfair Mall—multiple Wauwatosa Police Officers, including Joseph Mensah, Evan Olson, David Shamsi, and Jeffrey Johnson responded to Mayfair Mall in marked squad cars. (ECF 80-3 Deposition of Joseph Mensah (hereinafter Mensah 06/26/2023 Dep.) pp. 191-197; ECF 80-4 Deposition of Evan Olson (hereinafter Olson Dep.) pp. 68-70; ECF 80-5 Deposition of David Shamsi (herein after Shamsi Dep.) pp. 13-15; Schleis Dep. pp. 9-10; ECF 80-7 Deposition of Jeffrey Johnson (hereinafter Johnson Dep.) pp. 49-50)

**RESPONSE:** Dispute that Officers Olson, Shamsi, and Johnson went to Mayfair Mall "due to the nature of the call" and because of an armed individual, plus, Mensah was never dispatched. (Mensah 6/26/23 Dep. at 192:5-11, 196:16-20). In addition, defendants failed to file an answer to the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole case, 22-cv-0856, after the Court's ruling on the motion to dismiss, and therefore, Defendants admit the allegations that the officers went to the mall only for a verbal dispute and that when they arrived it was unclear if Cole had committed any crimes as contained in Paragraphs 118-120 to the Amended Complaint. *See* FRCP 8(b)(6)("Effect of Failing to Deny. An allegation – other than one relating to the amount of damages – is admitted if a responsive pleading is required and the allegation is not denied. . . ."); *Modrowski v. Pigatto,* 712 F.3d 1166, 1170 (7th Cir. 2013); *Barwin v. Village of Oak Park*, 14-cv-6046, 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

17.  On February 2, 2020, Officer Mensah was assigned to patrol squad area 2, which did not include Mayfair Mall. However, when he heard the call for service involving a person with a gun at Mayfair Mall he immediately responded. (Mensah 6/26/2023 Dep. p.198)

**RESPONSE:** Undisputed that Mensah was assigned to patrol squad area 2, which did not include Mayfair Mall, but further adding that Mensah left his squad area on his own initiative, Mensah was not dispatched to Mayfair Mall. (Mensah 6/26/23 Dep. at 192:5-11, 196:16-20).

18.    Officer Mensah initially responded to the east side of the mall and monitored the radio for updates, but when he heard none, started to travel back to his assigned squad area. (Mensah 06/26/2023 Dep. pp. 197-198)

**RESPONSE:** Undisputed that Mensah testified to the fact, but further adding that after Mensah left the mall and went back to his assigned squad area, Mensah overheard that the suspect was located and decided to return to the mall. (Mensah 06/26/23 Dep. at 201:11-14).

19.    On February 2, 2020, Officer Johnson was assigned to patrol squad area 4 but left his squad area and responded to Mayfair Mall when he heard the report of a domestic violence and disorderly conduct incident involving an individual threatened another patron with a handgun; Officer Johnson responded because it was a dangerous and high-priority call. (Johnson Dep. pp. 6-7)

**RESPONSE:** Dispute as it misstates Johnson testimony, he did not testify that he "responded because it was a dangerous and high-priority call" he only testified he is allowed to go outside his area for dangerous or high priority calls. (Johnson Dep. 7:11-14).

20.     Officer Johnson responded to Mayfair Mall near Nordstroms, aware of Cole's description and began monitoring radio traffic. (Johnson Dep. pp. 10-13)

**RESPONSE:** Undisputed that Officer Johnson responded to Mayfair Mall near Nordstrom but disputed that the citation supports the purported fact that Johnson was aware of Cole's description and began monitoring radio traffic. (Johnson Dep. pp. 10-13)

21.     On February 2, 2020, Officer Shamsi was on patrol when he heard the report of a disturbance involving a gun at Mayfair Mall and responded immediately. (Shamsi Dep. pp. 14-17)

**RESPONSE:** Disputed that the citation supports the purported fact that there was a disturbance involving a gun.  Shamsi testified that he got a call that there was a disturbance and did not say that it was involving a gun, only that a person they described had a gun.  (Shamsi Dep. pp. 14-17).

22.     On February 2, 2020, Officer Olson was on patrol assigned squad area 2 on the east end of the city when he heard the call that a firearm was displayed during an altercation at Mayfair Mall. (Olson Dep. p. 10)

**RESPONSE:** Disputed that the citation supports the purported fact that there

was an altercation at Mayfair Mall. (Olson Dep. p. 10). In addition, Defendants have admitted the allegations that the officers went to the mall only for a verbal dispute and that when they arrived it was unclear if Cole had committed any crimes as contained in Paragraphs 118-120 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

23.      The report of an armed individual at Mayfair created a dangerous situation that prompted multiple squads to respond, including Officer Olson who headed to the mall to investigate a suspect engaged in disorderly conduct while carrying a concealed weapon; Olson parked on North Mayfair Road just north of North Avenue. (Olson Dep. pp. 14-16; 68-69; 70-71)

**RESPONSE:** Disputed. The report identified that the individual was a "minor" according to Olson. Olson Dep. 70:18-20. In addition, Defendants have admitted the allegations that the officers went to the mall only for a verbal dispute and that when they arrived it was unclear if Cole had committed any crimes as contained in Paragraphs 118-120 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

24.      Additional broadcast updating the groups' location came in as the Officers patrolled Mayfair Mall's exterior to locate the suspect in the grey sweatshirt with the

fanny pack. (Albiter Decl. ¶ 13-14; Schleis Dep. pp. 9-10)

> **RESPONSE:** Disputed**.** Olson overheard the "additional broadcast" via a mall
> security guard's radio about the suspect with a grey sweatshirt and "satchel".
> Olson Dep. 11: 22-25, 12:1-9; Schleis Dep. 10:5-10.

### WPD Encountered the Suspect (Cole) and a Foot Pursuit Began

25.     Officer Johnson first located the group walking west by the Nordstrom
parking deck and broadcast that he located the suspect in the grey sweatshirt walking
south and requested back up officers to respond to the Southeast side of the mall near
the Container store. And soon after Officer Shamsi responded to the area. (Johnson
Dep. pp. 13-15; Schleis Dep. p. 10)

> **RESPONSE:** Disputed, the citations do not support the purported fact that
> Johnson requested back up officers to respond to the Southeast side of the mall.
> (Johnson Dep. pp. 13-15; Schleis Dep. p. 10)

26.     When Officer Johnson encountered the suspect and the group and he
yelled "Police, Stop!" The command was disregarded, and the individuals fled
westbound causing a foot pursuit. (Johnson Dep. p. 18, 21-23; see also ECF 76-24, Exh.
24 Officer Shamsi Squad Video (hereinafter Shamsi Squad Video) timestamp 0:00:36;

see also Shamsi Dep. p. 53)

**RESPONSE:** Disputed, that the group heard him yell and "disregarded" his command. (Johnson Dep. p. 18, 21-23; see also ECF 76-24, Motley Decl., at ¶ 24 (hereafter Shamsi Squad Video) timestamp 0:00:36; see also Shamsi Dep. p. 53).

27.     When the group fled, Officer Johnson called out "foot pursuit" over the radio and dispatch sent all squads to respond to the location. (Johnson Dep. p. 51)

**RESPONSE:** No dispute that this is Officer Johnson's testimony. (Johnson Dep. p. 51)

28.     When Officer Johnson radioed "foot pursuit," Officer Olson made his way towards North Mayfair Road to try and cut off the group from fleeing further and to establish a set perimeter. (Olson Dep. pp. 13-14)

**RESPONSE:** Disputed that the citation supports the purported fact that Olson knew that it was Johnson who radioed "foot pursuit." (Olson Dep. pp. 13-14)

29.     Officer Johnson exited his squad and pursued the suspect who matched the description of the armed male on foot while Officer Shamsi pursued the group in his squad. (Shamsi Dep. pp. 17-21; Johnson Dep. p. 18; Shamsi Squad Video 0:00:23)

**RESPONSE:** No dispute.

30.     The group runs westbound, and Officer Schleis pursued them on foot, yelling several times "Stop, Police! Get on the ground!" (Schleis Dep. pp. 13-14)

   **RESPONSE:** Disputed. Schleis did not yell "Stop, Police!" (Schleis Dep. at 13-14).

31.     Officer Johnson continued to pursue the suspect in the grey sweatshirt and broadcast that he was running toward Cheesecake Factory. (Shamsi Squad Video 0:00:55; see also Olson Dep. p. 13; see also Johnson Dep. pp. 23-24).

   **RESPONSE:** Disputed. Johnson was pursuing all of the suspects; Officer Johnson was not pursuing only the suspect in grey. (Johnson Dep. at 23:2-10, 24:1-7).

32.     When Officer Johnson radioed "foot pursuit" and updated the location of the suspect whose description matched the initial call related to a disorderly conduct while armed Officer Mensah responded back to the area of Mayfair Mall, through the Cheesecake Factory Parking lot. (Mensah 6/26/2023 Dep. pp. 201-202, 260-261)

   **RESPONSE:** Disputed that the citation supports the purported fact the citation does not mention anything specific to Officer Johnson.  (Mensah 6/26/2023 Dep.

pp. 201-202, 260-261).

33.     Officer Mensah arrived on scene near the Cheesecake Factory parking lot after the group had been located and the foot pursuit had commenced. Officer Mensah observed the group running westbound through the parking lot being chased by other officers and observed an individual who matched the description of the suspect. (Mensah 06/26/2023 Dep. pp. 204-206; 261; see also Shamsi Squad Video 0:01:30)

**RESPONSE:** No dispute, however, further adding that Mensah did not know for a fact that anyone had a weapon. (Mensah 6/26/23 Dep. at 205:20-25).

34.     Officer Shamsi parked and exited his vehicle and pursued the individual matching the description broadcast of the male with a gun, who was later identified as Alvin Cole. (Shamsi Dep. p. 22; Shamsi Squad Video 0:01:20)

**RESPONSE:** No dispute that this is Officer Shamsi's testimony. (Shamsi Dep. p. 22.)

35.     Officer Shamsi yelled "Stop, Police!" several times while pursuing Cole. (Shamsi Dep. pp. 38, 53; Shamsi Squad Video 0:01:31)

**RESPONSE:** No dispute that Shamsi testified that he yelled "Stop, Police,"

however, disputing the squad footage does not capture this audio. Shamsi Squad 0:01:31.

36.    While in pursuit of Cole, Officer Johnson fell on a snow mound and lost distance from Cole but observed officers in front of him pursuing Cole. (Johnson Dep. pp. 23-25)

   **RESPONSE:** No dispute, but further adding that Officer Johnson was in pursuit of all of the suspects, not just Cole. (Johnson Dep. pp. 23-25)

37.    As he fled from the Officers, Cole removed the firearm from his concealed fanny pack and fired a single shot. (ECF 20 ¶ 124; see also Shamsi Squad Video 0:01:34; Shamsi Dep. pp. 51; see also ECF 76-25, pp. 4-6)

   **RESPONSE:** Disputed. There is no evidence on when Cole removed the gun from the fanny pack, Cole shot himself in the arm by accident and immediately dropped to the ground without the gun in his hands. ECF 20, ¶124-126. In addition, defendants failed to file an answer to the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole case, 22-cv-0856, after the Court's ruling on the motion to dismiss, and therefore, Defendants admit the allegations contained in Paragraphs 123-126, 129 to the Amended Complaint. *See* FRCP 8(b)(6)("Effect of Failing to Deny. An allegation – other than one relating to the amount of

damages – is admitted if a responsive pleading is required and the allegation is not denied. . . ."); *Modrowski v. Pigatto,* 712 F.3d 1166, 1170 (7th Cir. 2013); *Barwin v. Village of Oak Park*, 14-cv-6046, 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

38.     Officer Mensah called out "shots fired" over the radio and dispatch sent all squads to Mayfair Mall. (Mensah 6/26/2023 Dep. pp. 206, 211, 213-214, 264)

**RESPONSE:** Disputed**.**  Defendants have admitted the allegations that Mensah never gave any verbal directions to anyone 133 as contained in Paragraphs 130, 136 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021)

39.     Officer Mensah believed the gunshot came from the suspect because it was a single shot and came from the direction of the suspect. (Mensah 06/26/2023 Dep. pp. 259-260)

**RESPONSE:** Disputed. Mensah testified that he heard the single shot and saw the flash in front of him but did not know where or who it came from. Mensah Dep. 6/26/23 209:13-17; 211:2-12.  Mensah also told the officers that he did not see a muzzle flash.  Disputed that the citation supports the purported fact that at the time Mensah believed the gunshot came from the suspect.

40. Officer Johnson continued a foot pursuit towards Cole and heard a gunshot come from Cole's vicinity while other officers were ahead of Johnson and "moved off the course" also known as "move off the mark or line" upon hearing the gunshot. (Johnson Dep. pp. 25-28, 38, 52- 53)

      **RESPONSE:** No dispute to Johnson's testimony regarding "moved off the course." Further adding that Johnson did not know that the gunshot was from any weapons possessed by Cole. Johnson Dep. pp. 25-28, 38, 52- 53.

41. Based on his training and experience, when Officer Johnson saw another WPD Officer "move off the mark" he believed that Officer was acquiring position to return fire to the suspect. (Johnson Dep. pp. 52-54)

      **RESPONSE:** No dispute. Further clarifying that Johnson stated "I believe the gunshot came from as we know now Mr. Cole based on where the sound came from and officers moving off line or changing the direction which typically indicates that officers are being fired upon or are moving into position to return – return fire." Johnson Dep. 52:25-53:5.

42. Officer Olson heard a shot come from Cole's vicinity; based on his training and experience it is typical for officers to fire more than one round, thus in this

situation he believed the single shot to be consistent with a non- law enforcement discharge of a firearm. (Olson Dep. pp. 71-72)

**RESPONSE:** No dispute that Olson testified to this.

**Cole Refused to Disarm, Pointed his Firearm, and was Shot by Officer Mensah**

43.     Officer Shamsi heard the gunshot while pursuing Cole and then saw a firearm in Cole's hand. (Shamsi Dep. pp. 22-23, 28, 39, 53)

**RESPONSE:**  Disputed. Shamsi stated that as he was chasing Cole, he heard "something" that may have sounded like a gunshot but truly had no idea what it was at the time. Furthermore, Shamsi saw Cole down on the ground *and then* noticed the gun; Shamsi did not see a gun on Cole or any suspect prior to that moment. Shamsi Dep. 22:21-23:9.

44.     After Cole fired a shot, he went to the ground in a kneeling position. (Mensah 06/26/2023 Dep. pp. 211-213, 216-222; Olson Dep. pp. 19-25, 53-55; Shamsi Dep. pp. 22-23)

**RESPONSE**: Disputed. Mensah testified that Alvin was down on all fours. (Mensah 06/26/2023 Dep 215: 10-12).  In addition, Defendants have admitted the allegations that Cole was kneeling with both hands on the ground with no

gun in his hand as contained in Paragraphs 123-126, 136 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); Modrowski, 712 F.3d at 1170; Barwin 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021)

45. Officer Shamsi was about ten to twenty feet behind Cole after Cole went down on the ground in a crouched position while maintaining possession of the firearm despite Officer Shamsi's numerous requests to drop the gun. (Shamsi Dep. pp. 22-23, 27-29)

**RESPONSE:** Disputed as to improper citation to the deposition with regard to Shamsi giving verbal commands to Cole who was likely unconscious after shooting himself in the arm on accident; medical reports suggest two abrasions on Cole's face. (Motley Decl. Ex. 28 ("Medical Examiners Autopsy Report" p. 2). In addition, Defendants have admitted the allegations that Cole was kneeling with both hands on the ground with no gun in his hand as contained in Paragraphs 123-126, 136 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021)

46. In response to observing Cole's hand on the gun and his finger on the trigger, Officer Shamsi pulled out his firearm and pointed it at Cole. (Shamsi Dep. pp. 23, 26-27)

**RESPONSE:** Dispute that Cole had his hand on the gun and his finger on the trigger. In addition, Defendants have admitted the allegations that Cole was kneeling with both hands on the ground with no gun in his hand as contained in Paragraphs 123-126, 136 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021). No dispute that Shamsi testified that he pulled his weapon; further adding that Shamsi testified that he was only starting to depress the trigger on his gun *just in case*; Shamsi was not and did not shoot at Cole at that moment. (Shamsi Dep. at 23:16-19).

47.    Officer Shamsi ordered Cole to drop the gun, but Cole did not comply. (Shamsi Dep. pp. 31-32)

**RESPONSE:** Disputed. Shamsi ordered Cole to let the gun go because Cole did not have the gun in his hand in a raised or elevated position. (Shamsi Dep. at 31:17-32-2.) In addition, Defendants have admitted the allegations that Cole was kneeling with both hands on the ground with no gun in his hand as contained in Paragraphs 123-126, 136 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021)

48.     Cole had the gun in his right hand with his finger on the trigger, pointed west towards Officer Olson. (Olson Dep. pp. 24-25, 30, 48, 76; Shamsi Dep. pp. 32-34)

**RESPONSE**: Disputed. It is impossible for Cole to be pointing a weapon at Olson, Shamsi, Mensah, and Johnson all at the same time. Mensah claims that Cole pointed the gun "right at [him]" such that Cole "twisted to point at [Mensah]. Mensah Dep. 219:1-6, 267:20-21. Shamsi claims Cole was pointing the gun between "where [he] was" and where "Evan Olson" was at the time, with no one else in proximity. Shami Dep. 32:13-33:3. Olson testified that Cole turned his right shoulder under his body and head towards his direction by twisting his arm under his body. Olson Dep. 24:24-25:7. In addition, Defendants have admitted the allegations that Cole was kneeling with both hands on the ground with no gun in his hand as contained in Paragraphs 123-126, 136 of the Amended Complaint (Dkt. 20) in the *Estate of Alvin Cole*, 22-cv-0856. FRCP 8(b)(6); *Modrowski*, 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021)

49.     Officer Olson observed Cole raise and point the gun directly at him (Olson Dep. pp. 24-26)

**RESPONSE:**  Disputed. It is impossible for Cole to be pointing a weapon at Olson, Shamsi, Mensah, and Johnson all at the same time. Mensah claims that Cole pointed the gun "right at [him] such that Cole "twisted to point at [Mensah]. Mensah Dep. 219:1-6, 267:20-21. Shamsi claims Cole was pointing the gun

between "where [he] was" and where "Evan Olson" was at the time, with no one else in proximity. Shami Dep. 32:13-33:3. Olson testified that Cole turned his right shoulder under his body and head towards his direction by twisting his arm under his body. (Olson Dep. 24:24-25:7). In addition, Defendants have admitted the allegations that Cole was kneeling with both hands on the ground with no gun in his hand as contained in Paragraphs 123-126, 136 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021)

50.     When Cole pointed the gun at Officer Olson, Officer Olson "moved-off the mark" into shooting position with his finger on his trigger prepared to shoot Cole. (Olson Dep. pp. 26- 28, 50; see also Johnson Dep. pp. 25-28, 38, 52-53)

**RESPONSE:** Disputed. It is impossible for Cole to be pointing a weapon at Olson, Shamsi, Mensah, and Johnson all at the same time. Mensah claims that Cole pointed the gun "right at [him] such that Cole "twisted to point at [Mensah]. (Mensah Dep. 219:1-6, 267:20-21). Shamsi claims Cole was pointing the gun between "where [he] was" and where "Evan Olson" was at the time, with no one else in proximity. Shami Dep. 32:13-33:3. Olson testified that Cole turned his right shoulder under his body and head towards his direction by twisting his arm under his body. Olson Dep. 24:24-25:7. Moreover, Olson was not prepared to take a shot at Cole; in order for Olson to actually take a shot at Cole, Olson would

have been closer to Cole. Shamsi Dep. at 42:1-11.

51.    Officer Mensah yelled, "the gun is out!" (Mensah 06/26/2023 Dep. p. 267)

**RESPONSE:** Disputed. Shamsi testified that while he was standing behind Cole, he heard "a volley of shots off to [his] left, and [he] didn't know there was another officer there" until he looked and finally registered that Mensah had taken shots at Cole. Shamsi Dep. 23:20-24. In addition, Defendants have admitted the allegations that Mensah never gave any verbal directions to anyone 133 as contained in Paragraphs 130, 136 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021)

52.    Officer Shamsi ordered Cole to "throw the fucking gun!" among multiple variations of "drop the gun, throw the gun, push the gun." Officer Olson commanded Cole of the same. (Olson Dep. p. 57; Shamsi Dep. pp. 34, 52-53)

**RESPONSE:** No dispute that both officers testified that they were giving Cole various contradicting commands at the same time. Disputed however that Cole was conscious when commands were given; medical reports show that Cole suffered two abrasions to his face. (Motley Decl., Ex. 28 at p. 2). Also, Defendants have admitted the allegations contained in Paragraph 123 of the

Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP
8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill.
Apr. 30, 2021).

53.     Officer Mensah ran to where Cole went down and observed Cole had both
knees and his left hand on the ground, and a gun in his right hand. (Mensah 06/26/2023
Dep. pp. 218- 220, 266-267)

**RESPONSE:** Disputed. Mensah testified that Cole was down on all fours.
(Mensah 06/26/2023 Dep 215: 10-12).  In addition, Defendants have admitted
the allegations that Cole was kneeling with both hands on the ground with no
gun in his hand as contained in Paragraphs 123-126, 136 of the Amended
Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6);
*Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30,
2021)

54.     Officer Mensah observed Cole move forward about three yards in a
crawling manner, then saw that Cole picked up his right arm, with gun still in tow, across
his body, and pointed the gun in Officer Mensah's direction. (Mensah 06/26/2023 Dep.
pp. 216-219, 221-222; Shamsi Video at 0:01:40)

**RESPONSE:** Disputed. The Shamsi squad video does not show Cole moving or

crawling. Moreover, if the gun was pointed between "where [Shamsi] was" and where "Evan Olson" was at the time and Mensah came from the non-gun side, it would have been impossible that Cole had "picked up his right arm, with gun still in tow, across his body, and pointed the gun" in Mensah's direction. (Shamsi Dep. 32:13-33:3, 42:15-23, 44:6-9; Olson Dep. 25:4-21). Cole never pointed the gun in Mensah's direction nor did he move. (Shamsi Dep. at 45:16-23, 52:21-25). Further disputed because it would be impossible for Cole to be pointing his gun at Mensah, Olson, Johnson, etc. all at the same time with varying arm/body/head positions. In addition, Defendants have admitted the allegations that Cole was kneeling with both hands on the ground with no gun in his hand as contained in Paragraphs 123-126, 136 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021)

55.     Officer Mensah discharged his firearm at Cole five times. (Mensah 06/26/2023 Dep. pp. 216, 240)

> **RESPONSE:** No dispute. And further adding that at the time Mensah was shooting Cole, Office Shamsi was yelling at Mensah to "Stop! Stop!" because Shamsi did not think deadly force was justified. (ECF 20, Paragraph 141). Importantly, however, Defendants have admitted the allegations contained in Paragraphs 133-134, 141, 161-167 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

56.     Officers Olson, Shamsi, and Mensah all observed Cole with the firearm in his right hand before Officer Mensah discharged his service weapon. (Mensah 06/26/2023 Dep. pp. 218- 220, 266-267; Olson Dep. pp. 24-25, 30, 48, 76; Shamsi Dep pp. 28, 39, 53).

> **RESPONSE:** Disputed. Cole was likely unconscious after shooting himself in the arm; medical reports suggest that he had two abrasions on his face indicating impact from the fall. (Motley Decl., Ex. 28, p. 2). Defendants have admitted the allegations that Cole was kneeling with both hands on the ground with no gun in his hand as contained in Paragraphs 123-126, 136 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

57.     In the split second before Officer Mensah fired, Officer Shamsi had determined that Cole posed a deadly threat, and that deadly force was justified. (Shamsi Dep. pp. 34-36, 54)

> **RESPONSE:** Disputed that in the split second what Officer Shamsi determined. In addition, Defendants have admitted the allegations that Cole was kneeling with both hands on the ground with no gun in his hand and that Shamsi did not believe that Cole posed a threat to anyone and he had control of the situation as contained in Paragraphs 123-126, 136, 141-143 of the Amended Complaint (Dkt.

20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021)

58.     In the split-second before Officer Mensah shot, Officer Shamsi had his finger depressing the trigger of his firearm pointed at Cole. (Shamsi Dep. pp. 23, 34-36)

**RESPONSE:** Disputed because Defendants have admitted the allegations contained in Paragraphs 141-142 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021). See Response 57.

59.     In the split second before Officer Mensah fired, Officer Olson had determined that Cole posed a deadly threat, and that deadly force was justified. (Olson Dep. pp. 73-75)

**RESPONSE:** Disputed because Defendants have admitted the allegations contained in Paragraphs 141-142 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021). See Response 57.

60.     As soon as he heard the first gunshot, Officer Johnson pulled his firearm to protect himself and others as he perceived that the discharge of a firearm justified

deadly force. (Johnson Dep. p. 56)

> **RESPONSE:** Disputed because Defendants have admitted the allegations contained in Paragraphs 141-142 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

61.     After Officer Mensah fired, Cole went completely prone on the ground. (Olson Dep. pp. 29-30; Johnson Dep. pp. 37-39)

> **RESPONSE:** No dispute, but further adding that immediately after Mensah shot and killed Cole, Cole was disabled. Disputed because Defendants have admitted the allegations contained in Paragraphs 138 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

62.     After Cole was shot and lying flat on the ground, Officer Olson approached Cole with his gun still drawn and pointed at Cole ordering him not to move. (Olson Dep. pp. 74-75)

> **RESPONSE:** No dispute.

63.     Even after being shot, the scene was not secure, and Cole still posed a threat at this time because the gun was still in his hand. (Olson Dep. pp. 74-75)

**RESPONSE:** Disputed. Mensah used deadly force to kill Cole. Furthermore, Defendants have admitted the allegations contained in Paragraphs 125-126 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

64.     Officer Olson kicked the gun away from Cole's hand and Officer Johnson then secured Cole's firearm while other Officers rendered first aid. (Olson Dep. pp. 35-36; Shamsi Dep. pp. 22-24, 45-46; Schleis Dep. pp. 15-16; Johnson Dep. pp. 37-39)

**RESPONSE:** No dispute. Further adding that Olson testified that he ordered Johnson to detain the two subjects that were still considered a "secondary unknown threat" (Olson Dep. 36:23-25), while Shami stated we "disarm[e]d Mr. Cole" (Shamsi Dep. 23:24-25).

65.     On February 2, 2020, guns were prohibited at Mayfair mall for any purpose. (Albiter Decl. ¶ 4, Mensah 06/06/2023 Dep. p. 280; Olson Dep. p. 70; Schleis Dep. p. 26; Johnson Dep. p. 50)

**RESPONSE:** No dispute.

66.     Cole had committed several crimes on February 2, 2020 prior to the shooting which included: Disorderly conduct while armed (Mensah 06/26/2023 Dep. p. 258; Olson Dep. p. 70; Schleis Dep. p. 26; Johnson Dep. p. 6), resisting and obstructing, recklessly endangering safety (Mensah 06/26/2023 Dep. pp. 260-261); Domestic disturbance or violence (Mensah 06/26/2023 Dep. p. 258; Johnson Dep. p. 6).

> **RESPONSE:** Disputed. Cole was never criminally charged with any crimes nor was there any adjudication that any crimes were committed. Furthermore, defendants have admitted the allegations contained in Paragraphs 161-167 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

67.     During the pursuit, Cole did not take any actions to suggest that he was going to comply or surrender; Cole did not put his hands above his head, he did not throw his fanny pack or his weapon from his possession, he did not provide any other indication that he was intending to comply. (Mensah 06/26/2023 Dep. pp. 267-269; Olson Dep. pp. 74-75; Shamsi Dep. pp. 35-36, 52-53)

> **RESPONSE:** Disputed. Mensah never issued any commands to Cole before

shooting Cole, Mensah cannot recall telling Cole to drop the gun and Shamsi testified that Mensah did not make any commands. (Mensah 6/26/23 Dep. at 267; Shamsi Dep. at 41:17-20). In addition, Cole stopped running and was on his hands and knees when he was shot and killed by Mensah likely because he was unconscious. (Motley Decl., Ex 28, p. 2). In addition, Defendants have admitted the allegations that Cole was kneeling with both hands on the ground with no gun in his hand and that Shamsi did not believe that Cole posed a threat to anyone, and he had control of the situation as contained in Paragraphs 123-126, 136, 141-143 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021)

68.     Cole was issued multiple commands by multiple officers and ignored every command during the foot pursuit and leading up to Officer Mensah's shots. (Mensah 06/26/2023 Dep. pp. 262-263, 267; Olson Dep. pp.57, 59, 74; Shamsi Dep. 31-32, 34; Schleis Dep. pp. 12-14, Johnson Dep. pp. 51-52)

**RESPONSE:** No dispute that officers were giving Cole various contradicting commands at the same time. However, disputed because Cole did stop running and had accidentally shot himself in the arm and was likely Cole unconscious of such commands; medical reports suggest that he had two abrasions on his face indicating impact from the fall. (Motley Decl., Ex 28, p. 2). In addition, Defendants have admitted the allegations that Cole was kneeling with both hands on the

ground with no gun in his hand and that Shamsi did not believe that Cole posed a threat to anyone and he had control of the situation as contained in Paragraphs 123-126, 136, 141-143 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021)

69.     Cole escalated the situation when he removed the gun from the fanny pack. (Shamsi Dep. pp. 22-23, 51-52)

**RESPONSE:** Disputed. Shamsi testified that "you kind of always assume that things are going to escalate;" running is also considered "escalation." Shamsi Dep. 51:15-25.   In addition, Defendants have admitted to the allegation that Cole was given conflicting commands for him to "drop the gun" and "throw his gun" as contained in Paragraph 123 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

70.     Cole removing the gun from his fanny pack demonstrated his intent to use the firearm. (Mensah 06/26/2023 Dep. p. 267-270; Shamsi Dep. pp. 51-53)

**RESPONSE:** Disputed. Neither Shamsi nor Mensah physically observed Cole "removing the gun from his fanny pack" or testified to "intent;" Shamsi did not notice the gun until he caught up to Cole later on, and Mensah "did not see a gun" until he "had got to him." Shamsi Dep. 22:21-23:9; Mensah Dep 6/26/23

268:1-4. In addition, Defendants have admitted to the allegation that Cole was given conflicting commands for him to "drop the gun" and "throw his gun" as contained in Paragraph 123 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

71.     Officer Mensah did not know Alvin Cole at the time of the shooting and did not have any previous encounters with him. (Mensah 06/26/2023 Dep. p. 262)

**RESPONSE:** No dispute.

72.     Officer Mensah did not shoot Alvin Cole because he was black. (Mensah 06/26/2023 Dep. p. 270)

**RESPONSE:** Disputed. Defendants have admitted to the allegation that Defendant Mensah treated Mr. Cole with an unreasonable amount of force wholly or in part because he was black as contained in Paragraph 201; but have also admitted to the allegations in Paragraphs 43-44, 51, 191, 205, 211 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

**<u>Investigations into the February 2, 2020, Critical Incident</u>**

**WPD Policy 1407 – Investigations into Law Enforcement Fatalities**

73. Pursuant to protocol and in conformity with §175.47 of the Wisconsin Statutes, the Milwaukee Police Department was designated as the independent lead investigative agency, supplemented by suburban law enforcement agencies, including State Patrol. (ECF 76-4, Exh. C2 pp. 1-3)

RESPONSE: No dispute.

74. Law Enforcement duties sometimes expose Officers to situations where the use of force, including deadly force is necessary. It is imperative that Officer Involved Deadly Force or In-Custody Death incidents be investigated with the utmost thoroughness, professionalism, and impartiality. (ECF 76-4 p. 1)

RESPONSE: Disputed that this is an out of court statement being used to prove the truth of the matter asserted. *See* FRE 801. In addition, Defendants have admitted the allegations contained in Paragraph 111-114 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

75. At the time of the February 2, 2020, critical incident, it was the policy of the Wauwatosa Police Department to conduct investigations into all officer-involved fatalities. (ECF 76-4; ECF 80-8, Exh. S, Deposition of Barry Weber 07/07/2023

(hereinafter Weber 07/07/2023 Dep.) pp. 64-68)

**RESPONSE:** No dispute. In addition, as testified by Weber, it was the policy of the Wauwatosa Police Department involved in a fatality that they were required to be evaluated by a psychologist who would need to approve them coming back to work.  Weber 6/6/23 at 69:4-6; Weber Testimony 5/4/21, 47:17-22).  In addition, Defendants have admitted the allegation that Mensah never underwent a fitness for duty evaluation after the Gonzales shooting of 7/16/15 Paragraph 77-78 Amended Complaint (Dkt. 20) in the Estate of Alvin Cole case, 22-cv-856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

76.     Wisconsin Act 348 mandated that an outside agency must investigate all police related critical incidents. (ECF 76 Declaration of Joseph Roy (hereinafter Roy Decl.) ¶ 6; see also ECF 76-4 pp. 1-2)

**RESPONSE:** Disputed.  Wisconsin Act 348 mandates how police agencies are to investigate deaths involving officers.  (See. Wisconsin Act 348).

77.     At the time of the February 2, 2020, critical incident and in accordance with Wisconsin Act 348, it was the policy of the Wauwatosa Police Department that the Milwaukee County Investigative Team would lead the investigation of any officer-involved deaths involving Wauwatosa Police Officers. (ECF 76-4 p. 1, Roy Decl. ¶ 6)

**RESPONSE:** Disputed Wisconsin Act 348 does not articulate which agencies are to lead the investigations of officer-involved or in-custody deaths whether they are traffic related or not. (*See* Wisconsin Act 348)

78.    The Milwaukee County Investigative Team is comprised of contributing law enforcement agencies in the Milwaukee County area who lead the investigation after an officer involved death pursuant to Wis. Stat. § 175.47. (ECF 76-4 pp.1-2; see also Mensah 06/26/2023 Dep. pp. 280-281)

**RESPONSE:** No dispute.

79.    On February 2, 2020, the Milwaukee Police Department and additional Milwaukee Area Investigative Team (hereinafter MAIT) agencies were requested and responded to Mayfair Mall to the investigation into the Cole shooting. (Mensah 06/26/2023 Dep. 280-281)

**RESPONSE:** Disputed. The cited testimony does not support the purported fact. MAIT agencies were required to investigate, there was no testimony that they responded to Mayfair Mall. (Mensah 06/26/2023 Dep. 280-281)

80.    At the time of the February 2, 2020, incident, it was the policy of the Wauwatosa Police Department that all officers involved will be placed on administrative leave. (ECF 76-4; Roy Decl. ¶ 6; Johnson Dep. pp. 43-44; Weber 07/07/2023 Dep. p.

75)

**RESPONSE:** No dispute.

81.    Pursuant to Wauwatosa Police Department Policy, Officer Mensah was placed on administrative leave after the February 2, 2020, incident involving Alvin Cole. (Weber 07/07/23 Dep. p. 75)

**RESPONSE:** No dispute.

82.    At the time of the February 2, 2020, incident, it was the policy of the Wauwatosa Police Department that Officers involved in a fatality attend a counseling evaluation with an approved specialist prior to returning to full duty patrol after an office involved shooting. (ECF 76-4)

**RESPONSE:** Disputed. Wauwatosa Police Department had a policy that officers involved in a fatality were required to be evaluated by a psychologist to have approval coming back on duty. Weber 6/6/23 at 69:4-6; Testimony of Barry Weber 5/4/21 pg. 47 lines 17-22).  In addition, Defendants have admitted the allegation that Mensah never underwent a fitness nor did they have a policy regarding fitness for duty at all times relevant as contained in Paragraphs 77-78 the Amended Complaint (Dkt. 20) in the Estate of Jay Alvin case, 22-cv-856. FRCP 8(b)(6);

*Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

83.     At the time of the February 2, 2020, incident, it was the policy of the Wauwatosa Police Department that Officers involved in a fatality will remain on leave at the discretion of the Chief of Police; however, will not be permitted to return to duty until after the evaluation has occurred. (ECF 76-4)

**RESPONSE:** Disputed that an officer "will remain on leave at the discretion of the Chief of Police" and the officer would be on "administrative leave," "not [be] responsible for reporting to his normal shift duties" and will engage in zero "police work." (Weber Dep, 7/7/23, 75:4-21).

84.     Officer Mensah remained on administrative leave until his resignation date and never returned to duty at the Wauwatosa Police Department after the February 2, 2020, incident. (Weber 07/07/2023 Dep. pp. 80-81)

**RESPONSE:** Disputed.  Mensah worked in an administrative capacity for the WPD after the Cole shooting**.**  (Weber 7/7/23 Dep. at 81:13-15).

**Milwaukee County District Attorney**

85.     On October 7, 2020, the Milwaukee County District Attorney sent a letter to Chief Weber outlining his decision to decline prosecution of Officer Joseph Mensah

in relation to the February 2, 2020, shooting of Alvin Cole. (ECF 76-25; Roy Decl. ¶ 36; Weber 7/7/2023 Dep. p. 80)

> **RESPONSE:** Undisputed that the Milwaukee County District Attorney sent a letter to Chief Weber outlining his decision to decline to criminally charge Mensah, however, disputed that the letter is admissible. The letter is hearsay and not subject to any exceptions. *See* FRE 801.

The Milwaukee County District Attorney concluded that Officer Mensah's decision to use deadly force was privileged under Wisconsin's "self-defense or defense of others" law. (ECF 76-25 pp. 13-14)Wisconsin Statutes Section 938.48(1) (sic) Self-defense and defense of others states as follows:

> A person is privileged to threaten or intentionally use force against another for the purpose of preventing or terminating what the person reasonably believes to be an unlawful interference with his or her person by such other person. The actor may intentionally use only such force or threat thereof as the actor reasonably believes is necessary to prevent or terminate the interference. The actor may not intentionally use force which is intended or likely to cause death or great bodily harm unless the actor reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself.

(ECF 76-25, pp. 13-14)

> **RESPONSE:** Disputed, the purported fact misstates the cited evidence and is inadmissible. The Milwaukee County District Attorney concluded that they "could not meet the burden required to charge Officer Mensah," i.e., that they could not prove beyond a reasonable doubt that Mensah was not privileged to used deadly

force; that is an entirely different standard of proof than in this present case. (ECF 76-25, pp. 14). Moreover, the District Attorney's letter is hearsay and is not subject to any hearsay exceptions. FRE 801.

**Wauwatosa Police Department Internal
Investigation**

86.     At the time of the February 2, 2020, incident, it was the policy of the Wauwatosa Police Department for the Police Chief to order a separate internal investigation to determine whether any officers violated department rules, regulations, or policies and to identify any potential training deficiencies in all officer involved fatalities. (ECF 76-4; Roy Decl. ¶ 6; Weber 07/07/2023 Dep. pp. 64-69) Policy 17-11(E) Internal Investigations/Administrative Review provides:

> The law allows for a separate internal investigation into the incident, provided that it does not interfere with the criminal investigation. The Chief of Police may order a separate internal investigation to determine whether Officer(s) violated any department rules, regulations or policies, and / or to identify training deficiencies.

(ECF 76-4; Roy Decl. ¶ 6)

**RESPONSE:** No dispute that Weber testified that WPD had this policy in place. Weber Dep 7/7/23 at 63-65.

**Training, Supervision, Policy Claims**

87.     Under Wisconsin Law all police officers have to undergo psychological preemployment test before they can be certified through the state. As such, all officers hired by the Wauwatosa Police Department are required to undergo a preemployment

psychological screening to determine their fitness for duty, from a psychological standpoint. (ECF 77-2, Weber 9/16/2022 Dep. pp. 46-47)

**RESPONSE:** Disputed. Misstates testimony for this purported fact and to clarify that the preemployment psychological screening was performed after a police officer passed the written and physical evaluation and was used to determine their "fitness as far as from a psychological standpoint." (ECF 77-2, Weber 9/16/22 Dep. pp. 46:19-25, 49:19-21). In addition, Defendants fail to cite which Wisconsin Law requires this. In addition, Defendants have admitted to the allegation that the WPD never conducted a psychological evaluation of Mensah prior to his employment as alleged contained in Paragraph 50 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

88.    Prior to his employment with Wauwatosa Police Department, Officer Mensah underwent a preemployment psychological screening with Dr. Bauman and was deemed fit for duty by Dr. Bauman. (ECF 77-2, Weber 9/16/2022 Dep. pp. 55, 251; ECF 77-7 Weber 6/6/2023 Dep. pp. 98-99 referencing Baynard Supp Decl. Exh. L; see also ECF 77-1 Mensah 3/17/2022 Dep. p. 129)

**RESPONSE:** Disputed. Dr. Bauman's opinions are inadmissible hearsay and not subject to any exceptions as Dr. Bauman's opinions are not trustworthy because

Defendant attempts to use the professional's medical findings to bolster their position on summary judgment when they vehemently objected to Plaintiff having any access to these materials, even under a protective order. The use of such statements goes against Court orders, is improper, irrelevant, and frivolous. *See* ECF Nos. 42, 43, 44, 53; Fed. R. Evid. 801, 702. Also, misstates testimony for the purported fact as Weber did not testify that the screening revealed Mensah was fit for duty. (ECF 77-2 Weber 9/16/22 Dep. at. 55, 251). In addition, Mensah testified that he was required to take a psychological assessment but did not remember the name of the doctor; Mensah did not testify to the results of that assessment. (ECF 77-1 Mensah 3/17/22 Dep. at 129:15-25, 130:1-3). In addition, Defendants have admitted to the allegation that the WPD never conducted a psychological evaluation of Mensah prior to his employment as alleged contained in Paragraph 50 of the Amended Complaint (Dkt. 47) in the Estate of Jay Anderson case, 21-cv-1179. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).


89.     After the July 16, 2015, Gonzales shooting incident, Officer Mensah was referred to licensed professional counselor Marcia Williams at Systemic Perspectives, for evaluation and counseling regarding the critical incident, whereby Officer Mensah met with Marcia Williams on July 27, 2015, August 3, 2015, August 18, 2015, and August 24, 2015. (Roy Decl. ¶ 8, Roy Exh. E; Weber 9/16/2022 Dep. pp. 234-235; Mensah 2/28/2023 Dep. pp. 122-124)

**RESPONSE:** Disputed. Mensah was not sure that he saw Marcia Williams and he certainly did not testify that she was a licensed professional counselor. (Mensah 2/28/23 Dep. at 123:18-20)("One was Marcia Williams, Marcia, maybe"). ECF 76-6, Exhibit E, does not show that Mensah *met with* Marcia Williams, Exhibit E is Dr. Bauman's letter, which is inadmissible hearsay and not subject to any exceptions as Dr. Bauman's opinions are not trustworthy because Defendant attempts to use the professional's medical findings to bolster their position on summary judgment when they vehemently objected to Plaintiff having any access to these materials, even under a protective order. The use of such statements goes against Court orders, is improper, irrelevant, and frivolous. *See* ECF Nos. 42, 43, 44, 53; Fed. R. Evid. 801, 702.


90.     After the June 23, 2016, Anderson shooting incident, Officer Mensah was referred to licensed professional counselor, Jay Schrinsky, for evaluation and counseling regarding the critical incident, whereby Officer Mensah met with Jay Schrinsky at ABC Medical Clinics on June 30, 2016, July 6, 2016, August 3, 2016, August 24, 2016, and September 13, 2016. (Mensah 2/28/2023 Dep. pp. 123-125, 138-139; Weber 6/6/2023 Dep. pp. 231-232; see also Weber 7/7/2023 Dep. pp. 76-77 citing ECF 76-22 Schrinsky Ltr.; ECF 76-22)


**RESPONSE:** Disputed as to ECF 76-22 as cited, this evidence is inadmissible hearsay as this document is an unsigned letter by an unnamed person is grossly inadmissible evidence and there has been no evidence provided to support what

if any credentials Jay Schrinsky had or has. *See* FRE 801. Whether Jay Schrinsky was a "licensed professional counselor" is unknown and thus, lacks trustworthiness specifically because Defendant attempts to use this unsigned/unauthored document and to allege Schrinsky's credentials to bolster their position on summary judgment when they vehemently objected to Plaintiff having any access to these materials, even under a protective order. The use of such statements goes against Court orders, is improper, irrelevant, and frivolous. *See* ECF Nos. 42, 43, 44, 53.

91.     On December 7, 2016, Dr. Bauman evaluated Joseph Mensah for the purpose of providing a Fitness for Duty evaluation and "found Officer Mensah to be competent and capable of rendering appropriate Law Enforcement service to the Wauwatosa community" and cleared him to return to full duty. (ECF 77-5, Exh. E; see also Weber 7/7/2023 Dep. 87-88, 96-97)

**RESPONSE:** Disputed based on inadmissible evidence. Dr. Bauman's opinions and written statements are inadmissible hearsay. *See* FRE 801. Defendants attempt to use the professional's medical findings to bolster their position on summary judgment when they vehemently objected to Plaintiff having any access to these materials, even under a protective order. The use of such statements goes against Court orders, is improper, irrelevant, and frivolous. *See* ECF Nos. 42, 43, 44, 53; Fed. R. Evid. 801, 702. In addition, Defendants have admitted the allegations contained in Paragraph 53 of the Amended Complaint

(Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

92.     Chief Weber relied on opinions from professionals and the assessment of outside law enforcement agencies in determining that Officer Mensah was able to perform his law enforcement duties. (Weber 7/7/2023 Dep. pp. 94-98)

**RESPONSE:** Disputed. The professionals' opinions are inadmissible hearsay and concern specialized knowledge, which may not be based on sufficient facts or data, or the product of reliable principals and methods. Specifically, that is because Defendant attempts to use the professional's medical findings to bolster their position on summary judgment when they vehemently objected to Plaintiff having any access to these materials, even under a protective order. The use of such statements goes against Court orders, is improper, irrelevant, and frivolous. *See* ECF Nos. 42, 43, 44, 53; Fed. R. Evid. 801, 702. In addition, Defendants have admitted the allegations contained in Paragraph 53, 55-57, 155, 157 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

93.     At no time did any of the counseling providers alert Chief Weber of a concern regarding Mensah, and Chief Weber was not concerned with Mensah's ability to fulfill his role as a police officer. (Weber 7/7/2023 Dep. pp. 90-96)

**RESPONSE:** Disputed. The testimony regarding what the counseling providers told Weber is inadmissible hearsay. Fed. R. Evid. 801. In addition, Defendant attempts to use this inadmissible hearsay to bolster their position on summary judgment when they vehemently objected to Plaintiff having any access to Defendant Mensah medical records, even under a protective order. The use of such statements goes against Court orders, is improper, irrelevant, and frivolous. *See* ECF Nos. 42, 43, 44, 53. In addition, Defendants have admitted the allegations contained in Paragraph 55, 77, 79, 102, 149 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

94.     The City of Wauwatosa trains its officers that excessive force is prohibited. It is the policy of the Wauwatosa Police Department that its police officers use only the amount of force reasonable and necessary to arrest, apprehend, or control any person or situation. (ECF 76-11; Roy Decl. ¶¶ 12-17)

Wauwatosa Police Department "Use of Force" Policy Provides the following:

The decision to use force is based on the facts and circumstances known to the officer at the time the decision to use force was made. Wauwatosa Police Officers are permitted to use force in the accomplishment of legitimate law enforcement objectives, which include:
To prevent a person from injuring himself/herself and in self defense or defense of another.

(ECF 76-11; Roy Decl. ¶¶ 12-17)

**RESPONSE:** Disputed. Defendants have admitted the allegations contained in Paragraph 47-51, 57-58, 71 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

95.     Wauwatosa Police Officers are required to sign off on acknowledging the Police Department's use of force policy and receive training regarding the same through in-services. (Weber 07/07/23 Dep. pp. 103-104)

**RESPONSE:** Undisputed that officers merely sign off acknowledging they received the use of force policy, but disputed that Weber has any recollection of the training officers receive regarding legal materials. (Weber 7/7/23 Dep. at 104:2-6).  In addition, Defendants have admitted the allegations contained in Paragraph 47-51, 57-58, 71 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

96.     The Wauwatosa Police Department trained its officers on the constitutional standards outlined in Graham v. Conner and Tennessee v. Gardner through the mandated Inservice trainings such as the Spring 2019 Firearms training. (Weber 7/7/2023 Dep. pp. 99-100, 103-105)

**RESPONSE:** Disputed. The purported "training" on Graham v. Conner was that Wauwatosa officers might have merely read Graham v. Connor. Weber was not sure whether Graham v. Conner was covered in the training and did not have them ever read Graham v. Conner. And even if it had been, officers are not trained on it, rather, they merely initial a piece of paper that they received the case materials. (Weber 7/7/23 Dep. at 100:2-17, 103:14-17). In addition, the cited evidence makes no reference to Tennessee v. Gardner. Moreover, Defendants have admitted the allegations contained in Paragraph 47-51, 57-58, 71 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

97.     Officer Mensah received training on the use of force as well as training on the Wauwatosa Police Department Policies. (ECF 76-12; Mensah 2/28/2023 Dep. pp. 254-244; Mensah 06/26/2023 Dep. pp. 271-273)

**RESPONSE:** Disputed.  Further adding that officers at the Wauwatosa Police Department were not trained on the policies, rather, officers reviewed the policies on their own or a supervisor would read off the policy to the officers word for word and officers were not expected to know "every single thing" or know the policies "word for word." (Mensah 6/26/23 Dep. at 272:13-25, 273:1-16). In addition, Defendants have admitted the allegations that neither Weber nor

Wauwatosa instituted any training of WPD policies as contained in Paragraph 49, additionally Defendants have admitted the allegations contained in Paragraph 47, 48, 50-51, 58, 71 of the Amended Complaint (Dkt. 20) in the Estate of Alvin Cole, 22-cv-0856. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin* 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

98.     Wauwatosa Police Officers are trained that deadly force is a last resort and that police officers should use only the amount of force reasonable and necessary to arrest, apprehend or control any person, or situation. (ECF 76-11 pp. 1-5, 7)

**RESPONSE:** Disputed. The citation does not provide evidentiary support for the purported fact. In addition, Wauwatosa's policy directly contradicts the purported fact: "It is not the intent of this policy to direct officers to try [less lethal] options of force before escalating," "the ultimate goal of any force used is to gain control." (ECF 76-11, at 4).

99.     Throughout his career, Officer Mensah received training in Defense and Arrest Tactics (DAAT), use of force justifications, firearms, and at all relevant times, maintained his certification through the State of Wisconsin. (ECF 77-1, Exh. A, Mensah 3/17/2022 Dep. pp. 40- 42, 76, 102-107, 120; see also Roy Decl. ¶ 19; ECF 76-12, Exh. J, Mensah Training Report).

**RESPONSE:** Disputed. Joseph Roy worked with Mensah while he was with the WPD from 2015 through 2020 and did not indicate if "throughout his career" Mensah "maintained his certifications." Mensah 3/17/22 Dep. pp. 40-42, 76, 102-107, 120; *see also* Roy Decl. ¶ 19; Exh. J, Mensah Training records)

Dated this 22nd day of August, 2023.

**MOTLEY LEGAL SERVICES**                **CADE LAW GROUP LLC**

By*: /s/Kimberley Cy. Motley*              Nathaniel Cade, Jr. SBN: 1028115
Kimberley Cy. Motley                        Annalisa Pusick SBN: 1116379
State Bar No: 1047193                       Antonique C. Williams SBN: 1051850
2206 Bonnie Butler Way                      P.O. Box 170887
Charlotte, North Carolina 28270             Milwaukee, WI 53217
E: kmotley@motleylegal.com                  P: (414) 255-3802
P: (704) 763-5413                           F: (414) 255-3804
                                            E: nate@cade-law.com
                                            E: annalisa@cade-law.com
                                            E: antonique@cade-law.com