# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN

ESTATE OF ANTONIO GONZALES, by and through its
its Personal Representative, Sandra Gonzales,

        Plaintiff,        CASE NO. 2:21-cv-00848

v.

CITY OF WAUWATOSA, et al.,

        Defendants.

---

ESTATE OF JAY ANDERSON, JR.
by Special Administrator, Starkeisha DeLaRosa;
J.A. minor child, through her next friend Starkeisha DeLaRosa,

        Plaintiffs,        CASE NO. 2:21-cv-1179

v.

CITY OF WAUWATOSA, et al.,

        Defendants.

---

ESTATE OF ALVIN COLE, by and through its
Special Administrator, Tracy Cole;
TRACY COLE, and ALBERT COLE,

        Plaintiffs,        CASE NO. 22-cv-856

v.

CITY OF WAUWATOSA, et al.,

        Defendants.

---

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT [COLE]

I.    **The Allegations in Plaintiff's Amended Complaint Were Not Admitted by the Defendants for Purposes of Summary Judgment or for any Other Purpose.**

Defendants have fully briefed this issue in their Motion to Enlarge Time, ECF 101, 108, and the Anderson Reply Brief and fully incorporate all facts and argument made therein.

II.   **Plaintiffs' Excessive Force Claims Against Officer Mensah Cannot Survive Summary Judgment.**

The undisputed factual record demonstrates that on February 2, 2020, Alvin Cole brought a stolen gun to Mayfair Mall and while there, started an argument with another patron. (DPFF 9-10; ECF 76-25 p. 1) Cole threatened the patron with the firearm which prompted Mayfair Mall security to call Wauwatosa Police Department ("WPD"). (DPFF 11-15; ECF 76-25 p. 1) The report of disorderly conduct while armed in a public venue created a dangerous situation and thus prompted a large response from the WPD. (DPFF 16, 23) Ultimately, Cole was confronted by officers in the mall parking lot, led them on a foot pursuit, and fired his gun. (DPFF 24-43; ECF 76-25 p. 1) Officers ordered Cole to surrender the weapon. (DPFF 44-53) Cole refused, and with his finger on the trigger, pointed the gun at the officers. (DPFF 48-50, 53-54, 56) In response to Cole's actions, Officer Mensah shot him. (DPFF 55; ECF 80-5 pp. 41-43)

At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). However, this does not extend to drawing inferences that are supported by only speculation or conjecture. *King v. Hendricks Cty. Commissioners*, 954 F.3d 981, 984 (7th Cir. 2020). Plaintiff asks the court to ignore this and accept a version of events based not on admissible evidence or reasonable inferences, but rather on assumptions about Cole's motivation, and speculation that Cole lost consciousness after accidentally shooting himself. (ECF 94 pp. 14-17)

Plaintiffs gamble on the misrepresented evidence to bolster their "unconsciousness" claim by citing to a non-existent declaration (in this case's docket) and a medical examiner report that

1

has neither a reference nor reasonable inference regarding an "unconscious" state. (ECF 94-97) Even with reasonable inferences in light most favorable to Plaintiffs, the proposed fact that Cole was unconscious not does pass muster when Plaintiffs' speculative "fact" that raises a metaphysical doubt, is not legitimized with evidence in the record. *See generally*, *King*, 954 F.3d at 985-986. Here, the result of Plaintiffs' fact is identical to *King*'s in that the unconsciousness allegation requires a reasonable person to rely on a theory that calls for a logical leap. *Id.* Plaintiffs' response brief attempts to salvage their "facts" by drawing inferences that are supported only by conjecture, because with conjecture comes a false sense of "genuine dispute," which Plaintiffs hope in turn will deceptively help their claims survive summary judgment.

### A.   Cole Committed Dangerous Crimes While Armed.

Plaintiffs' suggestion that Cole did not commit a "serious crime" prior to officers responding to Mayfair Mall is contrary to the undisputed facts. (DPFF 11-24) They further purport that, "Cole had not committed a crime nor was there evidence that he had committed a violent felony." (ECF 94 p. 12) Rearranging the order of facts, omitting crucial observations, and fumbling officers' testimonies leads to Plaintiffs' desirable conclusions, but it does not make them reasonable. Instead, it requires the factfinder to make illogical leaps and ignore established case law, especially those with similar fact patterns to this case. Plaintiffs' citations to *Smith* work against them when fleshing out the facts. In *Smith*, officers *did not* engage Smith in response to reports of a serious crime. *Estate of Smith by Hanes v. City of Milwaukee, Wisconsin*, 410 F. Supp. 3d 1066, 1072 (E.D. Wis. 2019)(Adelman, J.) In contrast, WPD officers were pursuing Cole because of a call regarding an individual with a firearm in a location where firearms are prohibited and using that firearm to threaten a patron. (DPFF 10-14, 16-17, 19, 21-23, 65)

Plaintiffs concede there is no dispute that Cole was running from the police as demonstrated by the video—yet suggest the existence of a material factual dispute as to whether Cole was simply fleeing without committing a crime. *See* (ECF 94 p. 12) Plaintiffs state that this dispute is the turning point of the case, and resolution must determine the fleeing allows for the use of deadly force and whether doing so is reasonable. (ECF 94 p. 12) This issue posture is misplaced. The analysis of using force is not always predicated solely on a single action or factor - it requires consideration of the totality of the circumstances. The Plaintiffs acknowledge that the totality of circumstance is pertinent. (ECF 94 p. 11, citing *Strand v. Minchuk*, 910 F.3d 909, 914-15 (7th Cir. 2018).) Plaintiffs ignore the following paragraph in *Strand* that also highlights the significance of the officers' judgment in such circumstances: "To be sure, the 'calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are *tense, uncertain, and rapidly evolving*—about the amount of force that is necessary in a particular situation." *Id.* at 915, (citing *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). Here, Wauwatosa officers were tasked with the same *tense, uncertain, and rapidly evolving* factors; from the initial call to the fleeing, from ordering commands to hearing a gunshot, and from observing a weapon to that weapon being pointed at officers. (DPFF 12-64)

### B. Cole Fled From Officers and Ignored Lawful Orders.

Plaintiffs' severely flawed argument is that Cole was not under arrest at the time he ran away from the officers and that he was no longer running when he was shot, therefore Cole running away from police is of no significant factor to the deadly force analysis. (ECF 94 p. 13-14) Cole successfully being able to out-run the officers and evade arrest does not mean that he "was not under arrest." *Graham v. Connor* 490 U.S. 386, 396. Test of reasonableness requires careful

attention to facts including "whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*, citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985). The officers were attempting to take him into custody, and at the very least stop him to investigate the circumstances of disorderly conduct while armed, resisting and obstructing, recklessly endangering safety, and domestic disturbance or violence. (DPFF 66) The circumstances leading up to the foot pursuit bolstered probable cause to justify an arrest: the initial dispatch regarding an incident of potential disorderly conduct while armed; learning the description of the suspect; and then observing an individual that fit the exact description. (DPFF 11-17, 19-24) *See Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 713-14 (2013). Officers had sufficient information that Cole may have committed a crime. This was enough to meet the standard for probable cause. *Id.* at 714.

Even if the Court accepts that the circumstances (having enough information to effectuate an arrest) do not warrant the conclusion that Cole was "under arrest" at the time he was fleeing from officers' commands, the facts still lead to Cole evading a seizure. (DPFF 26, 30) Officer Mensah did not use deadly force to *apprehend* Cole. This is the opposite of what Plaintiffs wish to convey in their response. The case law cited is applicable to a scenario where an officer would use force to subdue a fleeing suspect, but this is not that fact pattern. Cole fleeing from officers factors into the *totality* of circumstances that reached the point where Officer Mensah reasonably used deadly force, including Cole's possession of a firearm that he aimed at Mensah. (DPFF 54)

**C.    The Testimony From Officers On Scene Is Not Conflicting.**

Although officers had different points of view of Cole throughout the interaction, at the time Mensah used force, their positions were clear. Cole posed a deadly threat. (DPFF 56-60) Following the chain of events as it happened and being cognizant of at least four moving parts (testimonies of Officers Shamsi, Olson, Mensah, and Johnson) would alleviate any claimed

4

dispute. "No evidence is no evidence," and making illogical leaps to conclusions because "None of Them Stated That the Gun was Ever Pointed at Mensah" does not create concrete rebuttal evidence. *See King*, 954 F.3d at 986-87. When there are several individuals, in varying positions, with different vantage points, the answers to questions will be "inconsistent" insofar as they will not all be doing the same exact thing at the same exact time: "[m]inor inconsistencies and small differences in memory do not render testimony incredible as a matter of law…" *See U.S. v. Smith*, No. 01-2196, 2001 WL 1497763, at *3 (7th Cir. 2001).

Plaintiffs provide a table that allegedly shows the officers made statements that were contradictory *before* Cole was shot by Mensah. (ECF 96 p. 19) Statements often seem inconsistent when there is lacking precision in reading the deposition testimony. For example, the table indicates that Officer Johnson "Observed the 'Gun is next to Cole.'" *Id*. Plaintiffs deliberately omit (even though they included the citation to the context in their filing) that Johnson arrived closer to Cole *after* Officer Mensah's gunshots. (DPFF 40, 61, 64; PPFF 16) As Plaintiffs also note, the location of each officer varied, thus the vantage point of each officer varied. (PPFF 50, Exhibit 22; DPFF 25-64) Plaintiffs create intentional confusion by discombobulating the order of events and by rearranging the Defendant Officers' deposition testimonies.

To summarize: Each officer arrived near Cole at different times, from different angles. (ECF 76-24 Shamsi Squad Video at 0:01:22 to 0:01:42) While in pursuit, Officer Shamsi was ten to twenty feet behind Cole before Cole went down on the ground, and then Officer Shamsi placed himself near Cole's feet. (DPFF 45; ECF 80-5 pp. 22-23) Officer Olson was near Mayfair Road and observed Cole running westbound towards his location. (ECF 80-4 pp. 18-19) After Cole went down on the ground, facing southbound, Officer Olson was facing Cole's right side with a view of his shoulder and back of his head, but not quite his arm at this point. (ECF 80-4 pp. 20-22)

Officer Olson then observed Cole turn his head towards Olson's direction and extend his right arm from under his body and point the firearm in Olson's direction, westbound. (DPFF 48-50, 56; ECF 80-4 pp. 24-25) While Officer Shamsi was at Cole's feet, he was aware there is another officer to his right on Mayfair Road, and observed Cole point the firearm in the vicinity of Officer Olson and Mayfair Road (DPFF 48, 56; ECF 80-4 pp. 33-34) Meanwhile, Officer Mensah arrived near Cole and Cole was facing southbound on the ground with his back towards Mensah, who was now offset to Cole from behind, and Mensah was aware of other officers in the vicinity. (DPFF 53; ECF 80-3 pp. 217-220) Officer Mensah observed Cole crawl further southbound, turn his head, bring his right hand with the weapon across his body, and point the weapon at him. (DPFF 54, 56; ECF 80-3 pp. 215-222, 263-64) It was then Officer Mensah discharged his weapon, shooting Cole. (DPFF 55; ECF 80-3 pp. 218-219) Officer Mensah was to the east of Officer Shamsi when Shamsi heard Mensah fire the shots. (ECF 80-5 pp. 42-43) Officer Johnson did not arrive near Cole and the other officers until after Officer Mensah deployed his weapon. (ECF 76-24 at 0:01:31- 0:01:50; DPFF 64; ECF 80-7 pp. 37-39)

### D. No Rational Factfinder Could Conclude That Officer Mensah Acted Objectively Unreasonable Under the Circumstances.

The parties agree that Officer Mensah was permitted to use deadly force if he believed Cole's actions placed himself or others in the immediate vicinity in imminent danger of death or serious bodily injury. *See* (ECF 94 pp. 11-12) It is Plaintiffs' burden to come forward with evidence demonstrating that Mensah's belief that Cole posed a deadly threat was objectively unreasonable. *Abbott*, 705 F.3d at 725. With a firearm pointed directly at him, Officer Mensah's actions were objectively reasonable. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing

governmental interests at stake." *Graham*, 490 U.S. at 396, quoting *Garner*, 471 U.S. at 8. In assessing whether an officer used excessive force, courts will consider the totality of the circumstances and analyze the actions of the officer objectively, from "'the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Weinmann v. McClone*, 787 F.3d 444, 448-49 (7th Cir. 2015).

While assessing the reasonableness of an officer's use of force requires an evaluation of the totality of circumstances, it is a balancing approach to each of those factors, not a conjunctive list where each factor must be satisfied before concluding reasonableness. Although Plaintiffs would prefer that the totality of circumstances evaluation be a conjunctive list, this would result in circumstances where if an individual poses a deadly threat, but the other two factors are not satisfied, deadly force *would not* be justified: this is not the law. *See generally King*, 954 F.3d at 983; *see also Strand*, 910 F.3d 909 at 912. Cole posed a deadly threat to Officer Mensah when he pointed his firearm at Mensah. (DPFF 54; ECF 80-3 pp. 222, 267-270) Cole running away from officers after commands to stop, setting off a shot while being pursued, and then pointing the gun at Officer Mensah, are undeniably the events that play a significant factor to Officer Mensah's use of force; but the most germane fact here is the weapon pointed directly at Officer Mensah. (DPFF 26-54)

Officers Olson and Mensah's testimony demonstrates the unconscious claim to be highly improbable as both witnessed Cole move and the weapon in his hand. (DPFF 48-50, 53-54) To insinuate that a gun pointed at an officer does not rise to the level of a reasonable officer using deadly force is absurd. Surely, Officer Mensah "did not need to wait and hope" that Cole "was a skilled marksman before taking action to shut down [Cole's] threat." *See Sanzone v. Gray*, 884 F.3d 736, 740 (7th Cir. 2018). The fact that so many WPD officers acted in accordance with the

7

Case 2:21-cv-00848-LA   Filed 09/22/23   Page 8 of 17   Document 116

idea that Cole was armed lends credence to the reasonableness of the belief that he was indeed armed. *See Doxtator v. O'Brien*, 39 F.4th 852, 861 (7th Cir. 2022). Officer Shamsi was prepared to use deadly force after observing Cole's finger on the trigger (DPFF 48, 58; ECF 80-5 pp. 23, 32-36, 54) Officer Olson was prepared to use deadly force after observing Cole's finger on the trigger and observing the gun in Cole's hand pointed directly at him. (DPFF 48-50, 59; ECF 80-4 pp. 73-75)

While Plaintiffs may be unwilling to accept Mensah's account of the incident, "the only person in a good position to offer evidence contradicting the police account is dead," and mere speculation that Mensah might be lying, or that Cole was unconscious, is not enough to overcome summary judgment. *See Gysan v. Francisko*, 965 F.3d 567, 570 (7th Cir. 2020) (citing *King v. Hendricks Cty. Comm'rs*, 954 F.3d 981, 985 (7th Cir. 2020)). "[N]o evidence is no evidence." Thus, the uncontroverted fact is that several officers witnessed Cole possess a gun and point that gun. There is no evidence part of this record that rebuts this fact.

### III. Officer Mensah is Entitled to Qualified Immunity.

The threshold question of qualified immunity is properly resolved on summary judgment because its analysis is ostensibly objective. *See Rakovich v. Wade*, 850 F.2d 1180, 1203–04 (7th Cir. 1988). Although intertwined with a case's facts, the qualified immunity issue is a question of law for the court. *Alvarado v. Picur*, 859 F.2d 448, 452 (7th Cir. 1988). Further, although the privilege of qualified immunity is a defense, the plaintiff carries the burden of defeating it. *Mannoia v. Farrow*, 476 F.3d 453, 457 (7th Cir. 2007). To do so, they must demonstrate the existence of a clearly established right by identifying a closely analogous case that had decided that the conduct at issue was forbidden. *Forman v. Richard Police Department*, 104 F.3d 950, 958 (7th Cir. 1997). Plaintiffs cannot make this showing, and thereby fail to meet the standard to defeat Officer Mensah's defense of qualified immunity.

Plaintiffs cite to a string of cases that, in their view prove that Cole was in no position to cause death or bodily harm to any officer. (*See* ECF 94 pp. 21-23) Plaintiffs' reliance on the cases is misguided: 1) reliance on district court decision insufficient to demonstrate a clearly established constitutional right (*Boyd v. Owen*, 481 F.3d 520, 527 (7th Cir. 2007)); and 2) these cases are not sufficiently analogous to govern the facts and circumstances that confronted Officer Mensah on February 2, 2020.

This court determined in *Smith* the context of Smith's handling of the weapon played a crucial factor to assessing whether there was an imminent threat to officers; Smith had "grasped [the gun] by the muzzle instead of the handle." *Smith*, 410 Supp. 3d at 1072-1073. In this case, Cole had the muzzle pointed in the direction of multiple officers during the encounter. (DPFF 48-50, 54; ECF 80-3 pp. 219-220, 80-4 pp. 24-25, 47, 80-5 p. 32) This court cited to *Weinmann*, 787 F.3d at 449-50 "if [decedent] had the gun raised to his shoulder and pointed at [defendant-officer], then [defendant-officer] would have been justified in using deadly force and hence entitled to qualified immunity." *Id.* at 1073. At least three (3) of the WPD officers present during the encounter with Cole were ready to depress the trigger of their firearms when Cole pointed his firearm at them. (DPFF 47, 50, 55; ECF 80-4 pp. 50-51, 72-73; 80-5 pp. 34-36,51-54) Plaintiffs assert in their complaint and briefs that an individual who pointed a weapon at police was somehow not a threat to the responding officers. (*See* Cole ECF 1, Complaint p. 19; see also ECF 94 pp. 17-20) As inversely reasoned by the Court in *Smith*, here, multiple officers reasonably engaged in a foot pursuit after receiving multiple reports of a serious crime occurring and had a weapon drawn on them during the encounter by the suspect who refused to discard his weapon; these factors lead to a strong conclusion that Mensah's actions were not excessive as to violate Cole's constitutional right. *See Smith v. Milwaukee*, 410 F. Supp.3d. at 1076. (See also DPFF 9-54)

The factual scenario in *Weinmann* differs from the events that occurred with Cole. Notably, a suicidal armed subject alone in their own home clearly does not pose the level of threat to others as an armed person on public property, who fled from police and discharged a firearm—whether intentional or not. *Rios* is a case stemming from the Northern District of Illinois. As cited above, district court cases do not set precedence. *Boyd*, 481 F.3d at 527.

The *Biegert* court reminds us that "[w]e must evaluate the reasonableness of the officers' actions with the understanding that the situation they faced was 'tense, uncertain, and rapidly evolving' and required them to 'make split second judgments' about how much force to apply to counter the danger Biegert posed." *Estate of Biegert by Biegert v. Molitor*, 968 F.3d 693, 701 (7th Cir. 2020) (citing *Graham*, 490 U.S. at 397). Biegert was armed with a knife and unfortunately officers were not able to deploy deadly force before an officer was stabbed multiple times. *Id*. at 700. The court states that dispute of fact has to go beyond speculation or conjecture. *Id*. at 701 (citing *King*, 954 F.3d at 986). Here, Plaintiffs' claim regarding Cole's unconscious state of mind do not surpass conjecture and Plaintiffs do not provide evidence that supports their position. Thus, Officer Menah made a split-second judgment, just as Officer Shamsi and Officer Olson were about to, and used deadly force. (DPFF 56-59) There is no evidence that Cole was unconscious, thus no evidence that rebuts the testimony of Officers who witnessed Cole's movements that night, with a firearm in hand, pointed at officers. (DPFF 43-60)

**IV.    Individual Capacity Claims Against Weber Cannot Survive Summary Judgment.**

To survive summary judgment on their individual capacity claims against former Police Chief Weber ("Weber"), Plaintiffs are required to put forth relevant, admissible, and factually supported evidence that (1) unconstitutional conduct of a subordinate; and (2) that Weber knew, facilitated, approved, condoned, or turned a blind eye to. *Jones v. City of Chicago*, 856 F.2d 985, 992–93 (7th Cir. 1988). Plaintiffs cannot meet this burden because Officer Mensah's conduct was

10

lawful. Plaintiffs rely solely on the allegations in the Amended Complaint, which have been disproved by the undisputed record evidence to survive summary judgment on their individual capacity claims against Weber. (ECF 94 pp. 24-25) Plaintiffs makes the following claims regarding Chief Weber, and Defendants provide, with corresponding evidence, why the following claims are without merit: <u>First</u>, Weber, who was the chief policy maker for Wauwatosa, failed to conduct an internal investigation or conduct a fitness for duty evaluation of Mensah after the Gonzales and Anderson shootings. (ECF 94 p. 24) <u>This is false.</u> Despite state statutes not requiring an internal investigation, Chief Weber ordered internal investigations into both incidents in accordance with WPD policy and compliance with requirements of *Graham v. Conner* (DPFF 75, 87, 95, 96-97; ECF 77-4; ECF 77-9) Mensah attended multiple counseling sessions after the Gonzales incident, and was cleared to return to duty on August 24, 2015 (ECF 71 ¶¶ 59-61); Officer Mensah attended multiple counseling sessions after the Anderson incident and also underwent a psychological evaluation which certified his return to full patrol duties (ECF 79 ¶¶ 55-57; ECF 80-2).

<u>Second</u>, WPD never had a fitness for duty policy for any officer-involved shooting from July 16, 2015 to February 2, 2020. (ECF 94 p. 24) <u>This is false</u>. The factual record demonstrates these policies existed within WPD. (ECF 76-3, 76-4; ECF 80-2)

<u>Third</u>, despite the investigation of Mensah by the Milwaukee County District Attorney, Weber decided to award Mensah with a Medal of Valor for killing Antonio Gonzales (and Alvin Cole) (ECF 94 pp. 24-25) <u>This is inaccurate</u>. It is abhorrent to suggest these medals were awarded in celebration of "killing" human beings. Officer Mensah was recognized for his actions in responding professionally and appropriately during a critical incident that avoided great bodily harm, injury, or death to the officers or innocent others. (ECF 77-2 pp. 181-182; ECF 80-3 pp. 276-277)

Fourth, Wauwatosa failed to create and implement appropriate and adequate use of force policies. (ECF 94 p. 25) This is false. The factual record demonstrates that all WPD policies relating to uses of force are constitutionally compliant. (ECF 76-10, 76-11; ECF 80-8 pp. 99-100, 103-05)

Fifth, Weber was aware of Wauwatosa's defective customs, policies and procedures before Mensah shot and killed Gonzales and Anderson. (ECF 94 p. 25) No evidence of such customs, policies, and procedures were produced by Plaintiffs. Generalized allegations without more is insufficient to demonstrate § 1983 culpability on the part of Weber.

## V. Plaintiffs' Monell Claims Cannot Survive Summary Judgment.

Plaintiffs seek to impose *Monell* liability on the basis that the WPD lacked clear policies on how to handle officers who returned to duty after being involved in a fatality. (ECF 94 pp. 25-28). To claim that a "lack of policy itself is what is at the very heart of that which creates *Monell* liability" but then provide no evidence of the causation is attempted outfoxing at best. (ECF 94 p. 27) The Supreme Court has repeatedly cautioned about drawing the inference that a gap in policy can *sometimes support* a *Monell* claim. (Emphasis added) *See, e.g.*, *Bd. of the County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 409 (1997). Plaintiffs' citations to support their claim go so far as to insert the claim that, "Defendant Weber and Wauwatosa knew about Mensah (sic) prior objectively unreasonable excessive deadly force against Antonio Gonzalez… and acted with deliberate, reckless indifference as a result they condoned, approved and helped facilitated (sic) his behavior, which resulted in Mensah shooting and killing him (Cole)." (ECF 94 p. 27; ECF 96 ¶ 94) Stating this as *evidence* and then following up with their summary judgment response to the Gonzeles case by conceding that the Gonzales shooting was justified, severely undermines their *Monell* claim both in the Anderson case and this case for Cole. (ECF 110)

In response to Plaintiffs' assertions regarding their *Monell* claims, Defendants provide the following: (1) There is no evidence to support that WPD had a *de facto* policy of condoning excessive force; (2) Plaintiffs have conceded that the Gonzales shooting was justified by failing to oppose summary judgment. (ECF 110) Further, there was an investigation after the Gonzales incident and there was no basis for discipline. (ECF 77-4); and (3) Wauwatosa did conduct an internal investigation after the Anderson shooting along with numerus other agencies. (ECF 77-9; ECF 76-7, 20, 23) There would have been no basis for discipline where all the investigating law enforcement agencies came to the same conclusion**.**

Plaintiffs' failure to demonstrate a claim against Officer Mensah precludes their claims against the municipality. Even if Plaintiffs could demonstrate a constitutional deprivation, they have not shown municipal fault or moving-force causation—two indispensable prerequisites to *Monell* liability. *Brown*, 520 U.S. at 397-98. The literal "propensity" that Plaintiffs try to claim now stems from an incident that Plaintiffs concede was not a constitutional deprivation. *See generally Brown*, 520 U.S. at 399. (ECF 110)

To succeed on their *Monell* claim, Plaintiffs must have evidence that Wauwatosa and Weber's lack of adequate polices relating to officers returning to patrol after critical incidents— actually caused Cole's constitutional injury. Plaintiffs suggest that WPD fails to ensure officers are fit to return to patrol after critical incidents but cite only Officer Mensah as an example. (ECF 94 pp. 27-28) In sum, Plaintiffs rest their entire *Monell* claim on the allegation that WPD lacked adequate process for making sure Officer Mensah was fit to return to duty after his involvement in the June 23, 2016, shooting of Jay Andrson, and that lack of process led to the February 2, 2020, shooting of Alvin Cole. This assertion is contradicted by the evidence in this case, as shown above. (*See also* ECF 76-22, 77-5)

It is incorrect that Wauwatosa has no policies to ensure that officers are fit to return to patrol after being involved in critical incidents. (ECF 76-3, 76-4) Per WPD Policy, all officers involved in a shooting incident are immediately removed from patrol, placed on administrative leave, and remain on administrative leave until several actions occur—first, WPD requires counseling evaluations and clearance by a mental health professional; second, a criminal investigation conducted by an outside law enforcement agency; third an evaluation and charging decision by the District Attorney; finally, an internal administrative review. (Id.)

With Plaintiffs conceding to the Gonzales incident, we will focus on their allegations regarding the procedures post Anderson. Officer Mensah was put on administrative leave after the Anderson incident. (*See* ECF 76-4, 21; ECF 80-8 pp. 75-76) Officer Mensah received counseling services and evaluations. (ECF 76-22; ECF 80-2) Criminal investigation was led by the Milwaukee Police Department. (ECF 77-9; see also ECF 76-20) The Milwaukee County District Attorney's Office issued a decision not to charge, citing "[T]he conduct of Officer Joseph Mensah on June 23, 2016 was privileged in self-defense and justified under Wisconsin Law." (ECF 76-20)

Even if Plaintiffs could demonstrate that there were no procedures in place to address officers returning to duty after shootings, they cannot and have not demonstrated that any municipal inaction caused a violation of Cole's constitutional rights.

## VI. Plaintiffs' Equal Protection Claim Cannot Survive Summary Judgment.

"To show a violation of the Equal Protection Clause, plaintiffs must prove that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose.*"* *Chavez v. Illinois State Police*, 251 F.3d 612, 635–636 (7th Cir. 2001). This may be done through direct or indirect evidence; however, **Plaintiffs' bare allegations of racism are not enough**. See *Minority Police Officers Ass'n of S. Bend v. City of S. Bend*, 801 F.2d 964, 967 (7th Cir. 1986).

14

Plaintiffs rely on factually unsupported complaint allegations and misrepresent those allegations which do not support Plaintiffs pattern arguments. (ECF 84 pp. 25-27) There is no evidence to support the claim that Wauwatosa devalues people of color or that there is an "over policing of black people." Further, there is absolutely no evidence to support the claim that Officer Mensah shot Cole because of his race. On the contrary, Officer Mensah had a clear, non-discriminatory, reason to shoot Cole: Cole posed an immediate and deadly threat when he pointed a firearm at Officer Mensah, and additional officers on scene were also ready to use deadly force due to Cole's actions. (DPFF 25-64) When asked whether Officer Mensah shot Cole because he was black, Officer Mensah answered "no." (ECF 80-3 pp. 270; DPFF ¶ 105) Plaintiffs have not shown that Defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose" *Chavez*, 251 F.3d at 635–636, thus summary judgment is warranted.

## VII. Plaintiff's Loss of Society and Companionship Claim Cannot Survive Summary Judgment.

Plaintiffs only response to this argument is that Defendants have conceded this claim by failing to answer the allegations in amended complaint after the Court's decision on Defendants' Motion to dismiss. (ECF 94 p. 31) However, Defendants did deny such allegations in responding to Plaintiffs' discovery (ECF 101-1, p. 6, Req No. 31)

**Request**: Admit that each of Mensah's killings were excessive and not justified.

**Response:** Deny.

This admissible evidence is the only evidence that exists relative to this claim, and its existence requires dismissal of the claim.

Dated at Wauwatosa, Wisconsin this 22nd day of September 2023.

**WIRTH + BAYNARD**
Attorneys for Defendants

*/s/ Jasmyne M. Baynard*
Jasmyne M. Baynard, WI Bar No. 1099898
9898 W. Bluemound Road, Suite 2
Wauwatosa, Wisconsin 53226
T: (414) 291-7979 / F: (414) 291-7960
Email: jmb@wbattys.com